**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | |
|---|---|
| **ANTHONY BERNARD MOORER**, | ) |
|     Plaintiff, | ) |
| | ) |
| v. | ) Case No. **2:06-CV-672-WKW** |
| | ) |
| **CITY OF MONTGOMERY**; | ) |
| **BERNARD HARRIS**, individually; and | ) |
| **THOMAS PROVITT**, individually, | ) |
|     Defendants. | ) |

<u>**BRIEF IN SUPPORT OF
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**</u>

COME NOW the above-named Defendants, City of Montgomery, Bernard Harris and Thomas Provitt, and respectfully submit this Brief in support of their motion for summary judgment, filed separately herein, and state:

**I. PROCEDURAL HISTORY**

1.      On or about October 25, 2005, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). (Doc. 3, at 4-5). On or about April 28, 2006, the EEOC issued a Dismissal and Notice of Rights, notifying Plaintiff of his right to sue. (Doc. 3, at 1).

2.      On July 27, 2006, Plaintiff filed a Complaint for employment discrimination pursuant to Title VII of the Civil Rights Act of 1964. (Doc. 1). In his Complaint, Plaintiff alleged he was discharged from his employment with the City of Montgomery because of his race.

3.      On August 2, 2006, Plaintiff filed a motion to amend his complaint. (Doc. 3). On August 9, 2006, the Court granted Plaintiff's motion to amend (Doc. 6, at 3), and ordered Plaintiff to show cause why his Complaint should not be dismissed for lack of

jurisdiction. On August 21, 2006, Plaintiff filed a response to this Court's show cause order, seeking to amend his complaint to bring his claims under 42 U.S.C. §1983, and to add Bernard Harris ("Harris") and Thomas Provitt ("Provitt") as defendants in their individual capacity.

4.    On August 23, 2006, this Court dismissed Plaintiff's Title VII claims, and granted Plaintiff leave to amend his Complaint to add Harris and Provitt as defendants in their individual capacity, and to assert his claims pursuant to 42 U.S.C. §1983.

5.    Despite ample opportunity and a direct court order to do so (Doc. 10), Plaintiff never filed an amended complaint. On February 9, 2007, this Court:

> ORDERED that Plaintiff's claims now stand as presented. These include: Racial Discrimination charged against Defendant Harris, in his individual capacity; (2) Violation of Due Process against Defendant Provitt, in his individual capacity; and (3) Failure to Properly Train charged against the City of Montgomery." (Doc. 12-1, at 2).

This Court went on to say it would not afford Plaintiff any further opportunity to amend his complaint. Id.

## II. STATEMENT OF AGREED FACTS

6.    Plaintiff was employed by the City of Montgomery from April 22, 2003 to April 21, 2006 as a service maintenance worker. (Doc. 7).

7.    In April 2005, Defendant Harris was Plaintiff's supervisor. (Doc. 7; Def. Ex. A). Plaintiff worked on a five-man paint crew made up of two black males and three white males. (Doc. 7; Def. Ex. A).

8.    April 18, 2006 was Plaintiff's last day at work for the City. (Doc. 7).

## III. PLAINTIFF'S CLAIMS

9.    **Plaintiff's Claims.** Plaintiff makes three claims: (1) Defendant Harris,

individually, racially discriminated against Plaintiff; (2) Defendant Provitt, individually violated Plaintiff's Due Process rights; and (3) Defendant City of Montgomery failed to properly train Harris and Provitt.

10.    **Relief Sought.** As relief, Plaintiff seeks compensatory and punitive damages.

## IV. MEMORANDUM OF POINTS AND AUTHORITIES

### A. STANDARD OF REVIEW

11.    Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

12.    The party requesting summary judgment bears the initial burden to inform the Court of the basis for its motion and to show the absence of any genuine issue of material fact. Id. at 323. The movant can meet this burden by presenting evidence showing that there is no dispute of material fact, or by showing the district court that the non-moving party has failed to present evidence in support of some element of the case on which it bears the ultimate burden of proof. Id. at 322-324.

13.    Once the non-moving party has met its burden, Rule 56(e) requires the non-moving party to present specific facts showing that there is a genuine issue for trial. Id. at 324. To avoid summary judgment, the non-moving party "must do more than show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

14.     Once the non-moving party has responded to the motion for summary judgment, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. Proc. Rule 56(c).  Similarly, the moving party is entitled to summary judgment if the non-moving party has failed to prove the elements of his case or there is the absence of evidence in the record to support a judgment for the non-moving party on the issue in question.  Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115-16 (11th Cir. 1993).

## B. SPECIFIC CLAIMS

15.     As stated above, Plaintiff claims that: (1) Defendant Harris, individually, racially discriminated against Plaintiff; (2) Defendant Provitt, individually violated Plaintiff's Due Process rights; and (3) Defendant City of Montgomery failed to properly train Harris and Provitt.

## 1. RACIAL DISCRIMINATION

16.     In cases alleging disparate treatment in which § 1983 is employed as a remedy for the same conduct attacked under Title VII, the elements of the two causes of action are the same. Richardson v. Leeds Police Dept., 71 F.3d 801 (11th Cir. 1995), on remand 990 F.Supp. 1331.

Plaintiff claims he was racially discriminated against by Bernard Harris, his supervisor. Specifically, Plaintiff claims he was assigned to paint on a tall ladder because of his race. On the face of his Complaint, however, Plaintiff states that he worked for Defendant Harris, a black male, on a paint crew that consisted of "two blacks and three whites." (Doc. 7, p. 2, ¶ 6A). Plaintiff goes on to say he was the only member of the crew required to do "high work." Plaintiff points to the three white members of this crew who

were not assigned to do "high work," but fails to mention the other black member of the crew, whom the black foreman treated the same as the three white members. There was no illegal disparate treatment here.  It does not stand to reason that a purportedly racist supervisor would only discriminate against one member of the subject class, much less a member of his own class.

17.     Be that as it may, Defendant Harris had legitimate, non-discriminatory reasons for his task assignments. (Def. Ex. A). Plaintiff was the newest member of Defendant Harris' paint crew and had the least amount of experience. (Def. Ex. A). Plaintiff made assignments based on crew members' skills and abilities. (Def. Ex. A). Plaintiff's race was never a factor in any of Defendant Harris' decisions about what tasks Plaintiff would be assigned to. (Def. Ex. A). Defendant Harris did not treat Plaintiff differently than any other crew member (Def. Ex. A), and Defendant Harris certainly did not discriminate against Plaintiff because of his race. (Def. Ex. A).

18.     As a paint-crew supervisor, Defendant Harris routinely makes decisions about which crew members will perform which tasks and how best to use the manpower available to him to accomplish the job. (Def. Ex. A). At all times relevant to Plaintiff's claims, Defendant Harris was acting within the scope of his discretion as a paint crew supervisor. (Def. Ex. A).

19.     Plaintiff has failed to make a prima facie case that he was discriminated against on the basis of his race. By his own admission, another similarly situated black male member of his paint crew did not have to do the "high work." Plaintiff presents no evidence of racial animus toward Plaintiff by his foreman, Defendant Bernard Harris, who is also a black male. Further, Plaintiff suffered no adverse employment action. He

resigned. (Def. Ex. C). Plaintiff abandoned his job because he did no want to do the work he was assigned. Accordingly, Defendant Bernard Harris is entitled to summary judgment against Plaintiff on the charge of race discrimination.

20.    **Qualified Immunity.** The defense of qualified immunity is an affirmative defense that shields governmental officials performing discretionary functions from civil liability if their conduct violates no clearly established statutory or constitutional right of which a reasonable person would have known. Harlow v. Fitzgerald, 457 U.S. 800, 817-19 (1982). In this case, Defendant Harris is entitled to qualified immunity because he was at all times relevant acting within the scope of his discretionary authority and his conduct did not violate any clearly established constitutional right. (Def. Ex. A).

21.    To be entitled to qualified immunity, a defendant must prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred. Gray ex rel. Alexander v. Bostic, 458 F.3d 1295, 1303 (11th Cir.2006). In assessing whether a defendant's challenged actions are within the scope of his discretionary authority, courts examine "whether the government employee was (a) pursuing a legitimate job-related function (that is, pursuing a job-related goal), (b) through means that were within his power to utilize." Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1265 (11th Cir.2004).

22.    The discretionary authority criteria are clearly satisfied here. Defendant Harris was performing job-related functions when he made day-to-day assignments of paint crew members assigned to his supervision. (Def. Ex. A). Defendant Harris' job was to supervise his paint crew to complete paint projects for the City. (Def. Ex. A).

23.    Once the official has established that he was engaged in a discretionary

function, the plaintiff bears the burden of demonstrating that the official is not entitled to qualified immunity. <u>Crosby v. Monroe County</u>, 394 F.3d at 1328, 1332 (11th Cir. 2004). The plaintiff then must demonstrate that a reasonable jury could find from record evidence that the defendant violated a clearly established constitutional right of which a reasonable government official would have been aware. <u>Chesser v. Sparks</u>, 248 F.3d 1117, 1122 (11th Cir. 2001).

24.    Here, even viewing the evidence in the light most favorable to the plaintiff, Defendant Harris did not violate any of Plaintiff's statutory or constitutional rights. It is Defendant Harris' job as a paint crew supervisor to assign tasks to members of his crew. This is exactly what he did. Thus, Defendant Harris is entitled to qualified immunity and the claims against him are due to be dismissed.

## 2. DUE PROCESS VIOLATION

25.    Plaintiff claims his due process rights were violated by Thomas Provitt, Assistant Director of the City of Montgomery Maintenance Department, when Defendant Provitt told him to get off the City Lot. (Doc. 7, p. 2, ¶ 6B). Plaintiff goes on to say he was terminated, was not given a hearing, and was not advised of any way he could contest his termination. <u>Id.</u>

26.    The Due Process Clause provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. Amend XIV §1. The Fourteenth Amendment protects against the government's deprivation of liberty or property without procedural due process. <u>Warren v. Crawford</u>, 927 F.2d 559 (11th Cir. 1991), <u>citing</u> <u>Board of Regents of State Colleges v. Roth</u>, 408 U.S. 564, 569, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548 (1972). State law determines whether a public employee has

a property interest in his or her job. <u>Warren v. Crawford</u>, 927 F.2d 559 (11th Cir. 1991),

<u>citing</u> <u>Bishop v. Wood</u>, 426 U.S. 341, 344, 96 S.Ct. 2074, 2077, 48 L.Ed.2d 684 (1976).

27.    It is not necessary, in this case, to reach the issue of whether Plaintiff had

a property interest in his continued employment because the evidence shows he

abandoned his job.

28.    **Res Judicata**. The Honorable Tracy McCooey, Montgomery County

Circuit Judge, upon conclusion of a bench trial on the circumstances surrounding

Plaintiffs termination, held that Plaintiff resigned. (Def. Ex. C).

29.    Specifically she held that "Plaintiff refused to perform assigned duties and

left the work locality after a verbal altercation with a supervisor. That same day he called

an assistant to the Mayor and was explicitly informed that if he did not return to work

within three days he would be considered to have voluntarily left his employment. The

Plaintiff did not return to his work within that time." (Def. Ex. C).

30.    The Circuit Court went on to find that "The Plaintiff left employment after

an argument with a supervisor. A superior to that supervisor clearly told the Plaintiff that

he would have to report back to work to remain employed. The Plaintiff's failure to

report evidenced an indifference as to whether he remained employed and constituted an

abandonment of his employment." (Def. Ex. C).

31.    Plaintiff did not appeal the Circuit Judge's decision, and therefore *res*

*judicata* applies to the issue of whether Plaintiff resigned.

32.    **No Process Due upon Resignation**. In the Eleventh Circuit, a public

employer does not deprive an employee of due process rights where the employee resigns

voluntarily. <u>Hargray v. City of Hallandale</u>, 57 F.3d 1560, 1567 (11th Cir. 1995).

Employee resignations are presumed to be voluntary, <u>Id.</u>, at 1568 (11th Cir. 1995), and "This presumption will prevail unless [the employee] comes forward with sufficient evidence to establish that the resignation was involuntarily extracted." <u>Hargray v. City of Hallandale</u>, 57 F.3d 1560, 1568 (11th Cir. 1995), <u>quoting</u> <u>Christie</u>, 518 F.2d at 587.

33.     There is no evidence that Plaintiff's resignation was involuntarily extracted. To the contrary, the Circuit Court found that Plaintiff was told to go back to work and that if he was absent from work for three days, it would be considered job resignation by job abandonment. (Def. Ex. C). Plaintiff made an affirmative choice not to return to work. (Def. Ex. C). Because Plaintiff voluntarily resigned, he was not entitled to due process, therefore, his claim of due process violation against Defendant Provitt cannot stand.

34.     **Qualified Immunity**. Like Harris, Defendant Provitt is entitled to qualified immunity, and respectfully incorporates the Qualified Immunity authority and argument stated above in Paragraphs 18-22.

35.     At all times relevant, Provitt was acting within his discretionary authority as Assistant Director of the City of Montgomery Maintenance Department. On April 19, 2005, Plaintiff told Defendant Provitt he was going to quit so Defendant Provitt told Plaintiff to go fill out the required resignation paperwork. (Def. Ex. B). Plaintiff refused, so Defendant Provitt told him to leave City property. (Def. Ex. B). Clearly both decisions – the decision to order Plaintiff to complete the resignation paperwork and the decision to order an employee who refuses to work off of City property – both fall squarely within Defendant Provitt's discretionary authority as Assistant Director.

36.     Further, as explained more fully below, Defendant Provitt did not violate

Plaintiff's constitutional rights. Therefore, based on the aforementioned authority on qualified immunity, Defendant Provitt is entitled to qualified immunity and the charge against him is due to be dismissed.

### 3. FAILURE TO TRAIN

37.    Plaintiff makes the bare allegation that the City of Montgomery failed to properly train Defendants Harris and Provitt (Doc. 7, p. 3, ¶ 6D), but never explains what he means or produces any evidence that the City failed to train anyone.

38.    A city can be liable under § 1983 for inadequate training of its employees, but only where a municipality's failure to train its employees in a relevant respect evidences a "deliberate indifference" to the rights of its inhabitants. City of Canton, Ohio v. Harris, 489 U.S. 378, 388-389, 109 S.Ct. 1197, 1204 - 1205 (1989). The Supreme Court has explained that there are only 'limited circumstances' in which an allegation of a failure to train or supervise can be the basis for liability under § 1983. Gold v. City of Miami, 151 F.3d 1346, 1350 (11th Cir.1998). These "limited circumstances" occur only when the municipality inadequately trains or supervises its employees, this failure to train or supervise is a city policy, and that city policy causes the employees to violate a citizen's constitutional rights." Id.

39.    Plaintiff has not submitted any evidence that the City inadequately trained Harris or Provitt, that failure to train was a City policy, or that City policy caused employees to violate a citizen's constitutional rights. In fact, every City employee receives a copy of the Personnel Board Rules and Regulations, including the portions about discrimination and harassment. (Def. Ex. A). For instance, in his 18½ years with the City, Defendant Harris was routinely trained on discrimination and harassment,

including training on how to handle discrimination and harassment as a manager. (Def. Ex. A).

40.    Plaintiff cannot identify any City policy likely to result in a constitutional violation. In fact, Plaintiff's claim consists entirely of a statement that "Plaintiff alleges that the City has failed to properly train the persons who have violated his constitutional rights." Plaintiff cannot point to a City policy resulting in inadequate training of employees. Plaintiff has not given any indication what type of training should have occurred, nor has he alleged any causal connection between the alleged failure to train and any claimed injury.

41.    Conclusory allegations cannot interpose genuine issues of material fact into litigation so as to preclude entry of summary judgment. Fed. R. Civ. Proc. Rule 56. Plaintiff's Failure to Train claim against the City is a conclusory allegation, with nothing more to explain or support it. Therefore, summary judgment should be granted in favor of Defendant City of Montgomery with regard to this claim.

## V. CONCLUSION

42.    In light of the foregoing, it is clear that there is no genuine issue of material fact and Plaintiff cannot succeed on any of his claims. Therefore summary judgment should be entered in favor of Defendants and against Plaintiff Anthony Moorer.

43.    Defendants Harris and Provitt are entitled to qualified immunity. Both were acting within the scope of their discretionary authority at all times relevant. Accordingly, Plaintiff's claims should be dismissed on immunity grounds.

44.    Plaintiff has failed to make a prima facie case that he was discriminated against on the basis of his race. By his own admission, another similarly situated black

male member of his paint crew did not have to do the "high work." Plaintiff presents no evidence of racial animus toward Plaintiff by his foreman, Defendant Bernard Harris, who is also a black male. Further, Plaintiff suffered no adverse employment action; he resigned. Plaintiff abandoned his job because he did no want to do the work he was assigned. Accordingly, Defendant Bernard Harris is entitled to summary judgment against Plaintiff on the charge of race discrimination.

45.     Also, the Circuit Court of Montgomery County determined after a full trial that Plaintiff voluntarily resigned. Plaintiff was therefore not entitled to due process. Accordingly, the claims against Defendant Provitt are due to be dismissed.

Finally, Conclusory allegations cannot interpose genuine issues of material fact into litigation so as to preclude entry of summary judgment. Fed. R. Civ. Proc. Rule 56. Finally, Plaintiff has produced no evidence that the City of Montgomery failed to train Harris and Provitt adequately, nor has he shown a causal connection between the alleged failure to train and any alleged injury. As shown herein, Plaintiff's claims are unfounded and he cannot prevail on any of them. Plaintiff is not entitled to any relief, therefore Summary Judgment in favor of Defendants is just and proper, and all claims against them are due to be dismissed with prejudice.

WHEREFORE, premises considered Defendants petition this Honorable Court to enter summary judgment in their favor and against Plaintiff Anthony Moorer as to all issues in controversy alleged against them.

Respectfully submitted this 16th day of November, 2007.

/s/ Allison H. Highley
Allison H. Highley (HIG024)
Counsel for Defendants

OF COUNSEL:
CITY OF MONTGOMERY
Legal Department
Post Office Box 1111
Montgomery, AL 36101-1111
(334) 241-2050 Telephone
(334) 241-2310 Facsimile

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 16, 2007, I sent a copy of the foregoing to the

Plaintiff via U.S. mail, first-class postage pre-paid to:

Anthony Moorer
4240 Green Meadow Drive
Montgomery, Alabama 36108

/s/ Allison H. Highley
Of Counsel

Exhibit A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | |
|---|---|
| ANTHONY BERNARD MOORER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. **2:06-CV-672-WKW** |
| | ) |
| CITY OF MONTGOMERY; | ) |
| BERNARD HARRIS, individually; and | ) |
| THOMAS PROVITT, individually, | ) |
| | ) |
| Defendants. | ) |

### AFFIDAVIT OF BERNARD HARRIS

| | |
|---|---|
| STATE OF ALABAMA | ) |
| COUNTY OF MONTGOMERY | ) |

Before me, a Notary Public in and for said State and County, personally appeared Bernard Harris and, after first being duly sworn by me, did depose and state:

My name is Bernard and I am over nineteen years of age. I have firsthand knowledge of the facts contained in this affidavit and am confident to testify thereto.

I am currently employed as a paint crew supervisor with the City of Montgomery, Maintenance Division. In April 2005, I was Anthony Moorer's supervisor. Mr. Moorer worked on a five-man paint crew made up of two black males and three white males. At all times relevant to Mr. Moorer's claims, I was acting within the scope of my employment and within my discretion as supervisor of that paint crew.

Mr. Moorer was the newest member of my paint crew, so he had the least amount experience. In spite of this fact, Mr. Moorer did not feel he should have to prove his capabilities for increased responsibility or more difficult tasks. Mr. Moorer was always a difficult employee to supervise because he did not want to follow orders.

As a supervisor, I make decisions on a daily basis about which of my crew members will do which tasks. I have to decide how best to use my manpower to accomplish the job.

Mr. Moorer's race was never a factor in any of my decisions about what tasks he would be assigned to. I did not treat Mr. Moorer differently than any other member of my crew. For each task that came up, I would decide who was best qualified to do the job based on their unique skills and ability. My job is simply to make sure the job gets done, and that is what I did.

I did not discriminate against Mr. Moorer because of his race, and I did not violate his constitutional rights. Like every City employee, I received a copy of the Personnel Board Rules and Regulations, including the portions about discrimination and harassment. I have worked for the City of Montgomery for 18½ years, and during that time I have repeatedly received training on discrimination and harassment, including training on how to handle discrimination and harassment as a manager.

I have read the above and foregoing affidavit consisting in total of two pages and state that it is true and correct to my present knowledge and information.

Further Affiant saith not.

Bernard Harris
Defendant / Affiant

**SWORN to and SUBSCRIBED before me this the** 16th **day of November 2007.**

Notary Public
My commission expires

NOTARY PUBLIC STATE OF ALABAMA AT LARGE
MY COMMISSION EXPIRES: Mar 28, 2011
BONDED THRU NOTARY PUBLIC UNDERWRITERS

Exhibit B

## AFFIDAVIT OF THOMAS PROVITT, JR.

**STATE OF ALABAMA**                    )

**COUNTY OF MONTGOMERY**        )

Before me, a Notary Public in and for said State and County, personally appeared Thomas Provitt, Jr. and, after first being duly sworn by me, did depose and state as follows:

My name is Thomas Provitt, Jr. and I am over nineteen (19) years of age. I am currently employed as the Assistant Director in the Maintenance Department for the City of Montgomery.

On April 19, 2006, I told Anthony Moorer that he would no longer be clocking in at the carpentry shop, but would clock in at the Maintenance Administration office. The Maintenance Administration office is where the grass cutting crew clocks in. Mr. Moorer had been transferred from the painting crew, to the grass cutting crew. Mr. Moorer's foreman, Bill Stinson, took him out to the job site, for the grass cutting crew, on April 19, 2006. Mr. Stinson informed me that Mr. Moorer asked to be brought back in. He dropped him off at the carpentry shop and came to get me from the Maintenance Administration office. I walked to the carpentry shop to talk to Mr. Moorer and see why he wanted to be brought in. When I walked in the office, Mr. Moorer was on the phone trying to get someone to pick him up. At that time, I told him to hang up the phone, and he told me that he quit. I told him that he needed to go to the Maintenance Administration Office to sign his resignation paperwork. After he informed me that he was quitting his job and not going to the administration office, I told him to leave the lot.

Further Affiant saith not.

_Thomas Provitt_
Thomas Provitt, Jr.

**SWORN to and SUBSCRIBED before me this the** ___14th___ **day of July, 2006.**

_____
Notary Public

My commission expires: _10/16/09_

DEFENDANT'S
EXHIBIT
4

Exhibit C

IN THE CIRCUIT COURT OF MONTGOMERY COUNTY, ALABAMA

ANTHONY B. MOORER,                    )
                                      )
        Plaintiff,                    )
                                      )
vs.                                   )
                                      )
DIRECTOR OF THE DEPARTMENT   )
OF INDUSTRIAL RELATIONS and )
CITY OF MONTGOMERY,          )        Case No. CV-2006-3015
                                      )
        Defendants.          )

## ORDER

This is an unemployment compensation case heard before this Court on July 16, 2007. All parties were present and represented by counsel.

## FACTS

The Plaintiff was employed by the City of Montgomery, Alabama as a maintenance worker for approximately three years. He began work on the grass cutting crew and was subsequently transferred to the painting crew.

During the course of his employment, the Plaintiff had been administered several disciplinary write-ups and suspensions. He had filed grievances on some of these personnel actions. On or about April 18, 2006, Plaintiff was reassigned back to grass cutting duties.

The Plaintiff refused to perform assigned duties and left the work locality after a verbal altercation with a supervisor. That same day he called an assistant to the Mayor and was explicitly informed that if he did not return to work within three days he would considered to have voluntarily left his employment. The Plaintiff did not return to his work within that time.

## CONCLUSIONS OF LAW

Ala. Code §25-4-78(2) (2000) provides that a claimant shall be disqualified from receipt of unemployment compensation benefits if he has left his most recent bona fide work voluntarily without good cause connected with such work. Good cause for voluntarily leaving employment is a cause that is material and substantial under the circumstances. The applicable test to good cause is whether an average or normal worker would have similarly terminated employment under those facts. (See State, Dept. of Indus. Relations v. Prance, 369 So.2d 289 (Ala.Civ.App. (1979))

2

The Plaintiff left employment after an argument with a supervisor. A superior to that supervisor clearly told the Plaintiff that he would have to report back to work to remain employed. The Plaintiff's failure to report evidenced an indifference as to whether he remained employed and constituted an abandonment of his employment.

It is the opinion of this Court that the Plaintiff is subject to a disqualification from unemployment compensation benefits under the provisions of Ala. Code §25-4-78(2) (2000).

### JUDGMENT

Therefore, it is ORDERED, ADJUDGED and DECREED that judgment be entered in favor of the Defendants and against the Plaintiff.

Costs are taxed against the Plaintiff for which let execution issue.

Judge Tracey McCooey

4-7-07

STATE OF ALABAMA
MONTGOMERY COUNTY
I, as Circuit Clerk, Montgomery County Circuit Court, do hereby certify that the within is a complete, true and correct copy of the ORDER on file in said office.
Witness my hand and the seal of said Court is hereto affixed, this the 16th day of November 2007

CIRCUIT CLERK

3

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
### NORTHERN DIVISION

ANTHONY BERNARD MOORER,    )
                                    )
      **Plaintiff,**               )
                                      )
**v.**                                 )   **Case No. 2:06-CV-672-WKW**
                                    )
**CITY OF MONTGOMERY;**     )
**BERNARD HARRIS, individually; and**  )
**THOMAS PROVITT, individually,**    )
                                      )
      **Defendants.**           )

## APPENDIX OF EVIDENCE TO BRIEF
## IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

COME NOW the above-named Defendants and submit this Appendix to their

Brief in Support of Defendants' Motion for Summary Judgment:

### EXHIBITS

1.    Defendant's Exhibit A – Affidavit of Bernard Harris

2.    Defendant's Exhibit B – Affidavit of Thomas Provitt

3.    Defendant's Exhibit C – Certified Copy of Order, Montgomery Circuit

      Court Case No. CV-2006-3015

Respectfully submitted this 16th day of November, 2007.

                              /s/ Allison H. Highley
                              Allison H. Highley (HIG024)
                              Counsel for Defendants

OF COUNSEL:
CITY OF MONTGOMERY
Legal Department
Post Office Box 1111
Montgomery, AL 36101-1111
(334) 241-2050 Telephone
(334) 241-2310 Facsimile

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 16, 2007, I sent a copy of the foregoing to the

Plaintiff via U.S. mail, first-class postage pre-paid to:

Anthony Moorer
4240 Green Meadow Drive
Montgomery, Alabama 36108

/s/ Allison H. Highley
Allison H. Highley (HIG024)

Exhibit A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | |
|---|---|
| **ANTHONY BERNARD MOORER,** | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. **2:06-CV-672-WKW** |
| | ) |
| **CITY OF MONTGOMERY;** | ) |
| **BERNARD HARRIS**, individually; and | ) |
| **THOMAS PROVITT**, individually, | ) |
| | ) |
| Defendants. | ) |

## AFFIDAVIT OF BERNARD HARRIS

| | |
|---|---|
| **STATE OF ALABAMA** | ) |
| **COUNTY OF MONTGOMERY** | ) |

Before me, a Notary Public in and for said State and County, personally appeared Bernard Harris and, after first being duly sworn by me, did depose and state:

My name is Bernard and I am over nineteen years of age. I have firsthand knowledge of the facts contained in this affidavit and am confident to testify thereto.

I am currently employed as a paint crew supervisor with the City of Montgomery, Maintenance Division. In April 2005, I was Anthony Moorer's supervisor. Mr. Moorer worked on a five-man paint crew made up of two black males and three white males. At all times relevant to Mr. Moorer's claims, I was acting within the scope of my employment and within my discretion as supervisor of that paint crew.

Mr. Moorer was the newest member of my paint crew, so he had the least amount experience. In spite of this fact, Mr. Moorer did not feel he should have to prove his capabilities for increased responsibility or more difficult tasks. Mr. Moorer was always a difficult employee to supervise because he did not want to follow orders.

As a supervisor, I make decisions on a daily basis about which of my crew members will do which tasks. I have to decide how best to use my manpower to accomplish the job.

Mr. Moorer's race was never a factor in any of my decisions about what tasks he would be assigned to. I did not treat Mr. Moorer differently than any other member of my crew. For each task that came up, I would decide who was best qualified to do the job based on their unique skills and ability. My job is simply to make sure the job gets done, and that is what I did.

I did not discriminate against Mr. Moorer because of his race, and I did not violate his constitutional rights. Like every City employee, I received a copy of the Personnel Board Rules and Regulations, including the portions about discrimination and harassment. I have worked for the City of Montgomery for 18½ years, and during that time I have repeatedly received training on discrimination and harassment, including training on how to handle discrimination and harassment as a manager.

I have read the above and foregoing affidavit consisting in total of two pages and state that it is true and correct to my present knowledge and information.

Further Affiant saith not.

_Bernard Harris_
Bernard Harris
Defendant / Affiant

**SWORN to and SUBSCRIBED before me this the 16th day of November 2007.**

_Tracie Oates_
Notary Public
My commission expires

NOTARY PUBLIC STATE OF ALABAMA AT LARGE
MY COMMISSION EXPIRES: Mar 28, 2011
BONDED THRU NOTARY PUBLIC UNDERWRITERS

Exhibit B

## AFFIDAVIT OF THOMAS PROVITT, JR.

**STATE OF ALABAMA**  )

**COUNTY OF MONTGOMERY**  )

Before me, a Notary Public in and for said State and County, personally appeared Thomas Provitt, Jr. and, after first being duly sworn by me, did depose and state as follows:

My name is Thomas Provitt, Jr. and I am over nineteen (19) years of age. I am currently employed as the Assistant Director in the Maintenance Department for the City of Montgomery.

On April 19, 2006, I told Anthony Moorer that he would no longer be clocking in at the carpentry shop, but would clock in at the Maintenance Administration office. The Maintenance Administration office is where the grass cutting crew clocks in. Mr. Moorer had been transferred from the painting crew, to the grass cutting crew. Mr. Moorer's foreman, Bill Stinson, took him out to the job site, for the grass cutting crew, on April 19, 2006. Mr. Stinson informed me that Mr. Moorer asked to be brought back in. He dropped him off at the carpentry shop and came to get me from the Maintenance Administration office. I walked to the carpentry shop to talk to Mr. Moorer and see why he wanted to be brought in. When I walked in the office, Mr. Moorer was on the phone trying to get someone to pick him up. At that time, I told him to hang up the phone, and he told me that he quit. I told him that he needed to go to the Maintenance Administration Office to sign his resignation paperwork. After he informed me that he was quitting his job and not going to the administration office, I told him to leave the lot.

Further Affiant saith not.

_Thomas Provitt_
Thomas Provitt, Jr.

**SWORN to and SUBSCRIBED before me this the** 14th **day of July, 2006.**

_Notary Public_
Notary Public

My commission expires: 10/16/09

DEFENDANT'S EXHIBIT 4

Exhibit C

IN THE CIRCUIT COURT OF MONTGOMERY COUNTY, ALABAMA

ANTHONY B. MOORER,                    )
                                      )
        Plaintiff,                    )
                                      )
vs.                                   )
                                      )
DIRECTOR OF THE DEPARTMENT  )
OF INDUSTRIAL RELATIONS and )
CITY OF MONTGOMERY,                   )        Case No. CV-2006-3015
                                      )
        Defendants.                   )

### ORDER

This is an unemployment compensation case heard before this Court on July 16, 2007. All parties were present and represented by counsel.

### FACTS

The Plaintiff was employed by the City of Montgomery, Alabama as a maintenance worker for approximately three years. He began work on the grass cutting crew and was subsequently transferred to the painting crew.

During the course of his employment, the Plaintiff had been administered several disciplinary write-ups and suspensions. He had filed grievances on some of these personnel actions. On or about April 18, 2006, Plaintiff was reassigned back to grass cutting duties.

The Plaintiff refused to perform assigned duties and left the work locality after a verbal altercation with a supervisor.  That same day he called an assistant to the Mayor and was explicitly informed that if he did not return to work within three days he would considered to have voluntarily left his employment. The Plaintiff did not return to his work within that time.

## CONCLUSIONS OF LAW

Ala.  Code §25-4-78(2)  (2000)  provides  that  a claimant  shall  be  disqualified  from  receipt  of unemployment compensation benefits if he has left his most  recent  bona  fide  work  voluntarily  without  good cause  connected  with  such  work.  Good  cause  for voluntarily  leaving  employment  is  a  cause  that  is material  and  substantial  under  the  circumstances.  The applicable  test  to  good  cause  is  whether  an  average  or normal  worker  would  have  similarly  terminated employment  under  those  facts.  (See  State, Dept. of Indus. Relations v. Prance, 369 So.2d 289 (Ala.Civ.App. (1979))

The Plaintiff left employment after an argument with a supervisor. A superior to that supervisor clearly told the Plaintiff that he would have to report back to work to remain employed. The Plaintiff's failure to report evidenced an indifference as to whether he remained employed and constituted an abandonment of his employment.

It is the opinion of this Court that the Plaintiff is subject to a disqualification from unemployment compensation benefits under the provisions of Ala. Code §25-4-78(2) (2000).

<u>JUDGMENT</u>

Therefore, it is ORDERED, ADJUDGED and DECREED that judgment be entered in favor of the Defendants and against the Plaintiff.

Costs are taxed against the Plaintiff for which let execution issue.

STATE OF ALABAMA
MONTGOMERY COUNTY
I, as Circuit Clerk, Montgomery County Circuit Court, do hereby certify that the within is a complete, true and correct copy of the ORDER
on file in said office.
Witness my hand and the seal of said Court is hereto affixed, this the 16th
day of November 2007

CIRCUIT CLERK

Judge Tracey McCooey

4-7-07

3

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| ANTHONY BERNARD MOORER, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | Case No. 2:06-CV-672-WKW |
| | ) | |
| CITY OF MONTGOMERY; | ) | |
| BERNARD HARRIS, individually; and | ) | |
| THOMAS PROVITT, individually, | ) | |
| | ) | |
| **Defendants.** | ) | |

**APPENDIX OF AUTHORITY TO BRIEF
IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

COME NOW the above-named Defendants and submit this Appendix to their Brief in Support of Defendants' Motion for Summary Judgment:

**CITED AUTHORITY**

1. 42 U.S.C. §1983

2. Rule 56, Federal Rules of Civil Procedure

3. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)

4. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)

5. Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115-16 (11th Cir. 1993)

6. Richardson v. Leeds Police Dept., 71 F.3d 801 (11th Cir. 1995)

7. Harlow v. Fitzgerald, 457 U.S. 800, 817-19 (1982)

8. Gray ex rel. Alexander v. Bostic, 458 F.3d 1295, 1303 (11th Cir.2006)

9. Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1265 (11th Cir.2004)

10. Crosby v. Monroe County, 394 F.3d at 1328, 1332 (11th Cir. 2004)

11.   <u>Chesser v. Sparks,</u> 248 F.3d 1117, 1122 (11th Cir. 2001)

12.   <u>Warren v. Crawford,</u> 927 F.2d 559 (11th Cir. 1991)

13.   <u>Board of Regents of State Colleges v. Roth</u>, 408 U.S. 564, 569, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548 (1972)

14.   <u>Bishop v. Wood</u>, 426 U.S. 341, 344, 96 S.Ct. 2074, 2077, 48 L.Ed.2d 684 (1976)

15.   <u>Hargray v. City of Hallandale</u>, 57 F.3d 1560, 1567 (11th Cir. 1995)

16.   <u>Christie v. U.S</u>, 518 F.2d 584, 587 (Ct. Cl. 1975)

17.   <u>City of Canton, Ohio v. Harris</u>, 489 U.S. 378, 388-389, 109 S.Ct. 1197, 1204 - 1205 (1989)

18.   <u>Gold v. City of Miami</u>, 151 F.3d 1346, 1350 (11th Cir.1998)

Respectfully submitted this 16th day of November, 2007.

/s/ Allison H. Highley
Allison H. Highley (HIG024)
Counsel for Defendants

OF COUNSEL:
CITY OF MONTGOMERY
Legal Department
Post Office Box 1111
Montgomery, AL 36101-1111
(334) 241-2050 Telephone
(334) 241-2310 Facsimile

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 16, 2007, I sent a copy of the foregoing motion to the Plaintiff via U.S. mail, first-class postage pre-paid to:

Anthony Moorer
4240 Green Meadow Drive
Montgomery, Alabama 36108

/s/ Allison H. Highley
Allison H. Highley (HIG024)

**42 U.S.C.A. § 1983. Civil action for deprivation of rights**

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

**Federal Rules of Civil Procedure Rule 56. Summary Judgment**

(a) For Claimant. A party seeking to recover upon a claim, counterclaim, or cross-claim or to obtain a declaratory judgment may, at any time after the expiration of 20 days from the commencement of the action or after service of a motion for summary judgment by the adverse party, move with or without supporting affidavits for a summary judgment in the party's favor upon all or any part thereof.

(b) For Defending Party. A party against whom a claim, counterclaim, or cross-claim is asserted or a declaratory judgment is sought may, at any time, move with or without supporting affidavits for a summary judgment in the party's favor as to all or any part thereof.

(c) Motion and Proceedings Thereon. The motion shall be served at least 10 days before the time fixed for the hearing. The adverse party prior to the day of hearing may serve opposing affidavits. The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. A summary judgment, interlocutory in character, may be rendered on the issue of liability alone although there is a genuine issue as to the amount of damages.

(d) Case Not Fully Adjudicated on Motion. If on motion under this rule judgment is not rendered upon the whole case or for all the relief asked and a trial is necessary, the court at the hearing of the motion, by examining the pleadings and the evidence before it and by interrogating counsel, shall if practicable ascertain what material facts exist without substantial controversy and what material facts are actually and in good faith controverted. It shall thereupon make an order specifying the facts that appear without substantial controversy, including the extent to which the amount of damages or other relief is not in controversy, and directing such further proceedings in the action as are just. Upon the trial of the action the facts so specified shall be deemed established, and the trial shall be conducted accordingly.

(e) Form of Affidavits; Further Testimony; Defense Required. Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith. The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits. When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

(f) When Affidavits are Unavailable. Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

(g) Affidavits Made in Bad Faith. Should it appear to the satisfaction of the court at any time that any of the affidavits presented pursuant to this rule are presented in bad faith or solely for the purpose of delay, the court shall forthwith order the party employing them to pay to the other party the amount of the reasonable expenses which the filing of the affidavits caused the other party to incur, including reasonable attorney's fees, and any offending party or attorney may be adjudged guilty of contempt.

106 S.Ct. 2548                                                                 Page 1

477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265, 54 USLW 4775, 4 Fed.R.Serv.3d 1024
**(Cite as: 477 U.S. 317, 106 S.Ct. 2548)**

Celotex Corp. v. Catrett
U.S.Dist.Col.,1986.

Supreme Court of the United States
CELOTEX CORPORATION, Petitioner
v.
Myrtle Nell CATRETT, Administratrix of the Es-
tate of Louis H. Catrett, Deceased.
**No. 85-198.**

Argued April 1, 1986.
Decided June 25, 1986.

Administratrix of estate of deceased worker
brought action against asbestos manufacturer. The
United States District Court for the District of
Columbia granted manufacturer's motion for sum-
mary judgment and administratrix appealed. The
Court of Appeals for the District of Columbia Cir-
cuit, 756 F.2d 181, reversed. The Supreme Court,
Justice Rehnquist, held that: (1) Rule 56(c) man-
dates the entry of summary judgment after adequate
time for discovery against a party who fails to make
a showing sufficient to establish the existence of an
element essential to that party's case as to which
that party will bear the burden of proof at trial; (2)
there is no requirement that moving party support
its motion with affidavits or other similar materials
negating the opponent's claim; and (3) nonmoving
party need not produce evidence in a form that
would be admissible at trial in order to avoid sum-
mary judgment.

Reversed and remanded.

Justice White filed an opinion concurring in the
Court's opinion and judgment.

Justice Brennan filed a dissenting opinion in which
Chief Justice Burger and Justice Blackmun joined.

Justice Stevens filed a dissenting opinion.

Opinion on remand, 826 F.2d 33.
West Headnotes

**[1] Federal Civil Procedure 170A ☞2466**

170A Federal Civil Procedure
   170AXVII Judgment
      170AXVII(C) Summary Judgment
         170AXVII(C)1 In General
            170Ak2465 Matters Affecting Right to
Judgment
               170Ak2466 k. Lack of Cause of
Action or Defense. Most Cited Cases
Entry of summary judgment is mandated, after ad-
equate time for discovery and upon motion, against
a party who fails to make a showing sufficient to
establish that existence of an element essential to
that party's case and on which that party will bear
the burden of proof at trial. Fed.Rules
Civ.Proc.Rule 56(c), 28 U.S.C.A.

**[2] Federal Civil Procedure 170A ☞2470**

170A Federal Civil Procedure
   170AXVII Judgment
      170AXVII(C) Summary Judgment
         170AXVII(C)1 In General
            170Ak2465 Matters Affecting Right to
Judgment
               170Ak2470 k. Absence of Genuine
Issue of Fact in General. Most Cited Cases
Where party will have burden of proof on an ele-
ment essential to its case at trial and does not, after
adequate time for discovery, make a showing suffi-
cient to establish the existence of that element,
there can be no genuine issue as to any material fact
since a complete failure of proof concerning an es-
sential element of the nonmovant's case necessarily
renders all other facts immaterial. Fed.Rules
Civ.Proc.Rule 56(c), 28 U.S.C.A.

**[3] Federal Civil Procedure 170A ☞2535**

170A Federal Civil Procedure
   170AXVII Judgment
      170AXVII(C) Summary Judgment
         170AXVII(C)3 Proceedings
            170Ak2535 k. Presentation of Case in
General. Most Cited Cases

477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265, 54 USLW 4775, 4 Fed.R.Serv.3d 1024

**(Cite as: 477 U.S. 317, 106 S.Ct. 2548)**

Party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. Fed.Rules Civ.Proc.Rule 56(c), 28 U.S.C.A.

**[4] Federal Civil Procedure 170A ☜2536.1**

170A Federal Civil Procedure
   170AXVII Judgment
     170AXVII(C) Summary Judgment
      170AXVII(C)3 Proceedings
       170Ak2536 Affidavits
        170Ak2536.1 k. In General. Most Cited Cases
   (Formerly 170Ak2536)
There is no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials negating the opponent's claim. Fed.Rules Civ.Proc.Rule 56, 28 U.S.C.A.

**[5] Federal Civil Procedure 170A ☜2536.1**

170A Federal Civil Procedure
   170AXVII Judgment
     170AXVII(C) Summary Judgment
      170AXVII(C)3 Proceedings
       170Ak2536 Affidavits
        170Ak2536.1 k. In General. Most Cited Cases
   (Formerly 170Ak2536)
Regardless of whether the moving party accompanies its summary judgment motion with affidavits, the motion may and should be granted so long as whatever is before the district court demonstrates that the standard for the entry of summary judgment set forth in Rule 56(c) is satisfied. Fed.Rules Civ.Proc.Rule 56(c), 28 U.S.C.A.

**[6] Federal Civil Procedure 170A ☜2536.1**

170A Federal Civil Procedure
   170AXVII Judgment
     170AXVII(C) Summary Judgment

      170AXVII(C)3 Proceedings
       170Ak2536 Affidavits
        170Ak2536.1 k. In General. Most Cited Cases
   (Formerly 170Ak2536)
Where nonmoving party will bear burden of proof at trial on a dispositive issue, summary judgment motion may properly be made in reliance solely on the pleadings, depositions, answers to interrogatories, and admissions on file and such a motion, whether or not accompanied by affidavits, will be "made and supported as provided in this rule" so that the nonmoving party must go beyond the pleadings to show that there is a genuine issue for trial. Fed.Rules Civ.Proc.Rule 56(e), 28 U.S.C.A.

**[7] Federal Civil Procedure 170A ☜2545**

170A Federal Civil Procedure
   170AXVII Judgment
     170AXVII(C) Summary Judgment
      170AXVII(C)3 Proceedings
       170Ak2542 Evidence
        170Ak2545 k. Admissibility. Most Cited Cases
Nonmoving party need not produce evidence in a form that would be admissible at trial in order to avoid summary judgment. Fed.Rules Civ.Proc.Rule 56(e), 28 U.S.C.A.

**[8] Federal Civil Procedure 170A ☜2536.1**

170A Federal Civil Procedure
   170AXVII Judgment
     170AXVII(C) Summary Judgment
      170AXVII(C)3 Proceedings
       170Ak2536 Affidavits
        170Ak2536.1 k. In General. Most Cited Cases
   (Formerly 170Ak2536)

**Federal Civil Procedure 170A ☜2544**

170A Federal Civil Procedure
   170AXVII Judgment
     170AXVII(C) Summary Judgment
      170AXVII(C)3 Proceedings
       170Ak2542 Evidence

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

106 S.Ct. 2548
477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265, 54 USLW 4775, 4 Fed.R.Serv.3d 1024
**(Cite as: 477 U.S. 317, 106 S.Ct. 2548)**

170Ak2544 k. Burden of Proof.
Most Cited Cases
Last two sentences of Rule 56(e) precluding a non-moving party from resting on its pleadings to avoid summary judgment were added to disapprove a line of cases allowing a party opposing summary judgment to resist a properly made motion by reference only to its pleadings and were not intended to reduce the burden of the moving party or to add to that burden. Fed.Rules Civ.Proc.Rule 56(e), 28 U.S.C.A.

**[9] Federal Civil Procedure 170A ☞2461**

170A Federal Civil Procedure
   170AXVII Judgment
      170AXVII(C) Summary Judgment
         170AXVII(C)1 In General
            170Ak2461 k. In General. Most Cited Cases
Summary judgment procedure is properly regarded not a disfavored procedural shortcut but, rather, as an integral part of the federal rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action. Fed.Rules Civ.Proc.Rules 1, 56, 28 U.S.C.A.

**[10] Federal Civil Procedure 170A ☞2461**

170A Federal Civil Procedure
   170AXVII Judgment
      170AXVII(C) Summary Judgment
         170AXVII(C)1 In General
            170Ak2461 k. In General. Most Cited Cases
Rule 56 must be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury but also for the rights of persons opposing such claims and defenses to demonstrate, in the manner provided by the Rule prior to trial, that the claims and defenses have no factual basis. Fed.Rules Civ.Proc.Rule 56, 28 U.S.C.A.

**\*\*2549 \*317 Syllabus** FN\*

   FN\* The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 287, 50 L.Ed. 499.

In September 1980, respondent administratrix filed this wrongful-death action in Federal District Court, alleging that her husband's death in 1979 resulted from his exposure to asbestos products manufactured or distributed by the defendants, who included petitioner corporation. In September 1981, petitioner filed a motion for summary judgment, asserting that during discovery respondent failed to produce any evidence to support her allegation that the decedent had been exposed to petitioner's products. In response, respondent produced documents tending to show such exposure, but petitioner argued that the documents were inadmissible hearsay and thus could not be considered in opposition to the summary judgment motion. In July 1982, the court granted the motion because there was no showing of exposure to petitioner's products, but the Court of Appeals reversed, holding that summary judgment in petitioner's favor was precluded because of petitioner's failure to support its motion with evidence tending to *negate* such exposure, as required by Federal Rule 56(e) of Civil Procedure and the decision in *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142.

*Held:*

1. The Court of Appeals' position is inconsistent with the standard for summary \*\***2550** judgment set forth in Rule 56(c), which provides that summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Pp. 2552-2559.

(a) The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

106 S.Ct. 2548
477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265, 54 USLW 4775, 4 Fed.R.Serv.3d 1024
**(Cite as: 477 U.S. 317, 106 S.Ct. 2548)**

case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is "entitled to a judgment as a matter of law" because the nonmoving party has failed to **\*318** make a sufficient showing on an essential element of its case with respect to which it has the burden of proof. Pp. 2552-2553.

(b) There is no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim. On the contrary, Rule 56(c), which refers to the affidavits, "if any," suggests the absence of such a requirement, and Rules 56(a) and (b) provide that claimants and defending parties may move for summary judgment "with or without supporting affidavits." Rule 56(e), which relates to the form and use of affidavits and other materials, does not require that the moving party's motion always be supported by affidavits to show initially the absence of a genuine issue for trial. *Adickes v. S.H. Kress & Co., supra,* explained. Pp. 2553-2554.

(c) No serious claim can be made that respondent was "railroaded" by a premature motion for summary judgment, since the motion was not filed until one year after the action was commenced and since the parties had conducted discovery. Moreover, any potential problem with such premature motions can be adequately dealt with under Rule 56(f). Pp. 2554-2555.

2. The questions whether an adequate showing of exposure to petitioner's products was in fact made by respondent in opposition to the motion, and whether such a showing, if reduced to admissible evidence, would be sufficient to carry respondent's burden of proof at trial, should be determined by the Court of Appeals in the first instance. P. 2555.

244 U.S.App.D.C. 160, 756 F.2d 181, reversed and remanded.

REHNQUIST, J., delivered the opinion of the

Court, in which WHITE, MARSHALL, POWELL, and O'CONNOR, JJ., joined. WHITE, J., filed a concurring opinion, *post,* p. ---. BRENNAN, J., filed a dissenting opinion, in which BURGER, C.J., and BLACKMUN, J., joined, *post,* p. ---. STEVENS, J., filed a dissenting opinion, *post,* p. ---.

*Leland S. Van Koten* argued the cause for petitioner. With him on the briefs were *H. Emslie Parks* and *Drake C. Zaharris.*

*Paul March Smith* argued the cause for respondent. With him on the brief were *Joseph N. Onek, Joel I. Klein, James F. Green,* and *Peter T. Enslein.*\*

\* *Stephen M. Shapiro, Robert L. Stern, William H. Crabtree, Edward P. Good,* and *Paul M. Bator* filed a brief for the Motor Vehicle Manufacturers Association et al. as *amici curiae* urging reversal.

**\*319** Justice REHNQUIST delivered the opinion of the Court.

The United States District Court for the District of Columbia granted the motion of petitioner Celotex Corporation for summary judgment against respondent Catrett because the latter was unable to produce evidence in support of her allegation in her wrongful-death complaint that the decedent had been exposed to petitioner's asbestos products. A divided panel of the Court of Appeals for the District of Columbia Circuit reversed, however, holding that petitioner's failure to support its motion with evidence tending to *negate* such exposure precluded the entry of summary judgment in its favor. *Catrett v. Johns-Manville Sales Corp.,* 244 U.S.App.D.C. 160, 756 F.2d 181 (1985). This view conflicted with that of the Third Circuit in *In re Japanese* **\*\*2551** *Electronic Products,* 723 F.2d 238 (1983), rev'd on other grounds *sub nom. Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).FN1 We granted certiorari to resolve the conflict, 474 U.S. 944, 106 S.Ct. 342, 88 L.Ed.2d 285 (1985), and now reverse the decision of the District of Columbia Circuit.

> FN1. Since our grant of certiorari in this case, the Fifth Circuit has rendered a decision squarely rejecting the position adop-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

106 S.Ct. 2548
477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265, 54 USLW 4775, 4 Fed.R.Serv.3d 1024
**(Cite as: 477 U.S. 317, 106 S.Ct. 2548)**

ted here by the District of Columbia Circuit. See *Fontenot v. Upjohn Co.,* 780 F.2d 1190 (1986).

Respondent commenced this lawsuit in September 1980, alleging that the death in 1979 of her husband, Louis H. Catrett, resulted from his exposure to products containing asbestos manufactured or distributed by 15 named corporations. Respondent's complaint sounded in negligence, breach of warranty, and strict liability. Two of the defendants filed motions challenging the District Court's *in personam* jurisdiction, and the remaining 13, including petitioner, filed motions for summary judgment. Petitioner's motion, which was first filed in September 1981, argued that summary judgment was proper because respondent had "failed to produce evidence that any [Celotex] product ... was the proximate cause of the injuries alleged within the jurisdictional*320 limits of [the District] Court." In particular, petitioner noted that respondent had failed to identify, in answering interrogatories specifically requesting such information, any witnesses who could testify about the decedent's exposure to petitioner's asbestos products. In response to petitioner's summary judgment motion, respondent then produced three documents which she claimed "demonstrate that there is a genuine material factual dispute" as to whether the decedent had ever been exposed to petitioner's asbestos products. The three documents included a transcript of a deposition of the decedent, a letter from an official of one of the decedent's former employers whom petitioner planned to call as a trial witness, and a letter from an insurance company to respondent's attorney, all tending to establish that the decedent had been exposed to petitioner's asbestos products in Chicago during 1970-1971. Petitioner, in turn, argued that the three documents were inadmissible hearsay and thus could not be considered in opposition to the summary judgment motion.

In July 1982, almost two years after the commencement of the lawsuit, the District Court granted all of the motions filed by the various defendants. The court explained that it was granting petitioner's summary judgment motion because "there [was] no

showing that the plaintiff was exposed to the defendant Celotex's product in the District of Columbia or elsewhere within the statutory period." App. 217.[FN2] Respondent*321 appealed only the grant of summary judgment in favor of petitioner, and a divided panel of the District of Columbia Circuit reversed. The majority of the Court of Appeals held that petitioner's **2552 summary judgment motion was rendered "fatally defective" by the fact that petitioner "made no effort to adduce *any* evidence, in the form of affidavits or otherwise, to support its motion." 244 U.S.App.D.C., at 163, 756 *322 F.2d, at 184 (emphasis in original). According to the majority, Rule 56(e) of the Federal Rules of Civil Procedure,[FN3] and this Court's decision in *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 159, 90 S.Ct. 1598, 1609, 26 L.Ed.2d 142 (1970), establish that "the party opposing the motion for summary judgment bears the burden of responding *only after* the moving party has met its burden of coming forward with proof of the absence of any genuine issues of material fact." 244 U.S.App.D.C., at 163, 756 F.2d, at 184 (emphasis in original; footnote omitted). The majority therefore declined to consider petitioner's argument that none of the evidence produced by respondent in opposition to the motion for summary judgment would have been admissible at trial. *Ibid.* The dissenting judge argued that "[t]he majority errs in supposing that a party seeking summary judgment must always make an affirmative evidentiary showing, even in cases where there is not a triable, factual dispute." *Id.,* at 167, 756 F.2d, at 188 (Bork, J., dissenting). According to the dissenting judge, the majority's decision "undermines the traditional authority of trial judges to grant summary judgment in meritless cases." *Id.,* at 166, 756 F.2d, at 187.

FN2. Justice STEVENS, in dissent, argues that the District Court granted summary judgment only because respondent presented no evidence that the decedent was exposed to Celotex asbestos products *in the District of Columbia.* See *post,* at 2560-2561. According to Justice STEVENS, we should affirm the decision of the Court of Appeals, reversing the Dis-

106 S.Ct. 2548
477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265, 54 USLW 4775, 4 Fed.R.Serv.3d 1024
**(Cite as: 477 U.S. 317, 106 S.Ct. 2548)**

trict Court, on the "narrower ground" that respondent "made an adequate showing" that the decedent was exposed to Celotex asbestos products in Chicago during 1970-1971. See *Ibid.*

Justice STEVENS' position is factually incorrect. The District Court expressly stated that respondent had made no showing of exposure to Celotex asbestos products "in the District of Columbia *or elsewhere.*" App. 217 (emphasis added). Unlike Justice STEVENS, we assume that the District Court meant what it said. The majority of the Court of Appeals addressed the very issue raised by Justice STEVENS, and decided that "[t]he District Court's grant of summary judgment must therefore have been based on its conclusion that there was 'no showing that the plaintiff was exposed to defendant Celotex's product in the District of Columbia *or elsewhere* within the statutory period.' " *Catrett v. Johns-Manville Sales Corp.,* 244 U.S.App.D.C. 160, 162, n. 3, 756 F.2d 181, 183, n. 3 (1985) (emphasis in original). In other words, no judge involved in this case to date shares Justice STEVENS' view of the District Court's decision.

FN3. Rule 56(e) provides:

"Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith. The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits. When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise

provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him."

[1][2] We think that the position taken by the majority of the Court of Appeals is inconsistent with the standard for summary judgment set forth in Rule 56(c) of the Federal Rules of Civil Procedure.FN4 Under Rule 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation,**\*323** there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is "entitled to a judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof. "[T]h[e] standard [for granting summary judgment] mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a)...." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. **\*\*2553** 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

FN4. Rule 56(c) provides:
"The motion shall be served at least 10 days before the time fixed for the hearing. The adverse party prior to the day of hearing may serve opposing affidavits. The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show

106 S.Ct. 2548
477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265, 54 USLW 4775, 4 Fed.R.Serv.3d 1024
**(Cite as: 477 U.S. 317, 106 S.Ct. 2548)**

that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. A summary judgment, interlocutory in character, may be rendered on the issue of liability alone although there is a genuine issue as to the amount of damages."

[3][4][5] Of course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact. But unlike the Court of Appeals, we find no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim. On the contrary, Rule 56(c), which refers to "the affidavits, *if any*" (emphasis added), suggests the absence of such a requirement. And if there were any doubt about the meaning of Rule 56(c) in this regard, such doubt is clearly removed by Rules 56(a) and (b), which provide that claimants and defendants, respectively, may move for summary judgment "*with or without supporting affidavits*" (emphasis added). The import of these subsections is that, regardless of whether the moving party accompanies its summary judgment motion with affidavits, the motion may, and should, be granted so long as whatever is before the district court demonstrates that the standard for the entry of summary judgment, as set forth in Rule 56(c), is satisfied. One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported**324** claims or defenses, and we think it should be interpreted in a way that allows it to accomplish this purpose.[FN5]

> FN5. See Louis, Federal Summary Judgment Doctrine: A Critical Analysis, 83 Yale L.J. 745, 752 (1974); Currie, Thoughts on Directed Verdicts and Summary Judgments, 45 U.Chi.L.Rev. 72, 79 (1977).

[6] Respondent argues, however, that Rule 56(e), by its terms, places on the nonmoving party the burden of coming forward with rebuttal affidavits, or other specified kinds of materials, only in response to a motion for summary judgment "made and supported as provided in this rule." According to respondent's argument, since petitioner did not "support" its motion with affidavits, summary judgment was improper in this case. But as we have already explained, a motion for summary judgment may be made pursuant to Rule 56 "with or without supporting affidavits." In cases like the instant one, where the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the "pleadings, depositions, answers to interrogatories, and admissions on file." Such a motion, whether or not accompanied by affidavits, will be "made and supported as provided in this rule," and Rule 56(e) therefore requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial."

[7] We do not mean that the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment. Obviously, Rule 56 does not require the nonmoving party to depose her own witnesses. Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves, and it is from this list that one would normally expect the nonmoving party to make the showing to which we have referred.

**325** The Court of Appeals in this case felt itself constrained, however, by language in our decision in *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). There we held that summary judgment had been improperly entered in favor of the defendant restaurant in an action brought under 42 U.S.C. § 1983. In the course of its opinion, the *Adickes* Court said that "both the commentary on and the background of the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265, 54 USLW 4775, 4 Fed.R.Serv.3d 1024

**(Cite as: 477 U.S. 317, 106 S.Ct. 2548)**

1963 amendment conclusively**2554 show that it was not intended to modify the burden of the moving party ... to show initially the absence of a genuine issue concerning any material fact." *Id.,* at 159, 90 S.Ct., at 1609. We think that this statement is accurate in a literal sense, since we fully agree with the *Adickes* Court that the 1963 amendment to Rule 56(e) was not designed to modify the burden of making the showing generally required by Rule 56(c). It also appears to us that, on the basis of the showing before the Court in *Adickes,* the motion for summary judgment in that case should have been denied. But we do not think the *Adickes* language quoted above should be construed to mean that the burden is on the party moving for summary judgment to produce evidence showing the absence of a genuine issue of material fact, even with respect to an issue on which the nonmoving party bears the burden of proof. Instead, as we have explained, the burden on the moving party may be discharged by "showing"-that is, pointing out to the district court-that there is an absence of evidence to support the nonmoving party's case.

[8] The last two sentences of Rule 56(e) were added, as this Court indicated in *Adickes,* to disapprove a line of cases allowing a party opposing summary judgment to resist a properly made motion by reference only to its pleadings. While the *Adickes* Court was undoubtedly correct in concluding that these two sentences were not intended to *reduce* the burden of the moving party, it is also obvious that they were not adopted to *add to* that burden. Yet that is exactly the result which the reasoning of the Court of Appeals would produce; in effect, an amendment to Rule 56(e) designed to *326 facilitate* the granting of motions for summary judgment would be interpreted to make it *more difficult* to grant such motions. Nothing in the two sentences themselves requires this result, for the reasons we have previously indicated, and we now put to rest any inference that they do so.

Our conclusion is bolstered by the fact that district courts are widely acknowledged to possess the power to enter summary judgments *sua sponte,* so long as the losing party was on notice that she had

to come forward with all of her evidence. See 244 U.S.App.D.C., at 167-168, 756 F.2d, at 189 (Bork, J., dissenting); 10A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2720, pp. 28-29 (1983). It would surely defy common sense to hold that the District Court could have entered summary judgment *sua sponte* in favor of petitioner in the instant case, but that petitioner's filing of a motion requesting such a disposition precluded the District Court from ordering it.

Respondent commenced this action in September 1980, and petitioner's motion was filed in September 1981. The parties had conducted discovery, and no serious claim can be made that respondent was in any sense "railroaded" by a premature motion for summary judgment. Any potential problem with such premature motions can be adequately dealt with under Rule 56(f),[FN6] which allows a summary judgment motion to be denied, or the hearing on the motion to be continued, if the nonmoving party has not had an opportunity to make full discovery.

> FN6. Rule 56(f) provides:
> "Should it appear from the affidavits of a party opposing the motion that he cannot for reasons stated present by affidavit facts essential to justify his opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just."

In this Court, respondent's brief and oral argument have been devoted as much to the proposition that an adequate showing of exposure to petitioner's asbestos products was *327 made as to the proposition that no such showing should have been required. But the Court of Appeals declined to address either the adequacy of the showing made by respondent in opposition to petitioner's motion for summary judgment, or the question whether such a showing, if **2555 reduced to admissible evidence, would be sufficient to carry respondent's burden of proof at trial. We think the Court of Appeals with

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265, 54 USLW 4775, 4 Fed.R.Serv.3d 1024

**(Cite as: 477 U.S. 317, 106 S.Ct. 2548)**

its superior knowledge of local law is better suited than we are to make these determinations in the first instance.

[9][10] The Federal Rules of Civil Procedure have for almost 50 years authorized motions for summary judgment upon proper showings of the lack of a genuine, triable issue of material fact. Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed "to secure the just, speedy and inexpensive determination of every action." Fed.Rule Civ.Proc. 1; see Schwarzer, Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact, 99 F.R.D. 465, 467 (1984). Before the shift to "notice pleading" accomplished by the Federal Rules, motions to dismiss a complaint or to strike a defense were the principal tools by which factually insufficient claims or defenses could be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources. But with the advent of "notice pleading," the motion to dismiss seldom fulfills this function any more, and its place has been taken by the motion for summary judgment. Rule 56 must be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury, but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis.

**\*328** The judgment of the Court of Appeals is accordingly reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*
Justice WHITE, concurring.
I agree that the Court of Appeals was wrong in holding that the moving defendant must always support his motion with evidence or affidavits showing the absence of a genuine dispute about a material fact. I also agree that the movant may rely on depositions, answers to interrogatories, and the

like, to demonstrate that the plaintiff has no evidence to prove his case and hence that there can be no factual dispute. But the movant must discharge the burden the Rules place upon him: It is not enough to move for summary judgment without supporting the motion in any way or with a conclusory assertion that the plaintiff has no evidence to prove his case.

A plaintiff need not initiate any discovery or reveal his witnesses or evidence unless required to do so under the discovery Rules or by court order. Of course, he must respond if required to do so; but he need not also depose his witnesses or obtain their affidavits to defeat a summary judgment motion asserting only that he has failed to produce any support for his case. It is the defendant's task to negate, if he can, the claimed basis for the suit.

Petitioner Celotex does not dispute that if respondent has named a witness to support her claim, summary judgment should not be granted without Celotex somehow showing that the named witness' possible testimony raises no genuine issue of material fact. Tr. of Oral Arg. 43, 45. It asserts, however, that respondent has failed on request to produce any basis for her case. Respondent, on the other hand, does not contend that she was not obligated to reveal her witnesses and evidence but insists that she has revealed enough to defeat the motion for summary judgment. Because the Court of Appeals found it unnecessary to address this aspect **\*329** of the case, I agree that the case should be remanded for further proceedings.

Justice BRENNAN, with whom THE CHIEF JUSTICE and Justice BLACKMUN join, dissenting.
This case requires the Court to determine whether Celotex satisfied its initial **\*\*2556** burden of production in moving for summary judgment on the ground that the plaintiff lacked evidence to establish an essential element of her case at trial. I do not disagree with the Court's legal analysis. The Court clearly rejects the ruling of the Court of Appeals that the defendant must provide affirmative evidence disproving the plaintiff's case. Beyond this,

106 S.Ct. 2548

477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265, 54 USLW 4775, 4 Fed.R.Serv.3d 1024

**(Cite as: 477 U.S. 317, 106 S.Ct. 2548)**

however, the Court has not clearly explained what is required of a moving party seeking summary judgment on the ground that the nonmoving party cannot prove its case.[FN1] This lack of clarity is unfortunate: district courts must routinely decide summary judgment motions, and the Court's opinion will very likely create confusion. For this reason, even if I agreed with the Court's result, I would have written separately to explain more clearly the law in this area. However, because I believe that Celotex did not meet its burden of production under Federal Rule of Civil Procedure 56, I respectfully dissent from the Court's judgment.

> FN1. It is also unclear what the Court of Appeals is supposed to do in this case on remand. Justice WHITE-who has provided the Court's fifth vote-plainly believes that the Court of Appeals should reevaluate whether the defendant met its initial burden of production. However, the decision to reverse rather than to vacate the judgment below implies that the Court of Appeals should assume that Celotex has met its initial burden of production and ask only whether the plaintiff responded adequately, and, if so, whether the defendant has met its ultimate burden of persuasion that no genuine issue exists for trial. Absent some clearer expression from the Court to the contrary, Justice WHITE's understanding would seem to be controlling. Cf. *Marks v. United States,* 430 U.S. 188, 193, 97 S.Ct. 990, 993, 51 L.Ed.2d 260 (1977).

**\*330** I

Summary judgment is appropriate where the Court is satisfied "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.Rule Civ.Proc. 56(c). The burden of establishing the nonexistence of a "genuine issue" is on the party moving for summary judgment. 10A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2727, p. 121 (2d ed. 1983) (hereinafter Wright) (citing

cases); 6 J. Moore, W. Taggart & J. Wicker, Moore's Federal Practice ¶ 56.15 [3] (2d ed. 1985) (hereinafter Moore) (citing cases). See also, *ante,* at 2551; *ante,* at 2553 (WHITE, J., concurring). This burden has two distinct components: an initial burden of production, which shifts to the nonmoving party if satisfied by the moving party; and an ultimate burden of persuasion, which always remains on the moving party. See 10A Wright, Miller & Kane § 2727. The court need not decide whether the moving party has satisfied its ultimate burden of persuasion[FN2] unless and until the Court finds that the moving party has discharged its initial **\*331** burden of production. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157-161, 90 S.Ct. 1598, 1608-10, 26 L.Ed.2d 142 (1970); 1963 Advisory Committee's Notes on Fed.Rule Civ.Proc. 56(e), 28 U.S.C.App., p. 626.

> FN2. The burden of persuasion imposed on a moving party by Rule 56 is a stringent one. 6 Moore ¶ 56.15[3], pp. 56-466; 10A Wright, Miller & Kane § 2727, p. 124. Summary judgment should not be granted unless it is clear that a trial is unnecessary, *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, ----,91 L.Ed.2d 202 (1986), and any doubt as to the existence of a genuine issue for trial should be resolved against the moving party, *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158-159, 90 S.Ct. 1598, 1608-09, 26 L.Ed.2d 142 (1970). In determining whether a moving party has met its burden of persuasion, the court is obliged to take account of the entire setting of the case and must consider all papers of record as well as any materials prepared for the motion. 10A Wright, Miller & Kane § 2721, p. 44; see, *e.g., Stepanischen v. Merchants Despatch Transportation Corp.,* 722 F.2d 922, 930 (CA1 1983); *Higgenbotham v. Ochsner Foundation Hospital,* 607 F.2d 653, 656 (CA5 1979). As explained by the Court of Appeals for the Third Circuit in *In re Japanese Electronic Products Antitrust Litigation,* 723 F.2d 238 (1983), rev'd

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

on other grounds *sub nom. Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), "[i]f ... there is any evidence in the record from any source from which a reasonable inference in the [nonmoving party's] favor may be drawn, the moving party simply cannot obtain a summary judgment...." 723 F.2d, at 258.

**\*\*2557** The burden of production imposed by Rule 56 requires the moving party to make a prima facie showing that it is entitled to summary judgment. 10A Wright, Miller & Kane § 2727. The manner in which this showing can be made depends upon which party will bear the burden of persuasion on the challenged claim at trial. If the *moving* party will bear the burden of persuasion at trial, that party must support its motion with credible evidence-using any of the materials specified in Rule 56(c)-that would entitle it to a directed verdict if not controverted at trial. *Ibid.* Such an affirmative showing shifts the burden of production to the party opposing the motion and requires that party either to produce evidentiary materials that demonstrate the existence of a "genuine issue" for trial or to submit an affidavit requesting additional time for discovery. *Ibid.;* Fed.Rules Civ.Proc. 56(e), (f).

If the burden of persuasion at trial would be on the *non-moving* party, the party moving for summary judgment may satisfy Rule 56's burden of production in either of two ways. First, the moving party may submit affirmative evidence that negates an essential element of the nonmoving party's claim. Second, the moving party may demonstrate to the Court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim. See 10A Wright, Miller & Kane § 2727, pp. 130-131; Louis, Federal Summary Judgment Doctrine: A Critical Analysis, 83 Yale L.J. 745, 750 (1974) (hereinafter Louis). If the nonmoving party cannot muster sufficient evidence to make out its claim, a trial would be useless and the moving party is entitled to summary judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, ----,91 L.Ed.2d 202

(1986).

Where the moving party adopts this second option and seeks summary judgment on the ground that the nonmoving party-who will bear the burden of persuasion at trial-has **\*332** no evidence, the mechanics of discharging Rule 56's burden of production are somewhat trickier. Plainly, a conclusory assertion that the nonmoving party has no evidence is insufficient. See *ante,* at 2551 (WHITE, J., concurring). Such a "burden" of production is no burden at all and would simply permit summary judgment procedure to be converted into a tool for harassment. See Louis 750-751. Rather, as the Court confirms, a party who moves for summary judgment on the ground that the nonmoving party has no evidence must affirmatively show the absence of evidence in the record. *Ante,* at 2553. This may require the moving party to depose the nonmoving party's witnesses or to establish the inadequacy of documentary evidence. If there is literally no evidence in the record, the moving party may demonstrate this by reviewing for the court the admissions, interrogatories, and other exchanges between the parties that are in the record. Either way, however, the moving party must affirmatively demonstrate that there is no evidence in the record to support a judgment for the nonmoving party.

If the moving party has not fully discharged this initial burden of production, its motion for summary judgment must be denied, and the Court need not consider whether the moving party has met its ultimate burden of persuasion. Accordingly, the nonmoving party may defeat a motion for summary judgment that asserts that the nonmoving party has no evidence by calling the Court's attention to supporting evidence already in the record that was overlooked or ignored by the moving party. In that event, the moving party must respond by making an attempt to demonstrate the inadequacy of this evidence, for it is only by attacking all the record evidence allegedly supporting the nonmoving party that a party seeking summary judgment satisfies Rule 56's burden of production.[FN3] Thus, if the record disclosed that the **\*\*2558** moving **\*333** party had overlooked a witness who would provide relevant

477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265, 54 USLW 4775, 4 Fed.R.Serv.3d 1024
**(Cite as: 477 U.S. 317, 106 S.Ct. 2548)**

testimony for the nonmoving party at trial, the Court could not find that the moving party had discharged its initial burden of production unless the moving party sought to demonstrate the inadequacy of this witness' testimony. Absent such a demonstration, summary judgment would have to be denied on the ground that the moving party had failed to meet its burden of production under Rule 56.

> FN3. Once the moving party has attacked whatever record evidence-if any-the nonmoving party purports to rely upon, the burden of production shifts to the nonmoving party, who must either (1) rehabilitate the evidence attacked in the moving party's papers, (2) produce additional evidence showing the existence of a genuine issue for trial as provided in Rule 56(e), or (3) submit an affidavit explaining why further discovery is necessary as provided in Rule 56(f). See 10A Wright, Miller & Kane § 2727, pp. 138-143. Summary judgment should be granted if the nonmoving party fails to respond in one or more of these ways, or if, after the nonmoving party responds, the court determines that the moving party has met its ultimate burden of persuading the court that there is no genuine issue of material fact for trial. See, *e.g., First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 289, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569 (1968).

The result in *Adickes v. S.H. Kress & Co., supra,* is fully consistent with these principles. In that case, petitioner was refused service in respondent's lunchroom and then was arrested for vagrancy by a local policeman as she left. Petitioner brought an action under 42 U.S.C. § 1983 claiming that the refusal of service and subsequent arrest were the product of a conspiracy between respondent and the police; as proof of this conspiracy, petitioner's complaint alleged that the arresting officer was in respondent's store at the time service was refused. Respondent subsequently moved for summary judgment on the ground that there was no actual evid-

ence in the record from which a jury could draw an inference of conspiracy. In response, petitioner pointed to a statement from her own deposition and an unsworn statement by a Kress employee, both already in the record and both ignored by respondent, that the policeman who arrested petitioner was in the store at the time she was refused service. We agreed that "[i]f a policeman were present, ... it would be open to a jury, in light of the sequence that followed,**334** to infer from the circumstances that the policeman and Kress employee had a 'meeting of the minds' and thus reached an understanding that petitioner should be refused service." 398 U.S., at 158, 90 S.Ct., at 1609. Consequently, we held that it was error to grant summary judgment "on the basis of this record" because respondent had "failed to fulfill its initial burden" of demonstrating that there was no evidence that there was a policeman in the store. *Id.,* at 157-158,98 S.Ct., at 1608-1609.

The opinion in *Adickes* has sometimes been read to hold that summary judgment was inappropriate because the respondent had not submitted affirmative evidence to negate the possibility that there was a policeman in the store. See Brief for Respondent 20, n. 30 (citing cases). The Court of Appeals apparently read *Adickes* this way and therefore required Celotex to submit evidence establishing that plaintiff's decedent had not been exposed to Celotex asbestos. I agree with the Court that this reading of *Adickes* was erroneous and that Celotex could seek summary judgment on the ground that plaintiff could not prove exposure to Celotex asbestos at trial. However, Celotex was still required to satisfy its initial burden of production.

II

I do not read the Court's opinion to say anything inconsistent with or different than the preceding discussion. My disagreement with the Court concerns the application of these principles to the facts of this case.

Defendant Celotex sought summary judgment on the ground that plaintiff had "failed to produce" any

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

106 S.Ct. 2548
477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265, 54 USLW 4775, 4 Fed.R.Serv.3d 1024
**(Cite as: 477 U.S. 317, 106 S.Ct. 2548)**

evidence that her **\*\*2559** decedent had ever been exposed to Celotex asbestos.<sup>FN4</sup> App. 170. Celotex supported this motion with a **\*335** two-page "Statement of Material Facts as to Which There is No Genuine Issue" and a three-page "Memorandum of Points and Authorities" which asserted that the plaintiff had failed to identify any evidence in responding to two sets of interrogatories propounded by Celotex and that therefore the record was "totally devoid" of evidence to support plaintiff's claim. See *id.,* at 171-176.

> FN4. Justice STEVENS asserts that the District Court granted summary judgment on the ground that the plaintiff had failed to show exposure in the District of Columbia. He contends that the judgment of the Court of Appeals reversing the District Court's judgment should be affirmed on the "narrow ground" that it was "palpably erroneous" to grant summary judgment on this basis. *Post,* at 2561 (dissenting). The Court replies that what the District Court said was that plaintiff had failed to show exposure in the District of Columbia "or elsewhere." *Ante,* at 2560, n. 2. In my view, it does not really matter which reading is correct in this case. For, contrary to Justice STEVENS' claim, deciding this case on the ground that Celotex failed to meet its burden of production under Rule 56 does not involve an "abstract exercise in Rule construction." *Post,* at 2560 (STEVENS, J., dissenting). To the contrary, the principles governing a movant's burden of proof are straightforward and well established, and deciding the case on this basis does not require a new construction of Rule 56 at all; it simply entails applying established law to the particular facts of this case. The choice to reverse because of "palpable erro[r]" with respect to the burden of a moving party under Rule 56 is thus no more "abstract" than the choice to reverse because of such error with respect to the elements of a tort claim. Indeed, given that

the issue of the moving party's burden under Rule 56 was the basis of the Court of Appeals' decision, the question upon which certiorari was granted, and the issue briefed by the parties and argued to the Court, it would seem to be the preferable ground for deciding the case.

Approximately three months earlier, Celotex had filed an essentially identical motion. Plaintiff responded to this earlier motion by producing three pieces of evidence which she claimed "[a]t the very least ... demonstrate that there is a genuine factual dispute for trial,"*id.,* at 143: (1) a letter from an insurance representative of another defendant describing asbestos products to which plaintiff's decedent had been exposed, *id.,* at 160; (2) a letter from T.R. Hoff, a former supervisor of decedent, describing asbestos products to which decedent had been exposed, *id.,* at 162; and (3) a copy of decedent's deposition from earlier workmen's compensation proceedings, *id.,* at 164. Plaintiff also apparently indicated**\*336** at that time that she intended to call Mr. Hoff as a witness at trial. Tr. of Oral Arg. 6-7, 27-29.

Celotex subsequently withdrew its first motion for summary judgment. See App. 167.<sup>FN5</sup> However, as a result of this motion, when Celotex filed its second summary judgment motion, the record *did* contain evidence-including at least one witness-supporting plaintiff's claim. Indeed, counsel for Celotex admitted to this Court at oral argument that Celotex was aware of this evidence and of plaintiff's intention to call Mr. Hoff as a witness at trial when the second summary judgment motion was filed. Tr. of Oral Arg. 5-7. Moreover, plaintiff's response to Celotex' second motion pointed to this evidence-noting that it had already been provided to counsel for Celotex in connection with the first motion-and argued that Celotex had failed to "meet its burden of proving that there is no genuine factual dispute for trial." App. 188.

> FN5. Celotex apparently withdrew this motion because, contrary to the assertion made in the first summary judgment mo-

Case 2:06-cv-00672-WKW-WC    Document 25-6    Filed 11/16/2007    Page 19 of 273

106 S.Ct. 2548                                                                                    Page 14
477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265, 54 USLW 4775, 4 Fed.R.Serv.3d 1024
**(Cite as: 477 U.S. 317, 106 S.Ct. 2548)**

tion, its second set of interrogatories had not been served on the plaintiff.

On these facts, there is simply no question that Celotex failed to discharge its initial burden of production. Having chosen to base its motion on the argument that there was no evidence in the record to support plaintiff's claim, Celotex was not free to ignore supporting evidence that the record clearly contained. Rather, Celotex was required, as an initial matter, to attack the adequacy of this evidence. Celotex' failure to fulfill this simple requirement constituted a failure to discharge its initial **2560 burden of production under Rule 56, and thereby rendered summary judgment improper.[FN6]

FN6. If the plaintiff had answered Celotex' second set of interrogatories with the evidence in her response to the first summary judgment motion, and Celotex had ignored those interrogatories and based its second summary judgment motion on the first set of interrogatories only, Celotex obviously could not claim to have discharged its Rule 56 burden of production. This result should not be different simply because the evidence plaintiff relied upon to support her claim was acquired by Celotex other than in plaintiff's answers to interrogatories.

*337 This case is indistinguishable from *Adickes.* Here, as there, the defendant moved for summary judgment on the ground that the record contained no evidence to support an essential element of the plaintiff's claim. Here, as there, the plaintiff responded by drawing the court's attention to evidence that was already in the record and that had been ignored by the moving party. Consequently, here, as there, summary judgment should be denied on the ground that the moving party failed to satisfy its initial burden of production.[FN7]

FN7. Although Justice WHITE agrees that "if [plaintiff] has named a witness to support her claim, summary judgment should not be granted without Celotex somehow showing that the named witness' possible

testimony raises no genuine issue of material fact," he would remand "[b]ecause the Court of Appeals found it unnecessary to address this aspect of the case." *Ante,* at 2555-2556 (concurring). However, Celotex has admitted that plaintiff had disclosed her intent to call Mr. Hoff as a witness at trial before Celotex filed its second motion for summary judgment. Tr. of Oral Arg. 6-7. Under the circumstances, then, remanding is a waste of time.Justice STEVENS, dissenting.

As the Court points out, *ante,* at 2551, petitioner's motion for summary judgment was based on the proposition that respondent could not prevail unless she proved that her deceased husband had been exposed to petitioner's products "within the jurisdictional limits" of the District of Columbia.[FN1] *338 Respondent made an adequate showing-albeit possibly not in admissible form[FN2]-that her husband had been exposed to petitioner's product in Illinois.FN3 Although the basis of the motion and the argument had been the lack of exposure *in the District of Columbia,* the District Court stated at the end of the argument: "The Court will grant the defendant Celotex's motion for summary judgment there being no showing that the plaintiff was exposed to the defendant Celotex's product in the District of Columbia *or elsewhere* within the statutory period." App. 217 (emphasis added). The District Court offered no additional explanation and no written**2561 opinion. The Court of Appeals reversed on the basis that Celotex had not met its burden; the court noted the incongruity of the District Court's opinion in the context of the motion and argument, but did not rest on that basis because of the "or elsewhere" language.[FN4]

FN1. See Motion of Defendant Celotex Corporation for Summary Judgment, App. 170 ("Defendant Celotex Corporation, pursuant to Rule 56(b) of the Federal Rules of Civil Procedure moves this Court for an Order granting Summary Judgment on the ground that plaintiff has failed to produce evidence that any product designed, manufactured or distributed by Celotex Corpora-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

tion was the proximate cause of the injuries alleged *within the jurisdictional limits of this Court*") (emphasis added); Memorandum of Points and Authorities in Support of Motion of Defendant Celotex Corporation for Summary Judgment, *id.,* at 175 (Plaintiff "must demonstrate some link between a Celotex Corporation product claimed to be the cause of the decedent's illness and the decedent himself. The record is totally devoid of any such evidence *within the jurisdictional confines of this Court*") (emphasis added); Transcript of Argument in Support of Motion of Defendant Celotex Corporation for Summary Judgment, *id.,* at 211 ("Our position is ... there has been no product identification of any Celotex products ... that have been used *in the District of Columbia* to which the decedent was exposed") (emphasis added).

FN2. But cf. *ante,* at 2553 ("We do not mean that the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment").

FN3. See App. 160 (letter from Aetna Life Insurance Co.) (referring to the "asbestos that Mr. Catrett came into contact with while working for Anning-Johnson Company" and noting that the "manufacturer of this product" was purchased by Celotex); *id.,* at 162 (letter from Anning-Johnson Co.) (confirming that Catrett worked for the company and supervised the installation of asbestos produced by the company that Celotex ultimately purchased); *id.,* at 164, 164c (deposition of Catrett) (description of his work with asbestos "in Chicago").

FN4. See *Catrett v. Johns-Manville Sales Corp.,* 756 F.2d 181, 185, n. 14 (1985) ("[T]he discussion at the time the motion was granted actually spoke to venue. It was

only the phrase 'or elsewhere,' appearing with no prior discussion, in the judge's oral ruling at the close of argument that made the grant of summary judgment even conceivably proper").

Taken in the context of the motion for summary judgment on the basis of no exposure in the District of Columbia, the ***339** District Court's decision to grant summary judgment was palpably erroneous. The court's bench reference to "or elsewhere" neither validated that decision nor raised the complex question addressed by this Court today. In light of the District Court's plain error, therefore, it is perfectly clear that, even after this Court's abstract exercise in Rule construction, we should nonetheless affirm the reversal of summary judgment on that narrow ground.[FN5]

> FN5. Cf. n. 2, *supra.* The Court's statement that the case should be remanded because the Court of Appeals has a "superior knowledge of local law," *ante,* at 2555, is bewildering because there is no question of local law to be decided. Cf. *Bishop v. Wood,* 426 U.S. 341, 345-347, 96 S.Ct. 2074, 2077-2079, 48 L.Ed.2d 684 (1976).
> The Court's decision to remand when a sufficient ground for affirmance is available does reveal, however, the Court's increasing tendency to adopt a presumption of reversal. See, *e.g., New York v. P.J. Video, Inc.,* 475 U.S. 868, 884, 106 S.Ct. 1610, 1619, 89 L.Ed.2d 871 (1986) (MARSHALL, J., dissenting); *Icicle Seafoods, Inc., v. Worthington,* 475 U.S. 709, 715, 106 S.Ct. 1527, 1530, 89 L.Ed.2d 739 (1986) (STEVENS, J., dissenting); *City of Los Angeles v. Heller,* 475 U.S. 796, 800, 106 S.Ct. 1571, 1573, 89 L.Ed.2d 806 (1986) (STEVENS, J., dissenting); *Pennsylvania v. Goldhammer,* 474 U.S. 28, 31, 106 S.Ct. 353, 88 L.Ed.2d 183 (1985) (STEVENS, J., dissenting). As a matter of efficient judicial administration and of respect for the state and federal courts, I believe the presumption should be precisely

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265, 54 USLW 4775, 4 Fed.R.Serv.3d 1024
**(Cite as: 477 U.S. 317, 106 S.Ct. 2548)**

the opposite.

I respectfully dissent.

U.S.Dist.Col.,1986.
Celotex Corp. v. Catrett
477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265, 54
USLW 4775, 4 Fed.R.Serv.3d 1024

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

106 S.Ct. 1348                                                                                    Page 1
475 U.S. 574, 106 S.Ct. 1348, 7 ITRD 2057, 89 L.Ed.2d 538, 54 USLW 4319, 1986-1 Trade Cases P 67,004, 4
Fed.R.Serv.3d 368
**(Cite as: 475 U.S. 574, 106 S.Ct. 1348)**

Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio
Corp.
U.S.Pa.,1986.

Supreme Court of the United States
MATSUSHITA ELECTRIC INDUSTRIAL CO.,
LTD., et al., Petitioners
v.
ZENITH RADIO CORPORATION et al.
**No. 83-2004.**

Argued Nov. 12, 1985.
Decided March 26, 1986.

American manufacturers of television sets brought
suit against Japanese manufacturers alleging that
the Japanese manufacturers had illegally conspired
to drive the American manufacturers from the
American market by engaging in a scheme to fix
and maintain artificially high prices for television
sets sold by the Japanese manufacturers in Japan
and, at the same time, to fix and maintain low
prices for the sets exported to and sold in the
United States. The United States District Court for
the Eastern District of Pennsylvania, 513 F.Supp.
1100, granted summary judgment in favor of the Ja-
panese manufacturers. The United States Court of
Appeals for the Third Circuit, 723 F.2d 238, af-
firmed in part and reversed in part, and the Japan-
ese manufacturers petitioned for certiorari. The Su-
preme Court, Justice Powell, held that: (1) Americ-
an television manufacturers could not recover anti-
trust damages against Japanese television manufac-
turers for any conspiracy by the Japanese manufac-
turers to charge higher than competitive prices in
the American market since such conduct could not
injure the American manufacturers who stood to
gain from any such conspiracy, and (2) in order to
survive a motion for summary judgment by Japan-
ese manufacturers, American manufacturers were
required to establish a material issue as to whether
the Japanese manufacturers entered into an illegal
conspiracy which caused the American manufactur-
ers to suffer cognizable injury; because the factual

context rendered the claims of the American manu-
facturers implausible, the American manufactures
were required to offer more persuasive evidence to
support their claims than would otherwise be neces-
sary.

Reversed and remanded.

Justice White filed a dissenting opinion in which
Justice Brennan, Justice Blackmun and Justice
Stevens joined.
West Headnotes
**[1] Antitrust and Trade Regulation 29T ☞945**

29T Antitrust and Trade Regulation
    29TXVI Antitrust and Foreign Trade
        29Tk945 k. In General. Most Cited Cases
        (Formerly 265k12(7))
American television manufacturers could not recov-
er antitrust damages from Japanese television man-
ufacturers based solely on an alleged cartelization
of the Japanese market since American antitrust
laws do not regulate the competitive conditions of
other nations' economies.

**[2] Antitrust and Trade Regulation 29T ☞
963(3)**

29T Antitrust and Trade Regulation
    29TXVII Antitrust Actions, Proceedings, and
Enforcement
        29TXVII(B) Actions
            29Tk959 Right of Action; Persons En-
titled to Sue; Standing; Parties
                29Tk963 Injury to Business or Prop-
erty
                    29Tk963(3) k. Particular Cases.
Most Cited Cases
        (Formerly 265k28(2))
American television manufacturers could not recov-
er antitrust damages against Japanese television
manufacturers for any conspiracy by the Japanese
manufacturers to charge higher than competitive
prices in the American market since such conduct
could not injure the American manufacturers who
stood to gain from any such conspiracy; further-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

106 S.Ct. 1348                                                                                          Page 2
475 U.S. 574, 106 S.Ct. 1348, 7 ITRD 2057, 89 L.Ed.2d 538, 54 USLW 4319, 1986-1 Trade Cases P 67,004, 4
Fed.R.Serv.3d 368
**(Cite as: 475 U.S. 574, 106 S.Ct. 1348)**

more, the American manufacturers could not recover for a conspiracy to impose nonprice restraints that had the effect of either raising market prices or limiting output.

**[3] Federal Civil Procedure 170A ⚖2544**

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)3 Proceedings
                170Ak2542 Evidence
                    170Ak2544 k. Burden of Proof.
Most Cited Cases
In order to survive a motion for summary judgment by Japanese manufacturers of television sets, American manufacturers were required to establish a material issue as to whether the Japanese manufacturers entered into an illegal conspiracy which caused the American manufacturers to suffer cognizable antitrust injury; because the factual context rendered implausible the claims of the American manufacturers that the Japanese manufacturers had conspired to increase prices in Japan while reducing them in the United States, the American manufacturers were required to offer more persuasive evidence to support their claims than would otherwise be necessary.

**[4] Federal Civil Procedure 170A ⚖2544**

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)3 Proceedings
                170Ak2542 Evidence
                    170Ak2544 k. Burden of Proof.
Most Cited Cases
To survive a motion for summary judgment or for a directed verdict, a plaintiff seeking damages for a violation of § 1 of the Sherman Act must present evidence that tends to exclude the possibility that the alleged conspirators acted independently. Sherman Anti-Trust Act, § 1, 15 U.S.C.A. § 1.

**\*\*1349 \*574 Syllabus** [FN*]

    FN* The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 287,50 L.Ed.2d 499.

Petitioners are 21 Japanese corporations or Japanese-controlled American corporations that manufacture and/or sell "consumer electronic products" (CEPs) (primarily television sets). Respondents are American corporations that manufacture and sell television sets. In 1974, respondents brought an action in Federal District Court, alleging that petitioners, over a 20-year period, had illegally conspired to drive American firms from the American CEP market by engaging in a scheme to fix and maintain artificially high prices for television sets sold by petitioners in Japan and, at the same time, to fix and maintain low prices for the sets exported to and sold in the United States. Respondents claim that various portions of this scheme violated, *inter alia,*§§ 1 and 2 of the Sherman Act, § 2(a) of the Robinson-Patman Act, and § 73 of the Wilson Tariff Act. After several years of discovery, petitioners moved for summary judgment on all claims. The District Court then directed the parties to file statements listing all the documentary evidence that would be offered if the case went to trial. After the statements were filed, the court found the bulk of the evidence on which respondents relied was inadmissible, that the admissible evidence did not raise a genuine issue of material fact as to the existence of the alleged conspiracy, and that any inference of conspiracy was unreasonable. Summary judgment therefore was granted in petitioners' favor. The Court of Appeals reversed. After determining that much of the evidence excluded by the District Court was admissible, the Court of Appeals held that the District Court erred in granting a summary judgment and that there was both direct and circumstantial evidence of a conspiracy. Based on inferences drawn from the evidence, the Court of Appeals concluded that a reasonable factfinder could find a conspiracy to depress prices in the American market in order to drive out American competitors, which conspiracy was funded **\*\*1350** by excess profits obtained in the Japanese market.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

475 U.S. 574, 106 S.Ct. 1348, 7 ITRD 2057, 89 L.Ed.2d 538, 54 USLW 4319, 1986-1 Trade Cases P 67,004, 4
Fed.R.Serv.3d 368
**(Cite as: 475 U.S. 574, 106 S.Ct. 1348)**

*Held:* The Court of Appeals did not apply proper standards in evaluating the District Court's decision to grant petitioners' motion for summary judgment. Pp. 1354-1362.

(a) The "direct evidence" on which the Court of Appeals relied-petitioners' alleged supracompetitive pricing in Japan, the "five company *575 rule" by which each Japanese producer was permitted to sell only to five American distributors, and the "check prices" (minimum prices fixed by agreement with the Japanese Government for CEPs exported to the United States) insofar as they established minimum prices in the United States-cannot by itself give respondents a cognizable claim against petitioners for antitrust damages. P. 1354.

(b) To survive petitioners' motion for a summary judgment, respondents must establish that there is a genuine issue of material fact as to whether petitioners entered into an illegal conspiracy that caused respondents to suffer a cognizable injury. If the factual context renders respondents' claims implausible, *i.e.,* claims that make no economic sense, respondents must offer more persuasive evidence to support their claims than would otherwise be necessary. To survive a motion for a summary judgment, a plaintiff seeking damages for a violation of § 1 of the Sherman Act must present evidence "that tends to exclude the possibility" that the alleged conspirators acted independently. Thus, respondents here must show that the inference of a conspiracy is reasonable in light of the competing inferences of independent action or collusive action that could not have harmed respondents. Pp. 1355-1357.

(c) Predatory pricing conspiracies are by nature speculative. They require the conspirators to sustain substantial losses in order to recover uncertain gains. The alleged conspiracy is therefore implausible. Moreover, the record discloses that the alleged conspiracy has not succeeded in over two decades of operation. This is strong evidence that the conspiracy does not in fact exist. The possibility that petitioners have obtained supracompetitive profits in the Japanese market does not alter this assessment. Pp. 1357-1359.

(d) Mistaken inferences in cases such as this one are especially costly, because they chill the very conduct that the antitrust laws are designed to protect. There is little reason to be concerned that by granting summary judgment in cases where the evidence of conspiracy is speculative or ambiguous, courts will encourage conspiracies. P. 1360.

(e) The Court of Appeals erred in two respects: the "direct evidence" on which it relied had little, if any, relevance to the alleged predatory pricing conspiracy, and the court failed to consider the absence of a plausible motive to engage in predatory pricing. In the absence of any rational motive to conspire, neither petitioners' pricing practices, their conduct in the Japanese market, nor their agreements respecting prices and distributions in the American market sufficed to create a "genuine issue for trial" under Federal Rule of Civil Procedure 56(e). On remand, the Court of Appeals may consider whether there is other, unambiguous evidence of the alleged conspiracy. Pp. 1360-1362.

723 F.2d 238 (CA3 1983), reversed and remanded.

*576 POWELL, J., delivered the opinion of the Court, in which BURGER, C.J., and MARSHALL, REHNQUIST, and O'CONNOR, JJ., joined. WHITE, J., filed a dissenting opinion, in which BRENNAN, BLACKMUN, and STEVENS, JJ., joined, *post,* p. ---.

*Donald J. Zoeller* argued the cause for petitioners. With him on the briefs were *John L. Altieri, Jr., Harold G. Levison, Peter J. Gartland, James S. Morris, Kevin R. Keating, Charles F. Schirmeister, Ira M. Millstein, A. Paul Victor, Jeffrey L. Kessler, Carl W. Schwarz, Michael E. Friedlander, William H. Barrett, Donald F. Turner,* and *Henry T. Reath.*
*Charles F. Rule* argued the cause *pro hac vice* for the United States as *amicus curiae* urging reversal. With him on the brief were *Acting Solicitor General Wallace, Charles S. Stark, Robert B. Nicholson, Edward T. Hand, Richard P. Larm, Abraham D. Sofaer,* and *Elizabeth M. Teel.*
*Edwin P. Rome* argued the cause for respondents. With him on the brief were *William H. Roberts,*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

106 S.Ct. 1348

Page 4

475 U.S. 574, 106 S.Ct. 1348, 7 ITRD 2057, 89 L.Ed.2d 538, 54 USLW 4319, 1986-1 Trade Cases P 67,004, 4 Fed.R.Serv.3d 368

**(Cite as: 475 U.S. 574, 106 S.Ct. 1348)**

*Arnold I. Kalman, Philip J. Curtis,* and *John Borst, Jr.*

* Briefs of *amici curiae* urging reversal were filed for the Government of Japan by *Stephen M. Shapiro;* and for the American Association of Exporters and Importers et al. by *Robert Herzstein* and *Hadrian R. Katz.*

Briefs of *amici curiae* were filed for the Government of Australia et al. by *Mark R. Joelson* and *Joseph P. Griffin;* and for the Semiconductor Industry Association by *Joseph R. Creighton.*

Justice POWELL delivered the opinion of the Court.

This case requires that we again consider the standard district courts must apply **\*\*1351** when deciding whether to grant summary judgment in an antitrust conspiracy case.

I

Stating the facts of this case is a daunting task. The opinion of the Court of Appeals for the Third Circuit runs to 69 pages; the primary opinion of the District Court is more than three times as long. *In re Japanese Electronic Products* **\*577** *Antitrust Litigation,* 723 F.2d 238 (CA3 1983); 513 F.Supp. 1100 (ED Pa.1981). Two respected District Judges each have authored a number of opinions in this case; the published ones alone would fill an entire volume of the Federal Supplement. In addition, the parties have filed a 40-volume appendix in this Court that is said to contain the essence of the evidence on which the District Court and the Court of Appeals based their respective decisions.

We will not repeat what these many opinions have stated and restated, or summarize the mass of documents that constitute the record on appeal. Since we review only the standard applied by the Court of Appeals in deciding this case, and not the weight assigned to particular pieces of evidence, we find it unnecessary to state the facts in great detail. What follows is a summary of this case's long history.

A

Petitioners, defendants below, are 21 corporations that manufacture or sell "consumer electronic products" (CEPs)-for the most part, television sets. Petitioners include both Japanese manufacturers of CEPs and American firms, controlled by Japanese parents, that sell the Japanese-manufactured products. Respondents, plaintiffs below, are Zenith Radio Corporation (Zenith) and National Union Electric Corporation (NUE). Zenith is an American firm that manufactures and sells television sets. NUE is the corporate successor to Emerson Radio Company, an American firm that manufactured and sold television sets until 1970, when it withdrew from the market after sustaining substantial losses. Zenith and NUE began this lawsuit in 1974,[FN1] claiming that petitioners had illegally conspired to drive **\*578** American firms from the American CEP market. According to respondents, the gist of this conspiracy was a " 'scheme to raise, fix and maintain artificially *high* prices for television receivers sold by [petitioners] in Japan and, at the same time, to fix and maintain *low* prices for television receivers exported to and sold in the United States.' " 723 F.2d, at 251 (quoting respondents' preliminary pretrial memorandum). These "low prices" were allegedly at levels that produced substantial losses for petitioners. 513 F.Supp., at 1125. The conspiracy allegedly began as early as 1953, and according to respondents was in full operation by sometime in the late 1960's. Respondents claimed that various portions of this scheme violated §§ 1 and 2 of the Sherman Act, § 2(a) of the Robinson-Patman Act, § 73 of the Wilson Tariff Act, and the Antidumping Act of 1916.

> FN1. NUE had filed its complaint four years earlier, in the District Court for the District of New Jersey. Zenith's complaint was filed separately in 1974, in the Eastern District of Pennsylvania. The two cases were consolidated in the Eastern District of Pennsylvania in 1974.

After several years of detailed discovery, petitioners filed motions for summary judgment on all claims against them. The District Court directed the parties to file, with preclusive effect, "Final Pretrial Statements" listing all the documentary evidence that would be offered if the case proceeded to trial.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

475 U.S. 574, 106 S.Ct. 1348, 7 ITRD 2057, 89 L.Ed.2d 538, 54 USLW 4319, 1986-1 Trade Cases P 67,004, 4
Fed.R.Serv.3d 368
**(Cite as: 475 U.S. 574, 106 S.Ct. 1348)**

Respondents filed such a statement, and petitioners responded with a series of motions challenging the admissibility of respondents' evidence. In three detailed opinions, the District Court found the bulk of the evidence on which Zenith and NUE relied inadmissible.[FN2]

> FN2. The inadmissible evidence included various government records and reports, *Zenith Radio Corp. v. Matsushita Electric Industrial Co.,* 505 F.Supp. 1125 (ED Pa.1980), business documents offered pursuant to various hearsay exceptions, *Zenith Radio Corp. v. Matsushita Electric Industrial Co.,* 505 F.Supp. 1190 (ED Pa.1980), and a large portion of the expert testimony that respondents proposed to introduce. *Zenith Radio Corp. v. Matsushita Electric Industrial Co.,* 505 F.Supp. 1313 (ED Pa.1981).

**\*\*1352** The District Court then turned to petitioners' motions for summary judgment. In an opinion spanning 217 pages, the court found that the admissible evidence did not raise a genuine issue of material fact as to the existence of the alleged **\*579** conspiracy. At bottom, the court found, respondents' claims rested on the inferences that could be drawn from petitioners' parallel conduct in the Japanese and American markets, and from the effects of that conduct on petitioners' American competitors. 513 F.Supp., at 1125-1127. After reviewing the evidence both by category and *in toto,* the court found that any inference of conspiracy was unreasonable, because (i) some portions of the evidence suggested that petitioners conspired in ways that did not injure respondents, and (ii) the evidence that bore directly on the alleged price-cutting conspiracy did not rebut the more plausible inference that petitioners were cutting prices to compete in the American market and not to monopolize it. Summary judgment therefore was granted on respondents' claims under § 1 of the Sherman Act and the Wilson Tariff Act. Because the Sherman Act § 2 claims, which alleged that petitioners had combined to monopolize the American CEP market, were functionally indistinguishable from the § 1

claims, the court dismissed them also. Finally, the court found that the Robinson-Patman Act claims depended on the same supposed conspiracy as the Sherman Act claims. Since the court had found no genuine issue of fact as to the conspiracy, it entered judgment in petitioners' favor on those claims as well.[FN3]

> FN3. The District Court ruled separately that petitioners were entitled to summary judgment on respondents' claims under the Antidumping Act of 1916. *Zenith Radio Corp. v. Matsushita Electric Industrial Co.,* 494 F.Supp. 1190 (ED Pa.1980). Respondents appealed this ruling, and the Court of Appeals reversed in a separate opinion issued the same day as the opinion concerning respondents' other claims. *In re Japanese Electronic Products Antitrust Litigation,* 723 F.2d 319 (CA3 1983). Petitioners ask us to review the Court of Appeals' Antidumping Act decision along with its decision on the rest of this mammoth case. The Antidumping Act claims were not, however, mentioned in the questions presented in the petition for certiorari, and they have not been independently argued by the parties. See this Court's Rule 21.1(a). We therefore decline the invitation to review the Court of Appeals' decision on those claims.

**\*580** B

The Court of Appeals for the Third Circuit reversed.[FN4] The court began by examining the District Court's evidentiary rulings, and determined that much of the evidence excluded by the District Court was in fact admissible. 723 F.2d, at 260-303. These evidentiary rulings are not before us. See 471 U.S. 1002, 105 S.Ct. 1863, 85 L.Ed.2d 157 (1985) (limiting grant of certiorari).

> FN4. As to 3 of the 24 defendants, the Court of Appeals affirmed the entry of summary judgment. Petitioners are the 21 defendants who remain in the case.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

475 U.S. 574, 106 S.Ct. 1348, 7 ITRD 2057, 89 L.Ed.2d 538, 54 USLW 4319, 1986-1 Trade Cases P 67,004, 4 Fed.R.Serv.3d 368
**(Cite as: 475 U.S. 574, 106 S.Ct. 1348)**

On the merits, and based on the newly enlarged record, the court found that the District Court's summary judgment decision was improper. The court acknowledged that "there are legal limitations upon the inferences which may be drawn from circumstantial evidence,"723 F.2d, at 304, but it found that "the legal problem ... is different" when "there is direct evidence of concert of action." *Ibid.* Here, the court concluded, "there is both direct evidence of certain kinds of concert of action and circumstantial evidence having some tendency to suggest that other kinds of concert of action may have occurred." *Id.,* at 304-305. Thus, the court reasoned, cases concerning the limitations on inferring conspiracy from ambiguous evidence were not dispositive. *Id.,* at 305. Turning to the evidence, the court determined that a factfinder reasonably could draw the following conclusions:

1. The Japanese market for CEPs was characterized by oligopolistic behavior,**1353** with a small number of producers meeting regularly and exchanging information on price and other matters. *Id.,* at 307. This created the opportunity for a stable combination to raise both prices and profits in Japan. American firms could not attack such a combination because the Japanese Government imposed significant barriers to entry. *Ibid.*

2. Petitioners had relatively higher fixed costs than their American counterparts, and therefore needed to *581 operate at something approaching full capacity in order to make a profit. *Ibid.*

3. Petitioners' plant capacity exceeded the needs of the Japanese market. *Ibid.*

4. By formal agreements arranged in cooperation with Japan's Ministry of International Trade and Industry (MITI), petitioners fixed minimum prices for CEPs exported to the American market. *Id.,* at 310. The parties refer to these prices as the "check prices," and to the agreements that require them as the "check price agreements."

5. Petitioners agreed to distribute their products in the United States according to a "five company rule": each Japanese producer was permitted to sell only to five American distributors. *Ibid.*

6. Petitioners undercut their own check prices by a variety of rebate schemes. *Id.,* at 311. Petitioners

sought to conceal these rebate schemes both from the United States Customs Service and from MITI, the former to avoid various customs regulations as well as action under the antidumping laws, and the latter to cover up petitioners' violations of the check-price agreements.

Based on inferences from the foregoing conclusions,[FN5] the Court of Appeals concluded that a reasonable factfinder could find a conspiracy to depress prices in the American market in order to drive out American competitors, which conspiracy was funded by excess profits obtained in the Japanese market. The court apparently did not consider whether it was as plausible to conclude that petitioners' price-cutting behavior was independent and not conspiratorial.

> FN5. In addition to these inferences, the court noted that there was expert opinion evidence that petitioners' export sales "generally were at prices which produced losses, often as high as twenty-five percent on sales." 723 F.2d, at 311. The court did not identify any direct evidence of below-cost pricing; nor did it place particularly heavy reliance on this aspect of the expert evidence. See n. 19, *infra.*

*582 The court found it unnecessary to address petitioners' claim that they could not be held liable under the antitrust laws for conduct that was compelled by a foreign sovereign. The claim, in essence, was that because MITI required petitioners to enter into the check-price agreements, liability could not be premised on those agreements. The court concluded that this case did not present any issue of sovereign compulsion, because the check-price agreements were being used as "evidence of a low export price conspiracy" and not as an independent basis for finding antitrust liability. The court also believed it was unclear that the check prices in fact were mandated by the Japanese Government, notwithstanding a statement to that effect by MITI itself. *Id.,* at 315.

We granted certiorari to determine (i) whether the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

106 S.Ct. 1348
475 U.S. 574, 106 S.Ct. 1348, 7 ITRD 2057, 89 L.Ed.2d 538, 54 USLW 4319, 1986-1 Trade Cases P 67,004, 4
Fed.R.Serv.3d 368
**(Cite as: 475 U.S. 574, 106 S.Ct. 1348)**

Court of Appeals applied the proper standards in evaluating the District Court's decision to grant petitioners' motion for summary judgment, and (ii) whether petitioners could be held liable under the antitrust laws for a conspiracy in part compelled by a foreign sovereign. 471 U.S. 1002, 105 S.Ct. 1863, 85 L.Ed.2d 157 (1985). We reverse on the first issue, but do not reach the second.

## II

[1][2] We begin by emphasizing what respondents' claim is *not.* Respondents cannot recover antitrust damages based solely on an alleged cartelization of the Japanese market, because American antitrust laws do not regulate the competitive conditions of other nations' economies. **\*\*1354** *United States v. Aluminum Co. of America,* 148 F.2d 416, 443 (CA2 1945) (L. Hand, J.); 1 P. Areeda & D. Turner, Antitrust Law ¶ 236d (1978).FN6 Nor can respondents recover damages for **\*583** any conspiracy by petitioners to charge higher than competitive prices in the American market. Such conduct would indeed violate the Sherman Act, *United States v. Trenton Potteries Co.,* 273 U.S. 392, 47 S.Ct. 377, 71 L.Ed. 700 (1927); *United States v. Socony-Vacuum Oil Co.,* 310 U.S. 150, 223, 60 S.Ct. 811, 844, 84 L.Ed. 1129 (1940), but it could not injure respondents: as petitioners' competitors, respondents stand to gain from any conspiracy to raise the market price in CEPs. Cf. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 488-489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977). Finally, for the same reason, respondents cannot recover for a conspiracy to impose nonprice restraints that have the effect of either raising market price or limiting output. Such restrictions, though harmful to competition, actually *benefit* competitors by making supracompetitive pricing more attractive. Thus, neither petitioners' alleged supracompetitive pricing in Japan, nor the five-company rule that limited distribution in this country, nor the check prices insofar as they established minimum prices in this country, can by themselves give respondents a cognizable claim against petitioners for antitrust damages. The Court of Appeals therefore erred to the extent that it found evidence of these alleged conspiracies to be

"direct evidence" of a conspiracy that injured respondents. See 723 F.2d, at 304-305.

> FN6. The Sherman Act does reach conduct outside our borders, but only when the conduct has an effect on American commerce. *Continental Ore Co. v. Union Carbide & Carbon Corp.,* 370 U.S. 690, 704, 82 S.Ct. 1404, 1413, 8 L.Ed.2d 777 (1962) ("A conspiracy to monopolize or restrain the domestic or foreign commerce of the United States is not outside the reach of the Sherman Act just because part of the conduct complained of occurs in foreign countries"). The effect on which respondents rely is the artificially depressed level of prices for CEPs in the United States.

Petitioners' alleged cartelization of the Japanese market could not have caused that effect over a period of some two decades. Once petitioners decided, as respondents allege, to reduce output and raise prices in the Japanese market, they had the option of either producing fewer goods or selling more goods in other markets. The most plausible conclusion is that petitioners chose the latter option because it would be more profitable than the former. That choice does not flow from the cartelization of the Japanese market. On the contrary, were the Japanese market perfectly competitive petitioners would still have to choose whether to sell goods overseas, and would still presumably make that choice based on their profit expectations. For this reason, respondents' theory of recovery depends on proof of the asserted price-cutting conspiracy in this country.

**\*584** Respondents nevertheless argue that these supposed conspiracies, if not themselves grounds for recovery of antitrust damages, are circumstantial evidence of another conspiracy that *is* cognizable: a conspiracy to monopolize the American market by means of pricing below the market level.FN7 The thrust of respondents' argument is

106 S.Ct. 1348
475 U.S. 574, 106 S.Ct. 1348, 7 ITRD 2057, 89 L.Ed.2d 538, 54 USLW 4319, 1986-1 Trade Cases P 67,004, 4
Fed.R.Serv.3d 368
**(Cite as: 475 U.S. 574, 106 S.Ct. 1348)**

that petitioners used their monopoly profits from the Japanese market to fund a concerted campaign to price predatorily and thereby drive respondents and other American manufacturers of CEPs out of business. Once successful, according to respondents, petitioners would cartelize the American CEP market, restricting output and raising prices above the level that fair competition would produce. The resulting **1355 monopoly profits, respondents contend, would more than compensate petitioners for the losses they incurred through years of pricing below market level.

> FN7. Respondents also argue that the check prices, the five company rule, and the price fixing in Japan are all part of one large conspiracy that includes monopolization of the American market through predatory pricing. The argument is mistaken. However one decides to describe the contours of the asserted conspiracy-whether there is one conspiracy or several-respondents must show that the conspiracy caused them an injury for which the antitrust laws provide relief. *Associated General Contractors of California, Inc. v. Carpenters,* 459 U.S. 519, 538-540, 103 S.Ct. 897, 908-909, 74 L.Ed.2d 723 (1983); *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 488-489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977); see also Note, Antitrust Standing, Antitrust Injury, and the Per Se Standard, 93 Yale L.J. 1309 (1984). That showing depends in turn on proof that petitioners conspired to price predatorily in the American market, since the other conduct involved in the alleged conspiracy cannot have caused such an injury.

The Court of Appeals found that respondents' allegation of a horizontal conspiracy to engage in predatory pricing,[FN8] *585 if proved,[FN9] would be a *per se* violation of § 1 of the Sherman Act. 723 F.2d, at 306. Petitioners did not appeal from that conclusion. The issue in this case thus becomes whether respondents adduced sufficient evidence in support of their theory to survive summary judgment. We therefore examine the principles that govern the summary judgment determination.

> FN8. Throughout this opinion, we refer to the asserted conspiracy as one to price "predatorily." This term has been used chiefly in cases in which a single firm, having a dominant share of the relevant market, cuts its prices in order to force competitors out of the market, or perhaps to deter potential entrants from coming in. *E.g., Southern Pacific Communications Co. v. American Telephone & Telegraph Co.,* 238 U.S.App.D.C. 309, 331-336, 740 F.2d 980, 1002-1007 (1984), cert. denied, 470 U.S. 1005, 105 S.Ct. 1359, 84 L.Ed.2d 380 (1985). In such cases, "predatory pricing" means pricing below some appropriate measure of cost. *E.g., Barry Wright Corp. v. ITT Grinnell Corp.,* 724 F.2d 227, 232-235 (CA1 1983); see *Utah Pie Co. v. Continental Baking Co.,* 386 U.S. 685, 698, 701, 702, n. 14, 87 S.Ct. 1326, 1333, 1335, 1336, n. 14, 18 L.Ed.2d 406 (1967). There is a good deal of debate, both in the cases and in the law reviews, about what "cost" is relevant in such cases. We need not resolve this debate here, because unlike the cases cited above, this is a Sherman Act § 1 case. For purposes of this case, it is enough to note that respondents have not suffered an antitrust injury unless petitioners conspired to drive respondents out of the relevant markets by (i) pricing below the level necessary to sell their products, or (ii) pricing below some appropriate measure of cost. An agreement without these features would either leave respondents in the same position as would market forces or would actually benefit respondents by raising market prices. Respondents therefore may not complain of conspiracies that, for example, set maximum prices above market levels, or that set minimum prices at *any* level.

106 S.Ct. 1348
475 U.S. 574, 106 S.Ct. 1348, 7 ITRD 2057, 89 L.Ed.2d 538, 54 USLW 4319, 1986-1 Trade Cases P 67,004, 4
Fed.R.Serv.3d 368
**(Cite as: 475 U.S. 574, 106 S.Ct. 1348)**

FN9. We do not consider whether recovery should *ever* be available on a theory such as respondents' when the pricing in question is above some measure of incremental cost. See generally Areeda & Turner, Predatory Pricing and Related Practices Under Section 2 of the Sherman Act, 88 Harv.L.Rev. 697, 709-718 (1975) (discussing cost-based test for use in § 2 cases). As a practical matter, it may be that only direct evidence of below-cost pricing is sufficient to overcome the strong inference that rational businesses would not enter into conspiracies such as this one. See Part IV-A, *infra.*

### III

[3] To survive petitioners' motion for summary judgment,[FN10] respondents must establish that there is a genuine issue of material *586 as to whether petitioners entered into an illegal conspiracy that caused respondents to suffer a cognizable injury. Fed.Rule Civ.Proc. 56(e);[FN11] *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 288-289, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569 (1968). This showing has two components. First, respondents must show more than a conspiracy in violation of the antitrust laws; they must show an injury to them resulting from the illegal conduct. Respondents charge petitioners with a whole host of conspiracies in restraint of trade. *Supra,* at 1354. Except for the alleged conspiracy to monopolize the American market through predatory pricing, these alleged conspiracies could not have caused respondents to suffer an "antitrust injury," **1356 *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S., at 489, 97 S.Ct., at 697, because they actually tended to benefit respondents. *Supra,* at 1354. Therefore, unless, in context, evidence of these "other" conspiracies raises a genuine issue concerning the existence of a predatory pricing conspiracy, that evidence cannot defeat petitioners' summary judgment motion.

FN10. Respondents argued before the District Court that petitioners had failed to

carry their initial burden under Federal Rule of Civil Procedure 56(c) of demonstrating the absence of a genuine issue of material fact. See *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). Cf. *Catrett v. Johns-Manville Sales Corp.,* 244 U.S.App.D.C. 160, 756 F.2d 181,cert. granted, 474 U.S. 944, 106 S.Ct. 342, 88 L.Ed.2d 285 (1985). That issue was resolved in petitioners' favor, and is not before us.

FN11. Rule 56(e) provides, in relevant part:
"When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him."

Second, the issue of fact must be "genuine." Fed.Rules Civ.Proc. 56(c), (e). When the moving party has carried its burden under Rule 56(c),[FN12] its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. See *DeLuca v. Atlantic Refining Co.,* 176 F.2d 421, 423 (CA2 1949) (L. Hand, J.), cert. denied, 338 U.S. 943, 70 S.Ct. 423, 94 L.Ed. 581 (1950); 10A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2727 (1983); Clark, Special Problems*587 in Drafting and Interpreting Procedural Codes and Rules, 3 Vand.L.Rev. 493, 504-505 (1950). Cf. *Sartor v. Arkansas Natural Gas Corp.,* 321 U.S. 620, 627, 64 S.Ct. 724, 728, 88 L.Ed. 967 (1944). In the language of the Rule, the nonmoving party must come forward with "specific facts showing that there is a *genuine issue for trial.*" Fed.Rule Civ.Proc. 56(e) (emphasis added). See also Advisory Committee Note to 1963 Amendment of Fed.Rule Civ.Proc. 56(e), 28 U.S.C.App., p. 626 (purpose of summary judgment

475 U.S. 574, 106 S.Ct. 1348, 7 ITRD 2057, 89 L.Ed.2d 538, 54 USLW 4319, 1986-1 Trade Cases P 67,004, 4 Fed.R.Serv.3d 368

**(Cite as: 475 U.S. 574, 106 S.Ct. 1348)**

is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial"). Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no "genuine issue for trial." *Cities Service, supra,* 391 U.S., at 289, 88 S.Ct., at 1592.

FN12. See n. 10, *supra.*

It follows from these settled principles that if the factual context renders respondents' claim implausible-if the claim is one that simply makes no economic sense-respondents must come forward with more persuasive evidence to support their claim than would otherwise be necessary. *Cities Service* is instructive. The issue in that case was whether proof of the defendant's refusal to deal with the plaintiff supported an inference that the defendant willingly had joined an illegal boycott. Economic factors strongly suggested that the defendant had no motive to join the alleged conspiracy. 391 U.S., at 278-279, 88 S.Ct., at 1587. The Court acknowledged that, in isolation, the defendant's refusal to deal might well have sufficed to create a triable issue. *Id.,* at 277, 88 S.Ct., at 1586. But the refusal to deal had to be evaluated in its factual context. Since the defendant lacked any rational motive to join the alleged boycott, and since its refusal to deal was consistent with the defendant's independent interest, the refusal to deal could not by itself support a finding of antitrust liability. *Id.,* at 280, 88 S.Ct., at 1588.

[4] Respondents correctly note that "[o]n summary judgment the inferences to be drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion." *United States v. Diebold, Inc.,* 369 **\*588** U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962). But antitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 case. Thus, in *Monsanto Co. v. Spray-Rite Service Corp.,* 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984), we held that conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust

conspiracy. *Id.,* at 764, 104 S.Ct., at 1470. See also *Cities Service, supra,* 391 U.S., at 280, 88 S.Ct., at 1588. To survive a motion for summary judgment or for a directed verdict, a plaintiff seeking damages for a violation of § 1 must present evidence "that tends to exclude the possibility" that the alleged conspirators acted independently. 465 U.S., at 764, 104 S.Ct., at 1471. Respondents in this case, in other words, must show that the inference of conspiracy is reasonable in light of the competing inferences of independent action or collusive action that **\*\*1357** could not have harmed respondents. See *Cities Service, supra,* 391 U.S., at 280, 88 S.Ct., at 1588.

Petitioners argue that these principles apply fully to this case. According to petitioners, the alleged conspiracy is one that is economically irrational and practically infeasible. Consequently, petitioners contend, they had no motive to engage in the alleged predatory pricing conspiracy; indeed, they had a strong motive *not* to conspire in the manner respondents allege. Petitioners argue that, in light of the absence of any apparent motive and the ambiguous nature of the evidence of conspiracy, no trier of fact reasonably could find that the conspiracy with which petitioners are charged actually existed. This argument requires us to consider the nature of the alleged conspiracy and the practical obstacles to its implementation.

IV

A

A predatory pricing conspiracy is by nature speculative. Any agreement to price below the competitive level requires the conspirators to forgo profits that free competition would offer them. The forgone profits may be considered an investment in the future. For the investment to be rational, **\*589** the conspirators must have a reasonable expectation of recovering, in the form of later monopoly profits, more than the losses suffered. As then-Professor Bork, discussing predatory pricing by a single firm, explained:

"Any realistic theory of predation recognizes that

475 U.S. 574, 106 S.Ct. 1348, 7 ITRD 2057, 89 L.Ed.2d 538, 54 USLW 4319, 1986-1 Trade Cases P 67,004, 4
Fed.R.Serv.3d 368
**(Cite as: 475 U.S. 574, 106 S.Ct. 1348)**

the predator as well as his victims will incur losses during the fighting, but such a theory supposes it may be a rational calculation for the predator to view the losses as an investment in future monopoly profits (where rivals are to be killed) or in future undisturbed profits (where rivals are to be disciplined). The future flow of profits, appropriately discounted, must then exceed the present size of the losses." R. Bork, The Antitrust Paradox 145 (1978).

See also McGee, Predatory Pricing Revisited, 23 J.Law & Econ. 289, 295-297 (1980). As this explanation shows, the success of such schemes is inherently uncertain: the short-run loss is definite, but the long-run gain depends on successfully neutralizing the competition. Moreover, it is not enough simply to achieve monopoly power, as monopoly pricing may breed quick entry by new competitors eager to share in the excess profits. The success of any predatory scheme depends on *maintaining* monopoly power for long enough both to recoup the predator's losses and to harvest some additional gain. Absent some assurance that the hoped-for monopoly will materialize, *and* that it can be sustained for a significant period of time, "[t]he predator must make a substantial investment with no assurance that it will pay off." Easterbrook, Predatory Strategies and Counterstrategies, 48 U.Chi.L.Rev. 263, 268 (1981). For this reason, there is a consensus among commentators that predatory pricing schemes are rarely tried, and even more rarely successful. See, *e.g.,* Bork, *supra,* at 149-155; Areeda & Turner, Predatory Pricing and Related Practices Under Section 2 of the Sherman Act, 88 Harv.L.Rev. 697, 699 (1975); Easterbrook, *supra;* Koller, The Myth of Predatory Pricing-An Empirical Study, **\*590** 4 Antitrust Law & Econ.Rev. 105 (1971); McGee, Predatory Price Cutting: The *Standard Oil (N.J.) Case,* 1 J.Law & Econ. 137 (1958); McGee, Predatory Pricing Revisited, 23 J.Law & Econ., at 292-294. See also *Northeastern Telephone Co. v. American Telephone & Telegraph Co.,* 651 F.2d 76, 88 (CA2 1981) ("[N]owhere in the recent outpouring of literature on the subject do commentators suggest that [predatory] pricing is either common or likely to increase"), cert. denied, 455 U.S. 943, 102 S.Ct. 1438, 71 L.Ed.2d 654

(1982).

These observations apply even to predatory pricing by a *single firm* seeking monopoly power. In this case, respondents allege that a large number of firms have conspired over a period of many years to **\*\*1358** charge below-market prices in order to stifle competition. Such a conspiracy is incalculably more difficult to execute than an analogous plan undertaken by a single predator. The conspirators must allocate the losses to be sustained during the conspiracy's operation, and must also allocate any gains to be realized from its success. Precisely because success is speculative and depends on a willingness to endure losses for an indefinite period, each conspirator has a strong incentive to cheat, letting its partners suffer the losses necessary to destroy the competition while sharing in any gains if the conspiracy succeeds. The necessary allocation is therefore difficult to accomplish. Yet if conspirators cheat to any substantial extent, the conspiracy must fail, because its success depends on depressing the market price for *all* buyers of CEPs. If there are too few goods at the artificially low price to satisfy demand, the would-be victims of the conspiracy can continue to sell at the "real" market price, and the conspirators suffer losses to little purpose.

Finally, if predatory pricing conspiracies are generally unlikely to occur, they are especially so where, as here, the prospects of attaining monopoly power seem slight. In order to recoup their losses, petitioners must obtain enough market power to set higher than competitive prices, and then must sustain those prices long enough to earn in excess profits**\*591** what they earlier gave up in below-cost prices. See *Northeastern Telephone Co. v. American Telephone & Telegraph Co., supra,* at 89; Areeda & Turner, 88 Harv.L.Rev., at 698. Two decades after their conspiracy is alleged to have commenced,FN13 petitioners appear to be far from achieving this goal: the two largest shares of the retail market in television sets are held by RCA and respondent Zenith, not by any of petitioners. 6 App. to Brief for Appellant in No. 81-2331 (CA3), pp. 2575a-2576a. Moreover, those shares, which together approximate 40% of sales, did not decline

475 U.S. 574, 106 S.Ct. 1348, 7 ITRD 2057, 89 L.Ed.2d 538, 54 USLW 4319, 1986-1 Trade Cases P 67,004, 4 Fed.R.Serv.3d 368

**(Cite as: 475 U.S. 574, 106 S.Ct. 1348)**

appreciably during the 1970's. *Ibid.* Petitioners' collective share rose rapidly during this period, from one-fifth or less of the relevant markets to close to 50%. 723 F.2d, at 316.[FN14] Neither the District Court nor the Court of Appeals found, however, that petitioners' share presently allows them to charge monopoly prices; to the contrary, respondents contend that the conspiracy is ongoing-that petitioners are still artificially *depressing* the market price in order to drive Zenith out of the market. The data in the record strongly suggest that that goal is yet far distant.[FN15]

> FN13. NUE's complaint alleges that petitioners' conspiracy began as early as 1960; the starting date used in Zenith's complaint is 1953. NUE Complaint ¶ 52; Zenith Complaint ¶ 39.
>
> FN14. During the same period, the number of American firms manufacturing television sets declined from 19 to 13. 5 App. to Brief for Appellant in No. 81-2331 (CA3), p. 1961a. This decline continued a trend that began at least by 1960, when petitioners' sales in the United States market were negligible. *Ibid.* See Zenith Complaint ¶¶ 35, 37.
>
> FN15. Respondents offer no reason to suppose that entry into the relevant market is especially difficult, yet without barriers to entry it would presumably be impossible to maintain supracompetitive prices for an extended time. Judge Easterbrook, commenting on this case in a law review article, offers the following sensible assessment:
>
> "The plaintiffs [in this case] maintain that for the last fifteen years or more at least ten Japanese manufacturers have sold TV sets at less than cost in order to drive United States firms out of business. Such conduct cannot possibly produce profits by harming competition, however. If the Japanese firms drive some United States firms out of business, they could not re-

coup. Fifteen years of losses could be made up only by very high prices for the indefinite future. (The losses are like investments, which must be recovered with compound interest.) If the defendants should try to raise prices to such a level, they would attract new competition. There are no barriers to entry into electronics, as the proliferation of computer and audio firms shows. The competition would come from resurgent United States firms, from other foreign firms (Korea and many other nations make TV sets), and from defendants themselves. In order to recoup, the Japanese firms would need to suppress competition among themselves. On plaintiffs' theory, the cartel would need to last at least thirty years, far longer than any in history, even when cartels were not illegal. None should be sanguine about the prospects of such a cartel, given each firm's incentive to shave price and expand its share of sales. The predation-recoupment story therefore does not make sense, and we are left with the more plausible inference that the Japanese firms did not sell below cost in the first place. They were just engaged in hard competition." Easterbrook, The Limits of Antitrust, 63 Texas L.Rev. 1, 26-27 (1984) (footnotes omitted).

**\*592 \*\*1359** The alleged conspiracy's failure to achieve its ends in the two decades of its asserted operation is strong evidence that the conspiracy does not in fact exist. Since the losses in such a conspiracy accrue before the gains, they must be "repaid" with interest. And because the alleged losses have accrued over the course of two decades, the conspirators could well require a correspondingly long time to recoup. Maintaining supracompetitive prices in turn depends on the continued cooperation of the conspirators, on the inability of other would-be competitors to enter the market, and (not incidentally) on the conspirators' ability to escape antitrust liability for their *minimum* price-fixing cartel.[FN16] Each of these factors weighs more

106 S.Ct. 1348
475 U.S. 574, 106 S.Ct. 1348, 7 ITRD 2057, 89 L.Ed.2d 538, 54 USLW 4319, 1986-1 Trade Cases P 67,004, 4
Fed.R.Serv.3d 368
**(Cite as: 475 U.S. 574, 106 S.Ct. 1348)**

heavily as the time needed to recoup losses grows. If the losses have been substantial-as would likely be necessary**593** in order to drive out the competition [FN17] -petitioners would most likely have to sustain their cartel for years simply to break even.

> FN16. The alleged predatory scheme makes sense only if petitioners can recoup their losses. In light of the large number of firms involved here, petitioners can achieve this only by engaging in some form of price fixing *after* they have succeeded in driving competitors from the market. Such price fixing would, of course, be an independent violation of § 1 of the Sherman Act. *United States v. Socony-Vacuum Oil Co.,* 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940).

> FN17. The predators' losses must actually *increase* as the conspiracy nears its objective: the greater the predators' market share, the more products the predators sell; but since every sale brings with it a loss, an increase in market share also means an increase in predatory losses.

Nor does the possibility that petitioners have obtained supracompetitive profits in the Japanese market change this calculation. Whether or not petitioners have the *means* to sustain substantial losses in this country over a long period of time, they have no *motive* to sustain such losses absent some strong likelihood that the alleged conspiracy in this country will eventually pay off. The courts below found no evidence of any such success, and-as indicated above-the facts actually are to the contrary: RCA and Zenith, not any of the petitioners, continue to hold the largest share of the American retail market in color television sets. More important, there is nothing to suggest any relationship between petitioners' profits in Japan and the amount petitioners could expect to gain from a conspiracy to monopolize the American market. In the absence of any such evidence, the possible existence of supracompetitive profits in Japan simply cannot overcome the economic obstacles to the ultimate success of

this alleged predatory conspiracy. [FN18]

> FN18. The same is true of any supposed excess production capacity that petitioners may have possessed. The existence of plant capacity that exceeds domestic demand does tend to establish the ability to sell products abroad. It does not, however, provide a motive for selling at prices lower than necessary to obtain sales; nor does it explain why petitioners would be willing to *lose* money in the United States market without some reasonable prospect of recouping their investment.

### B

In *Monsanto,* we emphasized that courts should not permit factfinders to infer conspiracies when such inferences are implausible, because the effect of such practices is often to deter procompetitive conduct. *Monsanto,* 465 U.S., at 762-764, 104 S.Ct., at 1470. ***594** Respondents, petitioners' competitors, seek to hold petitioners liable for ****1360** damages caused by the alleged conspiracy to cut prices. Moreover, they seek to establish this conspiracy indirectly, through evidence of other combinations (such as the check-price agreements and the five company rule) whose natural tendency is to raise prices, and through evidence of rebates and other price-cutting activities that respondents argue tend to prove a combination to suppress prices. [FN19] But cutting prices in order to increase business often is the very essence of competition. Thus, mistaken inferences in cases such as this one are especially costly, because they chill the very conduct the antitrust laws are designed to protect. See *Monsanto, supra,* at 763-764, 104 S.Ct., at 1470. "[W]e must be concerned lest a rule or precedent that authorizes a search for a particular type of undesirable pricing behavior end up by discouraging legitimate price competition." *Barry Wright Corp. v. ITT Grinnell Corp.,* 724 F.2d 227, 234 (CA1 1983).

> FN19. Respondents also rely on an expert study suggesting that petitioners have sold their products in the American market at

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

106 S.Ct. 1348                                                                    Page 14
475 U.S. 574, 106 S.Ct. 1348, 7 ITRD 2057, 89 L.Ed.2d 538, 54 USLW 4319, 1986-1 Trade Cases P 67,004, 4
Fed.R.Serv.3d 368
**(Cite as: 475 U.S. 574, 106 S.Ct. 1348)**

substantial losses. The relevant study is not based on actual cost data; rather, it consists of expert opinion based on a mathematical construction that in turn rests on assumptions about petitioners' costs. The District Court analyzed those assumptions in some detail and found them both implausible and inconsistent with record evidence. *Zenith Radio Corp. v. Matsushita Electric Industrial Co.,* 505 F.Supp., at 1356-1363. Although the Court of Appeals reversed the District Court's finding that the expert report was inadmissible, the court did not disturb the District Court's analysis of the factors that substantially undermine the probative value of that evidence. See 723 F.2d, at 277-282. We find the District Court's analysis persuasive. Accordingly, in our view the expert opinion evidence of below-cost pricing has little probative value in comparison with the economic factors, discussed in Part IV-A, *supra,* that suggest that such conduct is irrational.

In most cases, this concern must be balanced against the desire that illegal conspiracies be identified and punished. That balance is, however, unusually one-sided in cases such as this one. As we earlier explained, *supra,* at 1357-1359, predatory pricing schemes require conspirators to suffer losses in order eventually to realize their illegal gains; moreover, the **\*595** gains depend on a host of uncertainties, making such schemes more likely to fail than to succeed. These economic realities tend to make predatory pricing conspiracies self-deterring: unlike most other conduct that violates the antitrust laws, failed predatory pricing schemes are costly to the conspirators. See Easterbrook, The Limits of Antitrust, 63 Texas L.Rev. 1, 26 (1984). Finally, unlike predatory pricing by a single firm, *successful* predatory pricing conspiracies involving a large number of firms can be identified and punished once they succeed, since some form of minimum price-fixing agreement would be necessary in order to reap the benefits of predation. Thus, there is little reason to be concerned that by granting summary judgment in cases where the evidence of

conspiracy is speculative or ambiguous, courts will encourage such conspiracies.

V

As our discussion in Part IV-A shows, petitioners had no motive to enter into the alleged conspiracy. To the contrary, as presumably rational businesses, petitioners had every incentive *not* to engage in the conduct with which they are charged, for its likely effect would be to generate losses for petitioners with no corresponding gains. Cf. *Cities Service,* 391 U.S., at 279, 88 S.Ct., at 1587. The Court of Appeals did not take account of the absence of a plausible motive to enter into the alleged predatory pricing conspiracy. It focused instead on whether there was "direct evidence of concert of action." 723 F.2d, at 304. The Court of Appeals erred in two respects: (i) the "direct evidence" on which the court relied had little, if any, relevance to the alleged predatory pricing conspiracy; and (ii) the court failed to consider the absence of a plausible motive to engage in predatory pricing.

**\*\*1361** The "direct evidence" on which the court relied was evidence of *other* combinations, not of a predatory pricing conspiracy. Evidence that petitioners conspired to raise prices in Japan provides little, if any, support for respondents' **\*596** claims: a conspiracy to increase profits in one market does not tend to show a conspiracy to sustain losses in another. Evidence that petitioners agreed to fix *minimum* prices (through the check-price agreements) for the American market actually works in petitioners' favor, because it suggests that petitioners were seeking to place a floor under prices rather than to lower them. The same is true of evidence that petitioners agreed to limit the number of distributors of their products in the American market-the so-called five company rule. That practice may have facilitated a horizontal territorial allocation, see *United States v. Topco Associates, Inc.,* 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972), but its natural effect would be to raise market prices rather than reduce them.[FN20] Evidence that tends to support any of these collateral conspiracies thus says little, if anything, about the existence of a conspiracy to

106 S.Ct. 1348
475 U.S. 574, 106 S.Ct. 1348, 7 ITRD 2057, 89 L.Ed.2d 538, 54 USLW 4319, 1986-1 Trade Cases P 67,004, 4
Fed.R.Serv.3d 368
**(Cite as: 475 U.S. 574, 106 S.Ct. 1348)**

charge below-market prices in the American market over a period of two decades.

> FN20. The Court of Appeals correctly reasoned that the five company rule might tend to insulate petitioners from competition with each other. 723 F.2d, at 306. But this effect is irrelevant to a conspiracy to price predatorily. Petitioners have no incentive to underprice each other if they already are pricing *below* the level at which they could sell their goods. The far more plausible inference from a customer allocation agreement such as the five company rule is that petitioners were conspiring to *raise* prices, by limiting their ability to take sales away from each other. Respondents-petitioners' competitors-suffer no harm from a conspiracy to raise prices. *Supra,* at 1354. Moreover, it seems very unlikely that the five company rule had any significant effect of any kind, since the "rule" permitted petitioners to sell to their American subsidiaries, and did not limit the number of distributors to which the subsidiaries could resell. 513 F.Supp., at 1190.

That being the case, the absence of any plausible motive to engage in the conduct charged is highly relevant to whether a "genuine issue for trial" exists within the meaning of Rule 56(e). Lack of motive bears on the range of permissible conclusions that might be drawn from ambiguous evidence: if petitioners had no rational economic motive to conspire, and if their conduct is consistent with other, equally plausible explanations,**\*597** the conduct does not give rise to an inference of conspiracy. See *Cities Service, supra,* 391 U.S., at 278-280, 88 S.Ct., at 1587-1588. Here, the conduct in question consists largely of (i) pricing at levels that succeeded in taking business away from respondents, and (ii) arrangements that may have limited petitioners' ability to compete with each other (and thus kept prices from going even lower). This conduct suggests either that petitioners behaved competitively, or that petitioners conspired to *raise* prices.

Neither possibility is consistent with an agreement among 21 companies to price below-market levels. Moreover, the predatory pricing scheme that this conduct is said to prove is one that makes no practical sense: it calls for petitioners to destroy companies larger and better established than themselves, a goal that remains far distant more than two decades after the conspiracy's birth. Even had they succeeded in obtaining their monopoly, there is nothing in the record to suggest that they could recover the losses they would need to sustain along the way. In sum, in light of the absence of any rational motive to conspire, neither petitioners' pricing practices, nor their conduct in the Japanese market, nor their agreements respecting prices and distribution in the American market, suffice to create a "genuine issue for trial." Fed.Rule Civ.Proc. 56(e).<sup>FN21</sup>

> FN21. We do not imply that, if petitioners had had a plausible reason to conspire, ambiguous conduct could suffice to create a triable issue of conspiracy. Our decision in *Monsanto Co. v. Spray-Rite Service Corp.,* 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984), establishes that conduct that is as consistent with permissible competition as with illegal conspiracy does not, without more, support even an inference of conspiracy. *Id.,* at 763-764, 104 S.Ct., at 1470. See *supra,* at 1356.

**\*\*1362** On remand, the Court of Appeals is free to consider whether there is other evidence that is sufficiently unambiguous to permit a trier of fact to find that petitioners conspired to price predatorily for two decades despite the absence of any apparent motive to do so. The evidence must "ten[d] to exclude the possibility" that petitioners underpriced respondents to compete for business rather than to implement an economically**\*598** senseless conspiracy. *Monsanto,* 465 U.S., at 764, 104 S.Ct., at 1471. In the absence of such evidence, there is no "genuine issue for trial" under Rule 56(e), and petitioners are entitled to have summary judgment reinstated.

475 U.S. 574, 106 S.Ct. 1348, 7 ITRD 2057, 89 L.Ed.2d 538, 54 USLW 4319, 1986-1 Trade Cases P 67,004, 4 Fed.R.Serv.3d 368
**(Cite as: 475 U.S. 574, 106 S.Ct. 1348)**

## VI

Our decision makes it unnecessary to reach the sovereign compulsion issue. The heart of petitioners' argument on that issue is that MITI, an agency of the Government of Japan, required petitioners to fix minimum prices for export to the United States, and that petitioners are therefore immune from antitrust liability for any scheme of which those minimum prices were an integral part. As we discussed in Part II, *supra,* respondents could not have suffered a cognizable injury from any action that *raised* prices in the American CEP market. If liable at all, petitioners are liable for conduct that is distinct from the check-price agreements. The sovereign compulsion question that both petitioners and the Solicitor General urge us to decide thus is not presented here.

The decision of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

Justice WHITE, with whom Justice BRENNAN, Justice BLACKMUN, and Justice STEVENS join, dissenting.

It is indeed remarkable that the Court, in the face of the long and careful opinion of the Court of Appeals, reaches the result it does. The Court of Appeals faithfully followed the relevant precedents, including *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968), and *Monsanto Co. v. Spray-Rite Service Corp.,* 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984), and it kept firmly in mind the principle that proof of a conspiracy should not be fragmented, see *Continental Ore Co. v. Union Carbide & Carbon Corp.,* 370 U.S. 690, 699, 82 S.Ct. 1404, 1410, 8 L.Ed.2d 777 (1962). After surveying the massive record, including very **\*599** significant evidence that the District Court erroneously had excluded, the Court of Appeals concluded that the evidence taken as a whole creates a genuine issue of fact whether petitioners engaged in a conspiracy in violation of §§ 1 and 2 of the Sherman

Act and § 2(a) of the Robinson-Patman Act. In my view, the Court of Appeals' opinion more than adequately supports this judgment.

The Court's opinion today, far from identifying reversible error, only muddies the waters. In the first place, the Court makes confusing and inconsistent statements about the appropriate standard for granting summary judgment. Second, the Court makes a number of assumptions that invade the factfinder's province. Third, the Court faults the Third Circuit for nonexistent errors and remands the case although it is plain that respondents' evidence raises genuine issues of material fact.

## I

The Court's initial discussion of summary judgment standards appears consistent with settled doctrine. I agree that **\*\*1363** "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.' " *Ante,* at 1356 (quoting *Cities Service, supra,* 391 U.S., at 289, 88 S.Ct., at 1592). I also agree that " '[o]n summary judgment the inferences to be drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion.' " *Ante,* at 1356 (quoting *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962)). But other language in the Court's opinion suggests a departure from traditional summary judgment doctrine. Thus, the Court gives the following critique of the Third Circuit's opinion:

"[T]he Court of Appeals concluded that a reasonable factfinder could find a conspiracy to depress prices in the American market in order to drive out American competitors, which conspiracy was funded by excess profits obtained in the Japanese market. The court apparently did not consider whether it was as plausible to conclude **\*600** that petitioners' price-cutting behavior was independent and not conspiratorial." *Ante,* at 1353.

In a similar vein, the Court summarizes *Monsanto Co. v. Spray-Rite Service Corp., supra,* as holding that "courts should not permit factfinders to infer

106 S.Ct. 1348                                                                                    Page 17
475 U.S. 574, 106 S.Ct. 1348, 7 ITRD 2057, 89 L.Ed.2d 538, 54 USLW 4319, 1986-1 Trade Cases P 67,004, 4
Fed.R.Serv.3d 368
**(Cite as: 475 U.S. 574, 106 S.Ct. 1348)**

conspiracies when such inferences are implausible...." *Ante,* at 1360. Such language suggests that a judge hearing a defendant's motion for summary judgment in an antitrust case should go beyond the traditional summary judgment inquiry and decide for himself whether the weight of the evidence favors the plaintiff. *Cities Service* and *Monsanto* do not stand for any such proposition. Each of those cases simply held that a particular piece of evidence standing alone was insufficiently probative to justify sending a case to the jury.[FN1] These holdings in no way undermine\*601 the doctrine that all evidence must be construed in the light most favorable to the party opposing summary judgment.

> FN1. The Court adequately summarizes the quite fact-specific holding in *Cities Service. Ante,* at 1356.
> In *Monsanto,* the Court held that a manufacturer's termination of a price-cutting distributor after receiving a complaint from another distributor is not, *standing alone,* sufficient to create a jury question. 465 U.S., at 763-764, 104 S.Ct., at 1470. To understand this holding, it is important to realize that under *United States v. Colgate & Co.,* 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919), it is permissible for a manufacturer to announce retail prices in advance and terminate those who fail to comply, but that under *Dr. Miles Medical Co. v. John D. Park & Sons Co.,* 220 U.S. 373, 31 S.Ct. 376, 55 L.Ed. 502 (1911), it is impermissible for the manufacturer and its distributors to agree on the price at which the distributors will sell the goods. Thus, a manufacturer's termination of a price-cutting distributor after receiving a complaint from another distributor is lawful under *Colgate, unless* the termination is pursuant to a shared understanding between the manufacturer and its distributors respecting enforcement of a resale price maintenance scheme. *Monsanto* holds that to establish liability under *Dr. Miles,* more is needed than evidence of behavior that is consistent with a distributor's

exercise of its prerogatives under *Colgate.* Thus, "[t]here must be evidence that tends to exclude the possibility that the manufacturer and nonterminated distributors were acting independently." 465 U.S., at 764, 104 S.Ct., at 1471. *Monsanto* does *not* hold that if a terminated dealer produces some further evidence of conspiracy beyond the bare fact of postcomplaint termination, the judge hearing a motion for summary judgment should balance all the evidence pointing toward conspiracy against all the evidence pointing toward independent action.

If the Court intends to give every judge hearing a motion for summary judgment in an antitrust case the job of determining if the evidence makes the inference of conspiracy more probable than not, it is overturning settled law. If the Court does not intend such a pronouncement, it should refrain from using unnecessarily broad and confusing language.

II

In defining what respondents must show in order to recover, the Court makes assumptions\*\*1364 that invade the factfinder's province. The Court states with very little discussion that respondents can recover under § 1 of the Sherman Act only if they prove that "petitioners conspired to drive respondents out of the relevant markets by (i) pricing below the level necessary to sell their products, or (ii) pricing below some appropriate measure of cost." *Ante,* at 1355, n. 8. This statement is premised on the assumption that "[a]n agreement without these features would either leave respondents in the same position as would market forces or would actually benefit respondents by raising market prices." *Ibid.* In making this assumption, the Court ignores the contrary conclusions of respondents' expert DePodwin, whose report in very relevant part was erroneously excluded by the District Court.

The DePodwin Report, on which the Court of Appeals relied along with other material, indicates that respondents were harmed in two ways that are independent of whether petitioners priced their products

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

475 U.S. 574, 106 S.Ct. 1348, 7 ITRD 2057, 89 L.Ed.2d 538, 54 USLW 4319, 1986-1 Trade Cases P 67,004, 4 Fed.R.Serv.3d 368
**(Cite as: 475 U.S. 574, 106 S.Ct. 1348)**

below "the level necessary to sell their products or ... some appropriate measure of cost." *Ibid.* First, the Report explains that the price-raising scheme in Japan resulted in lower consumption of petitioners' goods in that country and the exporting of more of petitioners' goods to this country than would have occurred had prices in Japan been at the competitive level. Increasing exports **\*602** to this country resulted in depressed prices here, which harmed respondents.[FN2] Second, the DePodwin Report indicates that petitioners exchanged confidential proprietary information and entered into agreements such as the five company rule with the goal of avoiding intragroup competition in the United States market. The Report explains that petitioners' restrictions on intragroup competition caused respondents to lose business that they would not have lost had petitioners competed with one another.[FN3]

> FN2. Dr. DePodwin summarizes his view of the harm caused by Japanese cartelization as follows:
>
> "When we consider the injuries inflicted on United States producers, we must again look at the Japanese television manufacturers' export agreement as part of a generally collusive scheme embracing the Japanese domestic market as well. This scheme increased the supply of television receivers to the United States market while restricting supply in the Japanese market. If Japanese manufacturers had competed in both domestic and export markets, they would have sold more in the domestic market and less in the United States. A greater proportion of Japanese production capacity would have been devoted to domestic sales. Domestic prices would have been lower and export prices would have been higher. The size of the price differential between domestic and export markets would have diminished practically to the vanishing point. Consequently, competition among Japanese producers in both markets would have resulted in reducing exports to the United States and United States prices would have risen. In addition,

investment by the United States industry would have increased. As it was, however, the influx of sets at depressed prices cut the rates of return on television receiver production facilities in the United States to so low a level as to make such investment uneconomic.

"We can therefore conclude that the American manufacturers of television receivers would have made larger sales at higher prices in the absence of the Japanese cartel agreements. Thus, the collusive behavior of Japanese television manufacturers resulted in a very severe injury to those American television manufacturers, particularly to National Union Electric Corporation, which produced a preponderance of television sets with screen sizes of nineteen inches and lower, especially those in the lower range of prices." 5 App. to Brief for Appellants in No. 81-2331 (CA3), pp. 1629a-1630a.

> FN3. The DePodwin Report has this, among other things, to say in summarizing the harm to respondents caused by the five company rule, exchange of production data, price coordination, and other allegedly anti-competitive practices of petitioners:
>
> "The impact of Japanese anti-competitive practices on United States manufacturers is evident when one considers the nature of competition. When a market is fully competitive, firms pit their resources against one another in an attempt to secure the business of individual customers. However, when firms collude, they violate a basic tenet of competitive behavior, i.e., that they act independently. United States firms were confronted with Japanese competitors who collusively were seeking to destroy their established customer relationships. Each Japanese company had targeted customers which it could service with reasonable assurance that its fellow Japanese cartel members would not be-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

106 S.Ct. 1348

475 U.S. 574, 106 S.Ct. 1348, 7 ITRD 2057, 89 L.Ed.2d 538, 54 USLW 4319, 1986-1 Trade Cases P 67,004, 4
Fed.R.Serv.3d 368
**(Cite as: 475 U.S. 574, 106 S.Ct. 1348)**

come involved. But just as importantly, each Japanese firm would be assured that what was already a low price level for Japanese television receivers in the United States market would not be further depressed by the actions of its Japanese associates.

"The result was a phenomenal growth in exports, particularly to the United States. Concurrently, Japanese manufacturers, and the defendants in particular, made large investments in new plant and equipment and expanded production capacity. It is obvious, therefore, that the effect of the Japanese cartel's concerted actions was to generate a larger volume of investment in the Japanese television industry than would otherwise have been the case. This added capacity both enabled and encouraged the Japanese to penetrate the United States market more deeply than they would have had they competed lawfully." *Id.,* at 1628a-1629a.

For a more complete statement of DePodwin's explanation of how the alleged cartel operated, and the harms it caused respondents, see *id.,* at 1609a-1642a. This material is summarized in a chart found *id.,* at 1633a.

**\*603 \*\*1365** The DePodwin Report alone creates a genuine factual issue regarding the harm to respondents caused by Japanese cartelization and by agreements restricting competition among petitioners in this country. No doubt the Court prefers its own economic theorizing to Dr. DePodwin's, but that is not a reason to deny the factfinder an opportunity to consider Dr. DePodwin's views on how petitioners' alleged collusion harmed respondents.FN4

> FN4. In holding that Parts IV and V of the Report had been improperly excluded, the Court of Appeals said:
>
> "The trial court found that DePodwin did not use economic expertise in reaching the opinion that the defendants participated in

a Japanese television cartel. 505 F.Supp. at 1342-46. We have examined the excluded portions of Parts IV and V in light of the admitted portions, and we conclude that this finding is clearly erroneous. As a result, the court also held the opinions to be unhelpful to the factfinder. What the court in effect did was to eliminate all parts of the report in which the expert economist, after describing the conditions in the respective markets, the opportunities for collusion, the evidence pointing to collusion, the terms of certain undisputed agreements, and the market behavior, expressed the opinion that there was concert of action consistent with plaintiffs' conspiracy theory. Considering the complexity of the economic issues involved, it simply cannot be said that such an opinion would not help the trier of fact to understand the evidence or determine that fact in issue." *In re Japanese Electronics Products Antitrust Litigation,* 723 F.2d 238, 280 (CA3 1983).

The Court of Appeals had similar views about Parts VI and VII.

**\*604** The Court, in discussing the unlikelihood of a predatory conspiracy, also consistently assumes that petitioners valued profit-maximization over growth. See, *e.g., ante,* at 1360. In light of the evidence that petitioners sold their goods in this country at substantial losses over a long period of time, see Part III-B, *infra,* I believe that this is an assumption that should be argued to the factfinder, not decided by the Court.

### III

In reversing the Third Circuit's judgment, the Court identifies two alleged errors: "(i) [T]he 'direct evidence' on which the [Court of Appeals] relied had little, if any, relevance to the alleged predatory pricing conspiracy; and (ii) the court failed to consider the absence of a plausible motive to engage in predatory pricing." *Ante,* at 1361. The Court's position is without substance.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

475 U.S. 574, 106 S.Ct. 1348, 7 ITRD 2057, 89 L.Ed.2d 538, 54 USLW 4319, 1986-1 Trade Cases P 67,004, 4
Fed.R.Serv.3d 368
**(Cite as: 475 U.S. 574, 106 S.Ct. 1348)**

A

The first claim of error is that the Third Circuit treated evidence regarding price fixing in Japan and the so-called five company rule and check prices as " 'direct evidence' of a conspiracy that injured respondents." *Ante,* at 1354 (citing *In re Japanese Electronics Products Antitrust Litigation,* 723 F.2d 238, 304-305 (CA3 1983)). The passage from the Third **\*605** Circuit's opinion in which the Court locates this alleged error makes what I consider to be a quite simple and correct observation, namely, that this case is distinguishable from traditional "conscious parallelism" cases, in that there is direct evidence of concert of action among petitioners. *Ibid.* The Third Circuit did not, as the Court implies, jump unthinkingly from this observation to the conclusion that evidence regarding the five company rule could support a finding of antitrust injury to respondents.[FN5] The Third **\*\*1366** Circuit twice specifically noted that horizontal agreements allocating customers, though illegal, do not ordinarily injure competitors of the agreeing parties. *Id.,* at 306, 310-311. However, after reviewing evidence of cartel activity in Japan, collusive establishment of dumping prices in this country, and long-term, below-cost sales, the Third Circuit held that a factfinder could reasonably conclude that the five company rule was not a simple price-raising device:

> FN5. I use the Third Circuit's analysis of the five company rule by way of example; the court did an equally careful analysis of the parts the cartel activity in Japan and the check prices could have played in an actionable conspiracy. See generally *id.,* at 303-311.
>
> In discussing the five-company rule, I do not mean to imply any conclusion on the validity of petitioners' sovereign compulsion defense. Since the Court does not reach this issue, I see no need of my addressing it.

"[A] factfinder might reasonably infer that the allocation of customers in the United States, com-

bined with price-fixing in Japan, was intended to permit concentration of the effects of dumping upon American competitors while eliminating competition among the Japanese manufacturers in either market." *Id.,* at 311.
I see nothing erroneous in this reasoning.

B

The Court's second charge of error is that the Third Circuit was not sufficiently skeptical of respondents' allegation that petitioners engaged in predatory pricing conspiracy. But **\*606** the Third Circuit is not required to engage in academic discussions about predation; it is required to decide whether respondents' evidence creates a genuine issue of material fact. The Third Circuit did its job, and remanding the case so that it can do the same job again is simply pointless.

The Third Circuit indicated that it considers respondents' evidence sufficient to create a genuine factual issue regarding long-term, below-cost sales by petitioners. *Ibid.* The Court tries to whittle away at this conclusion by suggesting that the "expert opinion evidence of below-cost pricing has little probative value in comparison with the economic factors ... that suggest that such conduct is irrational." *Ante,* at 1360, n. 19. But the question is not whether the Court finds respondents' experts persuasive, or prefers the District Court's analysis; it is whether, viewing the evidence in the light most favorable to respondents, a jury or other factfinder could reasonably conclude that petitioners engaged in long-term, below-cost sales. I agree with the Third Circuit that the answer to this question is "yes."

It is misleading for the Court to state that the Court of Appeals "did not disturb the District Court's analysis of the factors that substantially undermine the probative value of [evidence in the DePodwin Report respecting below-cost sales]." *Ibid.* The Third Circuit held that the exclusion of the portion of the DePodwin Report regarding below-cost pricing was erroneous because "the trial court ignored DePodwin's uncontradicted affidavit that all data relied on

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

475 U.S. 574, 106 S.Ct. 1348, 7 ITRD 2057, 89 L.Ed.2d 538, 54 USLW 4319, 1986-1 Trade Cases P 67,004, 4 Fed.R.Serv.3d 368

**(Cite as: 475 U.S. 574, 106 S.Ct. 1348)**

in his report were of the type on which experts in his field would reasonably rely." 723 F.2d, at 282. In short, the Third Circuit found DePodwin's affidavit sufficient to create a genuine factual issue regarding the correctness of his conclusion that petitioners sold below cost over a long period of time. Having made this determination, the court saw no need-nor do I-to address the District Court's analysis point by point. The District Court's criticisms of DePodwin's**607** methods are arguments that a factfinder should consider.

IV

Because I believe that the Third Circuit was correct in holding that respondents have demonstrated the existence of genuine issues of material fact, I would affirm **1367** the judgment below and remand this case for trial.

U.S.Pa.,1986.
Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.
475 U.S. 574, 106 S.Ct. 1348, 7 ITRD 2057, 89 L.Ed.2d 538, 54 USLW 4319, 1986-1 Trade Cases P 67,004, 4 Fed.R.Serv.3d 368

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2 F.3d 1112                                                                 Page 1

2 F.3d 1112, 62 Fair Empl.Prac.Cas. (BNA) 1484, 62 Empl. Prac. Dec. P 42,554, 2 A.D. Cases 1270, 3 A.D.D. 320, 4 NDLR P 187

**(Cite as: 2 F.3d 1112)**

Fitzpatrick v. City of Atlanta
C.A.11 (Ga.),1993.

United States Court of Appeals, Eleventh Circuit.
Walter FITZPATRICK, Wayne E. Hall, William J. Hutchinson, Thomas Jones, Darryl J. Levette, Miguelito Marcelli, Andre D. Mitchell, Dennis Bernard Thomas, Melvin Whitehead, Gregory Wilkinson, Alfonzo L. Williams, and Elton M. Worthy, Plaintiffs-Appellants,
v.
CITY OF ATLANTA, Defendant-Appellee.
**No. 92-8306.**

Sept. 27, 1993.

African-American fire fighters who suffered from bacterial disorder precluding their shaving their faces brought suit challenging fire department regulation requiring all fire fighters be clean shaven. Plaintiffs alleged that "no-beard" rule had a discriminatory disparate impact on African-Americans who suffer disproportionately from the disorder, and that rule was adopted for racially discriminatory reasons. Plaintiffs also asserted that rule discriminated against the handicapped in violation of the Rehabilitation Act. The United States District Court for the Northern District of Georgia, No. 1:89-cv-2917-RLV, Robert L. Vining, Jr., J., entered summary judgment in favor of city, and plaintiffs appealed. The Court of Appeals, Anderson, Circuit Judge, held that: (1) city's evidence concerning safe use of respirators established business necessity defense to claim that no-beard rule had disparate impact; (2) with respect to disparate treatment claim, plaintiffs failed to establish that safety justification for no-beard rule was a pretext for racial discrimination; and (3) city could not be held liable under the Rehabilitation Act in absence of evidence that an adequate reasonable accommodation was available.

Affirmed.
West Headnotes

**[1] Civil Rights 78 ⟷1140**

78 Civil Rights
    78II Employment Practices
        78k1140 k. Disparate Impact. Most Cited Cases
    (Formerly 78k153)
In order to establish Title VII liability for employer's nondiscriminatory actions or practices that have discriminatory effects, plaintiff must first demonstrate that challenged employment action or practice has a disproportionate adverse impact on category of persons protected by statute; once prima facie case has been made out, employer must show that challenged action was demonstrably necessary to meeting goal of the sort that, as a matter of law, qualifies as an important business goal for Title VII purposes. Civil Rights Act of 1964, § 703, as amended, 42 U.S.C.A. § 2000e-2.

**[2] Civil Rights 78 ⟷1140**

78 Civil Rights
    78II Employment Practices
        78k1140 k. Disparate Impact. Most Cited Cases
    (Formerly 78k153)
Upon a showing of "business necessity" by employer in a Title VII action based on discriminatory effects of nondiscriminatory actions or practices, challenged action or practice is deemed justifiable, its regrettable discriminatory effects notwithstanding; however, even after such a showing, plaintiff may still overcome proffered business necessity defense by demonstrating that there exist alternative policies with lesser discriminatory effects that would be comparably as effective at serving employer's identified business needs. Civil Rights Act of 1964, § 703, as amended, 42 U.S.C.A. § 2000e-2.

**[3] Civil Rights 78 ⟷1544**

78 Civil Rights
    78IV Remedies Under Federal Employment Discrimination Statutes

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2 F.3d 1112, 62 Fair Empl.Prac.Cas. (BNA) 1484, 62 Empl. Prac. Dec. P 42,554, 2 A.D. Cases 1270, 3 A.D.D. 320, 4 NDLR P 187
**(Cite as: 2 F.3d 1112)**

78k1543 Weight and Sufficiency of Evidence

78k1544 k. In General. Most Cited Cases

(Formerly 78k382.1)

Evidence presented by city established "business necessity" defense to claim by African-American fire fighters that regulation requiring that all male fire fighters be clean-shaven had discriminatory impact; city's allegation that safe use of respirators precluded facial hair that could interfere with forming a proper seal was supported by Occupational Safety and Health Administration (OSHA) regulation and by recommendations of three national organizations that set occupational safety and health standards. Civil Rights Act of 1964, § 703, as amended, 42 U.S.C.A. § 2000e-2.

**[4] Civil Rights 78 ☞1140**

78 Civil Rights

78II Employment Practices

78k1140 k. Disparate Impact. Most Cited Cases

(Formerly 78k153)

African-American fire fighters who brought suit alleging that fire department rule requiring fire fighters to be clean-shaven had discriminatory disparate impact on African-Americans in violation of Title VII failed to show availability of less discriminatory alternative that would satisfy safety concerns in connection with use of respirators; although plaintiffs, who suffered from bacterial disorder that precluded shaving, proposed allowing very short "shadow" beards, plaintiffs failed to establish that shadow beards were safe; plaintiffs also failed to show that partial shaving would be a viable and safe alternative. Civil Rights Act of 1964, § 703, as amended, 42 U.S.C.A. § 2000e-2.

**[5] Civil Rights 78 ☞1140**

78 Civil Rights

78II Employment Practices

78k1140 k. Disparate Impact. Most Cited Cases

(Formerly 78k153)

African-American fire fighters who brought Title VII disparate impact claim against city alleging that fire department regulation requiring all fire fighters be clean-shaven was adopted for purpose of removing from fire department group of African-American men who suffered from bacterial disorder which precluded their shaving failed to establish that city's proffered safety justification was a pretext for racial discrimination, based on fact that "no-beard" rule required for safe wearing of respirators was underinclusive in not banning wearing of respirators by persons with other hazardous facial conditions. Civil Rights Act of 1964, § 703, as amended, 42 U.S.C.A. § 2000e-2.

**[6] Civil Rights 78 ☞1218(4)**

78 Civil Rights

78II Employment Practices

78k1215 Discrimination by Reason of Handicap, Disability, or Illness

78k1218 Who Is Disabled; What Is Disability

78k1218(4) k. Employment Qualifications, Requirements, or Tests. Most Cited Cases

(Formerly 78k173.1)

**Civil Rights 78 ☞1225(3)**

78 Civil Rights

78II Employment Practices

78k1215 Discrimination by Reason of Handicap, Disability, or Illness

78k1225 Accommodations

78k1225(3) k. Particular Cases. Most Cited Cases

(Formerly 78k173.1)

Fire fighters who suffered from bacterial disorder which precluded their shaving failed to establish that fire department regulation requiring all fire fighters be clean shaven for safe use of respirators violated the Rehabilitation Act; fire fighters did not present evidence that allowing short "shadow" beards or shaving only portions of their faces that would come into contact with respirator seals constituted reasonable accommodations. Rehabilitation Act of 1973, § 504, 29 U.S.C.A. § 794.

**\*1113** Michael Weinstock, Weinstock & Scavo, Atlanta, GA, for plaintiffs-appellants.

2 F.3d 1112, 62 Fair Empl.Prac.Cas. (BNA) 1484, 62 Empl. Prac. Dec. P 42,554, 2 A.D. Cases 1270, 3 A.D.D. 320, 4 NDLR P 187
**(Cite as: 2 F.3d 1112)**

Miguelito Marcelli, pro se.
Overtis Hicks Brantley, City of Atlanta Law Dept., Atlanta, GA, for defendant-appellee.
Paul Bogas, EEOC, Washington, DC, Rosalind A. Rubens, Willie Jake Lovett, Jr., Atlanta, GA, for amicus EEOC.

Appeal from the United States District Court for the Northern District of Georgia.

Before FAY and ANDERSON, Circuit Judges, and RONEY, Senior Circuit Judge.

ANDERSON, Circuit Judge:

This suit was brought against the City of Atlanta ("the City") by several African-American firefighters employed by the Atlanta Department of Public Safety, Bureau of Fire Services ("the Fire Department") who suffer from a medical condition on account of which they cannot shave their faces. Plaintiffs challenge a fire department regulation that requires all firefighters to be clean-shaven. They allege (1) that this "no-beard" rule has a discriminatory disparate impact on African-Americans in violation of Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e *et seq.;* (2) that the no-beard rule was adopted for racially discriminatory reasons in violation of Title VII; (3) that the rule discriminates against the handicapped in violation of § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794(a); and (4) that the rule infringes the firefighters' constitutional right to substantive due process of law.[FN1] The City defends the policy, contending that the **1114** respirator masks used by firefighters cannot safely be worn by bearded men. The district court granted summary judgment for the City and the firefighters have appealed. For the reasons set forth below, we affirm the judgment of the district court.

> FN1. In their summary judgment papers the firefighters also stated that they were asserting a cause of action for illegal retaliation under Title VII, § 704(a), 42 U.S.C. § 2000e-3(a). They alleged that the Fire Department had retaliated against the plaintiff firefighters for their having filed this EEO action. *See* Firefighters' Memo Opposing

Summary Judgment (R-33-27-31). Although the magistrate judge and district court neglected to address this claim, we need not consider it as the firefighters have abandoned the issue, having failed to raise it in their brief on appeal.

## I. FACTS AND PROCEDURAL HISTORY

In order to breathe in smoke-filled environments, firefighters must wear respirators, otherwise known as positive pressure self-contained breathing apparatuses ("SCBA's"). For the SCBA mask to operate properly and safely, its edges must be able to seal securely to the wearer's face. The parties do not dispute that a wearer's long facial hair can interfere with the forming of a proper seal. In an attempt to address the hazard posed by such hair, the City Fire Department until 1982 enforced a policy requiring all male firefighters to be completely clean-shaven. *See* Bureau of Fire Services Standard Operating Procedure 88.9.

The twelve plaintiff-appellant firefighters in this case are all African-American men who suffer from pseudofolliculitis barbae ("PFB"), a bacterial disorder which causes men's faces to become infected if they shave them. It is generally recognized that PFB disproportionately afflicts African-American men. At least one of the appellants, firefighter Darryl Levette, has been fighting with the City over its no-beard policy for more than ten years. Levette first challenged the requirement in 1982. In response to his complaints, the City modified its policy in order to accommodate firefighters with PFB. *See* Bureau of Fire Services Standard Operating Procedure 82.5 (R-31-Exhib. 1, Attach. B).

Under the modified policy, firefighters with PFB were permitted to participate in a program known as the "shaving clinic." Shaving clinic participants were allowed to wear very short "shadow" beards, which were not to exceed length limits specified by a dermatologist employed by the City. To enforce these limits, the Fire Department subjected the participating firefighters to a series of periodic beard inspections. It was believed that so long as the

2 F.3d 1112, 62 Fair Empl.Prac.Cas. (BNA) 1484, 62 Empl. Prac. Dec. P 42,554, 2 A.D. Cases 1270, 3 A.D.D. 320, 4 NDLR P 187
**(Cite as: 2 F.3d 1112)**

shadow beards were kept very short, the SCBA masks would still be able to seal sufficiently well to enable the firefighters to use them safely.

In 1988, after one of the appellant firefighters, William Hutchinson, complained that he had been wrongly refused permission to participate in the shaving clinic, the City decided to reconsider the shadow beard policy. On the recommendation of Del Corbin, the City's then-Assistant Commissioner of Public Safety, the Fire Department decided that shadow beards would no longer be permitted, on the grounds that even shadow beards may interfere with the safe use of SCBA's.

On November 4, 1988, the Department of Public Safety issued Special Order 3.9, directing the Fire Department to resume enforcement of Bureau of Fire Services Standard Operating Procedure 88.9, the no-beard rule. Under the new policy, firefighters who cannot be clean-shaven must be removed from firefighting duty. Such persons may be transferred to non-firefighting positions within the Department, if suitable openings are available. They may also apply for other available positions with the City but are accorded no special priority and must compete on an equal basis with other eligible candidates. Under the new policy such persons are granted the right to be temporarily reassigned from firefighting duties for a one-time period of ninety days. Dep't of Pub. Safety, Special Order 3.9 (R-33-Exhib. A). Male firefighters who cannot shave and for whom non-firefighting positions are not available within the Department are terminated, once they have exhausted their ninety days of temporary reassignment.

Firefighter Hutchinson challenged the new policy by filing a charge with the U.S. Equal Employment Opportunity Commission ("EEOC") on December 14, 1988. In March 1989, the EEOC certified the charge as a "class" charge on behalf of all city firefighters adversely affected by the policy change. Magistrate's Report (R-43-2-3). The appellant firefighters initiated this suit on December 29, 1989. The district court issued and then extended a restraining order prohibiting the City from changing

the terms or conditions**1115** of the plaintiff firefighters' employment during the pendency of the litigation before the district court. (R-3; R-42). The City has kept the appellant firefighters on the payroll and has permitted them to continue reporting for work at their regular fire stations, but it has required them to perform various janitorial duties instead of their regular jobs. Magistrate's Report (R-43-2-5).

The City answered the complaint and moved for summary judgment. The district court referred that motion to a magistrate judge and on November 18, 1991, adopted the magistrate's recommendation that the motion be granted. District Court Order (R-53), *adopting* Magistrate's Report (R-43). This appeal followed.

## II. SUMMARY JUDGMENT STANDARD

### A. Introduction

Under Fed.R.Civ.P. 56(c), a moving party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." The substantive law applicable to the case determines which facts are material. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). "The district court should resolve all reasonable doubts about the facts in favor of the non-movant, and draw all justifiable inferences in his [or her] favor." *U.S. v. Four Parcels of Real Property,* 941 F.2d 1428, 1437 (11th Cir.1991) (en banc) (internal quotation marks and citations omitted).

In *Adickes v. Kress,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970), the Supreme Court instructed the federal courts to employ a two-part framework of shifting burdens to determine whether, as regards a given material fact, there exists a genuine issue precluding summary judgment. The operation of this framework was modified significantly in *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The current frame-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2 F.3d 1112, 62 Fair Empl.Prac.Cas. (BNA) 1484, 62 Empl. Prac. Dec. P 42,554, 2 A.D. Cases 1270, 3 A.D.D. 320, 4 NDLR P 187

**(Cite as: 2 F.3d 1112)**

work is set out below.

### B. Movant's Initial Burden

The movant's initial burden consists of a "responsibility [to] inform [ ] the ... court of the basis for its motion and [to] identify[ ] those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323, 106 S.Ct. at 2553. The nature of this responsibility varies, however, depending on whether the legal issues, as to which the facts in question pertain, are ones on which the movant or the non-movant would bear the burden of proof at trial.

### 1. For Issues on Which Movant Would Bear Burden of Proof at Trial

As interpreted by this court sitting en banc, *Celotex* requires that for issues on which the movant would bear the burden of proof at trial,

that party must show *affirmatively* the absence of a genuine issue of material fact: it must support its motion with credible evidence ... that would entitle it to a directed verdict if not controverted at trial. In other words, the moving party must show that, on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party. If the moving party makes such an affirmative showing, it is entitled to summary judgment unless the non-moving party, in response, come [s] forward with significant, probative evidence demonstrating the existence of a triable issue of fact.

*Four Parcels,* 941 F.2d at 1438 (citations and internal quotation marks omitted; emphasis in original).

### 2. For Issues on Which Non-Movant Would Bear Burden of Proof at Trial

For issues, however, on which the non-movant would bear the burden of proof at trial,

the moving party is not required to support its motion with affidavits or other similar material *negat-*

*ing* the opponent's claim in order to discharge this initial responsibility.**\*1116** Instead, the moving party simply may show [ ]-that is, point[ ] out to the district court-that there is an absence of evidence to support the non-moving party's case. Alternatively, the moving party may support its motion for summary judgment with affirmative evidence demonstrating that the non-moving party will be unable to prove its case at trial.

*Four Parcels,* 941 F.2d at 1437-38 (citations, footnote, and internal quotation marks omitted; emphasis in original).[FN2]

> FN2. In applying this rule, there has been some confusion among courts as to the nature of the showing required when the movant seeks to discharge the initial responsibility in the first of the two permitted manners-by demonstrating that there is an absence of evidence to prove a fact necessary to the non-movant's case. *See Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608-09 n. 8 (11th Cir.1991) (noting confusion). Although this confusion has largely been resolved in this circuit by prior decisions of this court, *see Four Parcels,* 941 F.2d at 1438 & n. 19; *Coats & Clark,* 929 F.2d at 608; *see also Celotex,* 477 U.S. at 332, 106 S.Ct. at 2555 (White, J., concurring); Melissa L. Nelkin, *One Step Forward, Two Steps Back: Summary Judgment After Celotex,* 40 Hastings L.J. 53, 68-69 (1988), it is not necessary for us to rehearse this body of law in this opinion, for on none of the grounds on which we decide this case does the City attempt to carry its movant's initial summary judgment burden by showing that the firefighters would lack evidence to prove at trial a necessary element of their case.

### C. Non-Movant's Responsibility Once Movant Satisfies Initial Burden

If the party moving for summary judgment fails to discharge the initial burden, then the motion must

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2 F.3d 1112, 62 Fair Empl.Prac.Cas. (BNA) 1484, 62 Empl. Prac. Dec. P 42,554, 2 A.D. Cases 1270, 3 A.D.D. 320, 4 NDLR P 187
**(Cite as: 2 F.3d 1112)**

be denied and the court need not consider what, if any, showing the non-movant has made. *Coats & Clark,* 929 F.2d at 608. If, however, the movant carries the initial summary judgment burden in one of the ways discussed above, responsibility then devolves upon the non-movant to show the existence of a genuine issue as to the material fact.[FN3]

> FN3. When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.
>
> Fed.R.Civ.P. 56(e). Where a non-moving party could with further discovery acquire evidence sufficient to carry his or her burden and avoid summary judgment, the party may move pursuant to Fed.R.Civ.P. 56(f) for a continuance to obtain further evidence.

### 1. For Issues on Which Movant Would Bear Burden of Proof at Trial

For issues on which the movant would bear the burden of proof at trial, the non-movant, in order to avoid summary judgment, must come forward with evidence sufficient to call into question the inference created by the movant's evidence on the particular material fact. Only if after introduction of the non-movant's evidence, the combined body of evidence presented by the two parties relevant to the material fact is still such that the movant would be entitled to a directed verdict at trial-that is, such that no reasonable jury could find for the non-movant-should the movant be permitted to prevail without a full trial on the issues. *Anderson,* 477 U.S. at 249-50, 106 S.Ct. at 2511.

### 2. For Issues on Which Non-Movant Would Bear

### Burden of Proof at Trial

For issues on which the non-movant would bear the burden of proof at trial, the means of rebuttal available to the non-movant vary depending on whether the movant put on evidence affirmatively negating the material fact or instead demonstrated an absence of evidence on the issue. Where the movant did the former, then the non-movant must respond with evidence sufficient to withstand a directed verdict motion at trial on the material fact sought to be negated. Where the movant did the latter, the non-movant must respond in one of two ways. First, he or she may show that the record in fact contains supporting evidence, sufficient to withstand a directed verdict motion, which was "overlooked or ignored" by the moving party, who has thus failed to meet the initial burden of showing an absence of evidence. *Celotex,* 477 U.S. at 332, 106 S.Ct. at 2557 (Brennan, J., dissenting). Second, he or she **\*1117** may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. *See* Melissa L. Nelkin, *One Step Forward, Two Steps Back: Summary Judgment After* Celotex, 40 Hastings L.J. 53, 82-83 (1988).

## III. STANDARD OF APPELLATE REVIEW

The court of appeals reviews grants of summary judgment de novo, applying the same legal standard employed by the district court in the first instance. *Browning v. Peyton,* 918 F.2d 1516, 1520 (11th Cir.1990). When reviewing a grant of summary judgment, the court of appeals may affirm if there exists any adequate ground for doing so, regardless of whether it is the one on which the district court relied. *Davis v. Liberty Mutual Ins. Co.,* 525 F.2d 1204, 1207 (5th Cir.1976)[FN4]; 10 C. Wright, A. Miller & M. Kane, *Federal Practice & Procedure: Civil* § 2716, at 658 (1983).

> FN4. In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 7

2 F.3d 1112, 62 Fair Empl.Prac.Cas. (BNA) 1484, 62 Empl. Prac. Dec. P 42,554, 2 A.D. Cases 1270, 3 A.D.D. 320, 4 NDLR P 187
**(Cite as: 2 F.3d 1112)**

### IV. DISCUSSION OF ISSUES ON APPEAL

The district court granted summary judgment for the City on each of the firefighters' four claims. On appeal the firefighters challenge those rulings. As explained below, we affirm the judgment of the district court on all four claims.

### A. Title VII Disparate Impact Claim

#### 1. Elements of Claim

[1] Title VII of the Civil Rights Act of 1964 prohibits employers covered by the statute from taking actions or engaging in practices that discriminate against workers or job applicants on the basis of their race, color, religion, sex, or national origin. 42 U.S.C. § 2000e-2. This ban on employment discrimination extends, not just to actions taken or practices instituted for discriminatory reasons, but also to otherwise nondiscriminatory actions or practices that have discriminatory effects. *Griggs v. Duke Power Co.,* 401 U.S. 424, 432, 91 S.Ct. 849, 854, 28 L.Ed.2d 158 (1971). In order to establish Title VII liability under this effects-based definition of discrimination, a plaintiff must first demonstrate that a challenged employment action or practice has a disproportionate adverse impact on a category of persons protected by the statute. *Connecticut v. Teal,* 457 U.S. 440, 446, 102 S.Ct. 2525, 2530, 73 L.Ed.2d 130 (1982); *Dothard v. Rawlinson,* 433 U.S. 321, 329, 97 S.Ct. 2720, 2726-27, 53 L.Ed.2d 786 (1977). Once such a prima facie case has been made out, the defendant must show that the challenged action is demonstrably necessary to meeting a goal of a sort that, as a matter of law, qualifies as an important business goal for Title VII purposes.

The Supreme Court held in *Wards Cove Packing Co. v. Atonio,* 490 U.S. 642, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989), that the defendant's burden on the "business necessity" defense is only one of production; under *Wards Cove* the burden of persuasion remains at all times with the plaintiff. *Id.* at 659, 109 S.Ct. at 2126. Congress, however, statutorily reversed this ruling in the Civil Rights Act of 1991, Pub.L. No. 102-166, 105 Stat. 1071, which amended Title VII to provide that, once a plaintiff

makes out a prima facie case, the full burden of proof shifts to the defendant who must demonstrate business necessity in order to avoid liability. *Id.* § 105(a), 105 Stat. at 1074-75 (codified at 42 U.S.C. §§ 2000e-2(k)(1)(A)).[FN5] In this case *1118 the district court entered summary judgment on November 21, 1991, one day before the President signed the 1991 Civil Rights Act into law. We shall assume *arguendo* that the burden allocation set out in the new statute applies retroactively to this case, for we conclude that defendant is entitled to summary judgment even under the 1991 Civil Rights Act standard-that is, the standard most favorable for plaintiffs. *See infra* Part IV.A.3.

> FN5. Prior to 1989, the "business necessity" showing was an affirmative defense for which the defendant bore the burden of proof and risk of nonpersuasion. *Dothard v. Rawlinson,* 433 U.S. 321, 329, 97 S.Ct. 2720, 2727, 53 L.Ed.2d 786 (1977); *Griggs v. Duke Power Co.,* 401 U.S. 424, 432, 91 S.Ct. 849, 854, 28 L.Ed.2d 158 (1971); *Larkin v. Pullman-Standard Div., Pullman, Inc.,* 854 F.2d 1549, 1580 (11th Cir.1988), *vacated sub nom., Pullman-Standard, Inc. v. Swint,* 493 U.S. 929, 110 S.Ct. 316, 107 L.Ed.2d 307 (1989). In 1989, the Supreme Court in *Wards Cove* changed the law, holding that the defendant bore only the burden of coming forward with an alleged business-related justification for the challenged practice which the plaintiff would then have to disprove in order to prevail. *Wards Cove,* 490 U.S. at 659, 109 S.Ct. at 2126. The Court also broadened the scope of the necessity defense by holding that practices causing a disparate impact were permissible, even if they could not be shown to be absolutely necessary, so long as they "served, in a significant way, the legitimate employment goals of the employer." *Id.* at 659, 109 S.Ct. at 2125-26. These changes were statutorily reversed by the Civil Rights Act of 1991, Pub.L. No. 102-166, § 105(a), 105 Stat. 1071, 1074-75 (codified at 42 U.S.C.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2 F.3d 1112, 62 Fair Empl.Prac.Cas. (BNA) 1484, 62 Empl. Prac. Dec. P 42,554, 2 A.D. Cases 1270, 3 A.D.D. 320, 4 NDLR P 187
**(Cite as: 2 F.3d 1112)**

§§ 2000e-2(k)(1)(A)).

[2] Upon a showing of "business necessity," the challenged action or practice is deemed justifiable, its regrettable discriminatory effects notwithstanding. However, even after such a showing, the plaintiff may still overcome a proffered business necessity defense by demonstrating that there exist alternative policies with lesser discriminatory effects that would be comparably as effective at serving the employer's identified business needs. Upon such a showing, Title VII liability is established. *Dothard,* 433 U.S. at 329, 97 S.Ct. at 2727.

### 2. Grounds for Summary Judgment Urged by the City

The City moved for summary judgment on the Title VII disparate impact claim, contending that it was entitled to prevail for two separate reasons. First, the City argued that the firefighters had failed to adduce statistics of the sort required under Title VII doctrine to show that PFB indeed afflicts African-Americans disproportionately and that, consequently, the firefighters had failed to show that the no-beard rule disproportionately excludes African-American men from firefighting jobs. Thus, the City claimed that the firefighters had failed even to create a genuine issue as to whether-let alone to prove as a fact that-the rule has a disparate racial impact. If it were in fact true that the firefighters lacked the evidence necessary to prove at trial that there is a disproportionate incidence of PFB among blacks, then the City would indeed be entitled to summary judgment, for where a Title VII disparate impact plaintiff fails to make out a prima facie case, the defendant is entitled to prevail. *Frazier v. Garrison Indep. Sch. Dist.,* 980 F.2d 1514, 1525 (5th Cir.1993).

Second, the City proffered an affirmative "business necessity" defense, asserting that the ban on shadow beards is necessary to meeting the goal of ensuring worker safety. Contending that ensuring worker safety constitutes an important business goal for Title VII purposes, and that there was no genuine issue that the no-beard rule was necessary

to meeting that goal, the City maintained that it was therefore entitled to summary judgment. *See* City's Memo in Support of Summary Judgment Motion (R-31-6-8); City's Reply Memo in Support of Summary Judgment Motion (R-39-2-3).

### 3. Propriety of Summary Judgment

The district court granted summary judgment in favor of the City on the ground that there was an absence of evidence showing that the no-beard rule has a disparate impact. *See* Magistrates's Report (R-43-7-13). We, however, find it unnecessary to address that issue on appeal. Exercising our discretion to affirm grants of summary judgment on any adequate alternative ground fairly presented in the record, we uphold the court's order regarding the firefighters' Title VII disparate impact claim on the ground that appellants have failed to create a genuine issue as to the City's contention that the ban on shadow beards is necessitated by safety concerns.

In ruling on this ground, we assume *arguendo* that the firefighters have adequately alleged a prima facie case of disparate impact. Where a Title VII disparate impact challenge is mounted against a practice or action which admittedly causes a disparate impact, the defendant is entitled to prevail if (1) the defendant shows that the practice or action is necessary to meeting a goal that, as a matter of law, qualifies as an important business goal for Title VII purposes, and (2) *1119 the plaintiff fails to show the availability of less discriminatory alternative practice or action that would provide a comparably effective means of meeting that goal. Thus, in order for such a defendant to be entitled to summary judgment, the following must be true: (1) there must be no genuine issue that the practice or action is required to meet a goal that, as a matter of law, qualifies as an important business goal under Title VII; and (2) there must be no genuine issue with respect to the existence of a comparably effective less discriminatory alternative.

#### a. Business Necessity Defense

[3] The City defends its decision to ban shadow beards on the ground that the prohibition is required

2 F.3d 1112, 62 Fair Empl.Prac.Cas. (BNA) 1484, 62 Empl. Prac. Dec. P 42,554, 2 A.D. Cases 1270, 3 A.D.D. 320, 4 NDLR P 187
**(Cite as: 2 F.3d 1112)**

to protect the firefighters from health and safety risks. If true, these safety claims would afford the City an affirmative defense, for protecting employees from workplace hazards is a goal that, as a matter of law, has been found to qualify as an important business goal for Title VII purposes. *Hayes v. Shelby Memorial Hosp.,* 726 F.2d 1543, 1552 n. 14 (11th Cir.1984); *New York City Transit Auth. v. Beazer,* 440 U.S. 568, 587 & n. 31, 99 S.Ct. 1355, 1366 & n. 31, 59 L.Ed.2d 587 (1979); *Dothard,* 433 U.S. at 331 n. 14, 97 S.Ct. at 2728 n. 14.FN6 *But cf. International Union, U.A.W. v. Johnson Controls,* 499 U.S. 187, 111 S.Ct. 1196, 113 L.Ed.2d 158 (1991) (employer desire to guard against birth defects in employees' potential offspring does not constitute bona fide occupational qualification justifying facially discriminatory employment policy). Measures demonstrably necessary to meeting the goal of ensuring worker safety are therefore deemed to be "required by business necessity" under Title VII.

> FN6. Though recognizing that measures necessary to protect employees or third parties from documented health or safety hazards are "required by business necessity," courts have stressed that merely asserting a safety rationale does not suffice to prove the defense. *See Maclennan v. American Airlines, Inc.,* 440 F.Supp. 466, 472 (E.D.Va.1977) ("[T]he incantation of a safety rationale is not an abracadabra to which [a] [c]ourt must defer judgment."). An employer's subjective belief that a practice is necessary, without any supporting evidence, is plainly insufficient to justify a discriminatory practice. *See Craig v. County of Los Angeles,* 626 F.2d 659, 667 n. 8 (9th Cir.1980), *cert. denied,*450 U.S. 919, 101 S.Ct. 1364, 67 L.Ed.2d 345 (1981); *United States v. Lee Way Motor Freight, Inc.,* 625 F.2d 918, 941-43 (10th Cir.1979). In order to establish a safety-based business necessity defense, employers have been required to present convincing expert testimony demonstrating that a challenged practice is in fact required to

protect employees or third parties from documented hazards. *See Burwell v. Eastern Air Lines, Inc.,* 633 F.2d 361, 365-66 (4th Cir.1980) (plurality opinion), *cert. denied,*450 U.S. 965, 101 S.Ct. 1480, 67 L.Ed.2d 613 (1981); *see also Harriss v. Pan Am. World Airways, Inc.,* 649 F.2d 670, 675 (9th Cir.1980); *Levin v. Delta Air Lines, Inc.,* 730 F.2d 994, 997 (5th Cir.1984). The sources of proof invoked by the City in this case to prove its safety defense meet this evidentiary standard. *See infra.*

Whether the no-beard rule is demonstrably necessary to meeting the acknowledged business goal of worker safety is a factual issue on which, for the purposes of this case, we have assumed that the City, the movant, would bear the burden of proof at trial. *See supra* Part IV.A.1. Thus, our analysis of whether there exists a genuine issue as to this material fact begins with an examination of whether the City has carried the initial burden imposed on parties moving for judgment on issues on which they would bear the burden of proof at trial. *See* discussion *supra* Part II.B.1. The City has supported its safety allegations with evidence in the form of an affidavit from an expert in the field of occupational safety and health and with a citation to a U.S. Occupational Safety and Health Administration ("OSHA") regulation concerning use of respirators by persons with facial hair. *See* City's Memo in Support of Summary Judgment Motion (R-31-6, 8) (citing R-31-Exhib. 2, and 29 C.F.R. § 1910.134(e)(5)(i)).

The City's expert, Kevin Downes, swore that, "Based upon my research and experience in training on the proper use of SCBA's, it is my opinion that the SCBA should not be worn with any amount of facial hair that contacts the sealing surface of the face piece." Affidavit of Kevin Downes (R-31-Exhib. 2-¶ 5). In the affidavit Downes detailed particular safety risks that he maintained were posed by use of SCBA's by men with facial hair. Such use would be dangerous, asserted Downes, because facial hair is likely to interfere

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2 F.3d 1112, 62 Fair Empl.Prac.Cas. (BNA) 1484, 62 Empl. Prac. Dec. P 42,554, 2 A.D. Cases 1270, 3 A.D.D. 320, 4 NDLR P 187

**(Cite as: 2 F.3d 1112)**

with the forming of a **\*1120** proper seal between the SCBA mask and the wearer's face. An imperfect seal may permit air from the outside environment to leak into the mask-when this occurs the wearer is said to have "overbreathed"-thereby risking exposing the wearer to contaminants. *Id.* at ¶ 7.[FN7]

> FN7. Downes also described three other hazards that might be posed by use of an SCBA by a man with facial hair. However, none of these appear to be as important as the risk of overbreathing. First, Downes stated that an imperfect seal is likely to permit air from the wearer's tank supply to leak out around the sides of the mask, thereby causing the wearer to deplete his air supply more quickly than he otherwise would. *Id.* at ¶ 6. Second, Downes warned that "significant facial hair" might clog the exhalation valve of the SCBA, perhaps permitting contaminants to enter through it. *Id.* at ¶ 8. From Downes' description it does not appear that the very short shadow beards would necessarily pose this risk. Third, Downes stated that air leaking out of a mask due to an imperfect seal might create air turbulence which might then in turn force contaminated air back into the mask. *Id.* at ¶ 9. Downes conceded, however, that this concern "is theoretical at this point in time." *Id.*

As support for his opinion, Downes noted that three national organizations that set occupational safety and health standards-the American National Standards Institute ("ANSI"), the National Institute for Occupational Safety and Health ("NIOSH"), and OSHA-all recommend that SCBA's should not be worn with facial hair which contacts the sealing surface of the face piece. *Id.* at ¶ 10. In addition to submitting the Downes affidavit, the City in its summary judgment memorandum also referred to the OSHA, NIOSH, and ANSI recommendations, and cited directly to the OSHA respirator standard. The OSHA regulation provides: "Respirators shall not be worn when conditions prevent a good face seal. Such conditions may be a growth of beard...."

OSHA Occupational Safety and Health Standards, Respiratory Protection, 29 C.F.R. § 1910.134(e)(5)(i).[FN8]

> FN8. Although the City did not put into the record the recommendations of ANSI and NIOSH referred to in its memorandum and in the Downes affidavit, the firefighters attached documents detailing these organizations' respirator standards to their memorandum opposing summary judgment. The ANSI and NIOSH standards set out in those documents are as follows:
> A respirator equipped with a facepiece shall not be worn if facial hair comes between the sealing periphery of the facepiece and the face....
> ANSI Practices for Respirator Protection, Z88.2-1980, § 3.5.8 (R-33-Exhib. E).
> Facial hair that lies along the sealing area of the respirator, such as beards, sideburns, moustaches, or even a few days growth of stubble should not be permitted on employees who are required to wear respirators that rely on a tight facepiece fit to achieve maximum protection. Facial hair between the wearer's skin and the sealing surfaces of the respirator will prevent a good seal.
> NIOSH Guide to Industrial Respiratory Protection at 119 (Sept. 1, 1987) (R-33-Exhib. F).

We hold that this evidence that safety concerns necessitate the ban on shadow beards is "credible evidence ... that would entitle [the City] to a directed verdict if not controverted at trial." *Four Parcels,* 941 F.2d at 1438 (quoting *Celotex,* 477 U.S. at 325, 106 S.Ct. at 2553 (Brennan, J., dissenting)). The City has thus carried its movant's initial summary judgment burden on the business necessity issue.

At this point, responsibility devolves upon the firefighters to come forward with evidence that, when considered together with the City's evidence, is sufficient to create a genuine issue as to the reality of

2 F.3d 1112, 62 Fair Empl.Prac.Cas. (BNA) 1484, 62 Empl. Prac. Dec. P 42,554, 2 A.D. Cases 1270, 3 A.D.D. 320, 4 NDLR P 187
**(Cite as: 2 F.3d 1112)**

the City's safety claims. The only real evidence invoked by the firefighters to counter the City's claims is the fact that for the six years between 1982 and 1988 the City permitted firefighters with PFB to wear their SCBA's over shadow beards. The firefighters argue that the fact that the shadow beard program was tested over this period, apparently without mishap or reported problems obtaining adequate seals, creates at least a genuine issue that shadow beards may in fact be safe. Firefighters' Brief on Appeal at 26; Firefighters' Memo Opposing Summary Judgment (R-33-26-27). We disagree. The firefighters have not adduced evidence showing how carefully the firefighters' seals were monitored over this period, or whether examinations were made that would have uncovered any resulting safety or health problems. The mere absence of unfortunate incidents is not sufficient to establish the safety of shadow beards; otherwise, safety measures could be instituted only once accidents had occurred**1121** rather than in order to avert accidents. Although the six-year history is not irrelevant to the question of whether it is unsafe to wear SCBA's over shadow beards, we hold that when considered in the context of the totality of the evidence, it would not be sufficient to prevent the City from obtaining a directed verdict at trial.

In reaching this conclusion we are swayed particularly by the recommendations of the occupational safety and health standards organizations. Although public employers such as the City are not required by law to comply with OSHA standards, *see*29 U.S.C. § 652(5) (excluding states and their political subdivisions from definition of OSHA "employer"), such standards certainly provide a trustworthy bench mark for assessing safety-based business necessity claims. It is true that the OSHA and ANSI standards speak in somewhat general terms about "facial hair" and "growths of beard" and do not specifically address the case of very short shadow beards; however, the NIOSH standard provides that "even a few days growth of stubble should not be permitted." *See supra* note 8. At least in the absence of any evidence showing that safety experts view shadow beards as a special case, we hold that the only reasonable inference supported by the

OSHA, ANSI, and NIOSH standards is that shadow beards are encompassed by the prohibitions.

This is not to say that allegations that a challenged practice is required for safety are by any means unassailable. Expert testimony or results from adequately conducted field tests tending to show that shadow beards do not prevent SCBA's from sealing to the face would be sufficient to create a genuine issue as to the reality of the City's safety claims. However, the firefighters have come forward with no such evidence.[FN9] We thus hold that the firefighters have failed to carry their non-movant's summary judgment rebuttal burden and that, therefore, there was in the record before the district court at the time of the summary judgment motion no evidence creating a genuine issue as to whether safety requires the ban on shadow beards.

> FN9. It is true that on appeal the firefighters referred to evidence that two of the plaintiff firefighters took and passed a firefighting skills examination, one component of which apparently tested use of a SCBA's. *See* Firefighters' Brief on Appeal at 30 & Exhib. A. However, appellate review of summary judgment rulings is conducted on the basis of the record presented to the district court and we ordinarily decline to take into account evidence referred to for the first time on appeal. Moreover, even if we were to consider it, we would deem this evidence insufficient to create a genuine issue as to the City's contention that shadow beards are unsafe.
> The evidence adduced by the firefighters describing this test failed to specify the nature of the SCBA test, to note whether it focused on the adequacy of the seal, or to separate the results of the segment of the test that rated SCBA use from those of the segments testing other skills. In light of these critical lapses and the fact that the examination was a one-time test of just two firefighters, this evidence, even if it had been presented to the district court, would not have been sufficient to call the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2 F.3d 1112, 62 Fair Empl.Prac.Cas. (BNA) 1484, 62 Empl. Prac. Dec. P 42,554, 2 A.D. Cases 1270, 3 A.D.D. 320, 4 NDLR P 187
**(Cite as: 2 F.3d 1112)**

City's safety claims into question.

The firefighters also call to our attention a factual finding made by the District of Columbia Superior Court in a case involving a similar challenge to a fire department no-beard rule by African-American firefighters suffering from PFB. The court in that case found that SCBA's can safely seal over shadow beards. *See Kennedy v. Dixon,* No. 2264-83, 1991 WL 489548 (D.C.Superior Court)(R-55),*quoted in* Firefighters' Brief on Appeal at 28. Appellants argue that this court should take judicial notice of this finding, and treat it as creating a genuine issue as to validity of the City's safety allegations.

It is true that where in civil rights cases the racially discriminatory nature of a particular policy or practice has been consistently recognized in other decisions, courts have absolved plaintiffs of responsibility for adducing evidence of their own to prove that such is indeed the case. Rather than force such plaintiffs to "reinvent the wheel," courts have taken judicial notice of the findings made by other courts in similar cases. *See United Steelworkers v. Weber,* 443 U.S. 193, 198 n. 1, 99 S.Ct. 2721, 2725 n. 1, 61 L.Ed.2d 480 (1979). However, appellants failed to call the *Kennedy* case to the attention of the district court during the summary judgment proceeding, and we believe that judicial notice of its findings is not appropriate in this appeal.

b. Less Discriminatory Alternative Issue

[4] As stated above, in order for the City to be entitled to summary judgment on the disparate impact claim, there must also be no genuine issue of fact with respect to whether a less discriminatory comparably effective alternative to the no-beard rule is available. The existence of a less discriminatory alternative**1122** is an issue on which the firefighters, the non-movants, would bear the burden of proof at trial. Thus, our analysis of whether there exists a

genuine issue as to this material fact begins with an examination of whether the City has carried the movant's initial burden applicable for issues on which the movant would not bear the burden of proof at trial.

In such circumstances, the movant may carry the initial burden by adducing evidence affirmatively negating the material fact at issue, or else by showing an absence of evidence on the part of the non-movant to prove the fact at trial. *See* discussion *supra* Part II.B.2. As discussed above, the City has cited the OSHA, ANSI, and NIOSH safety standards which advise that safety requires that SCBA-wearers be clean-shaven. *See supra* Part IV.A.3.a. We believe that this evidence affirmatively demonstrates, not only that being clean-shaven is a business necessity for firefighters, but also that any proposed less discriminatory alternatives to the no-beard rule that would not require firefighters to be clean-shaven would not be adequately safe. Thus the evidence is sufficient to satisfy the City's initial burden as the summary judgment movant on the less discriminatory alternative issue.

Responsibility then devolves upon the firefighters to adduce evidence creating a genuine issue as to the availability of a comparably safe, less discriminatory alternative. The firefighters have proposed two possible alternatives to the City's rule requiring firefighters to be clean-shaven. The first is simply reinstatement of the shadow beard shaving clinic. However, in order for the shadow beard program to constitute a legitimate less discriminatory alternative, shadow beards must adequately serve the Fire Department's acknowledged business need, namely, safety. As we have explained above in addressing the City's business necessity defense, the firefighters have failed to create a genuine issue that shadow beards are safe. Thus, for the same reason, they have also failed to create a genuine issue that the shaving clinic would be a comparably effective alternative to the shadow beard ban.

The second possible alternative suggested by the firefighters is shaving only the portion of the face where the SCBA seal would come into contact with

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2 F.3d 1112, 62 Fair Empl.Prac.Cas. (BNA) 1484, 62 Empl. Prac. Dec. P 42,554, 2 A.D. Cases 1270, 3 A.D.D. 320, 4 NDLR P 187
**(Cite as: 2 F.3d 1112)**

the skin. However, in the two sentences of their summary judgment papers in which they propose this alternative, the firefighters cite no evidence to show that partial shaving would be a viable and safe alternative.[FN10] Moreover, as a matter of common knowledge, it is apparent that partial shaving would pose the same PFB problems as full-face shaving, and thus it is doubtful that the firefighters could have adduced evidence that partial shaving constitutes a viable less discriminatory alternative. Thus, the firefighters have failed to carry their summary judgment rebuttal burden of creating a genuine issue as to the viability of either of the two less discriminatory alternatives they propose.[FN11] Having concluded (1) that the City has carried its initial summary judgment burdens on the business necessity and less discriminatory alternative issues, and (2) that the firefighters have failed to carry their summary judgment rebuttal burdens on either of these two points, we affirm *1123 the grant of summary judgment on the Title VII disparate impact claim.

> FN10. The following is their discussion of the partial shaving option in its entirety: Another reasonable accommodation might be shaving only the portion of the face where the seal would come into contact with the skin. However, this method has never been attempted or tested by the Defendant. (See Dep. of Chamberlain, p. 28). Firefighters' Memo Opposing Summary Judgment (R-31-26). Thus, the firefighters allege no more than that partial shaving "might" be a viable alternative and that the City has failed to explore the possibility. Indeed, the firefighters themselves do not appear particularly interested in pursuing the partial shaving alternative. Not only was the option proposed only in passing in a couple of lines of their summary judgment memorandum, but appellants' counsel, when questioned about possible alternative practices at oral argument before this court, made no mention of partial shaving.

> FN11. On appeal, appellants attempted to proffer for the first time evidence concerning the availability of a third less discriminatory alternative practice: use of a different style of SCBA incorporating a larger mask that covers the whole of the front of the wearer's head. This alternative was not part of the record before the district court, and so cannot properly be considered by this court as we evaluate the propriety of the summary judgment grant.

### B. Title VII Disparate Treatment Claim

#### 1. Elements of Claim

[5] The firefighters also challenge the no-beard rule on the ground that it was allegedly adopted for racially discriminatory reasons in violation of Title VII. Where, as here, Title VII plaintiffs alleging intentional discrimination-commonly known as disparate treatment-lack direct evidence that an employment-related action was taken for discriminatory reasons, courts usually use the special evidentiary framework set out by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and *Texas Dep't of Commun. Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), to determine whether the available circumstantial evidence is sufficient to prove that discrimination has occurred. *See Bell v. Birmingham Linen Service,* 715 F.2d 1552, 1556 (11th Cir.1983), *cert. denied,* 467 U.S. 1204, 104 S.Ct. 2385, 81 L.Ed.2d 344 (1984).

Like the analytic framework used for disparate impact claims, the *McDonnell Douglas-Burdine* disparate treatment framework is composed of three stages. A prima facie case of discrimination is made out when a plaintiff adduces evidence tending to show that the challenged adverse employment action is not readily explainable by considerations of merit. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824. Upon such a showing, the burden of production then shifts to the employer to articulate some legitimate, nondiscriminatory reason for the adverse employment decision. *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093. If the employer succeeds in

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2 F.3d 1112, 62 Fair Empl.Prac.Cas. (BNA) 1484, 62 Empl. Prac. Dec. P 42,554, 2 A.D. Cases 1270, 3 A.D.D. 320, 4 NDLR P 187
**(Cite as: 2 F.3d 1112)**

discharging this light burden, the plaintiff may prevail only by "demonstrat[ing] that the proffered reason was not the true reason for the employment decision. [The plaintiff] may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id.* at 256, 101 S.Ct. at 1095. *See also* B. Schlei & P. Grossman, *Employment Discrimination Law* 1314 (2d ed. 1983).

The *McDonnell Douglas-Burdine* framework has been used to analyze suits alleging a wide variety of different types of intentional discrimination. *See Nix v. WLCY Radio/Rahall Communications,* 738 F.2d 1181, 1185 (11th Cir.1984) (discussing different variants of framework used to analyze cases alleging discrimination in hiring, firing, and application of disciplinary rules). As the leading treatise on the law of employment discrimination explains, [T]he elements of a prima facie case are flexible and should be tailored, on a case-by-case basis, to differing factual circumstances. The central inquiry in evaluating whether the plaintiff has met his initial burden is whether the circumstantial evidence presented is sufficient to create an inference (*i.e.,* a rebuttable presumption) that the basis for an employment-related decision was an illegal criterion.

B. Schlei & P. Grossman, *Employment Discrimination Law* 476 (2d ed. 5-Year Cum.Supp.1989) (footnote omitted).

Because the firefighters allege disparate treatment but do not possess any direct evidence showing that the no-beard rule was instituted for discriminatory reasons, they are permitted to proceed under the *McDonnell Douglas-Burdine* framework using circumstantial evidence. However, the particular employment practice targeted by the firefighters is not of the sort typically challenged under disparate treatment theory. In most disparate treatment cases, a plaintiff alleges that an otherwise legitimate rule or policy is being invoked pretextually as an excuse for what is really discrimination. In this case, however, it is the employment policy itself-the no-

beard rule-with which plaintiffs take issue. They charge that the rule was adopted for the purpose of removing from the Fire Department a group of African-American men: the plaintiff firefighters suffering from PFB. Such challenges are more typically brought as disparate impact claims and, of course, appellants have also chosen to proceed under that theory.

In light of this difference between the firefighters' challenge and the typical disparate**\*1124** treatment claim, it is not obvious what would constitute the elements of a prima facie case in this circumstance.FN12 As it turns out, however, it is not necessary for us to resolve this question. The district court assumed *arguendo* that the firefighters had made out a prima facie case of disparate treatment under the *McDonnell Douglas-Burdine* framework and went on to grant summary judgment on other grounds. Magistrates's Report (R-43-15-19). We affirm for the same reasons.

> FN12. The nature of the showing required to make out a prima facie case of disparate treatment varies depending on the nature of the employment action at issue. As a general matter, a Title VII plaintiff need only show that he or she belongs to a protected group and that it appears from the circumstances that the adverse employment action is not readily explained by legitimate reasons. For example, in a suit charging that a job applicant has been denied a job for discriminatory reasons, a prima facie case is established once the plaintiff shows that: (i) that he belongs to a [protected group]; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after the rejection, the position remained open and the employer continued to seek applica[tions] from persons of complainant's qualifications. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824. For a description of the elements of the prima facie case in suits chal-

2 F.3d 1112, 62 Fair Empl.Prac.Cas. (BNA) 1484, 62 Empl. Prac. Dec. P 42,554, 2 A.D. Cases 1270, 3 A.D.D. 320, 4 NDLR P 187
**(Cite as: 2 F.3d 1112)**

lenging other types of discriminatory actions, see *Nix v. WLCY Radio/Rahall Communications,* 738 F.2d 1181, 1185 (11th Cir.1984).

### 2. Propriety of Summary Judgment

Where a plaintiff, lacking direct evidence of discrimination, proceeds under the *McDonnell Douglas-Burdine* framework, the defendant is entitled to prevail where (1) it has come forward with a legitimate, nondiscriminatory explanation for the challenged employment action, and (2) the plaintiff has failed to discredit the proffered justification or to show that a discriminatory reason more likely motivated the challenged action. Assuming *arguendo* that the firefighters have succeeded in making out a prima facie case of disparate treatment, the City has adduced evidence showing that at trial it would readily be able to carry its light burden of coming forward with a legitimate, nondiscriminatory reason-namely, safety-for its reinstitution of the shadow beard ban. *See* City's Memo in Support of Summary Judgment Motion (R-31-10-11) (citing Deposition of George Napper, Jr., former Commissioner, Atlanta Dep't of Public Safety). The City is therefore entitled to summary judgment on the disparate treatment claim if there is no genuine issue that its proffered safety justification is not a pretext for discrimination. *Sparks v. Pilot Freight Carriers, Inc.,* 830 F.2d 1554, 1564 (11th Cir.1987) (genuine issue regarding pretext bars summary judgment).

As discussed above, the City has adduced evidence that safety considerations require firefighters to be clean-shaven, and plaintiffs have not adduced evidence sufficient to call that contention into question. *See supra* Part IV.A.3.a. We hold that this same evidence suffices to carry the City's movant's initial summary judgment burden with respect to the issue of absence of pretext. Thus, in order to avoid summary judgment, the firefighters must have adduced evidence that, when considered along with the City's evidence, creates a genuine issue that the proffered safety justification is, in fact, a pretext for discrimination.

The firefighters invoke only one piece of evidence in their attempt to undermine the credibility of the proffered safety justification: the fact that the same occupational safety standards organizations that recommend against the wearing of SCBA's over facial hair also warn that facial conditions such as acne, dentures, glasses, scars, deformities, and deep skin folds can interfere with the safe use of SCBA's. *See* Firefighters' Memo Opposing Summary Judgment (R-31-11-13).[FN13] Appellants contend that, because when the City reinstituted the no-**1125** beard rule it issued no regulations concerning these other conditions, this underinclusiveness shows that the City's claim that it was motivated by safety concerns is in fact pretextual. *Id.;* Firefighters' Brief on Appeal at 21.

> FN13. *See* NIOSH Guide to Industrial Respiratory Protection at 119-20 (Sept. 1, 1987) (R-33-Exhib. F) (noting that eye glasses, facial deformities such as scars, deep skin creases, prominent cheekbones, severe acne, and the lack of teeth or dentures can prevent SCBA from sealing properly); OSHA Occupational Safety and Health Standards, Respiratory Protection, 29 C.F.R. § 1910.134(e)(5)(i) (noting same about sideburns, skull caps that project under the face piece, temple pieces on glasses, and absence of one or both dentures).

We find this fact insufficient to create a genuine issue as to the sincerity of the City's claims that it reinstituted the no-beard rule out of concern for safety. Although the Fire Department did not ban the wearing of SCBA's by persons with other hazardous facial conditions when it first adopted the no-beard rule, the Department did not immediately begin enforcing the new prohibition. By the time the Department began actually enforcing the no-beard rule, it had also amended its policies to address problems caused by one of the other above-noted facial conditions: eyeglasses. *See* City's Reply Memo in Support of Summary Judgment Motion (R-39-5), *citing* Dep't of Pub. Safety Special Order 3.23 (R-31-Attach. 1, Exhib. E, ¶

2 F.3d 1112, 62 Fair Empl.Prac.Cas. (BNA) 1484, 62 Empl. Prac. Dec. P 42,554, 2 A.D. Cases 1270, 3 A.D.D. 320, 4 NDLR P 187

**(Cite as: 2 F.3d 1112)**

FN14 In light of the substantial evidence adduced by the City in support of its safety justification, we hold that no reasonable finder of fact could find the justification pretextual solely on the basis of the underinclusiveness of the City's SCBA safety rule. Accordingly, the City is entitled to summary judgment on the Title VII disparate treatment claim.

> FN14. Thus, when they actually took effect, the City's SCBA safety rules were not as underinclusive as the firefighters charge. Moreover, the record supports the inference that the City is addressing safety problems pursuant to a reasonable priority, and does not indicate that the City is using safety as a pretext for discrimination.

### C. Claim Under § 504 of the Rehabilitation Act of 1973

### 1. Elements of Claim

[6] Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794(a), provides that:

No otherwise qualified handicapped individual ... shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

The appellant firefighters allege that, because they suffer from PFB, they qualify as handicapped individuals. They contend that the City's preventing them from working as firefighters on account of that condition constitutes illegal "exclu[sion] from ... [and/or] discrimination under a [ ] program ... receiving Federal financial assistance" in violation of § 504. FN15

> FN15. In their complaint the firefighters allege that the City Fire Department receives financial assistance from the federal government and therefore is subject to the non-discrimination duty that § 504 imposes on federal funds recipients. Complaint (R-1-8, ¶ 29). In its answer the City admits this fact. Answer (R-2-¶ 29).

The statute defines the term "handicapped individual" as including, inter alia,

any person who ... has a physical or mental impairment which substantially limits one or more of such person's major life activities....

29 U.S.C. § 706(8)(B)(i). U.S. Department of Health and Human Services ("HHS") regulations implementing § 504 FN16 define "major **\*1126** life activities" as including "working." 45 C.F.R. § 84.3(j)(2)(ii). The regulations define "physical or mental impairment" as including "any physiological disorder or condition, [or] cosmetic disfigurement, ... affecting ... [the] skin." 45 C.F.R. § 84.3(j)(2)(ii). PFB qualifies as a "physical ... impairment" as it is a "physiological disorder or condition ... affecting ... [the] skin." That impairment, and the firefighters' inability to shave that results from it, "substantially limit" the firefighters' ability to engage in the "major life activity" of work on account of the no-beard rule. Thus, under the HHS § 504 regulations and the 29 U.S.C. § 706(8)(B)(i) statutory definition, the appellant firefighters would seem to qualify as "handicapped individual[s]."

> FN16. The amended Rehabilitation Act instructs each federal agency distributing federal financial assistance to "promulgate such regulations as may be necessary to carry out" the purposes of § 504. 29 U.S.C. § 794(a). The firefighters cited to the district court, and the court accepted as controlling, regulations implementing § 504 that were promulgated by HHS. *See* Magistrates's Report (R-43-20) (citing 45 C.F.R. § 84.3(j)(2)). However, the § 504 duties of a recipient of federal financial assistance are defined by the implementing regulations issued by the particular agency from which the recipient secures its federal aid. Nowhere in the record do the parties specify from which federal agency or pursuant to what program the Fire Department receives federal funds. We thus have no way of knowing which agency's § 504 regulations ought properly to govern this case.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2 F.3d 1112, 62 Fair Empl.Prac.Cas. (BNA) 1484, 62 Empl. Prac. Dec. P 42,554, 2 A.D. Cases 1270, 3 A.D.D. 320, 4 NDLR P 187
**(Cite as: 2 F.3d 1112)**

However, it happens to be the case that for all of the definitional issues on which we consult agency regulations below, the regulations of all federal agencies are identical. *See, e.g.*,7 C.F.R. § 15b.3(i), (j)(1), (k) (Agriculture); 10 C.F.R. § 1040.62(c), (d)(1)(i), (d)(2) (Energy); 15 C.F.R. § 8b.3(g)(1)(i), (3)(i)(A), (3)(ii) (Commerce); 22 C.F.R. § 142.3(j)(1)(i), (2)(i)(A), (2)(ii) (State); 24 C.F.R. § 8.3 (HUD); 28 C.F.R. § 42.540(k)(1)(i), (2)(i)(A), (2)(ii) (Justice); 29 C.F.R. § 32.3 (Labor); 34 C.F.R. § 104.3(j)(1)(i), (2)(i)(A), (2)(ii) (Education); 38 C.F.R. § 18.403(j)(1)(i), (2)(i)(A), (2)(ii) (Veterans Affairs); 40 C.F.R. § 7.25 (EPA); 45 C.F.R. § 84.3(j)(1)(i), (2)(i)(A), (2)(ii) (HHS); 49 C.F.R. § 27.5 (Transportation). In view of this fact, there is no harm in treating as controlling the HHS regulations relied upon by the district court.

Section 504 has been construed as requiring federal funds recipients to refrain from engaging in several different sorts of discrimination against the handicapped. *See Prewitt v. U.S. Postal Service,* 662 F.2d 292, 305 n. 19 (5th Cir. Unit A Nov. 1981). One such non-discrimination duty is the affirmative obligation to provide "reasonable accommodations" where such accommodations would permit "otherwise qualified handicapped individual[s]" to participate in activities in which they would otherwise be unable to take part. *School Bd. of Nassau County v. Arline,* 480 U.S. 273, 287 n. 17, 107 S.Ct. 1123, 1131 n. 17, 94 L.Ed.2d 307 (1987) (citing 45 C.F.R. § 84.12(c)); *Southeastern Community College v. Davis,* 442 U.S. 397, 412-13, 99 S.Ct. 2361, 2370, 60 L.Ed.2d 980 (1979); B. Tucker & B. Goldstein, *Legal Rights of Persons with Disabilities* 5:1 (1991). The firefighters allege that the City has violated this duty.

Section 504 requires covered institutions to provide reasonable accommodations to handicapped persons only where such persons are "otherwise qualified" to participate in the activity at issue. 29 U.S.C. § 794(a). In the employment context, a han-

dicapped person is deemed "otherwise qualified" for a position if he or she "can perform 'the essential functions' of the job in question." *Arline,* 480 U.S. at 287 n. 17, 107 S.Ct. at 1131 n. 17 (quoting 45 C.F.R. § 84(3)(k) (HHS)). Performing the essential functions of a job means, among other things, being able to perform those functions without risk of serious physical harm to oneself or others. *See* B. Tucker & B. Goldstein, *supra,* at 5:16-19.

### 2. Propriety of Summary Judgment

With respect to the § 504 claim, the district court appeared to rest its grant of summary judgment on two separate grounds. First, while conceding that work constitutes a "major life activity" for the purposes of 29 U.S.C. § 706(8)(B)(i), the court appeared to express some doubt whether PFB qualifies as a "physical impairment" or whether PFB indeed precludes shaving, thereby "substantially limit[ing] ... [the] major life activit[y]" of working, on account of the no-beard rule. *See* Magistrates's Report (R-43-20-21). Second, the court found that the firefighters had failed to show the availability of a reasonable accommodation through which they might safely perform the essential functions of their job without having to be clean-shaven. *Id.* at 21. Although it appears probable to us that the district court erred insofar as it indicated that the firefighters do not qualify as "handicapped individual[s]" under 29 U.S.C. § 706(8)(B)(i), it is not necessary for us to rule on that issue. We find that the second ground for summary judgment relied on by the district court was correct and we therefore affirm the grant on that basis.

A § 504 employer defendant is entitled to prevail on a reasonable accommodation claim where there exists no reasonable accommodation by which the employee plaintiff would be able to perform the essential functions of the job. A defendant is thus entitled to summary judgment on a § 504 reasonable accommodation claim where there exists no genuine issue with respect to the availability of reasonable accommodation. As we have explained above in the course of our discussion of the less discriminatory alternative inquiry under the Title VII dis-

2 F.3d 1112, 62 Fair Empl.Prac.Cas. (BNA) 1484, 62 Empl. Prac. Dec. P 42,554, 2 A.D. Cases 1270, 3 A.D.D. 320, 4 NDLR P 187
**(Cite as: 2 F.3d 1112)**

parate impact claim, the City has adduced evidence affirmatively showing that the no-beard rule is required for safety and that there exists no **\*1127** comparably safe, less discriminatory alternative to the ban. *See supra* Part IV.A.3.b. Because of the conceptual similarity between the Title VII less discriminatory alternative and the § 504 reasonable accommodation showings, this same evidence suffices to carry the City's initial burden of showing that there exists no reasonable accommodation that would permit the firefighters to perform the essential function of obtaining a safe seal on their SCBA's without being clean-shaven. In other words, we find, as we did with respect to the Title VII less discriminatory alternative issue, that the City's evidence showing that the no-beard rule is required by safety also constitutes an affirmative showing that there exists no reasonable accommodation by which the firefighters with PFB would be able to perform their jobs safely without being clean-shaven. *See supra* Part II.B.1.[FN17] *See also* City's Memo in Support of Summary Judgment Motion (R-31-17-18); City's Reply Memo in Support of Summary Judgment Motion (R-39-6-8).

> FN17. One distinction between the two showings is that while the plaintiff bears the burden of proof on the Title VII less discriminatory alternative, it is the defendant who does so on § 504 reasonable accommodation. *Treadwell v. Alexander,* 707 F.2d 473, 475 (11th Cir.1983); *Simon v. St. Louis County,* 735 F.2d 1082, 1084 (8th Cir.1984). However, this difference is not significant for present purposes. It is true that for issues on which the summary judgment movant would not bear the burden of proof at trial, the movant may take advantage of an additional means of carrying the initial burden-showing an absence of evidence on the part of the non-movant to prove the fact at trial-not available where the movant bears the burden of proof on the issue. *Compare supra* Part II.B.1 *with* Part II.B.2. However, in this case the City carried its initial burden on the Title VII less discriminatory alternative by coming

forward with affirmative evidence showing that the no-beard rule is necessary. *See supra* Part IV.A.3.a & b. Such an affirmative showing is also sufficient to carry a movant's initial burden on an issue, like § 504 reasonable accommodation, on which the movant would bear the burden of proof at trial. *See supra* Part II.B.1. Thus, in this case the fact that the City carried its movant's initial summary judgment burden on the Title VII less discriminatory alternative issue means that it has also done so on that of reasonable accommodation under § 504.

As also discussed above, the firefighters have proposed as reasonable accommodations two possible alternatives to the no-beard rule: reinstituting the shadow beard program, or requiring the firefighters to shave just the portions of their faces that come into contact with the SCBA seal. *See* Firefighters' Memo Opposing Summary Judgment (R-31-26). However, the firefighters have failed to come forward with any evidence showing that through either of these two means firefighters with PFB would be able to perform the essential function of obtaining adequate seals on their SCBA's. *See* discussion *supra* Part IV.A.3.b. In light of the City's substantial evidence that SCBA's cannot adequately seal over shadow beards and the unrebutted reasonable inference that partial shaving would not be viable and safe for men with PFB, the firefighters' evidence is insufficient to create a genuine issue as to the availability of an adequate reasonable accommodation. The City is thus entitled to summary judgment on the § 504 reasonable accommodation claim as well.

### V. CONCLUSION

For the foregoing reasons,[FN18] we affirm the ruling of the district court granting summary judgment for the City on each of the firefighters' claims.

> FN18. The firefighters also challenge the no-beard rule relying on a constitutional substantive due process theory. However,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2 F.3d 1112, 62 Fair Empl.Prac.Cas. (BNA) 1484, 62 Empl. Prac. Dec. P 42,554, 2 A.D. Cases 1270, 3 A.D.D. 320,
4 NDLR P 187

**(Cite as: 2 F.3d 1112)**

even assuming *arguendo* that a substantive
due process right would be implicated if
the government were to reach out and re-
quire male citizens to shave, there would
still be no constitutional violation on the
facts of this case under the analyses pre-
scribed by any of the cases cited by the
firefighters, *see Pickering v. Board of Edu-
cation,* 391 U.S. 563, 88 S.Ct. 1731, 20
L.Ed.2d 811 (1968); *Kelley v. Johnson,*
425 U.S. 238, 96 S.Ct. 1440, 47 L.Ed.2d
708 (1976), or by any remotely analogous
case. Accordingly, we reject the firefight-
ers' substantive due process argument
without further discussion.

AFFIRMED.

C.A.11 (Ga.),1993.
Fitzpatrick v. City of Atlanta
2 F.3d 1112, 62 Fair Empl.Prac.Cas. (BNA) 1484,
62 Empl. Prac. Dec. P 42,554, 2 A.D. Cases 1270, 3
A.D.D. 320, 4 NDLR P 187

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

71 F.3d 801                                                                                    Page 1

71 F.3d 801, 69 Fair Empl.Prac.Cas. (BNA) 795, 67 Empl. Prac. Dec. P 43,793, 64 USLW 2447

**(Cite as: 71 F.3d 801)**

Richardson v. Leeds Police Dept.
C.A.11 (Ala.),1995.

United States Court of Appeals,Eleventh Circuit.
Jerroll RICHARDSON, Plaintiff-Appellant,
v.
LEEDS POLICE DEPARTMENT; Leeds, City of,
Defendants-Appellees.
**No. 94-6316.**

Dec. 15, 1995.

Police officer brought civil rights action against police department and city alleging racial discrimination in violation of Title VII, § 1981 and § 1983. After the close of all evidence, defendants moved for judgment as a matter of law on reinstatement claim, which the United States District Court for the Northern District of Alabama, No. CV-92-AR-1588-S,William M. Acker, Jr., J., granted. Officer appealed. The Court of Appeals held that issue of whether mayor's decision not to rehire police officer was racially motivated was question for jury.

Judgment vacated and remanded.
West Headnotes
**[1] Civil Rights 78 🔑1106**

78 Civil Rights
    78II Employment Practices
        78k1102 Constitutional and Statutory Provisions
            78k1106 k. Retrospective Application.
Most Cited Cases
    (Formerly 78k102.1)

**Jury 230 🔑10**

230 Jury
    230II Right to Trial by Jury
        230k10 k. Constitutional and Statutory Provisions. Most Cited Cases
Civil Rights Act of 1991 did not apply to former employee's allegations that employer refused to re-

hire him because of his race and that he was forced to resign because of disparate treatment in job assignments in violation of Title VII, § 1983 and § 1981 as all events occurred prior to Act's effective date; thus, employee was not entitled to jury trial on his Title VII claims nor was he permitted to Title VII compensatory or punitive damages. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.; 42 U.S.C.A. §§ 1981, 1983.

**[2] Federal Courts 170B 🔑776**

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
            170BVIII(K)1 In General
                170Bk776 k. Trial De Novo. Most Cited Cases
Court of Appeals reviews decision to grant judgment as a matter of law de novo, applying same standards utilized by district court. Fed.Rules Civ.Proc.Rule 50(a)(1), 28 U.S.C.A.

**[3] Federal Civil Procedure 170A 🔑2152**

170A Federal Civil Procedure
    170AXV Trial
        170AXV(F) Taking Case or Question from Jury
            170AXV(F)2 Questions for Jury
                170Ak2152 k. Conclusions or Inferences from Evidence. Most Cited Cases
When evaluating motion for judgment as matter of law, court must consider all of evidence and reasonable inferences arising therefrom in light most favorable to nonmoving party. Fed.Rules Civ.Proc.Rule 50(a)(1), 28 U.S.C.A.

**[4] Federal Courts 170B 🔑764**

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
            170BVIII(K)1 In General
                170Bk763 Extent of Review Dependent on Nature of Decision Appealed from

71 F.3d 801, 69 Fair Empl.Prac.Cas. (BNA) 795, 67 Empl. Prac. Dec. P 43,793, 64 USLW 2447
**(Cite as: 71 F.3d 801)**

170Bk764 k. Taking Case from Jury. Most Cited Cases

Judgment as a matter of law may be affirmed only when facts and inferences points so overwhelmingly in favor of movant that reasonable people could not arrive at a contrary verdict. Fed.Rules Civ.Proc.Rule 50(a)(1), 28 U.S.C.A.

**[5] Civil Rights 78 ☞1138**

78 Civil Rights
    78II Employment Practices
        78k1138 k. Disparate Treatment. Most Cited Cases
    (Formerly 78k153)

In cases alleging disparate treatment in which § 1983 is employed as remedy for the same conduct attacked under Title VII, elements of the two causes of action are the same. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.; 42 U.S.C.A. § 1983.

**[6] Civil Rights 78 ☞1138**

78 Civil Rights
    78II Employment Practices
        78k1138 k. Disparate Treatment. Most Cited Cases
    (Formerly 78k153)

In alleging disparate treatment under both Title VII and § 1983, plaintiff must prove that defendant acted with discriminatory intent. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.; 42 U.S.C.A. § 1983.

**[7] Civil Rights 78 ☞1405**

78 Civil Rights
    78III Federal Remedies in General
        78k1400 Presumptions, Inferences, and Burdens of Proof
            78k1405 k. Employment Practices. Most Cited Cases
    (Formerly 78k240(2))

**Civil Rights 78 ☞1536**

78 Civil Rights

78IV Remedies Under Federal Employment Discrimination Statutes
    78k1534 Presumptions, Inferences, and Burden of Proof
        78k1536 k. Effect of Prima Facie Case; Shifting Burden. Most Cited Cases
    (Formerly 78k378)

In proving disparate treatment under § 1983 and Title VII, plaintiff must establish prima facie case, which raises presumption that employee's decision was more likely than not based upon impermissible factor, defendant may rebut this presumption by articulating legitimate, nondiscriminatory reason for its decision, and if defendant meets this burden, plaintiff must then have opportunity to persuade trier of fact, through presentation of his own case and by cross-examining defendant's witnesses, that reason proffered was not sole basis for decision, but pretext for discrimination. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.; 42 U.S.C.A. § 1983.

**[8] Federal Civil Procedure 170A ☞1962**

170A Federal Civil Procedure
    170AXV Trial
        170AXV(A) In General
            170Ak1959 Separate Trial of Particular Issues
                170Ak1962 k. Equitable Issues. Most Cited Cases

When legal and equitable causes are joined in one action, legal issues must be decided first.

**[9] Federal Civil Procedure 170A ☞2197**

170A Federal Civil Procedure
    170AXV Trial
        170AXV(H) General Verdict
            170Ak2197 k. Construction and Operation. Most Cited Cases

To extent that elements of two types of claims mirror one another, jury's findings on legal conclusions are binding in resolving equitable issues.

**[10] Civil Rights 78 ☞1430**

78 Civil Rights

71 F.3d 801, 69 Fair Empl.Prac.Cas. (BNA) 795, 67 Empl. Prac. Dec. P 43,793, 64 USLW 2447

**(Cite as: 71 F.3d 801)**

78III Federal Remedies in General
    78k1425 Questions of Law or Fact
        78k1430 k. Employment Practices. Most Cited Cases
    (Formerly 78k244)

**Civil Rights 78 ⚖══1555**

78 Civil Rights
    78IV Remedies Under Federal Employment Discrimination Statutes
        78k1555 k. Questions of Law or Fact. Most Cited Cases
    (Formerly 78k389)

Question of whether mayor's decision not to rehire police officer after he resigned was racially motivated under Title VII and § 1983 was for jury. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.; 42 U.S.C.A. § 1983; Fed.Rules Civ.Proc.Rule 50(a)(1), 28 U.S.C.A.

**[11] Civil Rights 78 ⚖══1405**

78 Civil Rights
    78III Federal Remedies in General
        78k1400 Presumptions, Inferences, and Burdens of Proof
            78k1405 k. Employment Practices. Most Cited Cases
    (Formerly 78k240(2))

**Civil Rights 78 ⚖══1536**

78 Civil Rights
    78IV Remedies Under Federal Employment Discrimination Statutes
        78k1534 Presumptions, Inferences, and Burden of Proof
            78k1536 k. Effect of Prima Facie Case; Shifting Burden. Most Cited Cases
    (Formerly 78k378)

When trier of fact has before it all evidence needed to decide ultimate issue of whether defendant intentionally discriminated against plaintiff under Title VII and § 1983, question of whether plaintiff properly made prima facie case of disparate impact is no longer relevant. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.; 42 U.S.C.A. § 1983.

**\*802** Gregory O. Wiggins, Robert L. Wiggins, Jr., Gordon, Silberman, Wiggins and Childs, Birmingham, AL, for Appellant.

James W. Porter, II, Birmingham, AL, for Leeds Police Dept. & City of Leeds.

Appeal from the United States District Court for the Northern District of Alabama.

Before EDMONDSON and BIRCH, Circuit Judges, and HENDERSON, Senior Circuit Judge.
PER CURIAM:

Jerroll Richardson, a former police officer for the City of Leeds, Alabama ("City"), appeals from the judgment of the United States District Court for the Northern District of Alabama dismissing this action alleging racial discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et* **\*803** *seq.,* 42 U.S.C. § 1981 and 42 U.S.C. § 1983. We reverse and remand for further proceedings.

### I. STATEMENT OF THE CASE

[1] Richardson, an African American, was an officer of the Leeds Police Department ("Department") from January 1989 until he resigned in May 1991. A short time after leaving the Department he changed his mind and sought reinstatement. His efforts were unsuccessful. On July 29, 1991, he filed an administrative complaint with the Equal Employment Opportunity Commission ("EEOC") alleging that he resigned because of disparate treatment in job assignments during his period of employment. He also accused the Department of refusing to rehire him because of his race. After receiving a right to sue letter from the EEOC, Richardson commenced this action in the district court against the City and the Chief of Police, Thomas W. McDonald. He alleged in deposition testimony that his resignation amounted to a constructive discharge because it stemmed from the denial of opportunities for advancement while employed by the City, as well as racial slurs directed at him by a fellow officer and general hostility within the Department toward black citizens. He

71 F.3d 801, 69 Fair Empl.Prac.Cas. (BNA) 795, 67 Empl. Prac. Dec. P 43,793, 64 USLW 2447
**(Cite as: 71 F.3d 801)**

also claimed that he was not restored to his former position with the Department on account of his race and because he complained that black citizens were treated more severely by the City's police officers than were white citizens. The complaint as amended included causes of action for alleged violations of Title VII of the Civil Rights Act of 1964 ("1964 Act"), § 1981 and § 1983.[FN1] He sought declaratory and injunctive relief, backpay, compensatory and punitive damages and reinstatement to the position he would have held absent the purported discrimination.[FN2]

FN1. The petition did not specify the provision or provisions of Title VII relied upon by Richardson. Section 2000e-2(a)(1) of the 1964 Act, however, clearly applies to the allegations. It states:

It shall be an unlawful employment practice for an employer-

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin....

Section 1981 bars racial discrimination in the making and enforcement of contracts. Richardson's cause of action under § 1983, which prohibits the deprivation of federal rights, privileges or immunities under color of state law, was based upon charges that the defendants violated his equal protection rights protected by the United States Constitution.

FN2. The complaint also invoked the Civil Rights Act of 1991 ("1991 Act" or "Act"), which expanded the scope of § 1981 and provided for the recovery of compensatory and punitive damages for certain violations of Title VII, as well as the right to a jury trial when such damages are sought. The 1991 Act did not apply to the defendants' conduct alleged here, however, because it occurred prior to the Act's November 21,

1991 effective date. *Landgraf v. USI Film Prods.,* 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994); *Rivers v. Roadway Express, Inc.,* 511 U.S. 298, 114 S.Ct. 1510, 128 L.Ed.2d 274 (1994); *Goldsmith v. City of Atmore,* 996 F.2d 1155, 1159 (11th Cir.1993). Consequently, under this court's precedent, which construed Title VII claims as equitable in nature, Richardson was not entitled to a jury trial on his Title VII cause of action. *Lincoln v. Board of Regents of the Univ. Sys. of Ga.,* 697 F.2d 928, 934 (11th Cir.), *cert. denied,* 464 U.S. 826, 104 S.Ct. 97, 78 L.Ed.2d 102 (1983). Nor was he permitted to seek Title VII compensatory or punitive damages. *Walker v. Ford Motor Co.,* 684 F.2d 1355, 1364 (11th Cir.1982). Moreover, Richardson's § 1981 allegations were governed by the pre-1991 Act rule of law announced in *Patterson v. McLean Credit Union,* 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989), in which the Court held that the reach of § 1981 was limited to discriminatory actions taken during the initial formation of a contract and conduct designed to impair the enforcement of contracts through the legal process. *Id.* at 179-80, 109 S.Ct. at 2374, 105 L.Ed.2d at 152. Accordingly, Richardson's complaints of constructive discharge and disparate treatment during the course of his employment were not actionable under that statute, but only under Title VII and § 1983. We need not decide whether Richardson's claim for failure to rehire was cognizable under § 1981 as interpreted by *Patterson, see Wall v. Trust Co. of Ga.,* 946 F.2d 805, 808 (11th Cir.1991) (test is whether a "new and distinct" relationship would be formed), because the procedures and relief available under that law, including the right to have a jury determine compensatory and punitive damages, are duplicative of those afforded by § 1983 when, as here, state actors are sued as defendants. *See*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

71 F.3d 801, 69 Fair Empl.Prac.Cas. (BNA) 795, 67 Empl. Prac. Dec. P 43,793, 64 USLW 2447
**(Cite as: 71 F.3d 801)**

*Johnson v. Railway Express Agency, Inc.,* 421 U.S. 454, 460, 95 S.Ct. 1716, 1720, 44 L.Ed.2d 295, 301 (1975) (§ 1981 plaintiffs may seek both equitable and legal relief, including compensatory damages and, in limited circumstances, punitive damages); *Smith v. Wade,* 461 U.S. 30, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983) (both compensatory and punitive damages are available under § 1983); *but see City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 271, 101 S.Ct. 2748, 2762, 69 L.Ed.2d 616, 634-35 (1981) (punitive damages may not be assessed against municipalities). We therefore treat the complaint as alleging infractions of Title VII and § 1983.

**\*804** The City subsequently filed a motion for summary judgment on all charges against it. The district court granted the motion with respect to the claim for constructive discharge, finding that Richardson's reapplication for his old position foreclosed a conclusion that he resigned because of unbearable working conditions. *See Morgan v. Ford,* 6 F.3d 750, 755-56 (11th Cir.1993) (employee who involuntarily resigns to escape illegal discrimination must prove that his employment situation was so intolerable that a reasonable person his position would have felt compelled to leave), *cert. denied,*512 U.S. 1221, 114 S.Ct. 2708, 129 L.Ed.2d 836 (1994). The court denied summary judgment on all other claims. The court then, on July 23, 1993, entered final judgment for the City on the constructive discharge issue pursuant to Fed.R.Civ.P. 54(b).[FN3] Richardson did not appeal.

> FN3. When more than one claim for relief is presented in an action, Rule 54(b) permits the entry of final judgment on a single count "upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment."

A jury trial on the § 1983 cause of action stemming from the alleged disparate treatment during the course of employment and in rehiring was held in 1994. At the conclusion of Richardson's case-in-chief, the defendants moved for judgment as a matter of law in compliance with Fed.R.Civ.P. 50. The district court denied the motions and continued with the trial. After the close of all the evidence, the defendants renewed their Rule 50 motions. The court took the motions under advisement and submitted the case to the jury, which was instructed to respond to a set of interrogatories as part of its deliberations. By its answers the jury exonerated McDonald of all alleged wrongdoing. It also found that the City did not discriminate against Richardson during his tenure with the Department. It could not reach a verdict, however, on the question of whether Richardson's race played a part in the City's refusal to rehire him. The district court announced that it would enter orders on the partial verdict and released the jury.

Thereafter, in a memorandum opinion, the court granted the City's motion for judgment as a matter of law on the reinstatement claim. In arriving at this decision, the court found that Richardson failed to prove a prima facie case of discrimination in the rehiring context because, unlike other white officers who were reemployed after they resigned, Richardson indicated when he left the Department that he was "burned out." The court consequently determined that Richardson was not similarly situated to the nonminority officers who were restored to their former positions. The court found further that, even assuming Richardson carried his initial burden of proof, he did not actually want the job for which he made application. In support of this finding the court relied on the jury's negative response to interrogatory number five, which inquired whether Richardson "presently" desired a position with the City as a police patrolman.[FN4] The court **\*805** concluded that Richardson could not prevail on the claim for reinstatement under any theory of recovery given this circumstance. The court found additionally that, to the extent that the evidence presented an issue of credibility, Richardson's admission that he resigned because he was "burned out" was a legitimate reason for declining to rehire him which was not pretextual.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

71 F.3d 801, 69 Fair Empl.Prac.Cas. (BNA) 795, 67 Empl. Prac. Dec. P 43,793, 64 USLW 2447

**(Cite as: 71 F.3d 801)**

FN4. Richardson testified as follows:

Q. Do you wish to go back to work for the City of Leeds as a police officer if you win this case?

A. I'm afraid.

Q. Afraid of what?

A. I have put so many people in prison for drugs that it would be too easy for a while on the night shift or patrolling or an abandoned car stop for someone to shoot me. I'm not necessarily saying that it would be an individual that I had arrested. But when the investigation took place, then that, that is what would probably come out.

....

Q. ... you said you didn't think you wanted your job back, that you were afraid to go back?

A. No, sir, that's not what I said. I did not say that I didn't want my job back. I still want my job back. I'm just afraid, and that fear is a fear that I did not have at the time that I went and asked to be rehired.

Q. You say that whatever that fear is, you still want your job back now?

A. After taking certain precautions, yes, sir.

Q. So that fear, whatever it is, was not so great that you don't want your job back now?

A. Sir?

Q. You want it back? You want to go back to work with the City of Leeds doing what you were doing?

A. I want to go back to work for the City of Leeds, yes, sir.

(R4 at 196-97, 325-26).

Pursuant to the jury's partial verdict and the ruling on the motion for judgment as a matter of law, the district court dismissed the action in its entirety against both defendants. Richardson subsequently filed this appeal in which he challenges only the judgment rendered as a matter of law in favor of the City on the § 1983 and Title VII causes of action arising from the failure to restore him to his former position.

## II. DISCUSSION

[2][3][4] We review a decision to grant a judgment as a matter of law *de novo,* applying the same standards utilized by the district court. *Daniel v. City of Tampa, Fla.,* 38 F.3d 546, 549 (11th Cir.1994), *cert. denied,* 515 U.S. 1132, 115 S.Ct. 2557, 132 L.Ed.2d 811 (1995). A judgment as a matter of law is warranted "[i]f during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." Fed.R.Civ.P. 50(a)(1). When evaluating a Rule 50 motion, the court must consider all of the evidence and reasonable inferences arising therefrom in the light most favorable to the nonmoving party. *Beckwith v. City of Daytona Beach Shores, Fla.,* 58 F.3d 1554, 1560 (11th Cir.1995). A judgment as a matter of law may be affirmed only when " 'the facts and inferences point so overwhelmingly in favor of the movant ... that reasonable people could not arrive at a contrary verdict.' " *Pulte Home Corp. v. Osmose Wood Preserving, Inc.,* 60 F.3d 734, 739 (11th Cir.1995) (quoting *Roboserve, Ltd. v. Tom's Foods, Inc.,* 940 F.2d 1441, 1448 (11th Cir.1991)).

[5][6] In a case such as this alleging disparate treatment, in which § 1983 is employed as a remedy for the same conduct attacked under Title VII, " 'the elements of the two causes of action are the same.' " *Cross v. State of Ala.,* 49 F.3d 1490, 1508 (11th Cir.1995) (quoting *Hardin v. Stynchcomb,* 691 F.2d 1364, 1369 n. 16 (11th Cir.1982)). In both instances, the plaintiff must prove that the defendant acted with discriminatory intent. *Hardin,* 691 F.2d at 1369 n. 16.

[7] Identical methods of proof, as described in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), are also employed. *See St. Mary's Honor Center v. Hicks,* 509 U.S. 502, ---- n. 1, 113 S.Ct. 2742, 2746 n. 1, 125 L.Ed.2d 407, 415 n. 1 (1993) (assuming that the *McDonnell Douglas* analysis applies equally to § 1983 and Title VII claims of discrimination). First, the plaintiff must establish a prima facie case, which raises a presumption that the employer's de-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

71 F.3d 801, 69 Fair Empl.Prac.Cas. (BNA) 795, 67 Empl. Prac. Dec. P 43,793, 64 USLW 2447
**(Cite as: 71 F.3d 801)**

cision was more likely than not based upon an impermissible factor.[FN5] *McDonnell Douglas Corp.,* 411 U.S. at 802, 93 S.Ct. at 1824, 36 L.Ed.2d at 677; *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207, 216 (1981). The defendant may rebut this presumption by articulating a legitimate, nondiscriminatory reason for its decision. *McDonnell Douglas Corp.,* 411 U.S. at 802, 93 S.Ct. at 1824, 36 L.Ed.2d at 678; *Texas Dep't of Community Affairs,* 450 U.S. at 254-55, 101 S.Ct. at 1094, 67 *806 L.Ed.2d at 216. If the defendant meets this burden, the plaintiff must then have the opportunity to persuade the trier of fact, through the presentation of his own case and by cross-examining the defendant's witnesses, that the reason proffered was not the real basis for the decision, but a pretext for discrimination. *McDonnell Douglas Corp.,* 411 U.S. at 804, 93 S.Ct. at 1825, 36 L.Ed.2d at 679; *St. Mary's Honor Center,* 509 U.S. at ----, 113 S.Ct. at 2747, 125 L.Ed.2d at 416.

> FN5. The proof required to establish a prima facie case will vary depending on the circumstances. *McDonnell Douglas Corp.,* 411 U.S. at 802 n. 13, 93 S.Ct. at 1824 n. 13, 36 L.Ed.2d at 677 n. 13. In *McDonnell Douglas Corp.,* in which the plaintiff likewise alleged that his former employer refused to rehire him on account of his race, the Court stated that this initial burden may be satisfied with evidence that (1) the applicant belonged to a racial minority; (2) he applied and was qualified for the job; (3) he was rejected; and (4) after his rejection, the position remained open and the employer continued to seek qualified applicants. *Id.* at 802, 93 S.Ct. at 1824, 36 L.Ed.2d at 677.

[8][9] The distinction between the Title VII and § 1983 causes in the present case was in the availability of a jury trial and compensatory damages under § 1983, but not with respect to the Title VII equitable claims, which were tried to the court. *See supra* note 2. When legal and equitable causes are joined in one action, the legal issues must be de-

cided first. *Dairy Queen, Inc. v. Wood,* 369 U.S. 469, 479, 82 S.Ct. 894, 900-01, 8 L.Ed.2d 44, 52 (1962). To the extent that the elements of the two types of claims mirror one another, the jury's findings on the legal questions are binding in resolving the equitable issues. *Lincoln v. Board of Regents of the Univ. Sys. of Ga.,* 697 F.2d 928, 934 (11th Cir.), *cert. denied,*464 U.S. 826, 104 S.Ct. 97, 78 L.Ed.2d 102 (1983).

[10][11] Richardson argues on appeal that the district court erred by visiting whether he had established a prima facie case of discrimination after the action was fully tried on the merits, in violation of *United States Postal Serv. Bd. of Governors v. Aikens,* 460 U.S. 711, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983). We agree that it was wrong for the court to follow this procedure. In *Aikens,* the Supreme Court held that

when the defendant fails to persuade the district court to dismiss the action for lack of a prima facie case, and responds to the plaintiff's proof by offering evidence of the reason for the plaintiff's rejection, the factfinder must then decide whether the rejection was discriminatory within the meaning of Title VII.

*Id.* at 714-15, 103 S.Ct. at 1481, 75 L.Ed.2d at 410 (footnote omitted). When the trier of fact has before it all the evidence needed to decide the ultimate issue of whether the defendant intentionally discriminated against the plaintiff, the question of whether the plaintiff properly made out a prima facie case "is no longer relevant." *Id.* at 715, 103 S.Ct. at 1482, 75 L.Ed.2d at 410; *see also Wall v. Trust Co. of Georgia,* 946 F.2d 805, 809-10 (11th Cir.1991).

The district court's reliance on Richardson's statement that he was "burned out" to find that he failed to establish a prima facie case was substantively flawed as well. "The burden of establishing a prima facie case of disparate treatment is not onerous." *Texas Dep't of Community Affairs,* 450 U.S. at 253, 101 S.Ct. at 1094, 67 L.Ed.2d at 215; *see also Howard v. BP Oil Co., Inc.,* 32 F.3d 520, 524 (11th Cir.1994) (characterizing the requirements of demonstrating a prima facie case as "minimal"). To

71 F.3d 801, 69 Fair Empl.Prac.Cas. (BNA) 795, 67 Empl. Prac. Dec. P 43,793, 64 USLW 2447
**(Cite as: 71 F.3d 801)**

raise an inference of discrimination, it was not necessary for Richardson to show that he and the non-minority applicants who were rehired gave the same reason or reasons for resigning. Rather, it was sufficient for him to show that he belonged to a racial minority, that he applied for and was qualified for the job and that after his rejection, the position remained open and the Department continued to seek qualified applicants. *See supra* note 5.

The district court also decided that Richardson's admission of "burn out" was a legally acceptable ground for the City's decision, which was not pretextual. Richardson urges us to hold that the evidence relating to pretext was sufficient to create a jury issue.[FN6] **\*807** After reviewing the trial transcript, we agree that the district court could have reached its conclusion only by improperly resolving conflicting inferences arising from the evidence in the light most favorable to the City.

> FN6. Richardson argues on appeal that Lynn Maxey, the City's mayor with whom the decision ultimately rested, never proffered Richardson's "burnout" as a reason for not rehiring him. Maxey testified, however, that he was aware that Richardson complained of being "burned out" when he resigned. (R6 at 674-75). Although Maxey did not directly state that this influenced his decision, the jury could have inferred that it did. Maxey cited additional reasons for not rehiring Richardson, chief among them that he already had someone else in mind for the position when Richardson expressed an interest. Richardson maintains that the evidence reveals the existence of an issue of fact as to whether the other grounds given by the mayor were also pretextual. The district court specifically declined to consider these various explanations, however (R2-96 at 4), and rested its judgment solely on its finding that Richardson was "burned out" (*id.* at 9). We confine our review, therefore, to whether this particular motive cited by the district court must lead inexor-

ably to a finding of no discrimination. We also note that the City's contention on appeal that Richardson failed to demonstrate that the mayor was the final decisionmaker for purposes of municipal liability under § 1983 is without merit.

The proof at the trial established that Richardson worked initially in the detective division as an undercover narcotics officer, which he understood would be a temporary assignment. In April 1989, after the undercover detail ended, he was reassigned to patrol duty. While working the 11:00 p.m. to 7:00 a.m. shift, he was required to testify during the day in court proceedings resulting from his prior undercover work. During this time he was also "loaned" to several other police departments to assist in narcotics work conducted in nearby counties. After certain conversations with McDonald, Richardson expected to be considered for the next available permanent position in the detective division, which McDonald indicated would be filled by someone from within the Department. Instead, the next opening went to a white applicant from outside the Department. Richardson remained in a patrol slot until his resignation.

Richardson testified that he left "basically due to the adverse treatment, the type of double standards. I was, I was burnt out." (R4 at 168). He explained that

between working narcotics, patrol, narcotics on loan, court time, and all of this running together, trying to perform my job the best that I could in patrol, that culminated with, at the time that the position was filled in the detective division, it was from outside and not from within. Also when the DARE program came around, it was filled from the outside, not from within.

When the subject that had went to the DARE program left, leaving a slot open again, and two hires were made and then the slot was filled by one of the hires coming in, it was just all culminating. And at the time I felt that I was fighting a losing battle.

(*Id.* at 170).[FN7] He stated further that he informed McDonald of the foregoing reasons when he sub-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

mitted his letter of resignation. (*Id.* at 183). Later, after time for reflection, he decided that he wished to continue in his old job. (*Id.* at 184-85). After he was turned down by the mayor, he sought out and obtained other police work. (*Id.* at 191-93).

> FN7. Richardson had expressed an interest in participating in DARE, which was a Department-sponsored drug awareness program for teenagers.

There was also evidence that the mayor reinstated three white patrolmen after they had resigned. McDonald testified that one of the officers left the Department because he was unhappy over the denial of a promotion. (R5 at 403). Another was dissatisfied with his pay and felt he had been treated unfairly with respect to a request for military leave. (*Id.* at 406-07, 416-17). The third was rehired despite a poor work record and an evident lack of interest in performing cooperatively with other members of the force. (*Id.* at 424-25).

The district court apparently believed that the evidence failed to create an issue of fact as to the decisionmaker's intent with respect to Richardson because it was undisputed that Richardson complained he was "burned out" when he left the Department. Although the evidence would have permitted a reasonable jury to infer an innocent motive on the City's part-that the mayor viewed Richardson as a poor candidate for reemployment because he was "burned out" by police work and no longer inspired to perform to the best of his ability-a reasonable jury could also have concluded that Richardson's professed "burn out" was not the true reason he was not rehired. Like Richardson, two of the white officers who were rehired voiced dissatisfaction with their treatment within the Department. Richardson was arguably more qualified**808** than the third reinstated patrolman.[FN8] Apart from Richardson's race, the evidence did not demonstrate any circumstances peculiar to his situation which set him apart from the white officers who were restored to their jobs.[FN9] In short, the evidence presented a question of fact as to whether the mayor's decision not to rehire Richardson was racially

motivated.

> FN8. Although Richardson's record was not unblemished, he received commendations for his undercover work. In addition, McDonald recommended against rehiring the poorly qualified white officer, but did not oppose Richardson's reapplication.

> FN9. In each case, the applicant sought to return to the same position he had vacated, a similar length of time elapsed between the officer's departure and his request to be rehired and the mayor made the final decision.

As additional support for the judgment, the district court cited the jury's finding that Richardson did not "presently" desire to be reinstated.[FN10] This factor, of course, could not have served as a rationale for the mayor's decision to reject Richardson's application in 1991, because it came to light for the first time during the trial in 1994. The district court construed this circumstance, however, as interposing a complete obstacle to granting any type of relief. In doing so the court confused the issue of liability with the type of warranted relief.

> FN10. We reject without discussion Richardson's assertion that the jury's finding was inconsistent with its deadlock on the issue of whether the City's refusal to rehire him was motivated by a discriminatory purpose.

According to an "Amended Damage List" which was filed in support of the action, Richardson asked for backpay, reinstatement, declaratory and injunctive relief, costs and attorney's fees under Title VII. In his § 1983 suit he sought compensation for "financial hardship, pain, suffering and mental anguish." (R2-49). The jury's finding that, at the time of trial, Richardson no longer wanted his old job, may well have been relevant to fashioning a remedy in the event of the City's liability. *See Goldstein v. Manhattan Indus., Inc.,* 758 F.2d 1435, 1448 (11th Cir.) (the decision of whether reinstatement should be ordered is within the sound discretion of the dis-

71 F.3d 801, 69 Fair Empl.Prac.Cas. (BNA) 795, 67 Empl. Prac. Dec. P 43,793, 64 USLW 2447
**(Cite as: 71 F.3d 801)**

trict court), *cert. denied,* 474 U.S. 1005, 106 S.Ct. 525, 88 L.Ed.2d 457 (1985); *Carmichael v. Birmingham Saw Works,* 738 F.2d 1126, 1136 (11th Cir.1984) (injunction ordering employer to refrain from discriminatory practices not justified where the plaintiff is not reinstated). But it would not have foreclosed a declaratory judgment that the City acted with bad intent, making it liable for backpay and compensatory damages. The district court's alternative reasoning for ordering judgment as a matter of law was therefore erroneous.

### III. CONCLUSION

The judgment rendered as a matter of law in favor of the City on Richardson's § 1983 and Title VII causes of action alleging he was not rehired on account of his race is hereby VACATED. The case is REMANDED to the district court for further proceedings consistent with this opinion.

C.A.11 (Ala.),1995.
Richardson v. Leeds Police Dept.
71 F.3d 801, 69 Fair Empl.Prac.Cas. (BNA) 795, 67 Empl. Prac. Dec. P 43,793, 64 USLW 2447

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

102 S.Ct. 2727                                                                                    Page 1
457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396
**(Cite as: 457 U.S. 800, 102 S.Ct. 2727)**

▷

Harlow v. Fitzgerald
U.S.Dist.Col.,1982.

Supreme Court of the United States
Bryce N. HARLOW and Alexander P. Butterfield,
Petitioners
v.
A. Ernest FITZGERALD.
**No. 80-945.**

Argued Nov. 30, 1981.
Decided June 24, 1982.

Plaintiff brought suit for damages based on his al-
legedly unlawful discharge from employment in
Department of Air Force. The United States District
Court for the District of Columbia denied defend-
ants' motions for summary judgment, holding, inter
alia, that presidential aides were not entitled to ab-
solute immunity, and such aides appealed. The
Court of Appeals for the District of Columbia Cir-
cuit dismissed appeal, and certiorari was granted.
The Supreme Court, Justice Powell, held that: (1)
presidential aides generally are entitled only to
qualified immunity; (2) aides failed to establish that
their official functions required absolute immunity;
(3) presidential aides are entitled to application of
qualified immunity standard that permits defeat of
insubstantial claims without resort to trial; and (4)
government officials performing discretionary
functions generally are shielded from liability for
civil damages insofar as their conduct does not vi-
olate clearly established statutory or constitutional
rights of which reasonable person would not have
known.

Vacated and remanded.

Justice Brennan filed a concurring opinion in which
Justices Marshall and Blackmun joined.

Justices Brennan, White, Marshall and Blackmun
filed a separate concurring statement.

Justice Rehnquist filed a concurring opinion.

Chief Justice Burger filed a dissenting opinion.
West Headnotes
**[1] Officers and Public Employees 283 ⬤⟃114**

283 Officers and Public Employees
   283III Rights, Powers, Duties, and Liabilities
      283k114 k. Liabilities for Official Acts. Most
Cited Cases

**United States 393 ⬤⟃50.5(4)**

393 United States
   393I Government in General
      393k50 Liabilities of Officers or Agents for
Negligence or Misconduct
        393k50.5 Immunity or Privilege in Gener-
al
          393k50.5(4) k. Good Faith or Notice;
Motive or Purpose. Most Cited Cases
    (Formerly 393k50)
Government officials whose special functions or
constitutional status requires complete protection
from suits for damages, including certain officials
of executive branch, such as prosecutors, similar
officials and the president are entitled to defense of
absolute immunity; however, executive officials in
general are usually entitled to only qualified or
good-faith immunity.

**[2] United States 393 ⬤⟃50.5(2)**

393 United States
   393I Government in General
      393k50 Liabilities of Officers or Agents for
Negligence or Misconduct
        393k50.5 Immunity or Privilege in Gener-
al
          393k50.5(2) k. Absolute or Qualified
Immunity. Most Cited Cases
    (Formerly 393k50)
Federal officers seeking absolute immunity from
personal liability for unconstitutional conduct must
bear burden of showing that public policy requires
exemption of that scope.

**[3] United States 393 ⬤⟃50.5(5)**

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

393 United States
    393I Government in General
        393k50 Liabilities of Officers or Agents for
Negligence or Misconduct
            393k50.5 Immunity or Privilege in General
                393k50.5(5) k. Rank or Office, Employment or Agency Relation. Most Cited Cases
    (Formerly 393k50)
Presidential aides generally are entitled only to qualified immunity.

**[4] Officers and Public Employees 283 ⌘114**

283 Officers and Public Employees
    283III Rights, Powers, Duties, and Liabilities
        283k114 k. Liabilities for Official Acts. Most Cited Cases
Under "functional" approach to immunity law, immunity of government officials extends no further than its justification warrants.

**[5] United States 393 ⌘50.5(5)**

393 United States
    393I Government in General
        393k50 Liabilities of Officers or Agents for
Negligence or Misconduct
            393k50.5 Immunity or Privilege in General
                393k50.5(5) k. Rank or Office, Employment or Agency Relation. Most Cited Cases
    (Formerly 393k50)
In order to establish entitlement to absolute immunity, presidential aide must first show that responsibilities of his office embraced function so sensitive as to require total shield from liability; he then must demonstrate that he was discharging protected function when performing act for which liability is asserted.

**[6] United States 393 ⌘50.10(5)**

393 United States
    393I Government in General
        393k50 Liabilities of Officers or Agents for
Negligence or Misconduct
            393k50.10 Particular Acts or Claims

                393k50.10(5) k. Armed Services Members, Claims By. Most Cited Cases
    (Formerly 393k50)
In action based on alleged unlawful discharge from employment in Department of Air Force, presidential aides, claimed to have participated in alleged conspiracy to violate plaintiff's constitutional and statutory rights, failed to show that public policy required absolute immunity, and even assuming that they had function for which absolute immunity would be warranted, it could not be concluded that acts charged, if taken at all, would lie within protected area.

**[7] United States 393 ⌘50.5(5)**

393 United States
    393I Government in General
        393k50 Liabilities of Officers or Agents for
Negligence or Misconduct
            393k50.5 Immunity or Privilege in General
                393k50.5(5) k. Rank or Office, Employment or Agency Relation. Most Cited Cases
    (Formerly 393k50)
Presidential aides are entitled to application of qualified immunity standard that permits defeat of insubstantial claims without resort to trial.

**[8] Federal Civil Procedure 170A ⌘751**

170A Federal Civil Procedure
    170AVII Pleadings and Motions
        170AVII(C) Answer
            170AVII(C)2 Affirmative Defense or Avoidance
                170Ak751 k. In General. Most Cited Cases
Qualified or "good faith" immunity is affirmative defense that must be pleaded by defendant official.

**[9] Officers and Public Employees 283 ⌘114**

283 Officers and Public Employees
    283III Rights, Powers, Duties, and Liabilities
        283k114 k. Liabilities for Official Acts. Most Cited Cases
Government officials performing discretionary

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396
**(Cite as: 457 U.S. 800, 102 S.Ct. 2727)**

functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which reasonable person would have known.

**[10] Federal Civil Procedure 170A ☞2547.1**

170A Federal Civil Procedure
   170AXVII Judgment
      170AXVII(C) Summary Judgment
         170AXVII(C)3 Proceedings
            170Ak2547 Hearing and Determination
               170Ak2547.1 k. In General. Most Cited Cases
    (Formerly 170Ak2547)

**Officers and Public Employees 283 ☞114**

283 Officers and Public Employees
   283III Rights, Powers, Duties, and Liabilities
      283k114 k. Liabilities for Official Acts. Most Cited Cases
In determining whether government officials performing discretionary functions are shielded from liability, judge, on summary judgment, appropriately may determine, not only currently applicable law, but whether that law was clearly established at time action occurred; if this threshold immunity question is resolved, discovery should not be allowed, and if law was clearly established, immunity defense ordinarily should fail; nevertheless, if official pleading defense claims extraordinary circumstances and can prove that he neither knew nor should have known of relevant legal standard, defense should be sustained.

**\*\*2728 Syllabus** [FN*]

    FN* The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Lumber Co.*, 200 U.S. 321, 337, 26 S.Ct. 282, 287, 50 L.Ed. 499.

**\*800** In respondent's civil damages action in Federal District Court based on his alleged unlawful dis-

charge from employment in the Department of the Air Force, petitioners, White House aides to former President Nixon, were codefendants with him and were claimed to have participated in the same alleged conspiracy to violate respondent's constitutional and statutory rights as was involved in *Nixon v. Fitzgerald*, 457 U.S. 731, 102 S.Ct. 2690, 73 L.Ed.2d 349. After extensive pretrial discovery, the District Court denied the motions of petitioners and the former President for summary judgment, holding, *inter alia*, that petitioners were not entitled to absolute immunity from suit. Independently of the former President, petitioners appealed the denial of their immunity defense, but the Court of Appeals dismissed the appeal.

*Held:*

1. Government officials whose special functions or constitutional status requires complete protection from suits for damages-including certain officials of the Executive Branch, such as prosecutors and similar officials, see *Butz v. Economou*, 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895, and the President, *Nixon v. Fitzgerald*, 457 \*\*2729 U.S. 731, 102 S.Ct. 2690, 73 L.Ed.2d 349 are entitled to the defense of absolute immunity. However, executive officials in general are usually entitled to only qualified or good-faith immunity. The recognition of a qualified immunity defense for high executives reflects an attempt to balance competing values: not only the importance of a damages remedy to protect the rights of citizens, but also the need to protect officials who are required to exercise discretion and the related public interest in encouraging the vigorous exercise of official authority. *Scheuer v. Rhodes*, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90. Federal officials seeking absolute immunity from personal liability for unconstitutional conduct must bear the burden of showing that public policy requires an exemption of that scope. Pp. 2732-2733.

2. Public policy does not require a blanket recognition of absolute immunity for Presidential aides. Cf. *Butz, supra.* Pp. 2733-2736.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(a) The rationale of *Gravel v. United States*, 408 U.S. 606, 92 S.Ct. 2614, 33 L.Ed.2d 583-which held the Speech and Debate Clause derivatively applicable to the "legislative acts" of a Senator's aide that would have been privileged if performed by the Senator himself-does not mandate "derivative" absolute **\*801** immunity for the President's chief aides. Under the "functional" approach to immunity law, immunity protection extends no further than its justification warrants. Pp. 2734-2735.

(b) While absolute immunity might be justified for aides entrusted with discretionary authority in such sensitive areas as national security or foreign policy, a "special functions" rationale does not warrant a blanket recognition of absolute immunity for all Presidential aides in the performance of all their duties. To establish entitlement to absolute immunity, a Presidential aide first must show that the responsibilities of his office embraced a function so sensitive as to require a total shield from liability. He then must demonstrate that he was discharging the protected function when performing the act for which liability is asserted. Under the record in this case, neither petitioner has made the requisite showing for absolute immunity. However, the possibility that petitioners, on remand, can satisfy the proper standards is not foreclosed. Pp. 2735-2736.

3. Petitioners are entitled to application of the qualified immunity standard that permits the defeat of insubstantial claims without resort to trial. Pp. 2736-2740.

(a) The previously recognized "subjective" aspect of qualified or "good faith" immunity-whereby such immunity is not available if the official asserting the defense "took the action with the malicious intention to cause a deprivation of constitutional rights or other injury,"*Wood v. Strickland*, 420 U.S. 308, 322, 95 S.Ct. 992, 1000, 43 L.Ed.2d 214-frequently has proved incompatible with the principle that insubstantial claims should not proceed to trial. Henceforth, government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate "clearly established" stat-

utory or constitutional rights of which a reasonable person would have known. Pp. 2736-2740.

(b) The case is remanded for the District Court's reconsideration of the question whether respondent's pretrial showings were insufficient to withstand petitioners' motion for summary judgment. Pp. 2739-2740.

Vacated and remanded.

Herbert J. Miller, Jr., Washington, D. C., for petitioner Nixon.
**\*802** Elliot L. Richardson, Washington, D. C., for petitioners Harlow and Butterfield.
John E. Nolan, Jr., Washington, D. C., for respondent.
Justice POWELL delivered the opinion of the Court.
The issue in this case is the scope of the immunity available to the senior aides and advisers of the President of the United **\*\*2730** States in a suit for damages based upon their official acts.

I

In this suit for civil damages petitioners Bryce Harlow and Alexander Butterfield are alleged to have participated in a conspiracy to violate the constitutional and statutory rights of the respondent A. Ernest Fitzgerald. Respondent avers that petitioners entered the conspiracy in their capacities as senior White House aides to former President Richard M. Nixon. As the alleged conspiracy is the same as that involved in *Nixon v. Fitzgerald*, 457 U.S. 731, 102 S.Ct. 2690, 73 L.Ed.2d 349, the facts need not be repeated in detail.

Respondent claims that Harlow joined the conspiracy in his role as the Presidential aide principally responsible for congressional relations.[FN1] At the conclusion of discovery the **\*803** supporting evidence remained inferential. As evidence of Harlow's conspiratorial activity respondent relies heavily on a series of conversations in which Harlow discussed Fitzgerald's dismissal with Air Force Secretary Robert Seamans.[FN2] The other evidence most supportive of Fitzgerald's claims consists of a recorded

conversation in which the President later voiced a tentative recollection that Harlow was "all for canning" Fitzgerald.[FN3]

FN1. Harlow held this position from the beginning of the Nixon administration on January 20, 1969, through November 4, 1969. On the latter date he was designated as Counselor to the President, a position accorded Cabinet status. He served in that capacity until December 9, 1970, when he returned to private life. Harlow later resumed the duties of Counselor for the period from July 1, 1973, through April 14, 1974. Respondent appears to allege that Harlow continued in a conspiracy against him throughout the various changes of official assignment.

FN2. The record reveals that Secretary Seamans called Harlow in May 1969 to inquire about likely congressional reaction to a draft reorganization plan that would cause Fitzgerald's dismissal. According to Seamans' testimony, "[W]e [the Air Force] didn't ask [Harlow] to pass judgment on the action itself. We just asked him what the impact would be in the relationship with the Congress." App. 153a, 164a-165a (deposition of Robert Seamans). Through an aide Harlow responded that "this was a very sensitive item on the Hill and that it would be [his] recommendation that [the Air Force] not proceed to make such a change at that time." *Id.*, at 152a. But the Air Force persisted. Seamans spoke to Harlow on at least one subsequent occasion during the spring of 1969. The record also establishes that Secretary Seamans called Harlow on November 4, 1969, shortly after the public announcement of Fitzgerald's impending dismissal, and again in December 1969. See *id.*, at 186a.

FN3. See *id.*, at 284a. (transcript of a recorded conversation between Richard Nixon and Ronald Ziegler, February 26,

1973). In a conversation with the President on January 31, 1973, John Ehrlichman also recalled that Harlow had discussed the Fitzgerald case with the President. See *id.*, at 218a-221a. (transcript of recorded conversation between Richard Nixon and John Ehrlichman, January 31, 1973). In the same conversation the President himself asserted that he had spoken to Harlow about the Fitzgerald matter, see *id.*, at 218a, but the parties continue to dispute whether Mr. Nixon-at the most relevant moments in the discussion-was confusing Fitzgerald's case with that of another dismissed employee. The President explicitly stated at one point that he previously had been confused. See *id.*, at 220a.

Disputing Fitzgerald's contentions, Harlow argues that exhaustive discovery has adduced no direct evidence of his involvement**804** in any wrongful activity.[FN4] He avers that Secretary Seamans advised him that considerations of efficiency required Fitzgerald's removal by a reduction in force, despite anticipated adverse congressional reaction. Harlow asserts he had no reason to believe that a conspiracy existed. He contends that he took all his actions in good faith.[FN5]

FN4. See Defendants Memorandum of Points and Authorities in Support of Their Motion for Summary Judgment in Civ. No. 74-178 (DC), p. 7 (Feb. 12, 1980).

FN5. In support of his version of events Harlow relies particularly on the deposition testimony of Air Force Secretary Seamans, who stated that he regarded abolition of Fitzgerald's position as necessary "to improve the efficiency" of the Financial Management Office of the Air Force and that he never received any White House instruction regarding the Fitzgerald case. App. 159a-160a. Harlow also disputes the probative value of Richard Nixon's recorded remark that Harlow had supported Fitzgerald's firing. Harlow emphas-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

izes the tentativeness of the President's statement. To the President's query whether Harlow was "all for canning [Fitzgerald], wasn't he?", White House Press Secretary Ronald Ziegler in fact gave a negative reply: "No, I think Bryce may have been the other way." *Id.*, at 284a. The President did not respond to Ziegler's comment.

**\*\*2731** Petitioner Butterfield also is alleged to have entered the conspiracy not later than May 1969. Employed as Deputy Assistant to the President and Deputy Chief of Staff to H. R. Haldeman,[FN6] Butterfield circulated a White House memorandum in that month in which he claimed to have learned that Fitzgerald planned to "blow the whistle" on some "shoddy purchasing practices" by exposing these practices to public view.[FN7] Fitzgerald characterizes this memorandum as evidence**\*805** that Butterfield had commenced efforts to secure Fitzgerald's retaliatory dismissal. As evidence that Butterfield participated in the conspiracy to conceal his unlawful discharge and prevent his reemployment, Fitzgerald cites communications between Butterfield and Haldeman in December 1969 and January 1970. After the President had promised at a press conference to inquire into Fitzgerald's dismissal, Haldeman solicited Butterfield's recommendations. In a subsequent memorandum emphasizing the importance of "loyalty," Butterfield counseled against offering Fitzgerald another job in the administration at that time.[FN8]

FN6. The record establishes that Butterfield worked from an office immediately adjacent to the oval office. He had almost daily contact with the President until March 1973, when he left the White House to become Administrator of the Federal Aviation Administration.

FN7. *Id.*, at 274a. Butterfield reported that this information had been referred to the Federal Bureau of Investigation. In the memorandum Butterfield reported that he had received the information "by word of

several mouths, but allegedly from a senior AFL-CIO official originally .... Evidently, Fitzgerald attended a recent meeting of the National Democratic Coalition and, while there, revealed his intentions to a labor representative who, fortunately for us, was unsympathetic." *Ibid.*

FN8. *Id.*, 99a-100a, 180a-181a. This memorandum, quoted in *Nixon v. Fitzgerald*, 457 U.S., at 735-736, 102 S.Ct., at 2694-2695, was not sent to the Defense Department.

For his part, Butterfield denies that he was involved in any decision concerning Fitzgerald's employment status until Haldeman sought his advice in December 1969-more than a month after Fitzgerald's termination had been scheduled and announced publicly by the Air Force. Butterfield states that he never communicated his views about Fitzgerald to any official of the Defense Department. He argues generally that nearly eight years of discovery have failed to turn up any evidence that he caused injury to Fitzgerald.[FN9]

FN9. See Memorandum in Support of Summary Judgment, *supra*, at 26. The history of Fitzgerald's litigation is recounted in *Nixon v. Fitzgerald*, 457 U.S. 731, 102 S.Ct. 2690, 73 L.Ed.2d 349. Butterfield was named as a defendant in the initial civil action filed by Fitzgerald in 1974. Harlow was named for the first time in respondent's second amended complaint of July 5, 1978.

Together with their codefendant Richard Nixon, petitioners Harlow and Butterfield moved for summary judgment on February 12, 1980. In denying the motion the District Court upheld the legal sufficiency of Fitzgerald's *Bivens (Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971)) claim under the First Amendment and his "inferred" statutory causes of action under 5 U.S.C. § 7211 (1976 ed., Supp.IV) and 18 U.S.C. § 1505.[FN10] The court

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**\*806** found that **\*\*2732** genuine issues of disputed fact remained for resolution at trial. It also ruled that petitioners were not entitled to absolute immunity. App. to Pet. for Cert. 1a-3a.

> FN10. The first of these statutes, 5 U.S.C. § 7211 (1976 ed., Supp.IV), provides generally that "[t]he right of employees ... to ... furnish information to either House of Congress, or to a committee or Member thereof, may not be interfered with or denied." The second, 18 U.S.C. § 1505, is a criminal statute making it a crime to obstruct congressional testimony. Neither expressly creates a private right to sue for damages. Petitioners argue that the District Court erred in finding that a private cause of action could be inferred under either statute, and that "special factors" present in the context of the federal employer-employee relationship preclude the recognition of respondent's *Bivens* action under the First Amendment. The legal sufficiency of respondent's asserted causes of action is not, however, a question that we view as properly presented for our decision in the present posture of this case. See n. 36, *infra.*

Independently of former President Nixon, petitioners invoked the collateral order doctrine and appealed the denial of their immunity defense to the Court of Appeals for the District of Columbia Circuit. The Court of Appeals dismissed the appeal without opinion. *Id.*, at 11a-12a. Never having determined the immunity available to the senior aides and advisers of the President of the United States, we granted certiorari. 452 U.S. 959, 101 S.Ct. 3106, 69 L.Ed.2d 969 (1981).FN11

> FN11. As in *Nixon v. Fitzgerald*, 457 U.S. 731, 102 S.Ct. 2690, 73 L.Ed.2d 349, our jurisdiction has been challenged on the basis that the District Court's order denying petitioners' claim of absolute immunity was not an appealable final order and that the Court of Appeals' dismissal of petition-

ers' appeal establishes that this case was never "in" the Court of Appeals within the meaning of 28 U.S.C. § 1254. As the discussion in *Nixon* establishes our jurisdiction in this case as well, we need not consider those challenges in this opinion.

## II

As we reiterated today in *Nixon v. Fitzgerald*, 457 U.S. 731, 102 S.Ct. 2690, 73 L.Ed.2d 349, our decisions consistently have held that government officials are entitled to some form of immunity from suits for damages. As recognized at common law, public officers require this protection to shield them from undue interference with their duties and from potentially disabling threats of liability.

[1] **\*807** Our decisions have recognized immunity defenses of two kinds. For officials whose special functions or constitutional status requires complete protection from suit, we have recognized the defense of "absolute immunity." The absolute immunity of legislators, in their legislative functions, see, *e.g., Eastland v. United States Servicemen's Fund*, 421 U.S. 491, 95 S.Ct. 1813, 44 L.Ed.2d 324 (1975), and of judges, in their judicial functions, see, *e.g., Stump v. Sparkman*, 435 U.S. 349, 98 S.Ct. 1099, 55 L.Ed.2d 331 (1978), now is well settled. Our decisions also have extended absolute immunity to certain officials of the Executive Branch. These include prosecutors and similar officials, see *Butz v. Economou*, 438 U.S. 478, 508-512, 98 S.Ct. 2894, 2911-2916, 57 L.Ed.2d 895 (1978), executive officers engaged in adjudicative functions, *id.*, at 513-517, 98 S.Ct., at 2914-2916, and the President of the United States, see *Nixon v. Fitzgerald*, 457 U.S. 731, 102 S.Ct. 2690, 73 L.Ed.2d 349.

For executive officials in general, however, our cases make plain that qualified immunity represents the norm. In *Scheuer v. Rhodes*, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), we acknowledged that high officials require greater protection than those with less complex discretionary responsibilities. Nonetheless, we held that a governor and

his aides could receive the requisite protection from qualified or good-faith immunity. *Id.*, at 247-248, 94 S.Ct. at 1691-1692. In *Butz v. Economou, supra,* we extended the approach of *Scheuer* to high federal officials of the Executive Branch. Discussing in detail the considerations that also had underlain our decision in *Scheuer,* we explained that the recognition of a qualified immunity defense for high executives reflected an attempt to balance competing values: not only the importance of a damages remedy to protect the rights of citizens, 438 U.S., at 504-505, 98 S.Ct., at 2909-2910, but also "the need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority." *Id.*, at 506, 98 S.Ct., at 2910. Without discounting the adverse consequences of denying high officials an absolute immunity from private lawsuits alleging constitutional violations-consequences found sufficient in *Spalding v. Vilas*, 161 U.S. 483, 16 S.Ct. 631, 40 L.Ed. 780 (1896), and *Barr v. Matteo*, 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 **\*808** 1959), to warrant extension to such officials of absolute immunity from suits at common **\*\*2733** law-we emphasized our expectation that insubstantial suits need not proceed to trial:

"Insubstantial lawsuits can be quickly terminated by federal courts alert to the possibilities of artful pleading. Unless the complaint states a compensable claim for relief ..., it should not survive a motion to dismiss. Moreover, the Court recognized in *Scheuer* that damages suits concerning constitutional violations need not proceed to trial, but can be terminated on a properly supported motion for summary judgment based on the defense of immunity.... In responding to such a motion, plaintiffs may not play dog in the manger; and firm application of the Federal Rules of Civil Procedure will ensure that federal officials are not harassed by frivolous lawsuits." 438 U.S., at 507-508, 98 S.Ct., at 2911-2912 (citations omitted).

[2] *Butz* continued to acknowledge that the special functions of some officials might require absolute immunity. But the Court held that "federal officials who seek absolute exemption from personal liabil-

ity for unconstitutional conduct must bear the burden of showing that public policy requires an exemption of that scope." *Id.*, at 506, 98 S.Ct. at 2910. This we reaffirmed today in *Nixon v. Fitzgerald*, 457 U.S., at 747, 102 S.Ct., at 2700.

### III

### A

Petitioners argue that they are entitled to a blanket protection of absolute immunity as an incident of their offices as Presidential aides. In deciding this claim we do not write on an empty page. In *Butz v. Economou, supra,* the Secretary of Agriculture-a Cabinet official directly accountable to the President-asserted a defense of absolute official immunity from suit for civil damages. We rejected his claim. In so doing we did not question the power or the importance of the Secretary's office. Nor did we doubt the importance to the **\*809** President of loyal and efficient subordinates in executing his duties of office. Yet we found these factors, alone, to be insufficient to justify absolute immunity. "[T]he greater power of [high] officials," we reasoned, "affords a greater potential for a regime of lawless conduct." 438 U.S., at 506, 98 S.Ct., at 2910. Damages actions against high officials were therefore "an important means of vindicating constitutional guarantees." *Ibid.* Moreover, we concluded that it would be "untenable to draw a distinction for purposes of immunity law between suits brought against state officials under [42 U.S.C.] § 1983 and suits brought directly under the Constitution against federal officials." *Id.*, at 504, 98 S.Ct., at 2909.

[3] Having decided in *Butz* that Members of the Cabinet ordinarily enjoy only qualified immunity from suit, we conclude today that it would be equally untenable to hold absolute immunity an incident of the office of every Presidential subordinate based in the White House. Members of the Cabinet are direct subordinates of the President, frequently with greater responsibilities, both to the President and to the Nation, than White House staff. The considerations that supported our decision in *Butz* apply with equal force to this case. It

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

is no disparagement of the offices held by petitioners to hold that Presidential aides, like Members of the Cabinet, generally are entitled only to a qualified immunity.

B

In disputing the controlling authority of *Butz*, petitioners rely on the principles developed in *Gravel v. United States*, 408 U.S. 606, 92 S.Ct. 2614, 33 L.Ed.2d 583 (1972).[FN12] In *Gravel* we endorsed the view **2734** that "it is literally impossible ... for Members of Congress to perform***810** their legislative tasks without the help of aides and assistants" and that "the day-to-day work of such aides is so critical to the Members' performance that they must be treated as the latter's alter egos...." *Id.*, at 616-617, 92 S.Ct., at 2622-2623. Having done so, we held the Speech and Debate Clause derivatively applicable to the "legislative acts" of a Senator's aide that would have been privileged if performed by the Senator himself. *Id.*, at 621-622, 92 S.Ct., at 2625-2626.

> FN12. Petitioners also claim support from other cases that have followed *Gravel* in holding that congressional employees are derivatively entitled to the legislative immunity provided to United States Senators and Representatives under the Speech and Debate Clause. See *Eastland v. United States Servicemen's Fund*, 421 U.S. 491, 95 S.Ct. 1813, 44 L.Ed.2d 324 (1975); *Doe v. McMillan*, 412 U.S. 306, 93 S.Ct. 2018, 36 L.Ed.2d 912 (1973).

Petitioners contend that the rationale of *Gravel* mandates a similar "derivative" immunity for the chief aides of the President of the United States. Emphasizing that the President must delegate a large measure of authority to execute the duties of his office, they argue that recognition of derivative absolute immunity is made essential by all the considerations that support absolute immunity for the President himself.

[4] Petitioners' argument is not without force. Ultimately, however, it sweeps too far. If the Presid-

ent's aides are derivatively immune because they are essential to the functioning of the Presidency, so should the Members of the Cabinet-Presidential subordinates some of whose essential roles are acknowledged by the Constitution itself[FN13]-be absolutely immune. Yet we implicitly rejected such derivative immunity in *Butz*.[FN14] Moreover, in general our cases have followed a "functional" approach to immunity law. We have recognized***811** that the judicial, prosecutorial, and legislative functions require absolute immunity. But this protection has extended no further than its justification would warrant. In *Gravel*, for example, we emphasized that Senators and their aides were absolutely immune only when performing "acts legislative in nature," and not when taking other acts even "in their official capacity." 408 U.S., at 625, 92 S.Ct., at 2627. See *Hutchinson v. Proxmire*, 443 U.S. 111, 125-133, 99 S.Ct. 2675, 2683-2687, 61 L.Ed.2d 411 (1979). Our cases involving judges[FN15] and prosecutors[FN16] have followed a similar line. The undifferentiated extension of absolute "derivative" immunity to the President's aides therefore could not be reconciled with the "functional" approach that has characterized the immunity decisions of this Court, indeed including *Gravel* itself.[FN17]

> FN13. See U.S.Const., Art. II, § 2 ("The President ... may require the Opinion, in writing, of the principal Officer in each of the executive Departments, upon any Subject relating to the Duties of their respective Offices....").

> FN14. The Chief Justice, *post*, at 2744, argues that senior Presidential aides work "more intimately with the President on a daily basis than does a Cabinet officer," and that *Butz* therefore is not controlling. In recent years, however, such men as Henry Kissinger and James Schlesinger have served in both Presidential advisory and Cabinet positions. Kissinger held both posts simultaneously. In our view it is impossible to generalize about the role of "offices" in an individual President's administration without reference to the func-

tions that particular officeholders are assigned by the President. *Butz v. Economou* cannot be distinguished on this basis.

FN15. See, *e.g., Supreme Court of Virginia v. Consumers Union of the United States*, 446 U.S. 719, 731-737, 100 S.Ct. 1967, 1974-1977, 64 L.Ed.2d 641 (1980); *Stump v. Sparkman*, 435 U.S. 349, 362, 98 S.Ct. 1099, 1107, 55 L.Ed.2d 331 (1978). 438 U.S., at 362,98 S.Ct., at 1107.

FN16. In *Imbler v. Pachtman*, 424 U.S. 409, 430-431, 96 S.Ct. 984, 994-995, 47 L.Ed.2d 128 (1973), this Court reserved the question whether absolute immunity would extend to "those aspects of the prosecutor's responsibility that cast him in the role of an administrator or investigative officer." Since that time the Courts of Appeals generally have ruled that prosecutors do not enjoy absolute immunity for acts taken in those capacities. See, *e.g., Mancini v. Lester*, 630 F.2d 990, 992 (CA3 1980); *Forsyth v. Kleindienst*, 599 F.2d 1203, 1213-1214 (CA3 1979). This Court at least implicitly has drawn the same distinction in extending absolute immunity to executive officials when they are engaged in quasi-prosecutorial functions. See *Butz v. Economou*, 438 U.S., at 515-517, 98 S.Ct., at 2915-2916.

FN17. Our decision today in *Nixon v. Fitzgerald*, 457 U.S. 731, 102 S.Ct. 2690, 73 L.Ed.2d 349, in no way abrogates this general rule. As we explained in that opinion, the recognition of absolute immunity for all of a President's acts in office derives in principal part from factors unique to his constitutional responsibilities and station. Suits against other officials-including Presidential aides-generally do not invoke separation-of-powers considerations to the same extent as suits against the President himself.

**\*\*2735** C

Petitioners also assert an entitlement to immunity based on the "special functions" of White House aides. This form **\*812** of argument accords with the analytical approach of our cases. For aides entrusted with discretionary authority in such sensitive areas as national security or foreign policy, absolute immunity might well be justified to protect the unhesitating performance of functions vital to the national interest.[FN18] But a "special functions" rationale does not warrant a blanket recognition of absolute immunity for all Presidential aides in the performance of all their duties. This conclusion too follows from our decision in *Butz*, which establishes that an executive official's claim to absolute immunity must be justified by reference to the public interest in the special functions of his office, not the mere fact of high station.[FN19]

FN18. Cf. *United States v. Nixon*, 418 U.S. 683, 710-711, 94 S.Ct. 3090, 3108-3109, 41 L.Ed.2d 1039 (1974) ("[C]ourts have traditionally shown the utmost deference to Presidential responsibilities" for foreign policy and military affairs, and claims of privilege in this area would receive a higher degree of deference than invocations of "a President's generalized interest in confidentiality"); *Katz v. United States*, 389 U.S. 347, 364, 88 S.Ct. 507, 518, 19 L.Ed.2d 576 (1967) (WHITE, J., concurring) ("We should not require the warrant procedure and the magistrate's judgment if the President of the United States *or his chief legal officer, the Attorney General*, has considered the requirements of national security and authorized electronic surveillance as reasonable") (emphasis added).

FN19. *Gravel v. United States*, 408 U.S. 606, 92 S.Ct. 2614, 33 L.Ed.2d 583 (1972), points to a similar conclusion. We fairly may assume that some aides are assigned to act as Presidential "alter egos," *id.*, at 616-617, 92 S.Ct., at 2622-2623, in the ex-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

ercise of functions for which absolute immunity is "essential for the conduct of the public business,"*Butz, supra,* at 507, 98 S.Ct., at 2911. Cf. *Gravel, supra,* at 620, 92 S.Ct., at 2624 (derivative immunity extends only to acts within the "central role" of the Speech and Debate Clause in permitting free legislative speech and debate). By analogy to *Gravel,* a derivative claim to Presidential immunity would be strongest in such "central" Presidential domains as foreign policy and national security, in which the President could not discharge his singularly vital mandate without delegating functions nearly as sensitive as his own.

[5] *Butz* also identifies the location of the burden of proof. The burden of justifying absolute immunity rests on the official asserting the claim. 438 U.S., at 506, 98 S.Ct., at 2910. We have not of course had occasion to identify how a Presidential aide might carry this burden. But the general requisites are familiar in our cases. In order to establish entitlement to absolute immunity*813 a Presidential aide first must show that the responsibilities of his office embraced a function so sensitive as to require a total shield from liability.[FN20] He then must demonstrate that he was discharging the protected function when performing the act for which liability is asserted.[FN21]

> FN20. Here as elsewhere the relevant judicial inquiries would encompass considerations of public policy, the importance of which should be confirmed either by reference to the common law or, more likely, our constitutional heritage and structure. See *Nixon v. Fitzgerald,* 457 U.S., at 747-748, 102 S.Ct., at 2700-2701.

> FN21. The need for such an inquiry is implicit in *Butz v. Economou, supra,* at 508-517,98 S.Ct., at 2911-2916; see *Imbler v. Pachtman, supra,* at 430-431, 96 S.Ct., at 994-995. Cases involving immunity under the Speech and Debate Clause have inquired explicitly into whether particular

acts and activities qualified for the protection of the Clause. See, *e.g., Hutchinson v. Proxmire,* 443 U.S. 111, 99 S.Ct. 2675, 61 L.Ed.2d 411 (1979); *Doe v. McMillan,* 412 U.S. 306, 93 S.Ct. 2018, 36 L.Ed.2d 912 (1973); *Gravel v. United States, supra.*

[6] Applying these standards to the claims advanced by petitioners Harlow and Butterfield, we cannot conclude on the record before us that either has shown that "public policy requires [for any of the functions of his office] an exemption of [absolute] scope." *Butz,* 438 U.S., at 506, 98 S.Ct., at 2910. Nor, assuming that petitioners did have functions for which absolute immunity would be warranted, could **2736 we now conclude that the acts charged in this lawsuit-if taken at all-would lie within the protected area. We do not, however, foreclose the possibility that petitioners, on remand, could satisfy the standards properly applicable to their claims.

IV

[7] Even if they cannot establish that their official functions require absolute immunity, petitioners assert that public policy at least mandates an application of the qualified immunity standard that would permit the defeat of insubstantial claims without resort to trial. We agree.

A

The resolution of immunity questions inherently requires a balance between the evils inevitable in any available alternative.*814 In situations of abuse of office, an action for damages may offer the only realistic avenue for vindication of constitutional guarantees. *Butz v. Economou, supra,* at 506, 98 S.Ct., at 2910; see *Bivens v. Six Unknown Fed. Narcotics Agents,* 403 U.S., at 410, 91 S.Ct., at 2011 ("For people in Bivens' shoes, it is damages or nothing"). It is this recognition that has required the denial of absolute immunity to most public officers. At the same time, however, it cannot be disputed seriously that claims frequently run against the innocent as well as the guilty-at a cost not only to the defendant officials, but to society as a whole.[FN22]

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396

**(Cite as: 457 U.S. 800, 102 S.Ct. 2727)**

These social costs include the expenses of litigation, the diversion of official energy from pressing public issues, and the deterrence of able citizens from acceptance of public office. Finally, there is the danger that fear of being sued will "dampen the ardor of all but the most resolute, or the most irresponsible [public officials], in the unflinching discharge of their duties." *Gregoire v. Biddle*, 177 F.2d 579, 581 (CA2 1949), cert. denied, 339 U.S. 949, 70 S.Ct. 803, 94 L.Ed. 1363 (1950).

> FN22. See generally Schuck, Suing Our Servants: The Court, Congress, and the Liability of Public Officials for Damages, 1980 S.Ct.Rev. 281, 324-327.

In identifying qualified immunity as the best attainable accommodation of competing values, in *Butz, supra*, 438 U.S., at 507-508, 98 S.Ct., 2911-2912, as in *Scheuer*, 416 U.S., at 245-248, 94 S.Ct., at 1691-1692, we relied on the assumption that this standard would permit "[i]nsubstantial lawsuits [to] be quickly terminated." 438 U.S., at 507-508, 98 S.Ct., at 2911-2912; see *Hanrahan v. Hampton*, 446 U.S. 754, 765, 100 S.Ct. 1987, 1993, 64 L.Ed.2d 670 (1980) (POWELL, J., concurring in part and dissenting in part).<sup>FN23</sup> Yet petitioners advance persuasive arguments that the dismissal of insubstantial lawsuits without trial-a factor presupposed in the balance of competing interests struck by *815 our prior cases-requires an adjustment of the "good faith" standard established by our decisions.

> FN23. The importance of this consideration hardly needs emphasis. This Court has noted the risk imposed upon political officials who must defend their actions and motives before a jury. See *Lake Country Estates, Inc. v. Tahoe Regional Planning Agency*, 440 U.S. 391, 405, 99 S.Ct. 1171, 1179, 59 L.Ed.2d 401 (1979); *Tenney v. Brandhove*, 341 U.S. 367, 377-378, 71 S.Ct. 783, 788-789,95 L.Ed.2d 1019 (1951). As the Court observed in *Tenney*: "In times of political passion, dishonest or vindictive motives are readily attributed ... and as readily believed." *Id.*, at 378, 71

S.Ct., at 789.

**B**

[8] Qualified or "good faith" immunity is an affirmative defense that must be pleaded by a defendant official. *Gomez v. Toledo*, 446 U.S. 635, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980).<sup>FN24</sup> Decisions of this Court have established that the "good faith" defense has both an "objective" and a "subjective" aspect. The objective element**2737 involves a presumptive knowledge of and respect for "basic, unquestioned constitutional rights." *Wood v. Strickland*, 420 U.S. 308, 322, 95 S.Ct. 992, 1001, 43 L.Ed.2d 214 (1975). The subjective component refers to "permissible intentions." *Ibid.* Characteristically the Court has defined these elements by identifying the circumstances in which qualified immunity would *not* be available. Referring both to the objective and subjective elements, we have held that qualified immunity would be defeated if an official "*knew or reasonably should have known* that the action he took within his sphere of official responsibility would violate the constitutional rights of the [plaintiff], *or* if he took the action *with the malicious intention* to cause a deprivation of constitutional rights or other injury...." *Ibid.*(emphasis added).<sup>FN25</sup>

> FN24. Although *Gomez* presented the question in the context of an action under 42 U.S.C. § 1983, the Court's analysis indicates that "immunity" must also be pleaded as a defense in actions under the Constitution and laws of the United States. See 446 U.S., at 640, 100 S.Ct., at 1924. *Gomez* did not decide which party bore the burden of proof on the issue of good faith. *Id.*, at 642, 100 S.Ct., 1924 (Rehnquist, J., concurring).

> FN25. In *Wood* the Court explicitly limited its holding to the circumstances in which a school board member, "in the specific context of school discipline,"420 U.S., at 322, 95 S.Ct., 1001, would be stripped of claimed immunity in an action under §

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1983. Subsequent cases, however, have quoted the *Wood* formulation as a general statement of the qualified immunity standard. See, *e.g., Procunier v. Navarette*, 434 U.S. 555, 562-563, 566, 98 S.Ct. 855, 859-860, 862, 55 L.Ed.2d 24 (1978), quoted in *Baker v. McCollan*, 443 U.S. 137, 139, 99 S.Ct. 2689, 2692, 61 L.Ed.2d 433 (1979).

The subjective element of the good-faith defense frequently has proved incompatible with our admonition in *Butz* **816** that insubstantial claims should not proceed to trial. Rule 56 of the Federal Rules of Civil Procedure provides that disputed questions of fact ordinarily may not be decided on motions for summary judgment.FN26 And an official's subjective good faith has been considered to be a question of fact that some courts have regarded as inherently requiring resolution by a jury.FN27

> FN26. Rule 56(c) states that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In determining whether summary judgment is proper, a court ordinarily must look at the record in the light most favorable to the party opposing the motion, drawing all inferences most favorable to that party. *E.g., Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962).

> FN27. *E.g., Landrum v. Moats*, 576 F.2d 1320, 1329 (CA8 1978); *Duchesne v. Sugarman*, 566 F.2d 817, 832-833 (CA2 1977); cf. *Hutchinson v. Proxmire*, 443 U.S., at 120 n.9, 99 S.Ct., at 2680, n.9 (questioning whether the existence of "actual malice," as an issue of fact, may properly be decided on summary judgment in a suit alleging libel of a public figure).

In the context of *Butz*' attempted balancing of competing values, it now is clear that substantial costs attend the litigation of the subjective good faith of government officials. Not only are there the general costs of subjecting officials to the risks of trial-distraction of officials from their governmental duties, inhibition of discretionary action, and deterrence of able people from public service. There are special costs to "subjective" inquiries of this kind. Immunity generally is available only to officials performing discretionary functions. In contrast with the thought processes accompanying "ministerial" tasks, the judgments surrounding discretionary action almost inevitably are influenced by the decisionmaker's experiences, values, and emotions. These variables explain in part why questions of subjective intent so rarely can be decided by summary judgment. Yet they also frame a background**817** in which there often is no clear end to the relevant evidence. Judicial inquiry into subjective motivation therefore may entail broad-ranging discovery and the deposing of numerous persons, including an official's professional colleagues.FN28 Inquiries of this **2738** kind can be peculiarly disruptive of effective government.FN29

> FN28. In suits against a President's closest aides, discovery of this kind frequently could implicate separation-of-powers concerns. As the Court recognized in *United States v. Nixon*, 418 U.S., at 708, 94 S.Ct., at 3107:
> "A President and those who assist him must be free to explore alternatives in the process of shaping policies and making decisions and to do so in a way many would be unwilling to express except privately. These are the considerations justifying a presumptive privilege for Presidential communications. The privilege is fundamental to the operation of Government and inextricably rooted in the separation of powers under the Constitution."

> FN29. As Judge Gesell observed in his concurring opinion in *Halperin v. Kissinger*, 196 U.S.App.D.C. 285, 307, 606 F.2d

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1192, 1214 (1979), aff'd in pertinent part by an equally divided Court, 452 U.S. 713, 101 S.Ct. 3132, 69 L.Ed.2d 367 (1981):

"We should not close our eyes to the fact that with increasing frequency in this jurisdiction and throughout the country plaintiffs are filing suits seeking damage awards against high government officials in their personal capacities based on alleged constitutional torts. Each such suit almost invariably results in these officials and their colleagues being subjected to extensive discovery into traditionally protected areas, such as their deliberations preparatory to the formulation of government policy and their intimate thought processes and communications at the presidential and cabinet levels. Such discover [*sic* ] is wideranging, time-consuming, and not without considerable cost to the officials involved. It is not difficult for ingenious plaintiff's counsel to create a material issue of fact on some element of the immunity defense where subtle questions of constitutional law and a decisionmaker's mental processes are involved. A sentence from a casual document or a difference in recollection with regard to a particular policy conversation held long ago would usually, under the normal summary judgment standards, be sufficient [to force a trial].... The effect of this development upon the willingness of individuals to serve their country is obvious."

[9] Consistently with the balance at which we aimed in *Butz*, we conclude today that bare allegations of malice should not suffice to subject government officials either to the costs of **\*818** trial or to the burdens of broad-reaching discovery. We therefore hold that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. See *Procunier v. Navarette*, 434 U.S. 555, 565, 98 S.Ct. 855, 861, 55 L.Ed.2d

24 (1978); *Wood v. Strickland*, 420 U.S., at 322, 95 S.Ct., at 1001.[FN30]

> FN30. This case involves no issue concerning the elements of the immunity available to state officials sued for constitutional violations under 42 U.S.C. § 1983. We have found previously, however, that it would be "untenable to draw a distinction for purposes of immunity law between suits brought against state officials under § 1983 and suits brought directly under the Constitution against federal officials." *Butz v. Economou*, 438 U.S., at 504, 98 S.Ct., at 2909.
>
> Our decision in no way diminishes the absolute immunity currently available to officials whose functions have been held to require a protection of this scope.

[10] Reliance on the objective reasonableness of an official's conduct, as measured by reference to clearly established law,[FN31] should avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment. On summary judgment, the judge appropriately may determine, not only the currently applicable law, but whether that law was clearly established at the time an action occurred.[FN32] If the law at that time was not clearly established, an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to "know" that the law forbade conduct not previously identified as unlawful. Until this threshold immunity question is resolved, discovery should not be allowed. If the law was clearly established, the immunity defense ordinarily **\*819** should fail, since a reasonably competent public official should know the law governing his conduct. Nevertheless, if the official pleading the defense claims extraordinary circumstances and can prove that he neither knew nor should have known of the relevant legal standard, the defense should be sustained. But again, the defense would turn primarily on objective factors.

> FN31. This case involves no claim that

Congress has expressed its intent to impose "no fault" tort liability on high federal officials for violations of particular statutes or the Constitution.

FN32. As in *Procunier v. Navarette*, 434 U.S., at 565, 98 S.Ct., at 861, we need not define here the circumstances under which "the state of the law" should be "evaluated by reference to the opinions of this Court, of the Courts of Appeals, or of the local District Court."

By defining the limits of qualified immunity essentially in objective terms, we provide**2739** no license to lawless conduct. The public interest in deterrence of unlawful conduct and in compensation of victims remains protected by a test that focuses on the objective legal reasonableness of an official's acts. Where an official could be expected to know that certain conduct would violate statutory or constitutional rights, he should be made to hesitate; and a person who suffers injury caused by such conduct may have a cause of action.FN33 But where an official's duties legitimately require action in which clearly established rights are not implicated, the public interest may be better served by action taken "with independence and without fear of consequences." *Pierson v. Ray*, 386 U.S. 547, 554, 87 S.Ct. 1213, 1217, 18 L.Ed.2d 288 (1967).FN34

FN33. Cf. *Procunier v. Navarette, supra,* 434 U.S., at 565, 98 S.Ct., at 861, quoting *Wood v. Strickland*, 420 U.S., at 322, 95 S.Ct., at 1001 ("Because they could not reasonably have been expected to be aware of a constitutional right that had not yet been declared, petitioners did not act with such disregard for the established law that their conduct 'cannot reasonably be characterized as being in good faith' ").

FN34. We emphasize that our decision applies only to suits for civil *damages* arising from actions within the scope of an official's duties and in "objective" good faith. We express no view as to the conditions in

which injunctive or declaratory relief might be available.

C

In this case petitioners have asked us to hold that the respondent's pretrial showings were insufficient to survive their motion for summary judgment.FN35 We think it appropriate,**820** however, to remand the case to the District Court for its reconsideration of this issue in light of this opinion.FN36 The trial court is more familiar with the record so far developed and also is better situated to make any such further findings as may be necessary.

FN35. In *Butz*, we admonished that "insubstantial" suits against high public officials should not be allowed to proceed to trial. 438 U.S., at 507, 98 S.Ct., at 2911. See Schuck, *supra* n.22, at 324-327. We reiterate this admonition. Insubstantial lawsuits undermine the effectiveness of government as contemplated by our constitutional structure, and "firm application of the Federal Rules of Civil Procedure" is fully warranted in such cases. 438 U.S., at 508, 98 S.Ct., at 2911.

FN36. Petitioners also have urged us, prior to the remand, to rule on the legal sufficiency of respondent's "implied" causes of action under 5 U.S.C. § 7211 (1976 ed., Supp.IV) and 18 U.S.C. § 1505 and his *Bivens* claim under the First Amendment. We do not view petitioners' argument on the statutory question as insubstantial. Cf. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 4 U.S. 353, 377-378,102 S.Ct. 1825, 1838-1839, 72 L.Ed.2d 182 (1982) (controlling question in implication of statutory causes of action is whether Congress affirmatively intended to create a damages remedy); *Middlesex County Sewerage Auth. v. National Sea Clammers Assn.*, 453 U.S. 1, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981) (same); *Texas Indus-*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*tries, Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 638-639, 101 S.Ct. 2061, 2065-2066, 68 L.Ed.2d 500 (1981) (same). Nor is the *Bivens* question. Cf. *Bush v. Lucas*, 647 F.2d 573, 576 (CA5 1981) (holding that the "unique relationship between the Federal Government and its civil service employees is a special consideration which counsels hesitation in inferring a *Bivens* remedy"). As in *Nixon v. Fitzgerald*, 457 U.S. 731, 102 S.Ct. 2690, 73 L.Ed.2d 349, however, we took jurisdiction of the case only to resolve the immunity question under the collateral order doctrine. We therefore think it appropriate to leave these questions for fuller consideration by the District Court and, if necessary, by the Court of Appeals.

V

The judgment of the Court of Appeals is vacated, and the case is remanded for further action consistent with this opinion.

*So ordered.*
Justice BRENNAN, with whom Justice MARSHALL, and Justice BLACKMUN join, concurring.
I agree with the substantive standard announced by the Court today, imposing liability when a public-official defendant**821** "knew or should have known" of the constitutionally violative effect of his actions. *Ante*, at 2737, 2739. This standard would not allow the official who *actually knows* that he was violating the law to escape liability for his actions, even if he could not "reasonably have been expected" to know what he actually did know. *Ante*, at 2739, **2740** n.33. Thus the clever and unusually well-informed violator of constitutional rights will not evade just punishment for his crimes. I also agree that this standard applies "across the board," to all "government officials performing discretionary functions." *Ante*, at 2738. I write separately only to note that given this standard, it seems inescapable to me that some measure of discovery may sometimes be required to determine exactly

what a public-official defendant did "know" at the time of his actions. In this respect the issue before us is very similar to that addressed in *Herbert v. Lando*, 441 U.S. 153, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979), in which the Court observed that "[t]o erect an impenetrable barrier to the plaintiff's use of such evidence on his side of the case is a matter of some substance, particularly when defendants themselves are prone to assert their goo[d f]aith...." *Id.*, at 170, 99 S.Ct., at 1645. Of course, as the Court has already noted, *ante*, at 2739, summary judgment will be readily available to public-official defendants whenever the state of the law was so ambiguous at the time of the alleged violation that it could not have been "known" then, and thus liability could not ensue. In my view, summary judgment will also be readily available whenever the plaintiff cannot prove, as a threshold matter, that a violation of his constitutional rights actually occurred. I see no reason why discovery of defendants' "knowledge" should not be deferred by the trial judge pending decision of any motion of defendants for summary judgment on grounds such as these. Cf. *Herbert v. Lando, supra*, at 180, n.4, 99 S.Ct., at 1650, n.4 (POWELL, J., concurring).
Justice BRENNAN, Justice WHITE, Justice MARSHALL and Justice BLACKMUN, concurring.
We join the Court's opinion but, having dissented in *Nixon* *822 *v. Fitzgerald*, 457 U.S. 731, 102 S.Ct. 2690, 73 L.Ed.2d 349, we disassociate ourselves from any implication in the Court's opinion in the present case that *Nixon v. Fitzgerald* was correctly decided.
Justice REHNQUIST, concurring.
At such time as a majority of the Court is willing to re-examine our holding in *Butz v. Economou*, 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978), I shall join in that undertaking with alacrity. But until that time comes, I agree that the Court's opinion in this case properly disposes of the issues presented, and I therefore join it.

Chief Justice BURGER, dissenting.
The Court today decides in *Nixon v. Fitzgerald*, 457 U.S. 731, 102 S.Ct. 2690, 73 L.Ed.2d 349, what has been taken for granted for 190 years, that it is implicit in the Constitution that a President of the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**(Cite as: 457 U.S. 800, 102 S.Ct. 2727)**

United States has absolute immunity from civil suits arising out of official acts as Chief Executive. I agree fully that absolute immunity for official acts of the President is, like executive privilege, "fundamental to the operation of Government and inextricably rooted in the separation of powers under the Constitution." *United States v. Nixon*, 418 U.S. 683, 708, 94 S.Ct. 3090, 3107, 41 L.Ed.2d 1039 (1974).[FN1]

> FN1. As I noted in *Nixon v. Fitzgerald*, Presidential immunity for official acts while in office has never been seriously questioned until very recently. At 758, n.1, 102 S.Ct., at 2706, n.1. (BURGER, C.J., concurring).

In this case the Court decides that senior aides of the President do not have derivative immunity from the President. I am at a loss, however, to reconcile this conclusion with our holding in *Gravel v. United States*, 408 U.S. 606, 92 S.Ct. 2614, 33 L.Ed.2d 583 (1972). The Court reads *Butz v. Economou*, 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978), as resolving that question; I do not. *Butz* is clearly distinguishable.[FN2]

> FN2. If indeed there is an irreconcilable conflict between *Gravel*, and *Butz*, the Court has an obligation to try to harmonize its holdings-or at least tender a reasonable explanation. The Court has done neither.

**\*823 \*\*2741** In *Gravel* we held that it is implicit in the Constitution that aides of Members of Congress have absolute immunity for acts performed for Members in relation to their legislative function. We viewed the aides' immunity as deriving from the Speech or Debate Clause, which provides that "for any Speech or Debate *in either House*, [Senators and Representatives] shall not be questioned in any other Place." Art. I, § 6, cl. 1 (emphasis added). Read literally, the Clause would, of course, limit absolute immunity only to the Member and only to speech and debate within the Chamber. But we have read much more into this plain language. The Clause says nothing about

"legislative acts" outside the Chambers, but we concluded that the Constitution grants absolute immunity for legislative acts not only "in either House" but in committees and conferences and in reports on legislative activities.

Nor does the Clause mention immunity for congressional aides. Yet, going far beyond any words found in the Constitution itself, we held that a Member's aides who implement policies and decisions of the Member are entitled to the same absolute immunity as a Member. It is hardly an overstatement to say that we thus avoided a "literalistic approach," *Gravel, supra*, at 617, 92 S.Ct. at 2623, and instead looked to the structure of the Constitution and the evolution of the function of the Legislative Branch. In short, we drew this immunity for legislative aides from a functional analysis of the legislative process in the context of the Constitution taken as a whole and in light of 20th-century realities. Neither Presidents nor Members of Congress can, as they once did, perform all their constitutional duties personally.[FN3]

> FN3. A Senator's allotment for staff varies significantly, but can range from as few as 17 to over 70 persons, in addition to committee staff aides who perform important legislative functions for Members. S.Doc.No. 97-19, pp. 27-106 (1981). House Members have roughly 18 to 26 assistants at any one time, in addition to committee staff aides. H.R.Doc.No. 97-113, pp. 28-174 (1981).

**\*824** We very properly recognized in *Gravel* that the central purpose of a Member's absolute immunity would be "diminished and frustrated" if the legislative aides were not also protected by the same broad immunity. Speaking for the Court in *Gravel*, Justice WHITE agreed with the Court of Appeals that

"it is literally impossible, in view of the complexities of the modern legislative process, with Congress almost constantly in session and matters of legislative concern constantly proliferating, for Members of Congress to perform their legislative tasks

*without the help of aides* and assistants; that the day-to-day work of such aides *is so critical to the Members' performance* that they must be treated as the latter's *alter egos*; and that if they are not so recognized, the central role of the Speech or Debate Clause-to prevent intimidation of legislators by the Executive and accountability before a possibly hostile judiciary ...-will inevitably be diminished and frustrated." 408 U.S., at 616-617, 92 S.Ct., at 2622-2623 (emphasis added).

I joined in that analysis and continue to agree with it, for without absolute immunity for these "elbow aides," who are indeed "alter egos," a Member could not effectively discharge all of the assigned constitutional functions of a modern legislator.

The Court has made this reality a matter of our constitutional jurisprudence. How can we conceivably hold that a President of the United States, who represents a vastly larger constituency than does any Member of Congress, should not have "alter egos" with comparable immunity? To perform the constitutional duties assigned to the Executive would be "literally impossible, in view of the complexities of the modern [Executive] process,...without the help of *825 aides and assistants." FN4 *Id.*, at 616, 92 **2742 S.Ct., at 2623. These words reflect the precise analysis of *Gravel*, and this analysis applies with at least as much force to a President. The primary layer of senior aides of a President-like a Senator's "alter egos"-are literally at a President's elbow, with offices a few feet or at most a few hundred feet from his own desk. The President, like a Member of Congress, may see those personal aides many times in one day. They are indeed the President's "arms" and "fingers" to aid in performing his constitutional duty to see "that the laws [are] faithfully executed." Like a Member of Congress, but on a vastly greater scale, the President cannot personally implement a fraction of his own policies and day-to-day decisions. FN5

> FN4. In the early years of the Republic, Members of Congress and Presidents performed their duties without staffs of aides and assistants. Washington and Jefferson

spent much of their time on their plantations. Congress did not even appropriate funds for a Presidential clerk until 1857. Lincoln opened his own mail, Cleveland answered the phone at the White House, and Wilson regularly typed his own speeches. S. Wayne, The Legislative Presidency 30 (1978). Whatever may have been the situation beginning under Washington, Adams, and Jefferson, we know today that the Presidency functions with a staff that exercises a wide spectrum of authority and discretion and directly assists the President in carrying out constitutional duties.

> FN5. Justice WHITE's dissent in *Nixon v. Fitzgerald* today expresses great concern that a President may "cause serious injury to any number of citizens even though he knows his conduct violates a statute ...." At 764, 102 S.Ct., at 2709. What the dissent wholly overlooks, however, is the plain fact that the absolute immunity does not protect a President for acts *outside* the constitutional function of a President.

For some inexplicable reason the Court declines to recognize the realities in the workings of the Office of a President, despite the Court's cogent recognition in *Gravel* concerning the realities of the workings of 20th-century Members of Congress. Absent equal protection for a President's aides, how will Presidents be free from the risks of "intimidation ... by [Congress] and accountability before a possibly hostile **826 judiciary?" *Gravel*, 408 U.S., at 617, 92 S.Ct., at 2623. Under today's holding in this case the functioning of the Presidency will inevitably be "diminished and frustrated." *Ibid.*

Precisely the same public policy considerations on which the Court now relies in *Nixon v. Fitzgerald*, and that we relied on only recently in *Gravel*, are fully applicable to senior Presidential aides. The Court's opinion in *Nixon v. Fitzgerald* correctly points out that if a President were subject to suit, awareness of personal vulnerability to suit

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

"frequently could distract a President from his public duties, to the detriment of not only the President and his office but also the Nation that the Presidency was designed to serve." At 753, 102 S.Ct., at 2703. This same negative incentive will permeate the inner workings of the Office of the President if the Chief Executive's "alter egos" are not protected derivatively from the immunity of the President. In addition, exposure to civil liability for official acts will result in constant judicial questioning, through judicial proceedings and pretrial discovery, into the inner workings of the Presidential Office beyond that necessary to maintain the traditional checks and balances of our constitutional structure.[FN6]

FN6. The same remedies for checks on Presidential abuse also will check abuses by the comparatively small group of senior aides who act as "alter egos" of the President. The aides serve at the pleasure of the President and thus may be removed by the President. Congressional and public scrutiny maintain a constant and pervasive check on abuses, and such aides may be prosecuted criminally. See *Nixon,* 457 U.S., at 757, 102 S.Ct., at 2705-2706. However, a criminal prosecution cannot be commenced absent careful consideration by a grand jury at the request of a prosecutor; the same check is not present with respect to the commencement of civil suits in which advocates are subject to no realistic accountability.

I challenge the Court and the dissenters in *Nixon v. Fitzgerald* who join in the instant holding to say that the effectiveness of Presidential aides will not "inevitably be diminished and frustrated," *Gravel, supra,* 408 U.S., at 617, 92 S.Ct., at 2623, if they must weigh every act and decision in relation to the risks of future *827 lawsuits. The *Gravel* Court took note of the burdens on congressional aides: the stress of long **2743 hours, heavy responsibilities, constant exposure to harassment of the political arena. Is the Court suggesting the stresses are less for Presidential aides? By construing the Constitution to give only qualified immunity to senior Pres-

idential aides we give those key "alter egos" only lawsuits, winable lawsuits perhaps, but lawsuits nonetheless, with stress and effort that will disperse and drain their energies and their purses.[FN7]

FN7. The Executive Branch may as a matter of grace supply some legal assistance. The Department of Justice has a longstanding policy of representing federal officers in civil suits involving conduct performed within the scope of their employment. In addition, the Department provides for retention of private legal counsel when necessary. See Senate Subcommittee on Administrative Practice and Procedure of the Committee on the Judiciary, Justice Department Retention of Private Legal Counsel to Represent Federal Employees in Civil Lawsuits, 95th Cong., 2d Sess. (Comm.Print 1978). The Congress frequently pays the expenses of defending its Members even as to acts wholly outside the legislative function.

In this Court we witness the new filing of as many as 100 cases a week, many utterly frivolous and even bizarre. Yet the defending party in many of these cases may have spent or become liable for thousands of dollars in litigation expense. Hundreds of thousands of other cases are disposed of without reaching this Court. When we see the myriad irresponsible and frivolous cases regularly filed in American courts, the magnitude of the potential risks attending acceptance of public office emerges. Those potential risks inevitably will be a factor in discouraging able men and women from entering public service.

We-judges collectively-have held that the common law provides us with absolute immunity for ourselves with respect to judicial acts, however erroneous or ill-advised. See, *e.g., Stump v. Sparkman,* 435 U.S. 349, 98 S.Ct. 1099, 55 L.Ed.2d 331 (1978). Are the lowest ranking of 27,000 or more judges, thousands of prosecutors, and thousands of congressional aides-an aggregate *828 of not less than 75,000 in all-entitled to greater protec-

tion than two senior aides of a President?

*Butz v. Economou*, 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978), does not dictate that senior Presidential aides be given only qualified immunity. *Butz* held only that a Cabinet officer exercising discretion was not entitled to absolute immunity; we need not abandon that holding. A senior Presidential aide works more intimately with the President on a daily basis than does a Cabinet officer, directly implementing Presidential decisions literally from hour to hour.

In his dissent today in *Nixon v. Fitzgerald*, Justice WHITE states that the "Court now applies the dissenting view in *Butz* to the Office of the President." 457 U.S., at 764, 102 S.Ct., at 2709. However, this suggests that a President and his Cabinet officers, who serve only "during the pleasure of the President," are on the same plane constitutionally. It wholly fails to distinguish the role of a President or his "elbow aides" from the role of Cabinet officers, who are department heads rather than "alter egos." It would be in no sense inconsistent to hold that a President's personal aides have greater immunity than Cabinet officers.

The Court's analysis in *Gravel* demonstrates that the question of derivative immunity does not and should not depend on a person's rank or position in the hierarchy, but on the *function* performed by the person and the relationship of that person to the superior. Cabinet officers clearly outrank United States Attorneys, yet qualified immunity is accorded the former and absolute immunity the latter; rank is important only to the extent that the rank determines the function to be performed. The function of senior Presidential aides, as the "alter egos" of the President, is an integral, inseparable part of the function of the President.[FN8] Justice WHITE **829** was clearly **\*\*2744** correct in *Gravel*, stating that Members of Congress could not "perform their legislative tasks without the help of aides and assistants; [and] that the day-to-day work of such aides is so critical to the Members' performance that they must be treated as the latter's alter egos ...." 408 U.S., at 616–617, 92 S.Ct., at 2623.

FN8. This Court had no trouble reconciling *Gravel* with *Kilbourn v. Thompson*, 103 U.S. 168, 26 L.Ed. 377 (1881). In *Kilbourn* the Sergeant-at-Arms of the House of Representatives was held not to share the absolute immunity enjoyed by the Members of Congress who ordered that officer to act.

By ignoring *Gravel* and engaging in a wooden application of *Butz*, the Court significantly undermines the functioning of the Office of the President. Under the Court's opinion in *Nixon* today it is clear that Presidential immunity derives from the Constitution as much as congressional immunity comes from that source. Can there rationally be one rule for congressional aides and another for Presidential aides simply because the initial absolute immunity of each derives from different aspects of the Constitution? I find it inexplicable why the Court makes no effort to demonstrate why the Chief Executive of the Nation should not be assured that senior staff aides will have the same protection as the aides of Members of the House and Senate.

U.S.Dist.Col.,1982.
Harlow v. Fitzgerald
457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

458 F.3d 1295                                                                    Page 1

458 F.3d 1295, 211 Ed. Law Rep. 701, 19 Fla. L. Weekly Fed. C 894

**(Cite as: 458 F.3d 1295)**

H

Gray ex rel. Alexander v. Bostic
C.A.11 (Ala.),2006.

United States Court of Appeals,Eleventh Circuit.
Laquarius GRAY, a minor, by and through her
mother and next friend, Toniko L. ALEXANDER,
Plaintiff-Appellee,
v.
Antonio BOSTIC, individually and in his official
capacity as Deputy Sheriff for Tuscaloosa County,
AL, Edmund Sexton, individually and in his official
capacity as Principal of Holt Elementary School,
Tuscaloosa, AL, Defendants-Appellants,
Joyce Sellers, individually and in her official capa-
city as Superintendent of Tuscaloosa County, AL,
School System and/or Tuscaloosa County, AL,
Board of Education, et al., Defendants.
**No. 06-10216**
**Non-Argument Calendar.**

Aug. 7, 2006.

**Background:** Elementary school student brought §
1983 action, by and through her mother, against
deputy sheriff who served as a school resource of-
ficer (SRO), county sheriff, and others, arising from
detention and handcuffing of student during a phys-
ical education class. The United States District
Court for the Northern District of Alabama dis-
missed action for failure to state a claim, but the
Court of Appeals reversed. On remand, the District
Court, No. 03-02989-CV-UWC-W,U.W. Clemon,
Chief Judge, denied defendants' motion for sum-
mary judgment based on qualified immunity, and
defendants took interlocutory appeal.

**Holdings:** The Court of Appeals, Hull, Circuit
Judge, held that:

(1) deputy sheriff, acting as SRO, was acting within
scope of his discretionary authority when he de-
tained and handcuffed student;

(2) deputy acted reasonably in stopping student to
question her about her allegedly threatening con-

duct toward teacher;

(3) deputy's handcuffing of student violated her
Fourth Amendment rights;

(4) right violated by deputy was clearly established,
so he was not entitled to qualified immunity; and

(5) sheriff could not be held personally liable for
deputy's violation of student's Fourth Amendment
rights.

Affirmed in part, reversed in part, and remanded.
West Headnotes
**[1] Federal Courts 170B ⟲574**

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(C) Decisions Reviewable
            170BVIII(C)2 Finality of Determination
                170Bk572 Interlocutory Orders Ap-
pealable
                    170Bk574 k. Other Particular Or-
ders. Most Cited Cases
Although the denial of summary judgment gener-
ally is not a final appealable order subject to imme-
diate appeal, an interlocutory appeal may be taken
where the district court denies the defense of quali-
fied immunity and the appeal involves a question of
law.

**[2] Federal Courts 170B ⟲776**

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
            170BVIII(K)1 In General
                170Bk776 k. Trial De Novo. Most
Cited Cases

**Federal Courts 170B ⟲802**

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
            170BVIII(K)3 Presumptions

458 F.3d 1295    Page 2
458 F.3d 1295, 211 Ed. Law Rep. 701, 19 Fla. L. Weekly Fed. C 894
**(Cite as: 458 F.3d 1295)**

170Bk802 k. Summary Judgment.
Most Cited Cases

Court of Appeals reviews *de novo* a district court's denial of summary judgment based on qualified immunity, viewing the evidence in a light most favorable to the opposing party.

**[3] Civil Rights 78 ⟐1376(2)**

78 Civil Rights
    78III Federal Remedies in General
        78k1372 Privilege or Immunity; Good Faith and Probable Cause
           78k1376 Government Agencies and Officers
              78k1376(2) k. Good Faith and Reasonableness; Knowledge and Clarity of Law; Motive and Intent, in General. Most Cited Cases

"Qualified immunity" offers a complete protection for government officials sued in their individual capacities if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.

**[4] Civil Rights 78 ⟐1376(1)**

78 Civil Rights
    78III Federal Remedies in General
        78k1372 Privilege or Immunity; Good Faith and Probable Cause
           78k1376 Government Agencies and Officers
              78k1376(1) k. In General. Most Cited Cases

**Civil Rights 78 ⟐1407**

78 Civil Rights
    78III Federal Remedies in General
        78k1400 Presumptions, Inferences, and Burdens of Proof
           78k1407 k. Defenses; Immunity and Good Faith. Most Cited Cases

To be entitled to qualified immunity, a government official must prove that he was acting within the scope of his discretionary authority; once the defendants establish that they were acting within their discretionary authority, the burden shifts to the plaintiff to demonstrate that qualified immunity is not appropriate.

**[5] Civil Rights 78 ⟐1376(1)**

78 Civil Rights
    78III Federal Remedies in General
        78k1372 Privilege or Immunity; Good Faith and Probable Cause
           78k1376 Government Agencies and Officers
              78k1376(1) k. In General. Most Cited Cases

**Civil Rights 78 ⟐1376(2)**

78 Civil Rights
    78III Federal Remedies in General
        78k1372 Privilege or Immunity; Good Faith and Probable Cause
           78k1376 Government Agencies and Officers
              78k1376(2) k. Good Faith and Reasonableness; Knowledge and Clarity of Law; Motive and Intent, in General. Most Cited Cases

Under two-part test to evaluate whether an official is entitled to qualified immunity, Court of Appeals first addresses, as a threshold inquiry, whether the facts presented, taken in a light most favorable to the non-moving party, establish a constitutional violation; if Court answers this question in the affirmative, it then asks whether the right was clearly established.

**[6] Civil Rights 78 ⟐1376(1)**

78 Civil Rights
    78III Federal Remedies in General
        78k1372 Privilege or Immunity; Good Faith and Probable Cause
           78k1376 Government Agencies and Officers
              78k1376(1) k. In General. Most Cited Cases

To establish that a government official's challenged actions were within the scope of his discretionary authority, so as to support claim of qualified immunity, the official must show that those actions

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

458 F.3d 1295, 211 Ed. Law Rep. 701, 19 Fla. L. Weekly Fed. C 894

**(Cite as: 458 F.3d 1295)**

were (1) undertaken pursuant to the performance of his duties, and (2) within the scope of his authority; to that end, a court must ask whether the act complained of, if done for a proper purpose, would be within, or reasonably related to, the outer perimeter of an official's discretionary duties.

**[7] Civil Rights 78 ⬚1376(6)**

78 Civil Rights
    78III Federal Remedies in General
        78k1372 Privilege or Immunity; Good Faith and Probable Cause
            78k1376 Government Agencies and Officers
                78k1376(6) k. Sheriffs, Police, and Other Peace Officers. Most Cited Cases
Deputy sheriff who served as a school resource officer (SRO) at elementary school was acting within scope of his discretionary authority when he detained and handcuffed student who allegedly acted in disrespectful manner and threatened teacher during physical education class, thus supporting deputy's claim of qualified immunity in student's resulting § 1983 action alleging violation of her Fourth Amendment rights; deputy was charged with responsibility to investigate criminal activity that might be taking place at school and allegedly believed that student had committed a misdemeanor. U.S.C.A. Const.Amend. 4; 42 U.S.C.A. § 1983.

**[8] Civil Rights 78 ⬚1088(4)**

78 Civil Rights
    78I Rights Protected and Discrimination Prohibited in General
        78k1088 Police, Investigative, or Law Enforcement Activities
            78k1088(4) k. Arrest and Detention. Most Cited Cases
Elementary school student's excessive force claim against deputy sheriff who, while serving as school resource officer (SRO), detained and handcuffed student after she allegedly acted in disrespectful manner and threatened teacher during physical education class was not an independent claim, but was subsumed within student's illegal seizure claim, in

student's resulting § 1983 action, where student argued that deputy used excessive force in detaining her because he lacked a right to detain her at all. U.S.C.A. Const.Amend. 4; 42 U.S.C.A. § 1983.

**[9] Schools 345 ⬚169.5**

345 Schools
    345II Public Schools
        345II(L) Pupils
            345k169.5 k. Searches and Seizures. Most Cited Cases
The legality of a search of a student by a law enforcement officer should depend simply on the reasonableness, under all the circumstances, of the search. U.S.C.A. Const.Amend. 4.

**[10] Schools 345 ⬚169.5**

345 Schools
    345II Public Schools
        345II(L) Pupils
            345k169.5 k. Searches and Seizures. Most Cited Cases
Under the reasonableness standard applicable to school seizures by law enforcement officers, the reasonableness of a search is evaluated using a two-step inquiry: first, one must consider whether the action was justified at its inception; second, one must determine whether the search as actually conducted was reasonably related in scope to the circumstances which justified interference in the first place. U.S.C.A. Const.Amend. 4.

**[11] Schools 345 ⬚169**

345 Schools
    345II Public Schools
        345II(L) Pupils
            345k169 k. Control of Pupils and Discipline in General. Most Cited Cases
Deputy sheriff who served as a school resource officer (SRO) acted reasonably in stopping student to question her about her conduct, after witnessing student threaten to do something physically to teacher in her physical education class, even if neither of two teachers that was present feared for their safety, in view of state statute providing that

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

458 F.3d 1295
458 F.3d 1295, 211 Ed. Law Rep. 701, 19 Fla. L. Weekly Fed. C 894
**(Cite as: 458 F.3d 1295)**

certain verbal threats would constitute misdemean-
or of harassment. U.S.C.A. Const.Amend. 4;
Ala.Code 1975, § 13A-11-8(a)(1-3).

**[12] Schools 345 ⟸169**

345 Schools
   345II Public Schools
    345II(L) Pupils
     345k169 k. Control of Pupils and Discip-
line in General. Most Cited Cases
Conduct of deputy sheriff who, while serving as
school resource officer (SRO), detained and hand-
cuffed nine-year-old elementary school student
after she allegedly acted in disrespectful manner
and threatened teacher during physical education
class was not reasonably related to scope of circum-
stances that justified deputy's initial investigatory
stop of student, and thus deputy's conduct violated
student's Fourth Amendment rights; handcuffing
student was excessively intrusive given student's
young age and fact that deputy acted not to protect
anyone's safety, but to persuade student to get rid of
her disrespectful attitude and to impress upon her
the serious nature of committing crimes. U.S.C.A.
Const.Amend. 4.

**[13] Schools 345 ⟸169**

345 Schools
   345II Public Schools
    345II(L) Pupils
     345k169 k. Control of Pupils and Discip-
line in General. Most Cited Cases

**Schools 345 ⟸169.5**

345 Schools
   345II Public Schools
    345II(L) Pupils
     345k169.5 k. Searches and Seizures. Most
Cited Cases
A seizure by a law enforcement officer in a school
setting will be permissible in its scope when the
measures adopted are reasonably related to the ob-
jectives of the seizure and not excessively intrusive
in light of the age and sex of the student and the
nature of the infraction. U.S.C.A. Const.Amend. 4.

**[14] Arrest 35 ⟸63.5(9)**

35 Arrest
   35II On Criminal Charges
    35k63.5 Investigatory Stop or Stop-
And-Frisk
     35k63.5(9) k. Duration of Detention and
Extent or Conduct of Investigation or Frisk. Most
Cited Cases
An officer can handcuff a detainee during an in-
vestigatory stop when the officer reasonably be-
lieves that the detainee presents a potential threat to
safety. U.S.C.A. Const.Amend. 4.

**[15] Civil Rights 78 ⟸1376(6)**

78 Civil Rights
   78III Federal Remedies in General
    78k1372 Privilege or Immunity; Good Faith
and Probable Cause
     78k1376 Government Agencies and Of-
ficers
      78k1376(6) k. Sheriffs, Police, and
Other Peace Officers. Most Cited Cases
Fourth Amendment right of elementary school stu-
dent that was violated by deputy sheriff who, while
serving as school resource officer (SRO), detained
and handcuffed student after she allegedly acted in
disrespectful manner and threatened teacher during
physical education class was clearly established,
and thus deputy was not entitled to qualified im-
munity in student's resulting § 1983 action; even if
there was no factually similar pre-existing caselaw
to put deputy on notice this his conduct was object-
ively unreasonable, handcuffing of compliant nine-
year-old girl, who posed no safety concerns, for
sole purpose of punishing her was obvious violation
of her Fourth Amendment rights. U.S.C.A.
Const.Amend. 4; 42 U.S.C.A. § 1983.

**[16] Civil Rights 78 ⟸1376(2)**

78 Civil Rights
   78III Federal Remedies in General
    78k1372 Privilege or Immunity; Good Faith
and Probable Cause
     78k1376 Government Agencies and Of-
ficers

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

458 F.3d 1295, 211 Ed. Law Rep. 701, 19 Fla. L. Weekly Fed. C 894
**(Cite as: 458 F.3d 1295)**

78k1376(2) k. Good Faith and Reasonableness; Knowledge and Clarity of Law; Motive and Intent, in General. Most Cited Cases
Whether a constitutional right was clearly established at the time of a violation of that right, for purpose of qualified immunity analysis, turns on whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.

**[17] Arrest 35 ☞63.5(9)**

35 Arrest
    35II On Criminal Charges
        35k63.5 Investigatory Stop or Stop-And-Frisk
            35k63.5(9) k. Duration of Detention and Extent or Conduct of Investigation or Frisk. Most Cited Cases
Under the Fourth Amendment, the scope of an investigative detention must be carefully tailored to its underlying justification, and the investigatory methods employed during a detention should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time. U.S.C.A. Const.Amend. 4.

**[18] Civil Rights 78 ☞1376(2)**

78 Civil Rights
    78III Federal Remedies in General
        78k1372 Privilege or Immunity; Good Faith and Probable Cause
            78k1376 Government Agencies and Officers
                78k1376(2) k. Good Faith and Reasonableness; Knowledge and Clarity of Law; Motive and Intent, in General. Most Cited Cases
Even in the absence of factually similar case law, an official can have fair warning that his conduct is unconstitutional, for purpose of qualified immunity analysis, when the constitutional violation is obvious.

**[19] Civil Rights 78 ☞1376(6)**

78 Civil Rights
    78III Federal Remedies in General

        78k1372 Privilege or Immunity; Good Faith and Probable Cause
            78k1376 Government Agencies and Officers
                78k1376(6) k. Sheriffs, Police, and Other Peace Officers. Most Cited Cases
The Fourth Amendment's general proscription against unreasonable seizures seldom puts officers on notice that certain conduct is unlawful under precise circumstances, for purpose of determining whether right is clearly established under qualified immunity analysis. U.S.C.A. Const.Amend. 4.

**[20] Civil Rights 78 ☞1355**

78 Civil Rights
    78III Federal Remedies in General
        78k1353 Liability of Public Officials
            78k1355 k. Vicarious Liability and Respondeat Superior in General; Supervisory Liability in General. Most Cited Cases
Supervisory officials cannot be held liable under § 1983 for the unconstitutional actions of their subordinates based on respondeat superior liability. 42 U.S.C.A. § 1983.

**[21] Civil Rights 78 ☞1358**

78 Civil Rights
    78III Federal Remedies in General
        78k1353 Liability of Public Officials
            78k1358 k. Criminal Law Enforcement; Prisons. Most Cited Cases
Sheriff could not be held liable for deputy sheriff's violation of elementary school student's Fourth Amendment rights on ground that, under Alabama law, a deputy sheriff was the agent and alter ego of the sheriff, since such alter ego theory was equivalent of respondeat superior liability, which was not a permissible basis to support supervisory liability under § 1983. U.S.C.A. Const.Amend. 4; 42 U.S.C.A. § 1983.

**[22] Civil Rights 78 ☞1355**

78 Civil Rights
    78III Federal Remedies in General
        78k1353 Liability of Public Officials

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

458 F.3d 1295, 211 Ed. Law Rep. 701, 19 Fla. L. Weekly Fed. C 894
**(Cite as: 458 F.3d 1295)**

78k1355 k. Vicarious Liability and Respondeat Superior in General; Supervisory Liability in General. Most Cited Cases

Supervisors can be held personally liable under § 1983 for unconstitutional actions of their subordinates when either (1) the supervisor personally participates in the alleged constitutional violation, or (2) there is a causal connection between the actions of the supervisor and the alleged constitutional violation. 42 U.S.C.A. § 1983.

**[23] Civil Rights 78 ⟨⟩⟩1355**

78 Civil Rights
    78III Federal Remedies in General
        78k1353 Liability of Public Officials
            78k1355 k. Vicarious Liability and Respondeat Superior in General; Supervisory Liability in General. Most Cited Cases

To hold supervisor personally liable under § 1983 for unconstitutional actions of their subordinates due to causal connection between the actions of the supervisor and the alleged constitutional violation, the causal connection can be established when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so. 42 U.S.C.A. § 1983.

**[24] Civil Rights 78 ⟨⟩⟩1355**

78 Civil Rights
    78III Federal Remedies in General
        78k1353 Liability of Public Officials
            78k1355 k. Vicarious Liability and Respondeat Superior in General; Supervisory Liability in General. Most Cited Cases

To be sufficient to notify a supervisor of a need to correct an alleged deprivation, as would support holding supervisor personally liable under § 1983 for unconstitutional actions of their subordinates due to causal connection between actions of supervisor and alleged constitutional violation, the deprivations must not only be widespread, they also must be obvious, flagrant, rampant, and of continued duration, rather than isolated occurrences. 42 U.S.C.A. § 1983.

**[25] Civil Rights 78 ⟨⟩⟩1358**

78 Civil Rights
    78III Federal Remedies in General
        78k1353 Liability of Public Officials
            78k1358 k. Criminal Law Enforcement; Prisons. Most Cited Cases

Sheriff did not have sufficient notice of possible constitutional deprivations, as would support holding sheriff personally liable, under § 1983, for deputy sheriff's violation of elementary school student's Fourth Amendment rights by handcuffing student following student's alleged making of physical threat toward teacher, absent evidence of widespread and obvious handcuffed detentions of students by the deputy involved or other deputy sheriffs. U.S.C.A. Const.Amend. 4; 42 U.S.C.A. § 1983.

**[26] Civil Rights 78 ⟨⟩⟩1358**

78 Civil Rights
    78III Federal Remedies in General
        78k1353 Liability of Public Officials
            78k1358 k. Criminal Law Enforcement; Prisons. Most Cited Cases

Need for training deputy sheriffs as to detention of students was not so obvious that failure to do so constituted deliberate indifference to students' Fourth Amendment rights, as would warrant holding sheriff personally liable, under § 1983, for deputy sheriff's violation of elementary school student's Fourth Amendment rights by handcuffing student following student's alleged making of physical threat toward teacher. U.S.C.A. Const.Amend. 4; 42 U.S.C.A. § 1983.

**[27] Civil Rights 78 ⟨⟩⟩1376(6)**

78 Civil Rights
    78III Federal Remedies in General
        78k1372 Privilege or Immunity; Good Faith and Probable Cause
            78k1376 Government Agencies and Officers
                78k1376(6) k. Sheriffs, Police, and Other Peace Officers. Most Cited Cases

Any law that would require training of deputy sher-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

458 F.3d 1295, 211 Ed. Law Rep. 701, 19 Fla. L. Weekly Fed. C 894
**(Cite as: 458 F.3d 1295)**

iffs on how to detain students was not clearly established, such that reasonable person in sheriff's shoes would have known that failure to provide such training constituted deliberate indifference, for purpose of qualified immunity analysis in student's § 1983 action seeking to hold sheriff liable for deputy sheriff's deprivation of student's Fourth Amendment rights by handcuffing student following student's alleged making of physical threat toward teacher. U.S.C.A. Const.Amend. 4; 42 U.S.C.A. § 1983.

**[28] Federal Courts 170B ☞768.1**

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
            170BVIII(K)1 In General
                170Bk768 Interlocutory, Collateral and Supplementary Proceedings and Questions
                    170Bk768.1 k. In General. Most Cited Cases
Generally, the denial of summary judgment on a claim for injunctive relief is not a final appealable decision although, under the pendant appellate jurisdiction doctrine, Court of Appeals may address otherwise nonappealable orders if they are inextricably intertwined with an appealable decision.

**[29] Federal Courts 170B ☞770**

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
            170BVIII(K)1 In General
                170Bk768 Interlocutory, Collateral and Supplementary Proceedings and Questions
                    170Bk770 k. On Separate Appeal from Interlocutory Judgment or Order. Most Cited Cases
Student's claim for injunctive relief against sheriff was inextricably intertwined with sheriff's argument that he was entitled to qualified immunity, in student's § 1983 action alleging violation of her Fourth Amendment rights by deputy sheriff who, while acting as school resource officer (SRO), handcuffed student following student's alleged

making of physical threat toward teacher, and thus Court of Appeals reviewing denial of sheriff's motion for summary judgment based on qualified immunity, via interlocutory appeal, could also address district court's failure to grant summary judgment on student's claim for injunctive relief. U.S.C.A. Const.Amend. 4; 42 U.S.C.A. § 1983.

**\*1300** Travis Russell Wisdom, Robert McCollough Spence, Hubbard, Smith, McIlwain, Brakefield & Browder, P.C., Tuscaloosa, AL, for Defendants-Appellants.
Thomas Blake Liveoak, Collins, Liveoak & Boyles, P.C., Birmingham, AL, for Gray.

Appeal from the United States District Court for the Northern District of Alabama.

Before CARNES, HULL and PRYOR, Circuit Judges.
HULL, Circuit Judge:
This is the second appeal involving the detention and handcuffing of a nine-year-old student, Laquarius Gray, during her physical education class. The first time, we reversed the district court's Rule 12(b)(6) dismissal of this § 1983 action. *Gray v. Bostic,* 127 Fed.Appx. 472, 2004 WL 3112657 (11th Cir.2004). This time, the defendants appeal the district court's denial of their motions for summary judgment based on qualified immunity. After review, we affirm in part and reverse in part.

### I. BACKGROUND

#### A. The Incident

Coach Lattuce Greer Williams believed that Gray was not doing "jumping jacks" along with the rest of the physical education class. Coach Williams told Gray she needed to do her exercises. When Gray failed to comply, Coach Williams told Gray to "[c]ome to the wall" of the gym. Williams testified that as Gray walked to the wall, "[s]he told me that she would punch me or hit me, hit me in the face." A nearby teacher, Coach Tara Horton, witnessed the disagreement with Coach Williams. Coach Horton testified that Gray said, "I bust you in the head," which Coach Horton explained meant that

"she was going to hit him in the head." Although Coach Williams and Coach Horton attribute slightly different language to Gray, the gist of their testimony is that Gray threatened to hit Coach Williams.

In contrast, Gray testified that she did not threaten to "bust" Coach Williams in the head. Although Gray could not remember what she said, she agreed that she threatened to "do something" to Coach Williams and that what she said was disrespectful, as follows:

Q: Then, [Coach Williams] told me that, at that point, you told him that you were going to bust him in his head; is that right?

A: No, sir.

Q: You didn't say that?

A: No, sir.

Q: Is Coach Williams lying to me?

MR. LIVEOAK: Objection

Q: (By Mr. Wisdom) You can answer. Is Coach Williams telling me a lie?

A: I guess he did. I don't remember what I said, but I didn't say that.

Q: You don't remember what you said?

A: (Witness shakes head.)

Q: You don't have any idea what you said?

MR. LIVEOAK: Is that no?

**\*1301** A: No.

Q: (By Mr. Wisdom) So, you don't know if you said that you might punch him; is that right: Did you say something to him that was disrespectful?

A: Yes, sir.

Q: What was that?

A: I don't remember.

Q: Did you tell him that you might do something to him?

A: Yes, sir.

....

Q: What did you tell him that you were going to do to him?

A: I don't remember.[FN1]

> FN1. In the first appeal of the Rule 12(b)(6) dismissal, we reviewed the allegations in the complaint, which stated only

that Gray made a "disrespectful comment" to Coach Williams. We noted that at the Rule 12(b)(6) juncture, there was no allegation of profanity or fighting words or that Gray was a danger to any teacher or student. *Gray,* No. 04-12240, slip op. at 14, 17, 2004 WL 3112657. Now, at the summary judgment juncture, we have deposition testimony as to what was said and the context in which it was said.

Because of the summary judgment posture of the case, we construe Gray's testimony as denying the coaches' version of what she said. However, Gray does not dispute that she threatened to "do something" physically to Coach Williams. Thus the precise nature of her physical threat-whether it was to hit him in the face, poke him in the eye or kick him in the shins-does not change our analysis.

After hearing Gray's threat to Coach Williams, Coach Horton instructed Gray to come over to her. Coach Williams then turned his attention back to his class.

Deputy Antonio Bostic also witnessed the exchange between Gray and Coach Williams. Deputy Bostic was employed as a Tuscaloosa County Sheriff's Deputy and served as a school resource officer ("SRO") for several schools, including Holt Elementary. Before Gray reached Coach Horton, Deputy Bostic intervened and told Coach Horton that he would talk to Gray. Coach Horton insisted that she would handle the matter. However, Deputy Bostic insisted that he would handle Gray and escorted Gray out the gym door into a lobby area.

Deputy Bostic told Gray to turn around, pulled her hands behind her back and put Gray in handcuffs. Deputy Bostic tightened the handcuffs to the point that they caused Gray pain. Deputy Bostic told Gray, "[T]his is how it feels when you break the law," and "[T]his is how it feels to be in jail." Gray began to cry. Gray stood with the handcuffs on for not less than five minutes, with Deputy Bostic standing behind her.[FN2]

> FN2. There is a factual dispute about how

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

458 F.3d 1295, 211 Ed. Law Rep. 701, 19 Fla. L. Weekly Fed. C 894
**(Cite as: 458 F.3d 1295)**

long Gray was in handcuffs. As to time, Gray testified that she did not know how long she stood in handcuffs. However, Gray was asked whether it was "less than five minutes," and replied "No, sir." When Coach Horton was asked how long Gray was in handcuffs, she responded, "I'm going to guestimate two minutes maybe." Deputy Bostic averred that he "detained [Gray] for less than 30 seconds ...." At the summary judgment stage, however, we must review the evidence in a light most favorable to Gray and assume that Gray was handcuffed for not less than five minutes.

In discovery responses, Deputy Bostic averred that he detained and handcuffed Gray "to impress upon her the serious nature of committing crimes that can lead to arrest, detention or incarceration" and "to help persuade her to rid herself of her disrespectful attitude." Deputy Bostic's discovery responses also stated that he **\*1302** "did not feel the need to apologize to LaQuarius Gray for telling her that she committed a misdemeanor in my presence and showing her what would happen if a less generous officer than I were to arrest her for her actions."[FN3] After Deputy Bostic took the handcuffs off, Gray went to the Coaches' Office until her next class.

> FN3. Deputy Bostic was never deposed and did not file a declaration in support of his motion for summary judgment. Therefore, the only sworn statement from Deputy Bostic relating to the events is contained in his interrogatory responses.

Neither Coach Horton nor Coach Williams was afraid of Gray or believed that Gray would actually carry out her threat. When asked whether he was "ever afraid that [Gray] would commit an act of violence towards [him] or Ms. Horton," Coach Williams replied, "No, sir." Similarly, Coach Horton replied "No," when asked if she was "ever afraid that Ms. Gray would physically assault you or another student?" When asked, "[W]hen Ms. Gray told Coach Williams that she was going to bust him

in the head she's not actually physically capable of doing that, is she," Coach Horton agreed. Coach Horton planned to talk with Gray about the incident and give her a warning. Coach Horton testified that she would not have been required to write Gray up, give her detention, or send her to the principal's office "because it wasn't that major."

*B. Court Proceedings*

On November 4, 2003, by and through her mother, Gray filed suit against Deputy Bostic and Tuscaloosa County Sheriff, Edmund Sexton in their official and individual capacities.[FN4] Gray's complaint contained eight counts, including claims: (1) under 42 U.S.C. § 1983 for violations of Gray's First, Fourth, Fifth, Eighth and Fourteenth Amendment rights (Count 1); (2) under 42 U.S.C. § 1981 for race discrimination (Count 2); and (3) under state law for invasion of privacy, assault and battery, false imprisonment, defamation and intentional infliction of emotional distress (Counts 4 through 8). Gray also sought declaratory and injunctive relief (Count 3). The defendants filed a motion to dismiss, which the district court granted.

> FN4. Gray's original complaint also alleged claims against Joyce Harris, Holt Elementary School's principal; Joyce Sellers, the Tuscaloosa County School Superintendent; and members of the Tuscaloosa County Board of Education. Gray subsequently dismissed these claims.

Gray appealed to this Court, challenging only the district court's dismissal of her Fourth Amendment claims against Deputy Bostic and Sheriff Sexton individually and the denial of her motion for leave to amend her complaint.[FN5] We reversed, stating that on remand Gray was entitled to pursue her Fourth Amendment claims against defendants Deputy Bostic and Sheriff Sexton individually and to file an amended complaint. *Gray,* 127 Fed.Appx. 472. The district court ordered Gray to file an amended complaint asserting only the Fourth Amendment claims that remained following her appeal. Gray then amended her complaint, asserting claims of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

458 F.3d 1295, 211 Ed. Law Rep. 701, 19 Fla. L. Weekly Fed. C 894
**(Cite as: 458 F.3d 1295)**

excessive use of force and unreasonable seizure against defendants Bostic and Sexton individually.

> FN5. In the prior appeal, Gray did not challenge the dismissal of her First, Fifth, Eighth and Fourteenth Amendment claims, her state law claims or her official capacity claims against Deputy Bostic and Sheriff Sexton.

Following discovery, the defendants moved for summary judgment based on **\*1303** qualified immunity. The district court denied the motion, prompting this interlocutory appeal.

## II. STANDARD OF REVIEW

[1][2] Although the denial of summary judgment generally is not a final appealable order subject to immediate appeal, an interlocutory appeal may be taken where the district court denies the defense of qualified immunity and the appeal involves a question of law. *McMillian v. Johnson,* 88 F.3d 1554, 1563,*amended on other grounds,*101 F.3d 1363 (11th Cir.1996). We review *de novo* a district court's denial of summary judgment based on qualified immunity, viewing the evidence in a light most favorable to the opposing party. *Williams v. Consol. City of Jacksonville,* 341 F.3d 1261, 1266-67 (11th Cir.2003).

## III. DISCUSSION

### A. Qualified Immunity Principles

[3][4] "Qualified immunity offers a complete protection for government officials sued in their individual capacities if their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Vinyard v. Wilson,* 311 F.3d 1340, 1346 (11th Cir.2002) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)). To be entitled to qualified immunity, the defendant must prove that he was acting within the scope of his discretionary authority. *Id.* "Once the defendants establish that they were acting within their discretionary authority, the burden shifts to

the plaintiff to demonstrate that qualified immunity is not appropriate." *Lumley v. City of Dade City,* 327 F.3d 1186, 1194 (11th Cir.2003).

[5] The Supreme Court has established a two-part test to evaluate whether an official is entitled to qualified immunity. First, as a threshold inquiry, we address whether the facts presented, taken in a light most favorable to the non-moving party, establish a constitutional violation. *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 2156, 150 L.Ed.2d 272 (2001). If we answer this question in the affirmative, then we "ask whether the right was clearly established." *Id.*

### B. Deputy Bostic's Discretionary Authority

[6] Gray argues that Deputy Bostic was not acting within the scope of his discretionary authority when he detained and handcuffed Gray. "To establish that the challenged actions were within the scope of his discretionary authority, a defendant must show that those actions were (1) undertaken pursuant to the performance of his duties, and (2) within the scope of his authority." *Harbert Int'l v. James,* 157 F.3d 1271, 1282 (11th Cir.1998). To that end, "a court must ask whether the act complained of, if done for a proper purpose, would be within, or reasonably related to, the outer perimeter of an official's discretionary duties." *Id.* (quotation marks omitted).

[7] Although our prior opinion concluding that Deputy Bostic was acting within his discretionary authority was at the Rule 12(b)(6) stage and was based on merely the allegations in the complaint, there is no evidence at the summary judgment stage that changes our conclusion. Deputy Bostic as an SRO, was charged with the responsibility to investigate criminal activity that might be taking place at Holt Elementary School. As part of that responsibility, Deputy Bostic's duties included, under the right circumstances, detaining and questioning students and possibly arresting**\*1304** and handcuffing them. The fact that the right circumstances (for detention or handcuffing) may not have been present in this case is irrelevant to our inquiry. *See id.*(explaining that the "inquiry is not whether it

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

458 F.3d 1295, 211 Ed. Law Rep. 701, 19 Fla. L. Weekly Fed. C 894
**(Cite as: 458 F.3d 1295)**

was within the defendant's authority to commit the allegedly illegal act" because "[f]ramed that way, the inquiry is no more than an 'untenable' tautology").

Gray stresses that SROs were not supposed to discipline students and that Deputy Bostic admitted in his interrogatory responses that his reasons for detaining and handcuffing Gray were to "impress upon her the serious nature of committing crimes that can lead to arrest, detention or incarceration" and "to help persuade her to rid herself of her disrespectful attitude." We note, however, that it is also clear from Deputy Bostic's interrogatory responses that he believed Gray had committed a misdemeanor when she threatened her teacher and that Deputy Bostic detained her to discuss the incident with her. Therefore, we conclude that Deputy Bostic's actions were within his discretionary duties and turn to whether his actions were unconstitutional.

### C. Constitutional Violations

[8] Gray argues that Deputy Bostic used excessive force in detaining her because he lacked a right to detain her at all. Therefore, her excessive force claim is not an independent claim, but rather is subsumed in her illegal seizure claim. *See Bashir v. Rockdale County,* 445 F.3d 1323, 1331 (11th Cir.2006) (stating that "[u]nder this Circuit's law ... a claim that any force in an illegal stop or arrest is excessive is subsumed in the illegal stop or arrest claim and is not a discrete excessive force claim" (quotation marks omitted)).[FN6] Thus, our inquiry focuses on Deputy Bostic's seizure of Gray.

> FN6. Although Gray alleges that Deputy Bostic tightened the handcuffs enough to cause her pain, she has not argued that the handcuffing constituted excessive force even if Deputy Bostic's stop was supported by reasonable suspicion.

[9][10] As stated in Gray's earlier appeal, we apply the reasonableness standard articulated in *New Jersey v. T.L.O.,* 469 U.S. 325, 341-42, 105 S.Ct. 733, 742-43, 83 L.Ed.2d 720 (1985), to school seizures by law enforcement officers. *See Gray,* No.

04-12240, slip op. at 14, 2004 WL 3112657. In *T.L.O.,* the Supreme Court recognized that the substantial need to maintain discipline in the classroom and foster a positive learning environment "requires some modification of the level of suspicion of illicit activity needed to justify a search" in the public school setting. *T.L.O.* 469 U.S. at 340, 105 S.Ct. at 742. To that end, the Supreme Court concluded that "the accommodation of the privacy interests of schoolchildren with the substantial need of teachers and administrators for freedom to maintain order in the schools does not require strict adherence to the requirement that searches be based on probable cause." *Id.* at 341, 105 S.Ct. at 742. Instead, under *T.L.O.*'s reasonableness standard, "the legality of a search of a student should depend simply on the reasonableness, under all the circumstances, of the search." *Id.* Under the *T.L.O.* standard, the reasonableness of the search is evaluated using a two-step inquiry: "first, one must consider 'whether the ... action was justified at its inception'; second, one must determine whether the search as actually conducted 'was reasonably related in scope to the circumstances which justified interference in the first place.' " *Id.* at 341, 105 S.Ct. at 742-43**1305** (citations omitted). The *T.L.O.* standard mirrors the standard announced in *Terry v. Ohio* governing the reasonableness of investigatory stops. *See Terry v. Ohio,* 392 U.S. 1, 20, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968).

[11] Under *T.L.O.*'s first prong, we examine whether Deputy Bostic has a reasonable basis for calling Gray over to him, i.e., stopping her, and asking her questions. It is undisputed that Deputy Bostic witnessed Gray threaten to do something physically to her teacher. Under Alabama Code § 13A-11-8, a verbal threat, "made with the intent to carry out the threat, that would cause a reasonable person who is the target of the threat to fear for his or her safety," constitutes the crime of harassment, which is a Class C misdemeanor. *See*Ala.Code § 13A-11-8(a)(1)-(3). Gray stresses neither Coach Williams nor Coach Horton feared for their safety and that Deputy Bostic had no probable cause or arguable probable cause to arrest her. However, under *T.L.O.,* the level of suspicion in a school setting

458 F.3d 1295, 211 Ed. Law Rep. 701, 19 Fla. L. Weekly Fed. C 894

**(Cite as: 458 F.3d 1295)**

needed to justify a search or an investigatory stop is only reasonableness under the circumstances. Given his having witnessed Gray's threat in a school setting, Deputy Bostic's stopping Gray to question her about her conduct was reasonable.[FN7]

> FN7. Although defendants claim Deputy Bostic had probable cause, the conduct in § 13A-11-8 cases has been generally more egregious and has involved a credible threat. *See, e.g., B.B. v. State,* 863 So.2d 132, 135-36 (Ala.Crim.App.2003) (holding that a disruptive seventh grade student who threatened to kill his teacher violated § 13A-11-8 where the student was very angry during the incident, uttered the threat through clenched teeth and threw a desk across the room while stating, "I hate that teacher, I hate that teacher," and the teacher and another witness both testified that they feared the student would harm the teacher); *Fallin v. City of Huntsville,* 865 So.2d 473, 477 (Ala.Crim.App.2003) (concluding that defendant violated § 13A-11-8 where defendant, a large man, was yelling threats to his daughter's cheerleading coach while approaching her with waving arms and pointing fingers and the coach and other witnesses testified that they were afraid for their safety). However, because *T.L.O.* does not require probable cause in a school setting, we need not reach the issue of whether Deputy Bostic had probable cause or arguable probable cause. *See Durruthy v. Pastor,* 351 F.3d 1080, 1089 (11th Cir.2003) (explaining that a showing of only arguable probable cause is required to establish that an officer is entitled to qualified immunity).

[12][13] Turning to *T.L.O.*'s second prong, we must consider whether Deputy Bostic's subsequent handcuffing of Gray "was reasonably related to the scope of the circumstances which justified the interference in the first place." *T.L.O.* 469 U.S. at 341, 105 S.Ct. at 743 (quotation marks omitted and

emphasis supplied). "[A seizure] will be permissible in its scope when the measures adopted are reasonably related to the objectives of the [seizure] and not excessively intrusive in light of the age and sex of the student and the nature of the infraction." *Id.* at 342, 105 S.Ct. at 743. After stopping Gray, Deputy Bostic not only questioned her, but also handcuffed her for not less than five minutes. Thus, the question under the second prong is whether the handcuffing of nine-year-old Gray was reasonably related to the scope of the circumstances which justified Deputy Bostic's initial interference and was not excessively intrusive.

[14] By his own admission, Deputy Bostic did not handcuff Gray to effect an arrest of Gray. Rather, his handcuffing of Gray was during an investigatory stop. Nonetheless, during an investigatory stop, an officer can still handcuff a detainee when the officer reasonably believes that the detainee presents a potential threat to **\*1306** safety. *See United States v. Hastamorir,* 881 F.2d 1551, 1557 (11th Cir.1989); *United States v. Blackman,* 66 F.3d 1572, 1576-77 (11th Cir.1995); *United States v. Kapperman,* 764 F.2d 786, 790-91 & n. 4 (11th Cir.1985).

The problem in this case for Deputy Bostic is that, at the time Deputy Bostic handcuffed Gray, there was no indication of a potential threat to anyone's safety. The incident was over, and Gray, after making the comment, had promptly complied with her teachers' instructions, coming to the gym wall and then to Coach Horton when told to do so. There is no evidence that Gray was gesturing or engaging in any further disruptive behavior. Rather, Gray had cooperated with her teachers and did not pose a threat to anyone's safety. In fact, Coach Horton had insisted that she would handle the matter, but Deputy Bostic still intervened. Deputy Bostic does not even claim that he handcuffed Gray to protect his or anyone's safety. Rather, Deputy Bostic candidly admitted that he handcuffed Gray to persuade her to get rid of her disrespectful attitude and to impress upon her the serious nature of committing crimes. In effect, Deputy Bostic's handcuffing of Gray was his attempt to punish Gray in order to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

change her behavior in the future.

Thus, Deputy Bostic's handcuffing Gray was not reasonably related to the scope of the circumstances that justified the initial investigatory stop. Rather, the handcuffing was excessively intrusive given Gray's young age and the fact that it was not done to protect anyone's safety. Therefore, the handcuffing of Gray violated Gray's Fourth Amendment rights.

### D. Clearly Established Law

[15][16] Whether a constitutional right was "clearly established" at the time of the violation turns on " 'whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.' " *Bashir,* 445 F.3d at 1330 (quoting *Saucier,* 533 U.S. at 202, 121 S.Ct. at 2156). We focus on the status of the law in March 2003 when Deputy Bostic detained and handcuffed Gray.

[17] It is well settled that, under the Fourth Amendment, "[t]he scope of a detention must be carefully tailored to its underlying justification" and that the "investigatory methods employed [during a detention] should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Florida v. Royer,* 460 U.S. 491, 500, 103 S.Ct. 1319, 1325-26, 75 L.Ed.2d 229 (1983). As we have already discussed, this Court has long concluded that it is reasonable for officers to use handcuffs to protect themselves during an investigative detention. *See Hastamorir,* 881 F.2d at 1556-57; *Kapperman,* 764 F.2d at 790 n. 4. However, Gray does not cite and we cannot locate a case addressing before today when it may be reasonable to use handcuffs in an investigatory stop absent a safety rationale. Thus, no factually similar pre-existing case law put Deputy Bostic on notice that his use of handcuffs to discipline Gray was objectively unreasonable for Fourth Amendment purposes.

[18] However, our inquiry does not end here. Even in the absence of factually similar case law, an official can have fair warning that his conduct is unconstitutional when the constitutional violation is obvious, sometimes referred to as "obvious clarity" cases. *See United States v. Lanier,* 520 U.S. 259, 271, 117 S.Ct. 1219, 1227, 137 L.Ed.2d 432 (1997) ("[A] general constitutional**1307** rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has [not] been previously held unlawful."(quotation marks omitted)); *Vinyard v. Wilson,* 311 F.3d 1340, 1350-51 (11th Cir.2002).

[19] The Fourth Amendment's general proscription against "unreasonable" seizures seldom puts officers on notice that certain conduct is unlawful under precise circumstances. *Evans v. Stephens,* 407 F.3d 1272, 1283 (11th Cir.2005) (en banc). Nonetheless, on rare occasion we have concluded that general Fourth Amendment principles make the constitutional violation obvious. *See, e.g., Id.* at 1283 (concluding that the constitutional violation was obvious where an officer conducted body cavity searches in a degrading and forceful manner and when there was no need for immediate action); *Vinyard,* 311 F.3d at 1355 (concluding that the constitutional violation was obvious where the officer grabbed the arrestee by the hair and arm and applied pepper spray after she had been handcuffed and secured in the back of the patrol car); *Lee v. Ferraro,* 284 F.3d 1188, 1198-99 (11th Cir.2002) (concluding that the constitutional violation was readily apparent where an officer slammed the arrestee's head against the trunk after she was handcuffed, secured and any risk of danger or flight had passed); *Priester v. City of Riviera Beach,* 208 F.3d 919, 927 (11th Cir.2000) (concluding that the constitutional violation was obvious where an officer permitted his dog to attack a handcuffed, compliant arrestee for two minutes and then threatened to kill the arrestee when he kicked the dog in an effort to resist the attack). In these cases, the officer's conduct at issue lay "so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to [him] notwithstanding the lack of [fact-specific] case law." *Lee,* 284 F.3d at 1199 (internal quotation marks omitted). Put another way, the officer's conduct in these cases was "well beyond the 'hazy bor-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

der' that sometimes separates lawful conduct from unlawful conduct," such that every objectively reasonable officer would have known that the conduct was unlawful. *Evans,* 407 F.3d at 1283.

We likewise conclude that Deputy Bostic's conduct in handcuffing Gray, a compliant, nine-year-old girl for the sole purpose of punishing her was an obvious violation of Gray's Fourth Amendment rights. After making the comment, Gray had complied with her teachers' and Deputy Bostic's instructions. Indeed, one of the teachers had informed Deputy Bostic that she would handle the matter. In addition, Deputy Bostic's purpose in handcuffing Gray was not to pursue an investigation to confirm or dispel his suspicions that Gray had committed a misdemeanor. Rather, Deputy Bostic's purpose in handcuffing Gray was simply to punish her and teach her a lesson. Every reasonable officer would have known that handcuffing a compliant nine-year-old child for purely punitive purposes is unreasonable. We emphasize that the Court is not saying that the use of handcuffs during an investigatory stop of a nine-year-old child is always unreasonable, but just unreasonable under the particular facts of this case.

Therefore, Deputy Bostic is not entitled to qualified immunity, and the district court properly denied summary judgment in his favor.

### E. Sheriff Sexton

Gray alleges that Sheriff Sexton failed to train and supervise adequately Deputy **\*1308** Bostic on the proper use of force in this elementary school setting. The district court dismissed Gray's official capacity claim against Sheriff Sexton without challenge. Thus, all that remains is her individual capacity claim against Sheriff Sexton as Deputy Bostic's supervisor.

[20][21][22] Supervisory officials cannot be held liable under § 1983 for the unconstitutional actions of their subordinates based on respondeat superior liability. *Hartley v. Parnell,* 193 F.3d 1263, 1269 (11th Cir.1999).[FN8] Instead, supervisors can be held personally liable when either (1) the super-

visor personally participates in the alleged constitutional violation, or (2) there is a causal connection between the actions of the supervisor and the alleged constitutional violation. *Id.* Gray does not allege that Sheriff Sexton personally participated in her handcuffed detention. Thus, Gray attempts to use the second method.

> FN8. For this reason, we reject Gray's argument that Sheriff Sexton can be held liable because, under Alabama law, a deputy sheriff is the agent and alter ego of the sheriff. To hold Sheriff Sexton liable for Deputy Bostic's alleged constitutional violation under an alter ego theory would amount to respondeat superior liability.

[23][24] Under the second method, "[t]he causal connection can be established when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so." *Id.* (quoting *Brown v. Crawford,* 906 F.2d 667, 671 (11th Cir.1990)). Furthermore, to be sufficient to notify the supervisor, the deprivations must not only be widespread, they also "must be obvious, flagrant, rampant and of continued duration, rather than isolated occurrences." *Id.* (quoting *Brown,* 906 F.2d at 671).

[25] There is no evidence in the record of widespread and obvious handcuffed detentions of students by Deputy Bostic or other deputy sheriffs. There was some vague, arguably hearsay testimony by Coach Horton that she had heard that Deputy Bostic once placed another Holt Elementary student in handcuffs. However, there is no evidence that Sheriff Sexton was aware of this alleged incident. Furthermore, this one isolated incident, of which there are no details, is not sufficient to put Sheriff Sexton on notice that Deputy Bostic needed additional training or supervision on the use of force when detaining minors.

We also recognize that Gray alleges that Sheriff Sexton instituted a policy instructing deputies to detain, handcuff, arrest and incarcerate individuals who were not suspected of committing a crime.

There is no evidence in the record, however, that Sheriff Sexton instituted such a policy or any other policy that would have led Deputy Bostic to believe that he could detain a student in handcuffs absent safety concerns.

Finally, Gray emphasizes that Deputy Bostic received no training specifically addressing the detention of students. She contends that Sheriff Sexton should have foreseen that unwarranted handcuffed detentions of students were "bound to happen" without such training. Thus, Gray is arguing that the need to train was "so obvious" that the failure to do so constituted deliberate indifference without prior notice. *See Gold v. City of Miami,* 151 F.3d 1346, 1352 (11th Cir.1998) (addressing municipal liability for failure to train).

The Supreme Court has "hypothesized that, in a narrow range of circumstances, a **\*1309** violation of federal rights may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations." *Id.* (quoting *Bd. of County Comm'rs v. Brown,* 520 U.S. 397, 409, 117 S.Ct. 1382, 1391, 137 L.Ed.2d 626 (1997)). However, the Supreme Court's only example of an obvious training need was the use of deadly force when police officers are given firearms. We have already determined that the need for training regarding the proper use of handcuffs is " '[u]nlike the risk from a particular glaring omission in a training regimen,' " and is instead a risk from a "possible imperfection[ ], ... in ... training and supervision" that is " 'not obvious in the abstract.' " *Id.* at 1352 (quoting in part *Brown,* 520 U.S. at 409, 117 S.Ct. at 1391).

[26][27] We similarly conclude that the need for training regarding the detention of students specifically is not obvious in the abstract and that a lack of such training is a "possible imperfection," but not a "glaring omission" from a training regimen. Deputy Bostic received training, at both the police academy and the Tuscaloosa County Sheriff's Department, on the proper use of force and the principles of probable cause. The failure to provide *specific* training regarding the detention of students,

in addition to general training regarding use of force during detention and arrest, was not "so likely" to result in the violation of students' Fourth Amendment rights that Sheriff Sexton reasonably can be said to have been deliberately indifferent to the need for this particularized training without any prior notice. *See City of Canton v. Harris,* 489 U.S. 378, 390-92, 109 S.Ct. 1197, 1205-07, 103 L.Ed.2d 412 (1989) (finding no obvious need to train jail supervisors regarding when to provide medical treatment beyond first aid); *Gold,* 151 F.3d at 1352; *Young v. City of Augusta,* 59 F.3d 1160, 1172 (11th Cir.1995) (finding no obvious need to train jailers regarding medical treatment for mental illnesses and dispensing of prescribed medication).[FN9] Accordingly, Sheriff Sexton was entitled to summary judgment in his individual capacity.

> FN9. Gray cites no case law or statute that required Sheriff Sexton to train SROs, such as Deputy Bostic, on how to detain students. Therefore, the law was not "clearly established" for purposes of qualified immunity such that a reasonable official in Sheriff Sexton's shoes would have known that the failure to provide such training constituted deliberate indifference. *See Riley v. Newton,* 94 F.3d 632, 637 (11th Cir.1996) (concluding that sheriff was entitled to qualified immunity on failure-to-train claim where plaintiffs failed to cite case law or constitutional provision requiring sheriff to provide training on how to use Army personnel and rejecting plaintiffs' argument that *City of Canton's* general standard of liability in failure to train cases clearly established the right).

### F. Injunctive Relief

[28][29] Defendants also argue that the district court erred in failing to grant summary judgment on Gray's claim for injunctive relief against Sheriff Sexton.[FN10] Specifically, Gray's injunctive relief claim seeks a declaration that Sheriff Sexton's custom or policy of failing to train deputies on the detention of students is unconstitutional **\*1310** and

458 F.3d 1295, 211 Ed. Law Rep. 701, 19 Fla. L. Weekly Fed. C 894

**(Cite as: 458 F.3d 1295)**

seeks to enjoin Sheriff Sexton from continuing to implement that custom or policy. However, there is no evidence of an unconstitutional policy or custom implemented by Sheriff Sexton. Therefore, Gray's claim for injunctive relief against Sheriff Sexton also necessarily fails. Accordingly, Sheriff Sexton is entitled to summary judgment on Gray's claim for injunctive relief.

> FN10. Generally, the denial of summary judgment on a claim for injunctive relief is not a final appealable decision. *Switzerland Cheese Ass'n, Inc. v. E. Horne's Market, Inc.,* 385 U.S. 23, 25, 87 S.Ct. 193, 195, 17 L.Ed.2d 23 (1966). However, "[u]nder the pendant appellate jurisdiction doctrine, we may address [otherwise] nonappealable orders if they are 'inextricably intertwined' with an appealable decision." *Hudson v. Hall,* 231 F.3d 1289, 1294 (11th Cir.2000) (quotation marks omitted). Here, Gray's claim for injunctive relief and Sheriff Sexton's argument that he is entitled to qualified immunity are inextricably intertwined because both turn on whether Sheriff Sexton has implemented an unconstitutional policy or custom. *See Moniz v. City of Fort Lauderdale,* 145 F.3d 1278, 1281 n. 3 (11th Cir.1998) (concluding that the issues are inextricably intertwined when the court, in resolving the qualified immunity issue, also reaches the merits of the pendant claim).

### IV. CONCLUSION

For the forgoing reasons, we affirm the district court's denial of summary judgment on Gray's illegal seizure claim against Deputy Bostic in his individual capacity, reverse the district court's denial of summary judgment on Gray's claims against Sheriff Sexton and on her separate excessive force claim against Deputy Bostic, and remand for further proceedings consistent with this opinion.

AFFIRMED IN PART; REVERSED IN PART

AND REMANDED.

C.A.11 (Ala.),2006.
Gray ex rel. Alexander v. Bostic
458 F.3d 1295, 211 Ed. Law Rep. 701, 19 Fla. L. Weekly Fed. C 894

END OF DOCUMENT

370 F.3d 1252                                                                    Page 1
370 F.3d 1252, 188 Ed. Law Rep. 620, 28 Fla. L. Weekly Fed. C 593
**(Cite as: 370 F.3d 1252)**

Holloman ex rel. Holloman v. Harland
C.A.11 (Ala.),2004.

United States Court of Appeals,Eleventh Circuit.
Michael HOLLOMAN, on behalf of and as Next
Friend of his son, Michael HOLLOMAN, Plaintiff-
Appellant,
v.
George HARLAND, Fawn Allred, Defendants-Ap-
pellees.
Michael Holloman, Jr., Plaintiff-Appellant,
v.
Walker County Board of Education, Defendant-Ap-
pellee.
**Nos. 01-13864, 01-15094.**

May 28, 2004.

**Background:** Former Alabama public high school
student filed § 1983 action against economics and
government teacher, school principal, and county
board of education, claiming that his rights under
First Amendment's Speech Clause were violated
when teacher and principal punished him, with pad-
dling in lieu of detention that would have delayed
his graduation, for silently raising his fist during
daily flag salute instead of reciting Pledge of Alle-
giance with rest of class, and that his Establishment
Clause rights were violated by teacher's daily
"ritual" of conducting silent moment of prayer. The
United States District Court for the Northern Dis-
trict of Alabama, No. 00-01855-CV-AR-J,William
M. Acker, Jr., J., granted summary judgment on
both claims to teacher and principal on qualified
immunity grounds, and in separate opinion granted
summary judgment to school board. Student ap-
pealed both rulings.

**Holdings:** The Court of Appeals, Tjoflat, Circuit
Judge, held that:

(1) for purposes of determining their entitlement to
qualified immunity, both teacher and principal were
engaged in discretionary function at time they dis-
ciplined student in connection with flag salute in-

cident;

(2) genuine issue of material fact existed as to
whether teacher and principal punished student for
failing to say Pledge of Allegiance, in violation of
his clearly established right to be free from com-
pelled speech;

(3) genuine issue of material fact existed as to
whether teacher and principal punished student for
raising his fist in the air in violation of his clearly
established right to engage in affirmative expres-
sion;

(4) even if student's expression was not protected,
genuine issue of material fact existed as to whether
teacher and principal were motivated by unlawful
desire to suppress student's viewpoint;

(5) teacher was not engaged in discretionary func-
tion when she led class in moment of silent prayer;

(6) teacher's practice of soliciting prayer requests
from her students and enforcing moment of silence
violated Establishment Clause;

(7) student had successfully articulated Speech
Clause claims against school board, under either
"official policy" or delegation to final policymaker
theories; and

(8) student had successfully articulated Establish-
ment Clause claim against school board under
either "official policy" or "official custom" theory.

Reversed and remanded.

Wilson, Circuit Judge, filed opinion concurring in
part and dissenting in part.
West Headnotes
**[1] Civil Rights 78 ☞1335**

78 Civil Rights
   78III Federal Remedies in General
      78k1334 Persons Liable in General

78k1335 k. In General. Most Cited Cases

**Civil Rights 78 ☞1355**

78 Civil Rights
   78III Federal Remedies in General
      78k1353 Liability of Public Officials
         78k1355 k. Vicarious Liability and Respondeat Superior in General; Supervisory Liability in General. Most Cited Cases
Under § 1983, individual may be sued for his own personal actions on theory of "direct liability," or, under certain limited circumstances, for actions of his subordinates on theory of "supervisoral liability." 42 U.S.C.A. § 1983.

**[2] Federal Civil Procedure 170A ☞1752.1**

170A Federal Civil Procedure
   170AXI Dismissal
      170AXI(B) Involuntary Dismissal
         170AXI(B)2 Grounds in General
            170Ak1752 Affirmative Defenses, Raising by Motion to Dismiss
               170Ak1752.1 k. In General. Most Cited Cases

**Federal Civil Procedure 170A ☞2491.5**

170A Federal Civil Procedure
   170AXVII Judgment
      170AXVII(C) Summary Judgment
         170AXVII(C)2 Particular Cases
            170Ak2491.5 k. Civil Rights Cases in General. Most Cited Cases
When government official is sued under § 1983 under theory of direct liability, he may seek summary judgment on qualified immunity grounds; government official may also seek to have complaint dismissed on qualified immunity grounds prior to discovery, based solely on allegations in pleadings. Fed.Rules Civ.Proc.Rules 12(b)(6), 56, 28 U.S.C.A.; 42 U.S.C.A. § 1983.

**[3] Federal Civil Procedure 170A ☞2491.5**

170A Federal Civil Procedure
   170AXVII Judgment

170AXVII(C) Summary Judgment
   170AXVII(C)2 Particular Cases
      170Ak2491.5 k. Civil Rights Cases in General. Most Cited Cases
To even be potentially eligible for summary judgment due to qualified immunity, government official must have been engaged in discretionary function when he performed acts of which plaintiff complains; it is governmental official's burden to make this showing, and official who is able to do so may not receive summary judgment on qualified immunity grounds. Fed.Rules Civ.Proc.Rule 56, 28 U.S.C.A.; 42 U.S.C.A. § 1983.

**[4] Civil Rights 78 ☞1407**

78 Civil Rights
   78III Federal Remedies in General
      78k1400 Presumptions, Inferences, and Burdens of Proof
         78k1407 k. Defenses; Immunity and Good Faith. Most Cited Cases
If, interpreting evidence in light most favorable to § 1983 plaintiff, court concludes that government official was engaged in discretionary function, then burden shifts to plaintiff to show that official is not entitled to qualified immunity. 42 U.S.C.A. § 1983.

**[5] Civil Rights 78 ☞1376(1)**

78 Civil Rights
   78III Federal Remedies in General
      78k1372 Privilege or Immunity; Good Faith and Probable Cause
         78k1376 Government Agencies and Officers
            78k1376(1) k. In General. Most Cited Cases

**Civil Rights 78 ☞1376(2)**

78 Civil Rights
   78III Federal Remedies in General
      78k1372 Privilege or Immunity; Good Faith and Probable Cause
         78k1376 Government Agencies and Officers
            78k1376(2) k. Good Faith and Reason-

370 F.3d 1252, 188 Ed. Law Rep. 620, 28 Fla. L. Weekly Fed. C 593

**(Cite as: 370 F.3d 1252)**

ableness; Knowledge and Clarity of Law; Motive and Intent, in General. Most Cited Cases

To overcome qualified immunity, § 1983 plaintiff must satisfy two prong test; he must show that (1) government official violated constitutional right, and (2) this right was clearly established at time of alleged violation. 42 U.S.C.A. § 1983.

**[6] Constitutional Law 92 ⬤═⇒1490**

92 Constitutional Law
    92XVIII Freedom of Speech, Expression, and Press
        92XVIII(A) In General
          92XVIII(A)1 In General
            92k1490 k. In General. Most Cited Cases
    (Formerly 92k90(1))

**Constitutional Law 92 ⬤═⇒1564**

92 Constitutional Law
    92XVIII Freedom of Speech, Expression, and Press
        92XVIII(A) In General
          92XVIII(A)3 Particular Issues and Applications in General
            92k1564 k. Compelled or Forced Speech, Support, or Participation. Most Cited Cases
    (Formerly 92k90(1))

Speech Clause of First Amendment protects at least two separate, yet related, rights, the right to engage in affirmative expression and the right to be free from compelled expression. U.S.C.A. Const.Amend. 1.

**[7] Officers and Public Employees 283 ⬤═⇒114**

283 Officers and Public Employees
    283III Rights, Powers, Duties, and Liabilities
        283k114 k. Liabilities for Official Acts. Most Cited Cases
    (Formerly 78k1376(1))

In many areas other than qualified immunity, "discretionary function" is defined as activity requiring exercise of independent judgment, and is opposite of ministerial task; this dichotomy has been abandoned in qualified immunity context. 42

U.S.C.A. § 1983.

**[8] Officers and Public Employees 283 ⬤═⇒114**

283 Officers and Public Employees
    283III Rights, Powers, Duties, and Liabilities
        283k114 k. Liabilities for Official Acts. Most Cited Cases
    (Formerly 78k1376(1))

Instead of focusing on whether challenged acts of government employee seeking qualified immunity involved exercise of actual discretion, court assesses whether they were of type that fell within the employee's job responsibilities, and inquiry is two-fold; court asks whether government employee was (a) performing legitimate job-related function, i.e., pursuing job-related goal, (b) through means that were within his power to utilize. 42 U.S.C.A. § 1983.

**[9] Civil Rights 78 ⬤═⇒1376(1)**

78 Civil Rights
    78III Federal Remedies in General
        78k1372 Privilege or Immunity; Good Faith and Probable Cause
          78k1376 Government Agencies and Officers
            78k1376(1) k. In General. Most Cited Cases

To pass first step of discretionary function test for qualified immunity, government official must have been performing function that, but for the alleged constitutional infirmity, would have fallen with his legitimate job description. 42 U.S.C.A. § 1983.

**[10] Officers and Public Employees 283 ⬤═⇒114**

283 Officers and Public Employees
    283III Rights, Powers, Duties, and Liabilities
        283k114 k. Liabilities for Official Acts. Most Cited Cases
    (Formerly 78k1376(1))

After determining that government official is engaged in legitimate job-related function, it is then necessary to turn to second prong of discretionary function test for qualified immunity and determine whether official is executing that job-related func-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

tion, i.e., pursuing his job-related goals, in author-ized manner. 42 U.S.C.A. § 1983.

**[11] Civil Rights 78 ☞1376(5)**

78 Civil Rights
   78III Federal Remedies in General
      78k1372 Privilege or Immunity; Good Faith and Probable Cause
         78k1376 Government Agencies and Of-ficers
            78k1376(5) k. Schools. Most Cited Cases
Alabama public high school economics and govern-ment teacher's acts in relation to punishing graduat-ing student for silently raising his fist during daily flag salute instead of reciting Pledge of Allegiance with rest of class were discretionary acts for which she could seek qualified immunity under § 1983. 42 U.S.C.A. § 1983.

**[12] Civil Rights 78 ☞1376(5)**

78 Civil Rights
   78III Federal Remedies in General
      78k1372 Privilege or Immunity; Good Faith and Probable Cause
         78k1376 Government Agencies and Of-ficers
            78k1376(5) k. Schools. Most Cited Cases
Alabama public high school principal who "paddled" student for silently raising his fist during daily flag salute instead of reciting Pledge of Alle-giance with rest of class, in lieu of three-day deten-tion that would have delayed student's graduation, was engaged in legitimate discretionary function for purposes of determining his entitlement to qual-ified immunity against student's Speech Clause claims; disciplining students was such a function, and in state of Alabama spanking students was le-gitimate part of principal's arsenal for enforcing such discipline. U.S.C.A. Const.Amend. 1; 42 U.S.C.A. § 1983.

**[13] Federal Civil Procedure 170A ☞2491.5**

170A Federal Civil Procedure

170AXVII Judgment
   170AXVII(C) Summary Judgment
      170AXVII(C)2 Particular Cases
         170Ak2491.5 k. Civil Rights Cases in General. Most Cited Cases
To show that government official is not entitled to summary judgment on qualified immunity grounds, § 1983 plaintiff must demonstrate that reasonable jury could interpret evidence in record as showing that official violated constitutional right that was clearly established at time of acts in question. Fed.Rules Civ.Proc.Rule 56, 28 U.S.C.A.; 42 U.S.C.A. § 1983.

**[14] Constitutional Law 92 ☞1151**

92 Constitutional Law
   92X First Amendment in General
      92X(A) In General
         92k1151 k. Applicability to Governmental or Private Action; State Action. Most Cited Cases
      (Formerly 92k82(5))

**Constitutional Law 92 ☞3935**

92 Constitutional Law
   92XXVII Due Process
      92XXVII(D) Applicability to Governmental or Private Conduct; State Action
         92k3935 k. In General. Most Cited Cases
      (Formerly 92k254(1))

**Constitutional Law 92 ☞3937**

92 Constitutional Law
   92XXVII Due Process
      92XXVII(D) Applicability to Governmental or Private Conduct; State Action
         92k3937 k. State Government. Most Cited Cases
      (Formerly 92k254(2))
First Amendment, as incorporated through Due Process Clause of Fourteenth Amendment, applies to state and municipal governments, state-created entities, and state and municipal employees. U.S.C.A. Const.Amends. 1, 14.

**[15] Federal Civil Procedure 170A ☞2491.5**

370 F.3d 1252, 188 Ed. Law Rep. 620, 28 Fla. L. Weekly Fed. C 593
**(Cite as: 370 F.3d 1252)**

170A Federal Civil Procedure
  170AXVII Judgment
    170AXVII(C) Summary Judgment
      170AXVII(C)2 Particular Cases
        170Ak2491.5 k. Civil Rights Cases in General. Most Cited Cases

Genuine issue of material fact, as to whether Alabama public high school student who silently raised his fist during daily flag salute instead of reciting Pledge of Allegiance was disciplined for failing to recite Pledge, in violation of his constitutional right to be free from compelled speech, precluded summary judgment for teacher and school principal on that § 1983 claim on qualified immunity grounds. U.S.C.A. Const.Amend. 1; Fed.Rules Civ.Proc.Rule 56(c), 28 U.S.C.A.; 42 U.S.C.A. § 1983.

**[16] Civil Rights 78 ☞1376(5)**

78 Civil Rights
  78III Federal Remedies in General
    78k1372 Privilege or Immunity; Good Faith and Probable Cause
      78k1376 Government Agencies and Officers
        78k1376(5) k. Schools. Most Cited Cases

For purposes of determining whether Alabama public high school teacher and principal were entitled to qualified immunity in student's § 1983 action, student's constitutional right to be free from compelled speech was clearly established in May 2000, when student was disciplined for silently raising his fist during daily flag salute instead of reciting Pledge of Allegiance with rest of class; any reasonable person would have known that disciplining student for refusing to recite pledge impermissibly chilled his First Amendment rights. U.S.C.A. Const.Amend. 1; 42 U.S.C.A. § 1983.

**[17] Federal Civil Procedure 170A ☞2491.5**

170A Federal Civil Procedure
  170AXVII Judgment
    170AXVII(C) Summary Judgment
      170AXVII(C)2 Particular Cases

        170Ak2491.5 k. Civil Rights Cases in General. Most Cited Cases

Genuine issue of material fact, as to whether Alabama public high school student who silently raised his fist during daily flag salute to protest another student's discipline for remaining silent with his hands in his pockets during flag salute the day before was punished for raising his fist in the air during recitation rather than for merely refusing to recite Pledge of Allegiance, precluded summary judgment on qualified immunity grounds for teacher and principal on § 1983 claim based on violation of student's First Amendment right to engage in affirmative expression. U.S.C.A. Const.Amend. 1; Fed.Rules Civ.Proc.Rule 56(c), 28 U.S.C.A.; 42 U.S.C.A. § 1983.

**[18] Constitutional Law 92 ☞1497**

92 Constitutional Law
  92XVIII Freedom of Speech, Expression, and Press
    92XVIII(A) In General
      92XVIII(A)1 In General
        92k1497 k. Conduct, Protection Of. Most Cited Cases
  (Formerly 92k90(1))

**Constitutional Law 92 ☞1976**

92 Constitutional Law
  92XVIII Freedom of Speech, Expression, and Press
    92XVIII(Q) Education
      92XVIII(Q)1 In General
        92k1975 Student Speech or Conduct
          92k1976 k. In General. Most Cited Cases
  (Formerly 92k90(1), 92k90.1(1.4))

First Amendment guarantees students, and all people, the right to engage not only in pure speech, but "expressive conduct" as well; in determining whether conduct was "expressive conduct," court must ask whether reasonable person would interpret it as some sort of message, not whether observer would necessarily infer specific message. U.S.C.A. Const.Amend. 1.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

370 F.3d 1252, 188 Ed. Law Rep. 620, 28 Fla. L. Weekly Fed. C 593

**(Cite as: 370 F.3d 1252)**

**[19] Constitutional Law 92 ☞1965**

92 Constitutional Law
    92XVIII Freedom of Speech, Expression, and Press
        92XVIII(Q) Education
          92XVIII(Q)1 In General
              92k1965 k. In General. Most Cited Cases
    (Formerly 92k90.1(1.4))
Eleventh Circuit applies the same test in assessing school restrictions on both pure speech and expressive conduct. U.S.C.A. Const.Amend. 1.

**[20] Constitutional Law 92 ☞1976**

92 Constitutional Law
    92XVIII Freedom of Speech, Expression, and Press
        92XVIII(Q) Education
          92XVIII(Q)1 In General
            92k1975 Student Speech or Conduct
              92k1976 k. In General. Most Cited Cases
    (Formerly 92k90.1(1.4))

**Constitutional Law 92 ☞1979**

92 Constitutional Law
    92XVIII Freedom of Speech, Expression, and Press
        92XVIII(Q) Education
          92XVIII(Q)1 In General
            92k1975 Student Speech or Conduct
              92k1979 k. Threats or Violence. Most Cited Cases
    (Formerly 92k90.1(1.4))
Public educational institutions have right to adopt and enforce reasonable, nondiscriminatory regulations as to time, place and manner of student expressions and demonstrations. U.S.C.A. Const.Amend. 1.

**[21] Constitutional Law 92 ☞1978**

92 Constitutional Law
    92XVIII Freedom of Speech, Expression, and Press

        92XVIII(Q) Education
          92XVIII(Q)1 In General
            92k1975 Student Speech or Conduct
              92k1978 k. Disruption, Disturbance, or Interference in General. Most Cited Cases
    (Formerly 92k90.1(1.4))
Student expression must cause, or be likely to cause, material and substantial disruption and more than brief, easily overlooked, de minimum impact, before it may be curtailed. U.S.C.A. Const.Amend. 1.

**[22] Schools 345 ☞169**

345 Schools
    345II Public Schools
        345II(L) Pupils
          345k169 k. Control of Pupils and Discipline in General. Most Cited Cases
Conduct that may be constitutionally protected in one school or under one set of circumstances may tend to incite disruption or disorder, and so be constitutionally proscribable, in others.

**[23] Constitutional Law 92 ☞1978**

92 Constitutional Law
    92XVIII Freedom of Speech, Expression, and Press
        92XVIII(Q) Education
          92XVIII(Q)1 In General
            92k1975 Student Speech or Conduct
              92k1978 k. Disruption, Disturbance, or Interference in General. Most Cited Cases
    (Formerly 92k90.1(1.4))
Where students' expressive activity does not materially interfere with school's vital educational mission, and does not raise realistic chance of doing so, it may not be prohibited simply because it conceivably might have such an effect. U.S.C.A. Const.Amend. 1.

**[24] Constitutional Law 92 ☞1977**

92 Constitutional Law
    92XVIII Freedom of Speech, Expression, and Press
        92XVIII(Q) Education

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

370 F.3d 1252, 188 Ed. Law Rep. 620, 28 Fla. L. Weekly Fed. C 593
**(Cite as: 370 F.3d 1252)**

92XVIII(Q)1 In General
92k1975 Student Speech or Conduct
92k1977 k. Discipline in General.
Most Cited Cases
(Formerly 92k90.1(1.4))

**Schools 345 ☞169**

345 Schools
345II Public Schools
345II(L) Pupils
345k169 k. Control of Pupils and Discipline in General. Most Cited Cases
Fact that other students were disturbed by student's silent raising of fist during flag salute instead of reciting Pledge of Allegiance with rest of class, as evidenced by fact number of students came up to teacher after class and told her that what he did wasn't "right," and teacher's concern that student's behavior would lead to further disruptions by other students, was irrelevant to analysis of whether discipline of student for that incident violated his First Amendment right to freedom of expression. U.S.C.A. Const.Amend. 1.

**[25] Constitutional Law 92 ☞1490**

92 Constitutional Law
92XVIII Freedom of Speech, Expression, and Press
92XVIII(A) In General
92XVIII(A)1 In General
92k1490 k. In General. Most Cited Cases
(Formerly 92k90(1))
Protections of the First Amendment do not extend solely to speech which is well-mannered and attentive to the preferences of others. U.S.C.A. Const.Amend. 1.

**[26] Civil Rights 78 ☞1376(2)**

78 Civil Rights
78III Federal Remedies in General
78k1372 Privilege or Immunity; Good Faith and Probable Cause
78k1376 Government Agencies and Officers

78k1376(2) k. Good Faith and Reasonableness; Knowledge and Clarity of Law; Motive and Intent, in General. Most Cited Cases
While government officials must have fair warning that their acts are unconstitutional, there need not be case on all fours, with materially identical facts, before Court will deny officials qualified immunity and allow suits against them; principle of constitutional law can be "clearly established" even if there are notable factual distinctions between precedents relied on and cases then before Court, so long as prior decisions gave reasonable warning that conduct at issue violated constitutional rights. 42 U.S.C.A. § 1983.

**[27] Civil Rights 78 ☞1376(5)**

78 Civil Rights
78III Federal Remedies in General
78k1372 Privilege or Immunity; Good Faith and Probable Cause
78k1376 Government Agencies and Officers
78k1376(5) k. Schools. Most Cited Cases
For purposes of determining whether Alabama public high school teacher and principal were entitled to qualified immunity in § 1983 action, student's First Amendment right to raise his fist during flag salute instead of reciting Pledge of Allegiance with rest of class was clearly established as of May 16, 2000. U.S.C.A. Const.Amend. 1; 42 U.S.C.A. § 1983.

**[28] Constitutional Law 92 ☞1976**

92 Constitutional Law
92XVIII Freedom of Speech, Expression, and Press
92XVIII(Q) Education
92XVIII(Q)1 In General
92k1975 Student Speech or Conduct
92k1976 k. In General. Most Cited Cases
(Formerly 92k90.1(1.4))

**Constitutional Law 92 ☞1978**

370 F.3d 1252, 188 Ed. Law Rep. 620, 28 Fla. L. Weekly Fed. C 593
**(Cite as: 370 F.3d 1252)**

92 Constitutional Law
    92XVIII Freedom of Speech, Expression, and Press
        92XVIII(Q) Education
          92XVIII(Q)1 In General
            92k1975 Student Speech or Conduct
              92k1978 k. Disruption, Disturbance, or Interference in General. Most Cited Cases
    (Formerly 92k90.1(1.4))
*Tinker-Burnside* test calls for teachers to assess two factors: (1) whether student is engaged in expression, either pure speech or expressive conduct, and (2) whether expression is having non-negligible disruptive effect, or is likely to have such effect, on classroom order or educational process. U.S.C.A. Const.Amend. 1.

**[29] Federal Civil Procedure 170A ⚬⟶2491.5**

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
          170AXVII(C)2 Particular Cases
            170Ak2491.5 k. Civil Rights Cases in General. Most Cited Cases
Genuine issue of material fact, as to whether Alabama public high school teacher and principal who punished student who silently raised his fist during daily flag salute were motivated by desire to suppress student's supposedly unpatriotic viewpoint, precluded summary judgment on that Speech Clause claim against them on qualified immunity grounds. U.S.C.A. Const.Amend. 1; Fed.Rules Civ.Proc.Rule 56(c), 28 U.S.C.A.; 42 U.S.C.A. § 1983.

**[30] Constitutional Law 92 ⚬⟶1507**

92 Constitutional Law
    92XVIII Freedom of Speech, Expression, and Press
        92XVIII(A) In General
          92XVIII(A)1 In General
            92k1507 k. Viewpoint or Idea Discrimination. Most Cited Cases
    (Formerly 92k90(3))
Government actors may not discriminate against

speakers based on viewpoint, even in places or under circumstances where people do not have constitutional right to speak in the first place. U.S.C.A. Const.Amend. 1.

**[31] Civil Rights 78 ⚬⟶1376(5)**

78 Civil Rights
    78III Federal Remedies in General
        78k1372 Privilege or Immunity; Good Faith and Probable Cause
          78k1376 Government Agencies and Officers
            78k1376(5) k. Schools. Most Cited Cases
Alabama public high school economics and government teacher was not engaged in discretionary function when she led class in moment of silent prayer and thus was not entitled to qualified immunity on Establishment Clause-based § 1983 claim; assuming she was attempting to pursue legitimate job-related function of fostering her students' character education by teaching compassion, she was not doing so through legitimate means that fell within her powers. U.S.C.A. Const.Amend. 1; 42 U.S.C.A. § 1983; Ala.Code 1975, § 16-6B-2(h).

**[32] Constitutional Law 92 ⚬⟶3851**

92 Constitutional Law
    92XXVII Due Process
        92XXVII(A) In General
          92k3848 Relationship to Other Constitutional Provisions; Incorporation
            92k3851 k. First Amendment. Most Cited Cases
    (Formerly 92k274(3.1))
Establishment Clause has been made applicable to states, as well as state-created entities and their employees, through Due Process Clause of the Fourteenth Amendment. U.S.C.A. Const.Amends. 1, 14.

**[33] Constitutional Law 92 ⚬⟶1295**

92 Constitutional Law
    92XIII Freedom of Religion and Conscience
        92XIII(A) In General
          92k1294 Establishment of Religion

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

370 F.3d 1252, 188 Ed. Law Rep. 620, 28 Fla. L. Weekly Fed. C 593

**(Cite as: 370 F.3d 1252)**

92k1295 k. In General. Most Cited Cases

(Formerly 92k84.1)

**Constitutional Law 92 ☞1342**

92 Constitutional Law
   92XIII Freedom of Religion and Conscience
      92XIII(B) Particular Issues and Applications
         92k1341 Public Education
            92k1342 k. In General. Most Cited Cases

(Formerly 92k84.5(3))

**Constitutional Law 92 ☞1344**

92 Constitutional Law
   92XIII Freedom of Religion and Conscience
      92XIII(B) Particular Issues and Applications
         92k1341 Public Education
            92k1344 k. Employees in General. Most Cited Cases

(Formerly 92k84.5(3), 92k84.1)

Establishment Clause applies not only to state statutes, but acts and decisions of individual governmental actors, such as teachers and school administrators. U.S.C.A. Const.Amend. 1.

**[34] Constitutional Law 92 ☞1295**

92 Constitutional Law
   92XIII Freedom of Religion and Conscience
      92XIII(A) In General
         92k1294 Establishment of Religion
            92k1295 k. In General. Most Cited Cases

(Formerly 92k84.1)

Under *Lemon-Agostini* test for assessing permissibility of statutes under Establishment Clause, (1) statute must have secular legislative purpose, (2) statute's principal or primary effect must be one that neither advances nor inhibits religion, and (3) statute must not foster excessive government entanglement with religion. U.S.C.A. Const.Amend. 1.

**[35] Constitutional Law 92 ☞1350**

92 Constitutional Law

92XIII Freedom of Religion and Conscience
      92XIII(B) Particular Issues and Applications
         92k1341 Public Education
            92k1350 k. Prayer or Silence in General. Most Cited Cases

(Formerly 92k84.5(3))

**Schools 345 ☞165**

345 Schools
   345II Public Schools
      345II(L) Pupils
         345k165 k. Religious Instruction and Reading of Scriptures. Most Cited Cases

Alabama public high school economics and government teacher's practice of soliciting prayer requests from her students and enforcing moment of silence violated Establishment Clause; teacher's explanation that ritual was intended to teach students compassion pursuant to character education plan mandated by state legislature did not represent valid secular legislative purpose because her acts were motivated at least in part by desire to inculcate religiosity, and effect of teacher's behavior was to promote praying, a religious activity. U.S.C.A. Const.Amend. 1; Ala.Code 1975, § 16-6B-2.

**[36] Constitutional Law 92 ☞1350**

92 Constitutional Law
   92XIII Freedom of Religion and Conscience
      92XIII(B) Particular Issues and Applications
         92k1341 Public Education
            92k1350 k. Prayer or Silence in General. Most Cited Cases

(Formerly 92k84.5(3))

Public school prayer is not student-initiated, and hence constitutional under Establishment Clause, simply because initial idea for prayer was student′s; true test of constitutionality is whether school encouraged, facilitated, or in any way conducted the prayer. U.S.C.A. Const.Amend. 1.

**[37] Constitutional Law 92 ☞1350**

92 Constitutional Law
   92XIII Freedom of Religion and Conscience
      92XIII(B) Particular Issues and Applications

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

92k1341 Public Education
92k1350 k. Prayer or Silence in General. Most Cited Cases
(Formerly 92k84.5(3))

**Schools 345 ⚬⟶165**

345 Schools
345II Public Schools
345II(L) Pupils
345k165 k. Religious Instruction and Reading of Scriptures. Most Cited Cases
Fact that Alabama public high school students were not actually forced to pray during moment of silence, and may have been free to leave the room, did not alleviate constitutional infirmities of economics and government teacher's moment of silence under Establishment Clause, nor did moment's nondenominational nature or brevity. U.S.C.A. Const.Amend. 1.

**[38] Civil Rights 78 ⚬⟶1376(5)**

78 Civil Rights
78III Federal Remedies in General
78k1372 Privilege or Immunity; Good Faith and Probable Cause
78k1376 Government Agencies and Officers
78k1376(5) k. Schools. Most Cited Cases
Alabama public high school student's rights under Establishment Clause, were clearly established in May, 2000 when economics and government teacher implemented infringing daily "ritual" of conducting silent moment of prayer and soliciting prayer requests from students. U.S.C.A. Const.Amend. 1; 42 U.S.C.A. § 1983.

**[39] Civil Rights 78 ⚬⟶1346**

78 Civil Rights
78III Federal Remedies in General
78k1342 Liability of Municipalities and Other Governmental Bodies
78k1346 k. Education. Most Cited Cases
Alabama public school board could not be held liable under § 1983 for unconstitutional acts of high

school principal and teacher, its employees, under respondeat superior theory. 42 U.S.C.A. § 1983.

**[40] Civil Rights 78 ⚬⟶1351(2)**

78 Civil Rights
78III Federal Remedies in General
78k1342 Liability of Municipalities and Other Governmental Bodies
78k1351 Government Ordinance, Policy, Practice, or Custom
78k1351(2) k. Education. Most Cited Cases
Alabama public school board could be held liable for student's compelled speech First Amendment claim based on official policy directive requiring each school system to incorporate "Character Education Plan" including Pledge of Allegiance; directive lacked language of state statute making recitation of Pledge voluntary and indicated that each day included Pledge, rather than opportunity to recite it. U.S.C.A. Const.Amend. 1; 42 U.S.C.A. § 1983; Ala.Code 1975, § 16-43-5.

**[41] Civil Rights 78 ⚬⟶1351(2)**

78 Civil Rights
78III Federal Remedies in General
78k1342 Liability of Municipalities and Other Governmental Bodies
78k1351 Government Ordinance, Policy, Practice, or Custom
78k1351(2) k. Education. Most Cited Cases
Alabama public school board could be held liable under Establishment Clause claim for high school economics and government teacher's daily moment of silent prayer under "official policy" theory, based on teacher's uncontroverted deposition testimony that her practice of asking for prayer requests was actually included in "compassion" requirement of "Character Education Plan" that board required each school system to implement and fact each high school's plan had to be approved by school district before being forwarded on to State Department of Education. U.S.C.A. Const.Amend. 1; 42 U.S.C.A. § 1983; Ala.Code 1975, § 16-6B-2(h).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

370 F.3d 1252, 188 Ed. Law Rep. 620, 28 Fla. L. Weekly Fed. C 593

**(Cite as: 370 F.3d 1252)**

**[42] Civil Rights 78 €══1351(1)**

78 Civil Rights
    78III Federal Remedies in General
        78k1342 Liability of Municipalities and Other Governmental Bodies
            78k1351 Governmental Ordinance, Policy, Practice, or Custom
                78k1351(1) k. In General. Most Cited Cases
Municipal governing body may be held liable under § 1983 for acts or policies of individuals to whom it delegated final decisionmaking authority in particular area. 42 U.S.C.A. § 1983.

**[43] Civil Rights 78 €══1351(1)**

78 Civil Rights
    78III Federal Remedies in General
        78k1342 Liability of Municipalities and Other Governmental Bodies
            78k1351 Governmental Ordinance, Policy, Practice, or Custom
                78k1351(1) k. In General. Most Cited Cases
For purposes of determining governing body's liability under § 1983 for acts or policies of individuals, member or employee of governing body is "final policy maker" only if his decisions have legal effect without further action by governing body. 42 U.S.C.A. § 1983.

**[44] Civil Rights 78 €══1351(1)**

78 Civil Rights
    78III Federal Remedies in General
        78k1342 Liability of Municipalities and Other Governmental Bodies
            78k1351 Governmental Ordinance, Policy, Practice, or Custom
                78k1351(1) k. In General. Most Cited Cases
To determine if someone is final policy maker for § 1983 purposes, Court looks not only to state and local positive law, but also to custom and usage having force of law. 42 U.S.C.A. § 1983.

**[45] Federal Courts 170B €══776**

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
            170BVIII(K)1 In General
                170Bk776 k. Trial De Novo. Most Cited Cases
Court of Appeals reviews *de novo* district court's ruling about whether individual is final policy maker for § 1983 purposes. 42 U.S.C.A. § 1983.

**[46] Civil Rights 78 €══1351(1)**

78 Civil Rights
    78III Federal Remedies in General
        78k1342 Liability of Municipalities and Other Governmental Bodies
            78k1351 Governmental Ordinance, Policy, Practice, or Custom
                78k1351(1) k. In General. Most Cited Cases
In assessing whether governmental decision maker is "final policy maker" for § 1983 purposes, Court looks to whether there is actual opportunity for meaningful review. 42 U.S.C.A. § 1983.

**[47] Civil Rights 78 €══1351(2)**

78 Civil Rights
    78III Federal Remedies in General
        78k1342 Liability of Municipalities and Other Governmental Bodies
            78k1351 Governmental Ordinance, Policy, Practice, or Custom
                78k1351(2) k. Education. Most Cited Cases
Alabama high school principal who "paddled" student in lieu of detention that would have delayed his graduation, as punishment for student's act of silently raising his fist during daily flag salute instead of reciting Pledge of Allegiance along with rest of class acted as "final policymaker" in that instance, for purposes of determining whether school board could be held liable under § 1983; while student handbook set out formal multi-step appellate process that was theoretically available, there was no opportunity for meaningful review by school board, and "Corporal Punishment" section of student

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

370 F.3d 1252, 188 Ed. Law Rep. 620, 28 Fla. L. Weekly Fed. C 593
**(Cite as: 370 F.3d 1252)**

handbook could be interpreted as delegation to principal of final decisionmaking authority regarding administration of same. 42 U.S.C.A. § 1983.

**[48] Civil Rights 78 ⚖══1351(2)**

78 Civil Rights
    78III Federal Remedies in General
        78k1342 Liability of Municipalities and Other Governmental Bodies
            78k1351 Governmental Ordinance, Policy, Practice, or Custom
                78k1351(2) k. Education. Most Cited Cases
Alabama public high school principal was not "final policy maker" for purposes of § 1983 Establishment Clause challenge to teacher's practice of soliciting prayer requests from her students and enforcing moment of silence; prayers were recited as part of character education program, which was expressly subject to school board approval. U.S.C.A. Const.Amend. 1; 42 U.S.C.A. § 1983; Ala.Code 1975, § 16-6B-2(h).

**[49] Civil Rights 78 ⚖══1351(2)**

78 Civil Rights
    78III Federal Remedies in General
        78k1342 Liability of Municipalities and Other Governmental Bodies
            78k1351 Governmental Ordinance, Policy, Practice, or Custom
                78k1351(2) k. Education. Most Cited Cases
Alabama public high school student who was disciplined for silently raising his fist during daily flag salute instead of reciting Pledge of Allegiance with rest of class, in protest of disciplining of another student for remaining silent with his hands in his pockets during flag salute the day before, could not pursue his § 1983 Speech Clause claim against school board under theory that custom or practice existed in school district of disciplining students for failing to recite Pledge, or for engaging in nondisruptive protest during recitation thereof. U.S.C.A. Const.Amend. 1; 42 U.S.C.A. § 1983.

**[50] Civil Rights 78 ⚖══1351(2)**

78 Civil Rights
    78III Federal Remedies in General
        78k1342 Liability of Municipalities and Other Governmental Bodies
            78k1351 Governmental Ordinance, Policy, Practice, or Custom
                78k1351(2) k. Education. Most Cited Cases
Alabama public high school teacher's practice or "ritual" of conducting daily moment for silent prayer was sufficiently systematic to be considered pattern or custom for which school board may be held accountable in Establishment Clause challenge under § 1983. U.S.C.A. Const.Amend. 1; 42 U.S.C.A. § 1983.

**[51] Civil Rights 78 ⚖══1355**

78 Civil Rights
    78III Federal Remedies in General
        78k1353 Liability of Public Officials
            78k1355 k. Vicarious Liability and Respondeat Superior in General; Supervisory Liability in General. Most Cited Cases
When civil rights are systematically violated on near-daily basis, such abuses are sufficiently egregious to warrant supervisory liability, even if it is single "bad apple" engaging in repeated pattern of unconstitutional behavior. 42 U.S.C.A. § 1983.

**\*1259** Charles Clyde Tatum, Jr., Jasper, AL, for Holloman.
Phillip A. Laird, Laird & Robertson, P.C., Russell Brown Robertson, Laird & Wiley, P.C., Jasper, AL, for Defendants-Appellees.

Appeals from the United States District Court for the Northern District of Alabama.

Before TJOFLAT, WILSON and COWEN [FN*], Circuit Judges.

     FN* Honorable Robert E. Cowen, United States Circuit Judge for the Third Circuit, sitting by designation.

TJOFLAT, Circuit Judge:

I.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

370 F.3d 1252, 188 Ed. Law Rep. 620, 28 Fla. L. Weekly Fed. C 593
**(Cite as: 370 F.3d 1252)**

Michael Holloman, a former student at Parrish High School in Walker County, Alabama, filed a § 1983 suit against Fawn Allred, his economics and government teacher; George Harland, the school principal; and the Walker County Board of Education ("School Board"), which oversaw the school. He claimed that his rights under the First Amendment's Speech Clause were violated when Allred and Harland punished him for silently raising his fist during the daily flag salute instead of reciting the Pledge of Allegiance with the rest of his class. He further claims **\*1260** that his Establishment Clause rights were violated by Allred's daily "ritual" of conducting a silent moment of prayer. He sought both legal and equitable relief.

The district court granted summary judgment on both claims to Allred and Harland on qualified immunity grounds. In a separate opinion, it granted summary judgment to the School Board, concluding that Holloman failed to articulate a violation of his constitutional rights or demonstrate a way in which the Board (as a municipal governing entity) could be held liable for the acts at issue here. Holloman appeals both rulings.

Subpart A of this Part examines the facts supporting Holloman's Speech Clause claim. Subpart B explains his Establishment Clause allegations. Subpart C sets forth the framework of state statutes and School Board regulations implicated by Holloman's claims, and Subpart D delves into the procedural history of this case in greater detail. Throughout this discussion, because we are reviewing grants of summary judgment to the defendants, we view the evidence in the light most favorable to the plaintiff. *See Johnson v. Governor of Florida,* 353 F.3d 1287, 1292 (11th Cir.2003).

### A.

Holloman contends that Allred and Harland violated his First Amendment right to free speech (as incorporated against the states through the Fourteenth Amendment's Due Process Clause) by treating him adversely because he silently raised his fist during the flag salute instead of reciting the Pledge

of Allegiance.[FN1] To understand what happened, it is necessary to consider their treatment of another student, John Michael Hutto, the day before their confrontation with Holloman.

> FN1. We use the terms "Pledge of Allegiance" and "flag salute" interchangeably.

### 1.

Allred taught her Economics and Government class in the first period of each day, during which time the Pledge of Allegiance was recited over the school intercom system. It was customary for students to stand by their desks, with their hands over their hearts, and recite the pledge.

During the flag salute on May 16, 2000, Hutto remained silent with his hands in his pockets, without causing a disturbance. When Allred asked him why he was not participating in the flag salute, Hutto responded that he "didn't want to say it, he didn't have to say it, and he hadn't said it for a month." Allred stated, "You don't want to say the pledge and the United States Air Force Academy has given you a scholarship?," then continued class.

At lunch that day, Allred told Harland of Hutto's refusal to say the pledge. Harland became very angry and met with Allred, Hutto, and Vice Principal Jason Adkins in his office. Harland told Hutto that he was disappointed in Hutto's refusal to salute the flag, and threatened to report the incident to both Hutto's recruiter at the Air Force Academy as well as the Congressman who had recommended Hutto to the Academy. Harland also ordered Hutto to apologize to Allred and her class for refusing to salute the flag.

Later that day, Harland went to Hutto's physics class (in which Holloman was a student) and declared that "anyone who joined in [Hutto's] protest and refused to say the pledge or committed similar action would be punished." The following day, Hutto recited the Pledge of Allegiance with the rest of the class, and the day after that he apologized to Allred and her students.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

370 F.3d 1252, 188 Ed. Law Rep. 620, 28 Fla. L. Weekly Fed. C 593
**(Cite as: 370 F.3d 1252)**

***1261** 2.

During the flag salute on the day after the Hutto incident, Holloman stood with the other students in Allred's class, but did not recite the Pledge of Allegiance. Instead, he silently raised his fist in the air while the rest of the class recited the pledge; once the pledge was over, he sat down like everyone else. He did not say anything, touch any other students, disrupt the class, or obstruct anyone's view of the flag. Allred, however, immediately chastised him in front of the class, saying that he had acted inappropriately and "disrespectful[ly]," and that she was "disappointed." She then started class in her normal fashion.

Later that day, Allred informed Harland of what happened, and Harland summoned Allred and Holloman into the principal's office. Holloman explained that he had raised his fist "in protest of what happened to [Hutto]." Harland told Holloman "how disappointed he was, and that he felt that he had failed teaching Michael Holloman responsibility, morals and values." He also informed Holloman that he would have to serve three days' detention and could not receive his diploma until after he completed his punishment. In addition, Harland required Holloman to apologize to Allred's class. When Holloman left Harland's office, Harland called Holloman's mother, explaining "that he was too mad and upset to punish Michael at the time because he may hurt Michael."

Since graduation was that Friday, there was not enough time left in the school year for Holloman to serve his detentions while still being able to receive his diploma on graduation day. Harland consequently offered Holloman the opportunity to receive a paddling instead. Holloman agreed and, with Allred watching, was paddled by Harland.

B.

Allred began her Economics and Government class almost every day by asking, "Does anyone have any prayer requests?" After her students offered various dedications, Allred would hold a moment of silence. Allred frequently opened this moment of silence by saying "Let us pray," and often ended it by saying "Amen." Allred explicitly states that over the 1999-2000 school year, this practice became a daily "ritual." She never told her students that they were free to leave the room during either her prayer requests or the subsequent moment of silent prayer.

One day, Vice Principal Adkins sat in on her class and personally observed this phenomenon. When Allred attempted to begin her economics lesson, one of her students raised her hand and reminded Allred that she had forgotten to elicit her customary prayer requests. At that point, Allred took prayer requests from the class, then commenced a moment of silence by saying, "Let us pray." On another occasion, at the conclusion of the moment of silence, Allred permitted one of her students to read aloud a passage from the Bible.

C.

The events in this case did not occur in a vacuum. In 1995, the Alabama state legislature enacted a statute which required the State Board of Education and all local school boards to

develop and implement ... a comprehensive character education program for all grades to consist of not less than ten minutes of instruction per day focusing upon the students' development of the following character traits: courage, patriotism, citizenship, honesty, fairness, respect for others, kindness, cooperation, self-respect, self-control, courtesy, compassion, tolerance, diligence,***1262** generosity, punctuality, cleanliness, cheerfulness, school pride, respect for the environment, patience, creativity, sportsmanship, loyalty, and perseverance. Each plan of instruction shall include the Pledge of Allegiance to the American flag.

Ala.Code § 16-6B-2(h). This law made daily recitation of the Pledge of Allegiance a part of the character education program the Legislature required local school boards to implement. A separate statute, however, emphasized that students should not be forced to recite the pledge. *See* Ala.Code § 16-43-5 ("The State Board of Education shall afford all students attending public kindergarten,

370 F.3d 1252, 188 Ed. Law Rep. 620, 28 Fla. L. Weekly Fed. C 593
**(Cite as: 370 F.3d 1252)**

primary and secondary schools the *opportunity* each school day to *voluntarily* recite the pledge of allegiance to the United States flag."(emphasis added)).

To implement these requirements, Larry Banks, the Superintendent of the Walker County School District, sent a letter on behalf of the Walker County Board of Education to all the principals in the district, stating, "[E]ach school system must incorporate a Character Education Plan which will consist of 10 minutes of instruction per day in various areas, such as, the Pledge of Allegiance.... Each day must include the Pledge of Allegiance and then other areas as mentioned as you determine at your school."

Banks also sent each principal a form to complete to specify how each school intended to incorporate into its curriculum the character-education requirements set forth above. The memo directed, "Please begin to make plans and be prepared to submit your local Character Education Plan [to the county school board] which must be forwarded to the State Superintendent's Office." The County School Board apparently had to either review or approve each school's character education plan before it was forwarded to the State. Allred contends that her daily moment of silent prayer was conducted in partial fulfillment of these character education requirements-it was intended to teach compassion.

### D.

On July 3, 2000, Holloman and Hutto filed a class action suit under 42 U.S.C. § 1983 in the Northern District of Alabama against the Walker County Board of Education, Harland, Adkins, and Allred. They alleged that their First Amendment rights had been violated because they had been chastised, threatened, and punished for refusing to say the Pledge of Allegiance. They also claimed that Allred's practice of soliciting prayer requests and setting aside a moment of silence for prayer violated the Establishment Clause. The complaint sought compensatory and punitive damages, as well as declaratory and injunctive relief.

A few months later, an amended complaint was filed; it was substantially identical to the original except Hutto was no longer a party. The district court dismissed Jason Adkins as a defendant (with Holloman's consent), and declined to certify the class action. Holloman does not appeal either of these rulings.

In their answer to Holloman's amended complaint, Allred and Harland cited qualified immunity as an affirmative defense. They later moved the court for summary judgment on qualified immunity grounds. The court granted their motion and dismissed them from the case. It concluded that Holloman's Speech Clause allegations did not constitute a First Amendment violation, and certainly not a violation of a right that was "clearly established" at the time of the incidents. The court also rejected Holloman's Establishment Clause claims, stating there was no Eleventh Circuit**1263** precedent during the 1999-2000 school year that "clearly established" a moment of silence for prayer as being unconstitutional. Holloman appealed the court's decision to grant Allred and Harland summary judgment on qualified immunity grounds.[FN2]

> FN2. The court's opinion dismissed all of Holloman's constitutional claims against both defendants with prejudice. It entered a final judgment in favor of Allred and Harland pursuant to Fed.R.Civ.P. 54(b), rendering its order immediately appealable. The appeal was docketed in this court as No. 01-13864.

Following the district court's dismissal of Holloman's claims against Allred and Harland, the Board of Education also sought summary judgment. The court granted the Board's motion, concluding that Holloman had not alleged facts sufficient to hold the Board liable under § 1983. Holloman appeals this ruling as well, arguing that he stated valid claims against the School Board.[FN3]

> FN3. This appeal was docketed as No. 01-15094.

In these consolidated appeals, we review the district court orders granting the defendants summary judg-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

ment. Part II of this opinion explains why the district court erred in granting Allred and Harland summary judgment on qualified immunity grounds against Holloman's Speech Clause claims. Part III shows that Allred is not even potentially entitled to summary judgment on qualified immunity grounds against Holloman's Establishment Clause claims because she has not established as a matter of law that, in holding her daily moment of silent prayer, she was engaged in a discretionary function of her job. Part IV assesses Holloman's underlying Establishment Clause claim, concluding that he has introduced evidence sufficient to support a determination that a clearly established right has been violated.[FN4] Part V discusses how Holloman has successfully articulated several theories under which the School Board may be held liable for the Speech and Establishment Clause violations, while Part VI briefly concludes.

> FN4. We include this discussion because a legal determination that his constitutional rights were violated is a necessary predicate to allowing his suit against the School Board to proceed.

## II.

[1] Section 1983 provides:
Every person who, under color of any statute, ordinance, regulation, custom, or usage of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law [or] suit in equity....

42 U.S.C. § 1983. There are two ways in which an individual may be held liable under § 1983-he may be sued for his own personal actions ("direct liability"), or, under certain limited circumstances, for the actions of his subordinates ("supervisorial liability"), *see, e.g., Lewis v. Smith,* 855 F.2d 736, 738 (11th Cir.1988).[FN5]

> FN5. A supervisor, of course, may be held responsible under either or both theories. *See Brown v. Crawford,* 906 F.2d 667, 671

(11th Cir.1990) ("Supervisory liability occurs either when the supervisor personally participates in the alleged constitutional violation [direct liability] or when there is a causal connection between actions of the supervising official and the alleged constitutional deprivation [supervisoral liability].").

[2][3] When a government official is sued under a theory of direct liability, he may seek summary judgment on qualified immunity grounds.[FN6] To even be potentially **\*1264** eligible for summary judgment due to qualified immunity, the official must have been engaged in a "discretionary function" when he performed the acts of which the plaintiff complains. *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982) (holding that qualified immunity extends to "government officials performing discretionary functions"). It is the burden of the governmental official to make this showing. *Storck v. City of Coral Springs,* 354 F.3d 1307, 1314 (2003) ("Under qualified immunity analysis, *the public official* must first prove that he was acting within the scope of his discretionary authority when the allegedly unconstitutional acts took place."(emphasis added)). A defendant unable to meet this burden may not receive summary judgment on qualified immunity grounds. *Lumley v. City of Dade City,* 327 F.3d 1186, 1194 (11th Cir.2003) ("If the defendants were not acting within their discretionary authority, they are ineligible for the benefit of qualified immunity."); *see also Lee v. Ferraro,* 284 F.3d 1188, 1194 (11th Cir.2002). While a number of our cases omit this step of the analysis, *see, e.g., Denno v. Sch. Bd.,* 218 F.3d 1267 (11th Cir.2000); *Hall v. Talladega City Bd. of Educ.,* 115 F.3d 821 (11th Cir.1997), binding Supreme Court and Eleventh Circuit precedents require us to consider expressly this critical threshold matter. We explain this "discretionary function" test in greater detail in Subpart II.A.

> FN6. The government official may also seek to have the complaint dismissed on qualified immunity grounds prior to discovery, based solely on the allegations in

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

370 F.3d 1252, 188 Ed. Law Rep. 620, 28 Fla. L. Weekly Fed. C 593
**(Cite as: 370 F.3d 1252)**

the pleadings.

[4][5] If, interpreting the evidence in the light most favorable to the plaintiff, the court concludes that the defendant was engaged in a discretionary function, then the burden shifts to the plaintiff to show that the defendant is *not* entitled to qualified immunity. *Cottone v. Jenne,* 326 F.3d 1352, 1358 (11th Cir.2003) ("Once a defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that the defendant is not entitled to qualified immunity."). To overcome qualified immunity, the plaintiff must satisfy a two prong test; he must show that: (1) the defendant violated a constitutional right, and (2) this right was clearly established at the time of the alleged violation.[FN7] *Wilson v. Layne,* 526 U.S. 603, 609, 119 S.Ct. 1692, 1697, 143 L.Ed.2d 818 (1999) ("A court evaluating a claim of qualified immunity must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all, and if so, proceed to determine whether that right was clearly established at the time of the alleged violation.") (quotations and citations omitted). If the plaintiff prevails on both prongs of this test, then the defendant is unable to obtain summary judgment on qualified immunity grounds.

> FN7. Our rulings on these two questions are legal conclusions that are binding law of the case and may not be revisited in later proceedings. Consequently, once we deny defendants summary judgment on qualified immunity grounds because the plaintiff has alleged violations of clearly established rights, the defendants may not later attempt to re-assert qualified immunity against those claims on purely legal bases (e.g. by arguing that the rights do not exist or are not clearly established). The only remaining issues are questions of fact-i.e., whether the plaintiff can actually prove at trial that the alleged violations occurred.

[6] Applying this test, the district court awarded Allred and Harland summary judgment against Holloman's Speech Clause claims. The Speech Clause of the First Amendment protects at least two separate, yet related, rights: (1) the right to freedom of expression, and (2) the right to be free from compelled expression. *United States v. United Foods, Inc.,* 533 U.S. 405, 410, 121 S.Ct. 2334, 2338, 150 L.Ed.2d 438 (2001). These rights unquestionably exist in public schools. *See Tinker***1265** *v. Des Moines Indep. Comm. Sch. Dist.,* 393 U.S. 503, 506, 89 S.Ct. 733, 736, 21 L.Ed.2d 731 (1969).

Holloman argues that Allred and Harland are directly liable for violating both constitutional rights guaranteed by the Speech Clause. First, he maintains, they violated his right to be free from compelled expression by chastising, threatening, and ultimately punishing him for failing to recite the Pledge of Allegiance. Second, to the extent that he was punished for silently raising his fist in the air during the Pledge of Allegiance (rather than for simply failing to recite the pledge), Holloman contends that Allred and Harland violated his right to engage in affirmative expression. Finally, regardless of whether Holloman's expression was constitutionally protected in itself, he has the First Amendment right to be free of viewpoint-based discrimination and punishment.

We conclude that neither Allred nor Harland are not entitled to summary judgment on qualified immunity grounds against any of these First Amendment claims. In Subpart II.A, we conclude that both Allred and Harland were engaged in a discretionary function at the time they disciplined Holloman in connection with the flag salute incident, and so are potentially entitled to summary judgment on qualified immunity grounds. In Subpart II.B, we discuss how the evidence-interpreted in the light most favorable to Holloman-supports the conclusion that his clearly-established right to be free from compelled speech was violated. Subpart II.C makes a similar finding regarding his right to engage in affirmative expression. Subpart II.D concludes that, even if-as the dissent contends-Holloman's expression was not itself constitutionally protected, Allred's behavior nevertheless violated the First

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

370 F.3d 1252, 188 Ed. Law Rep. 620, 28 Fla. L. Weekly Fed. C 593
**(Cite as: 370 F.3d 1252)**

Amendment because she punished him for expressing a viewpoint she found repugnant, rather than for any disruption he purportedly caused (which, interpreting the evidence in his favor, was entirely negligible). Consequently, Holloman has made the necessary showings with regard to his three Speech Clause claims to overcome Allred's and Harland's assertions of qualified immunity at this stage.

A.

[7] In many areas other than qualified immunity, a "discretionary function" is defined as an activity requiring the exercise of independent judgment, and is the opposite of a "ministerial task." *See, e.g., Williams v. Wood,* 612 F.2d 982, 985 (5th Cir.1980).[FN8] In the qualified immunity context, however, we appear to have abandoned this "discretionary function/ministerial task" dichotomy. In *McCoy v. Webster,* 47 F.3d 404, 407 (11th Cir.1995), we interpreted "the term 'discretionary authority' to include actions that do not necessarily involve an element of choice," and emphasized that, for purposes of qualified immunity, a governmental actor engaged in purely ministerial activities can nevertheless be performing a discretionary function.

> FN8. In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

[8] Instead of focusing on whether the acts in question involved the exercise of actual discretion, we assess whether they are of a type that fell within the employee's job responsibilities. Our inquiry is twofold. We ask whether the government employee was (a) performing a legitimate job-related function (that is, pursuing a job-related goal), (b) through means that were within his power to utilize. *See* **\*1266** *Hill v. Dekalb Reg'l Youth Det. Ctr.,* 40 F.3d 1176, 1185 n. 17 (11th Cir.1994) ("A government official acts within his or her discretionary authority if objective circumstances compel the conclusion that challenged actions occurred in the per-

formance of the official's duties *and* within the scope of this authority."(emphasis added)).

One might reasonably believe that violating someone's constitutional rights is never a legitimate job-related function or within the scope of a government official's authority or power. As we explained in *Harbert Int'l, Inc. v. James,* 157 F.3d 1271, 1282 (11th Cir.1998) (quotation marks and citation omitted), however, "the inquiry is not whether it was within the defendant's authority to commit the allegedly illegal act. Framed that way, the inquiry is no more than an untenable tautology." In applying each prong of this test, we look to the general nature of the defendant's action, temporarily putting aside the fact that it may have been committed for an unconstitutional purpose, in an unconstitutional manner, to an unconstitutional extent, or under constitutionally inappropriate circumstances.

[9] Consider the first prong of the test-whether the official is engaged in a legitimate job-related function. In *Sims v. Metropolitan Dade County,* 972 F.2d 1230 (11th Cir.1992), "we did not ask whether it was within the defendant's authority to suspend an employee for an improper reason; instead, we asked whether [the defendant's] discretionary duties included the administration of discipline." *Harbert,* 157 F.3d at 1282. Similarly, in assessing whether a police officer may assert qualified immunity against a Fourth Amendment claim, we do not ask whether he has the right to engage in *unconstitutional* searches and seizures, but whether engaging in searches and seizures *in general* is a part of his job-related powers and responsibilities. *See, e.g., Madiwale v. Savaiko,* 117 F.3d 1321, 1324 (11th Cir.1997). Put another way, to pass the first step of the discretionary function test for qualified immunity, the defendant must have been performing a function that, *but for* the alleged constitutional infirmity, would have fallen with his legitimate job description.

Of course, we must be sure not to characterize and assess the defendant's act at too high a level of generality. Nearly every act performed by a government employee can be described, in general terms,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

370 F.3d 1252, 188 Ed. Law Rep. 620, 28 Fla. L. Weekly Fed. C 593
**(Cite as: 370 F.3d 1252)**

as ostensibly "furthering the public interest." If we jump to such a high level of abstraction, it becomes impossible to determine whether the employee was truly acting within the proper scope of his job-related activities. Consequently, we consider a government official's actions at the minimum level of generality necessary to remove the constitutional taint. In considering whether an act of allegedly excessive force fell within a police officer's duties, for example, we do not ask whether police have the right to use *excessive* force. We also do not immediately jump to a high level of generality and ask whether police are responsible for enforcing the law or promoting the public interest. We instead ask whether they have the power to attempt to effectuate arrests. *See, e.g., Ferraro,* 284 F.3d at 1194 (holding, in an excessive force suit, "there can be no doubt that [the police officer defendant] was acting in his discretionary capacity when he arrested [plaintiff]").

[10] After determining that an official is engaged in a legitimate job-related function, it is then necessary to turn to the second prong of the test and determine whether he is executing that job-related function-that is, pursuing his job-related goals-in an authorized manner. The primary purpose of the qualified immunity *1267 doctrine is to allow government employees to enjoy a degree of protection only when exercising powers that legitimately form a part of their jobs. *See, e.g., Harlow,* 457 U.S. at 819 & n. 34, 102 S.Ct. at 2739 & n. 34 (limiting the availability of qualified immunity to situations where "an official's duties legitimately require action" and to "actions within the scope of an official's duties"). Each government employee is given only a certain "arsenal" of powers with which to accomplish her goals. For example, it is not within a teacher's official powers to sign her students up for the Army to promote patriotism or civic virtue, or to compel them to bring their property to school to redistribute their wealth to the poor so that they can have firsthand experience with altruism.

Employment by a local, county, state, or federal government is not a *carte blanche* invitation to push the envelope and tackle matters far beyond

one's job description or achieve one's official goals through unauthorized means. Pursuing a job-related goal through means that fall outside the range of discretion that comes with an employee's job is not protected by qualified immunity.

[11] Under this standard, Allred-as a matter of law-was undoubtedly engaged in a discretionary function in chastising Holloman for raising his fist during the Pledge of Allegiance and later referring him to Harland for punishment. Though Allred is not empowered to violate constitutional rights as part of her official duties, she did have the responsibility of maintaining decorum in the classroom. The fact that she may have attempted to keep order in the classroom in an unconstitutional manner does not change the fact that she was fulfilling a legitimate job-related function. Moreover, the ways in which she attempted to pursue this job-related goal (chastising Holloman and reporting him to the principal)-examined on a general level rather than in this specific application-were legitimate prerogatives of her job. From an alternate perspective, putting aside Holloman's First Amendment claim, Allred's actions would undoubtedly be considered part of her duties and legitimate exercises of her authority. Consequently, under the two-prong test articulated above, her activities in relation to the flag salute incident were discretionary acts for which she may seek qualified immunity.

[12] For similar reasons, Harland is also potentially entitled to qualified immunity against Holloman's Speech Clause claims. Disciplining students is a legitimate discretionary function performed by principals. *See Kirkland v. Greene County Bd. of Educ.,* 347 F.3d 903, 903 n. 1 (11th Cir.2003), and in the State of Alabama, spanking students is a legitimate part of a principal's "arsenal" for enforcing such discipline. Consequently, the burden shifts to Holloman to demonstrate that Allred and Harland are not entitled to summary judgment on qualified immunity grounds.

**B.**

[13] As discussed earlier, once a defendant estab-

lishes that he was engaged in a discretionary function at the time of the acts in question, the burden shifts to the plaintiff to show that the defendant is *not* entitled to summary judgment on qualified immunity grounds. To do so, the plaintiff must demonstrate that a reasonable jury could interpret the evidence in the record as showing that the defendant violated a constitutional right that was clearly established at the time of the acts in question.

We begin by examining Holloman's claim that Allred and Harland violated his First Amendment right to be free from compelled speech. Section 1 considers **\*1268** whether Holloman has successfully articulated a violation of a constitutional right, while Section 2 analyzes whether such a right was clearly established at the time of the incidents. Based on these discussions, we conclude that, interpreting the evidence in the light most favorable to Holloman, both Allred and Harland engaged in acts amounting to violations of Holloman's right to be free from compelled speech. Consequently, neither defendant is entitled to summary judgment on qualified immunity grounds against this Speech Clause claim.

### 1.

[14] The Speech Clause of the First Amendment states, "Congress shall make no law ... abridging the freedom of speech...." U.S. Const. amend. I. The First Amendment, as incorporated through the Due Process Clause of the Fourteenth Amendment, *Near v. Minnesota,* 283 U.S. 697, 707, 51 S.Ct. 625, 628, 75 L.Ed. 1357 (1931), applies to state and municipal governments, state-created entities, and state and municipal employees, *West Virginia State Bd. of Educ. v. Barnette,* 319 U.S. 624, 637, 63 S.Ct. 1178, 1185, 87 L.Ed. 1628 (1943).

[15] In *Barnette,* the Court held that the right to be free from compelled speech protects public school students from being forced to participate in the flag salute. It stated, "[T]he action of the local authorities in compelling the flag salute and pledge transcends constitutional limitations on their power and invades the sphere of intellect and spirit which it is the purpose of the First Amendment to our Constitution to reserve from all official control." *Id.* at 642, 63 S.Ct. at 1187.

Several pieces of evidence in the record support Holloman's contention that he was disciplined for failing to recite the Pledge of Allegiance. First, the day before the Holloman incident, John Michael Hutto was chastised in front of the class, sent to the Principal's office, threatened that his recommendation to the Air Force Academy would be revoked, and forced to apologize to his teacher and classmates, simply because he remained silent during the Pledge of Allegiance (without engaging in any affirmatively expressive activity). Second, Allred's deposition is replete with references to her "patriotism" and desire to see the American flag saluted in the "proper" or "normal" way; she was deeply offended by the notion of Americans not wanting to salute the flag.

Third, according to Holloman's affidavit, Harland interrupted Holloman's physics class to explicitly threaten that any students who refused to say the Pledge of Allegiance would be punished. Fourth, the affidavits of both Holloman and his mother state that he was told he was being punished for failing to salute the flag. Indeed, Harland told Holloman's mother during their phone conversation that he had to wait before disciplining Holloman because he was afraid that he (Harland) would hurt him. Consequently, there is more than enough evidence in the record to allow a reasonable jury to adopt this interpretation of events.

Allred's acts (if proven at trial), as a matter of law, violated Holloman's constitutional rights. First, according to Allred's own testimony, she instructed him that there were only two "permissible" ways of saying the pledge, and that any other way of doing so was prohibited. Second, she verbally chastised him in front of the class for his constitutionally protected actions (either failing to salute the flag or expressing his opinion in a non-disruptive fashion).

Verbal censure is a form of punishment, albeit a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

370 F.3d 1252, 188 Ed. Law Rep. 620, 28 Fla. L. Weekly Fed. C 593

**(Cite as: 370 F.3d 1252)**

mild one. The intent behind this act was to dissuade him from exercising a **\*1269** constitutional right. She singled out Holloman in front of his entire class, subjecting him to embarrassment and humiliation. Given the gross disparity in power between a teacher and a student, such comments-particularly in front of the student's peers-coming from an authority figure with tremendous discretionary authority, whose words carry a presumption of legitimacy, cannot help but have a tremendous chilling effect on the exercise of First Amendment rights. *See Riley v. Nat'l Fed'n of the Blind,* 487 U.S. 781, 794, 108 S.Ct. 2667, 2676, 101 L.Ed.2d 669 (1988) (invaliding a "scheme" that "must necessarily chill speech in direct contravention of the First Amendment's dictates"); *Dickerson v. United States,* 530 U.S. 428, 459, 120 S.Ct. 2326, 2344, 147 L.Ed.2d 405 (2000) (Scalia, J., dissenting) ("[T]he Court has viewed the importation of 'chill' as *itself* a violation of the First Amendment.") (emphasis in original). As in the Establishment Clause context, such "public pressure ... can be as real as any overt compulsion," particularly in a "classroom setting, where ... the risk of compulsion is especially high"; such measures may not be used to deter, even if "subtl[y] or indirect[ly]," the exercise of constitutional rights. *Lee v. Weisman,* 505 U.S. 577, 593, 596, 112 S.Ct. 2649, 2658, 2660, 120 L.Ed.2d 467 (1992).

Finally, Allred played a major role in the administration of Holloman's more formal punishment, his paddling. She reported the incident to the principal with the intent and hope that Holloman be disciplined, was present during Holloman's questioning by Harland, did not object or attempt to dissuade Harland in any way, was present for the paddling, and manifested her approval of it throughout the entire process. For similar reasons, Holloman has also adduced sufficient evidence to support his claim against Harland, the one who actually spanked him.

Having demonstrated that the record amply supports Holloman's contention that the defendants violated his constitutional right to be free from compelled speech, we now consider whether this right was clearly established at the time of the events in question.

2.

[16] *Barnette,* 319 U.S. at 642, 63 S.Ct. at 1187, clearly and specifically established that schoolchildren have the right to refuse to say the Pledge of Allegiance. Under *Barnette,* any "reasonable person would have known" that disciplining Holloman for refusing to recite the pledge impermissibly chills his First Amendment rights. *Thomas v. Roberts,* 261 F.3d 1160, 1170 (11th Cir.2001) (citation omitted). Consequently, on these alleged facts, Allred and Harland are not entitled to qualified immunity against Holloman's claims related to compelled speech. We reverse the district court's holding to the contrary.

Having assessed the viability of Holloman's First Amendment claim to be free from compelled speech, we now turn to Holloman's First Amendment claim to engage in affirmative expression.

C.

[17] One of Holloman's alternate bases for recovery under the First Amendment is that the defendants punished him for engaging in constitutionally protected speech. He maintains, in other words, that even if the defendants punished him for silently raising his fist during the Pledge of Allegiance-rather than for merely remaining silent during the pledge-his rights under the Speech Clause were still violated. The district court dedicated the overwhelming majority of its opinion regarding Allred and Harland to this argument, concluding that **\*1270** "[n]o jury could reasonably conclude that 'every like-situated, reasonable' teacher or principal would necessarily know that punishing Holloman for his unorthodox and deliberately provocative and disruptive gesture violated federal law...." (Mem. Op., June 4, 2001, at 10).

We are again forced to reverse. Section 1 shows that the evidence (interpreted in Holloman's favor) demonstrates the existence of a limited constitutional right to engage in non-disruptive expression in a classroom environment, while Section 2

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

370 F.3d 1252, 188 Ed. Law Rep. 620, 28 Fla. L. Weekly Fed. C 593

**(Cite as: 370 F.3d 1252)**

demonstrates that this right was clearly established when the defendants chastised and punished him. Consequently, Allred and Harland are not entitled to summary judgment on qualified immunity grounds against Holloman's Speech Clause claim regarding his right to express himself.

1.

[18] The Constitution guarantees students (and all people) the right to engage not only in "pure speech," but "expressive conduct," as well. *See United States v. O'Brien,* 391 U.S. 367, 376-77, 88 S.Ct. 1673, 1678-79, 20 L.Ed.2d 672 (1968). In *Spence v. Washington,* 418 U.S. 405, 94 S.Ct. 2727, 41 L.Ed.2d 842 (1974), the Supreme Court held that, to determine whether a particular act counts as expressive conduct, a court must determine whether "[a]n intent to convey a particularized message was present, and in the surrounding circumstances the likelihood was great that the message would be understood by those who viewed it." *Id.* at 410-11, 94 S.Ct. at 2730. The Court later liberalized this test, however, emphasizing that "a narrow, succinctly articulable message is not a condition of constitutional protection, which if confined to expressions conveying a 'particularized message,' would never reach the unquestionably shielded painting of Jackson Pollock, music of Arnold Schonberg, or Jabberwocky verse of Lewis Carroll." *Hurley v. Irish-Am., Gay, Lesbian & Bisexual Group of Boston, etc.,* 515 U.S. 557, 569, 115 S.Ct. 2338, 2345, 132 L.Ed.2d 487 (1995). Thus, in determining whether conduct is expressive, we ask whether the reasonable person would interpret it as *some* sort of message, not whether an observer would necessarily infer a *specific* message.

At the very least, Holloman's gesture was expressive conduct. It is quite reasonable to infer that at least some students would have recognized his act for what it was-a protest over Allred's treatment of Hutto. Even if students were not aware of the specific message Holloman was attempting to convey, his fist clearly expressed a generalized message of disagreement or protest directed toward Allred, the school, or the country in general.

It is quite possible, however, that Holloman's act constituted "pure speech." As the Court suggested in *O'Brien,* 391 U.S. at 376, 88 S.Ct. at 1678, expressive conduct is an act with significant " 'non-speech' elements," that is being used in a particular situation to convey a message. Holloman's act does not contain any of the substantive "non-speech" elements that are necessary to remove something from the realm of "pure speech" into the realm of expressive conduct. It seems as purely communicative as a sign-language gesture or the act of holding up a sign, and in this respect is similar to the wearing of a black armband, which the *Tinker* Court found to be a "primary First Amendment right[ ] akin to 'pure speech.' " 393 U.S. at 508, 89 S.Ct. at 737.

[19] It does not ultimately matter whether Holloman's act is characterized as "pure speech" or "expressive conduct" because this circuit appears to apply the same test in assessing school restrictions on either kind of expression. This Section *1271 summarizes these principles and applies them to the instant case.

a.

[20] As with all rights, the scope of the First Amendment has boundaries. On many occasions, we have affirmed the right of public educational institutions "to adopt and enforce reasonable, non-discriminatory regulations as to the time, place and manner of student expressions and demonstrations." *Bayless v. Martine,* 430 F.2d 873, 878 (5th Cir.1970). This "reasonableness" test is not the anemic simulacrum of a constraint on governmental power found in the Due Process Clause's "rational basis" test, *see, e.g., Williamson v. Lee Optical,* 348 U.S. 483, 487-88, 75 S.Ct. 461, 464, 99 L.Ed. 563 (1955), but rather a more robust notion of "reasonableness" such as that applied in the Fourth Amendment context, *see U.S. Const.* amend. IV (prohibiting "unreasonable searches and seizures").

In *Burnside v. Byars,* we articulated the way to determine whether a public school regulation that curtailed expression was reasonable:

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[S]chool officials cannot ignore expressions of feelings with which they do not wish to contend. They cannot infringe on their students' right to free and unrestricted expression as guaranteed to them under the First Amendment to the Constitution, where the exercise of such rights in the school buildings and schoolrooms do[es] not materially and substantially interfere with the requirements of appropriate discipline in the operation of the school.

363 F.2d at 749. Under the *Burnside* standard, student expression may unquestionably be regulated when doing so "contributes to the maintenance of order and decorum within the educational system." *Id.* at 748; *accord Tinker,* 393 U.S. at 514, 89 S.Ct. at 740 (holding that a school may not prohibit expressive activity unless there are "facts which might reasonably have led school authorities to forecast substantial disruption of or material interference with school activities"); *Shanley,* 462 F.2d at 969 ("The test for curtailing in-school exercise of expression is whether or not the expression or its method of exercise 'materially and substantially' interferes with the activities or discipline of the school."). This doctrine allows school authorities to prohibit, among other things, "lewd, indecent, or offensive speech.... The First Amendment does not prevent the school officials from determining that to permit a vulgar and lewd speech such as respondent's would undermine the school's basic educational mission." *Bethel Sch. Dist. v. Fraser,* 478 U.S. 675, 683, 685, 106 S.Ct. 3159, 3164-65, 92 L.Ed.2d 549 (1986); *see also Healy v. James,* 408 U.S. 169, 189, 92 S.Ct. 2338, 2350, 33 L.Ed.2d 266 (1972) ("[First Amendment] [a]ssociational activities need not be tolerated where they infringe reasonable campus rules, interrupt classes, or substantially interfere with the opportunity of other students to obtain an education.").

However, in assessing the reasonableness of regulations that tread upon expression, we cannot simply defer to the specter of disruption or the mere theoretical possibility of discord, or even some *de minimis,* insubstantial impact on classroom decorum. Particularly given the fact that young people are required by law to spend a substantial portion of their lives in classrooms, student expression may not be suppressed simply because it gives rise to some slight, easily overlooked disruption, including but not limited to "a showing of mild curiosity" by other students, *see Burnside,* 363 F.2d at 748, "discussion and comment" among students, *Reineke v. Cobb Cty. Sch. Dist.,* 484 F.Supp. 1252, **\*1272** 1261 (N.D.Ga.1980), or even some "hostile remarks" or "discussion outside of the classrooms" by other students, *Tinker,* 393 U.S. at 508, 514, 89 S.Ct. at 737, 740. For example, one district court correctly found that a teacher was unjustified in censoring an article in the school newspaper because it was "inconceivable that the use of the word 'damn' one time in the newspaper would have caused material and substantial interference with school activities." *Reineke,* 484 F.Supp. at 1258.

[21] The dissent concludes that Holloman's gesture was unprotected because "[t]he students' comments [to Allred after class] demonstrate that they at least focused their attention during a portion of the recitation of the Pledge on Holloman's fist ... rather than on the planned curriculum of saying the Pledge." This approach appears to ignore the principle discussed above that student expression must cause (or be likely to cause) a "material[] and substantial[]" disruption, *Burnside,* 363 F.2d at 749, and more than a brief, easily overlooked, *de minimis* impact, before it may be curtailed. The dissent argues that Holloman's act was "meant to compete for students' attention." The same can be said of any of the forms of student expression that have been found to be protected, including the wearing of armbands or buttons in class. A student expressing himself in those ways clearly intends to attract the other students' attention and have them consider, however briefly, the meaning behind the symbolism. Indeed, if a student's attention is never focused, if even for a moment, on the expression, it becomes pointless. Under the dissent's approach, where schools may prohibit any speech or acts that do anything to distract a student's mind-however briefly or insubstantially-from the planned curriculum, constitutional protection for student expression by definition would be eliminated.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

370 F.3d 1252, 188 Ed. Law Rep. 620, 28 Fla. L. Weekly Fed. C 593
**(Cite as: 370 F.3d 1252)**

This point was made quite clearly in *Parducci v. Rutland,* 316 F.Supp. 352 (M.D.Ala.1970), where a teacher was terminated because she assigned a short story that school administrators found offensive. The district court recognized that First Amendment freedoms in public schools, including a teacher's right to academic freedom, could be constitutionally abridged under *Tinker* and *Burnside* only if there was a realistic threat that the conduct at issue would "materially and substantially interfere with the requirements of appropriate discipline in the operation of the school." *Id.* at 355. The court, correctly applying our precedents, held:

Rather than there being a threatened or actual substantial disruption to the educational processes of the school, the evidence reflects that the assigning of the story was greeted with apathy by most of the students. Only three of plaintiff's students asked to be excused from the assignment. On this question of whether there was a material and substantial threat of disruption, the Principal testified at the School Board hearing that there was no indication that any of plaintiff's other 87 students were planning to disrupt the normal routine of the school. This Court now specifically finds and concludes that the conduct for which plaintiff was dismissed was not such that "would materially and substantially interfere with" reasonable requirements of discipline in the school.

*Id.* at 356. There is no evidence in the record to suggest that Holloman's gesture caused any more disturbance or unrest than Parducci's assignment. By focusing entirely on whether students may have been momentarily "distracted," rather than on whether the distraction or disruption*1273 was "material" or "substantial," the dissent gives insufficient protection to students' First Amendment rights and incorrectly applies our precedents.

While certain types of expression unquestionably cause enough of a threat of disruption to warrant suppression even before negative consequences occur, "undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression," even in schools. *Tinker,* 393 U.S. at 508, 89 S.Ct. at 737. "[T]here must be

demonstrable factors that would give rise to any reasonable forecast by the school administration of 'substantial and material' disruption of school activities before expression may be constitutionally restrained." *Shanley,* 462 F.2d at 974; *accord Center for Participant Ed. v. Marshall,* 337 F.Supp. 126, 135 (N.D.Fla.1972) (suggesting that a "speculative fear" is insufficient to justify restrictions on student expression, but a "real and immediate fear of conduct potentially disruptive of the university routine" is enough).

We recognize that this test is more restrictive than the parsimonious interpretation of students' First Amendment freedoms offered in *Ferrell v. Dallas Indep. Sch. Dist.,* 392 F.2d 697 (5th Cir.1968). In *Ferrell*, a high school principal suspended students in a rock-and-roll band for growing their hair too long. This court upheld the principal's regulation because the principal felt "that the length and style of the boys' hair would cause commotion, trouble, distraction, and a disturbance in the school...." *Id.* at 699. To the degree this ruling is based on the principal's abstract concerns, it is patently inconsistent with the principle articulated in *Tinker, Burnside*, and numerous other cases discussed throughout this Subsection, that there must be a real or substantial threat of actual disorder, as opposed to the mere possibility of some. We are bound to follow *Burnside* rather than *Ferrell* because it is the earlier case. *See Local Union 48 Sheet Metal Workers v. S.L. Pappas & Co.,* 106 F.3d 970, 975 (11th Cir.1997). Similarly, we must follow *Tinker* rather than *Ferrell* because it is an intervening, inconsistent Supreme Court decision. *See Lufkin v. McCallum,* 956 F.2d 1104, 1107 (11th Cir.1992). Consequently, we apply the *Tinker-Burnside* doctrine in this case.

This *Tinker-Burnside* standard we reaffirm today was applied in *Banks v. Bd. of Public Instr.,* 314 F.Supp. 285 (S.D.Fla.1970), *vacated by* 401 U.S. 988, 91 S.Ct. 1223, 28 L.Ed.2d 526 (1971), *reinstated without published opinion by dist. ct. and aff'd,* 450 F.2d 1103 (5th Cir.1971), a case similar to this one, where a student was suspended for failing to stand during the Pledge of Allegiance. The dis-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

370 F.3d 1252, 188 Ed. Law Rep. 620, 28 Fla. L. Weekly Fed. C 593
(Cite as: 370 F.3d 1252)

trict court held, "The conduct of Andrew Banks in refusing to stand during the pledge ceremony constituted an expression of his religious beliefs and political opinions. His refusal to stand was no less a form of expression than the wearing of the black armband was to Mary Beth Tinker. He was exercising a right 'akin to pure speech.' " *Id.* at 295. While at first glance it might seem like Banks's right to be free from compelled speech was at issue in that case, the above quote from the district court makes clear that its ruling was not based on Banks's First Amendment right to remain silent, but his First Amendment right to affirmatively express himself. Both the school administration and the court in that case perceived Banks's act of remaining seated while everyone else was standing as an expressive act, rather than a mere refusal to speak. In upholding his right to act in such a way, the district court observed, "The unrefuted testimony clearly reflects that the plaintiff's refusal to stand has not caused any disruption in the educational process." **1274** *Id.*; cf. *Jenkins v. Louisiana State Bd. of Educ.,* 506 F.2d 992 (5th Cir.1975) (upholding restrictions on college students' activities because "[t]he actions of appellants resulted in a material disruption of the campus and of the rights of others. They were not protected by the First Amendment."). We therefore find *Banks* to be fully consistent with the approach mandated by *Burnside* and *Tinker,* and conclude that Holloman's gesture was sufficiently akin to Banks's refusal to stand (in that neither had any real impact on class discipline) as to be entitled to First Amendment protection.

Our cases involving "freedom buttons" are perhaps even more instructive. In *Blackwell v. Issaquena Cty. Bd. of Educ.,* 363 F.2d 749 (5th Cir.1966), black elementary school students wore "freedom buttons" to class in support of the civil rights movement.
[S]ome of these students were creating a disturbance by noisily talking in the hall when they were scheduled to be in class.... [Some students] accosted other students by pinning the buttons on them even though they did not ask for one. One of the students tried to put a button on a younger child who began crying. This activity created a state of

confusion, disrupted class instruction, and resulted in a general breakdown of orderly discipline.

*Id.* at 750-52 (footnote omitted). We held that the principal did not violate the students' constitutional rights by punishing them for their behavior and, *under those circumstances,* banning the buttons from the school. Such a restriction on student expression was justified, notwithstanding the First Amendment, because the "students conducted themselves in a disorderly manner, disrupted classroom procedure, interfered with the proper decorum and discipline of the school and disturbed other students who did not wish to participate in the wearing of the buttons." *Id.* at 753.

[22][23] In *Burnside,* however, the same panel of this court, on the same day, emphasized that the mere *possibility* of such consequences did *not* justify a different school in banning freedom buttons. 363 F.2d at 748 (overturning school's ban on freedom buttons because "affidavits and testimony before the District Court reveal no interference with educational activity and do not support a conclusion that there was a commotion or that the buttons tended to distract the minds of the students away from their teachers") (emphasis omitted). The *Burnside-Blackwell* dyad demonstrates that the permissibility of a restriction on student expression cannot be determined in the abstract, but must be assessed with at least one eye toward the actual or likely (not merely potential) impact of that expression on the learning environment. Conduct that may be constitutionally protected in one school or under one set of circumstances may tend to incite disruption or disorder-and so be constitutionally proscribable-in others. Where students' expressive activity does not materially interfere with a school's vital educational mission, and does not raise a realistic chance of doing so, it may not be prohibited simply because it conceivably *might* have such an effect.

b.

[24] Allred maintains that it was appropriate for her to discipline Holloman because the other students were disturbed by his demonstration. She claims a

370 F.3d 1252, 188 Ed. Law Rep. 620, 28 Fla. L. Weekly Fed. C 593
(Cite as: 370 F.3d 1252)

number of them came up to her after class and told her that what he did wasn't "right." She also expressed concern that his behavior would lead to further disruptions by other students.

The fact that other students may have disagreed with either Holloman's act or *1275 the message it conveyed is irrelevant to our analysis. *See Tinker,* 393 U.S. at 509, 89 S.Ct. at 738 ("In order for the State in the person of school officials to justify prohibition of a particular expression of opinion, it must be able to show that its action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint."); *Near v. Minnesota,* 283 U.S. 697, 722, 51 S.Ct. 625, 633, 75 L.Ed. 1357 (1931) ("If the township may prevent the circulation of a newspaper for no reason other than that some of its inhabitants may violently disagree with it, and resent its circulation by resorting to physical violence, there is no limit to what may be prohibited.") (quotation and citation omitted).

Nor is Holloman's expression removed from the realm of constitutional protection simply because the students cloaked their disagreement in the guise of offense or disgust. Holloman's behavior was not directed "toward" anyone or any group and could not be construed by a reasonable person (including a high school student) as a personal offense or insult.

*Ferrell v. Dallas Indep. Sch. Dist.* arguably supports Allred's position. In *Ferrell,* this court held that a school could prohibit students from wearing long hair simply because their choice of hairstyle "provoked" other students into breaking school rules and the law by responding violently. The court justified the hair-length regulation by pointing to such considerations:
On one occasion a group of boys in his school had decided that a classmate's hair was too long and that they were going to take the matter in their own hands and trim it themselves. Mr. Lanham stated that boys with long hair were subjected to substantial harassment. Obscene language had been used by some students in reference to others with long

hair and girls had come to his office complaining about the language being used. The long hair boys had also been challenged to a fight by other boys who did not like long hair. Also, long hair boys had been told by others that the girl's restroom was right down the hall.

392 F.2d at 700-01.

Allowing a school to curtail a student's freedom of expression based on such factors turns reason on its head. If certain bullies are likely to act violently when a student wears long hair, it is unquestionably easy for a principal to preclude the outburst by preventing the student from wearing long hair. To do so, however, is to sacrifice freedom upon the alter of order, and allow the scope of our liberty to be dictated by the inclinations of the unlawful mob. If bullies disrupted classes and beat up a student who refused to join the football team, the proper solution would not be to force the student to join the football team, but to protect the student and punish the bullies. If bullies disrupted classes and beat up a student because he wasn't wearing fancy enough clothes, the proper solution would not be to force the student to wear Abercrombie & Fitch or J. Crew attire, but to protect the student and punish the bullies. The same analysis applies to a student with long hair, who is doing nothing that the reasonable person would conclude is objectively wrong or directly offensive to anyone. The fact that other students might take such a hairstyle as an incitement to violence is an indictment of those other students, not long hair.

Such reasoning is part of the basis for *Street v. New York,* 394 U.S. 576, 592, 89 S.Ct. 1354, 1365, 22 L.Ed.2d 572 (1969), where the Supreme Court held that "the possible tendency of appellant's words to provoke violent retaliation" is not a basis *1276 for banning those words unless they are "fighting words." Street's conviction was reversed because "[t]hough it is conceivable that some listeners might have been moved to retaliate upon hearing appellant's disrespectful words, we cannot say that appellant's remarks were so inherently inflammatory as to come within that small class of 'fighting

words' which are 'likely to provoke the average person to retaliation, and thereby cause a breach of the peace.' " *Id.* (quoting *Chaplinsky v. New Hampshire,* 315 U.S. 568, 574, 62 S.Ct. 766, 770, 86 L.Ed. 1031 (1942)); *see also Cantwell v. Connecticut,* 310 U.S. 296, 308-10, 60 S.Ct. 900, 905-06, 84 L.Ed. 1213 (1940) (reversing conviction for breaching the peace in a case where there was "no assault or threatening of bodily harm, no truculent bearing, no intentional discourtesy, no personal abuse").

While the same constitutional standards do not always apply in public schools as on public streets, we cannot afford students less constitutional protection simply because their peers might illegally express disagreement through violence instead of reason. If the people, acting through a legislative assembly, may not proscribe certain speech, neither may they do so acting individually as criminals. Principals have the duty to maintain order in public schools, but they may not do so while turning a blind eye to basic notions of right and wrong.

Thus, under the *Tinker-Burnside* doctrine, we are required to reject this portion of *Ferrell* as well. Even if Allred were correct in fearing that other students may react inappropriately or illegally, such reactions do not justify suppression of Holloman's expression. Holloman's expression was constitutionally protected because the record reveals no way in which he "materially and substantially interfere[d] with the requirements of appropriate discipline in the operation of the school." *Burnside,* 363 F.2d at 749.

c.

On appeal, Allred repeatedly emphasizes that Holloman was punished not for his act, but for disobeying directions from her and Harland as to the only permissible ways to salute the flag. By raising his fist in the air the next day, Holloman contravened these instructions. Consequently, Allred argues, Holloman was punished for insubordination for violating these orders, rather than for exercising a First Amendment right.

[25] Although Holloman failed to salute the flag in

a manner amenable to Allred, "the protections of the First Amendment do not extend solely to speech which is well-mannered and attentive to the preferences of others." *Sabel v. Stynchcombe,* 746 F.2d 728, 731 (11th Cir.1984). As discussed throughout this Subsection, Holloman had the constitutional right to raise his fist during the Pledge of Allegiance so long as he did not disrupt the educational process or the class in any real way.

Allred could not prevent Holloman from exercising a constitutional right simply by telling him not to do so. School officials may not punish indirectly, through the guise of insubordination, what they may not punish directly. *See Rutland,* 316 F.Supp. at 358 (ordering reinstatement of public high school teacher who was dismissed in violation of the First Amendment for assigning a short story administrators found objectionable because "plaintiff's 'insubordination' was not insubordination in any sense and was not, in reality, a reason for the School Board's action"); *Dickey v. Alabama State Bd. of Educ.,* 273 F.Supp. 613, 618 (M.D.Ala.1967) ("The attempt to characterize Dickey's conduct, and the basis for their action **\*1277** in expelling him, as 'insubordination' requiring rather severe disciplinary action, does not disguise the basic fact that Dickey was expelled from Troy State College for exercising his constitutionally guaranteed right of academic and/or political expression."), *vacated as moot sub nom. Troy State Univ. v. Dickey,* 402 F.2d 515 (5th Cir.1968). Allred lacked the right to proscribe his behavior in the first place; neither she nor Harland could punish Holloman for violating a directive that was a constitutional nullity.

Consequently, we have no choice but to conclude as a matter of law that Holloman successfully articulated a violation of his First Amendment right to freedom of expression by Harland and Allred. We now must assess whether these rights were "clearly established" at the time of the incidents.

2.

This circuit was recently chastised by the Supreme Court for taking an unwarrantedly narrow view of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

370 F.3d 1252, 188 Ed. Law Rep. 620, 28 Fla. L. Weekly Fed. C 593

**(Cite as: 370 F.3d 1252)**

the circumstances in which public officials can be held responsible for their constitutional violations. *See Vaughan v. Cox,* 343 F.3d 1323, 1332 (11th Cir.2003) ("[T]he Supreme Court in *Hope* cautioned that we should not be unduly rigid in requiring factual similarity between prior cases and the case under consideration."). The law of this circuit used to be that a government actor could be denied qualified immunity only for acts that are "so obviously wrong, in light of the pre-existing law, that only a plainly incompetent officer or one who was knowingly violating the law would have done such a thing." *Lassiter v. Alabama A. & M. Univ.,* 28 F.3d 1146, 1149 (11th Cir.1994) (en banc). The Supreme Court, specifically citing *Lassiter* (along with a handful of other Eleventh Circuit cases), held that "[t]his rigid gloss in the qualified immunity standard ... is not consistent with [the Supreme Court's] cases." *Hope v. Pelzer,* 536 U.S. 730, 739 & n. 9, 122 S.Ct. 2508, 2515 & n. 9, 153 L.Ed.2d 666 (2002).

[26] While officials must have fair warning that their acts are unconstitutional, there need not be a case "on all fours," with materially identical facts, before we will allow suits against them. A principle of constitutional law can be "clearly established" even if there are "notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct at issue violated constitutional rights." *United States v. Lanier,* 520 U.S. 259, 269, 117 S.Ct. 1219, 1227, 137 L.Ed.2d 432 (1997); *Hope,* 536 U.S. at 741, 122 S.Ct. at 2516 ("[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances. Indeed, in *Lanier,* we expressly rejected a requirement that previous cases be 'fundamentally similar.' ").

In our pre-*Hope* jurisprudence, we held that [g]eneral rules, propositions, or abstractions ... do not determine qualified immunity. Instead, the circumstances that confronted the government actor must have been materially similar to prior precedent to constitute clearly established law because public officials are not obligated to be creative or

imaginative in drawing analogies from previously decided cases. For qualified immunity to be surrendered, pre-existing law must dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what defendant is doing violates federal law in the circumstances.

*Wood v. City of Lakeland,* 203 F.3d 1288, 1291-92 (11th Cir.2000) (citations and quotations omitted).

**\*1278** As discussed above, *Hope* reminds us that we need no longer focus on whether the facts of a case are "materially similar to prior precedent." Moreover, *Hope* emphasized that "general statements of the law are not inherently incapable of giving fair and clear warning ... [A] constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has [not] previously been held unlawful." 536 U.S. at 741, 122 S.Ct. at 2516 (quotations omitted). Thus, we do not just compare the facts of an instant case to prior cases to determine if a right is "clearly established;" we also assess whether the facts of the instant case fall within statements of general principle from our precedents. *See Vinyard v. Wilson,* 311 F.3d 1340, 1351 (11th Cir.2002) ("When looking at case law, some broad statements of principle in case law are not tied to particularized facts and can clearly establish law applicable in the future to different sets of detailed facts.").

*Hope* seems to have abrogated many of the other standards articulated in *Wood,* as well. For example, *Wood* 's requirement that a particular conclusion must be "dictate[d], that is, truly compel[led]" intimates a level of absolute crystal-clear certainty about precedent that forms no part of *Hope* 's requirements. To the degree there exists a conflict between *Hope* and our earlier cases, we are, of course, bound to follow the Supreme Court's intervening ruling. *See Lufkin v. McCallum,* 956 F.2d 1104, 1107 (11th Cir.1992). Since *Hope,* many of our cases have applied its standard to the exclusion of our earlier, more rigorous doctrinal tests.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*26* F.3d 1255
370 F.3d 1252, 188 Ed. Law Rep. 620, 28 Fla. L. Weekly Fed. C 593
**(Cite as: 370 F.3d 1252)**

*See, e.g., Holmes v. Kucynda,* 321 F.3d 1069, 1077-78 (11th Cir.2003); *Dahl v. Holley,* 312 F.3d 1228, 1233 (11th Cir.2002); *Weaver v. Bonner,* 309 F.3d 1312, 1324 (11th Cir.2002). *Hope* emphasizes that, notwithstanding more stringent standards articulated in some of our earlier cases, "the salient question ... is whether the state of the law [at the time of the events in question] gave respondents fair warning that their alleged treatment of [the plaintiff] was unconstitutional." 536 U.S. at 741, 122 S.Ct. at 2516.

[27] Turning to Holloman's claims, we find that, as of May 16, 2000, the *Tinker-Burnside* standard was clearly established and sufficiently specific as to give the defendants "fair warning" that their conduct was constitutionally prohibited. We do not find it unreasonable to expect the defendants-who holds themselves out as educators-to be able to apply such a standard, notwithstanding the lack of a case with material factual similarities. While we have not traditionally called upon government officials to be "creative or imaginative" in determining the scope of constitutional rights, *see Adams v. St. Lucie Cty. Sheriff's Dep't,* 962 F.2d 1563, 1575 (11th Cir.1992) (Edmondson, J., dissenting), neither are they free of the responsibility to put forth at least some mental effort in applying a reasonably well-defined doctrinal test to a particular situation. Our precedents would be of little value if government officials were free to disregard fairly specific statements of principle they contain and focus their attention solely on the particular factual scenarios in which they arose.

[28] The *Tinker-Burnside* test calls for teachers to assess two factors: (1) whether a student is engaged in expression (either pure speech or expressive conduct) and (2) whether the expression is having a non-negligible disruptive effect, or is likely to have such an effect, on classroom order or the educational process. The first factor is quite easy to apply; the test for determining whether an act constitutes expressive conduct is whether the "reasonable person" would perceive it as such. *See \*1279 Spence,* 418 U.S. at 410-11, 94 S.Ct. at 2730. Consequently, a teacher or principal should have no problem de-

termining whether a student is engaged in expression. Indeed, given the myriad forms of expression, we should be hesitant about requiring that a means of expression be the subject of a previous case before offering the speaker full § 1983 protection.

The second factor should also be quite effortless for an educator to apply. A teacher or principal should be able to instantly recognize whether a student is disrupting class, and it should not be too hard to determine whether a student's activities are likely to have such an effect. Consequently, we do not find the *Tinker-Burnside* test to be of such an unreasonable level of generality that Allred and Harland could not have been expected to apply it in this case. *Cf. Thomas v. Roberts,* 323 F.3d 950 (11th Cir.2003) ("[W]here the applicable legal standard is a highly general one, such as 'reasonableness,' preexisting caselaw that has applied general law to specific circumstances will almost always be necessary to draw a line that is capable of giving fair and clear notice that an official's conduct will violate federal law."). Because this standard is "clearly established," is not at an unreasonable high level of generality, and when applied to the facts of Holloman's case yields a fairly determinate result that should have been clear, Allred and Harland are not entitled to summary judgment on qualified immunity grounds against Holloman's Speech Clause claim concerning his right to affirmative expression. The *Tinker-Burnside* principle gave them "clear notice" that their conduct violated Holloman's constitutional rights; unlike the dissent, we believe that teachers are well equipped to "readily determine what conduct falls within" the *Tinker-Burnside* standard.

Indeed, Holloman's right to silently raise his fist during the Pledge of Allegiance would even be considered "clearly established" under *Barnette.* As discussed earlier, he clearly had the right to remain silent during the Pledge of Allegiance; we would be very reluctant to conclude that Holloman somehow shed the protection of the First Amendment simply by lifting his fist into the air while exercising this right. Allred and Harland are essentially asking us to distinguish, on constitutional grounds, between a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

370 F.3d 1252, 188 Ed. Law Rep. 620, 28 Fla. L. Weekly Fed. C 593

**(Cite as: 370 F.3d 1252)**

student with his hands in his pockets or at his sides (like Hutto) and a student with his hand in the air. This is a hair we will not split; First Amendment protections are not lost that easily.

### D.

[29] The dissent takes issue with the analysis in Subpart C, contending that Holloman's expression is unprotected because it "is the sort of activity that competes with the teacher for the students' attention." For the reasons discussed in the previous Subpart, we do not believe that Holloman's activity, which had virtually no impact on the class, was sufficient under *Tinker* and *Burnside* to fall outside the realm of constitutional protection. However, even if we (or a jury, based on the facts as they unfold at trial) were to find that Holloman's expression did "materially and substantially interfere with the requirements of appropriate discipline," Holloman would still be able to articulate a violation of his First Amendment rights.

[30] One of the most egregious types of First Amendment violations is viewpoint-based discrimination. *See Chandler v. James,* 180 F.3d 1254, 1265 (11th Cir.1999) (noting that "viewpoint discrimination[ ][is] the most egregious form of content-based censorship"); *Searcey v. Harris,* 888 F.2d 1314, 1324 (11th Cir.1989)**1280** ("The prohibition against viewpoint discrimination is firmly embedded in first amendment analysis."). Government actors may not discriminate against speakers based on viewpoint, even in places or under circumstances where people do not have a constitutional right to speak in the first place. *See Uptown Pawn & Jewelry, Inc. v. City of Hollywood,* 337 F.3d 1275, 1277 (11th Cir.2003) ("[R]estrictions on nonpublic forums need only be reasonable and not viewpoint discriminatory."); *Adler v. Duval County Sch. Bd.,* 206 F.3d 1070, 1081 (11th Cir.2000) ("The Supreme Court has consistently held that in nonpublic fora the government may not engage in viewpoint discrimination."). We have expressly recognized that this fundamental prohibition against viewpoint-based discrimination extends to public schoolchildren, as well, stating, "[W]e do not be-

lieve [that Supreme Court precedent] offers any justification for allowing educators to discriminate based on viewpoint.... Without more explicit direction, we will continue to require school officials to make decisions relating to speech which are viewpoint neutral." *Searcey,* 888 F.2d at 1325. Consequently, even if Holloman did not have the right to express himself in the manner he did, his rights were still violated if he was punished because Allred disagreed or was offended by what he said.

This theory was most clearly applied in *R.A.V. v. St. Paul,* 505 U.S. 377, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992). That case involved an ordinance which made it a crime to place a "burning cross or Nazi swastika, which one knows or has reasonable grounds to know arouses anger, alarm or resentment in others on the basis of race, color, creed, religion or gender." *Id.* at 380, 112 S.Ct. at 2541. The Supreme Court accepted the Minnesota Supreme Court's construction of the statute as prohibiting only "fighting words," a constitutionally proscribable category of expression. *Id.* at 380-81, 112 S.Ct. at 2541. The Court nevertheless invalidated the statute because, in the course of prohibiting conduct the state had the right to criminalize, it made a viewpoint-based distinction.

The Court acknowledged that people do not have the First Amendment right to use fighting words. *Id.* at 382, 112 S.Ct. at 2542-43. The Court emphasized, however, "What [that] means is that these areas of speech can, consistently with the First Amendment, be regulated because of their constitutionally proscribable content (obscenity, defamation, etc.)-not ... that they can be made the vehicles for content discrimination unrelated to their distinctively proscribable content." *Id.* at 383, 112 S.Ct. at 2543. Thus,

a particular instance of speech can be proscribable on the basis of one feature (e.g. obscenity) but not on the basis of another (e.g. opposition to the city government).... [Moreover,] the power to proscribe particular speech on the basis of a noncontent element (e.g. noise) does not entail the power to proscribe the same speech on the basis of a content element....

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*Id.* at 385-86, 112 S.Ct. at 2544. Applying this standard, the Court held that the ordinance was unconstitutional because "[d]isplays containing abusive invective, no matter how vicious or severe, are permissible unless they are addressed to one of the specified disfavored topics." *Id.* at 391, 112 S.Ct. at 2547. Moreover, the ordinance went beyond general content discrimination "to actual viewpoint discrimination.... '[F]ighting words' that do not themselves invoke race, color, creed, religion, or gender ... would seemingly be usable ad libitum in the placards of those arguing in favor of racial, color, etc., tolerance and equality, but could not be used by **\*1281** those speakers' opponents." *Id.* at 391, 112 S.Ct. at 2547-48.

Thus, even though Minneapolis had the unquestioned power to prohibit fighting words, it could not draw viewpoint based distinctions by targeting certain fighting words because of the repugnant message they conveyed. Applying this principle to the instant case, it becomes clear why Allred may potentially be held liable under the First Amendment even if Holloman was not engaging in constitutionally protected speech. Although Allred has the authority under the *Tinker-Burnside* standard to proscribe student expression that materially and substantially disrupts the class, she may not punish such expression based on the fact that she disagrees with it. Even when engaging in speech that is not directly constitutionally protected, Holloman still has the First Amendment right to be free from viewpoint discrimination.

The record, interpreted in the light most favorable to Holloman, more than amply supports his argument that he was punished for the substance of his unpatriotic views rather than an alleged disruption of class. Allred admitted in her deposition that when Hutto simply refused to recite the pledge of allegiance, she was "hurt" and "[v]ery disappointed in him" because "[h]e was a leader of the class .... [and] looked up to a great deal." Moreover, she because of "the freedoms we enjoy in this country," she couldn't understand how he wouldn't want to pledge. She emphasized, "It broke my heart, you know." Given that Hutto was chastised and ulti-

mately forced by Harland to apologize simply for remaining silent during the flag salute, a jury could reasonably conclude that Allred's punishment of Holloman was based on similar motivations.

When Holloman allegedly asked Allred about the ways in which students were permitted to salute the flag, she told him that he could either do so with his hand over his heart or in a military-type salute. She explained, "In our country, the normal way is putting your hand over your heart. That's the way you see everyone do it, the ball players on TV." Any other way is prohibited because it "is not the normal acceptance [sic] of saying the pledge in our country." She considered what he did "disrespectful" because "[i]t's going against the normal procedure behavior [sic] of pledging to our American flag." Holloman's gesture is "not an acceptable behavior in this country." She emphasized, "You just salute the way Americans salute and pledge. That's a given." Although she maintained that this disrespect to the flag wasn't the reason she actually punished Holloman, these statements would allow a jury to conclude that her actions were motivated by her disagreement with and offense at the unpatriotic views expressed by Holloman's gesture.

Harland expressed a similar attitude. According to Vice Principal Jason Adkins, Harland was "angry and disappointed and upset" that Hutto declined to salute the American flag. Harland threatened to rescind his recommendation of Hutto to the Air Force Academy. Again, such views toward the Pledge of Allegiance support Holloman's claim that he was punished for the offensive viewpoint he expressed.

Especially when considered in light of the virtually nonexistent evidence that Holloman disrupted the class in any way (discussed in the previous Subpart), the record virtually compels the conclusion (for summary judgment purposes) that both the fact and extent of his punishment stemmed from the fact that Allred and Harland found his ostensibly unpatriotic views repugnant and offensive. Indeed, many of our cases have used evidence such as this to support a finding that a particular governmental act

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

370 F.3d 1252, 188 Ed. Law Rep. 620, 28 Fla. L. Weekly Fed. C 593

**(Cite as: 370 F.3d 1252)**

was motivated by *1282 unconstitutional viewpoint discrimination. *See, e.g., Chandler v. Georgia Public Telecomm. Comm'n,* 917 F.2d 486, 491-92 (11th Cir.1990) ("The transcript of the evidentiary hearing held by the district court is replete with statements by Dr. Cooper, the executive director of [the state agency], that [the agency] decided that the viewpoints of the Libertarians were less valuable than those of the Democrats and Republicans.").

As emphasized earlier, the evidence at trial may prove that Allred did not discipline Holloman because of his viewpoint, but for a legitimate reason. Interpreting the evidence in Holloman's favor for summary judgment purposes, however, we must conclude that her motive was discriminatory. Because Holloman had the right to be free from viewpoint discrimination, and that right was clearly established (both in general as well as in the public school context) under the precedents discussed above, we must deny Allred qualified immunity at this time. As Justice Blackmun reminds us, "[I]f educators intentionally may eliminate all diversity of thought, the school will strangle the free mind at its source and teach youth to discount important principles of our government as mere platitudes." *Bd. of Educ. v. Pico,* 457 U.S. 853, 879, 102 S.Ct. 2799, 2814, 73 L.Ed.2d 435 (1982) (Blackmun, J., concurring in part). Consequently, even if the dissent's contention (that Holloman's conduct is not protected under the Tinker-Burnside standard) is correct, Holloman's punishment would still have violated the First Amendment. Viewpoint discrimination is another First-Amendment avenue for recovery that Holloman is entitled to pursue at trial.

Having concluded that Allred and Harland are not entitled to summary judgment on qualified immunity grounds against any of the three ways in which Holloman can articulate Speech Clause claims against them, we now turn to his Establishment Clause claim against them.

### III.

Holloman claims that his rights under the Establishment Clause were violated by Allred's daily mo-

ment of silent prayer. The district court granted both Allred and Harland summary judgment against this claim. While Holloman's brief on appeal vigorously contests this ruling as it applies to Allred, it does not even mention whether Harland was entitled to qualified immunity on this claim. Consequently, we are forced to conclude that Holloman has abandoned his appeal regarding Harland's summary judgment on qualified immunity grounds against Holloman's Establishment Clause claim.FN9 We reverse the district court's grant of summary judgment on this claim to Allred, however.

> FN9. Based on the record before us, it appears as if Holloman would be able to articulate a number of ways in which Harland could be held liable under a supervisoral theory of liability. As discussed earlier, qualified immunity is not a defense to a § 1983 suit premised on supervisorial liability. Because Holloman failed to articulate such a cause of action at any point before the district court, we need not consider the viability of such claims here.

As noted in Part II, the first step in assessing the viability of a qualified immunity defense is to determine whether the government official defendant was engaged in a "discretionary function" in performing the acts of which the plaintiff complains. This entails a two-step analysis: we begin by ascertaining whether the defendant was pursuing a job-related goal, and then examine whether the type of action in which she was engaging to further this goal was authorized.

*1283 [31] We are willing to assume that Allred satisfies the first prong of this test because she was attempting to pursue the legitimate job-related function of fostering her students' character education by teaching compassion. She nevertheless fails the second prong of the "discretionary function" test because she was not pursuing this job-related goal through legitimate means that fell within her powers. While fostering character development and moral education were undoubtedly parts of Allred's

official responsibilities, this does not automatically empower her to do anything within her judgment that furthers those goals; she cannot educate students at all costs.

Praying goes sufficiently beyond the range of activities normally performed by high school teachers and commonly accepted as part of their job as to fall outside the scope of Allred's official duties, even if she were using prayer as a means of achieving a job-related goal. It is not within the range of tools among which teachers are empowered to select in furtherance of their pedagogical duties.[FN10] Prayer is a relatively *sui generis* activity. Put another way, even ignoring Holloman's Establishment Clause claims, praying *still* would not be part of a public school teacher's responsibilities or duties.

> FN10. We emphasize that students were not studying the Bible as part of a course on literature, or singing a religious hymn in a music class, or analyzing a prayer as a poem, but instead were actually encouraged to pray. *Cf. Stone v. Graham,* 449 U.S. 39, 42, 101 S.Ct. 192, 194, 66 L.Ed.2d 199 (1980) ("This is not a case in which the Ten Commandments are integrated into the school curriculum, where the Bible may constitutionally be used in an appropriate study of history, civilization, ethics, comparative religion, or the like.").

We emphasize that, at this juncture, we are not denying Allred summary judgment on qualified immunity grounds against this claim because we feel her acts violated the Establishment Clause. Instead, we are holding her ineligible for qualified immunity as a matter of law because she failed to establish that her act-this type of act-fell within her duties or powers as a teacher. The fact that Allred is a teacher does not mean that anything she says or does in front of a classroom necessarily constitutes an exercise of her discretionary powers or is a job-related function. Prayer is distinct from the type of civil virtue and secular moralism Alabama sought to promote through its character education program. Consequently, Allred is not even potentially entitled to

summary judgment on qualified immunity grounds against Holloman's Establishment Clause claim.

The dissent takes issue with this conclusion, concluding that school prayer is a type of act that falls within the scope of a public school teacher's discretionary authority. It argues, "It was certainly within the scope of a public high school teacher's authority to lead students in prayer prior to 1962, when the Court ruled that teacher led prayer in public schools is a violation of the Establishment Clause." This analysis is beside the point. In determining whether a public official is authorized to perform a certain type of act (abstracting away from its unconstitutional aspects), we look to the scope of their authority as it exists today, and do not inquire as to what the forty-year old root causes of the present-day situation may have been. Prayer is not a type of act that falls within a reasonably specific category of actions that teachers are authorized to perform; there is no easy way of abstracting away its unconstitutional aspects to arrive at a type of behavior that falls within teachers' discretionary authority.

**\*1284** Moreover, we decline to embark on a sociological inquiry-one for which this court is singularly unequipped-in which we weigh Supreme Court rulings against other important stimuli that has led to the gradual secularization of this country over the past half century to determine why prayer is not a type of act that public school teachers are empowered to perform. Consequently, Allred acted outside her discretionary authority and is not even potentially eligible to invoke qualified immunity against Holloman's Establishment Clause claims.

### IV.

The district court granted Allred summary judgment on qualified immunity grounds against Holloman's Establishment Clause claims because it concluded that her daily moment of silent prayer did not violate Holloman's constitutional rights, and that even if it did, those rights were not clearly established at the time of the incident. In Part III, we reversed the court's grant of qualified immunity because Allred had failed to establish that she had

been performing a discretionary function in conducting this moment of silent prayer. In this Part, we conclude that Holloman demonstrated sufficient evidence to support the conclusion that Allred had violated clearly established rights under the Establishment Clause. We include this discussion as a preface to Part V, where we assess the liability of the School Board. Logically enough, the only way Holloman can maintain his Establishment Clause suit against the School Board is if he demonstrates, as a threshold matter, that his Establishment Clause rights were violated.[FN11]

> FN11. We also note that, even putting aside questions of qualified immunity, the district court's legal conclusion-that Holloman's rights under the Establishment Clause had not been violated-would have required that the court dismiss his § 1983 claims under the Establishment Clause for failure to state a claim. Given that the issue has been thoroughly briefed and argued by both sides before us, we need not wait for a subsequent appeal from this legally inevitable ruling to consider this matter.

### A.

[32][33] The Establishment Clause of the First Amendment states, "Congress shall make no law respecting an establishment of religion...." U.S. Const. amend. I. This restriction has been made applicable to states, as well as state-created entities and their employees, through the Due Process Clause of the Fourteenth Amendment. *Cantwell v. Connecticut,* 310 U.S. 296, 303, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940). The Establishment Clause applies not only to state statutes, but acts and decisions of individual governmental actors, such as teachers and school administrators. *Lee v. Weisman,* 505 U.S. 577, 587, 112 S.Ct. 2649, 2655, 120 L.Ed.2d 467 (1992).

[34] In *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), the Supreme Court set forth its famous three-prong test for assessing the permissibility of statutes under the Establish-

ment Clause. "First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion; finally, the statute must not foster an excessive government entanglement with religion." *Id.* at 612-13, 91 S.Ct. at 2111 (internal citations and quotations omitted). *Agostini v. Felton,* 521 U.S. 203, 233, 117 S.Ct. 1997, 2015, 138 L.Ed.2d 391 (1997), however, refined this test, stating, "[T]he factors we use to assess whether an entanglement is 'excessive' are similar to the factors we use to examine 'effect.' ...[I]t **\*1285** is simplest to recognize why entanglement is significant and treat it ... as an aspect of the inquiry into a statute's effect." Thus, while the Court has folded its traditional "excessive entanglement" inquiry into its "primary effect" analysis, the substance of its Establishment Clause jurisprudence remains fundamentally unaltered. *See, e.g., Zelman v. Simmons-Harris,* 536 U.S. 639, 648-49, 122 S.Ct. 2460, 2465, 153 L.Ed.2d 604 (2002). This Section demonstrates that Allred's practice of soliciting prayer requests from her students and enforcing a moment of silence runs afoul of the *Lemon-Agostini* standard. Subsection (a) looks to the purpose of her acts, while Subsection (b) examines their primary effect.

### 1.

A government official violates the Establishment Clause if she lacks a "secular legislative purpose" for her actions. *Comm. for Pub. Educ. & Religious Liberty v. Regan,* 444 U.S. 646, 652, 100 S.Ct. 840, 846, 63 L.Ed.2d 94 (1980). Allred attempts to defend her daily moment of silent prayer by arguing that it was intended to teach students compassion,[FN12] pursuant to the character education plan mandated by the State Legislature. *See supra* Section I.C; *see also Ala.Code* § 16-6B-2.

> FN12. Compassion was not the only character trait Allred attempted to instill in her students. She testified, "If you are talking about cleanliness, we talk about litter. You know, and I have discussed that with students, being fined if you throw out litter.

370 F.3d 1252, 188 Ed. Law Rep. 620, 28 Fla. L. Weekly Fed. C 593
**(Cite as: 370 F.3d 1252)**

Cleanliness as far as personal hygiene, I have actually mentioned that when I had a problem in class. You know, 'Everybody don't forget to, you know, bathe.' "

[35] This explanation does not constitute a valid secular legislative purpose for Allred's actions. First, Allred's most basic intent unquestionably was to offer her students an opportunity to pray in a public school during the school day, and effectively encourage them to do so. By collecting prayer requests, and using the phrases "let us pray" and "amen," she gave the practice of praying during the moment of silence her implicit imprimatur.

While she may also have had a higher-order ultimate goal of promoting compassion, we look not only to the ultimate goal or objective of the behavior, but also the more immediate, tangible, or lower-order consequences a government actor intends to bring about. Allred's mere "testimonial avowal of secular ... purpose is not sufficient to avoid conflict with the Establishment Clause." *Karen B. v. Treen,* 653 F.2d 897, 900 (5th Cir.1981).

This reasoning closely follows that employed by the Supreme Court in *Stone v. Graham,* wherein it held that, notwithstanding supposedly secular justifications offered by the school district, "[t]he pre-eminent purpose for posting the Ten Commandments on schoolroom walls is plainly religious in nature. The Ten Commandments are undeniably a sacred text in the Jewish and Christian faiths, and no legislative recitation of a supposedly secular purpose can blind us to that fact." 449 U.S. 39, 41, 101 S.Ct. 192, 194, 66 L.Ed.2d 199 (1980). Because prayer is "a primary religious activity in itself,"*see Treen,* 653 F.2d at 901, a teacher or administrator's intent to facilitate or encourage prayer in a public school is *per se* an unconstitutional intent to further a religious goal.

Second, even accepting Allred's testimony that she hoped to use prayer as a way of teaching compassion, our analysis does not end there. While promoting compassion may be a valid secular purpose, teaching students that praying is necessary or *1286

helpful to promoting compassion is not.[FN13] As we held in *Treen,*

> FN13. It is instructive, though by no means necessary to our holding, that Allred also considered readings from the Bible to be part of her students' character education.

Even if the avowed objective of the legislature and school board is not itself strictly religious, it is sought to be achieved through the observance of an intrinsically religious practice. The unmistakable message of the Supreme Court's teachings is that the state cannot employ a religious means to serve otherwise legitimate secular interests.
*Id.* at 901.

The Supreme Court was faced with similar facts in *School District v. Schempp,* 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963), wherein it refused to conclude that daily readings from the Bible in public schools had a valid secular purpose. The State argued that the purposes of the statute requiring the Bible readings were "the promotion of moral values, the contradiction to the materialistic trends of our times, the perpetuation of our institutions and the teaching of literature." *Id.* at 223, 83 S.Ct. at 1572. The Court struck down the statute, asserting that "even if its purpose is not strictly religious, [its purpose] is sought to be accomplished through readings, without comment, from the Bible. Surely the place of the Bible as an instrument of religion cannot be gainsaid...." *Id.* at 224, 83 S.Ct. at 1572. Elsewhere, this court has emphasized, "Recognizing that prayer is the quintessential religious practice implies that no secular purpose can be satisfied...." *Jaffree v. Wallace,* 705 F.2d 1526, 1534-35 (11th Cir.1983) [*Jaffree I* ], *aff'd sub nom. Wallace v. Jaffree,* 472 U.S. 38, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985) [*Jaffree II* ].

Under these precedents, a person attempting to further an ostensibly secular purpose through avowedly religious means is considered to have a constitutionally impermissible purpose. *See Jager v. Douglas Cty. Sch. Dist.,* 862 F.2d 824, 830 (11th Cir.1989) ("[A]n intrinsically religious practice

370 F.3d 1252, 188 Ed. Law Rep. 620, 28 Fla. L. Weekly Fed. C 593

**(Cite as: 370 F.3d 1252)**

cannot meet the secular purpose prong of the *Lemon* test...."). The point of Allred's daily "ritual" was to show that praying is a compassionate act; such an endorsement of an intrinsically religious activity is inconsistent with the Establishment Clause. For these reasons, we find that Allred violated the Establishment Clause because her acts were motivated, at least in part, by a desire to inculcate "religiosity."

2.

Allred's behavior also fails the "effects" prong of the *Lemon-Agostini* test because the effect of her behavior was clearly to promote praying, a religious activity. Praying is perhaps the "quintessential religious practice," *see Treen,* 653 F.2d at 901, and to explicitly call for prayer requests, invoke a moment of silence for prayer with the phrase "let us pray," actually hold such a moment of silence, and sometimes conclude with "Amen" has the effect of both endorsing religious activity, as well as encouraging or facilitating its practice.

This behavior is clearly the type of "invocation of God's blessings" of which the Supreme Court disapproved in *Engel v. Vitale,* 370 U.S. 421, 422, 82 S.Ct. 1261, 1262, 8 L.Ed.2d 601 (1962). Allred's use of the concept of silent prayer could quite reasonably appear to be an "endorsement [of religion that] is not consistent with the established principle that the government must pursue a course of complete neutrality toward religion." *Jaffree II,* 472 U.S. at 60, 105 S.Ct. at 2491 (holding that a statute allowing public school teachers to expressly dedicate a moment of silence to **\*1287** prayer violates the Establishment Clause); *see also Schempp,* 374 U.S. at 225, 83 S.Ct. at 1573 ("[T]he Government [must] maintain strict neutrality, neither aiding nor opposing religion."). While Allred did not promote any particular prayer, or even compel prayer in general, her policy undeniably "encourage[d] recitation of ... prayer." *Engel,* 370 U.S. at 424, 82 S.Ct. at 1263. Consequently, we conclude that Allred's acts violated the Establishment Clause.

Allred argues that her behavior does not have the effect of furthering religion because her students frequently asked her to hold the moments of silence. We held in *Chandler v. Siegelman,* "So long as the prayer is *genuinely student-initiated,* and not the product of any school policy which actively or surreptitiously encourages it, the speech is private and it is protected." 230 F.3d 1313, 1317 (11th Cir.2000)(*Chandler II* ). Allred takes an exceedingly broad view of the phrase "student-initiated," interpreting it to be woefully inconsistent with the rest of our opinion in that case.

[36] Under *Chandler II,* read as a whole, a prayer is not "student-initiated," and hence constitutional, simply because the initial idea for the prayer was a student's. For example, the fact that a student may come up with the idea of having the Lord's Prayer recited over his school's loudspeakers each day does not mean the prayer is "student initiated," and so constitutional, under *Chandler II.* Indeed, in the Supreme Court's *Santa Fe* ruling (which *Chandler II* applied), the student body had conducted an election and affirmatively voted to have prayers recited at football games, but the Court nevertheless invalidated the practice. School personnel may not facilitate prayer simply because a student requests or leads it.

The true test of constitutionality is whether the school encouraged, facilitated, or in any way conducted the prayer. *Chandler II* used the phrase "student-initiated" to mean "independently student organized and conducted," as opposed to "school sponsored" or "school conducted." In fact, in the actual holding of the case, we upheld a portion of an injunction enjoining the school district from " 'aiding, abetting, commanding, counseling, inducing, ordering, or procuring' school organized or officially sanctioned religious activity." *Id.* at 1317. While purely private prayer by students is constitutionally protected, prayer that is led, encouraged, or facilitated by school personnel is constitutionally prohibited. "[E]ven genuinely student-initiated speech may constitute state action if the State participates in or supervises the speech.... [S]tudent religious speech must be without oversight, without su-

370 F.3d 1252, 188 Ed. Law Rep. 620, 28 Fla. L. Weekly Fed. C 593

**(Cite as: 370 F.3d 1252)**

pervision, subject only to the same reasonable time, place, and manner restrictions as all other student speech in school." *Chandler v. James* [*Chandler I* ], 180 F.3d 1254, 1264-65 (11th Cir.1999). In this case, the prayer requests and moments of silence for prayer cannot be considered purely student speech because they were coordinated and conducted by a teacher (in a classroom during school hours, no less).

[37] That students were not actually forced to pray during the moment of silence, and may have been free to leave the room, does not alleviate the constitutional infirmities of Allred's moment of silence. The *Engel* Court declared, "[T]he fact that the program ... does not require all pupils to recite the prayer but permits those who wish to do so to remain silent or be excused from the room, ignores the essential nature of the program's constitutional defects." 370 U.S. at 430, 82 S.Ct. at 1266. The Court further explained, "The Establishment Clause, unlike the Free Exercise **\*1288** Clause, does not depend upon any showing of direct governmental compulsion and is violated by the enactment of laws which establish an official religion whether those laws operate directly to coerce nonobserving individuals or not." *Id.,* 82 S.Ct. at 1267. The *Schempp* Court later reaffirmed that the unconstitutionality of school-sponsored prayer is not "mitigated by the fact that individual students may absent themselves upon parental request, for that fact furnishes no defense to a claim of unconstitutionality under the Establishment Clause." *Schempp,* 374 U.S. at 223, 83 S.Ct. at 1572.

The "nondenominational" nature of the moment of silence is similarly of no avail. *Weisman,* 505 U.S. at 594, 112 S.Ct. at 2659 (stating that the nonsectarian nature of a school-sponsored prayer "does not lessen the offense or isolation to the objectors. At best it narrows their number, at worst increases their sense of isolation and affront."). "[G]overnment is required to be a neutral among religions *and between religion and nonreligion.*" *Mitchell v. Helms,* 530 U.S. 793, 878, 120 S.Ct. 2530, 2578, 147 L.Ed.2d 660 (2000) (emphasis added) (quotation and citation omitted). "It is now

firmly established that a law may be one 'respecting an establishment of religion' even though its consequence is not to promote a 'state religion' and even though it does not aid one religion more than another but merely benefits all religions alike." *Comm. for Pub. Educ. v. Nyquist,* 413 U.S. 756, 771, 93 S.Ct. 2955, 2964-65, 37 L.Ed.2d 948 (1973). Encouraging or facilitating any prayer clearly fosters and endorses religion over nonreligion, and so runs afoul of the First Amendment.

The brevity of Allred's moment of silent prayer does not alleviate her constitutional violation, either. It is "no defense to urge that the religious practices here may be relatively minor encroachments on the First Amendment." *Schempp,* 374 U.S. at 225, 83 S.Ct. at 1573. Our own precedents clearly state that "[t]he Establishment Clause does not focus on the amount of time an activity takes, but rather examines the religious character of the activity." *Jager,* 862 F.2d at 832.

It is instructive to compare the case before us with another moment-of-silence case in which we found that the Establishment Clause was not violated. In *Bown v. Gwinnett County School District,* 112 F.3d 1464 (11th Cir.1997), we held that a Georgia statute requiring public school teachers to observe a moment of silence each day in their classrooms did not violate the *Lemon* test. The statute had a secular purpose because it expressly declared that the "moment of quiet reflection ... is not intended to be and shall not be conducted as a religious service or exercise but shall be conducted as an opportunity for a moment of silent reflection on the anticipated activities of the day." *Id.* at 1469 (*quoting* O.C.G.A. § 20-2-1050(b)). Moreover, the statute's sponsor stated that he "viewed the Act not as providing for school prayer, but rather as providing for a moment for students to collect their thoughts, focus on the upcoming day, and begin to develop self-respect and discipline." *Id.* at 1471.

Because the statute, as actually implemented, did not have the effect of promoting or inhibiting religion, it also satisfied the second prong of the *Lemon* test. The announcement made over the school

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

370 F.3d 1252, 188 Ed. Law Rep. 620, 28 Fla. L. Weekly Fed. C 593

**(Cite as: 370 F.3d 1252)**

loudspeaker that commenced the moment of silence each day "indicated only that there would be a moment of silence to reflect on the day's activities .... [and] in no way suggested that students should or should not pray silently during the moment of quiet reflection...." *Id.* at 1472. Moreover, "[t]he Administrative Bulletin circulated to all school principals instructed **\*1289** that teachers should not suggest that students use the moment of quiet reflection for prayer," and we found no indication "that any teacher encouraged prayer in violation of the guidelines stated in the Administrative Bulletin." *Id.*

The instant case is easily distinguishable from *Bown* in that Allred, far from taking steps to ensure that her moment of silence was not regarded as a religious activity, affirmatively and repeatedly labeled it as such. Her characterization of the moment of silence is important; in *Adler v. Duval Cty. Sch. Bd.,* 250 F.3d 1330, 1342 (11th Cir.2001), we upheld a school's policy of having student graduation speakers in part because of "the complete absence ... of code words such as 'invocation' unequivocally connoting religion." The district court in this case was willing to overlook the fact that Allred would frequently " 'slip[ ] up' by using the word 'pray' instead of the words 'moment of silence,' ... and by indicating the end of the moment of silence by voicing the word 'amen', a poor substitute, perhaps, for the words 'let's get to work.' " (Mem. Op. June 4, 2001, at 6). Such labels, however, are quite important in determining not only the purpose behind the actions at issue (discussed in the prior Subsection), but also their nature, likely effects, and the degree to which they are likely to be perceived as state endorsement, facilitation, or promotion of religion.

For these reasons, we have no trouble in concluding that these facts amount to blatant and repeated violations of the Establishment Clause.

### B.

[38] Having established that Allred infringed Holloman's rights under the Establishment Clause, we now must assess whether these rights were "clearly established" at the time of her actions. The district court held, without explanation, that "[n]o jury could reasonably conclude that 'every like-situated, reasonable' teacher or principal would necessarily know ... that using the word 'prayer' as a euphemism for 'moment of silence,' violated freedom of religion or freedom from religion." (Mem. Op., June 4, 2001, at 10). We are again forced to disagree.

By now it should go without saying that it is unconstitutional for a teacher or administrator (or someone acting at their behest) to lead students aloud in voluntary prayer. *See Engel,* 370 U.S. at 422, 82 S.Ct. at 1262 (prohibiting recitation of nondenominational prayer); *Schempp,* 374 U.S. at 216, 83 S.Ct. at 1568 (invalidating school board practice of reciting the Lord's Prayer over the school loudspeakers each day).

In *Jaffree II,* another case from Alabama involving unconstitutional Establishment Clause practices, the Supreme Court went a step further and condemned the use of a moment of silence when one of the purposes for which it was expressly instituted was prayer. 472 U.S. 38, 105 S.Ct. 2479, 86 L.Ed.2d 29. The Alabama state legislature had enacted a statute, *Ala.Code* § 16-1-20, requiring that public school teachers in the first through sixth grades establish a daily moment of silence "for meditation." *Id.* at 40,105 S.Ct. at 2481. Three years later, it enacted § 16-1-20.1, which permitted (though not required) all public school teachers to hold a moment of silence "for meditation or voluntary prayer." The parties agreed that the original statute, providing only for a moment of silence for meditation, was constitutionally permissible. The Court held that the later enactment, which expressly specified "voluntary prayer" as an additional purpose for, or permissible activity to perform during, the moment of silence, was unconstitutional. It found that the enactment of § 16-1-20.1 "was not motivated by any **\*1290** clearly secular purpose-indeed, the statute had no secular purpose." *Id.* at 56, 105 S.Ct. at 2489-90. It further noted that, notwithstanding the general permissibility of a moment of silence, ex-

370 F.3d 1252, 188 Ed. Law Rep. 620, 28 Fla. L. Weekly Fed. C 593
**(Cite as: 370 F.3d 1252)**

pressly designating it as an opportunity for prayer "convey[s] a message of state endorsement and promotion of prayer." *Id.* at 59, 105 S.Ct. at 2491. The Court concluded, "Such an endorsement is not consistent with the established principle that the government must pursue a course of complete neutrality toward religion." *Id.* at 60, 105 S.Ct. at 2491.

We see no way of distinguishing *Jaffree II* from the instant case. If a law that allowed teachers to institute a moment of silence expressly for prayer is unconstitutional, then it surely also unconstitutional for a teacher to actually institute a moment of silence expressly for prayer. The law cannot get much more "clearly established" than that.

Having concluded that Holloman successfully alleged a violation of the Establishment Clause, we now turn to the viability of both his Speech and Establishment Clause claims against the School Board.

### V.

[39] The School Board may not be held liable for the unconstitutional acts of its employees under a *respondeat superior* theory. In cases such as *Monell v. Department of Social Services,* 436 U.S. 658, 690-91, 98 S.Ct. 2018, 2035-36, 56 L.Ed.2d 611 (1978), the Supreme Court articulated the circumstances in which "local governing bodies" are subject to § 1983 liability. This Part examines each of the ways in which Holloman contends that the School Board may be sued.

### A.

[40] *Monell* states that "when execution of a government's policy ... inflicts the injury ... [then] the government as an entity is responsible under § 1983." *Id.* at 694,98 S.Ct. at 2037-38. To hold the School Board liable for Holloman's Speech Clause claim under this theory, we must locate some affirmative official policy that a reasonable jury could understand as calling upon teachers to compel students to salute the flag. Ala.Code § 16-43-5 provides, "The State Board of Education shall afford all students attending public kindergarten,

primary and secondary schools the *opportunity* each school day to *voluntarily* recite the pledge of allegiance to the United States flag."(emphasis added). State law clearly does not allow students to be forced to salute the flag. The Superintendent of the Walker County Public School System issued a memorandum on the Board of Education's letterhead, stating, "[E]ach school system must incorporate a Character Education Plan which will consist of ten minutes of instruction per day in various areas, such as, the Pledge of Allegiance.... Each day must include the Pledge of Allegiance, and then other areas mentioned as you determine at your school." This official policy directive lacks the language of voluntariness found in the statute. It also mandates that each day *include* the pledge, rather than include *the opportunity* to recite the pledge. A reasonable jury could conclude that this memorandum required teachers to ensure that their students actually recited the pledge.[FN14] **\*1291** Consequently, the Board may be held liable for Holloman's compelled-speech First Amendment claim.

> FN14. In his deposition, Harland briefly discussed the memo. He testified, "We [have] a memo from when Mr. Larry Banks was the superintendent. I think the Pledge of Allegiance was spelled out as being one of the things that took place in the morning.... [The] Pledge of Allegiance was part of the character education, and the teachers did various things in there to teach character and promote good citizenship, but the pledge was part of it."

[41] To hold the Board liable under the Establishment Clause claim for Allred's daily moment of silent prayer under an "official policy" theory, we must find a policy mandating, authorizing, or permitting teachers to take prayer requests or hold moments of silence for prayer. The only testimony in the record concerning whether or not these prayers were conducted pursuant to School Board policy came from Allred. She testified during her deposition that her practice of asking for prayer requests was "actually included in compassion in the character education plan. For me to refuse students to ex-

370 F.3d 1252, 188 Ed. Law Rep. 620, 28 Fla. L. Weekly Fed. C 593

**(Cite as: 370 F.3d 1252)**

press compassion for someone else would be contrary to our character education plan that we implement through our curriculum." Based on the uncontroverted testimony from the teacher charged with implementing School Board policies (including the character education plan the Board required schools in the district to implement) that her unconstitutional acts were required by a Board policy, we cannot help but conclude that Holloman has introduced sufficient evidence to show that the Board can be held liable because Allred was acting pursuant to a Board policy.

In further support of this theory, we also note that each high school's character education plan had to be approved by the School District before being forwarded onto the State Department of Education. For reasons that are unclear to us, it appears that neither party actually entered Parrish High School's character education plan into the record. Consequently, we can only attempt to determine what inferences a reasonable jury could make. We know that the plan had to be approved by the School Board, and that Allred claims that her daily prayer ritual was part of it. It is also noteworthy that Vice Principal Adkins was aware of Allred's practice, having experienced it firsthand during his visit to her classroom; based on his lack of surprise or disapproval, a jury could infer that Adkins knew that prayer was part of Allred's contribution to the character development plan. Interpreting these facts in the light most favorable to Holloman, a reasonable jury could draw the inference that prayer was included in the written plan approved by the School Board, forming another, more direct way in which the Board may be held liable as having promulgated an unconstitutional policy.[FN15]

> FN15. Earlier, we held that (based on the facts before us interpreted in the light most favorable to the plaintiff) Allred had failed to establish as a matter of law that she was engaged in a discretionary function of her job when she held her daily moment of silent prayer. If a jury were to make this determination based on the evidence at trial, it would be impossible for the jury to like-

wise conclude that she was acting pursuant to an official board policy. Even under those circumstances, however, the Board could still be held liable under any of the other theories discussed in this Part.

### B.

[42][43][44][45] A municipal governing body may be held liable for acts or policies of individuals to whom it delegated final decisionmaking authority in a particular area. *Matthews v. Columbia Cty.,* 294 F.3d 1294, 1297 (11th Cir.2002) ("Local government liability can exist when someone with final policymaking authority delegates that authority to someone else. But, the delegation must be such that the decision is not subject to review by the policymaking authority."); *Gattis v. Brice,* 136 F.3d 724, 725 (11th Cir.1998) ("If a county official *1292 holds final policymaking authority for the county in the subject area of the alleged constitutional violation, that official's decisions may constitute county policy."). A member or employee of a governing body is a final policy maker only if his decisions have legal effect without further action by the governing body, *see Matthews,* 294 F.3d at 1297 ("[E]ven if [member of governing entity] was given the power to select which positions would be eliminated ... his selections still had to be accepted by a majority of the board. As such, [that member] never possessed final policymaking power himself ...."), and if the governing body lacks the power to reverse the member or employee's decision, *see Quinn v. Monroe Cty.,* 330 F.3d 1320, 1326 (11th Cir.2003) ("Because the [governmental entity] has the power to reverse any termination decision made by [individual government official], he is not a final policymaker with regard to termination decisions at the library."). To determine if someone is a final policy maker, we look not only to "state and local positive law," but also "custom and usage having the force of law." *McMillian v. Johnson,* 88 F.3d 1573, 1577 (11th Cir.1996); *see also Jett v. Dallas Indep. Sch. Dist.,* 491 U.S. 701, 109 S.Ct. 2702, 2723, 105 L.Ed.2d 598 (1989) (holding that an individual can be a "final policymaker" either by operation of "state and local positive law" or by "custom

1256 F.3d 1255?
370 F.3d 1252, 188 Ed. Law Rep. 620, 28 Fla. L. Weekly Fed. C 593
**(Cite as: 370 F.3d 1252)**

or usage having the force of law"). We review *de novo* a district court's ruling about whether an individual is a final policy maker. *Scala v. City of Winter Park,* 116 F.3d 1396, 1401 (11th Cir.1997).

In *Denno v. School Bd.,* 218 F.3d 1267, 1277 (11th Cir.2000), we held that the existence of a three-step process allowing parents to appeal a principal's decision to an area assistant superintendent and ultimately to the School Board was sufficient to strip the principal of final policymaking authority. While the principal's decisions clearly had immediate legal effect, the fact that at least two other entities could reverse those decisions was inconsistent with the notion that the principal was a final decision maker.

The School Board would have us rest this case on *Denno* because the Parrish High School student handbook specifies that students have "the right and the responsibility to express school-related concerns and grievances to the teachers and school administrator(s).... [I]n the event that the grievance cannot be settled by this procedure, then the student ... may pursue the grievance to the Superintendent of Schools and then to the Board." In *Denno,* however, the student was suspended, and we found that, under the circumstances, the policies outlined in the student handbook "allowed for meaningful review of Denno's suspension." *Denno,* 218 F.3d at 1277.

[46] Our ruling in *Denno* was based on a theme reiterated through much of our caselaw-in assessing whether a governmental decision maker is a final policy maker, we look to whether there is an actual "opportunity" for "meaningful" review. *See Oladeinde v. City of Birmingham,* 230 F.3d 1275, 1295 (11th Cir.2000) (emphasizing that there must be an actual "opportunity" for "meaningful administrative review" before we conclude that a governmental decision maker lacks final policymaking authority); *Scala,* 116 F.3d at 1401 ("Final policymaking authority over a particular subject area does not vest in an official whose decisions in the area are subject to *meaningful* administrative review.") (emphasis added); *see also Grech v. Clayton Cty.,*

335 F.3d 1326, 1351 (11th Cir.2003) (Barkett, J., concurring) ("An official must have discretion in a particular area of law in order to exercise final **\*1293** policymaking authority in that area and may not be subject to *significant* review.") (emphasis added); *Bowen v. Watkins,* 669 F.2d 979 (5th Cir.1982) ("If a higher official has the power to overrule a decision but as a practical matter never does so, the decision maker may represent the effective final authority on the question.").

[47] In the instant case, there was no opportunity for meaningful review by the School Board. While the student handbook set out an formal multi-step appellate process that was theoretically available on paper, Holloman could not, as a practical matter, take advantage of it. Graduation was barely a few days away, and Harland did not offer to "stay" Holloman's punishment while he sought Board review. Indeed, the record is silent as to whether there would even be an intervening meeting of the Board or other opportunity to invoke its oversight. Even if the School Board were to engage in an *ex post* review of the punishment, the fact remains that the paddling could not be undone. Due to the impending end of the school year, the punishment-unlike the suspension in *Denno*-could not be postponed to potentially allow for Board review; Harland had made it clear that if Holloman did not submit to punishment, he would not receive his diploma on graduation day. *Cf. Weisman,* 505 U.S. at 595, 112 S.Ct. at 2659 ("Everyone knows that in our society and in our culture high school graduation is one of life's most significant occasions.").

Needless to say, our holding that Harland acted as a final decision maker in this context does not mean that he always acts as such. As we noted in *McMillian,* "[a]n official or entity may be a final policymaker with respect to some actions but not others." 88 F.3d at 1578. On other occasions, where there is a meaningful opportunity for substantive Board review, or where a punishment is not a *fait accompli* or otherwise irreversible, the "appellate" procedures outlined in the student handbook may be pursued, and Harland would act as merely the initial-rather than final-policy maker.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

We could also interpret the "Corporal Punishment" section of the student handbook as a delegation to Harland of final decisionmaking authority regarding the administration of corporal punishment. It reads:

In order to establish and maintain an educational climate conducive to learning, the Board permits reasonable corporal punishment of students in the schools of the School District. If such punishment is required, it shall be administered with care, tact, and caution by the principal or his/her designee in accordance with Board policies.

Vice Principal Adkins testified in his deposition that there were no other Board policies regarding corporal punishment.

A student's pain and humiliation from this act of physical violence cannot be undone; Holloman cannot be un-spanked. In the absence of any meaningful Board oversight mechanism prior to the administration of corporal punishment, we cannot help but conclude that Harland had been delegated final policymaking authority in determining when to spank a student. In granting him this power without integrating itself into the pre-spanking review process, the Board necessarily bound itself to his decisions. Thus, the School Board's delegation of effectively unreviewable corporal punishment authority constitutes a related yet alternate basis upon which we find that Harland was a final decision maker. Consequently, depending on how the facts ultimately develop at trial, the Board may be held liable under the First Amendment for either his decision to punish Holloman for engaging in constitutionally protected expression, or to punish Holloman *1294 for engaging in unprotected expression on impermissible viewpoint-based grounds.

[48] Regarding the Establishment Clause issue, we find that Allred was not a final policy maker. The prayers were recited as part of the character education program, which as discussed earlier was expressly subject to School Board approval. Consequently, Allred could not have been the final policy maker in this area, and Holloman's Establishment Clause claims against the School Board

cannot be supported on this basis.

### C.

[49] The Supreme Court has recognized that municipal governing entities may be held liable for unconstitutional acts of employees that occur pursuant to a municipal "custom." *See Monell,* 436 U.S. at 690-91, 98 S.Ct. at 2036. We are unable to conclude, based on the incidents involving Holloman and Hutto, that a "custom" or "practice" of disciplining students for failing to recite the Pledge of Allegiance (or for engaging in a non-disruptive protest during the pledge) existed in the school district. Consequently, Holloman may not pursue his Speech Clause claim against the Board under this theory.

[50][51] In contrast, Allred's practice of conducting a daily moment for silent prayer-which she actually referred to as a "ritual"-was sufficiently systematic to be considered a pattern or custom for which the Board may be held accountable. Our precedents are clear that, for constitutional violations to be sufficiently "widespread" for a governmental supervisor to be held liable, they need occur with frequency, *see Brown,* 906 F.2d at 671 (holding that violations must be "obvious, flagrant, rampant, and of continued duration" to hold a supervisor liable); *see also Greason v. Kemp,* 891 F.2d 829, 837 (11th Cir.1990) (noting that the "situation of municipal liability" is "analogous" to the question of supervisory liability), and need not necessarily be committed by several people within a department or agency. When rights are systematically violated on a near-daily basis, such abuses are sufficiently egregious to warrant supervisory liability, even if it is a single "bad apple" engaging in the repeated pattern of unconstitutional behavior. *See St. Louis v. Praprotnik,* 485 U.S. 112, 130, 108 S.Ct. 915, 928, 99 L.Ed.2d 107 (1988) (noting that vicarious liability under § 1983 is appropriate "if a series of decisions by *a* subordinate official [singular] manifested a 'custom or usage' of which the supervisor must have been aware") (emphasis added). Consequently, based on the systematic frequency of these violations, a jury could conclude that the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

370 F.3d 1252, 188 Ed. Law Rep. 620, 28 Fla. L. Weekly Fed. C 593
**(Cite as: 370 F.3d 1252)**

Board knew of the practice yet nevertheless permitted it to fester unabated.

## VI.

Allred is not entitled to summary judgment on qualified immunity grounds against Holloman's Speech Clause claim to be free from compelled speech, his Speech Clause claim to affirmative freedom of expression, his Speech Clause claim to be free of viewpoint discrimination, or his Establishment Clause claim.

Harland is not entitled to summary judgment on qualified immunity grounds against Holloman's Speech Clause claim to be free from compelled speech, his Speech Clause claim to affirmative freedom of expression, or his Speech Clause claim to be free from viewpoint discrimination. We do not consider the question of Harland's entitlement to summary judgment against Holloman's Establishment Clause claim because Holloman abandoned this issue on appeal.

Holloman has successfully articulated claims against the School Board for violations**\*1295** of his Speech Clause right to be free from compelled speech (under an "official policy" theory), his Speech Clause right to engage in affirmative expression (under a "delegation to a final policymaker" theory), his Speech Clause claim to be free from viewpoint discrimination (also under a "delegation to a final policymaker" theory), and his Establishment Clause rights (under either an "official policy" or a "custom" theory). We reverse the district court's grant of summary judgment, and reinstate Holloman's claims against the Board.

REVERSED AND REMANDED.

WILSON, Circuit Judge, concurring in part and dissenting in part:

I join Parts I, II-A, and II-B of the majority's opinion, which hold that there is an issue of material fact as to whether Holloman was punished for failing to say the Pledge of Allegiance ("the Pledge"), which if true, would violate Holloman's clearly established constitutional right not to say the Pledge. However, I respectfully dissent from Part II-C. In Part II-C, the majority holds that even if Holloman was in fact punished for raising his fist in the air during the recitation of the Pledge rather than for merely failing to say the Pledge, then there is an issue of material fact as to whether his First Amendment right was violated. In addition, the majority holds that such a First Amendment right is clearly established in our case law. I disagree. I contend, rather, that Holloman does not have a First Amendment right to raise his clenched fist in the air during the school's recitation of the Pledge any more than he would have a First Amendment right to raise his fist in the air during math class. Such an act is inherently disruptive, and a teacher has every right to prevent such conduct in his or her classroom in order to prevent any potential disruption.[FN1] I also believe that even if Holloman had a First Amendment right to raise his fist in the air during the recitation of the Pledge, such a right certainly was not clearly established in our case law.

> FN1. We are not called upon to decide the propriety of the type of punishment inflicted here.

I agree with the majority's conclusion, though, with respect to Part II-D of its opinion. While Holloman's expression was not constitutionally protected in the classroom because it is inherently disruptive, he still has a clearly established First Amendment right to not be discriminated against on the basis of the viewpoint he is communicating. *See Cornelius v. NAACP Legal Defense and Educ. Fund, Inc.,* 473 U.S. 788, 812, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985) ("While we accept the validity and reasonableness of the justifications offered by petitioner for excluding [the relevant speech], those justifications cannot save an exclusion that is in fact based on the desire to suppress a particular point of view."). There is a genuine issue of material fact as to whether Allred and Harland were motivated by a desire to suppress Holloman's apparent unpatriotic viewpoint, which if true, would violate Holloman's First Amendment right. Thus, I concur with the majority's conclusion with respect to Part II-D of its opinion.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

370 F.3d 1252, 188 Ed. Law Rep. 620, 28 Fla. L. Weekly Fed. C 593

**(Cite as: 370 F.3d 1252)**

In addition, I join Part IV of the majority's opinion, which holds that there is an issue of material fact as to whether Allred violated clearly established rights under the Establishment Clause by leading her class in a prayerful moment of silence. However, while I concur in the result of Part III (for the reasons stated in Part IV of the majority's opinion), I cannot join the majority's holding that Allred did not act within her "discretionary function" when she led the class in a moment of silent prayer. I would hold, rather, that Allred acted within her discretionary function **\*1296** when leading her class in silent prayer, but that she violated the Establishment Clause by so doing.

Finally, I also join Part V of the majority's opinion only to the extent that it holds that there is an issue of material fact as to whether the School Board may be liable for punishing Holloman for remaining silent during the Pledge (if the factfinder finds that is the reason for his punishment) and for Allred's practice of leading the class in a prayerful moment of silence.

### I.

The majority not only holds that the evidence, reviewed in Holloman's favor, demonstrates that Holloman had a First Amendment right to raise his clenched fist in the air during the recitation of the Pledge in school, but also that such a right was clearly established. Because the majority's holding in this regard is neither consistent with Supreme Court precedent nor Eleventh Circuit case law, I respectfully dissent. I would hold that the First Amendment does not give a student in Holloman's circumstances the right to actively partake in conduct that is inherently disruptive during the curriculum portion of the school day. Yet, even if the First Amendment does grant such a right, that right certainly was not clearly established for qualified immunity purposes.

### A.

I agree with the majority that Holloman's act of raising his fist in the air during the Pledge is a form of expression, or indeed, may very well be "pure speech." It is an act that is, as the majority puts it, "purely communicative as a sign-language gesture or the act of holding up a sign...." Majority Opinion at 1270. I agree that Holloman's First Amendment right to Free Speech is implicated, but we must be mindful that "the constitutional rights of students in public school are not automatically coextensive with the rights of adults in other settings." *Bethel Sch. Dist. v. Fraser,* 478 U.S. 675, 682, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986). "It is always within the province of school authorities to provide by regulation the prohibition and punishment of acts calculated to undermine the school routine." *Blackwell v. Issaquena County Bd. of Educ.,* 363 F.2d 749, 753 (5th Cir.1966).[FN2] When balancing the First Amendment right of students at school, we must not forget that the state's interest to maintain "an orderly program of classroom learning" is a "compelling" one. *Burnside v. Byars,* 363 F.2d 744, 748 (5th Cir.1966). Thus, public schools have a "wide latitude of discretion" to formulate regulations "pertaining to the discipline of school children." *Id.*

> FN2. In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

Public schools are allowed "to adopt and enforce reasonable, non-discriminatory regulations as to the time, place and manner of student expressions and demonstrations." *Bayless v. Martine,* 430 F.2d 873, 878 (5th Cir.1970). Such a regulation may infringe upon a student's right to free speech only "where the exercise of such rights in the school buildings and schoolrooms do[es] not materially and substantially interfere with the requirements of appropriate discipline in the operation of the school." *Burnside,* 363 F.2d at 749. Keeping in mind that schools are given a "wide latitude of discretion," the critical issue in this case becomes whether Holloman's act of holding his clenched fist in the air during the recitation of the Pledge "materially and substantially interfere[d] **\*1297** with the requirements of appropriate discipline...." *Id.* at 748, 749.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

370 F.3d 1252, 188 Ed. Law Rep. 620, 28 Fla. L. Weekly Fed. C 593
**(Cite as: 370 F.3d 1252)**

The majority cites several cases supporting its view that Holloman's act was not a sufficient interference to justify a punishment. Yet, some of these cases involve student expression occurring *outside* the classroom. *See, e.g., Shanley v. Northeast Indep. Sch. Dist.,* 462 F.2d 960, 964 (5th Cir.1972) (involving the distribution of newspapers before and after school hours); *Reineke v. Cobb County Sch. Dist.,* 484 F.Supp. 1252 (N.D.Ga.1980) (involving the censorship of a student newspaper). Certainly, the type and amount of expression occurring outside class that would "interfere with the requirements of appropriate discipline,"*Burnside,* 363 F.2d at 749, will be different than the type and amount of expression that interferes with appropriate discipline in the classroom. The school has a more compelling interest to establish order and discipline in the classroom because that is where the curriculum portion of the school day occurs.

In addition, those cases cited by the majority that protect student expression within the classroom are easily distinguishable from Holloman's expression. For instance, the majority relies on *Burnside,* which held that students wearing "freedom buttons" to class did not cause a sufficient interruption to justify prohibiting students from wearing the buttons at school. *Id.* We based our holding in *Burnside* on the lack of evidence demonstrating that "the buttons tended to *distract* the minds of the students away from their teachers." *Id.* at 748 (emphasis added). We held that "[w]earing buttons on collars or shirt fronts is certainly not in the class of those activities which *inherently distract* students and break down the regimentation of the classroom such as carrying banners, scattering leaflets, and speech making, all of which are protected methods of expressions, but all of which have no place in an orderly classroom." *Id.* (emphasis added). In addition, we said,

Regulations which are essential in maintaining order and discipline on school property are reasonable. Thus school rules which assign students to a particular class, forbid unnecessary discussion in the classroom and prohibit the exchange of conversation between students are reasonable even though these regulations infringe on such basic rights as

freedom of speech and association, because they are necessary for the orderly presentation of classroom activities.

*Id.* Our inquiry should focus upon, therefore, whether a student holding his fist in the air during a curriculum portion of the school day is more akin to a student "carrying banners" and "exchang[ing] conversation" during class, rather than wearing a button on the front of one's shirt. *Id.*

Activity that can be regulated by a public school, like "unnecessary discussion in the classroom," "the exchange of conversation between students," "carrying banners," "scattering leaflets," and "speech making," all have in common the fact that they inherently compete with the teacher for the other students' attention. Wearing a button on the front of one's shirt, though, does not compete with the teacher for the students' attention anymore than a student wearing a shirt advertising a particular sports team. Thus, we must determine whether a student raising his fist in the air during class inherently is the sort of activity that competes with the teacher for the students' attention, or whether it is a more passive expression like a wearing a shirt or a button conveying a particular message.

I think it is quite clear that a student raising his clenched fist in the air during a curriculum portion of the school day is the sort of activity that inherently competes with the teacher for the other students' **\*1298** attention and thus can be prohibited by the school authorities. Holloman's act of holding his fist in the air during the recitation of the Pledge is, as the majority says, akin to "the act of holding up a sign." Majority Opinion at 1270. Such expression, unlike a button pinned to one's shirt, is meant to compete for students' attention, and thus *inherently* distracts students from a legitimate portion of the curriculum. Holding one's fist in the air is more like "carrying banners" which "inherently distract[s] students," *Burnside,* 363 F.2d at 748, than wearing a button on a shirt. Would a student have a right to hold up a sign during the recitation of the Pledge, as long as the student does not obstruct others' view of the flag? The answer to that question is plainly

370 F.3d 1252, 188 Ed. Law Rep. 620, 28 Fla. L. Weekly Fed. C 593
**(Cite as: 370 F.3d 1252)**

"no." Holding one's fist in the air is the same sort of communication as holding up a sign, as the majority even admits. It is meant to compete for students' attention and unnecessarily distract students from the recitation of the Pledge. It is not a passive expression, like wearing a button on the front of one's shirt. Like holding up a sign, it inherently is the sort of activity that distracts students during class. While a student may have more freedom to express himself outside of class, students in the classroom are limited to passive expressions that do not inherently distract students. A public school teacher is well within his or her authority to prohibit activity, like a student holding his fist in the air during class, that inherently distracts students.

Even if we were to assume, though, that a student holding his fist in the air during class is not activity that inherently distracts students, there is evidence on the record that Holloman in fact distracted students with his gesture, which would further distinguish the instant action from *Burnside*. After Holloman's act of raising his fist during the Pledge, students approached their teacher to complain that Holloman's expression was not "right." The majority reasons that this fact alone is not sufficient to show a material disruption. While the majority is correct that schools cannot prohibit expression on the basis that others may disagree with the content of the expression, the students' comments not only demonstrate disagreement with the content of Holloman's expression, but also that Holloman's gesture "distract[ed] the[ir] minds" during a curriculum portion of the school day. *Id.* The students' comments demonstrate that they at least focused their attention during a portion of the recitation of the Pledge on Holloman's fist-which precisely is what is intended by such expression-rather than on the planned curriculum of saying the Pledge.[FN3]

> FN3. The majority claims that this approach "appears to ignore the principle ... that student expression must cause (or be likely to cause) a 'material and substantial' disruption ... before it may be curtailed." Majority Opinion at 1272. I do not ignore this principle, but rather disagree with the

majority by what we meant in *Burnside* when we said that public schools can only infringe on a student's speech when it "materially and substantially interfere[s] with the requirements of appropriate discipline in the operation of the school." *Burnside,* 363 F.2d at 749. One of the "requirements of appropriate discipline" is preventing students from competing with the teacher or with the curriculum for other students' attention. For instance, we said in *Burnside* that a school may prohibit "the exchange of conversation between students" during class. *Id.* at 748. Thus, a teacher may prohibit and punish a student for whispering to his classmate during class, even if it causes a "brief, easily overlooked, *de minimis* impact." Majority Opinion at 1272. One student whispering to another student during class competes with the teacher for the attention of other students, and thus "materially and substantially interfere[s]" with one of the fundamental "requirements of appropriate discipline." *Burnside,* 363 F.2d at 749. Similarly, Holloman's act of raising his fist in the air during the Pledge competed for the students' attention during a legitimate curriculum portion of the school day. Indeed, some of the students' reaction after class indicated that he successfully distracted students from the recitation of the Pledge. Thus, Holloman's act "substantially and materially interfere[d] with the requirements of appropriate discipline" because it "tended to distract the minds of the students away from" the recitation Pledge. *Id.* at 749, 748.

**\*1299** If we do not interpret the students' comments as evidence of distraction, we necessitate absurd results in similar student expressions in the future. The majority's holding would imply, for example, that a student would be justified in holding up his fist in protest of the Vietnam conflict during a history lesson about Vietnam. Assume that the only evidence of disruption, like in the instant action, is

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

370 F.3d 1252, 188 Ed. Law Rep. 620, 28 Fla. L. Weekly Fed. C 593

**(Cite as: 370 F.3d 1252)**

that of students complaining that such a gesture during a class about the Vietnam conflict is not "right." Does such a circumstance necessarily indicate that the teacher does not have enough evidence of a disturbance to prohibit the student from holding his clenched fist in the air during history class? It would be difficult to conclude otherwise following the reasoning of the majority's opinion. Such a conclusion, though, would plainly go well beyond what was intended by the First Amendment right to Free Speech as it applies to students in the classroom.

A public school is given "wide latitude" in disciplining its students. *Id.* The defendants in the instant case had every right to prevent Holloman from distracting the students during a legitimate, curriculum portion of the school day because a student holding his fist in the air is the sort of activity that "inherently distract[s] the minds of students," and that is exactly what Holloman did here. *Id.* In the very least, such activity is distinguishable from a student wearing a button on his shirt during class. The result in *Burnside* does not demand the same result here.

The majority also relies on *Tinker v. Des Moines Indep. Cmty. Sch. Dist.,* 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969), which held that students had a constitutional right to wear a black arm band during class in protest of the Vietnam conflict. *Id.* at 514, 89 S.Ct. 733. The Court in *Tinker,* relying heavily on our reasoning in *Burnside,* said that wearing an arm band was not "disruptive action," nor was there any evidence of "interference, actual or nascent, with the school's work." *Id.* at 508,89 S.Ct. 733.

The instant case is distinguishable from *Tinker* for the same reason it is distinguishable from *Burnside.* Wearing a button or an arm band is passive activity that does not inherently distract students during the curriculum portion of the school day, unlike raising one's fist in the air. Also, in *Tinker* there was no evidence of any interference or distraction during class. In the instant case, however, we have evidence of students, at the very least, being distracted

for a portion of the Pledge due to Holloman's gesture. I fail to see how it follows that a right to wear a button or an arm band during class means that a student has a right to raise his fist during class. The result in *Tinker,* like *Burnside,* is inapposite to the instant action.

Finally, the district court relies on the reasoning and holding of *Banks v. Bd. of Pub. Instruction,* 314 F.Supp. 285 (S.D.Fla.1970), *vacated by* 401 U.S. 988, 91 S.Ct. 1223, 28 L.Ed.2d 526 (1971), *reinstated without published opinion by dist. ct. and aff'd,* 450 F.2d 1103 (5th Cir.1971). In *Banks,* the Southern District of Florida held that a student has a constitutional right to remain seated during the recitation of the Pledge in class. The district **\*1300** court in *Banks,* according to the majority's interpretation, held that refusing to stand was a form of expression that was protected by the First Amendment, and that the "district court makes clear that its ruling was not based on Banks's First Amendment right to remain silent." Majority Opinion at 1273. The majority concludes that the expression of remaining seated during the Pledge is akin to Holloman's holding his fist in the air during the Pledge, and thus Holloman's expression is entitled to First Amendment protection.

In addition to the fact that a district court holding is not binding authority on this Court, it is not at all "clear that [the district court's] ruling was not based on Banks's First Amendment right to remain silent." Majority Opinion at 1273. The court in *Banks* discussed extensively the reasoning of *West Virginia St. Bd. of Educ. v. Barnette,* 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943), which held that a public school cannot compel a student to participate in the Pledge. After discussing *Barnette,* the district court in *Banks* said,

Without more *Barnette* would be dispositive of this matter for [the plaintiff] was suspended for his refusal to act in accordance with a regulation, the operation of which prevented him from exercising his First Amendment rights.

*Banks,* 314 F.Supp. at 295. The court continued later in the opinion, Here, as in *Barnette,* the regula-

tion required the individual to communicate, by standing, his acceptance of and respect for all that for which our flag is but a symbol.

*Id.* at 296. In other words, the district court's holding was based on the reasoning of *Barnette.* The school's policy of forcing a student to stand during the Pledge violated the student's First Amendment right *not* to be compelled to speak or express a particular belief. Any discussion by the district court in addition to this more limited holding is arguably dictum.

As the majority points out, the court in *Banks* also said that remaining seated during the Pledge "was no less a form of expression than the wearing of the black arm-band was to Mary Beth Tinker. He was exercising a right 'akin to pure speech.' " *Id.* at 295. I agree that a student may intend to express himself by remaining seated-yet I do not agree that it follows that the *Tinker-Burnside* standard applies to a student who merely remains seated during the Pledge. Remaining seated during the Pledge is a way for a student *not* to participate in the Pledge. Thus, such a decision is afforded the more absolute protection of *Barnette,* in which the Supreme Court said,

If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or *act* their faith therein.

*Barnette,* 319 U.S. at 642, 63 S.Ct. 1178 (emphasis added). Forcing a student to stand during the Pledge would be compelling that student to "confess by ...*act* [his] faith" in the content of the Pledge and all that it symbolizes. *Id.* (emphasis added). Such a regulation would violate the central principle of *Barnette. See Lipp v. Morris,* 579 F.2d 834, 836 (3rd Cir.1978) (per curiam) (holding that forcing a student to stand is unconstitutional because it requires a student "to engage in what amounts to implicit expression by standing at respectful attention while the flag salute is being administered").

While it is true that remaining seated during the Pledge may also be construed as a way of speaking, remaining seated is already in the class of those activities that are afforded the more absolute protections **\*1301** of *Barnette*-i.e., the right not to participate in the Pledge. To hold that the *Tinker-Burnside* standard applies to a student who remains seated during the Pledge would limit a student's right *not* to participate in the Pledge. If it can be shown that a student, or a group of students, who do not participate in the Pledge by remaining seated causes a material disruption, we would be forced to defer to the school's decision to *compel* students to stand during the Pledge. Such a ruling would allow a public official to "force citizens to confess by ... act their faith" in the content of the Pledge and all it symbolizes. *Barnette,* 319 U.S. at 642, 63 S.Ct. 1178. As a result, the "fixed star in our constitutional constellation" would become contingent upon the degree of disruption judges decide is too much in a particular classroom. Limiting the central right of being free to abstain from participating in the Pledge should not be limited by applying the *Tinker-Burnside* standard to a decision more absolutely protected by *Barnette.*

A student may decide not to participate in the recitation of the Pledge by remaining silent and seated. In such circumstances, the holding in *Barnette* applies. On the other hand, raising one's fist in the air during the Pledge is not a way in which a student abstains from participating in the Pledge. It can only be construed as expression. Thus, *Barnette* and *Banks* are not applicable to Holloman's act, but rather *Tinker* and *Burnside* apply. As I indicated above, I believe Holloman's act of raising his fist in the air during class is easily distinguished from the act of wearing a button or an arm band during class because raising one's fist in the air during the curriculum portion of the school day inherently distracts students, and thus materially disrupts the requirements of appropriate discipline.

Reciting the Pledge of Allegiance during the school day is a legitimate activity of the curriculum, just as legitimate as conducting math or history class. While a student is not required to participate in the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

370 F.3d 1252, 188 Ed. Law Rep. 620, 28 Fla. L. Weekly Fed. C 593
**(Cite as: 370 F.3d 1252)**

Pledge, a student cannot engage in expressive conduct that inherently distracts the minds of the students from a legitimate portion of the school day. I would hold that there is no issue of material fact as to whether the school was justified in punishing Holloman, *if* that punishment was based on his act of raising his fist in the air during the recitation of the Pledge of Allegiance and was not motivated by a desire to suppress Holloman's point of view.

B.

Even if Holloman has a First Amendment right to hold his fist in the air during the recitation of the Pledge in class, such a right was not "clearly established." *Hope v. Pelzer,* 536 U.S. 730, 739, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). In order for a right to be clearly established, the public official must be given "fair warning" that his or her conduct violates a statutory or constitutional right. *See id.* at 741,122 S.Ct. 2508. Recently, the Supreme Court in *Hope* held that we improperly used a "rigid gloss" when demanding that the facts of previous cases be "materially similar" to the facts of the applicable case in order for the law to be clearly established. *Id.* at 739, 122 S.Ct. 2508. There are other ways, though, besides comparing the facts of the instant case with the facts of previous cases, to determine if a public official was given "fair warning" that a certain act violated a statutory or constitutional provision. There are some cases in which the law provides "obvious clarity," even in the absence of instances in which courts have applied a general principle to particular **\*1302** facts. *See Vinyard v. Wilson,* 311 F.3d 1340, 1351 (11th Cir.2002). The majority holds that Holloman's constitutional right to put his fist in the air during the recitation of the Pledge is clearly established because the *Tinker-Burnside* standard was "sufficiently specific" to give the defendants fair warning. *See* Majority Opinion at 1278-79. I respectfully disagree with both the majority's analysis and conclusion.

There are three ways in which we can find that the law is clearly established so as to give public offi-

cials fair warning that a particular act violates a statutory or constitutional right. First, the words of a statute or constitutional provision can be specific enough to clearly establish the law applicable to particular conduct and circumstances, even in the absence of any case law. *Vinyard,* 311 F.3d at 1350. No one alleges that such a case is present here. Second, sometimes "broad statements of principle in case law [that] are not tied to particularized facts ... can clearly establish law applicable in the future to different sets of detailed facts." *Id.* at 1351. The majority believes that such a case is present here, while I do not. I will address my disagreement below. Finally, and this is true in the vast majority of our qualified immunity cases, we inquire whether fact-specific precedents are "fairly distinguishable" from the facts facing a government official. *Id.* at 1352. I think this is the proper inquiry in the instant case. Using this inquiry, I would conclude that the precedent is fairly distinguishable from the circumstances in this case, and thus the defendants were not given fair warning that disciplining a student for raising his fist in the air during the Pledge was unconstitutional.

The majority considers whether the test, *by itself,* articulated in *Tinker* and *Burnside* clearly establishes that Holloman's act was constitutionally protected. The *Tinker-Burnside* test is whether the student expression "materially and substantially interfere[s] with the requirements of appropriate discipline in the operation of the school." *Burnside,* 363 F.2d at 749. The majority claims this test is "sufficiently specific" to give the defendants fair warning that Holloman's expression was constitutionally protected because it is reasonable "to expect the defendants-who hold themselves out as educators-to be able to apply such a standard, notwithstanding the lack of a case with material factual similarities." Majority Opinion at 1278. In addition, the majority says applying this test would be "effortless," as "[a] teacher or principal should be able to instantly recognize whether a student is disrupting class, and it should not be too hard to determine whether a student's activities are likely to have such an effect." Majority Opinion at 1279.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

370 F.3d 1252, 188 Ed. Law Rep. 620, 28 Fla. L. Weekly Fed. C 593

**(Cite as: 370 F.3d 1252)**

These reasons articulated by the majority are irrelevant to our analysis. The defendants thought that Holloman's act was *not* constitutionally protected-that is, they believed that his act "materially and substantially interfere[d] with the requirement of appropriate discipline." *Burnside,* 363 F.2d at 749. It simply does not follow that because it is "not too hard" for teachers to determine when a student disrupts class, that it is then *obvious* to every reasonable teacher that a certain disruption will survive judicial scrutiny. In other words, teachers cannot be expected to readily determine what conduct falls within the Court's definition of "material and substantial interference with appropriate discipline." *Id.* Reasonable people certainly can disagree about how the Court will apply such a general standard, especially to the facts of the instant action. *See Vinyard,* 311 F.3d at 1351 ("[I]f a broad principle in case law is to establish clearly the law applicable to a specific set **\*1303** of facts facing a governmental official, it must do so 'with obvious clarity' to the point that every objectively reasonable government official facing the circumstances would know that the official's conduct did violate federal law when the official acted.").

I do not think that the balancing test we use in our Free Speech cases established with "obvious clarity" that a student can raise his fist in the air during the curriculum portion of the school day. We define our broad standard of "materially and substantially interfer[ing] with the requirements of appropriate discipline" as including "those activities which inherently distract students" during class. *Burnside,* 363 F.2d at 749, 748. A reasonable teacher could conclude that a student raising his fist in the air during a curriculum portion of the school day is the sort of activity that "inherently distract[s] students." *Id.* at 748. Thus, the defendants were not given fair warning by our case law that they were prohibited from punishing Holloman for his expressive act.

In the alternative, the majority states that Holloman's right to raise his fist in the air during the Pledge is clearly established under *Barnette.* In *Barnette,* the Supreme Court held that a public school cannot compel a student to participate in the

Pledge. 319 U.S. at 642, 63 S.Ct. 1178. The majority says that it is "very reluctant" to conclude that Holloman shed his First Amendment protection to remain silent during the Pledge by simply lifting his fist into the air. Majority Opinion at 1279. "This is a hair we will not split," according to the majority because, I assume, "First Amendment protections are not lost that easily." Majority Opinion at 1279.

Yet, this is precisely the "hair" the majority "split" earlier in its own opinion. For instance, the majority in Part II-B-1 persuasively establishes that there is an issue of material fact as to whether Holloman was punished for failing to say the Pledge or for raising his fist in the air. This was a proper distinction to make, because the answer to that question determines whether *Barnette* applies or whether *Burnside* and *Tinker* apply. *Barnette* prohibits a school from *compelling* a student to say the Pledge. *Burnside* and *Tinker* prohibits a school from preventing a student from *voluntarily* engaging in expression, as long as that expression does not sufficiently interfere with proper discipline in the classroom. Holloman's act of raising his fist in the air, as the majority aptly pointed out, is what made his act *expression,* rather than just a failure to participate in the Pledge. In other words, Holloman's act of raising his fist is exactly what allows us to apply *Burnside* and *Tinker.* To conclude later, when considering whether *Barnette* clearly establishes Holloman's right to raise his fist, that it is no longer legally significant that Holloman raised his fist, is inconsistent.

*Barnette* holds that a student cannot be *compelled* to speak. *Barnette* says nothing about a student's *right* to speak. Holloman "spoke" by raising his fist. Thus, *Barnette* is not relevant to this inquiry.

For the reasons that I articulated above for why I believe Holloman's expression is distinguishable from the expression in *Tinker* and *Burnside,* I would hold that the law was not clearly established that Holloman had a right to raise his fist in the air during the recitation of the Pledge in class.

II.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

370 F.3d 1252, 188 Ed. Law Rep. 620, 28 Fla. L. Weekly Fed. C 593
**(Cite as: 370 F.3d 1252)**

I agree with the majority's conclusion that Allred is not entitled to qualified immunity for leading the class in a moment of silent prayer. Such action, as aptly pointed out in Part IV of the majority's **\*1304** opinion, violates the Establishment Clause. *See Engel v. Vitale,* 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962). Thus, I join Part IV of the majority's opinion. However, the majority also held, in Part III, that Allred is not even potentially entitled to summary judgment on qualified immunity grounds against Holloman's Establishment Clause claim because leading the class in a moment of prayerful silence is not within her "discretionary function." I think that such an interpretation stretches our inquiry of "discretionary function" beyond what is articulated in our case law. Thus, I would find that (1) Allred's act of leading her class in a prayerful moment of silence was within her discretionary authority, but (2) such an act was unconstitutional under the Supreme Court's interpretation of the Establishment Clause.

A government official acts within his discretionary authority when his actions "were undertaken pursuant to the performance of his duties and within the scope of his authority." *Sims v. Metro. Dade County,* 972 F.2d 1230, 1236 (11th Cir.1992) (internal quotations omitted). We must keep in mind that our "inquiry is not whether it was within the defendant's authority to commit the allegedly illegal act. Framed that way, the inquiry is no more than an untenable tautology." *Harbert Int'l, Inc. v. James,* 157 F.3d 1271, 1282 (11th Cir.1998) (internal quotation omitted). Thus, just because a defendant's act may be unconstitutional does not mean that the act was not within the defendant's discretionary authority.

In the instant action, the Alabama state legislature enacted a statute requiring local school boards to "implement ... a comprehensive character education program ... focusing upon the students' development of ... compassion." ALA.CODE § 16-6B-2(h). Allred claims she promoted compassion by asking the students for prayer requests before observing a moment of silence. While such an act would not pass muster under the Supreme Court's interpreta-

tion of the Establishment Clause, it is a legitimate way to promote compassion. Asking students to offer prayers for other people may habituate students to think of others by praying for them. Thus, I agree with the majority that Allred's act was pursuant to her job related goal of promoting compassion.

The majority believes, though, that while Allred's act of leading her class in a prayerful moment of silence was pursuant to a job related function, it was not within the scope of her authority. The majority states that "[p]raying goes sufficiently beyond the range of activities normally performed by high school teachers," because "[p]rayer is a relatively *sui generis* activity." Majority Opinion at 1283. Yet, the "*sui generis* activity" of praying in public schools *was* "normally performed" prior to the Supreme Court's decision in *Engel.* Indeed, even today, many teachers in private high schools throughout America, whether they be religious or secular, lead their students in prayer. Public school teachers no longer have the authority to lead their classes in prayer by virtue of the fact that the Supreme Court ruled it unconstitutional. It was certainly within the scope of a public high school teacher's authority to lead students in prayer prior to 1962, when the Court ruled that teacher led prayer in public schools is a violation of the Establishment Clause. The fact that a particular act may now be deemed unconstitutional does not mean that such an act is outside the scope of a public official's discretionary authority. *See Harbert,* 157 F.3d at 1282. There must be some other reason, besides the fact that a particular activity is unconstitutional, for that activity not to be within a public authority's scope of authority. I do not see an additional reason, besides the unconstitutionality of **\*1305** school prayer, in the majority's opinion giving me reason to believe that Allred's act was not within her discretionary authority. And neither can I think of one. Thus, I cannot join Part III of the majority's opinion. Its application of the "discretionary authority" requirement to Allred's act of leading her class in silent prayer is too stringent. However, I agree that Allred is nonetheless not entitled to qualified immunity for the reasons the majority states in Part IV of its opinion.

370 F.3d 1252, 188 Ed. Law Rep. 620, 28 Fla. L. Weekly Fed. C 593

**(Cite as: 370 F.3d 1252)**

### III.

A student raising his fist in the air during a curriculum portion of the school day engages in an act that inherently distracts student during class. A teacher, therefore, may prohibit a student from engaging in such activity. Thus, I cannot join Part II-C of the majority opinion's in which it holds that there is an issue of material fact as to whether Holloman's First Amendment right to free speech was violated if he was punished for holding his fist in the air during the recitation of the Pledge and if that punishment was not motivated by a desire to suppress a particular viewpoint. I also dissent from the majority's holding that Holloman's right to hold his fist in the air was clearly established for qualified immunity purposes.

In addition, while I agree with the majority's conclusion that there is an issue of material fact as to whether Allred violated Holloman's clearly established right under the Establishment Clause when Allred led the class in a moment of silent prayer, I cannot join Part III of the majority's opinion. In my view, Allred acted within her discretionary function when leading her class in prayer.

Finally, I join Part V of the majority's opinion, but only to the extent that it holds that the School Board may be held liable if Holloman was punished for remaining silent during the Pledge and for Allred's act of leading her students in silent prayer. Thus, I concur in part and dissent in part with the majority's opinion.

C.A.11 (Ala.),2004.
Holloman ex rel. Holloman v. Harland
370 F.3d 1252, 188 Ed. Law Rep. 620, 28 Fla. L. Weekly Fed. C 593

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**C**

Crosby v. Monroe County
C.A.11 (Ala.),2004.

United States Court of Appeals,Eleventh Circuit.
William J. CROSBY, Plaintiff-Appellant,
v.
MONROE COUNTY, Jason Terry, Defendants-Ap-
pellees.
William J. Crosby, Plaintiff-Appellant,
v.
Jason Terry, Defendant-Appellee.
**Nos. 03-13716, 03-14310.**

Dec. 28, 2004.

**Background:** Arrestee brought suit in state court,
alleging section 1983 claims of unlawful arrest, use
of excessive force, and denial of medical care while
in custody. Following removal, the United States
District Court for the Southern District of Alabama,
No. 01-00888-CV-1-BH-S,William B. Hand, J.,
dismissed all claims except federal law claims
against officer in his individual capacity, and gran-
ted officer summary judgment on that claim based
on qualified immunity. Arrestee appealed.

**Holdings:** The Court of Appeals, Carnes, Circuit
Judge, held that:

(1) officer was entitled to qualified immunity from
unlawful arrest claim;

(2) officer was entitled to qualified immunity from
excessive force claim; and

(3) arrestee was not denied medical care in viola-
tion of his right to due process.

Affirmed.
West Headnotes
**[1] Bankruptcy 51 ⇌2395**

51 Bankruptcy
    51IV Effect of Bankruptcy Relief; Injunction
and Stay

51IV(B) Automatic Stay
        51k2394 Proceedings, Acts, or Persons
Affected
            51k2395 k. Judicial Proceedings in
General. Most Cited Cases
Plaintiff's bankruptcy filing and automatic stay did
not preclude adjudication of merits of his appeal of
assessment of fees and costs against him upon dis-
missal of his civil rights claims. Bankr.Code, 11
U.S.C.A. § 362; 42 U.S.C.A. § 1988.

**[2] Bankruptcy 51 ⇌2154.1**

51 Bankruptcy
    51II Courts; Proceedings in General
        51II(B) Actions and Proceedings in General
            51k2154 Rights of Action by or on Behalf
of Trustee or Debtor
                51k2154.1 k. In General. Most Cited
Cases
Chapter 13 debtor retained standing to pursue legal
claims on behalf of the estate. Bankr.Code, 11
U.S.C.A. § 1303; Fed.Rules Bankr.Proc.Rule 6009,
11 U.S.C.A.

**[3] Civil Rights 78 ⇌1376(1)**

78 Civil Rights
    78III Federal Remedies in General
        78k1372 Privilege or Immunity; Good Faith
and Probable Cause
            78k1376 Government Agencies and Of-
ficers
                78k1376(1) k. In General. Most Cited
Cases
To be eligible for qualified immunity under § 1983,
official must first establish that he was performing
discretionary function at time alleged violation of
federal law occurred. 42 U.S.C.A. § 1983.

**[4] Civil Rights 78 ⇌1407**

78 Civil Rights
    78III Federal Remedies in General
        78k1400 Presumptions, Inferences, and Bur-
dens of Proof

394 F.3d 1328, 18 Fla. L. Weekly Fed. C 127

**(Cite as: 394 F.3d 1328)**

78k1407 k. Defenses; Immunity and Good Faith. Most Cited Cases

Once official asserting qualified immunity under § 1983 has established that he was engaged in discretionary function, burden shifts to plaintiff to show: (1) that defendant has committed constitutional violation and (2) that constitutional right defendant violated was "clearly established" at time he did it. 42 U.S.C.A. § 1983.

**[5] Officers and Public Employees 283 ⊂⟶114**

283 Officers and Public Employees
    283III Rights, Powers, Duties, and Liabilities
        283k114 k. Liabilities for Official Acts. Most Cited Cases

To determine whether official asserting qualified immunity was engaged in discretionary function, court considers whether acts the official undertook are of a type that fell within employee's job responsibilities.

**[6] Civil Rights 78 ⊂⟶1376(6)**

78 Civil Rights
    78III Federal Remedies in General
        78k1372 Privilege or Immunity; Good Faith and Probable Cause
            78k1376 Government Agencies and Officers
                78k1376(6) k. Sheriffs, Police, and Other Peace Officers. Most Cited Cases

Sheriff's deputy was performing discretionary function, as required to support his assertion of qualified immunity under § 1983, when he arrested plaintiff, since making arrest was within his official responsibilities. 42 U.S.C.A. § 1983.

**[7] Arrest 35 ⊂⟶63.4(2)**

35 Arrest
    35II On Criminal Charges
        35k63 Officers and Assistants, Arrest Without Warrant
          35k63.4 Probable or Reasonable Cause
            35k63.4(2) k. What Constitutes Such Cause in General. Most Cited Cases

Probable cause for arrest is defined in terms of facts

and circumstances sufficient to warrant prudent man in believing that suspect had committed or was committing an offense. U.S.C.A. Const.Amend. 4.

**[8] Civil Rights 78 ⊂⟶1376(6)**

78 Civil Rights
    78III Federal Remedies in General
        78k1372 Privilege or Immunity; Good Faith and Probable Cause
            78k1376 Government Agencies and Officers
                78k1376(6) k. Sheriffs, Police, and Other Peace Officers. Most Cited Cases

Arresting officer is protected by qualified immunity under § 1983 when there was arguable probable cause for arrest even if actual probable cause did not exist; arguable probable cause exists if, under all of the facts and circumstances, officer reasonably could, not necessarily would, have believed that probable cause was present. U.S.C.A. Const.Amend. 4; 42 U.S.C.A. § 1983.

**[9] Civil Rights 78 ⊂⟶1376(6)**

78 Civil Rights
    78III Federal Remedies in General
        78k1372 Privilege or Immunity; Good Faith and Probable Cause
            78k1376 Government Agencies and Officers
                78k1376(6) k. Sheriffs, Police, and Other Peace Officers. Most Cited Cases

Officer who had responded to report of gunshots fired toward a home was entitled to qualified immunity from arrestee's § 1983 claim that his arrest was unlawful; officer had arguable probable cause to make arrest for reckless endangerment after hearing shot from direction of arrestee's home, seeing arrestee carrying shotgun and hearing sound of him ejecting shell from the weapon. U.S.C.A. Const.Amend. 4; 42 U.S.C.A. § 1983; Ala.Code 1975, § 13A-6-24.

**[10] Arrest 35 ⊂⟶63.4(5)**

35 Arrest
    35II On Criminal Charges

394 F.3d 1328
394 F.3d 1328, 18 Fla. L. Weekly Fed. C 127
**(Cite as: 394 F.3d 1328)**

35k63 Officers and Assistants, Arrest Without Warrant

  35k63.4 Probable or Reasonable Cause

    35k63.4(5) k. Nature of Offense; Felony or Misdemeanor. Most Cited Cases

Under Alabama law, warrantless arrest for misdemeanor does not require that offense have occurred in officer's presence. Ala.Code 1975, § 13A-6-24(b).

**[11] Arrest 35 &#8734;68(2)**

35 Arrest

  35II On Criminal Charges

    35k68 Mode of Making Arrest

      35k68(2) k. Use of Force. Most Cited Cases

Fourth Amendment encompasses right to be free from use of excessive force during arrest. U.S.C.A. Const.Amend. 4.

**[12] Arrest 35 &#8734;68(2)**

35 Arrest

  35II On Criminal Charges

    35k68 Mode of Making Arrest

      35k68(2) k. Use of Force. Most Cited Cases

Reasonableness inquiry in suit alleging use of excessive force in violation of Fourth Amendment is objective one; question is whether officer's actions are objectively reasonable in light of facts and circumstances confronting him, without regard to his underlying intent or motivation. U.S.C.A. Const.Amend. 4.

**[13] Arrest 35 &#8734;68(2)**

35 Arrest

  35II On Criminal Charges

    35k68 Mode of Making Arrest

      35k68(2) k. Use of Force. Most Cited Cases

In determining whether officer used excessive force during arrest, in violation of Fourth Amendment, court must view situation through eyes of officer on scene who is hampered by incomplete information and forced to make split-second decision between action and inaction in circumstances where inaction could prove fatal. U.S.C.A. Const.Amend. 4.

**[14] Civil Rights 78 &#8734;1376(6)**

78 Civil Rights

  78III Federal Remedies in General

    78k1372 Privilege or Immunity; Good Faith and Probable Cause

      78k1376 Government Agencies and Officers

        78k1376(6) k. Sheriffs, Police, and Other Peace Officers. Most Cited Cases

Officer who had responded to report of gunshots fired toward a home was entitled to qualified immunity from arrestee's § 1983 claim that officer used excessive force, in violation of Fourth Amendment, particularly in putting his foot on arrestee's face when arrestee was down on the ground; reasonable officer could have believed that force applied was reasonably necessary after multiple shots had been fired and arrestee was not docile as he lay face down on the pavement, and force applied, while undignified in its placement, was not severe in amount. U.S.C.A. Const.Amend. 4; 42 U.S.C.A. § 1983.

**[15] Constitutional Law 92 &#8734;4545(2)**

92 Constitutional Law

  92XXVII Due Process

    92XXVII(H) Criminal Law

      92XXVII(H)3 Law Enforcement

        92k4543 Custody and Confinement of Suspects; Pretrial Detention

        92k4545 Conditions

          92k4545(2) k. Medical Treatment. Most Cited Cases

  (Formerly 92k262)

Officer violates detainee's Fourteenth Amendment right to due process if he acts with deliberate indifference to serious medical needs of detainee; officer acts with "deliberate indifference" when he knows that detainee is in serious need of medical care and does not obtain medical care for that detainee. U.S.C.A. Const.Amend. 14.

**[16] Constitutional Law 92 &#8734;4537**

394 F.3d 1328, 18 Fla. L. Weekly Fed. C 127

**(Cite as: 394 F.3d 1328)**

92 Constitutional Law
    92XXVII Due Process
        92XXVII(H) Criminal Law
            92XXVII(H)3 Law Enforcement
                92k4533 Stop and Arrest
                    92k4537 k. Conduct. Most Cited
Cases
  (Formerly 92k262)

**Prisons 310 ⟐17(2)**

310 Prisons
    310k17 Maintenance and Care of Prisoners
        310k17(2) k. Medical and Mental Care. Most
Cited Cases
There was no evidence that detainee was in need of
medical care, much less evidence that arresting of-
ficer was aware of his need and refused to obtain
care for him, as required to support detainee's claim
that he was denied medical care in violation of his
right to due process. U.S.C.A. Const.Amend. 14.

**\*1330** William Maurice Pompey, Pompey & Pom-
pey, P.C., Camden, AL, for Crosby.
Ashley Hawkins Freeman, Kendrick Emerson
Webb, Bart Gregory Harmon, Webb & Eley, P.C.,
Montgomery, AL, for Defendants-Appellees.

Appeals from the United States District Court for
the Southern District of Alabama.

Before ANDERSON, CARNES and RONEY, Cir-
cuit Judges.
CARNES, Circuit Judge:
Willie J. Crosby appeals the district court's grant of
summary judgment in favor of former Monroe
County Sheriff's Deputy Jason Terry based upon
the court's decision that Terry was entitled to quali-
fied immunity.

**I.**

On November 11, 1999 at 8:48 p.m., Willie Scott
called 911 to report that someone was trying to kill
him.[FN1] Gunshots could be heard in the back-
ground. Jason Terry, then a Monroe County Sher-
iff's Deputy, listened to a recording of Scott's call
and then responded immediately with other of-

ficers. When the officers arrived at Scott's home in
Beatrice, Alabama, he told them that the shooter
was in the woods near his home. The officers saw a
person but were unable to apprehend him.

> FN1. Because we are required to view the
> facts in the light most favorable to the non-
> moving party, *Skrtich v. Thornton,* 280
> F.3d 1295, 1299 (11th Cir.2002), we recite
> the facts in the light most favorable to
> Crosby.

As the officers walked back to Scott's house after
failing to apprehend the shooter, they heard another
gunshot. The sound came from the direction of Wil-
lie J. Crosby's house, which is located across a
wooded area from Scott's house. Upon investigat-
ing, the officers spotted Crosby carrying a shotgun.
At the time the officers approached Crosby, he was
returning the shotgun to his garage. (Crosby admits
that earlier he had fired a "warning shot" at an indi-
vidual he had spotted in his backyard.)

On his way to the garage, Crosby "racked" the
shotgun, ejecting a spent shell. The officers heard
this distinctive and threatening sound as they ap-
proached Crosby's home. The officers drew their
weapons and ordered Crosby to "drop" the shotgun
and lie face down on the ground. Crosby did not
immediately comply but instead continued placing
the shotgun inside the garage door. Crosby then lay
on the ground as the officers had ordered him to do.

Two of the officers got on top of Crosby, putting
their knees in his back, and began to handcuff him.
Crosby raised his head and asked why he was being
arrested. Deputy Terry then placed his foot on the
side of Crosby's face and neck and applied pres-
sure. In response, Crosby jerked one hand away
from the officers who were attempting to handcuff
him, shoved Terry's foot off his face, cursed at
Terry, and asked Terry if he were crazy.

Crosby was then handcuffed and arrested. When the
officers searched him, he was found to be carrying
a .38 handgun. He was initially charged with reck-
less endangerment, and days later with resisting ar-
rest. He was confined to jail on the reckless endan-

germent charge for approximately ten hours before being released.

At the time of his arrest, Crosby complained to Deputy Terry that he was handcuffed too tightly. At no time while he was in jail did Crosby display any symptoms indicating that he needed medical treatment, nor did he request medical attention. After being released on the morning of November 12, Crosby waited **\*1331** several days before visiting a doctor. The doctor he eventually saw merely refilled a prescription that Crosby had previously received for back pain and gave him some other pain medication for arthritis. On or about January 5, 2000, Crosby was diagnosed with congestive heart failure.

Crosby was tried in the state district court for reckless endangerment and resisting arrest. He was found not guilty of reckless endangerment but guilty of resisting arrest. He appealed the conviction for resisting arrest to the Circuit Court of Monroe County where he received a jury trial, and he was again found guilty. The court then granted Crosby's motion for a new trial on the resisting arrest charge. (The grounds on which the motion was granted are not clear in the record.) As of the time of oral argument in this case, Crosby had not been retried.

## II.

Crosby filed a lawsuit in Alabama state court against Monroe County, various other Monroe County entities, and Deputy Terry. Terry was named both in his individual capacity and in his official capacity as a Monroe County sheriff's deputy. In addition to various state law claims, Crosby's complaint alleged unlawful arrest, use of excessive force, and denial of medical care while in custody, all asserted as 42 U.S.C. § 1983 claims.

[1][2] The case was removed to federal court by the defendants. The district court dismissed: all claims against Monroe County and its various entities; all the state law claims against Deputy Terry; and all the federal law claims against Terry in his official capacity. That action left standing only the federal

law claims against Terry in his individual capacity. When the district court dealt with those claims, it decided Terry was entitled to qualified immunity, and accordingly granted summary judgment in his favor on all of them. This is Crosby's appeal from the grant of summary judgment in favor of Terry on the three federal law claims against him in his individual capacity.[FN2]

> FN2. Crosby also appealed the district court's order that he pay Deputy Terry's attorney's fees and costs, pursuant to 42 U.S.C. § 1988. After filing his appeal with this Court, Crosby filed for bankruptcy. The parties then agreed that the portion of the appeal dealing with attorney's fees and costs was moot because Crosby has no assets with which to satisfy an award.
>
> Crosby's bankruptcy filing does not prevent us from adjudicating the merits of this appeal. The automatic stay provision of the Bankruptcy Code, 11 U.S.C. § 362, does not extend to lawsuits initiated by the debtor. *See* 11 U.S.C. § 362; *Martin-Trigona v. Champion Fed. Sav. & Loan Ass'n,* 892 F.2d 575, 577 (7th Cir.1989) (the automatic stay is inapplicable to suits by the debtor); *Carley Capital Group v. Fireman's Fund Ins. Co.,* 889 F.2d 1126, 1127 (D.C.Cir.1989) (same); *see also Victor Foods, Inc. v. Crossroads Econ. Dev. of St. Charles County, Inc.,* 977 F.2d 1224, 1227 (8th Cir.1992); *Trans Caribbean Lines, Inc. v. Tracor Marine, Inc.,* 49 B.R. 360, 362 (S.D.Fla.1985) (stating that the automatic stay provision only applies to proceedings against the debtor).
>
> Additionally, because Crosby filed under Chapter 13 of the Bankruptcy Code, he retains standing to pursue legal claims on behalf of the estate. *See* 11 U.S.C. § 1303; Fed. R. Bankr.P. 6009; *In re Mosley,* 260 B.R. 590, 595 (Bankr.S.D.Ga.2000) ("In Chapter 13 cases where the debtor is the party plaintiff, courts recognize that the Chapter 13 debtor may sue and be sued, and that the debtor controls the litigation

394 F.3d 1328
394 F.3d 1328, 18 Fla. L. Weekly Fed. C 127
**(Cite as: 394 F.3d 1328)**

as well as the terms of the settlement.");
*see also Cable v. Ivy Tech State Coll.,* 200
F.3d 467, 474 (7th Cir.1999); *Olick v.
Parker & Parsley Petroleum Co.,* 145 F.3d
513, 515 (2d Cir.1998); *Mar. Elec. Co. v.
United Jersey Bank,* 959 F.2d 1194, 1210
n. 2 (3d Cir.1991).

### III.

This Court reviews *de novo* the district court's grant
of summary judgment, applying**1332** the same leg-
al standards as did the district court. *Skrtich v.
Thornton,* 280 F.3d 1295, 1299 (11th Cir.2002).
Summary judgment is proper only when the evid-
ence before the court establishes "that there is no
genuine issue as to any material fact and that the
moving party is entitled to a judgment as a matter
of law." Fed.R.Civ.P. 56(c); *see also Skrtich,* 280
F.3d at 1299. All evidence must be viewed in the
light most favorable to the nonmoving party. *Skr-
tich,* 280 F.3d at 1299.

### IV.

[3][4] A government official who is sued under §
1983 may seek summary judgment on the ground
that he is entitled to qualified immunity. *Holloman
ex rel. Holloman v. Harland,* 370 F.3d 1252, 1263
(11th Cir.2004). To be eligible for qualified im-
munity, the official must first establish that he was
performing a "discretionary function" at the time
the alleged violation of federal law occurred. *Id.* at
1263-64. Once the official has established that he
was engaged in a discretionary function, the
plaintiff bears the burden of demonstrating that the
official is not entitled to qualified immunity. *Id.* at
1264. In order to demonstrate that the official is not
entitled to qualified immunity, the plaintiff must
show two things: (1) that the defendant has com-
mitted a constitutional violation and (2) that the
constitutional right the defendant violated was
"clearly established" at the time he did it. *Saucier v.
Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 2156, 150
L.Ed.2d 272 (2001); *Holloman,* 370 F.3d at 1264.

### A.

[5][6] To determine whether an official was en-
gaged in a discretionary function, we consider
whether the acts the official undertook "are of a
type that fell within the employee's job responsibil-
ities." *Holloman,* 370 F.3d at 1265. That is easy
here. Because making an arrest is within the official
responsibilities of a sheriff's deputy, Terry was per-
forming a discretionary function when he arrested
Crosby.

### B.

We turn now to the question of whether the doc-
trine of qualified immunity entitled Deputy Terry to
summary judgment insofar as the three constitu-
tional claims Crosby brought against him are con-
cerned. Those three claims assert unlawful arrest,
use of excessive force, and denial of medical care
while in custody, and that is the order in which we
will take up the claims.

[7] As to the unlawful arrest claim, Crosby asserts
that there was no probable cause for his arrest. The
Fourth Amendment's guarantee against unreason-
able searches and seizures encompasses the right to
be free from arrest without probable cause. *See,
e.g., Von Stein v. Brescher,* 904 F.2d 572, 579 (11th
Cir.1990). Probable cause is "defined in terms of
facts and circumstances sufficient to warrant a
prudent man in believing that the suspect had com-
mitted or was committing an offense." *Gerstein v.
Pugh,* 420 U.S. 103, 111, 95 S.Ct. 854, 862, 43
L.Ed.2d 54 (1975) (internal marks and citations
omitted).

[8] The issue here, however, is not whether prob-
able cause existed but instead whether there was ar-
guable probable cause. Qualified immunity applies
when there was arguable probable cause for an ar-
rest even if actual probable cause did not exist.
*Jones v. Cannon,* 174 F.3d 1271, 1283 n. 3 (11th
Cir.1999) ("Arguable probable cause, not the high-
er standard of actual probable cause, governs the
qualified immunity inquiry."). Arguable probable
cause exists if, under all of the facts and circum-
stances, an officer reasonably could-not necessarily
would-have believed that probable cause was

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

394 F.3d 1328, 18 Fla. L. Weekly Fed. C 127

**(Cite as: 394 F.3d 1328)**

present. *Durruthy v. Pastor,* 351 F.3d 1080, 1089 **\*1333** (11th Cir.2003) ("Arguable probable cause exists when an officer reasonably could have believed that probable cause existed, in light of the information the officer possessed."(internal marks and citation omitted)); *Montoute v. Carr,* 114 F.3d 181, 184 (11th Cir.1997) ("In order to be entitled to qualified immunity from a Fourth Amendment claim, an officer need not have actual probable cause but only 'arguable probable cause,' i.e., the facts and circumstances must be such that the officer reasonably could have believed that probable cause existed.").

Whether a particular set of facts gives rise to probable cause or arguable probable cause to justify an arrest for a particular crime depends, of course, on the elements of the crime. Under Alabama law, "A person commits the crime of reckless endangerment if he recklessly engages in conduct which creates a substantial risk of serious physical injury to another person." Ala.Code § 13A-6-24. That is one of the crimes for which Crosby was arrested.

[9] It is undisputed that, in the events leading up to the arrest, Deputy Terry was responding to a report of gunshots fired toward the home of Crosby's neighbor, Scott, shortly before the officers arrived. The officers knew that Scott, who had been there when the shots were fired, was in fear for his life. While on the scene, they heard a shot from the direction of Crosby's home. As they approached that area, the officers saw Crosby carrying a shotgun and heard the sound of him ejecting a shell from the weapon. Given these facts, an officer in Terry's position reasonably could have believed that Crosby had fired multiple shots in the direction of his neighbor's house, including the shots they had heard while the neighbor was on the phone calling the sheriff's office for help, and that he had fired another shot after they arrived. Because an officer in that position reasonably could have believed that Crosby had "create[d] a substantial risk of serious physical injury to another person," there was arguable probable cause to arrest Crosby for reckless endangerment as defined in Ala.Code § 13A-6-24.

[10] Crosby argues that, even if there was probable cause, his arrest was still a violation of the Fourth Amendment. He points out that reckless endangerment is a misdemeanor, *see*Ala.Code § 13A-6-24(b), and Alabama law does not permit a warrantless arrest for a misdemeanor unless it occurred in the officer's presence, *see Telfare v. City of Huntsville,* 841 So.2d 1222, 1228-29 (Ala.2002). We rejected a materially identical contention in *Knight v. Jacobson,* 300 F.3d 1272, 1275-76 (11th Cir.2002), and that decision requires that we do the same here.

Crosby's second federal claim is that Deputy Terry used excessive force in arresting him. Although not happy about the way in which the officers held him down, Crosby's primary focus in making this claim is that at one point Terry put his foot on Crosby's face. Except for that fact, this would be an easy case.

[11][12] The Fourth Amendment encompasses the right to be free from the use of excessive force during an arrest. *See Vinyard v. Wilson,* 311 F.3d 1340, 1347 (11th Cir.2002). As we have recently said, "[t]he 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officer's actions are 'objectively reasonable' in light of the facts and circumstances confronting him, without regard to his underlying intent or motivation." *Kesinger ex rel. Estate of Kesinger v. Herrington,* 381 F.3d 1243, 1248 (11th Cir.2004).

[13] In making an excessive force inquiry, we are not to view the matter as judges from the comfort and safety of our **\*1334** chambers, fearful of nothing more threatening than the occasional paper cut as we read a cold record accounting of what turned out to be the facts. We must see the situation through the eyes of the officer on the scene who is hampered by incomplete information and forced to make a split-second decision between action and inaction in circumstances where inaction could prove fatal. *See Graham v. Connor,* 490 U.S. 386, 396-97, 109 S.Ct. 1865, 1872, 104 L.Ed.2d 443 (1989); *Kesinger,* 381 F.3d at 1248-50; *Garrett v. Athens-Clarke County,* 378 F.3d 1274, 1279 (11th

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Cir.2004).

[14] From that perspective, a reasonable officer could have believed that the force applied was reasonably necessary in the situation Deputy Terry found himself in that night. The circumstances were fraught with danger for the officers. Multiple shots had been fired, Crosby's neighbor was in fear for his life, and after the officers arrived on the scene a shot was fired from the direction of Crosby's house. As they approached, the officers saw Crosby carrying a shotgun and heard the sound of him ejecting a shell from the weapon. As Crosby himself described that "racking" sound in his deposition: "It makes a heart-wrenching sound if you're on the wrong side of the fence." Around this time, the officers began running and yelling, "He's got a shotgun!" Then one or more of the officers, with pistol drawn, ordered Crosby to drop the shotgun, but he did not do so. Instead, he continued placing the shotgun in the garage.

Thereafter Crosby did lie face down on the pavement, as the officers had ordered, but he was not docile. While the officers were trying to hold him down and handcuff him, Crosby raised his head and asked why he was being arrested. It was then that Deputy Terry put his foot on Crosby's face and pushed his head back down. In response, Crosby jerked his hand away from the handcuffing attempt, shoved Terry's foot off, cursed at Terry, and asked him if he were crazy. Terry did not put his foot back on Crosby's face or otherwise respond to the cursing. Eventually, the officers got Crosby handcuffed. At no time did Terry or any other officer kick or punch Crosby. Crosby did not cry out in pain. Other than being indignant about having a foot on his face, Crosby did not say then-and so far as the record reveals he has not testified since-that it was painful.

The Supreme Court "has long recognized that the right to make an arrest ... necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham,* 490 U.S. at 397, 109 S.Ct. at 1872-73; *accord Garrett,* 378 F.3d 1274 (hit with baton, tackled, pepper-sprayed,

and tied up); *Draper v. Reynolds,* 369 F.3d 1270 (11th Cir.2004) (taser gun); *Durruthy,* 351 F.3d 1080 (knee in back). Furthermore, the purpose of the qualified immunity doctrine is to give meaning to the proposition that "[g]overnment officials are not required to err on the side of caution" when it comes to avoiding constitutional violations. *Marsh v. Butler County,* 268 F.3d 1014, 1030 n. 8 (11th Cir.2001) (en banc).

Though Crosby was on the ground at the time Deputy Terry put his foot on Crosby's face, he had not yet been handcuffed. For all the officers knew, Crosby had other weapons concealed on his person-as it turned out, he actually did have another weapon on him-and raising his head to ask why he was being arrested could have been an attempt by Crosby to distract Terry and a prelude to actual resistance. Given the circumstances and the risks inherent in apprehending any suspect, an officer in Terry's position reasonably could have concluded that it was imperative to keep Crosby, who had not been **\*1335** entirely cooperative, completely flat and immobile until he had been successfully handcuffed. The fact that Crosby was able to wrestle his hand loose and push Terry's foot away indicates that he had not been subdued.

There is also the fact that the force about which Crosby complains, while undignified in its placement, was not severe in amount. *See Durruthy,* 351 F.3d at 1094 (stating that " 'the application of de minimis force, without more, will not support a claim for excessive force in violation of the Fourth Amendment' " (quoting *Nolin v. Isbell,* 207 F.3d 1253, 1257 (11th Cir.2000))); *Lee v. Ferraro,* 284 F.3d 1188, 1198 (11th Cir.2002) (noting that one factor to be considered in evaluating excessive force claims is "the relationship between the need and amount of force used" (internal citation omitted)). Before us there is no evidence-as distinguished from bare allegations-that Deputy Terry's foot on Crosby's face caused him any physical injury. Crosby did say in his affidavit that being handcuffed hurt, and he testified in his deposition that he thinks having the two officers on his back-Terry was not one of them-aggravated his preexist-

394 F.3d 1328, 18 Fla. L. Weekly Fed. C 127
**(Cite as: 394 F.3d 1328)**

ing back condition. However, he did not say in any affidavit or deposition testimony in the record before us that the foot on his face was physically painful.

[15] Crosby's final claim is that Deputy Terry denied him medical care while he was incarcerated. An officer violates a detainee's "Fourteenth Amendment right to due process if he acts with deliberate indifference to the serious medical needs of the detainee." *Lancaster v. Monroe County,* 116 F.3d 1419, 1425 (11th Cir.1997). An officer acts with "deliberate indifference" when he knows that a detainee is in "serious need of medical care" and does not obtain medical care for that detainee. *Id.*

[16] Crosby has presented no evidence that he was in need of medical care, much less evidence that Deputy Terry was aware of his need and refused to obtain care for him. In his deposition, Crosby admits that he did not request medical care while in jail. In fact, he did not seek medical treatment until several days after his release. He says that he went to see a doctor "whenever [he] could get around to it." Crosby's behavior upon being released is inconsistent with his argument that, while in jail, he had such serious medical needs that it should have been obvious to Terry. Besides, Crosby has not even presented any evidence that Terry observed him while he was incarcerated.

### C.

The district court's grant of summary judgment to Deputy Terry on grounds of qualified immunity is AFFIRMED.

C.A.11 (Ala.),2004.
Crosby v. Monroe County
394 F.3d 1328, 18 Fla. L. Weekly Fed. C 127

END OF DOCUMENT

248 F.3d 1117                                                                    Page 1
248 F.3d 1117, 143 Lab.Cas. P 59,233, 17 IER Cases 883, 6 Wage & Hour Cas.2d (BNA) 1736, 14 Fla. L. Weekly
Fed. C 643
**(Cite as: 248 F.3d 1117)**

C

Chesser v. Sparks
C.A.11 (Ga.),2001.

United States Court of Appeals,Eleventh Circuit.
Angie CHESSER, a.k.a. Angie Kimball, Plaintiff-
Appellee,
v.
Amos SPARKS, individually and in his official ca-
pacity as Haralson County Commissioner, Defend-
ant-Appellant.
**No. 99-14594.**

April 18, 2001.

Employee terminated from her county clerk posi-
tion brought § 1983 action against county commis-
sioner, alleging violation of her First Amendment
rights of free speech and freedom of association.
Commissioner moved to dismiss on qualified im-
munity grounds. The United States District Court
for the Northern District of Georgia, No.
99-00023-CV-JTC-3,Jack T. Camp, J., denied mo-
tion. Commissioner appealed. The Court of Ap-
peals, Tjoflat, Circuit Judge, held that commission-
er was entitled to qualified immunity.

Reversed.
West Headnotes
**[1] Federal Courts 170B ⚖➔579**

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(C) Decisions Reviewable
            170BVIII(C)2 Finality of Determination
                170Bk576 Particular Actions, Inter-
locutory Orders Appealable
                    170Bk579 k. Civil Rights Cases.
Most Cited Cases
Federal Court of Appeals has jurisdiction to review
the district court's denial of the defense of qualified
immunity in a civil rights action pursuant to statute
allowing interlocutory appeals. 28 U.S.C.A. § 1291.

**[2] Federal Civil Procedure 170A ⚖➔2491.5**

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)2 Particular Cases
                170Ak2491.5 k. Civil Rights Cases in
General. Most Cited Cases
While qualified immunity defense to a §1983 action
is typically addressed at the summary judgment
stage of the case, the defense may be raised and
considered on a motion to dismiss; the motion will
be granted if the complaint fails to allege the viola-
tion of a clearly established constitutional right. 42
U.S.C.A. § 1983.

**[3] Federal Courts 170B ⚖➔776**

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
            170BVIII(K)1 In General
                170Bk776 k. Trial De Novo. Most
Cited Cases

**Federal Courts 170B ⚖➔797**

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
            170BVIII(K)3 Presumptions
                170Bk797 k. Dismissal. Most Cited
Cases
On review of district court's denial of motion to dis-
miss §1983 action on qualified immunity grounds,
court of appeals reviews de novo issue of whether
complaint alleges a clearly established constitution-
al right, accepting the facts alleged in the complaint
as true and drawing all reasonable inferences there-
from in the plaintiff's favor. 42 U.S.C.A. § 1983.

**[4] Civil Rights 78 ⚖➔1376(1)**

78 Civil Rights
    78III Federal Remedies in General
        78k1372 Privilege or Immunity; Good Faith
and Probable Cause
            78k1376 Government Agencies and Of-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

248 F.3d 1117, 143 Lab.Cas. P 59,233, 17 IER Cases 883, 6 Wage & Hour Cas.2d (BNA) 1736, 14 Fla. L. Weekly Fed. C 643

**(Cite as: 248 F.3d 1117)**

ficers

　　　　　78k1376(1) k. In General. Most Cited Cases

　(Formerly 78k214(1))

"Qualified immunity" protects government actors performing discretionary functions from being sued for civil rights violations in their individual capacities.

**[5] Civil Rights 78 ☞1376(2)**

78 Civil Rights

　78III Federal Remedies in General

　　　78k1372 Privilege or Immunity; Good Faith and Probable Cause

　　　　　78k1376 Government Agencies and Officers

　　　　　78k1376(2) k. Good Faith and Reasonableness; Knowledge and Clarity of Law; Motive and Intent, in General. Most Cited Cases

　(Formerly 78k214(2))

"Qualified immunity" doctrine shields government officials from liability in civil rights actions to the extent that their conduct does not violate clearly established constitutional rights of which a reasonable person would have known.

**[6] Civil Rights 78 ☞1376(1)**

78 Civil Rights

　78III Federal Remedies in General

　　　78k1372 Privilege or Immunity; Good Faith and Probable Cause

　　　　　78k1376 Government Agencies and Officers

　　　　　78k1376(1) k. In General. Most Cited Cases

　(Formerly 78k214(1))

"Qualified immunity" doctrine protects government officials from always erring on the side of caution by shielding them both from liability in civil rights actions and the other burdens of litigation, including discovery.

**[7] Civil Rights 78 ☞1376(2)**

78 Civil Rights

　78III Federal Remedies in General

　　　78k1372 Privilege or Immunity; Good Faith and Probable Cause

　　　　　78k1376 Government Agencies and Officers

　　　　　78k1376(2) k. Good Faith and Reasonableness; Knowledge and Clarity of Law; Motive and Intent, in General. Most Cited Cases

　(Formerly 78k214(2))

Evaluating the defense of qualified immunity raised by a government official in a federal civil rights action involves a two step inquiry: first, whether the official's conduct violated a clearly established constitutional right; and second, whether a reasonable government official would have been aware of that fact.

**[8] Civil Rights 78 ☞1376(2)**

78 Civil Rights

　78III Federal Remedies in General

　　　78k1372 Privilege or Immunity; Good Faith and Probable Cause

　　　　　78k1376 Government Agencies and Officers

　　　　　78k1376(2) k. Good Faith and Reasonableness; Knowledge and Clarity of Law; Motive and Intent, in General. Most Cited Cases

　(Formerly 78k214(2))

A constitutional right is "clearly established," precluding defense of qualified immunity in a federal civil rights action, if controlling precedent has recognized the right in a concrete and factually defined context.

**[9] Civil Rights 78 ☞1376(2)**

78 Civil Rights

　78III Federal Remedies in General

　　　78k1372 Privilege or Immunity; Good Faith and Probable Cause

　　　　　78k1376 Government Agencies and Officers

　　　　　78k1376(2) k. Good Faith and Reasonableness; Knowledge and Clarity of Law; Motive and Intent, in General. Most Cited Cases

　(Formerly 78k214(2))

A § 1983 plaintiff cannot prove existence of a

248 F.3d 1117, 143 Lab.Cas. P 59,233, 17 IER Cases 883, 6 Wage & Hour Cas.2d (BNA) 1736, 14 Fla. L. Weekly Fed. C 643
**(Cite as: 248 F.3d 1117)**

"clearly established right," as required to avoid the qualified immunity defense, by referring to general rules and to the violation of abstract rights. 42 U.S.C.A. § 1983.

**[10] Constitutional Law 92 ⚯1946**

92 Constitutional Law
    92XVIII Freedom of Speech, Expression, and Press
        92XVIII(P) Public Employees and Officials
          92k1946 k. Demotion. Most Cited Cases
    (Formerly 92k90.1(7.2))

**Constitutional Law 92 ⚯1947**

92 Constitutional Law
    92XVIII Freedom of Speech, Expression, and Press
        92XVIII(P) Public Employees and Officials
          92k1947 k. Discharge. Most Cited Cases
    (Formerly 92k90.1(7.2))

A state may not demote or discharge a public employee in retaliation for protected speech. U.S.C.A. Const.Amend. 1.

**[11] Constitutional Law 92 ⚯1925**

92 Constitutional Law
    92XVIII Freedom of Speech, Expression, and Press
        92XVIII(P) Public Employees and Officials
          92k1925 k. In General. Most Cited Cases
    (Formerly 92k90.1(7.2))

A public employee's right to freedom of speech is not absolute. U.S.C.A. Const.Amend. 1.

**[12] Constitutional Law 92 ⚯1929**

92 Constitutional Law
    92XVIII Freedom of Speech, Expression, and Press
        92XVIII(P) Public Employees and Officials
          92k1929 k. Public or Private Concern. Most Cited Cases
    (Formerly 92k90.1(7.2))

**Constitutional Law 92 ⚯1934**

92 Constitutional Law
    92XVIII Freedom of Speech, Expression, and Press
        92XVIII(P) Public Employees and Officials
          92k1934 k. Efficiency of Public Services. Most Cited Cases
    (Formerly 92k90.1(7.2))

To determine whether a government official has retaliated against an employee because of the employee's protected speech, as would violate the First Amendment, court considers first whether employee's speech is fairly characterized as constituting speech on a matter of public concern; if it is, court applies *Pickering* balancing test, which weighs the employee's free speech interest against the interest of the government, as an employer, in promoting the efficiency of the public services it performs. U.S.C.A. Const.Amend. 1.

**[13] Civil Rights 78 ⚯1421**

78 Civil Rights
    78III Federal Remedies in General
        78k1416 Weight and Sufficiency of Evidence
          78k1421 k. Employment Practices. Most Cited Cases
    (Formerly 78k242(3))

**Constitutional Law 92 ⚯1947**

92 Constitutional Law
    92XVIII Freedom of Speech, Expression, and Press
        92XVIII(P) Public Employees and Officials
          92k1947 k. Discharge. Most Cited Cases
    (Formerly 92k90.1(7.2))

If a public employee's speech involves a matter of public concern, and the employee's interests outweigh those of the government as an employer under *Pickering* test, court, in determining whether First Amendment violation occurred, asks whether the speech played a substantial part in the government's decision to discharge the employee; if it did, court examines whether the government has shown by a preponderance of the evidence that it would have discharged the employee regardless of the protected conduct. U.S.C.A. Const.Amend. 1.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

248 F.3d 1117, 143 Lab.Cas. P 59,233, 17 IER Cases 883, 6 Wage & Hour Cas.2d (BNA) 1736, 14 Fla. L. Weekly Fed. C 643

**(Cite as: 248 F.3d 1117)**

**[14] Constitutional Law 92 ⟶1929**

92 Constitutional Law
    92XVIII Freedom of Speech, Expression, and Press
        92XVIII(P) Public Employees and Officials
            92k1929 k. Public or Private Concern.
Most Cited Cases
    (Formerly 92k90.1(7.2))
For purposes of determining whether government's alleged retaliation against employee for his speech violated the First Amendment, employee's speech addresses a "matter of public concern" if it relates to any matter of political, social, or other concern to the community. U.S.C.A. Const.Amend. 1.

**[15] Constitutional Law 92 ⟶1929**

92 Constitutional Law
    92XVIII Freedom of Speech, Expression, and Press
        92XVIII(P) Public Employees and Officials
            92k1929 k. Public or Private Concern.
Most Cited Cases
    (Formerly 92k90.1(7.2))
In determining whether a public employee's speech involved a "matter of public concern," as required to establish First Amendment retaliation claim, court examines the content, form, and context of the employee's speech. U.S.C.A. Const.Amend. 1.

**[16] Civil Rights 78 ⟶1376(10)**

78 Civil Rights
    78III Federal Remedies in General
        78k1372 Privilege or Immunity; Good Faith and Probable Cause
            78k1376 Government Agencies and Officers
                78k1376(10) k. Employment Practices.
Most Cited Cases
    (Formerly 78k214(4))
County commissioner was entitled to qualified immunity from county employee's §1983 claim, which alleged that she was discharged in violation of the First Amendment for informing commissioner that county's failure to pay wages for overtime would violate the Fair Labor Standards Act (FLSA); pre-

cedent did not clearly establish that such statement involved a "matter of public concern." U.S.C.A. Const.Amend. 1; 42 U.S.C.A. § 1983; Fair Labor Standards Act of 1938, § 7(a, *o*), 29 U.S.C.A. § 207(a, *o*).

**[17] Constitutional Law 92 ⟶1929**

92 Constitutional Law
    92XVIII Freedom of Speech, Expression, and Press
        92XVIII(P) Public Employees and Officials
            92k1929 k. Public or Private Concern.
Most Cited Cases
    (Formerly 92k90.1(7.2))

**Constitutional Law 92 ⟶1934**

92 Constitutional Law
    92XVIII Freedom of Speech, Expression, and Press
        92XVIII(P) Public Employees and Officials
            92k1934 k. Efficiency of Public Services.
Most Cited Cases
    (Formerly 92k90.1(7.2))
In determining whether a public employee's First Amendment right to engage in speech on a matter of public concern outweighs government's interest in promoting efficiency of public services it performs, court must consider three factors: (1) whether the speech at issue impedes the government's ability to perform its duties efficiently; (2) the manner, time and place of the speech; and (3) the context within which the speech was made. U.S.C.A. Const.Amend. 1.

**[18] Constitutional Law 92 ⟶1947**

92 Constitutional Law
    92XVIII Freedom of Speech, Expression, and Press
        92XVIII(P) Public Employees and Officials
            92k1947 k. Discharge. Most Cited Cases
    (Formerly 92k90.1(7.2))

**Counties 104 ⟶67**

104 Counties

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

248 F.3d 1117, 143 Lab.Cas. P 59,233, 17 IER Cases 883, 6 Wage & Hour Cas.2d (BNA) 1736, 14 Fla. L. Weekly Fed. C 643
**(Cite as: 248 F.3d 1117)**

104III Officers and Agents
104k67 k. Removal. Most Cited Cases
County employee who was allegedly terminated for informing county commissioner that county's failure to pay overtime wages violated the Fair Labor Standards Act (FLSA) could not establish First Amendment retaliation claim, even if such speech involved a "matter of public concern"; commissioner's interest in maintaining loyalty, discipline and good working relationships among his employees outweighed employee's free speech interest. U.S.C.A. Const.Amend. 1; Fair Labor Standards Act of 1938, § 7(a, *o*), 29 U.S.C.A. § 207(a, *o*).

**[19] Officers and Public Employees 283 ⚖︎66**

283 Officers and Public Employees
283I Appointment, Qualification, and Tenure
283I(G) Resignation, Suspension, or Removal
283k66 k. Grounds for Removal. Most Cited Cases
(Formerly 92k82(11))
For public employee to establish that employer took action affecting his or her job in way that impermissibly burdened a constitutional right, employee must first demonstrate that asserted right is protected by the Constitution and that he or she suffered "adverse employment action" for exercising the right.

**[20] Civil Rights 78 ⚖︎1376(10)**

78 Civil Rights
78III Federal Remedies in General
78k1372 Privilege or Immunity; Good Faith and Probable Cause
78k1376 Government Agencies and Officers
78k1376(10) k. Employment Practices. Most Cited Cases
(Formerly 78k214(4))
County commissioner was entitled to qualified immunity from county employee's claim that commissioner terminated her in violation of her First Amendment right to association because she was married to sheriff, who was political enemy of com-

missioner; employee also alleged that she was terminated in part for insubordination and lack of cooperation, and precedent did not clearly establish that such a termination violated the First Amendment. U.S.C.A. Const.Amend. 1; 42 U.S.C.A. § 1983.

**[21] Constitutional Law 92 ⚖︎1442**

92 Constitutional Law
92XVI Freedom of Association
92k1442 k. Intimate Association; Dating Relationships in General. Most Cited Cases
(Formerly 92k82(10))
At a minimum, the right of intimate association under the First Amendment encompasses the personal relationships that attend the creation and sustenance of a family, specifically marriage. U.S.C.A. Const.Amend. 1.

**\*1120** Benton J. Mathis, Jr.,Freeman Mathis & Gary, LLP, Atlanta, GA, for Defendant-Appellant.
Susan Marie Garrett, Decatur, GA, for Plaintiff-Appellee.

Appeal from the United States District Court for the Northern District of Georgia.

Before TJOFLAT, HULL and PROPST [FN*], Circuit Judges.

> FN* Honorable Robert B. Propst, U.S. District Judge for the Northern District of Alabama, sitting by designation.

TJOFLAT, Circuit Judge:
The sole issue in this interlocutory appeal is whether the defendant county Commissioner, who is being sued for money damages in his individual capacity under 42 U.S.C. § 1983, is entitled to qualified immunity with respect to the plaintiff's claims that he terminated her employment in violation of her First Amendment rights of free speech and freedom of association. The district court denied the Commissioner's motion to dismiss, holding that the plaintiff's complaint alleged facts sufficient to defeat the defense of qualified immunity. We reverse.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

248 F.3d 1117, 143 Lab.Cas. P 59,233, 17 IER Cases 883, 6 Wage & Hour Cas.2d (BNA) 1736, 14 Fla. L. Weekly Fed. C 643
**(Cite as: 248 F.3d 1117)**

I.

A.

According to the allegations of her complaint, plaintiff Angie Chesser began working in the clerk's office in Haralson County, Georgia, in 1985. At the time of her discharge in February 1997, she held the position of Assistant County Clerk. Her responsibilities included the preparation of the payroll for the County's several departments, including the sheriff's office.

Haralson County is governed by a one-person commission. In the November 1996 general election, defendant Amos Sparks was elected Commissioner and Chesser's then-husband, Ronnie Kimball, was elected Sheriff; both took office on January 1, 1997. Sparks and Kimball were political enemies. So, in an effort to avoid what might appear to be a conflict of interest, Chesser arranged for a co-worker to prepare the payroll for the sheriff's department.

On February 6, 1997, Sparks issued a memorandum to all county departments which stated that, due to budget concerns, overtime would not be reimbursed in the form of wages. Notwithstanding this instruction, overtime wages were paid to sheriff's department employees. Calling her attention to his memorandum, Sparks asked Chesser why overtime had been paid. After disclaiming knowledge of the memorandum, Chesser said that the County's failure to compensate overtime in the form of wages would violate the Fair Labor Standards Act.[FN1] Sparks terminated Chesser's employment on February 20, 1997;[FN2] his stated reason for the termination was that she was insubordinate and demonstrated a "lack of cooperation."

> FN1. Pursuant to the Fair Labor Standards Act, 29 U.S.C. §§ 201 et seq., a public employee working overtime has the choice to be reimbursed either in the form of wages or compensatory time. 29 U.S.C. §§ 207(a) and (o). A public employer may only substitute compensatory compensation for overtime pay pursuant to a collective bar-

gaining agreement or agreement between the employer and employee if there is no applicable collective bargaining agreement. 29 U.S.C. § 207(o)(2).

> FN2. Although the complaint makes no mention of the terms of her employment, we assume that Chesser was an at-will employee and that Sparks had the authority to terminate her employment.

B.

Chesser responded to her discharge by filing a two count complaint in the Northern **\*1121** District of Georgia against Haralson County and Sparks, in both his official and individual capacities. Count One, brought under the Fair Labor Standards Act ("FLSA"), alleged that her discharge constituted retaliatory conduct proscribed by the FLSA.[FN3] Count Two, brought under 42 U.S.C. § 1983,[FN4] alleged that Sparks's termination of Chesser's employment infringed her First Amendment rights of free speech and of freedom of association (her marriage to the Sheriff).[FN5]

> FN3. The FLSA makes it unlawful for an employer to:
> discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter, or has testified or is about to testify in any such proceeding, or has served or is about to serve on an industry committee.
> 29 U.S.C. § 215(a)(3) (1994).

> FN4. 42 U.S.C. § 1983 provides, in pertinent part:
> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the

248 F.3d 1117, 143 Lab.Cas. P 59,233, 17 IER Cases 883, 6 Wage & Hour Cas.2d (BNA) 1736, 14 Fla. L. Weekly Fed. C 643

**(Cite as: 248 F.3d 1117)**

Constitution and laws, shall be liable to the party injured in an action at law ....

FN5. Although Chesser's complaint does not mention the Fourteenth Amendment, which is the constitutional provision that makes the First Amendment applicable to state and local governments, *see Wallace v. Jaffree,* 472 U.S. 38, 49 n. 34, 105 S.Ct. 2479, 2486, 86 L.Ed.2d 29 (1985) (collecting cases), we treat the complaint as alleging violations of the Fourteenth Amendment.

Both defendants moved to dismiss the complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, contending that neither count stated a claim for relief. Sparks, in addition, contended that he was entitled to qualified immunity on the Count Two claims asserted against him in his individual capacity. The district court granted the defendants' motions as to Count One, but denied them as to Count Two. The court also found the allegations of the complaint sufficient to overcome Sparks's qualified immunity defense. The court stated that it would reconsider the defense if Sparks moved for summary judgment following the completion of discovery. After the court made these rulings, Sparks lodged this appeal.

## II.

### A.

[1][2][3] We have jurisdiction to review the denial of the defense of qualified immunity pursuant to 28 U.S.C. § 1291. *See Mitchell v. Forsyth,* 472 U.S. 511, 530, 105 S.Ct. 2806, 2817, 86 L.Ed.2d 411 (1985). While qualified immunity is typically addressed at the summary judgment stage of the case, the defense may be raised and considered on a motion to dismiss; the motion will be granted if the "complaint fails to allege the violation of a clearly established constitutional right." *Williams v. Ala. State Univ.,* 102 F.3d 1179, 1182 (11th Cir.1997). Whether the complaint alleges such a violation is a question of law which we review *de novo,* accepting the facts alleged in the complaint as true and

drawing all reasonable inferences therefrom in the plaintiff's favor. *Id.*

### B.

[4][5][6] Qualified immunity protects government actors performing discretionary functions from being sued in their individual capacities. *Williams,* 102 F.3d at 1182; *Lassiter v. Ala. A & M Univ., Bd. of Trustees,* 28 F.3d 1146, 1149 (11th Cir.1994)**\*1122** (en banc). The doctrine shields government officials from liability to the extent that "their conduct does not violate clearly established ... constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 817-18, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). The doctrine protects government officials from always "err[ing] on the side of caution" by shielding them both from liability "and the other burdens of litigation, including discovery." *Lassiter,* 28 F.3d at 1149.

[7] Evaluating the defense of qualified immunity involves a two step inquiry: first, whether the defendant's conduct violated a clearly established constitutional right; and, second, whether a reasonable government official would have been aware of that fact. *See Tindal v. Montgomery County Comm'n,* 32 F.3d 1535, 1539 (11th Cir.1994). This two-step inquiry is designed to "provide[ ] ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986).

[8][9] A constitutional right is clearly established if controlling precedent has recognized the right in a "concrete and factually defined context." *Lassiter,* 28 F.3d at 1149; *see also Post v. City of Fort Lauderdale,* 7 F.3d 1552, 1557 (11th Cir.1993) ("If case law, in factual terms, has not staked out a bright line, qualified immunity almost always protects the defendant."). A plaintiff cannot avoid the qualified immunity defense "by referring to general rules and to the violation of abstract 'rights.' " *Lassiter,* 28 F.3d at 1150. If the constitutional right has been clearly established, the plaintiff must demonstrate

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

248 F.3d 1117, 143 Lab.Cas. P 59,233, 17 IER Cases 883, 6 Wage & Hour Cas.2d (BNA) 1736, 14 Fla. L. Weekly Fed. C 643

**(Cite as: 248 F.3d 1117)**

that a reasonable government actor would have known that what he was doing infringed that right. *See Williams,* 102 F.3d at 1182. With this two step inquiry in mind, we turn to the question of whether Sparks's decision to terminate Chesser's employment violated either of the First Amendment rights involved here-freedom of speech or freedom of association-in such a manner that a reasonable government official would have known.

### III.

### A.

[10][11] "It is axiomatic that '[a] state may not demote or discharge a public employee in retaliation for protected speech.'" *Tindal v. Montgomery County Comm'n,* 32 F.3d 1535, 1539 (11th Cir.1994) (quoting *Morgan v. Ford,* 6 F.3d 750, 753-54 (11th Cir.1993)); *see Rankin v. McPherson,* 483 U.S. 378, 383, 107 S.Ct. 2891, 2896, 97 L.Ed.2d 315 (1987). A public employee's right to freedom of speech, however, is not absolute. *Bryson v. City of Waycross,* 888 F.2d 1562, 1565 (11th Cir.1989). To determine whether a state actor has retaliated against an employee because of the employee's protected speech, we have used a four-pronged test based on the Supreme Court's decision in *Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). *See Rice-Lamar v. City of Fort Lauderdale,* 232 F.3d 836, 841 (11th Cir.2000).

[12][13] First, we consider whether the employee's speech is " 'fairly characterized as constituting speech on a matter of public concern.'" *Bryson,* 888 F.2d at 1565 (quoting *Rankin,* 483 U.S. at 384, 107 S.Ct. at 2896-97). If it is, we apply the *Pickering* balancing test, which weighs the employee's free speech interest against "the interest of the state, as an employer, in promoting the efficiency of the public services it performs." *Pickering,* 391 U.S. at 568, 88 S.Ct. at 1734-35. If the employee's interests outweigh those of the state as an employer, we turn to the third **\*1123** prong: whether the speech "played a 'substantial part' in the government's decision to discharge the employee." *Fikes v. City of*

*Daphne,* 79 F.3d 1079, 1084 (11th Cir.1996). If it did, we must address the fourth prong, which is whether the government has shown by a preponderance of the evidence that it would have discharged the employee regardless of the protected conduct. *Id.* at 1085.

### 1.

[14][15] Speech addresses a matter of public concern, and thus establishes *Pickering* 's first prong, if it relates "to any matter of political, social, or other concern to the community." *Connick v. Myers,* 461 U.S. 138, 146, 103 S.Ct. 1684, 1690, 75 L.Ed.2d 708 (1983). In making this determination, we examine the content, form, and context of the employee's speech. *Bryson,* 888 F.2d at 1565.

[16] The speech at issue here is Chesser's statement to Sparks that the County's failure to pay wages for overtime would violate the FLSA. In focusing on the content, form, and context of the speech, we consider whether the employee is speaking as a citizen on behalf of the public or "as an employee upon matters only of personal interest." *Connick,* 461 U.S. at 147, 103 S.Ct. at 1690. Chesser's statement may not have been "only of personal interest," *id.,* but she was certainly speaking as an employee when, as Assistant County Clerk in charge of payroll, she told Sparks, in his capacity as County Commissioner, that the County could not lawfully refuse to pay overtime wages. Chesser cites no case, and our independent research has uncovered none, holding that a statement such as Chesser's, made in the same or similar context, satisfies the first prong of the *Pickering* test.[FN6] Because "case law, in factual terms, has not staked out a bright line,"*Post v. City of Fort Lauderdale,* 7 F.3d 1552, 1557 (11th Cir.1993), indicating that Chesser's speech was a matter of public concern, a reasonable government official in Sparks's position would have had no reason to believe that the Constitution protected Chesser's statement that the County's refusal to pay overtime wages would violate the FLSA.

FN6. Chesser contends that *Martinez v. City of Opa-Locka,* 971 F.2d 708 (11th

248 F.3d 1117, 143 Lab.Cas. P 59,233, 17 IER Cases 883, 6 Wage & Hour Cas.2d (BNA) 1736, 14 Fla. L. Weekly Fed. C 643
**(Cite as: 248 F.3d 1117)**

Cir.1992), and *Gonzalez v. Lee County Housing Authority,* 161 F.3d 1290 (11th Cir.1998), support her claim that the First Amendment clearly protected her statement to Sparks. Neither case is on point. In *Gonzalez* we reversed the district court's denial of qualified immunity on the plaintiff's free speech claim. We affirmed the district court's denial of qualified immunity only on the plaintiff's claim that the defendant terminated her employment in violation of a provision of the Fair Housing Act, 42 U.S.C. § 3617. *Gonzalez,* 161 F.3d at 1298, 1305.

In *Martinez,* the plaintiff alleged that she was discharged for testifying before a Board of Inquiry that the defendant, the city manager, had violated bid procedures in purchasing furniture for the city hall. *Martinez,* 971 F.2d at 710-11. We affirmed the denial of qualified immunity, finding that the plaintiff's speech was protected under the first prong of the *Pickering* test, *id.* at 712; the plaintiff's statements were made before a Board of Inquiry and provided information concerning the expenditure of public funds. *Id.* We further noted that the form of the speech was testimony and that the context was an examination into the activities of city personnel which was being conducted by officials having investigatory powers. *Id.* None of these factors exist in the instant case. Here, Chesser spoke directly to Sparks about paying overtime wages; there was no official investigation and the speech was not made to inform a third party.

2.

[17] Even if we were to find that binding precedent FN7 clearly established a constitutional **\*1124** right to inform one's supervisor of the requirements of the law, Chesser cannot satisfy the second prong of the *Pickering* test. That prong requires us to consider three factors: "(1) whether the speech at issue impedes the government's ability to perform its du-

ties efficiently, (2) the manner, time and place of the speech, and (3) the context within which the speech was made." *Bryson,* 888 F.2d at 1567 (internal quotations omitted). "Because no bright-line standard puts the reasonable public employer on notice of a constitutional violation, the employer is entitled to immunity except in the extraordinary case where *Pickering* balancing would lead to the inevitable conclusion that the discharge of the employee was unlawful." *Dartland v. Metropolitan Dade County,* 866 F.2d 1321, 1323 (11th Cir.1989).

> FN7. Binding precedent in this circuit consists of Supreme Court and Eleventh Circuit decisions (including Fifth Circuit cases handed down prior to October 1, 1981). *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981).

[18] "We need not decide the precise result of applying the ... balancing test to this case. We must decide only whether the result would be such that a reasonable official in [the defendant's] place would know that the termination of [the plaintiff] under these circumstances violated [the plaintiff's] constitutional rights." *Id.* at 1324. Here, Sparks certainly had an interest in maintaining "loyalty, discipline and good working relationships among those he supervises." *Id.* Regardless of whether Chesser's interpretation of the FLSA was correct, Sparks may reasonably have believed that Chesser was being insubordinate and disruptive, and hence that he was justified in discharging her.FN8 In sum, Chesser cannot satisfy the second prong of the test; consequently, we need not move to the third and fourth prongs. The district court erred in not granting Sparks qualified immunity with respect to the free speech component of Count Two.

> FN8. The complaint, in fact, specifically alleges that Sparks claimed that Chesser was being insubordinate.

B.

[19] The second theory of recovery in County Two is that Chesser's employment was terminated because of her association with her then-husband,

248 F.3d 1117, 143 Lab.Cas. P 59,233, 17 IER Cases 883, 6 Wage & Hour Cas.2d (BNA) 1736, 14 Fla. L. Weekly Fed. C 643
**(Cite as: 248 F.3d 1117)**

Ronnie Kimball. To prevail on this theory, the plaintiff must demonstrate that she had a constitutional right and that she suffered "adverse employment action for exercising the right." *McCabe v. Sharrett,* 12 F.3d 1558, 1562 (11th Cir.1994) (quotation omitted). If the plaintiff has established both elements, we use the *Pickering* balancing test to determine whether the adverse employment action was permissible. *See Ross v. Clayton County,* 173 F.3d 1305, 1310-11 (11th Cir.1999); *cf. Shahar v. Bowers,* 114 F.3d 1097, 1106-07 (11th Cir.1997) (en banc) (employing the *Pickering* balancing test in the context of a same-sex marriage).

[20][21] Count Two contains the two elements set out above. First, it asserts the constitutional right of free association, which in this case is an intimate association. "At a minimum, the right of intimate association encompasses the personal relationships that attend the creation and sustenance of a family-[specifically] marriage ...."*McCabe,* 12 F.3d at 1563. Second, Count Two alleges that, because of her relationship with her husband, Chesser suffered an adverse employment action (termination). Count Two goes on to state, however, that her employment was terminated for insubordination and lack of cooperation.

***1125** As an employer, Haralson County certainly has an interest in having employees who are not insubordinate.[FN9] We can find no concrete and factually defined case that has held unconstitutional an employer's decision to discharge an employee due in part to insubordination.[FN10] A reasonable government actor in Sparks's position would have no reason to believe that such a decision would violate the law. The district court erred in not granting qualified immunity to Sparks on this Count Two claim.

FN9. As we have said:

The more a public employee's transfer or discharge is necessary to the effective functioning of the office, the more the transfer or discharge becomes justifiable, and thus the more likely it is that a court will find the transfer or discharge constitu-

tionally permissible by finding the employer's interest to outweigh the employee's interest in the *Pickering* balance.
*McCabe,* 12 F.3d at 1570.

FN10. The district court based its denial of the motion to dismiss on our decision in *Wilson v. Taylor,* 733 F.2d 1539, 1544 (11th Cir.1984). *Wilson* involved a claim by a police officer that his employment was terminated for dating the adopted daughter of "a convicted felon reputed to be a key figure in organized crime in central Florida." *Id.* at 1540. We stated that "[a] state violates the [F]ourteenth [A]mendment when it seeks to interfere with the social relationship of two or more people." *Id.* at 1544. While that statement holds true today, we expressly recognized in *Wilson* that it was "a narrow holding." *Id.* at 1544 n. 3.

In this case, the [defendant] made the argument that dating was not protected under the [F]irst [A]mendment freedom of speech provision. The [defendant] did not make the argument that even if dating were protected under the freedom of association provision of the [F]irst [A]mendment, a[n employee's] rights under that provision could be curtailed due to the nature of [the employment].

*Id.*Because *Wilson* did not employ the *Pickering* balancing test, the decision would not have informed a reasonable government actor standing in Sparks's shoes that he would infringe Chesser's constitutional right of intimate association if he terminated her employment.

IV.

For the foregoing reasons, the decision of the district court denying Sparks's qualified immunity on Chesser's Count Two claims is

REVERSED.

C.A.11 (Ga.),2001.

248 F.3d 1117    Page 211

248 F.3d 1117, 143 Lab.Cas. P 59,233, 17 IER Cases 883, 6 Wage & Hour Cas.2d (BNA) 1736, 14 Fla. L. Weekly Fed. C 643

**(Cite as: 248 F.3d 1117)**

Chesser v. Sparks

248 F.3d 1117, 143 Lab.Cas. P 59,233, 17 IER Cases 883, 6 Wage & Hour Cas.2d (BNA) 1736, 14 Fla. L. Weekly Fed. C 643

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

927 F.2d 559                                                                                                    Page 1
927 F.2d 559
**(Cite as: 927 F.2d 559)**

⊳

Warren v. Crawford
C.A.11 (Ga.),1991.

United States Court of Appeals,Eleventh Circuit.
James A. WARREN, Plaintiff-Appellant,
v.
Dave CRAWFORD, et al., Defendants-Appellees.
**No. 90-8677.**

March 26, 1991.

Former Georgia county department head filed state
court wrongful discharge action against county
board and commissioners. Following removal of
case, the United States District Court for the North-
ern District of Georgia, No. 1:89-cv-916-ODE,
Orinda D. Evans, J., granted summary judgment
denying claim and declined to exercise pendent jur-
isdiction over state law claims. Appeal was taken.
The Court of Appeals, Johnson, Circuit Judge, held
that: (1) department head failed to establish that he
had due process property interest in his former pos-
ition, and (2) he also did not show that commission-
er's issuance of statements noting inefficiencies at
department deprived him of protected liberty in-
terest.

Affirmed.

West Headnotes

**[1] Federal Courts 170B ⟜776**

170B Federal Courts
   170BVIII Courts of Appeals
     170BVIII(K) Scope, Standards, and Extent
      170BVIII(K)1 In General
       170Bk776 k. Trial De Novo. Most
Cited Cases
District court's order granting motion for summary
judgment is reviewed de novo.

**[2] Federal Courts 170B ⟜802**

170B Federal Courts
   170BVIII Courts of Appeals
     170BVIII(K) Scope, Standards, and Extent

      170BVIII(K)3 Presumptions
       170Bk802 k. Summary Judgment.
Most Cited Cases
On review of district court order granting summary
judgment, all evidence and reasonable factual infer-
ences drawn therefrom are reviewed in light most
favorable to party opposing motion.

**[3] Constitutional Law 92 ⟜3879**

92 Constitutional Law
   92XXVII Due Process
     92XXVII(B) Protections Provided and
Deprivations Prohibited in General
      92k3878 Notice and Hearing
       92k3879 k. In General. Most Cited
Cases
   (Formerly 92k278(1.1), 92k255(1))
Fourteenth Amendment protects against govern-
ment's deprivation of liberty or property without
procedural due process. U.S.C.A. Const.Amend.
14.

**[4] Constitutional Law 92 ⟜4165(1)**

92 Constitutional Law
   92XXVII Due Process
     92XXVII(G) Particular Issues and Applica-
tions
      92XXVII(G)7 Labor, Employment, and
Public Officials
       92k4163 Public Employment Relation-
ships
        92k4165 Rights and Interests Pro-
tected in General
         92k4165(1) k. In General. Most
Cited Cases
   (Formerly 92k277(2))
State law determines whether public employee has
due process property interest in his or her job.
U.S.C.A. Const.Amend. 14.

**[5] Constitutional Law 92 ⟜4156**

92 Constitutional Law
   92XXVII Due Process

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

92XXVII(G) Particular Issues and Applications

92XXVII(G)7 Labor, Employment, and Public Officials

92k4156 k. Rights and Interests Protected in General. Most Cited Cases

(Formerly 92k277(1))

To obtain due process property interest in employment, person must have more than mere unilateral expectation of continued employment; one must have legitimate claim of entitlement to continued employment. U.S.C.A. Const.Amend. 14.

**[6] Labor and Employment 231H ⬤══40(2)**

231H Labor and Employment

231HI In General

231Hk37 Term, Duration, and Termination

231Hk40 Definite or Indefinite Term; Employment At-Will

231Hk40(2) k. Termination; Cause or Reason in General. Most Cited Cases

(Formerly 255k20 Master and Servant)

Under Georgia law, absent controlling contract between parties, employment for indefinite period is terminable at will by either party. O.C.G.A. § 34-7-1.

**[7] Constitutional Law 92 ⬤══4171**

92 Constitutional Law

92XXVII Due Process

92XXVII(G) Particular Issues and Applications

92XXVII(G)7 Labor, Employment, and Public Officials

92k4163 Public Employment Relationships

92k4171 k. Termination or Discharge. Most Cited Cases

(Formerly 92k277(2))

While Georgia public employee generally has no due process property right in employment, public employee who may be discharged only for cause has protected property interest in continued employment. U.S.C.A. Const.Amend. 14.

**[8] Constitutional Law 92 ⬤══4172(6)**

92 Constitutional Law

92XXVII Due Process

92XXVII(G) Particular Issues and Applications

92XXVII(G)7 Labor, Employment, and Public Officials

92k4163 Public Employment Relationships

92k4172 Notice and Hearing; Proceedings and Review

92k4172(6) k. Termination or Discharge. Most Cited Cases

(Formerly 92k277(2))

Georgia county department head failed to establish he had protected property interest in his job, for purposes of claim that his procedural due process rights were violated by his dismissal without notice or hearing; personnel handbook defined dismissal as a "separation for definable cause" but also granted county administrator discretion to dismiss department heads, and mutual understanding allegedly created by board's past actions could not create property interest contrary to state law. U.S.C.A. Const.Amend. 14.

**[9] Constitutional Law 92 ⬤══4173(4)**

92 Constitutional Law

92XXVII Due Process

92XXVII(G) Particular Issues and Applications

92XXVII(G)7 Labor, Employment, and Public Officials

92k4163 Public Employment Relationships

92k4173 Reputational Interests, Protection and Deprivation of

92k4173(4) k. Notice and Hearing; Proceedings and Review. Most Cited Cases

(Formerly 92k278.4(3))

To establish deprivation of liberty interest without due process of law discharged governmental employee must show false statement of stigmatizing nature attending discharge, made public by governmental employer without meaningful opportunity for name clearing hearing. U.S.C.A. Const.Amend. 14.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**[10] Constitutional Law 92 ⟜4173(3)**

92 Constitutional Law
   92XXVII Due Process
      92XXVII(G) Particular Issues and Applications
        92XXVII(G)7 Labor, Employment, and Public Officials
         92k4163 Public Employment Relationships
           92k4173 Reputational Interests, Protection and Deprivation of
            92k4173(3) k. Termination or Discharge. Most Cited Cases
    (Formerly 92k278.4(3))

**Counties 104 ⟜67**

104 Counties
   104III Officers and Agents
      104k67 k. Removal. Most Cited Cases
County did not deprive discharged department head of due process liberty interest through issuance of allegedly false and damaging statements regarding his management of department; statements consisted almost entirely of fact intensive examples of inefficiency at department and department head failed to identify specific disputes with those factual statements or to show that they were false. U.S.C.A. Const.Amend. 14.

**\*560** Amy Totenberg, Atlanta, Ga., Wade M. Crumbley, Crumbley & Crumbley, McDonough, Ga., for plaintiff-appellant.
Michael A. O'Quinn, Smith & Welch, McDonough, Ga., for defendants-appellees.

Appeal from the United States District Court for the Northern District of Georgia.

Before FAY and JOHNSON, Circuit Judges, and PECK [FN*], Senior Circuit Judge.

    FN* Honorable John W. Peck, Senior U.S. Circuit Judge for the Sixth Circuit, sitting by designation.

JOHNSON, Circuit Judge:

Plaintiff James A. Warren appeals the district court's summary judgment denying his claim that he had been illegally terminated from his position as head of the Henry County, Georgia, Department of Transportation ("the DOT").

I. STATEMENT OF THE CASE

A. *Background Facts*

In September of 1985, Warren accepted a position as Road Superintendent for Henry County. When he was hired, Warren received a copy of the Personnel Handbook,[FN1] which he believed established a probationary period of one year, during which he could be terminated at will. After completing the probationary period, Warren believed that he could only be fired for cause.

    FN1. This handbook represented a compilation of the Personnel System Ordinance and its amendments, which the Board passed in November of 1980.

During the fall of 1988, several candidates in the upcoming elections for the Board of Commissioners of Henry County ("the Board") made the efficiency of the DOT a campaign issue. Defendants Crawford, Honea, and Joyner were elected to the Board in November of 1988.

The defendant Board assumed office in January of 1989. In early 1989, defendants Crawford, Honea, and Joyner inspected the DOT's office. The inspection purportedly lasted for fifteen minutes. Defendant Crawford testified that they found the shop area of the DOT in disarray. Defendant Joyner testified that he and defendant Honea subsequently returned to the DOT offices for a second inspection and found things worse instead of better. Warren testified that the Board made no complaints to him personally about his job performance as a result of these inspections. Defendant Joyner testified, however, that he related his complaints to County Administrator Don Norton, who was Warren's supervisor.

On March 15, 1989, the Board held a specially

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

scheduled meeting to consider reorganizing the DOT. During the meeting, the Board retired into executive session in order to discuss the job performance of Warren.[FN2] During the executive session, **561** the Board discussed the DOT's deficiencies, *e.g.,* damage to two trash compactors, poor maintenance of equipment, lack of efficiency in road repair, decreased productivity in paving roads, and the disarray of the DOT shop. Defendants Joyner and Crawford both expressed their opinion that the DOT was not providing service commensurate with its share of the county budget.

> FN2. Under the Georgia Open Meeting Act, Ga.Code Ann. § 50-14-1*et seq.,* Board meetings must be public. Ga.Code Ann. § 50-14-3(6) allows a closed meeting, however, when discussing the performance of an employee. A transcript of this Executive Session was admitted into evidence.

The Board then reconvened in public session, and Commissioner Joyner proposed a reorganization plan for the DOT in order to improve efficiency. This plan divided the DOT into two separate departments. The shop and landfill functions became a separate department of services, and the preexisting engineering department was consolidated with the remaining sections of the DOT under the supervision of the County Engineer. The stated goal of the reorganization was to improve efficiency by reducing the number of employees under the supervision of DOT and by combining the road designing functions of the County Engineer with the road maintenance functions of the DOT. Thus, under the reorganization, all county activities associated with roads, including design, construction and maintenance, were under a single department headed by the County Engineer. Warren's job as head of the DOT was the only job eliminated by the reorganization.

At the meeting, the County Administrator[FN3] requested an additional thirty days to study the reorganization. He stated that by making specific personnel changes the reorganization crossed the boundary between his role and the Board's and undermined his authority. According to the minutes,

defendant Crawford stated that he believed the reorganization was a policy decision, not a personnel decision. The Board, with one abstention and one dissent, then voted to adopt the plan immediately.

> FN3. The County Administrator is the head of the administrative branch of county government, acting as the personnel director with the power to hire and fire most county employees. The Administrator is appointed by the Board and serves at their pleasure. Mr. Warren testified that he considered the County Administrator his boss.

### B. *Procedural History*

On April 5, 1989, Warren filed a complaint in state court, alleging that the Board had violated his procedural due process rights by terminating his employment as head of the DOT without notice and a hearing and that the reorganization violated the state's open meeting law. Warren asked that the state court enjoin the Board from terminating him until such time as they afforded him notice and a hearing and that he receive damages for wrongful termination.

After the case was removed to federal court, Warren amended his complaint to add two additional federal claims. He asserted that he had been dismissed arbitrarily, capriciously, and by pretextual means in violation of his substantive due process rights. Warren also asserted a Fourteenth Amendment liberty interest claim based on the defendants' publication of allegedly false and stigmatizing statements regarding Warren's supposedly unprofessional management of the DOT and their failure to provide Warren with a "name clearing" hearing.

After discovery, the parties filed cross motions for summary judgment. On June 15, 1990, the district court denied Warren's motion for summary judgment and granted the defendants' motion for summary judgment. The court declined to exercise pendant jurisdiction over the state law claims. Warren appeals these rulings.

### II. ANALYSIS

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[1][2] This Court reviews *de novo* a district court's order granting a motion for summary judgment. *Ordway v. United States,* 908 F.2d 890, 893 (11th Cir.1990). We must determine whether there is any genuine issue of material fact and whether the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). All evidence and reasonable**562 factual inferences drawn therefrom are reviewed in the light most favorable to the party opposing the motion. *Hinesville Bank v. Pony Express Courier Corp.,* 868 F.2d 1532, 1535 (11th Cir.1989).

### A. *Due Process*

[3][4][5][6][7] The Fourteenth Amendment protects against the government's deprivation of liberty or property without procedural due process. *Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 569, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548 (1972). State law determines whether a public employee has a property interest in his or her job. *Bishop v. Wood,* 426 U.S. 341, 344, 96 S.Ct. 2074, 2077, 48 L.Ed.2d 684 (1976); *Barnett v. Housing Auth. of Atlanta,* 707 F.2d 1571, 1576 (11th Cir.1983). A constitutionally protected property interest is created if there are "rules or mutually explicit understandings that support [a] claim of entitlement." *Perry v. Sindermann,* 408 U.S. 593, 601, 92 S.Ct. 2694, 2699, 33 L.Ed.2d 570 (1972). To obtain a protected property interest in employment, a person must have more than a mere unilateral expectation of continued employment; one must have a legitimate claim of entitlement to continued employment. *Roth,* 408 U.S. at 577, 92 S.Ct. at 2709. Under Georgia law, in the absence of a controlling contract between the parties, employment for an indefinite period is terminable at will by either party. *Land v. Delta Air Lines,* 130 Ga.App. 231, 203 S.E.2d 316 (1973); *see also* Ga.Code Ann. § 34-7-1 (1988). Moreover, a public employee generally has no property right in such employment. *Ogletree v. Chester,* 682 F.2d 1366, 1369 (11th Cir.1982) (citing *Barnes v. Mendonsa,* 110 Ga.App. 464, 138 S.E.2d 914, 915 (1964)). A public employee who may be terminated only for cause, however, has a protected property interest in continued employment. *Barnett,* 707 F.2d at 1576; *Brownlee v. Williams,* 233 Ga. 548, 212 S.E.2d 359, 362 (1975). Thus, to evaluate the validity of Warren's due process claims, we must first determine whether he has a protected property interest in his employment as head of the DOT.

[8] Warren argues that the Personnel Handbook he received when he was hired states that he could be dismissed only for cause and only after a hearing. He therefore claims that he had a protected property interest in his position as head of the DOT. In the alternative, Warren argues that the Personnel Handbook stated that the County Administrator could dismiss him only when the Administrator had determined that his termination was in the best interest of the County and only after he had received notice and a hearing. Warren also claims that the Board usurped the Administrator's authority by dismissing him. He therefore argues that the Board violated his procedural due process rights by dismissing him without notice or a hearing.

The defendants contend that they have not dismissed Warren. Rather, they argue that his position was eliminated as part of the reorganization of the DOT. They claim that the Board was acting within its authority under 1974 Ga.Laws 3680 ("the 1974 Act") in executing the reorganization.[FN4] More importantly, the defendants argue that the Personnel Handbook did not grant Warren a property interest in his employment because Warren could be fired at the County Administrator's discretion. They therefore argue that Warren has no due process rights.

> FN4. The 1974 Act states in part:
> **Section 1.** The Board of Commissioners of Henry County shall be the governing authority of Henry County and shall be vested with the control and management of the affairs of said county. Said Board shall exercise all of the powers, duties and responsibilities hereinafter provided for ...
> **Section 16.** It shall be the duty of the Board to maintain the public roads of the entire county. Said Board shall have the

authority to hire a superintendent of roads and such other persons as may be necessary for the proper working of the roads and building of bridges and keeping the same in repair, and to pay the same out of county funds.

The district court observed that while the Personnel Handbook defined dismissal as "a separation for definable cause" it also stated that department heads may be removed by the County Administrator "when, in his [the Administrator's] judgment,**563** it is in the best interest of the County." After reading the Personnel Handbook in its entirety, the court concluded that the Handbook was not intended to cover Warren's position as head of the DOT.FN5 The court therefore found that the Personnel Manual did not grant Warren a protected property interest in his position as department head.FN6

> FN5. Both parties agree that Mr. Warren, as Road Superintendent, was a department head.

> FN6. Furthermore, the court noted that the Personnel Handbook covered only those positions over which the County Administrator had appointment authority. The court held that while the Board had delegated some of its appointment authority to the Administrator, there was no indication that the Board had renounced its own power in this area.

As the district court noted, the Personnel Handbook states both that a "dismissal is a separation made for definable cause", and that the County Administrator may dismiss "department heads when, in his judgment, it is in the best interests of the County." Georgia courts have held that "a limited or specific provision will prevail over one that is more broadly inclusive." *Hearn v. Old Dominion Freight Lines,* 172 Ga.App. 658, 324 S.E.2d 517, 518 (1984). Accordingly, we must determine whether the "best interests of the County" language grants Warren a protected property interest in his job.

This Court has held that an ordinance which provided that an employee "shall serve during good behavior and efficient service, to be judged by the commissioner or a designee" created no property right for the employee. *Edwards v. Brown,* 699 F.2d 1073, 1077 (11th Cir.1983); *see also Wofford v. Glenn Brunswick Memorial Hosp.,* 864 F.2d 117 (11th Cir.1989) (per curiam) (holding internal personnel policies do not give an at-will employee a property interest in a job). In *Edwards,* this Court concluded that because the ordinance at issue placed no limit on the commissioner's discretion to determine whether an employee had fulfilled the standards of "good behavior and efficient service" it created no protected property interest.FN7 Thus, *Edwards* supports the Board's argument that the Personnel Handbook created no property interest for department heads because they may be dismissed at the discretion of the Administrator. This conclusion is further bolstered when the Personnel Handbook is read in its entirety. *See Glenn v. Newman,* 614 F.2d 467, 471 (5th Cir.1980).FN8 The Handbook makes numerous distinctions between department heads and rank and file employees, *e.g.,* department heads are given the authority to evaluate rank and file employees, to grant raises, and to hear appeals from employees facing detrimental job actions. These distinctions support the conclusion that the Board intended to grant a property interest to rank and file employees but not to department heads when it passed the personnel ordinances which make up the Handbook.

> FN7. Mr. Warren's argument relies heavily on *Brown v. Georgia Dept. of Revenue,* 881 F.2d 1018 (11th Cir.1989). *Brown* is not dispositive of the instant case. In *Brown,* the plaintiff claimed that the Georgia State Merit Systems Act ("the Merit Act") granted state employees a property interest in their employment, notwithstanding a disclaimer stating that the Merit Act "is not intended to create a property interest in the job." *Id.* at 1024. This Court held that the Merit Act's provision providing that state employees could only be terminated for a specified list of reasons was

equivalent to dismissal for cause and therefore ruled that the Merit Act granted a protected property interest in employment. *Id.* at 1028. In the instant case, the Personnel Handbook placed no limit on the Administrator's discretion to determine whether dismissal of a department head was in the best interest of the County. There are no guidelines, reasons, or "causes" that the Administrator must find before determining that the dismissal of a department head is the best interest of the County.

FN8. In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this Court adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981.

Warren argues that the Board's past actions with regard to the Personnel Handbook created a mutual understanding granting him a property right in his employment. *See Perry,* 408 U.S. at 602, 92 S.Ct. at 2700 (holding that the meaning of a promisor's words may be found from past usage). In particular, he points to the fact *564 that two former department heads had been given written notice and a hearing in front of the Board before termination.

The Board's past actions are not dispositive for two reasons. First, the parties' statement of stipulated facts states that these departments heads were being terminated for cause not because of a reorganization. More importantly, it is generally held that a mutual understanding cannot create a property interest contrary to state law. *Batterton v. Texas Gen. Land Office,* 783 F.2d 1220, 1124 (5th Cir.), *cert. denied* 479 U.S. 914, 107 S.Ct. 316, 93 L.Ed.2d 289 (1986); *see also Baden v. Koch,* 638 F.2d 486 (2nd Cir.1980).[FN9] *Batterton* is particularly instructive. In that case, the plaintiff argued that the practice of the Texas General Land Office ("the GLO") of giving employees notice and an opportunity to improve their performance before being dismissed created a protected property interest in employment. *Batterton,* 783 F.2d at 1223. The Fifth Circuit first determined that the Texas law governing em-

ployment in the GLO established that the employees were hired under an "at will" status. The court then held that informal customs cannot be the source of an employee's property interest where state law establishes at will employment. *Id.* In light of the statutory presumption of Ga.Code Ann. § 34-7-1 (1988) that employment for an indefinite term is terminable at will as well as this Court's holding in *Brown,* we must conclude the Personnel Ordinance did not grant department heads a property interest in their employment. Warren conceded at oral argument that the reorganization of the DOT fell completely within the Board's authority.[FN10] Because Warren has failed to establish that he had a protected property interest in his job as head of DOT, both his procedural and substantive due process claims must fail. *Nolin v. Douglas County,* 903 F.2d 1546, 1553 (11th Cir.1990).[FN11] We therefore need not reach the district court's rulings on legislative and qualified immunity.

FN9. Mr. Warren also contends that 1982 Ga.Laws 4094 ("the 1982 Act") vested supervisory authority over all Henry County employees, including the decision to terminate, exclusively in the County Administrator. He therefore argues that the Board did not have the authority to terminate him. Mr. Warren's reading of the 1982 Act is overbroad. This 1982 Act amended the 1974 Act which had established the Board as the governing body of Henry County and set forth the Board's authority. *See* n. 1 *supra.* The 1974 Act gave the Board the specific duty to maintain the county roads and authorized it to hire a superintendent of roads. The 1982 Act did not restrict the Board's authority. Rather, it merely created an administrative office to exercise some of the Board's administration functions.

FN10. Mr. Warren argues that if the Board's power over personnel maintaining roads was not repealed by the 1982 Act, then the Personnel Handbook provides property rights in employment for all County employees except those working

for the DOT. He claims that the Georgia legislature and the Board could not have intended this result. We have determined that the Board intended the Personnel Handbook to distinguish between department heads and rank and file employees. Accordingly, the Personnel Handbook may be read as providing a property right to all rank and file employees in the DOT but not to the DOT department head.

FN11. Moreover, Mr. Warren presented insufficient evidence to support a finding that the reorganization was a sham. The efficiency of the DOT had been an important campaign issue in the 1988 election. Furthermore, the Board implemented the reorganization fully. It consolidated all functions associated with road design, construction, and repair under a single department and placed the other DOT functions, the landfill and the shop, in a separate department of services. Consequently, Mr. Warren's reliance on our decision in *Hearn v. City of Gainesville,* 688 F.2d 1328 (11th Cir.1982), is misplaced. In *Hearn,* the plaintiff, a personnel technician, claimed that he was fired because of his boss' personal animosity toward him. *Id.* at 1333. The city claimed the plaintiff was terminated because there was insufficient work to occupy two personnel technicians. We found the evidence sufficient to support a finding that a reorganization was a sham where the plaintiff proved that his duties were assumed by the other personnel technician, whose overtime hours increased substantially, and that in the next city budget the supervisor requested funds for a second personnel technician, the position previously held by the plaintiff. *Id.* at 1334. In the instant case, the reorganization has remained in effect and related activities have been consolidated among separate departments.

### B. *The Liberty Interest Claim*

[9][10] Warren argues that defendant Joyner issued false and damaging statements**565** regarding his management of the DOT which deprived him of a protected liberty interest.

The district court found that the statements consisted almost entirely of fact intensive examples of inefficiency at the DOT, *e.g.,* comments about broken equipment and a decrease in productivity. The court held that Warren failed to identify specific disputes with these factual statements or to show that they were false. The court concluded that Warren had failed to come forward with specific facts showing that there was a genuine issue for trial.

To establish a deprivation of a liberty interest without due process of law, a plaintiff must show: "(1) a false statement (2) of a stigmatizing nature (3) attending a governmental employee's discharge (4) made public (5) by the governmental employer (6) without a meaningful opportunity for [an] employee name clearing hearing." *Buxton v. City of Plant City,* 871 F.2d 1037, 1042-43 (11th Cir.1989).

In his brief, Warren claims that he did not specifically challenge the truth of the defendant's statements because the defendants' motion for summary judgment was premised on his waiver of an employee name clearing hearing. Nevertheless, Warren still fails to identify any false statements made by the defendants. Rather, he complains that the defendants' investigation was cursory and that the defendants did not have the expertise to evaluate the DOT. Warren is merely objecting to the defendants' conclusion that the DOT was run inefficiently, not to the truthfulness or accuracy of their specific statements. Accordingly, the district court was correct in granting the defendants' summary judgment on the liberty interest claim.

### III. CONCLUSION

For the foregoing reasons, we AFFIRM the district court's grant of summary judgment.

C.A.11 (Ga.),1991.
Warren v. Crawford

927 F.2d 559

927 F.2d 559

**(Cite as: 927 F.2d 559)**

Page 9

927 F.2d 559

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

92 S.Ct. 2701                                                                    Page 1

408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548, 1 IER Cases 23

**(Cite as: 408 U.S. 564, 92 S.Ct. 2701)**

Board of Regents of State Colleges v. Roth,
U.S.Wis. 1972.

Supreme Court of the United States
The BOARD OF REGENTS OF STATE COL-
LEGES et al., Petitioners,
v.
David F. ROTH, etc.
**No. 71-162.**

Argued Jan. 18, 1972.
Decided June 29, 1972.

Action by assistant professor at state university,
who had no tenure rights to continued employment
and who was informed that he would not be rehired
after first academic year, alleging that decision not
to rehire him infringed his Fourteenth Amendment
rights. The United States District Court for the
Western District of Wisconsin, 310 F.Supp. 972,
granted summary judgment for assistant professor
on procedural issue, ordering university officials to
provide him with reasons and a hearing, and appeal
was taken. The Court of Appeals, 446 F.2d 806, af-
firmed the partial summary judgment, and certiorari
was granted. The Supreme Court, Mr. Justice Stew-
art, held that where state did not make any charge
against assistant professor that might seriously
damage his standing and associations in his com-
munity and there was no suggestion that state im-
posed on him a stigma or other disability that fore-
closed his freedom to take advantage of other em-
ployment opportunities, he was not deprived of
'liberty' protected by the Fourteenth Amendment
when he simply was not rehired in the job but re-
mained as free as before to seek another. The Court
further held that where terms of appointment of as-
sistant professor secured absolutely no interest in
reemployment for the next year and there was no
state statute or university rule or policy that secured
his interest in reemployment or that created any le-
gitimate claim to it, he did not have a property in-
terest protected by Fourteenth Amendment that was
sufficient to require university authorities to give

him a hearing when they declined to renew his con-
tract of employment.

Judgment of Court of Appeals reversed and case re-
manded.

Mr. Justice Douglas filed a dissenting opinion.

Mr. Justice Marshall filed a dissenting opinion.

For concurring opinion of Mr. Chief Justice Burger,
see 92 S.Ct. 2717.

For dissenting opinion of Mr. Justice Brennan in
which Mr. Justice Douglas joined, see 92 S.Ct.
2717.

Mr. Justice Powell took no part in decision of case.

West Headnotes

**[1] Constitutional Law 92 ⟨⟩3869**

92 Constitutional Law
    92XXVII Due Process
        92XXVII(B) Protections Provided and
Deprivations Prohibited in General
            92k3868 Rights, Interests, Benefits, or
Privileges Involved in General
                92k3869 k. In General. Most Cited
Cases
    (Formerly 92k252.5, 92k277(1), 92k255(1))

**Constitutional Law 92 ⟨⟩3879**

92 Constitutional Law
    92XXVII Due Process
        92XXVII(B) Protections Provided and
Deprivations Prohibited in General
            92k3878 Notice and Hearing
                92k3879 k. In General. Most Cited
Cases
    (Formerly 92k255(1))
Requirements of procedural due process apply only
to deprivation of interests encompassed by Four-
teenth Amendment's protection of liberty and prop-
erty, and when protected interests are implicated
the right to some kind of prior hearing is para-
mount. U.S.C.A.Const. Amend. 14.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548, 1 IER Cases 23
**(Cite as: 408 U.S. 564, 92 S.Ct. 2701)**

**[2] Constitutional Law 92 ⟲3869**

92 Constitutional Law
    92XXVII Due Process
        92XXVII(B) Protections Provided and
Deprivations Prohibited in General
        92k3868 Rights, Interests, Benefits, or
Privileges Involved in General
            92k3869 k. In General. Most Cited
Cases
    (Formerly 92k252.5, 92k277(1), 92k255(1))
To determine whether due process requirements ap-
ply in the first place, court must look not to the
"weight" but to the nature of the interest at stake
and must look to see if the interest is within the
Fourteenth Amendment's protection of liberty and
property. U.S.C.A.Const. Amend. 14.

**[3] Constitutional Law 92 ⟲3873**

92 Constitutional Law
    92XXVII Due Process
        92XXVII(B) Protections Provided and
Deprivations Prohibited in General
        92k3868 Rights, Interests, Benefits, or
Privileges Involved in General
            92k3873 k. Liberties and Liberty In-
terests. Most Cited Cases
    (Formerly 92k254.1, 92k255(1))

**Constitutional Law 92 ⟲3874(1)**

92 Constitutional Law
    92XXVII Due Process
        92XXVII(B) Protections Provided and
Deprivations Prohibited in General
        92k3868 Rights, Interests, Benefits, or
Privileges Involved in General
        92k3874 Property Rights and Interests
            92k3874(1) k. In General. Most
Cited Cases
    (Formerly 92k277(1))
Property interests protected by procedural due pro-
cess extend well beyond actual ownership of real
estate, chattels or money, and due process protec-
tion is required for deprivations of liberty beyond
the sort of formal constraints imposed by the crim-
inal process. U.S.C.A.Const. Amend. 14.

**[4] Constitutional Law 92 ⟲4040**

92 Constitutional Law
    92XXVII Due Process
        92XXVII(G) Particular Issues and Applica-
tions
        92XXVII(G)1 In General
            92k4040 k. Reputation; Defamation.
Most Cited Cases
    (Formerly 92k251.6, 92k251)
Where a person's good name, reputation, honor or
integrity is at stake because of what the government
is doing to him, notice and an opportunity to be
heard are essential. U.S.C.A.Const. Amend. 14.

**[5] Constitutional Law 92 ⟲2017**

92 Constitutional Law
    92XVIII Freedom of Speech, Expression, and
Press
        92XVIII(Q) Education
        92XVIII(Q)2 Post-Secondary Institutions
        92k2016 Employees
            92k2017 k. In General. Most Cited
Cases
    (Formerly 92k90(2))
Whatever may be a teacher's right of free speech,
interest in holding a teaching job at a state uni-
versity, simpliciter, is not itself a free speech in-
terest.

**[6] Constitutional Law 92 ⟲4223(7)**

92 Constitutional Law
    92XXVII Due Process
        92XXVII(G) Particular Issues and Applica-
tions
        92XXVII(G)8 Education
        92k4218 Post-Secondary Education
            92k4223 Employment Relation-
ships
            92k4223(7) k. Reputational In-
terests, Protection and Deprivation Of. Most Cited
Cases
    (Formerly 92k278.5(3), 92k255(2))
Where state in declining to rehire assistant profess-
or at state university, who had no tenure rights to
continued employment, did not make any charge

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548, 1 IER Cases 23

**(Cite as: 408 U.S. 564, 92 S.Ct. 2701)**

against him that might seriously damage his standing and associations in his community and there was no suggestion that state imposed on him a stigma or other disability that foreclosed his freedom to take advantage of other employment opportunities, he was not deprived of "liberty" protected by the Fourteenth Amendment when he simply was not rehired but remained as free as before to seek another. U.S.C.A.Const. Amend. 14; W.S.A. 37.31(1).

**[7] Constitutional Law 92 ⚖══3874(3)**

92 Constitutional Law
   92XXVII Due Process
        92XXVII(B) Protections Provided and Deprivations Prohibited in General
         92k3868 Rights, Interests, Benefits, or Privileges Involved in General
          92k3874 Property Rights and Interests
           92k3874(3) k. Benefits, Rights, and Interests In. Most Cited Cases
    (Formerly 92k277(1))
Fourteenth Amendment's procedural protection of property is a safeguard of security of interests that a person has already acquired in specific benefits. U.S.C.A.Const. Amend. 14.

**[8] Constitutional Law 92 ⚖══3874(3)**

92 Constitutional Law
   92XXVII Due Process
        92XXVIII(B) Protections Provided and Deprivations Prohibited in General
         92k3868 Rights, Interests, Benefits, or Privileges Involved in General
          92k3874 Property Rights and Interests
           92k3874(3) k. Benefits, Rights, and Interests In. Most Cited Cases
    (Formerly 92k277(1))

**Constitutional Law 92 ⚖══3879**

92 Constitutional Law
   92XXVII Due Process
        92XXVII(B) Protections Provided and Deprivations Prohibited in General
         92k3878 Notice and Hearing

         92k3879 k. In General. Most Cited Cases
    (Formerly 92k277(1))
To have a property interest in a benefit, a person must have more than an abstract need or desire for it or a unilateral expectation of it, and he must have a legitimate claim of entitlement to it, it is a purpose of ancient institution of property to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined, and it is a purpose of the constitutional right to a hearing to provide an opportunity for a person to vindicate those claims. U.S.C.A.Const. Amend. 14.

**[9] Constitutional Law 92 ⚖══3874(2)**

92 Constitutional Law
   92XXVII Due Process
        92XXVII(B) Protections Provided and Deprivations Prohibited in General
         92k3868 Rights, Interests, Benefits, or Privileges Involved in General
          92k3874 Property Rights and Interests
           92k3874(2) k. Source of Right or Interest. Most Cited Cases
    (Formerly 92k277(1))

**Constitutional Law 92 ⚖══3874(3)**

92 Constitutional Law
   92XXVII Due Process
        92XXVII(B) Protections Provided and Deprivations Prohibited in General
         92k3868 Rights, Interests, Benefits, or Privileges Involved in General
          92k3874 Property Rights and Interests
           92k3874(3) k. Benefits, Rights, and Interests In. Most Cited Cases
    (Formerly 92k277(1))
Property interests are not created by the Constitution; rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law, rules or understandings that secure certain benefits and that support claims of entitlement to those benefits. U.S.C.A.Const. Amend. 14.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

92 S.Ct. 2701                                                                    Page 4

408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548, 1 IER Cases 23

**(Cite as: 408 U.S. 564, 92 S.Ct. 2701)**

[10] Constitutional Law 92 ☞4223(5)

92 Constitutional Law
    92XXVII Due Process
        92XXVII(G) Particular Issues and Applications
          92XXVII(G)8 Education
            92k4218 Post-Secondary Education
              92k4223 Employment Relationships
                92k4223(5) k. Tenure. Most Cited Cases
    (Formerly 92k277(2))

Where terms of appointment of assistant professor at state university, who had no tenure rights to continued employment and who was informed that he would not be rehired after first academic year, secured absolutely no interest in reemployment for the next year and there was no state statute or university rule or policy that secured his interest in reemployment or that created any legitimate claim to it, he did not have a property interest protected by Fourteenth Amendment that was sufficient to require university authorities to give him a hearing when they declined to renew his contract of employment. U.S.C.A.Const. Amend. 14; W.S.A. 37.31(1).

**2702 Syllabus[FN*]

    FN* The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See United States v. Detroit Timber & Lumber Co., 200 U.S. 321, 337, 26 S.Ct. 282, 287, 50 L.Ed. 499.

*564 Respondent, hired for a fixed term of one academic year to teach at a state **2703 university, was informed without explanation that he would not be rehired for the ensuing year. A statute provided that all state university teachers would be employed initially on probation and that only after four years' continuous service would teachers achieve permanent employment 'during efficiency and good behavior,' with procedural protection against separation. University rules gave a nonten-

ured teacher 'dismissed' before the end of the year some opportunity for review of the 'dismissal,' but provided that no reason need be given for nonretention of a nontenured teacher, and no standards were specified for reemployment. Respondent brought this action claiming deprivation of his Fourteenth Amendment rights, alleging infringement of (1) his free speech right because the true reason for his nonretention was his criticism of the university administration, and (2) his procedural due process right because of the university's failure to advise him of the reason for its decision. The District Court granted summary judgment for the respondent on the procedural issue. The Court of Appeals affirmed. Held: The Fourteenth Amendment does not require opportunity for a hearing prior to the nonrenewal of a nontenured state teacher's contract, unless he can show that the nonrenewal deprived him of an interest in 'liberty' or that he had a 'property' interest in continued employment, despite the lack of tenure or a formal contract. Here the nonretention of respondent, absent any charges against him or stigma or disability foreclosing other employment, is not tantamount to a deprivation of 'liberty,' and the terms of respondent's employment accorded him no 'property' interest protected by procedural due process. The courts below therefore erred in granting summary judgment for the respondent on the procedural due process issue. Pp. 2705-2710.

446 F.2d 806, reversed and remanded.

*565 Charles A. Bleck, Asst. Atty. Gen., Madison, Wis., for petitioners.

Steven H. Steinglass, Milwaukee, Wis., for respondent.

*566 Mr. Justice STEWART delivered the opinion of the Court.

In 1968 the respondent, David Roth, was hired for his first teaching job as assistant professor of political science at Wisconsin State University-Oshkosh. He was hired for a fixed term of one academic year. The notice of his faculty appointment specified that his employment would begin on September 1, 1968, and would end on June 30, 1969.[FN1] The respondent completed that term. But

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

he was informed that he would not be rehired for the next academic year.

> FN1. The respondent had no contract of employment. Rather, his formal notice of appointment was the equivalent of an employment contract.

The notice of his appointment provided that: 'David F. Roth is hereby appointed to the faculty of the Wisconsin State University Position number 0262. (Location:) Oshkosh as (Rank:) Assistant Professor of (Department:) Political Science this (Date:) first day of (Month:) September (Year:) 1968.'The notice went on to specify that the respondent's 'appointment basis' was for the 'academic year.' And it provided that '(r)egulations governing tenure are in accord with Chapter 37.31, Wisconsin Statutes. The employment of any staff member for an academic year shall not be for a term beyond June 30th of the fiscal year in which the appointment is made.'See n. 2, infra.

The respondent had no tenure rights to continued employment. Under Wisconsin statutory law a state university teacher can acquire tenure as a 'permanent' employee only after four years of year-to-year employment. Having acquired tenure, a teacher is entitled to continued employment 'during efficiency and good behavior.' A relatively new teacher without tenure, however, is under Wisconsin law entitled to nothing**2704 beyond his one-year appointment.FN2 There are no statutory*567 or administrative standards defining eligibility for re-employment. State law thus clearly leaves the decision whether to rehire a nontenured teacher for another year to the unfettered discretion of university officials.

> FN2.Wis.Stat. s 37.31(1) (1967), in force at the time, provided in pertinent part that:
> 'All teachers in any state university shall initially be employed on probation. The employment shall be permanent, during efficiency and good behavior after 4 years of continuous service in the state university system as a teacher.'

The procedural protection afforded a Wisconsin

State University teacher before he is separated from the University corresponds to his job security. As a matter of statutory law, a tenured teacher cannot be 'discharged except for cause upon written charges' and pursuant to certain procedures.FN3 A nontenured teacher, similarly, is protected to some extent during his one-year term. Rules promulgated by the Board of Regents provide that a nontenured teacher 'dismissed' before the end of the year may have some opportunity for review of the 'dismissal.' But the Rules provide no real protection for a nontenured teacher who simply is not re-employed for the next year. He must be informed by February 1 'concerning retention or non-retention for the ensuing year.'But 'no reason for non-retention need be given. No review or appeal is provided in such case.'FN4

> FN3.Wis.Stat. s 37.31(1) further provided that:
> 'No teacher who has become permanently employed as herein provided shall be discharged except for cause upon written charges. Within 30 days of receiving the written charges, such teacher may appeal the discharge by a written notice to the president of the board of regents of state colleges. The board shall cause the charges to be investigated, hear the case and provide such teacher with a written statement as to their decision.'

> FN4. The Rules, promulgated by the Board of Regents in 1967, provide:
> 'RULE I-February first is established throughout the State University system as the deadline for written notification of non-tenured faculty concerning retention or non-retention for the ensuing year. The President of each University shall give such notice each year on or before this date.'
> 'RULE II-During the time a faculty member is on probation, no reason for non-retention need be given. No review or appeal is provided in such case.
> 'RULE III-'Dismissal' as opposed to 'Non-Retention' means termination of responsibilities during an academic year. When a non-tenure faculty member is dismissed he has no right under Wisconsin Statutes to a review of his case or to appeal. The President may, however, in his discretion,

408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548, 1 IER Cases 23
**(Cite as: 408 U.S. 564, 92 S.Ct. 2701)**

grant a request for a review within the institution, either by a faculty committee or by the President, or both. Any such review would be informal in nature and would be advisory only.

'RULE IV-When a non-tenure faculty member is dismissed he may request a review by or hearing before the Board of Regents. Each such request will be considered separately and the Board will, in its discretion, grant or deny same in each individual case.'

**\*568** In conformance with these Rules, the President of Wisconsin State University-Oshkosh informed the respondent before February 1, 1969, that he would not be rehired for the 1969-1970 academic year. He gave the respondent no reason for the decision and no opportunity to challenge it at any sort of hearing.

The respondent then brought this action in Federal District Court alleging that the decision not to rehire him for the next year infringed his Fourteenth Amendment rights. He attacked the decision both in substance and procedure. First, he alleged that the true reason for the decision was to punish him for certain statements critical of the University administration, and that it therefore violated his right to freedom of speech.[FN5] **\*\*2705 \*569** Second, he alleged that the failure of University officials to give him notice of any reason for nonretention and an opportunity for a hearing violated his right to procedural due process of law.

> FN5. While the respondent alleged that he was not rehired because of his exercise of free speech, the petitioners insisted that the non-retention decision was based on other, constitutionally valid grounds. The District Court came to no conclusion whatever regarding the true reason for the University President's decision. 'In the present case,' it stated, 'it appears that a determination as to the actual bases of (the) decision must await amplification of the facts at trial. . . . Summary judgment is inappropriate.'310 F.Supp. 972, 982.

The District Court granted summary judgment for the respondent on the procedural issue, ordering the University officials to provide him with reasons and a hearing. 310 F.Supp. 972. The Court of Appeals, with one judge dissenting, affirmed this partial summary judgment. 446 F.2d 806. We granted certiorari. 404 U.S. 909, 92 S.Ct. 227, 30 L.Ed.2d 181. The only question presented to us at this stage in the case is whether the respondent had a constitutional right to a statement of reasons and a hearing on the University's decision not to rehire him for another year.[FN6] We hold that he did not.

> FN6. The courts that have had to decide whether a nontenured public employee has a right to a statement of reasons or a hearing upon nonrenewal of his contract have come to varying conclusions. Some have held that neither procedural safeguard is required. E.g., Orr v. Trinter, 444 F.2d 128 (CA6);Jones v. Hopper, 410 F.2d 1323 (CA10); Freeman v. Gould Special School District, 405 F.2d 1153 (CA8). At least one court has held that there is a right to a statement of reasons but not a hearing.Drown v. Portsmouth School District, 435 F.2d 1182 (CA1). And another has held that both requirements depend on whether the employee has an 'expectancy' of continued employment.Ferguson v. Thomas, 430 F.2d 852, 856 (CA5).

I

[1] The requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property. When protected interests are implicated, the right **\*570** to some kind of prior hearing is paramount.[FN7] But the range of interests protected by procedural due process is not infinite.

> FN7. Before a person is deprived of a protected interest, he must be afforded opportunity for some kind of a hearing, 'except for extraordinary situations where some valid governmental interest is at stake that

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548, 1 IER Cases 23

**(Cite as: 408 U.S. 564, 92 S.Ct. 2701)**

justifies postponing the hearing until after the event.'Boddie v. Connecticut, 401 U.S. 371, 379, 91 S.Ct. 780, 786, 28 L.Ed.2d 113.'While '(m)any controversies have raged about . . . the Due Process Clause,' . . . it is fundamental that except in emergency situations (and this is not one) due process requires that when a State seeks to terminate (a protected) interest . . ., it must afford 'notice and opportunity for hearing appropriate to the nature of the case' before the termination becomes effective.'Bell v. Burson, 402 U.S. 535, 542, 91 S.Ct. 1586, 1591, 29 L.Ed.2d 90.For the rare and extraordinary situations in which we have held that deprivation of a protected interest need not be preceded by opportunity for some kind of hearing, see, e.g., Central Union Trust Co. v. Garvan, 254 U.S. 554, 566, 41 S.Ct. 214, 215, 65 L.Ed. 403;Phillips v. Commissioner of Internal Revenue, 283 U.S. 589, 597, 51 S.Ct. 608, 611, 75 L.Ed. 1289;Ewing v. Mytinger & Casselberry, Inc., 339 U.S. 594, 70 S.Ct. 870, 94 L.Ed. 1088.

[2] The District Court decided that procedural due process guarantees apply in this case by assessing and balancing the weights of the particular interests involved. It concluded that the respondent's interest in re-employment at Wisconsin State University-Oshkosh outweighed the University's interest in denying him re-employment summarily. 310 F.Supp., at 977-979. Undeniably, the respondent's re-employment prospects were of major concern to him-concern that we surely cannot say was insignificant. And a weighing process has long been a part of any determination of the form of hearing required in particular situations by procedural due process.[FN8] But, to determine whether **571** due **2706** process requirements apply in the first place, we must look not to the 'weight' but to the nature of the interest at stake. See Morrissey v. Brewer, 408 U.S. 471, at 481, 92 S.Ct. 2593, at 2600, 33 L.Ed.2d 484. We must look to see if the interest is within the Fourteenth Amendment's protection of liberty and property.

FN8. 'The formality and procedural requisites for the hearing can vary, depending upon the importance of the interests involved and the nature of the subsequent proceedings.'Boddie v. Connecticut, supra, 401 U.S., at 378, 91 S.Ct., at 786. See, e.g., Goldberg v. Kelly, 397 U.S. 254, 263, 90 S.Ct. 1011, 1018, 25 L.Ed.2d 287;Hannah v. Larche, 363 U.S. 420, 80 S.Ct. 1502, 4 L.Ed.2d 1307. The constitutional requirement of opportunity for some form of hearing before deprivation of a protected interest, of course, does not depend upon such a narrow balancing process. See n. 7, supra.

[3] 'Liberty' and 'property' are broad and majestic terms. They are among the '(g)reat (constitutional) concepts . . . purposely left to gather meaning from experience. . . . (T)hey relate to the whole domain of social and economic fact, and the statesmen who founded this Nation knew too well that only a stagnant society remains unchanged.'National Mutual Ins. Co. v. Tidewater Transfer Co., 337 U.S. 582, 646, 69 S.Ct. 1173, 1195, 93 L.Ed. 1556 (Frankfurter, J., dissenting). For that reason, the Court has fully and finally rejected the wooden distinction between 'rights' and 'privileges' that once seemed to govern the applicability of procedural due process rights.[FN9] The Court has also made clear that the property interests protected by **572** procedural due process extend well beyond actual ownership of real estate, chattels, or money.[FN10] By the same token, the Court has required due process protection for deprivations of liberty beyond the sort of formal constraints imposed by the criminal process.[FN11]

FN9. In a leading case decided many years ago, the Court of Appeals for the District of Columbia Circuit held that public employment in general was a 'privilege,' not a 'right,' and that procedural due process guarantees therefore were inapplicable.Bailey v. Richardson, 86 U.S.App.D.C. 248, 182 F.2d 46, aff'd by an equally divided Court, 341 U.S. 918, 71

Case 2:06-cv-00672-WKW-WC    Document 25-6    Filed 11/16/2007    Page 196 of 273

92 S.Ct. 2701    Page 6
408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548, 1 IER Cases 23
**(Cite as: 408 U.S. 564, 92 S.Ct. 2701)**

S.Ct. 669, 95 L.Ed. 1352. The basis of this holding has been thoroughly undermined in the ensuing years. For, as Mr. Justice Blackmun wrote for the Court only last year, 'this Court now has rejected the concept that constitutional rights turn upon whether a governmental benefit is characterized as a 'right' or as a 'privilege.'Graham v. Richardson, 403 U.S. 365, 374, 91 S.Ct. 1848, 1853, 29 L.Ed.2d 534. See, e.g., Morrissey v. Brewer, supra, 408 U.S., at 482, 92 S.Ct., at 2600;Bell v. Burson, supra, 402 U.S., at 539, 91 S.Ct., at 1589;Goldberg v. Kelly, supra, 397 U.S., at 262, 90 S.Ct., at 1017;Shapiro v. Thompson, 394 U.S. 618, 627 n. 6, 89 S.Ct. 1322, 1329, 22 L.Ed.2d 600;Pickering v. Board of Education, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811;Sherbert v. Verner, 374 U.S. 398, 404, 83 S.Ct. 1790, 1794, 10 L.Ed.2d 965.

FN10. See, e.g., Connell v. Higginbotham, 403 U.S. 207, 208, 91 S.Ct. 1772, 1773, 29 L.Ed.2d 418;Bell v. Burson, supra;Goldberg v. Kelly, supra.

FN11.'Although the Court has not assumed to define 'liberty' (in the Fifth Amendment's Due Process Clause) with any great precision, that term is not confined to mere freedom from bodily restraint.'Bolling v. Sharpe, 347 U.S. 497, 499, 74 S.Ct. 693, 694, 98 L.Ed. 884. See, e.g., Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551.

Yet, while the Court has eschewed rigid or formalistic limitations on the protection of procedural due process, it has at the same time observed certain boundaries. For the words 'liberty' and 'property' in the Due Process Clause of the Fourteenth Amendment must be given some meaning.

II

'While this court has not attempted to define with

exactness the liberty . . . guaranteed (by the Fourteenth Amendment), the term has received much consideration and some of the included things have been definitely stated. Without doubt, it denotes not merely **2707 freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized . . . as essential to the orderly pursuit of happiness by free men.'Meyer v. Nebraska, 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042. In a Constitution for a free people, there can be no doubt that the meaning of 'liberty' must be broad indeed. See, e.g., Bolling v. Sharpe, 347 U.S. 497, 499-500, 74 S.Ct. 693, 694, 98 L.Ed. 884;Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551.

*573 There might be cases in which a State refused to re-employ a person under such circumstances that interests in liberty would be implicated. But this is not such a case.

[4] The State, in declining to rehire the respondent, did not make any charge against him that might seriously damage his standing and associations in his community. It did not base the nonrenewal of his contract on a charge, for example, that he had been guilty of dishonesty, or immorality. Had it done so, this would be a different case. For '(w)here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential.'Wisconsin v. Constantineau, 400 U.S. 433, 437, 91 S.Ct. 507, 510, 27 L.Ed.2d 515;Wieman v. Updegraff, 344 U.S. 183, 191, 73 S.Ct. 215, 219, 97 L.Ed. 216;Joint Anti- Fascist Refugee Committee v. McGrath, 341 U.S. 123, 71 S.Ct. 624, 95 L.Ed. 817;United States v. Lovett, 328 U.S. 303, 316-317, 66 S.Ct. 1073, 1079, 90 L.Ed. 1252;Peters v. Hobby, 349 U.S. 331, 352, 75 S.Ct. 790, 801, 99 L.Ed. 1129 (Douglas, J., concurring). See Cafeteria & Restaurant Workers v. McElroy, 367 U.S. 886, 898, 81 S.Ct. 1743, 1750, 6 L.Ed.2d 1230. In such a case, due process would accord an opportunity to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

92 S.Ct. 2701
408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548, 1 IER Cases 23
**(Cite as: 408 U.S. 564, 92 S.Ct. 2701)**

refute the charge before University officials.FN12 In the present case, however, there is no suggestion whatever that the respondent's 'good name, reputation, honor, or integrity' is at stake.

> FN12. The purpose of such notice and hearing is to provide the person an opportunity to clear his name. Once a person has cleared his name at a hearing, his employer, of course, may remain free to deny him future employment for other reasons.

Similarly, there is no suggestion that the State, in declining to re-employ the respondent, imposed on him a stigma or other disability that foreclosed his freedom to take advantage of other employment opportunities. The State, for example, did not invoke any regulations to bar the respondent from all other public employment in state universities. Had it done so, this, again, would *574 be a different case. For '(t)o be deprived not only of present government employment but of future opportunity for it certainly is no small injury . . .'Joint Anti-Fascist Refugee Committee v. McGrath, supra, 341 U.S. at 185, 71 S.Ct. at 655 (Jackson, J., concurring). See Truax v. Raich, 239 U.S. 33, 41, 36 S.Ct. 7, 10, 60 L.Ed. 131. The Court has held, for example, that a State, in regulating eligibility for a type of professional employment, cannot foreclose a range of opportunities 'in a manner . . . that contravene(s) . . . Due Process,'Schware v. Board of Bar Examiners, 353 U.S. 232, 238, 77 S.Ct. 752, 756, 1 L.Ed.2d 796, and, specifically, in a manner that denies the right to a full prior hearing.Willner v. Committee on Character, 373 U.S. 96, 103, 83 S.Ct. 1175, 1180, 10 L.Ed.2d 224. See Cafeteria Workers v. McElroy, supra, 367 U.S. at 898, 81 S.Ct. at 1750. In the present case, however, this principle does not come into play.FN13

> FN13. The District Court made an assumption 'that non-retention by one university or college creates concrete and practical difficulties for a professor in his subsequent academic career.'310 F.Supp., at 979. And the Court of Appeals based its affirmance of the summary judgment

largely on the premise that 'the substantial adverse effect non-retention is likely to have upon the career interests of an individual professor' amounts to a limitation on future employment opportunities sufficient invoke procedural due process guarantees. 446 F.2d, at 809. But even assuming, arguendo, that such a 'substantial adverse effect' under these circumstances would constitute a state-imposed restriction on liberty, the record contains no support for these assumptions. There is no suggestion of how nonretention might affect the respondent's future employment prospects. Mere proof, for example, that his record of nonretention in one job, taken alone, might make him somewhat less attractive to some other employers would hardly establish the kind of foreclosure of opportunities amounting to a deprivation of 'liberty.' Cf. Schware v. Board of Bar Examiners, 353 U.S. 232, 77 S.Ct. 752, 1 L.Ed.2d 796.

**\*\*2708** [5] To be sure, the respondent has alleged that the nonrenewal of his contract was based on his exercise of his right to freedom of speech. But this allegation is not now before us. The District Court stayed proceedings on this issue, and the respondent has yet to prove that *575 the decision not to rehire him was, in fact, based on his free speech activities.FN14

> FN14. See n. 5, supra. The Court of Appeals, nonetheless, argued that opportunity for a hearing and a statement of reasons were required here 'as a prophylactic against non-retention decisions improperly motivated by exercise of protected rights.'446 F.2d, at 810 (emphasis supplied). While the Court of Appeals recognized the lack of a finding that the respondent's nonretention was based on exercise of the right of free speech, it felt that the respondent's interest in liberty was sufficiently implicated here because the decision not to rehire him was made 'with a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548, 1 IER Cases 23

**(Cite as: 408 U.S. 564, 92 S.Ct. 2701)**

background of controversy and unwelcome expressions of opinion.'Ibid.

When a State would directly impinge upon interests in free speech or free press, this Court has on occasion held that opportunity for a fair adversary hearing must precede the action, whether or not the speech or press interest is clearly protected under substantive First Amendment standards. Thus, we have required fair notice and opportunity for an adversary hearing before an injunction is issued against the holding of rallies and public meetings.Carroll v. President and Com'rs of Princess Anne, 393 U.S. 175, 89 S.Ct. 347, 21 L.Ed.2d 325. Similarly, we have indicated the necessity of procedural safeguards before a State makes a large-scale seizure of a person's allegedly obscene books, magazines, and so forth. A Quantity of Books v. Kansas, 378 U.S. 205, 84 S.Ct. 1723, 12 L.Ed.2d 809;Marcus v. Search Warrant, 367 U.S. 717, 81 S.Ct. 1708, 6 L.Ed.2d 1127. See Freedman v. Maryland, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649;Bantam Books v. Sullivan, 372 U.S. 58, 83 S.Ct. 631, 9 L.Ed.2d 584. See generally Monaghan, First Amendment 'Due Process', 83 Harv.L.Rev. 518.

In the respondent's case, however, the State has not directly impinged upon interests in free speech or free press in any way comparable to a seizure of books or an injunction against meetings. Whatever may be a teacher's rights of free speech, the interest in holding a teaching job at a state university, simpliciter, is not itself a free speech interest.

[6] Hence, on the record before us, all that clearly appears is that the respondent was not rehired for one year at one university. It stretches the concept too far to suggest that a person is deprived of 'liberty' when he simply is not rehired in one job but remains as free as before to seek another.Cafeteria Workers v. McElroy, supra, 367 U.S. at 895-896, 81 S.Ct. at 1748-1749, 6 L.Ed.2d 1230.

**\*576 III**

[7] The Fourteenth Amendment's procedural protection of property is a safeguard of the security of interests that a person has already acquired in spe-

cific benefits. These interests-property interests-may take many forms.

Thus, the Court has held that a person receiving welfare benefits under statutory and administrative standards defining eligibility for them has an interest in continued receipt of those benefits that is safeguarded by procedural due process.Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287.FN15**\*2709 See Flemming v. Nestor, 363 U.S. 603, 611, 80 S.Ct. 1367, 1373, 4 L.Ed.2d 1435. Similarly, in the area of public employment, the Court has held that a public college professor dismissed from an office held under tenure provisions, Slochower v. Board of Education, 350 U.S. 551, 76 S.Ct. 637, 100 L.Ed. 692, and college professors and **\*577** staff members dismissed during the terms of their contracts, Wieman v. Updegraff, 344 U.S. 183, 73 S.Ct. 215, 97 L.Ed. 216, have interests in continued employment that are safeguarded by due process. Only last year, the Court held that this principle 'proscribing summary dismissal from public employment without hearing or inquiry required by due process' also applied to a teacher recently hired without tenure or a formal contract, but nonetheless with a clearly implied promise of continued employment. Connell v. Higginbotham, 403 U.S. 207, 208, 91 S.Ct. 1772, 1773, 29 L.Ed.2d 418.

> FN15.Goldsmith v. United States Board of Tax Appeals, 270 U.S. 117, 46 S.Ct. 215, 70 L.Ed. 494, is a related case. There, the petitioner was a lawyer who had been refused admission to practice before the Board of Tax Appeals. The Board had 'published rules for admission of persons entitled to practice before it, by which attorneys at law admitted to courts of the United States and the states, and the District of Columbia, as well as certified public accountants duly qualified under the law of any state or the District are made eligible. . . . The rules further provide that the Board may in its discretion deny admission to any applicant, or suspend or disbar any person after admission.'Id., at

408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548, 1 IER Cases 23
**(Cite as: 408 U.S. 564, 92 S.Ct. 2701)**

119, 46 S.Ct., at 216. The Board denied admission to the petitioner under its discretionary power, without a prior hearing and a statement of the reasons for the denial. Although this Court disposed of the case on other grounds, it stated, in an opinion by Mr. Chief Justice Taft, that the existence of the Board's eligibility rules gave the petitioner an interest and claim to practice before the Board to which procedural due process requirements applied. It said that the Board's discretionary power 'must be construed to mean the exercise of a discretion to be exercised after fair investigation, with such a notice, hearing and opportunity to answer for the applicant as would constitute due process.' Id., at 123, 46 S.Ct., at 217.

[8] Certain attributes of 'property' interests protected by procedural due process emerge from these decisions. To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it. It is a purpose of the ancient institution of property to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined. It is a purpose of the constitutional right to a hearing to provide an opportunity for a person to vindicate those claims.

[9] Property interests, of course, are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law-rules or understandings that secure certain benefits and that support claims of entitlement to those benefits. Thus, the welfare recipients in Goldberg v. Kelly, supra, had a claim of entitlement to welfare payments that was grounded in the statute defining eligibility for them. The recipients had not yet shown that they were, in fact, within the statutory terms of eligibility. But we held that they had a right to a hearing at which they might attempt to do so.

*578 Just as the welfare recipients' 'property' interest in welfare payments was created and defined by statutory terms, so the respondent's 'property' interest in employment at Wisconsin State University-Oshkosh was created and defined by the terms of his appointment. Those terms secured his interest in employment up to June 30, 1969. But the important fact in this case is that they specifically provided that the respondent's employment was to terminate on June 30. They did not provide for contract renewal absent 'sufficient cause.' Indeed, they made no provision for renewal whatsoever.

**2710 [10] Thus, the terms of the respondent's appointment secured absolutely no interest in re-employment for the next year. They supported absolutely no possible claim of entitlement to re-employment. Nor, significantly, was there any state statute or University rule or policy that secured his interest in re-employment or that created any legitimate claim to it.FN16 In these circumstances, the respondent surely had an abstract concern in being rehired, but he did not have a property interest sufficient to require the University authorities to give him a hearing when they declined to renew his contract of employment.

> FN16. To be sure, the respondent does suggest that most teachers hired on a year-to-year basis by Wisconsin State University-Oshkosh are, in fact, rehired. But the District Court has not found that there is anything approaching a 'common law' of re-employment, see Perry v. Sindermann, 408 U.S. 593, at 602, 92 S.Ct. 2694, at 2705,33 L.Ed.2d 570, so strong as to require University officials to give the respondent a statement of reasons and a hearing on their decision not to rehire him.

IV

Our analysis of the respondent's constitutional rights in this case in no way indicates a view that an opportunity for a hearing or a statement of reasons for nonretention would, or would not, be appropriate or wise in public *579 colleges and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

92 S.Ct. 2701

408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548, 1 IER Cases 23

**(Cite as: 408 U.S. 564, 92 S.Ct. 2701)**

FN17 For it is a written Constitution that we apply. Our role is confined to interpretation of that Constitution.

>   FN17. See, e.g., Report of Committee A on Academic Freedom and Tenure, Procedural Standards in the Renewal or Nonrenewal of Faculty Appointments, 56 AAUP Bulletin No. 1, p. 21 (Spring 1970).

We must conclude that the summary judgment for the respondent should not have been granted, since the respondent has not shown that he was deprived of liberty or property protected by the Fourteenth Amendment. The judgment of the Court of Appeals, accordingly, is reversed and the case is remanded for further proceedings consistent with this opinion. It is so ordered. Reversed and remanded.

Mr. Justice POWELL took no part in the decision of this case.

Mr. Justice DOUGLAS, dissenting.

Respondent Roth, like Sindermann in the companion case, had no tenure under Wisconsin law and, unlike Sindermann, he had had only one year of teaching at Wisconsin State University-Oshkosh-where during 1968-1969 he had been Assistant Professor of Political Science and International Studies. Though Roth was rated by the faculty as an excellent teacher, he had publicly criticized the administration for suspending an entire group of 94 black students without determining individual guilt. He also criticized the university's regime as being authoritarian and autocratic. He used his classroom to discuss what was being done about the **\*580** black episode; and one day, instead of meeting his class, he went to the meeting of the Board of Regents.

In this case, as in Sindermann, an action was started in Federal District Court under 42 U.S.C. s 1983FN1 claiming in part that the decision of the school authorities not to rehire was in retaliation for his expression of opinion. The District Court, in partially granting Roth's motion for summary judgment, held that the Fourteenth Amendment required the university to give a hearing **\*\*2711** to teachers whose contracts were not to be renewed and to give reasons for its action. 310 F.Supp. 972, 983.The Court of Appeals affirmed. 446 F.2d 806.

>   FN1.Section 1983 reads as follows:
>   'Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.'

Professor Will Herberg, of Drew University, in writing of 'academic freedom' recently said:

'(I)t is sometimes conceived as a basic constitutional right guaranteed and protected under the First Amendment.

'But, of course, this is not the case. Whereas a man's right to speak out on this or that may be guaranteed and protected, he can have no imaginable human or constitutional right to remain a member of a university faculty. Clearly, the right to academic freedom is an acquired one, yet an acquired right of such value to society that in the minds of many it has verged upon the constitutional.'

Washington Sunday Star, Jan. 23, 1972, B-3, col. 1.

**\*581** There may not be a constitutional right to continued employment if private schools and colleges are involved. But Prof. Herberg's view is not correct when public schools move against faculty members. For the First Amendment, applicable to the States by reason of the Fourteenth Amendment, protects the individual against state action when it comes to freedom of speech and of press and the related freedoms guaranteed by the First Amendment; and the Fourteenth protects 'liberty' and 'property' as stated by the Court in Sindermann.

No more direct assault on academic freedom can be imagined than for the school authorities to be allowed to discharge a teacher because of his or her philosophical, political, or ideological beliefs. The same may well be true of private schools, if through

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548, 1 IER Cases 23

**(Cite as: 408 U.S. 564, 92 S.Ct. 2701)**

the device of financing or other umbilical cords they become instrumentalities of the State. Mr. Justice Frankfurther stated the constitutional theory in Sweezy v. New Hampshire, 354 U.S. 234, 261-262, 77 S.Ct. 1203, 1217, 1 L.Ed.2d 1311 (concurring in result):

'Progress in the natural sciences is not remotely confined to findings made in the laboratory. Insights into the mysteries of nature are born of hypothesis and speculation. The more so is this true in the pursuit of understanding in the groping endeavors of what are called the social sciences, the concern of which is man and society. The problems that are the respective preoccupations of anthropology, economics, law, psychology, sociology and related areas of scholarship are merely departmentalized dealing, by way of manageable division of analysis, with interpenetrating aspects of holistic perplexities. For society's good-if understanding be an essential need of society-inquires into these problems, speculations about them, stimulation in others of reflection upon them, must be left as unfettered **\*582** as possible. Political power must abstain from intrusion into this activity of freedom, pursued in the interest of wise government and the people's well-being, except for reasons that are exigent and obviously compelling.'

We repeated that warning in Keyishian v. Board of Regents, 385 U.S. 589, 603, 87 S.Ct. 675, 683, 17 L.Ed.2d 629:

'Our Nation is deeply committed to safeguarding academic freedom, which is of transcendent value to all of us and not merely to the teachers concerned. That freedom is therefore a special concern of the First Amendment, which does not tolerate laws that cast a pall of orthodoxy over the classroom.'

When a violation of First Amendment rights is alleged, the reasons for dismissal or for nonrenewal of an employment contract must be examined to see if the reasons given are only a cloak for activity or attitudes protected by the Constitution. A statutory analogy is present under the National Labor Relations Act, 29 U.S.C. s 151 et seq. While discharges of employees for 'cause' are **\*\*2712** permissible

(Fibreboard Paper Products Corp. v. NLRB, 379 U.S. 203, 217, 85 S.Ct. 398, 406, 13 L.Ed.2d 233), discharges because of an employee's union activities are banned by s 8(a)(3), 29 U.S.C. s 158(c)(3). So the search is to ascertain whether the stated ground was the real one or only a pretext. See J. P. Stevens & Co. v. NLRB, 380 F.2d 292, 300 (2 Cir.).

In the case of teachers whose contracts are not renewed, tenure is not the critical issue. In the Sweezy case, the teacher, whose First Amendment rights we honored, had no tenure but was only a guest lecturer. In the Keyishian case, one of the petitioners (Keyishian himself) had only a 'one-year-term contract' that was not renewed. 385 U.S., at 592, 87 S.Ct., at 678. In Shelton v. Tucker, 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231, one of the petitioners was **\*583** a teacher whose 'contract for the ensuing school year was not renewed' (id., at 483, 81 S.Ct., at 249) and two others who refused to comply were advised that it made 'impossible their re-employment as teachers for the following school year.'Id., at 484, 81 S.Ct., at 250. The oath required in Keyishian and the affidavit listing memberships required in Shelton were both, in our view, in violation of First Amendment rights. Those cases mean that conditioning renewal of a teacher's contract upon surrender of First Amendment rights is beyond the power of a State.

There is sometimes a conflict between a claim for First Amendment protection and the need for orderly administration of the school ststem, as we noted in Pickering v. Board of Education, 391 U.S. 563, 569, 88 S.Ct. 1731, 1735, 20 L.Ed.2d 811. That is one reason why summary judgments in this class of cases are seldom appropriate. Another reason is that careful factfinding is often necessary to know whether the given reason for nonrenewal of a teacher's contract is the real reason or a feigned one.

It is said that since teaching in a public school is a privilege, the State can grant it or withhold it on conditions. We have, however, rejected that thesis in numerous cases, e.g., Graham v. Richardson, 403

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548, 1 IER Cases 23

**(Cite as: 408 U.S. 564, 92 S.Ct. 2701)**

U.S. 365, 374, 91 S.Ct. 1848, 1853, 29 L.Ed.2d 534.See Van Alstyne, The Demise of the Right-Privilege Distinction in Constitutional Law, 81 Harv.L.Rev. 1439 (1968). In Hannegan v. Esquire, Inc., 327 U.S. 146, 156, 66 S.Ct. 456, 461, 90 L.Ed. 586, we said that Congress may not by withdrawal of mailing privileges place limitations on freedom of speech which it could not do constitutionally if done directly. We said in American Communications Ass'n v. Douds, 339 U.S. 382, 402, 70 S.Ct. 674, 685, 94 L.Ed. 925, that freedom of speech was abridged when the only restraint on its exercise was withdrawal of the privilege to invoke the facilities of the National Labor Relations Board. In Wieman v. Updegraff, 344 U.S. 183, 73 S.Ct. 215, 97 L.Ed. 216, we held that an applicant could not be denied the opportunity **\*584** for public employment because he had exercised his First Amendment rights. And in Speiser v. Randall, 357 U.S. 513, 78 S.Ct. 1332, 2 L.Ed.2d 1460, we held that a denial of a tax exemption unless one gave up his First Amendment rights was an abridgment of Fourteenth Amendment rights.

As we held in Speiser v. Randall, supra, when a State proposes to deny a privilege to one who it alleges has engaged in unprotected speech, Due Process requires that the State bear the burden of proving that the speech was not protected.'(T)he 'protection of the individual against arbitrary action' . . . (is) the very essence of due process,'Slochower v. Board of Higher Education, 350 U.S. 551, 559, 76 S.Ct. 637, 641, 100 L.Ed. 692, but where the State is allowed to act secretly behind closed doors and without any notice to those who are affected by its actions, there is no check against the possibility of such 'arbitrary action.'

**\*\*2713** Moreover, where 'important interests' of the citizen are implicated (Bell v. Burson, 402 U.S. 535, 539, 91 S.Ct. 1586, 1589, 29 L.Ed.2d 90) they are not to be denied or taken away without due process. Ibid. Bell v. Burson involved a driver's license. But also included are disqualification for unemployment compensation (Sherbert v. Verner, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965), discharge from public employment (Slochower v.

Board of Education, supra), denial of tax exemption (Speiser v. Randall, supra), and withdrawal of welfare benefits (Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287). And see Wisconsin v. Constantineau, 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515. We should now add that nonrenewal of a teacher's contract, whether or not he has tenure, is an entitlement of the same importance and dignity.

Cafeteria & Restaurant Workers v. McElroy, 367 U.S. 886, 81 S.Ct. 1743, 6 L.Ed.2d 1230, is not opposed. It held that a cook employed in a cafeteria in a military installation was not entitled to a hearing prior **\*585** to the withdrawal of her access to the facility. Her employer was prepared to employ her at another of its restaurants, the withdrawal was not likely to injure her reputation, and her employment opportunities elsewhere were not impaired. The Court held that the very limited individual interest in this one job did not outweigh the Government's authority over an important federal military establishment. Nonrenewal of a teacher's contract is tantamount in effect to a dismissal and the consequences may be enormous. Nonrenewal can be a blemish that turns into a permanent scar and effectively limits any chance the teacher has of being rehired as a teacher, at least in his State.

If this nonrenewal implicated the First Amendment, then Roth was deprived of constitutional rights because his employment was conditioned on a surrender of First Amendment rights; and, apart from the First Amendment, he was denied due process when he received no notice and hearing of the adverse action contemplated against him. Without a statement of the reasons for the discharge and an opportunity to rebut those reasons-both of which were refused by petitioners-there is no means short of a lawsuit to safeguard the right not to be discharged for the exercise of First Amendment guarantees.

The District Court held, 310 F.Supp., at 979-980: 'Substantive constitutional protection for a university professor against non-retention in violation of his First Amendment rights or arbitrary non-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548, 1 IER Cases 23
**(Cite as: 408 U.S. 564, 92 S.Ct. 2701)**

retention is useless without procedural safeguards. I hold that minimal procedural due process includes a statement of the reasons why the university intends not to retain the professor, notice of a hearing at which he may respond to the stated reasons, and a hearing if the professor appears at the appointed **\*586** time and place. At such a hearing the professor must have a reasonable opportunity to submit evidence relevant to the stated reasons. The burden of going forward and the burden of proof rests with the professor. Only if he makes a reasonable showing that the stated reasons are wholly inappropriate as a basis for decision or that they are wholly without basis in fact would the university administration become obliged to show that the stated reasons are not inappropriate or that they have a basis in fact.'

It was that procedure that the Court of Appeals approved. 446 F.2d, at 809-810. The Court of Appeals also concluded that though the s 1983 action was pending in court, the court should stay its hand until the academic procedures**\*\*2714** had been completed.<sup>FN1a</sup> As stated by the Court of Appeals in Sindermann v. Perry, 430 F.2d 939 (CA5):

> FN1a. Such a procedure would not be contrary to the well-settled rule that s 1983 actions do not require exhaustion of other remedies. See, e.g., Wilwording v. Swenson, 404 U.S. 249, 92 S.Ct. 407, 30 L.Ed.2d 419 (1971); Damico v. California, 389 U.S. 416, 88 S.Ct. 526, 19 L.Ed.2d 647 (1967); McNeese v. Board of Education, 373 U.S. 668, 83 S.Ct. 1433, 10 L.Ed.2d 622 (1963); Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). One of the allegations in the complaint was that respondent was denied any effective sate remedy, and the District Court's staying its hand thus furthered rather than thwarted the purposes of s 1983.

'School-constituted review bodies are the most appropriate forums for initially determining issues of this type, both for the convenience of the parties

and in order to bring academic expertise to bear in resolving the nice issues of administrative discipline, teacher competence and school policy, which so frequently must be balanced in reaching a proper determination.'Id., at 944-945.

That is a permissible course for district courts to take, though it does not relieve them of the final determination **\*587** whether nonrenewal of the teacher's contract was in retaliation for the exercise of First Amendment rights or a denial of due process.

Accordingly I would affirm the judgment of the Court of Appeals.

Mr. Justice MARSHALL, dissenting.

Respondent was hired as an assistant professor of political science at Wisconsin State University-Oshkosh for the 1968-1969 academic year. During the course of that year he was told that he would not be rehired for the next academic term, but he was never told why. In this case, he asserts that the Due Process Clause of the Fourteenth Amendment to the United States Constitution entitled him to a statement of reasons and a hearing on the University's decision not to rehire him for another year.FN1 This claim was sustained by the District Court, which granted respondent summary judgment, 310 F.Supp. 972, and by the Court of Appeals which affirmed the judgment of the District Court. 446 F.2d 806. This Court today reverses the judgment of the Court of Appeals and rejects respondent's claim. I dissent.

> FN1. Respondent has also alleged that the true reason for the decision not to rehire him was to punish him for certain statements critical of the University. As the Court points out, this issue is not before us the present time.

While I agree with Part I of the Court's opinion, setting forth the proper framework for consideration of the issue presented, and also with those portions of Parts II and III of the Court's opinion that assert that a public employee is entitled to procedural due process whenever a State stigmatizes him by denying employment, or injures his future employment

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

92 S.Ct. 2701

408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548, 1 IER Cases 23

**(Cite as: 408 U.S. 564, 92 S.Ct. 2701)**

prospects severely, or whenever the State deprives him of a property**588** interest. I would go further than the Court does in defining the terms 'liberty' and 'property.'

The prior decisions of this Court, discussed at length in the opinion of the Court, establish a principle that is as obvious as it is compelling-i.e., federal and state governments and governmental agencies are restrained by the Constitution from acting arbitrarily with respect employment opportunities that they either offer or control. Hence, it is now firmly established that whether or not a private employer is free to act capriciously or unreasonably with respect to employment practices, at least absent statutory[FN2] or contractual[FN3] controls, a government employer is different. The government may only act fairly and reasonably.

> FN2. See, e.g., Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971); 42 U.S.C. s 2000e.

> FN3. Cf. Note, Procedural 'Due Process' in Union Disciplinary Proceedings, 57 Yale L.J. 1302 (1948).

**\*\*2715** This Court has long maintained that 'the right to work for a living in the common occupations of the community is of the very essence of the personal freedom and opportunity that it was the purpose of the (Fourteenth) Amendment to secure.'Truax v. Raich, 239 U.S. 33, 41, 36 S.Ct. 7, 10, 60 L.Ed. 131 (1915) (Hughes, J.). See also Meyer v. Nebraska, 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042 (1923). It has also established that the fact that an employee has no contract guaranteeing work for a specific future period does not mean that as the result of action by the government he may be 'discharged at any time, for any reason or for no reason.'Truax v. Raich, supra, 239 U.S., at 38, 36 S.Ct., at 9.

In my view, every citizen who applies for a government job is entitled to it unless the government can establish some reason for denying the employment. This is the 'property' right that I believe is protected by the Fourteenth Amendment and that cannot

be denied 'without due process of law.' And it is also liberty-**589** liberty to work-which is the 'very essence of the personal freedom and opportunity' secured by the Fourteenth Amendment.

This Court has often had occasion to note that the denial of public employment is a serious blow to any citizen. See, e.g., Joint Anti-Fascist Refugee Committee v. McGrath, 341 U.S. 123, 185, 71 S.Ct. 624, 655, 95 L.Ed. 817 (1951) (Jackson, J., concurring); United States v. Lovett, 328 U.S. 303, 316-317, 66 S.Ct. 1073, 1079, 90 L.Ed. 1252 (1946). Thus, when an application for public employment is denied or the contract of a government employee is not renewed, the government must say why, for it is only when the reasons underlying government action are known that citizens feel secure and protected against arbitrary government action.

Employment is one of the greatest, if not the greatest, benefits that governments offer in modern-day life. When something as valuable as the opportunity to work is at stake, the government may not reward some citizens and not others without demonstrating that its actions are fair and equitable. And it is procedural due process that is our fundamental guarantee of fairness, our protection against arbitrary, capricious, and unreasonable government action.

Mr. Justice Douglas has written that:
'It is not without significance that most of the provisions of the Bill of Rights are procedural. It is procedure that spells much of the difference between rule by law and rule by whim or caprice. Steadfast adherence to strict procedural safeguards is our main assurance that there will be equal justice under law.'Joint Anti-Fascist Refugee Committee v. McGrath, supra, 341 U.S., at 179, 71 S.Ct., at 652 (concurring opinion).

And Mr. Justice Frankfurter has said that '(t)he history of American freedom is, in no small measure, the **590** history of procedure.'Malinski v. New York, 324 U.S. 401, 414, 65 S.Ct. 781, 787, 89 L.Ed. 1029 (1945) (separate opinion). With respect

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

to occupations controlled by the government, one lower court has said that '(t)he public has the right to expect its officers . . . to make adjudications on the basis of merit. The first step toward insuring that these expectations are realized is to require adherence to the standards of due process; absolute and uncontrolled discretion invites abuse.'Hornsby v. Allen, 326 F.2d 605, 610 (CA5 1964).

We have often noted that procedural due process means many different things in the numerous contexts in which it applies. See, e.g., Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970); Bell v. Burson, 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971). Prior decisions have held that an applicant for admission to practice as an attorney before the United States Board of Tax Appeals may not be rejected without a statement of reasons**2716 and a chance for a hearing on disputed issues of fact;[FN4] that a tenured teacher could not be summarily dismissed without notice of the reasons and a hearing;[FN5] that an applicant for admission to a state bar could not be denied the opportunity to practice law without notice of the reasons for the rejection of his application and a hearing;[FN6] and even that a substitute teacher who had been employed only two months could not be dismissed merely because she refused to take a loyalty oath without an inquiry into the specific facts of her case and a hearing on those in dispute.[FN7] I would follow these cases and hold that respondent was denied due process when his contract was not renewed and he was not informed of the reasons and given an opportunity to respond.

> FN4.Goldsmith v. United States Board of Tax Appeals, 270 U.S. 117, 46 S.Ct. 215, 70 L.Ed. 494 (1926).

> FN5.Slochower v. Board of Higher Education, 350 U.S. 551, 76 S.Ct. 637, 100 L.Ed. 692 (1956).

> FN6.Willner v. Committee on Character, 373 U.S. 96, 83 S.Ct. 1175, 10 L.Ed.2d 224 (1963).

> FN7.Connell v. Higginbotham, 403 U.S.

207, 91 S.Ct. 1772, 29 L.Ed.2d 418 (1971).

**\*591** It may be argued that to provide procedural due process to all public employees or prospective employees would place an intolerable burden on the machinery of government. Cf. Goldberg v. Kelly, supra.The short answer to that argument is that it is not burdensome to give reasons when reasons exist. Whenever an application for employment is denied, an employee is discharged, or a decision not to re-hire an employee is made, there should be some reason for the decision. It can scarcely be argued that government would be crippled by a requirement that the reason be communicated to the person most directly affected by the government's action.

Where there are numerous applicants for jobs, it is likely that few will choose to demand reasons for not being hired. But, if the demand for reasons is exceptionally great, summary procedures can be devised that would provide fair and adequate information to all persons. As long as the government has a good reason for its actions it need not fear disclosure. It is only where the government acts improperly that procedural due process is truly burdensome. And that is precisely when it is most necessary.

It might also be argued that to require a hearing and a statement of reasons is to require a useless act, because a government bent on denying employment to one or more persons will do so regardless of the procedural hurdles that are placed in its path. Perhaps this is so, but a requirement of procedural regularity at least renders arbitrary action more difficult. Moreover, proper procedures will surely eliminate some of the arbitrariness that results, not from malice, but from innocent error.'Experience teaches . . . that the affording of procedural safeguards, which by their nature serve to illuminate the underlying facts, in itself often operates to prevent erroneous decisions on the merits **\*592** from occurring.'Silver v. New York Stock Exchange, 373 U.S. 341, 366, 83 S.Ct. 1246, 1262, 10 L.Ed.2d 389 (1963). When the government knows it may have to justify its decisions with sound reasons, its conduct is likely to be more cautious, careful, and correct.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548, 1 IER Cases 23
**(Cite as: 408 U.S. 564, 92 S.Ct. 2701)**

Professor Gellhorn put the argument well:
'In my judgment, there is no basic division of interest between the citizenry on the one hand and officialdom on the other. Both should be interested equally in the quest for procedural safeguards. I echo the late Justice Jackson in saying: 'Let it not be overlooked that due process of law is not for the sole benefit of an accused. It is the best insurance for the Government itself against those blunders which leave lasting stains on a system of justice'-blunders which are **2717 likely to occur when reasons need not be given and when the reasonableness and indeed legality of judgments need not be subjected to any appraisal other than one's own. . . .' Summary of Colloquy on Administrative Law, 6 J. Soc. Pub. Teachers of Law, 70, 73 (1961).

Accordingly, I dissent.

U.S.Wis. 1972.
Board of Regents of State Colleges v. Roth
408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548, 1 IER Cases 23

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

96 S.Ct. 2074                                                                                    Page 1
426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684
**(Cite as: 426 U.S. 341, 96 S.Ct. 2074)**

Bishop v. Wood
U.S.N.C.,1976.

Supreme Court of the United States
Carl D. BISHOP, Petitioner,
v.
W. H. WOOD, etc., et al.
No. 74-1303.

Argued March 1, 1976.
Decided June 10, 1976.

Former police officer brought action against city, city manager and chief of police contending that his due process rights were violated when he was discharged from his job. The United States District Court for the Western District of North Carolina, Shelby Division, 377 F.Supp. 501, granted motion of defendants for summary judgment, and plaintiff appealed. The Court of Appeals for the Fourth Circuit affirmed, 498 F.2d 1341, and certiorari was granted. The Supreme Court, Mr. Justice Stevens, held that where district court's reading of ordinance was a tenable construction of state law and accepted by the Court of Appeals, independent examination of state law issued by the Supreme Court was foreclosed; that under view of state law that "permanent" employee held his position at the will and pleasure of city, with removal being conditioned only on compliance with certain specified procedures, discharge of police officer without hearing did not deprive him of a property interest protected by the Fourteenth Amendment; and that statements of asserted reasons for discharge did not deprive officer of "liberty," even if the reasons given were false, where initial statement of reasons was communicated orally to officer in private, and not made public, and later written statement was in response to interrogatories after the litigation had commenced.

Affirmed.

Mr. Justice Brennan dissented and filed opinion in which Mr. Justice Marshall concurred.

Mr. Justice White, with whom Mr. Justice Brennan, Mr. Justice Marshall, and Mr. Justice Blackmun joined, filed a dissenting opinion.

Mr. Justice Blackmun, with whom Mr. Justice Brennan joined, filed a dissenting opinion.

West Headnotes

**[1] Civil Rights 78 ⚫➝1349**

78 Civil Rights
    78III Federal Remedies in General
        78k1342 Liability of Municipalities and Other Governmental Bodies
            78k1349 k. Employment Practices. Most Cited Cases
    (Formerly 78k206(1), 78k13.7)

City was not a "person" within meaning of civil rights statute, section 1983, and thus was not a proper defendant in action brought under such statute by discharged city policeman. 42 U.S.C.A. § 1983; 28 U.S.C.A. § 1343(3).

**[2] Constitutional Law 92 ⚫➝4165(1)**

92 Constitutional Law
    92XXVII Due Process
        92XXVII(G) Particular Issues and Applications
            92XXVII(G)7 Labor, Employment, and Public Officials
                92k4163 Public Employment Relationships
                    92k4165 Rights and Interests Protected in General
                        92k4165(1) k. In General. Most Cited Cases
    (Formerly 92k277(2))

**Federal Courts 170B ⚫➝421**

170B Federal Courts
    170BVI State Laws as Rules of Decision
        170BVI(C) Application to Particular Matters
            170Bk421 k. Labor and Employment; Workers' Compensation. Most Cited Cases
    (Formerly 106k359.1(9))

96 S.Ct. 2074

426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684

**(Cite as: 426 U.S. 341, 96 S.Ct. 2074)**

A property interest in public employment in state, within the protection of due process guarantee, can be created by ordinance or by implied contract, but in either case the sufficiency of the claim of entitlement must be decided by reference to state law. U.S.C.A.Const. Amend. 14.

**[3] Federal Courts 170B ⇐➤460.1**

170B Federal Courts
    170BVII Supreme Court
        170BVII(B) Review of Decisions of Courts of Appeals
            170Bk460 Review on Certiorari
              170Bk460.1 k. In General. Most Cited Cases
    (Formerly 170Bk460, 106k383(7))
Where reading of ordinance by district judge familiar with North Carolina law and based on construction of North Carolina law was tenable and was accepted by the Court of Appeals for the Fourth Circuit, albeit by an equally divided court, independent examination of the state law issue by the Supreme Court was foreclosed, even though the ordinance on its face might have been fairly read so as to arrive at a different construction.

**[4] Constitutional Law 92 ⇐➤4172(6)**

92 Constitutional Law
    92XXVII Due Process
        92XXVII(G) Particular Issues and Applications
            92XXVII(G)7 Labor, Employment, and Public Officials
              92k4163 Public Employment Relationships
                92k4172 Notice and Hearing; Proceedings and Review
                  92k4172(6) k. Termination or Discharge. Most Cited Cases
    (Formerly 92k278.4(3), 92k277(2))
Where, under state law as reasonably construed by district court, city ordinance providing that a "permanent employee" could be discharged if he failed to perform work up to the standards of his classification or was negligent, inefficient or unfit

to perform his duties granted "permanent" employee no right to continued employment, so that he held his position at the will and pleasure of the city, though removal was conditioned on compliance with certain specified procedures, discharge of city policeman without a hearing did not deprive him of a property interest protected by the Fourteenth Amendment. U.S.C.A.Const. Amend. 14.

**[5] Federal Courts 170B ⇐➤460.1**

170B Federal Courts
    170BVII Supreme Court
        170BVII(B) Review of Decisions of Courts of Appeals
            170Bk460 Review on Certiorari
              170Bk460.1 k. In General. Most Cited Cases
    (Formerly 170Bk460, 106k383(9))
Where district court rendered summary judgment against plaintiff, plaintiff's version of the facts had to be accepted on appraisal of his claim by the Supreme Court. Fed.Rules Civ.Proc. rule 56(c), 28 U.S.C.A.

**[6] Constitutional Law 92 ⇐➤4173(3)**

92 Constitutional Law
    92XXVII Due Process
        92XXVII(G) Particular Issues and Applications
            92XXVII(G)7 Labor, Employment, and Public Officials
              92k4163 Public Employment Relationships
              92k4173 Reputational Interests, Protection and Deprivation of
                92k4173(3) k. Termination or Discharge. Most Cited Cases
    (Formerly 92k278.4(3), 92k255(2))
Discharge of public employee whose position is terminable at the will of the employer does not deprive such employee of "liberty" when there is no public disclosure of the reasons for the discharge. U.S.C.A.Const. Amend. 14.

**[7] Constitutional Law 92 ⇐➤4173(4)**

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684

**(Cite as: 426 U.S. 341, 96 S.Ct. 2074)**

92 Constitutional Law
   92XXVII Due Process
         92XXVII(G) Particular Issues and Applications
           92XXVII(G)7 Labor, Employment, and Public Officials
            92k4163 Public Employment Relationships
              92k4173 Reputational Interests, Protection and Deprivation of
                92k4173(4) k. Notice and Hearing; Proceedings and Review. Most Cited Cases
     (Formerly 92k278.4(5), 92k255(2))
Where asserted reasons for city manager's decision to discharge policeman were communicated orally to policeman in private, and were not made public, such statement of reasons could not form the basis of a claim that policeman's interest in his "good name, reputation, honor or integrity," and thus his interest in "liberty" under the Fourteenth Amendment, was thereby impaired, even if the reasons given for the discharge were false. U.S.C.A.Const. Amend. 14.

**[8] Constitutional Law 92 ⟐4173(4)**

92 Constitutional Law
   92XXVII Due Process
         92XXVII(G) Particular Issues and Applications
           92XXVII(G)7 Labor, Employment, and Public Officials
            92k4163 Public Employment Relationships
              92k4173 Reputational Interests, Protection and Deprivation of
                92k4173(4) k. Notice and Hearing; Proceedings and Review. Most Cited Cases
     (Formerly 92k278.4(5), 92k255(2))
Where written statement of reasons for discharge of city policeman were made in answer to interrogatories in the course of judicial proceeding which did not commence until after policeman had suffered the injuries for which he sought redress, such statement could not provide retroactive support for his claim that he was deprived of "liberty" guaranteed by the Fourteenth Amendment, even if the reasons

given for the discharge were false or constituted a deliberate lie. U.S.C.A.Const. Amend. 14.

**[9] Officers and Public Employees 283 ⟐72.41(1)**

283 Officers and Public Employees
   283I Appointment, Qualification, and Tenure
      283I(H) Proceedings for Removal, Suspension, or Other Discipline
         283I(H)3 Judicial Review
           283k72.41 Decisions Reviewable; Forum for Review
              283k72.41(1) k. In General. Most Cited Cases
     (Formerly 283k72.41, 283k72(2))
United States Constitution cannot feasibly be construed to require federal judicial review for every error in connection with discharge of a public employee; in absence of any claim that the public employer was motivated by a desire to curtail or penalize the exercise of employee's constitutionally protected rights, federal courts must presume that official action was regular and, if erroneous, can be corrected in other ways than by review of personnel decisions in the federal court.

**[10] Constitutional Law 92 ⟐4166(1)**

92 Constitutional Law
   92XXVII Due Process
         92XXVII(G) Particular Issues and Applications
           92XXVII(G)7 Labor, Employment, and Public Officials
            92k4163 Public Employment Relationships
              92k4166 Conduct and Control; Deprivations and Adverse Employment Actions
              92k4166(1) k. In General. Most Cited Cases
     (Formerly 92k278.4(1), 92k277(2))
The due process clause of the Fourteenth Amendment is not a guarantee against incorrect or ill-advised personnel decisions by public employers. U.S.C.A.Const. Amend. 14.
**\*\*2075 \*341 Syllabus** [FN*]

FN* The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See United States v. Detroit Timber & Lumber Co., 200 U.S. 321, 337, 26 S.Ct. 282, 287, 50 L.Ed. 499.

On respondent Chief of Police's recommendation, respondent City Manager terminated**2076** petitioner's employment as a policeman without a hearing, telling him privately that the dismissal was based on a failure to follow orders, poor attendance at police training classes, causing low morale, and conduct unsuited to an officer. A city ordinance provides that a permanent city employee (as petitioner was classified) may be discharged if he fails to perform work up to the standard of his classification, or if he is negligent, inefficient, or unfit to perform his duties. Petitioner brought suit against respondents, claiming that as a "permanent employee" he had a constitutional right to a pretermination hearing; that the ordinance, even though not expressly so providing, should be read to prohibit discharge for any reason other than those specified and therefore to confer tenure on all permanent employees; that his period of service, together with his "permanent" classification, gave him a sufficient expectation of continued employment to constitute a protected property interest under the Due Process Clause of the Fourteenth Amendment; and that the false explanation for his discharge deprived him of interest in liberty protected by that Clause. During pretrial discovery petitioner was again advised of the reasons for his dismissal. The District Court granted respondents' motion for a summary judgment, holding, on the basis of its understanding of state law, that petitioner "held his position at the will and pleasure of the city."The Court of Appeals affirmed. Held:

1. Under the District Court's tenable view of state law, which was upheld by the Court of Appeals and which will be accepted by this Court in the absence of any authoritative state-court interpretation of the ordinance involved, petitioner's discharge did not deprive him of a property interest protected by the Due Process Clause of the Fourteenth Amendment. Pp. 2077-2079.

2. Assuming that the explanation for petitioner's discharge was false, as this Court must do since summary judgment was entered against him, such false explanation did not deprive him of an interest in liberty protected by that Clause. Pp. 2079-2080.

***342** (a) Since the City Manager's private oral communication to petitioner of the reasons for his discharge was never made public, it cannot properly form the basis for a claim that petitioner's interest in his "good name, reputation, honor, or integrity" was thereby impaired. Nor can the communication of such reasons during pretrial discovery provide retroactive support for such claim, since it was made in the course of a judicial proceeding that did not commence until after petitioner had suffered his alleged injury. Pp. 2079-2080.

(b) The truth or falsity of the city manager's explanation determines whether or not his decision to discharge petitioner was correct or prudent, but neither enhances nor diminishes petitioner's claim that his constitutionally protected interest in liberty was impaired. P. 2080.

Affirmed. See 498 F.2d 1341.

Norman B. Smith, Greensboro, N. C., for petitioner.
Charles E. Burgin, Marion, N. C., for respondents.
Mr. Justice STEVENS delivered the opinion of the Court.
[1] Acting on the recommendation of the Chief of Police, the City Manager of Marion, N. C., terminated petitioner's employment as a policeman without affording him a hearing to determine the sufficiency of the cause for his discharge. Petitioner brought suit contending ***343** that since a city ordinance classified him as a "permanent employee," he had a constitutional right to a pretermination hearing.[FN1] During pretrial ***2077** discovery petitioner was advised that his dismissal was based on a failure to follow certain orders, poor attendance at police training classes, causing low morale, and conduct unsuited to an officer. Petitioner and several other police officers filed affidavits essentially

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

denying the truth of these charges. The District Court granted defendants' motion for summary judgment.[FN2] The Court of Appeals affirmed,[FN3] and we granted certiorari, 423 U.S. 890, 96 S.Ct. 185, 46 L.Ed.2d 121.

> FN1. He relied on 42 U.S.C. s 1983, invoking federal jurisdiction under 28 U.S.C. s 1343(3). He sought reinstatement and back-pay. The defendants were the then City Manager, Chief of Police, and the city of Marion. Since the city is not a "person" within the meaning of the statute, it was not a proper defendant. Monroe v. Pape, 365 U.S. 167, 187-192, 81 S.Ct. 473, 484, 5 L.Ed.2d 492.

> FN2. 377 F.Supp. 501 (WDNC 1973).

> FN3. A three-judge panel of the Court of Appeals affirmed, with one judge dissenting, 498 F.2d 1341 (CA4 1974); then, after granting a rehearing en banc, the court affirmed without opinion by an equally divided court.

The questions for us to decide are (1) whether petitioner's employment status was a property interest protected by the Due Process Clause of the Fourteenth Amendment,[FN4] and (2) assuming that the explanation for his discharge was false, whether that false explanation deprived him of an interest in liberty protected by that Clause.

> FN4. "(N)or shall any State deprive any person of life, liberty, or property, without due process of law . . . ." U.S.Const. Amdt. 14.

## I

Petitioner was employed by the city of Marion as a probationary policeman on June 9, 1969. After six months he became a permanent employee. He was dismissed on March 31, 1972. He claims that he had either an express or an implied right to continued employment.

*344 A city ordinance provides that a permanent employee may be discharged if he fails to perform work up to the standard of his classification, or if he is negligent, inefficient, or unfit to perform his duties.[FN5] Petitioner first contends that even though the ordinance does not expressly so provide, it should be read to prohibit discharge for any other reason, and therefore to confer tenure on all permanent employees. In addition, he contends that his period of service, together with his "permanent" classification, gave him a sufficient expectancy of continued employment to constitute a protected property interest.

> FN5. Article II, s 6, of the Personnel Ordinance of the city of Marion, reads as follows:
>
> "Dismissal. A permanent employee whose work is not satisfactory over a period of time shall be notified in what way his work is deficient and what he must do if his work is to be satisfactory. If a permanent employee fails to perform work up to the standard of the classification held, or continues to be negligent, inefficient, or unfit to perform his duties, he may be dismissed by the City Manager. Any discharged employee shall be given written notice of his discharge setting forth the effective date and reasons for his discharge if he shall request such a notice."

[2] A property interest in employment can, of course, be created by ordinance, or by an implied contract.[FN6] In either case, however, the sufficiency of the claim of entitlement must be decided by reference to state law.[FN7] *345 The North Carolina Supreme Court has held that an enforceable expectation of continued public employment in that State can exist only if the employer, by statute or contract, has actually granted some form of guarantee. Still v. Lance, 279 N.C. 254, 182 S.E.2d 403 (1971). Whether such a guarantee has been given can be determined only by an examination of the particular statute or ordinance in question.

> FN6. In Perry v. Sindermann, 408 U.S. 593, 601, 92 S.Ct. 2694, 2699, 33 L.Ed.2d 570, 579, the Court said that a "person's in-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

terest in a benefit is a 'property' interest for due process purposes if there are . . . rules or mutually explicit understandings that support his claim of entitlement to the benefit and that he may invoke at a hearing."

FN7. "Property interests, of course, are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." Board of Regents v. Roth, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548.

**\*\*2078** [3] On its face the ordinance on which petitioner relies may fairly be read as conferring such a guarantee. However, such a reading is not the only possible interpretation; the ordinance may also be construed as granting no right to continued employment but merely conditioning an employee's removal on compliance with certain specified procedures.FN8 We do not have any authoritative interpretation of this ordinance by a North Carolina state court. We do, however, have the opinion of the United States District Judge who, of course, sits in North Carolina and practiced law there for many years. Based on his understanding of state law, he concluded that petitioner "held his position at the will and pleasure of the city." FN9 This construction of North **\*346** Carolina law was upheld by the Court of Appeals for the Fourth Circuit, albeit by an equally divided court. In comparable circumstances, this Court has accepted the interpretation of state law in which the District Court and the Court of Appeals have concurred even if an examination of the state-law issue without such guidance might have justified a different conclusion.FN10

FN8. This is not the construction which six Members of this Court placed on the federal regulations involved in Arnett v. Kennedy, 416 U.S. 134, 94 S.Ct. 1633, 40

L.Ed.2d 15. In that case the Court concluded that because the employee could only be discharged for cause, he had a property interest which was entitled to constitutional protection. In this case, a holding that as a matter of state law the employee "held his position at the will and pleasure of the city" necessarily establishes that he had No property interest. The Court's evaluation of the federal regulations involved in Arnett sheds no light on the problem presented by this case.

FN9. "Under the law in North Carolina, nothing else appearing, a contract of employment which contains no provision for the duration or termination of employment is terminable at the will of either party irrespective of the quality of performance by the other party. By statute, G.S. s 115-142(b), a county board of education in North Carolina may terminate the employment of a teacher at the end of the school year without filing charges or giving its reasons for such termination, or granting the teacher an opportunity to be heard. Still v. Lance, 279 N.C. 254, 182 S.E.2d 403 (1971).

"It is clear from Article II, Section 6, of the City's Personnel Ordinance, that the dismissal of an employee does not require a notice or a hearing. Upon request of the discharged employee, he shall be given written notice of his discharge setting forth the effective date and the reasons for the discharge. It thus appears that both the city ordinance and the state law have been complied with.

"It further appears that the plaintiff held his position at the will and pleasure of the city." 377 F.Supp., at 504.

FN10. See United States v. Durham Lumber Co., 363 U.S. 522, 80 S.Ct. 1282, 4 L.Ed.2d 1371. In Propper v. Clark, 337 U.S. 472, 486-487, 69 S.Ct. 1333, 1341-1342, 93 L.Ed. 1480, the Court stated: "The precise issue of state law involved, I. e., whether the temporary receiv-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

er under s 977-b of the New York Civil Practice Act is vested with title by virtue of his appointment, is one which has not been decided by the New York courts. Both the District Court and the Court of Appeals faced this question and answered it in the negative. In dealing with issues of state law that enter into judgments of federal courts, we are hesitant to overrule decisions by federal courts skilled in the law of particular states unless their conclusions are shown to be unreasonable."In Township of Hillsborough v. Cromwell, 326 U.S. 620, 629-630, 66 S.Ct. 445, 451, 90 L.Ed. 358, the Court stated: "Petitioner makes an extended argument to the effect that Duke Power Co. (V. State Board, 129 N.J.L. 449, 30 A.2d 416; 131 N.J.L. 275, 36 A.2d 201,) is not a controlling precedent on the local law question on which the decision below turned. On such questions we pay great deference to the views of the judges of those courts 'who are familiar with the intricacies and trends of local law and practice.'Huddleston v. Dwyer, 322 U.S. 232, 237, 64 S.Ct. 1015, 1018, 88 L.Ed. 1246.We are unable to say that the District Court and the Circuit Court of Appeals erred in applying to this case the rule of Duke Power Co. v. State Board, which involved closely analogous facts."And in MacGregor v. State Mut. Life Assur. Co., 315 U.S. 280, 281, 62 S.Ct. 607, 86 L.Ed. 846, the Court stated: "No decision of the Supreme Court of Michigan, or of any other court of that State, construing the relevant Michigan law has been brought to our attention. In the absence of such guidance, we shall leave undisturbed the interpretation placed upon purely local law by a Michigan federal judge of long experience and by three circuit judges whose circuit includes Michigan."

**\*347** In this case, as the District Court construed the ordinance, the City Manager's determination of the adequacy of the grounds for discharge is not subject to judicial**\*\*2079** review; the employee is merely given certain procedural rights which the District Court found not to have been violated in this case. The District Court's reading of the ordinance is tenable; it derives some support from a decision of the North Carolina Supreme Court, Still v. Lance, supra ; and it was accepted by the Court of Appeals for the Fourth Circuit. These reasons are sufficient to foreclose our independent examination of the state-law issue.

[4] Under that view of the law, petitioner's discharge did not deprive him of a property interest protected by the Fourteenth Amendment.

II

Petitioner's claim that he has been deprived of liberty has two components. He contends that the reasons given for his discharge are so serious as to constitute a stigma that may severely damage his reputation in the community; in addition, he claims that those reasons were false.

[5] In our appraisal of petitioner's claim we must accept his version of the facts since the District Court granted summary judgment against him.FN11 His evidence established**\*348** that he was a competent police officer; that he was respected by his peers; that he made more arrests than any other officer on the force; that although he had been criticized for engaging in high-speed pursuits, he had promptly heeded such criticism; and that he had a reasonable explanation for his imperfect attendance at police training sessions. We must therefore assume that his discharge was a mistake and based on incorrect information.

> FN11. In granting summary judgment for respondents, the District Court was required to resolve all genuine disputes as to material facts in favor of petitioner. Fed.Rule Civ.Proc. 56(c); Arnett v. Kennedy, supra, 416 U.S. at 139-140, 94 S.Ct. at 1637, 40 L.Ed.2d 15.

[6] In Board of Regents v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548, we recognized that the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684
**(Cite as: 426 U.S. 341, 96 S.Ct. 2074)**

nonretention of an untenured college teacher might make him somewhat less attractive to other employers, but nevertheless concluded that it would stretch the concept to far "to suggest that a person is deprived of 'liberty' when he simply is not re-hired in one job but remains as free as before to seek another."Id., at 575, 92 S.Ct. at 2708.This same conclusion applies to the discharge of a public employee whose position is terminable at the will of the employer when there is no public disclosure of the reasons for the discharge.

[7][8] In this case the asserted reasons for the City Manager's decision were communicated orally to the petitioner in private and also were stated in writing in answer to interrogatories after this litigation commenced. Since the former communication was not made public, it cannot properly form the basis for a claim that petitioner's interest in his "good name, reputation, honor, or integrity"FN12 was thereby impaired. And since the latter communication was made in the course of a judicial proceeding which did not commence until after petitioner had suffered the injury for which he seeks redress, it surely cannot provide retroactive support for his claim. A contrary*349 evaluation of either explanation would penalize forthright and truthful communication between employer and employee in the former instance, and between litigants in the latter.

> FN12. See Wisconsin v. Constantineau, 400 U.S. 433, 437, 91 S.Ct. 507, 510, 27 L.Ed.2d 515, and the discussion of the interest in reputation allied to employment in Paul v. Davis, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405.

Petitioner argues, however, that the reasons given for his discharge were false. Even so, the reasons stated to him in private had no different impact on his reputation than if they had been true. And the answers to his interrogatories, whether true or false, did not cause the discharge. The truth or falsity of the City Manager's statement determines whether or not his decision to discharge the petitioner was correct or prudent, but neither enhances nor

**2080 petitioner's claim that his constitutionally protected interest in liberty has been impaired.FN13A contrary evaluation of his contention would enable every discharged employee to assert a constitutional claim merely by alleging that his former supervisor made a mistake.

> FN13. Indeed, the impact on petitioner's constitutionally protected interest in liberty is no greater even if we assume that the City Manager deliberately lied. Such fact might conceivably provide the basis for a state-law claim, the validity of which would be entirely unaffected by our analysis of the federal constitutional question.

[9][10] The federal court is not the appropriate forum in which to review the multitude of personnel decisions that are made daily by public agencies.FN14We must accept the *350 harsh fact that numerous individual mistakes are inevitable in the day-to-day administration of our affairs. The United States Constitution cannot feasibly be construed to require federal judicial review for every such error. In the absence of any claim that the public employer was motivated by a desire to curtail or to penalize the exercise of an employee's constitutionally protected rights, we must presume that official action was regular and, if erroneous, can best be corrected in other ways. The Due Process Clause of the Fourteenth Amendment is not a guarantee against incorrect or ill-advised personnel decisions.

> FN14. The cumulative impression created by the three dissenting opinions is that this holding represents a significant retreat from settled practice in the federal courts. The fact of the matter, however, is that the instances in which the federal judiciary has required a state agency to reinstate a discharged employee for failure to provide a pretermination hearing are extremely rare. The reason is clear. For unless we were to adopt Mr. Justice BRENNAN's remarkably innovative suggestion that we develop a federal common law of property rights, or his equally far-reaching view that almost

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

every discharge implicates a constitutionally protected liberty interest, the ultimate control of state personnel relationships is, and will remain, with the States; they may grant or withhold tenure at their unfettered discretion. In this case, whether we accept or reject the construction of the ordinance adopted by the two lower courts, the power to change or clarify that ordinance will remain in the hands of the City Council of the city of Marion.

The judgment is affirmed.

So ordered.

Mr. Justice BRENNAN, with whom Mr. Justice MARSHALL concurs, dissenting.

Petitioner was discharged as a policeman on the grounds of insubordination, "causing low morale," and "conduct unsuited to an officer." Ante, at 2077. It is difficult to imagine a greater "badge of infamy" that could be imposed on one following petitioner's calling; in a provision in which prospective employees are invariably investigated, petitioner's job prospects will be severely constricted by the governmental action in this case. Although our case law would appear to require that petitioner thus be accorded an opportunity "to clear his name" of this calumny, see, E. g., Board of Regents v. Roth, 408 U.S. 564, 573, and n. 12, 92 S.Ct. 2701, 2707, 33 L.Ed.2d 548 (1972); Arnett v. Kennedy, 416 U.S. 134, 157, 94 S.Ct. 1633, 1645, 40 L.Ed.2d 15 (1974) (opinion **\*351** of Rehnquist, J.), the Court condones this governmental action and holds that petitioner was deprived of no liberty interest thereby.

Paul v. Davis, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976), a decision overtly hostile to the basic constitutional safeguards of the Due Process Clauses of the Fifth and Fourteenth Amendments that I had hoped would be a "short-lived aberration," Id., at 735, 96 S.Ct., at 1177 (Brennan, J., dissenting), held that the "interest in reputation asserted in (Paul) is neither 'liberty' nor 'property' guaranteed against state deprivation without due

process of law."Id., at 712, 96 S.Ct., at 1166.Accordingly, it found inapplicable the rule that "(w)here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential."Wisconsin v. Constantineau, 400 U.S. 433, 437, 91 S.Ct. 507, 510, 27 L.Ed.2d 515 (1971), and cases cited therein. In so holding, the Court eviscerated the substance**\*\*2081** of a long line of prior cases, see, E. g., Anti-Fascist Comm. v. McGrath, 341 U.S. 123, 71 S.Ct. 624, 95 L.Ed. 817 (1951); Cafeteria Workers v. McElroy, 367 U.S. 886, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961); Board of Regents v. Roth, supra, by confining their protection of "liberty" to situations in which the State inflicts damage to a government employee's "good name, reputation, honor, or integrity" in the process of terminating his employment. See Paul v. Davis, supra, 424 U.S., at 708, 96 S.Ct., at 1164.Compare Id., at 709-710, 96 S.Ct., at 1164-1165, with Id., at 732-733, 96 S.Ct., at 1176 (Brennan, J., dissenting).[FN1] Today the Court effectively destroys even that last vestige of protection for "liberty" by holding that a State may tell an employee that he is being fired for some nonderogatory reason, and then turn around and inform prospective employers that the employee**\*352** was in fact discharged for a stigmatizing reason that will effectively preclude future employment.

> FN1. The Court in Paul also ignored the clear import of Goss v. Lopez, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975); Wisconsin v. Constantineau, 400 U.S. 433 (1971); and Jenkins v. McKeithen, 395 U.S. 411, 89 S.Ct. 1843, 23 L.Ed.2d 404 (1969). See Paul v. Davis, 424 U.S., at 729-733, 96 S.Ct., at 1174-1176 (Brennan, J., dissenting).

The Court purports to limit its holding to situations in which there is "no public disclosure of the reasons for the discharge,"Ante, at 2079, but in this case the stigmatizing reasons have been disclosed, and there is no reason to believe that respondents will not convey these actual reasons to petitioner's prospective employers.[FN2]The Court responds by

426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684

**(Cite as: 426 U.S. 341, 96 S.Ct. 2074)**

asserting that since the stigma was imposed "after petitioner had suffered the injury for which he seeks redress, it surely cannot provide retroactive support for his claim."Ibid. But the "claim" does not arise until the State has officially branded petitioner in some way, and the purpose of the due process hearing is to accord him an opportunity to clear his name; merely because the derogatory information is filed in respondents' records and no "publication" occurs until shortly after his discharge from employment does not subvert the fact that a post-deprivation hearing to accord petitioner an opportunity to clear his name has been contemplated by our cases.[FN3] **\*353** Even under Paul v. Davis, respondents should be required to accord petitioner a due process hearing in which he can attempt to vindicate his name; this further expansion of those personal interests that the Court simply writes out of the "life, liberty, or property" Clauses of the Fifth and Fourteenth Amendments is simply another curtailment of precious constitutional safeguards that marks too many recent decisions of the Court.

> FN2. It is only common sense, to be sure, that prospective employers will inquire as to petitioner's employment during the 33 months in which he was in respondents' service.

> FN3. The Court asserts that to provide petitioner with a post-deprivation hearing when the stigmatizing reasons become known during litigation "would penalize forthright and truthful communication . . . between litigants."Ante, at 2080. Of course, there are various sanctions under our judicial system to ensure that testimony is "forthright and truthful" without necessitating denial of petitioner's due process rights. And I suppose the Court would declare that according a discharged employee a postdeprivation hearing as soon as it is clear his former employer is stigmatizing his name when it communicates with prospective employers would similarly discourage "forthright and truthful" commu-

nication between employers in that situation. However, the purpose of the due process hearing is to provide petitioner a mechanism for clearing his name of a cloud that is not in fact "truthful."

I also fully concur in the dissenting opinions of Mr. Justice WHITE and Mr. Justice BLACKMUN, which forcefully demonstrate the Court's error in holding that petitioner was not deprived of "property" without due process of law. I would only add that the strained reading of the local ordinance, which the Court deems to be "tenable," Ante, at 2079, cannot be dispositive of the existence Vel non of petitioner's "property" interest. There is certainly a federal dimension to the definition of "property" in the Federal Constitution; cases such as Board of Regents v. Roth, supra, held merely**\*2082** that "property" interests encompass those to which a person has "a legitimate claim of entitlement," 408 U.S., at 577, 92 S.Ct., at 2709, and Can arise from "existing rules or understandings" that derive from "an independent source Such as state law."Ibid. (emphasis supplied). But certainly, at least before a state law is definitively construed as not securing a "property" interest, the relevant inquiry is whether it was objectively reasonable for the employee to believe he could rely on continued employment. Cf. Ibid.("It is a purpose of the ancient institution of property to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined."FN4) At a minimum, this would require in this **\*354** case an analysis of the common practices utilized and the expectations generated by respondents, and the manner in which the local ordinance would reasonably be read by respondents' employees.[FN5] These disputed issues of fact are not meet for resolution, as they were on summary judgment, and would thus at a minimum require a remand for further factual development in the District Court.

> FN4. By holding that States have "unfettered discretion" in defining "property" for purposes of the Due Process Clause of the Federal Constitution, see

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684
**(Cite as: 426 U.S. 341, 96 S.Ct. 2074)**

Ante, at 2080, n. 14, the Court is, as my Brother WHITE argues, effectively adopting the analysis rejected by a majority of the Court in Arnett v. Kennedy, 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974). More basically, the Court's approach is a resurrection of the discredited rights/ privileges distinction, for a State may now avoid all due process safeguards attendant upon the loss of even the necessities of life, cf. Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), merely by labelling them as not constituting "property." See also, E. g. Bell v. Burson, 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971); Fuentes v. Shevin, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972); Morrissey v. Brewer, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972).

FN5. For example, petitioner was hired for a "probationary" period of six months, after which he became a "permanent" employee. No reason appears on the record for this distinction, other than the logical assumption, confirmed by a reasonable reading of the local ordinance, that after completion of the former period, an employee may only be discharged for "cause." As to respondents' personnel practices, it is important to note that in a department which currently employs 17 persons, petitioner's was the only discharge, for cause or otherwise, during the period of over three years from the time of his hiring until the time of pretrial discovery.

These observations do not, of course, suggest that a "federal court is . . . the appropriate forum in which to review the multitude of personnel decisions that are made daily by public agencies."Ante, at 2080. However, the federal courts Are the appropriate forum for ensuring that the constitutional mandates of due process are followed by those agencies of government making personnel decisions that pervasively influence the lives of those affected

thereby; the fundamental premise of the Due Process Clause is that those procedural safeguards will help the government avoid the "harsh fact" of "incorrect or ill-advised personnel decisions." Ante, at 2080. **\*355** Petitioner seeks no more than that, and I believe that his "property" interest in continued employment and his "liberty" interest in his good name and reputation dictate that he be accorded procedural safeguards before those interests are deprived by arbitrary or capricious government action.

Mr. Justice WHITE, with whom Mr. Justice BRENNAN, Mr. Justice MARSHALL, and Mr. Justice BLACKMUN join, dissenting.
I dissent because the decision of the majority rests upon a proposition which was squarely addressed and in my view correctly rejected by six Members of this Court in Arnett v. Kennedy, 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974).

Petitioner Bishop was a permanent employee of the Police Department of the city of Marion, N. C. The city ordinance applicable to him provides:
"Dismissal. A permanent employee whose work is not satisfactory over a period of time shall be notified in what way his work is deficient and what he must do if his work is to be satisfactory. **\*\*2083** If a permanent employee fails to perform work up to the standard of the classification held, or continues to be negligent, inefficient, or unfit to perform his duties, he may be dismissed by the City Manager. Any discharged employee shall be given written notice of his discharge setting forth the effective date and reasons for his discharge if he shall request such a notice."(Emphasis added.)

The second sentence of this ordinance plainly conditions petitioner's dismissal on cause I. e., failure to perform up to standard, negligence, inefficiency, or unfitness to perform the job. The District Court below did not otherwise construe this portion of the ordinance. In the only part of its opinion rejecting petitioner's claim that the ordinance gave him a property interest in his job, **\*356** the District Court said, in an opinion predating this Court's decision in *Arnett v. Kennedy*, *supra* :"It is clear from Article

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

II, Section 6, of the City's Personnel Ordinance, that the dismissal of an employee does not require a notice or a hearing. Upon request of the discharged employee, he shall be given written notice of his discharge setting forth the effective date and the reasons for the discharge. It thus appears that both the city ordinance and the state law have been complied with."377 F.Supp. 501, 504 (WDNC 1973).

Thus in concluding that petitioner had no "property interest" in his job entitling him to a hearing on discharge and that he held his position "at the will and pleasure of the city,"ibid., the District Court relied on the fact that the ordinance described its own Procedures for determining cause, which procedures did not include a hearing. The majority purports, Ante, at 2078, and n. 8, to read the District Court's opinion as construing the ordinance Not to condition dismissal on cause, and, if this is what the majority means, its reading of the District Court's opinion is clearly erroneous for the reasons just stated.[FN1] However, later in its opinion the majority appears to *357 eschew this construction of the District Court's opinion and of the ordinance. In the concluding paragraph of its discussion of petitioner's property interest, the majority holds that since neither the ordinance nor state law provides for a hearing, or any kind of review of the City Manager's dismissal decision, petitioner had no enforceable property interest in his job. The majority concludes:

> FN1. The Court accepts the District Court's conclusion that the city employee holds his position at the will and pleasure of the city. If the Court believes that the District Court's conclusion did not rest on the procedural limitations in the ordinance, then the Court must construe the District Court's opinion and the ordinance as permitting, but not limiting, discharges to those based on the causes specified in the ordinance. In this view, discharges for other reasons or for no reason at all could be made. Termination of employment would in effect be within the complete discretion of the city; and for this reason the employ-

ee would have no property interest in his employment which would call for the protections of the Due Process Clause. As indicated in the text, I think this construction of the ordinance and of the District Court's opinion is in error.

"In this case, as the District Court construed the ordinance, the City Manager's Determination of the adequacy of the grounds for discharge is not subject to judicial review; the employee is merely given certain procedural rights which the District Court found not to have been violated in this case. The District Court's reading of the ordinance is tenable . . . ."Ante, at 2079. (Emphasis added.)

The majority thus implicitly concedes that the ordinance supplies the "grounds" for discharge and that the City Manager must determine them to be "adequate" before he may fire an employee. The majority's holding that petitioner had no property interest in his job in spite of the unequivocal language in the city ordinance that he may be dismissed only for certain kinds of cause rests, then, on the fact that state law provides no Procedures for assuring that the City Manager dismiss him only for cause. The right to his job apparently given by the first two sentences of the ordinance is thus **2084 redefined, according to the majority, by the procedures provided for in the third sentence and as redefined is infringed only if the procedures are not followed.

This is precisely the reasoning which was embraced by only three and expressly rejected by six Members of this Court in Arnett v. Kennedy, Supra.There a federal employee had "a statutory expectancy that he not be removed other than for 'such cause as will promote *358 the efficiency of (the) service.'"416 U.S., at 151-152, 94 S.Ct., at 1643 (opinion of Rehnquist, J., joined by Burger,. J., and Stewart, J.). The three Justices whose views were rejected by a majority of the Court went on to say:

"But the very section of the statute which granted him that right . . . expressly provided also for the procedure by which 'cause' was to be determined, and expressly omitted the procedural guarantees

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684
**(Cite as: 426 U.S. 341, 96 S.Ct. 2074)**

which appellee insists are mandated by the Constitution. Only by bifurcating the very sentence of the Act of Congress which conferred upon appellee the right not to be removed save for cause could it be said that he had an expectancy of that substantive right without the procedural limitations which Congress attached to it. . . ."Id., at 152, 94 S.Ct. at 1643.

The three Justices went on to:
"Here the property interest which appellee had in his employment was itself conditioned by the procedural limitations which had accompanied the grant of that interest. . . ."Id., at 155, 94 S.Ct. at 1645.

Accordingly they concluded that the Constitution imposed no independent procedural requirements.

This view was rejected by Mr. Justice Powell in an opinion joined by Mr. Justice Blackmun.
"The plurality opinion evidently reasons that the nature of appellee's interest in continued federal employment is necessarily defined and limited by the statutory procedures for discharge and that the constitutional guarantee of procedural due process accords to appellee no procedural protections against arbitrary or erroneous discharge other than those expressly provided in the statute. The plurality would thus conclude that the statute governing federal employment determines not only the nature of appellee's property interest, but also the extent of *359 the procedural protections to which he may lay claim. It seems to me that this approach is incompatible with the principles laid down in *Roth* and *Sindermann*.Indeed, it would lead directly to the conclusion that whatever the nature of an individual's statutorily created property interest, deprivation of that interest could be accomplished without notice or a hearing at any time. This view misconceives the origin of the right to procedural due process. That right is conferred, *not by legislative grace, but by constitutional guarantee*. While the legislature may elect not to confer a property interest in federal employment, it may not constitutionally authorize the deprivation of such an interest, once conferred, without appropriate proced-

ural safeguards. . . ."Id., at 166-167,94 S.Ct. at 1650.(Emphasis added.)

I, too, disagreed with the view stated in Mr. Justice Rehnquist's opinion:"I differ basically with the plurality's view that 'where the grant of a substantive right is inextricably intertwined with the limitations on the procedures which are to be employed in determining that right, a litigant in the position of appellee must take the bitter with the sweet,' and that 'the property interest which appellee had in his employment was itself conditioned by the procedural limitations which had accompanied the grant of that interest.'Ante, at 1644, 1645.The rationale of this position quickly leads to the conclusion that even though the statute requires cause for discharge, the requisites of due process could equally have been satisfied had the law dispensed with any hearing at all, whether pretermination or post-termination."Id., at 177-178, 94 S.Ct., at 1656.

*360 **2085 The view was also rejected by Mr. Justice Marshall in an opinion joined by Mr. Justice Brennan and Mr. Justice Douglas in which it was correctly observed:"Accordingly, a majority of the Court rejects Mr. Justice REHNQUIST's argument that because appellee's entitlement arose from statute, it could be conditioned on a statutory limitation of procedural due process protections, an approach which would render such protection inapplicable to the deprivation of any statutory benefit any 'privilege' extended by Government where a statute prescribed a termination procedure, no matter how arbitrary or unfair. It would amount to nothing less than a return, albeit in somewhat different verbal garb, to the thoroughly discredited distinction between rights and privileges which once seemed to govern the applicability of procedural due process."Id., at 211, 94 S.Ct., at 1673.

The views now expressed by the majority are thus squarely contrary to the views expressed by a majority of the Justices in Arnett.As Mr. Justice Powell suggested in Arnett, they are also "incompatible with the principles laid down in Roth And Sindermann."[FN2]Id., at 166, 94 S.Ct., at 1650.I would not so soon depart from these cases nor from the views

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684
**(Cite as: 426 U.S. 341, 96 S.Ct. 2074)**

expressed by a majority in Arnett.The ordinance plainly grants petitioner a right to his job unless there is cause to fire him. Having granted him such a right it is the Federal Constitution,[FN3] *361 not state law, which determines the process to be applied in connection with any state decision to deprive him of it.

> FN2.Board of Regents v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), and Perry v. Sindermann, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972).

> FN3. The majority intimates, Ante, at 2078 n. 8, that the views of the three plurality Justices in Arnett v. Kennedy were rejected because the other six Justices disagreed on the question of how the federal Statute Involved in that case should be construed. This is incorrect. All Justices agreed on the meaning of the statute. As the remarks of the six Justices quoted above indicate, it was the constitutional significance of the statute on which the six disagreed with the plurality.

Similarly, here, I do not disagree with the majority or the courts below on the meaning of the state law. If I did, I might be inclined to defer to the judgments of the two lower courts. The state law says that petitioner may be dismissed by the City Manager only for certain kinds of cause and then provides that he will receive notice and an explanation, but no hearing and no review. I agree that as a matter of state law petitioner has no remedy no matter how arbitrarily or erroneously the City Manager has acted. This is what the lower courts say the statute means. I differ with those courts and the majority only with respect to the constitutional significance of an unambiguous state law. A majority of the Justices in Arnett v. Kennedy stood on the proposition that the Constitution requires procedures Not Required by state law when the state conditions dismissal on "cause."Mr. Justice BLACKMUN, with whom Mr. Justice BRENNAN joins, dissenting.

I join Mr. Justice WHITE's dissent for I agree that the Court appears to be adopting a legal principle

which specifically was rejected by a majority of the Justices of this Court in Arnett v. Kennedy, 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974).

I also feel, however, that Still v. Lance, 279 N.C. 254, 182 S.E.2d 403 (1971), the only North Carolina case cited by the Court and by the District Court, is by no means the authoritative holding on state law that the Court, Ante, at 2078 and n. 9, seems to think it is. In Still the Supreme Court of North Carolina considered a statute that contained no "for cause" standard for failure to renew a teacher's contract at the End of a school year. In holding that this provision did not create a continued expectation of employment, the North Carolina court noted that it "does not limit the right of the employer board to terminate the employment of a teacher at the *362 end of a school year to a specified cause or circumstances."279 N.C., at 260, 182 S.E.2d, at 407.This provision, the court observed, stood in sharp contrast with another provision of the statute relating to termination of employment *during* the school year and prescribing that **2086 when "it shall have been determined that the services of an employee are not acceptable for the remainder of the current school year" (emphasis added), ibid., notice and hearing were required.

The Marion ordinance in the present case contains a "for cause" standard for dismissal and, it seems to me, is like that portion of the statute construed in Still pertaining to termination of employment during the year. As such, it plainly does not subject an employee to termination at the will and pleasure of the municipality, but, instead, creates a proper expectation of continued employment so long as he performs his work satisfactorily. At this point, the Federal Constitution steps in and requires that appropriate procedures be followed before the employee may be deprived of his property interest.

U.S.N.C.,1976.
Bishop v. Wood
426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

57 F.3d 1560                                                                                                              Page 1
57 F.3d 1560, 10 IER Cases 1409
**(Cite as: 57 F.3d 1560)**

▷

Hargray v. City of Hallandale
C.A.11 (Fla.),1995.

United States Court of Appeals,Eleventh Circuit.
Vernon E. HARGRAY, Plaintiff-Appellee,
v.
CITY OF HALLANDALE, Defendant-Appellant.
**No. 93-5281.**

July 19, 1995.

Former city employee brought suit under § 1983
against city, alleging violation of his property in-
terest in continued employment with city. Plaintiff
maintained that he was wrongfully discharged
without pretermination hearing when he resigned
involuntarily after being given choice between
resigning or facing possible criminal charges for
misappropriation of city property. The United
States District Court for the Southern District of
Florida, No. 91-6661-CIV-DLG, Donald L. Gra-
ham, J., 830 F.Supp. 1467, entered judgment in fa-
vor of plaintiff, and city appealed. The Court of
Appeals held that plaintiff failed to overcome pre-
sumption of voluntary resignation, either under the-
ory of duress or coercion or misrepresentation, and
thus he was not deprived of any protected interest
in his employment by city.

Reversed.

West Headnotes

**[1] Federal Courts 170B ⟜850.1**

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
            170BVIII(K)5 Questions of Fact, Verdicts
and Findings
                170Bk850 Clearly Erroneous Findings
of Court or Jury in General
                    170Bk850.1 k. In General. Most
Cited Cases
Court of Appeals will not reverse district court's
findings of fact in actions tried without a jury un-
less they are clearly erroneous; if court's findings

are plausible in light of record viewed in its en-
tirety, Court of Appeals must accept them.

**[2] Federal Courts 170B ⟜776**

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
            170BVIII(K)1 In General
                170Bk776 k. Trial De Novo. Most
Cited Cases
Review of district court's application of law to facts
to determine whether city employee's resignation
was involuntary was de novo.

**[3] Constitutional Law 92 ⟜4171**

92 Constitutional Law
    92XXVII Due Process
        92XXVII(G) Particular Issues and Applica-
tions
            92XXVII(G)7 Labor, Employment, and
Public Officials
                92k4163 Public Employment Relation-
ships
                    92k4171 k. Termination or Dis-
charge. Most Cited Cases
    (Formerly 92k278.4(1))
For purposes of due process, public employee
resignations are presumed to be voluntary.
U.S.C.A. Const.Amend. 14.

**[4] Constitutional Law 92 ⟜4171**

92 Constitutional Law
    92XXVII Due Process
        92XXVII(G) Particular Issues and Applica-
tions
            92XXVII(G)7 Labor, Employment, and
Public Officials
                92k4163 Public Employment Relation-
ships
                    92k4171 k. Termination or Dis-
charge. Most Cited Cases
    (Formerly 92k278.4(3))
There are two situations in which a public employ-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

57 F.3d 1560, 10 IER Cases 1409

**(Cite as: 57 F.3d 1560)**

ee's resignation will be considered involuntary, and thus a deprivation of due process: where employer forces resignation by coercion or duress; or where employer obtains resignation by deceiving or misrepresenting material fact to employee. U.S.C.A. Const.Amend. 14.

**[5] Constitutional Law 92 €══4171**

92 Constitutional Law
   92XXVII Due Process
      92XXVII(G) Particular Issues and Applications
        92XXVII(G)7 Labor, Employment, and Public Officials
         92k4163 Public Employment Relationships
          92k4171 k. Termination or Discharge. Most Cited Cases
    (Formerly 92k278.4(3))
In determining whether public employee's resignation was involuntary, and thus a deprivation of due process, under coercion or duress theory, Court of Appeals considers whether, under totality of the circumstances, employer's conduct in obtaining employee's resignation deprived employee of free will in choosing to resign. U.S.C.A. Const.Amend. 14.

**[6] Constitutional Law 92 €══4171**

92 Constitutional Law
   92XXVII Due Process
      92XXVII(G) Particular Issues and Applications
        92XXVII(G)7 Labor, Employment, and Public Officials
         92k4163 Public Employment Relationships
          92k4171 k. Termination or Discharge. Most Cited Cases
    (Formerly 92k278.4(3))
In determining whether public employee's resignation was obtained by coercion or duress, depriving employee of due process, factors to consider include: whether employee was given some alternative to resignation; whether employee understood nature of choice he was given; whether employee

was given reasonable time in which to choose; whether employee was permitted to select effective date of resignation; and whether employee had advice of counsel. U.S.C.A. Const.Amend. 14.

**[7] Constitutional Law 92 €══4171**

92 Constitutional Law
   92XXVII Due Process
      92XXVII(G) Particular Issues and Applications
        92XXVII(G)7 Labor, Employment, and Public Officials
         92k4163 Public Employment Relationships
          92k4171 k. Termination or Discharge. Most Cited Cases
    (Formerly 92k278.4(3))
In determining whether public employee's resignation was obtained by coercion or duress, depriving employee of due process, assessment of whether real alternatives were offered is gauged by objective standard rather than by employee's subjective evaluation; that employee may perceive his only option to be resignation is irrelevant; moreover, mere fact that choice is between comparably unpleasant alternatives does not of itself establish that resignation was induced by duress or coercion, and thus was involuntary. U.S.C.A. Const.Amend. 14.

**[8] Constitutional Law 92 €══4171**

92 Constitutional Law
   92XXVII Due Process
      92XXVII(G) Particular Issues and Applications
        92XXVII(G)7 Labor, Employment, and Public Officials
         92k4163 Public Employment Relationships
          92k4171 k. Termination or Discharge. Most Cited Cases
    (Formerly 92k278.4(1))
For due process purposes, public employee resignations can be voluntary even where the alternative to resignation is facing possible termination for cause or criminal charges; resignations obtained in cases

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

where employee is faced with such unpleasant alternatives are nevertheless voluntary because fact remains that employee had a choice; one exception to rule where employer actually lacked good cause to believe that grounds for termination and criminal charges existed. U.S.C.A. Const.Amend. 14.

**[9] Federal Courts 170B ☞858**

170B Federal Courts
    170BVIII Courts of Appeals
      170BVIII(K) Scope, Standards, and Extent
        170BVIII(K)5 Questions of Fact, Verdicts and Findings
          170Bk855 Particular Actions and Proceedings, Verdicts and Findings
            170Bk858 k. Civil Rights Cases. Most Cited Cases

District court's factual finding that city employee had no advance notice that criminal charges might be filed against him was clearly erroneous in employee's suit against city alleging that his resignation was obtained by coercion or duress in violation of due process; employee testified that he knew that many city employees had been summoned to police station to be questioned about misappropriation of city property, and he was also aware that there had been serious allegations made against him; moreover, employee knew that subordinate had resigned, and employee confessed to city manager that he knew that subordinate had city property. U.S.C.A. Const.Amend. 14.

**[10] Federal Courts 170B ☞858**

170B Federal Courts
    170BVIII Courts of Appeals
      170BVIII(K) Scope, Standards, and Extent
        170BVIII(K)5 Questions of Fact, Verdicts and Findings
          170Bk855 Particular Actions and Proceedings, Verdicts and Findings
            170Bk858 k. Civil Rights Cases. Most Cited Cases

District court's finding that city employee was not given an opportunity to consider alternatives before resigning was clearly erroneous in employee's action against city alleging that his resignation was obtained by coercion or duress, depriving him of due process; employee was aware that allegations that he misappropriated city property were being investigated some weeks before he was called to police station, he knew that subordinate resigned and consented to answer questions in exchange for not being criminally prosecuted, and during that time, employee had opportunity to consider whether he would go to police station at all, whether he would answer questions, and whether he would resign, if asked to do so, or not resign, even if it meant criminal charges being pressed. U.S.C.A. Const.Amend. 14.

**[11] Constitutional Law 92 ☞4171**

92 Constitutional Law
    92XXVII Due Process
      92XXVII(G) Particular Issues and Applications
        92XXVII(G)7 Labor, Employment, and Public Officials
          92k4163 Public Employment Relationships
            92k4171 k. Termination or Discharge. Most Cited Cases
    (Formerly 92k278.4(3))

**Municipal Corporations 268 ☞150**

268 Municipal Corporations
    268V Officers, Agents, and Employees
      268V(A) Municipal Officers in General
        268k150 k. Resignation or Abandonment. Most Cited Cases

Mere fact that city employee was forced to chose between resignation and facing criminal charges arising from misappropriation of city property did not in itself mean that his resignation was submitted under duress, depriving him of due process, absent evidence that police or city manager lacked good cause for threatened criminal proceedings at time alternatives were offered. U.S.C.A. Const.Amend. 14.

**[12] Constitutional Law 92 ☞4171**

92 Constitutional Law
   92XXVII Due Process
       92XXVII(G) Particular Issues and Applications
          92XXVII(G)7 Labor, Employment, and Public Officials
           92k4163 Public Employment Relationships
             92k4171 k. Termination or Discharge. Most Cited Cases
    (Formerly 92k278.4(3))

**Municipal Corporations 268 ☞150**

268 Municipal Corporations
   268V Officers, Agents, and Employees
      268V(A) Municipal Officers in General
         268k150 k. Resignation or Abandonment. Most Cited Cases
Fact that city employee suspected of misappropriation of city property was forced to make decision to resign or face criminal charges under time pressure and that he did so without advice of counsel were not, by themselves, sufficient to support conclusion that his resignation was involuntary, depriving him of due process. U.S.C.A. Const.Amend. 14.

**[13] Constitutional Law 92 ☞4171**

92 Constitutional Law
   92XXVII Due Process
       92XXVII(G) Particular Issues and Applications
          92XXVII(G)7 Labor, Employment, and Public Officials
           92k4163 Public Employment Relationships
             92k4171 k. Termination or Discharge. Most Cited Cases
    (Formerly 92k278.4(3))

**Municipal Corporations 268 ☞150**

268 Municipal Corporations
   268V Officers, Agents, and Employees
      268V(A) Municipal Officers in General
         268k150 k. Resignation or Abandonment.

Most Cited Cases
Under totality of circumstances, city's conduct in obtaining city employee's resignation did not constitute coercion or duress, depriving employee of due process; employee, who was accused of misappropriation of city property, was free to leave police station before signing resignation statement, he knew what charges were against him, he knew sources of allegations, he never requested more time to make decision, and he did not request to speak with his supervisor or an attorney; moreover, entire conversation was on tape, which indicated that interview was conducted in a casual atmosphere, during which employee at times even laughed with police. U.S.C.A. Const.Amend. 14.

**[14] Constitutional Law 92 ☞4171**

92 Constitutional Law
   92XXVII Due Process
       92XXVII(G) Particular Issues and Applications
          92XXVII(G)7 Labor, Employment, and Public Officials
           92k4163 Public Employment Relationships
             92k4171 k. Termination or Discharge. Most Cited Cases
    (Formerly 92k278.4(3))
Under misrepresentation theory, court may find public employee's resignation to be involuntary, and a deprivation of due process, if induced by employee's reasonable reliance upon employer's misrepresentation of material fact concerning the resignation; misrepresentation may be material if it concerns an alternative to resignation, such as possibility of criminal prosecution. U.S.C.A. Const.Amend. 14.

**[15] Constitutional Law 92 ☞4171**

92 Constitutional Law
   92XXVII Due Process
       92XXVII(G) Particular Issues and Applications
          92XXVII(G)7 Labor, Employment, and Public Officials

92k4163 Public Employment Relation-
ships

92k4171 k. Termination or Dis-
charge. Most Cited Cases
(Formerly 92k278.4(3))

In order for public employee to establish that his
resignation was involuntary, depriving him of due
process, on ground that it was obtained by misrep-
resentation, employee is not required to show that
employer intentionally deceived him; since stand-
ard is an objective one, court will not inquire into
subjective perceptions of employer or employee.
U.S.C.A. Const.Amend. 14.

**[16] Constitutional Law 92 ⟶4171**

92 Constitutional Law
   92XXVII Due Process
      92XXVII(G) Particular Issues and Applica-
tions
         92XXVII(G)7 Labor, Employment, and
Public Officials
            92k4163 Public Employment Relation-
ships
               92k4171 k. Termination or Dis-
charge. Most Cited Cases
(Formerly 92k278.4(3))

**Municipal Corporations 268 ⟶150**

268 Municipal Corporations
   268V Officers, Agents, and Employees
      268V(A) Municipal Officers in General
         268k150 k. Resignation or Abandonment.
Most Cited Cases

City employee did not establish that his resignation
was involuntary, depriving him of due process, on
ground that city misrepresented possibility of crim-
inal prosecution for grand theft of city property be-
cause city knew, or reasonably should have known,
that police did not have probable cause to prosecute
employee for grand theft at time they requested his
resignation; at time of police interrogation which
resulted in resignation, officers had corroborated al-
legations made in anonymous letter against employ-
ee and allegations made against him by other city
employees during their police interviews, and dur-

ing interrogation, employee admitted taking city
lumber and a garbage can. U.S.C.A. Const.Amend.
14.

**\*1562** Richard Kane, Hallandale, FL, for appellant.
Robert Elliot Weisberg, Coral Gables, FL, Martha
Chapman, Abling & Chapman, P.A., Orlando, FL,
for appellee.

Appeal from the United States District Court for the
Southern District of Florida.

Before COX and BLACK, Circuit Judges, and
FAY, Senior Circuit Judge.
PER CURIAM:

Appellee Vernon E. Hargray brought this suit under
42 U.S.C. § 1983 against his former employer, Ap-
pellant City of Hallandale (City), alleging a viola-
tion of his property interest in continued employ-
ment with the **\*1563** City. Hargray maintained that
he was wrongfully discharged without a pre-
termination hearing when he resigned after being
given a choice between resigning or facing possible
criminal charges. After a non-jury trial, the district
court entered judgment in favor of Hargray, and the
City appealed. Because we conclude that, under the
totality of the circumstances, Hargray's resignation
was voluntary, we reverse on the ground that the
City did not deprive him of any protected interest in
his employment within the meaning of the due pro-
cess clause.

## I. BACKGROUND

The full factual findings of the district court are re-
counted at *Hargray v. City of Hallandale*, 830
F.Supp. 1467 (S.D.Fla.1993). The facts relevant to
the issue presented in this appeal are as follows.
Hargray was employed by the City from 1979 until
his resignation in 1990. At the time he resigned,
Hargray held the position of Operations Manager in
the Department of Public Works (DPW), and repor-
ted directly to the Director of the DPW, John Depp.
In this position, Hargray was responsible for man-
aging the operations of several divisions within the
DPW, including the grounds and maintenance divi-
sion. Hargray had direct supervisory control over at
least four superintendents, who were the heads of

57 F.3d 1560, 10 IER Cases 1409
(Cite as: 57 F.3d 1560)

the divisions. In total, Hargray was responsible for approximately forty employees who worked within the divisions.

Sometime in 1989, Hargray recommended an acquaintance, Richard McDonald, to the City Manager, R.J. Intindola, for the position of superintendent over grounds and maintenance. Intindola, who had the final policy-making authority for the City with respect to personnel and administration, made the final decision to hire McDonald as a superintendent. As the superintendent of grounds and maintenance, McDonald reported directly to Hargray.

In June 1990, three or four employees of the DPW approached Richard Wroblewski, the City's Personnel Director, with allegations that Hargray and McDonald were misappropriating City property for their personal use. Wroblewski sent the employees to speak with Depp. Within a few days, Wroblewski informed Hargray of the allegations of theft in his department, and Hargray began an investigation to find out who had made these allegations. Hargray also consulted McDonald, and told him that McDonald had been accused of theft. Thereafter, Hargray found out that McDonald had met with Depp concerning the allegations.

On Saturday, August 4, 1990, Hargray went to Sheridan Lumber to pick up some timber for the Hepburn Center-a social services facility that the DPW was renovating. Hargray purchased with City money thirteen 4 x 4 pieces of lumber listed on a purchase order for the Hepburn Center and loaded them onto a City truck which he was driving alone that day. Hargray drove back to the DPW compound and placed the lumber behind the compound. On August 7 or 8, 1990, Hargray took seven of the 4 x 4's home.

On August 8, 1990, City officials, including Depp, received an anonymous letter dated August 5, 1990, accusing Hargray and McDonald of gross misuses of the City's equipment and supplies.[FN1] Intindola directed the City police department to conduct an investigation of the allegations contained in the Au-

gust 5 letter. Lieutenant William Owens and Investigator Tommy Long were primarily responsible for the investigation.

> FN1. Among other things, the letter alleged that:
> (1) Hargray or McDonald used a City truck to transport top soil purchased by the City to his own home;
> (2) Hargray or McDonald used a City truck to transport City landscaping logs to his own home;
> (3) Hargray and McDonald misappropriated trees, plants, grass, sod, fertilizer, Dursban, and sprinkler supplies;
> (4) Hargray and McDonald misappropriated supplies from the warehouse (the DPW compound) or directly from the vendors; and
> (5) Hargray or McDonald used other City employees to make improvements on his own home during working hours.

In the course of their investigation, Owens and Long photographed Hargray's house and yard. Four photos, which were introduced into evidence, revealed the following to the police. First, there were two types of plants, **1564** liriopes and exorias, around the trees and house in Hargray's yard. Some of the plants were planted, and some were still in pots. Both of these plants were the type that the City's grounds and maintenance division used in its landscaping of different areas of the City. Second, there were seven 4 x 4 timbers, some placed into the yard apparently creating a landscaping border, and some stacked against the house. Third, there was evidence of new sodding. Fourth, the lawn looked quite plush, indicating that fertilizer may have been recently laid down. Finally, there was a large City garbage can located in the side yard.

In the next step of their investigation, Owens and Long pulled City purchasing records. They discovered, among other things, a purchasing order signed by both McDonald and Hargray for the 4 x 4's which were photographed in Hargray's yard, and a receipt for the 4 x 4's from Sheridan Lumber.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

57 F.3d 1560, 10 IER Cases 1409
**(Cite as: 57 F.3d 1560)**

They also discovered a requisition signed by both McDonald and Hargray for $325 worth of repairs to a trailer. This same trailer had been photographed in McDonald's yard, and McDonald later confessed to keeping the trailer for at least a few months prior to the investigation.

By the week of June 15, 1990, Owens and Long began to interview City employees by calling them down one by one to the police station for questioning. In total, twenty-eight City employees were interviewed; McDonald and Hargray were the last two to be interviewed. Many employees made allegations accusing Hargray of misappropriating City property. Summaries of the interviews were compiled into a police report.[FN2]

> FN2. Although the district court found that the report was hearsay, it did allow the report to be admitted for the limited purpose of determining whether the officers had probable cause that Hargray was misappropriating the property. As such, our overview of the summary of the report is simply to establish what Owens and Long knew at the time they questioned Hargray, as opposed to determining whether or not Hargray actually misappropriated property.

Specifically, Elfran Gomez stated that he observed Hargray and McDonald dumping personal items at a lake using a City truck on City time. Angus Bryant stated that Hargray had given McDonald permission to use a City truck for personal use at his home. John Deck told police that three months prior to the investigation he observed Hargray pick up a load of top soil from Florida Silica Sand. Deck told police that it was unusual for Hargray, a director of operations, to be personally picking up supplies, especially on a Saturday. Elbridge Dean told police that Hargray had instructed him in May or June 1990 to take approximately 20-30 plants to Hargray's house.

Andrew Smith told police that he observed Hargray and another City employee driving a City truck which contained five yards of muck, which Smith maintained was not used on a City project. Smith stated that the two returned in the truck two hours later and the muck was gone. Jose Garcia stated that on several occasions he observed Hargray and McDonald inside the DPW compound, where supplies were kept, on Saturdays. Finally, James Simmons told police that he observed Hargray and a City employee using a City truck sometime in June. After Hargray returned the truck, Simmons found a receipt inside the truck for fourteen yards of top soil from Florida Silica Sand. Simmons claimed that there was no job needing top soil at the time, and that Hargray and the other employee were the only two employees in the truck that day.

Other employees told police that, although they had not personally observed Hargray stealing City property, they had heard many rumors about his misappropriations and his using City employees to make improvements on his home during City time. Many of these same employees told police that they had personally observed McDonald misappropriating various items of City property, as well as making improvements on his home during City time. McDonald corroborated the substance of the allegations against him in his own interview with the police.

On Monday, August 20, 1990, McDonald resigned and admitted to violating City policy by using City equipment or property for his personal use. On August 23, 1990, the police called McDonald to the station and offered him the option of resolving the criminal investigation against him through administrative **\*1565** rather than criminal channels. The police presented McDonald with a written agreement stating that he would answer all questions honestly in exchange for their not initiating criminal charges against him. McDonald requested to consider the offer overnight so that he could consult an attorney, and the officers allowed him to do so.

McDonald signed the agreement on August 24, and Long and Owens then conducted a two-hour taped interview regarding the allegations made against him. McDonald confessed to[FN3], and corroborated, many of the allegations made against him by

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

57 F.3d 1560
57 F.3d 1560, 10 IER Cases 1409
**(Cite as: 57 F.3d 1560)**

the other employees and by the anonymous letter. He denied that Hargray had any involvement with his theft of City property, but conceded that Hargray knew that McDonald used a City truck and a City trailer for personal purposes. He also conceded that it would have been unusual for Hargray to pick up lumber himself on a Saturday.

> FN3. Specifically, McDonald confessed the following: that he used a City truck to deliver top soil to his residence; that he stole some bedrock to use in his flower garden; that he stole some 6 x 8 timbers; that he made improvements on his property during City hours; that he stole two palm trees; that he stole some hibiscus, moripy, exoria, and bougenvillia plants; that he signed for many of the items stolen on purchase orders for the City; that he misappropriated six pallets of sod after purchasing them for the City from Kelly's Sod; that he was using a City trailer which he kept in his possession and had repair work on for over a month; that he stole some sprinkler fittings, piping, and valves; and finally, that he misappropriated the time of several City employees.

During the week of August 15, Hargray was aware that many City employees were being called down to the police station to be interviewed regarding misappropriation of City property. He also was aware that these employees were making serious allegations against him, and he discussed his concerns with his wife. During this time, Depp and Intindola observed that at the budget meetings on Friday, August 17 and Monday, August 20, Hargray, who was usually an active participant in meetings, was "unable to respond" and seemed "preoccupied." After McDonald resigned on August 20, Hargray went into Intindola's office and told him that he knew that McDonald had the trailer and other supplies, but that Hargray had told him to return them. When Intindola asked Hargray how he could have let McDonald have these items, Hargray had no answer.

Prior to August 24, Owens had three meetings with Intindola regarding the investigation of Hargray's alleged involvement. At the third meeting, Owens told Intindola that he had probable cause to bring criminal charges of grand theft against Hargray. After discussing the situation, Intindola and Owens decided to give Hargray the option of proceeding administratively, rather than criminally. They agreed that if Hargray chose the administrative route and confessed to some wrongdoing, they should secure his resignation.

At about 2:00 p.m. on August 24, 1990, Depp informed Hargray that the police wanted to interview him and that he should go to the police station. Owens and Long commenced the investigation at about 3:30. The interview was taped, but the recording did not commence until five to ten minutes after the beginning of the interrogation. During those pre-taping minutes, Owens informed Hargray that he was the subject of a grand theft investigation. Owens handed Hargray a memo from the chief of police offering Hargray the option of resolving the allegations of impropriety in the DPW through administrative rather than criminal channels.

Initially, Hargray indicated he preferred to go the criminal route. Owens told Hargray he would give Hargray a few minutes alone to consider the choice. Before leaving the room, Owens said to Hargray "I will give you two words to think about-Sheridan Lumber." When Owens returned a few minutes later, Hargray indicated that he wanted to proceed administratively, and signed an agreement to that effect. The police then began the tape recording, during which Hargray repeatedly denied taking any City property, besides the lumber and garbage can. Hargray, however, did not have receipts for many of the items found in his yard, and he was evasive when asked how he purchased the sod in his yard. As to the lumber and **\*1566** the garbage can, the interrogation proceeded as follows:

Lt. Owens: ... what, in fact, is the property misappropriated for your own use and the means by which you did it?

Mr. Hargray: Okay. I picked up the Sheridan [l]umber, I dropped it off on the weekend when

57 F.3d 1560, 10 IER Cases 1409
**(Cite as: 57 F.3d 1560)**

McDonald was having inspections because I'd been on his case about having inspections. Later in the week, as I was working in the yard, I needed borders so I can line up, because I had weeds growing on it, so that would help me line it up ... Now, there is nothing else in my house or yard that belongs to the City.

Inv. Long: How about that yellow trash can we saw at your house? ... Is that the property of the City of Hallandale?

* * * * * *

Mr. Hargray: Yes.

During this line of questioning, Hargray tried to explain that the City usually threw away the type of garbage can found in his yard. He also stated that he knew the 4 x 4's "had to come back," although he never used the term "borrow" during the taped interview. Owens then informed Hargray that even using City property temporarily is a crime, as follows:

Lt. Owens: The bottom line of this interview is, the only property of the City of Hallandale that you misappropriated to your own personal use, or to use another word, to steal for your own personal use, either temporary-see, you have to understand what theft says. The theft statute says temporarily or permanently. Okay? So to take temporarily or permanently to your own personal use is a commission of theft. That's the reading of the statute, that's the legal end of it. There's borrowing and then there's borrowing permanently. So the only thing is one of the yellow trash cans on a temporary basis and the lumber?

Mr. Hargray: That is it, that is it. That's why I felt, you know, and I even forgot about the, like I said, you know, about the timber.

The topic of Hargray's resignation came up twice during the interview, as follows:

Lt. Owens: I've got a couple of things. I'll put this on. Upon conclusion of this meeting, before you go home tonight, and the City manager wants your resignation-if you would like to-I believe you'll be seeing Mr. McDonald-

Mr. Hargray: No-oh, yeah-

Lt. Owens: -resignation?

Inv. Long: Yeah, I do. John gave it to me something-two years, that is at least a guide to your-probably be appropriate. I'm assuming by the time we're done here the secretarial staff will be gone.

Mr. Hargray: Well, somebody should be there.

Lt. Owens: If they're not, we can have the secretarial staff here do that for you. You can either write it out yourself, or we'll give you a copy of that and you can, you know, take the appropriate verbiage from it that you feel is relevant to yours-

* * * * * *

Inv. Long: Good. I don't have any more questions. Do you?

Lt. Owens: I have no more either, but the City Manager is adamant about the resignation before you leave today. If you want to make a call, you can use the phone out here, then call us.

At all times during the interview, Hargray was free to leave. He never requested to do so, nor did he request the assistance of an attorney or his supervisor. The interrogation concluded at about 5:00 p.m., at which time Hargray was free to leave the police station. Although the investigation was not complete at this point, pursuant to their agreement, Owens and Long abandoned the investigation as to Hargray's alleged misappropriation. Hargray then left the police station by himself, went back to the DPW building, and signed a letter of resignation which John Depp's secretary prepared for him.[FN4]

> FN4. We note that the resignation letter made no mention of any agreement to resign in exchange for the police not initiating criminal prosecution. For purposes of this appeal, however, we will assume, as the district court has, that Hargray's agreement to proceed administratively and avoid criminal prosecution encompassed an agreement to resign.

**\*1567** Thereafter, Hargray brought an action pursuant to 42 U.S.C. § 1983, claiming that the City had violated his due process rights by forcing him to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

57 F.3d 1560
57 F.3d 1560, 10 IER Cases 1409
**(Cite as: 57 F.3d 1560)**

resign from his employment without a hearing in that the police led him to believe that if he did not resign he could and would be prosecuted for grand theft. The City defended the suit on the ground that Hargray's resignation was voluntary. After a non-jury trial, the district court concluded that the City had constructively discharged Hargray because his resignation was involuntary. The court awarded Hargray back pay and reimbursement in the amount of $84,884.97 and compensatory damages in the amount of $150,000, and ordered the City to reinstate him. On appeal, the City maintains first, that Hargray's resignation was voluntary, and second, that if it were involuntary, the compensatory damages awarded were excessive.FN5

> FN5. As we hold that Hargray's resignation was voluntary, we need not address the issue of damages.

## II. STANDARD OF REVIEW

[1][2] The City contends that the district court erred in both its factual findings and its application of the law to these findings to determine whether Hargray voluntarily resigned. This Circuit will not reverse a district court's findings of fact in actions tried without a jury unless they are clearly erroneous. *Barnes v. Lacy,* 927 F.2d 539, 542 (11th Cir.1991); Fed.R.Civ.P. 52(a). "If the court's findings are 'plausible in light of the record viewed in its entirety,' " we must accept them. *Barnes,* 927 F.2d at 542 (quoting *United States v. Fidelity Capital Corp.,* 920 F.2d 827, 836 n. 36 (11th Cir.1991)). In contrast, our review of the district court's application of the law to the facts to determine whether Hargray's resignation was involuntary is *de novo.*FN6 *Barnes,* 927 F.2d at 543.

> FN6. Hargray cites *Steele v. Offshore Shipbuilding, Inc.,* 867 F.2d 1311 (11th Cir.1989) and *Huddleston v. Roger Dean Chevrolet, Inc.,* 845 F.2d 900 (11th Cir.1988), for the proposition that a finding of involuntary resignation is a factual finding. Hargray's reliance on these cases is misplaced. The courts in *Steele* and *Hud-*

*dleston* were reviewing the plaintiffs' alleged constructive discharge in the context of a hostile work environment created by sexual harassment. The only question for resolution in those cases was a factual one—whether intolerable working conditions caused by sexual harassment existed, thus forcing a constructive discharge. In contrast, here we are examining whether the district court could determine, from the facts presented, that coercion or misrepresentation, causing constructive discharge, occurred. The question of whether coercion or misrepresentation is present is a legal one, in which we are free to substitute our judgment for that of the district court. *See generally, Reich v. Dep't of Conservation and Natural Resources,* 28 F.3d 1076, 1082 (11th Cir.1994).

## III. DISCUSSION

The district court found, and the City does not dispute, that Hargray had a property interest in his continued employment with the City because he was covered by the City's Civil Service rules which protected him from arbitrary dismissal. The only issue on appeal is whether the City deprived Hargray of that interest without due process. *Cleveland Bd. of Education v. Loudermill,* 470 U.S. 532, 537, 105 S.Ct. 1487, 1491, 84 L.Ed.2d 494 (1985); *Board of Regents v. Roth,* 408 U.S. 564, 574-576, 92 S.Ct. 2701, 2708-2709, 33 L.Ed.2d 548 (1972). "If he resigned of his own free will even though prompted to do so by events set in motion by his employer, he relinquished his property interest voluntarily and thus cannot establish that the [City] 'deprived' him of it within the meaning of the due process clause." *Stone v. University of Md. Medical Sys., Corp.,* 855 F.2d 167, 173 (4th Cir.1988). "If, on the other hand, [Hargray]'s resignation was so involuntary that it amounted to a constructive discharge, it must be considered a deprivation by [City] action triggering the protections of the due process clause." *Id.* Our constitutional inquiry therefore must focus on the voluntariness of Hargray's resignation. The answer to this question will dispose of the constitu-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

57 F.3d 1560, 10 IER Cases 1409
**(Cite as: 57 F.3d 1560)**

tional deprivation issue.

[3] The question of whether a resignation from public employment that has been requested by an employer is sufficiently involuntary**1568** to trigger the protections of the due process clause is one of first impression in this Circuit. As an initial matter, employee resignations are presumed to be voluntary. *Angarita v. St. Louis County,* 981 F.2d 1537, 1544 (8th Cir.1992); *Alvarado v. Picur,* 859 F.2d 448, 453 (7th Cir.1988); *Christie v. United States,* 518 F.2d 584, 587, 207 Ct.Cl. 333 (1975). "This presumption will prevail unless [the employee] comes forward with sufficient evidence to establish that the resignation was involuntarily extracted." *Christie,* 518 F.2d at 587. Those circuits that have addressed whether a resignation was involuntary agree that the court must examine the surrounding circumstances to test the ability of the employee to exercise free choice. *See Angarita,* 981 F.2d at 1544; *Parker v. Board of Regents,* 981 F.2d 1159, 1162 (10th Cir.1992); *Alvarado,* 859 F.2d at 453-54; *Stone,* 855 F.2d at 173; *Scharf v. Dep't of the Air Force,* 710 F.2d 1572, 1574 (Fed.Cir.1983); *Christie,* 518 F.2d at 587.

[4] The relevant cases reveal that there are two situations in which an employee's resignation will be deemed involuntary, and thus a deprivation of due process: (1) where the employer forces the resignation by coercion or duress, *see, e.g., Schultz v. United States Navy,* 810 F.2d 1133, 1135-37 (Fed.Cir.1987); or (2) where the employer obtains the resignation by deceiving or misrepresenting a material fact to the employee, *see, e.g., Scharf,* 710 F.2d at 1574-76; *Covington v. Department of Health & Human Serv.,* 750 F.2d 937, 942-44 (Fed.Cir.1984).

A. *Resignations Obtained by Coercion or Duress*

[5][6] Under the coercion or duress theory, we consider whether, under the totality of the circumstances, the employer's conduct in obtaining the employee's resignation deprived the employee of free will in choosing to resign. Other circuits addressing this issue have indicated that certain

factors may be helpful in determining whether the resignation was obtained by coercion or duress: (1) whether the employee was given some alternative to resignation; (2) whether the employee understood the nature of the choice he was given; (3) whether the employee was given a reasonable time in which to choose; (4) whether the employee was permitted to select the effective date of the resignation; and (5) whether the employee had the advice of counsel. *Stone,* 855 F.2d at 174, 177. *See also Angarita,* 981 F.2d at 1544; *Parker,* 981 F.2d at 1162; *Schultz,* 810 F.2d at 1136; *Scharf,* 710 F.2d at 1574. These factors, although not dispositive, will guide us in our determination of whether Hargray's resignation was involuntary under the totality of the circumstances.

[7] "[T]he assessment [of] whether real alternatives were offered is gauged by an objective standard rather than by the employee's purely subjective evaluation; that the employee may perceive his only option to be resignation ... is irrelevant." *Stone,* 855 F.2d at 174. *See Christie,* 518 F.2d at 587-88. Moreover, "the mere fact that the choice is between comparably unpleasant alternatives ... does not of itself establish that a resignation was induced by duress or coercion, hence was involuntary." *Stone,* 855 F.2d at 174.

[8] Specifically, resignations can be voluntary even where the only alternative to resignation is facing possible termination for cause or criminal charges. *Pitt v. United States,* 420 F.2d 1028, 190 Ct.Cl. 506 (1970). Resignations obtained in cases where an employee is faced with such unpleasant alternatives are nevertheless voluntary because "the fact remains that plaintiff *had a choice.* [Plaintiff] could stand pat and fight." *Christie,* 518 F.2d at 587. The one exception to this rule is where the employer actually lacked good cause to believe that grounds for the termination and the criminal charges existed. *Stone,* 855 F.2d at 174; *Schultz,* 810 F.2d at 1136-37; *Christie,* 518 F.2d at 587-88.

The City contends that Hargray's resignation was voluntary because he was given a choice between resigning or facing criminal charges. Hargray con-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

57 F.3d 1560, 10 IER Cases 1409
**(Cite as: 57 F.3d 1560)**

tends that this was not a real choice, and that he had no other choice but to resign. The district court found that Hargray did not have a real alternative to resigning. The district court based this conclusion primarily on its findings that (1) Hargray*1569 was not given advance notice of the nature of the charges against him; (2) he did not have an opportunity to consider alternatives; (3) he did not have an opportunity to consult an attorney; (4) he did not have a reasonable amount of time to make a carefully-considered decision; and (5) he did not have the opportunity to select the effective date of his resignation. The court also found that Hargray felt intimidated during the interview.

[9] Initially, the City challenges many of the factual findings made by the district court. The record supports the City's position as to at least two of these findings. First, the record supports the City's contention that Hargray did have advance notice that charges may be brought against him. Hargray testified that he knew that many employees were being called down to the police station to be questioned about City misappropriation. He was also aware that there had been serious allegations made against him, and discussed these allegations with his wife. He knew that McDonald had resigned on August 20, that McDonald was called to the police station on August 23, and that McDonald elected to consult an attorney and did so after asking the police to delay his interrogation. In fact, after finding out that McDonald had resigned, Hargray confessed to Intindola that he knew McDonald had the trailer. In light of Hargray's own testimony, a finding that Hargray had no advance notice that criminal charges might be made against him is clearly erroneous.

[10] The second factual finding that is inconsistent with the record is the finding that Hargray was not given an opportunity to consider alternatives. As already noted, Hargray was aware that the allegations against him would be investigated at least a few weeks before he was called to the police station. He also knew that McDonald resigned and consented to answer questions in exchange for not being criminally prosecuted. During that time, Har-

gray had the opportunity to consider whether he would go to the police station at all, whether he would answer questions, and whether he would resign, if asked to do so, or "stand pat and fight," even if it meant criminal charges being pressed. He and his wife discussed at length what was occurring, and he was obviously preoccupied during the budget meetings. No other conclusion could be reached but that he had ample opportunity to think long and hard about what he would do when he was called down for questioning.

[11] As such, Hargray's argument is reduced to the following: that he was forced to make an unpleasant decision in a short period of time, while he felt intimidated, without the advice of an attorney. Unfortunately for Hargray, the mere fact that he was forced to choose between two inherently unpleasant alternatives does not in itself mean that his resignation was submitted under duress, absent evidence that the police or Intindola lacked good cause for the threatened criminal proceedings at the time the alternatives were offered. *Stone,* 855 F.2d at 174; *Christie,* 518 F.2d at 587-88.

A careful review of the record convinces us that at the time Hargray resigned, there was no evidence to suggest that Intindola or the police knew or believed that charges of grand theft could not be substantiated. At the time of his third meeting with the police, Intindola was aware of the following: (1) that there had been an anonymous letter written accusing Hargray of stealing City property; (2) that other employees had approached Wroblewski accusing Hargray of taking City property; (3) that the photos taken of Hargray's yard depicted City timbers and a City garbage can,[FN7] as well as plants and sodding used by the City; and (4) that Hargray was aware that McDonald was using City property for personal use. Thus, the record does not establish that Intindola lacked good cause to threaten proceeding criminally at the time he authorized the police to offer Hargray the two alternatives. In fact, the record establishes that Intindola had more than enough evidence to threaten Hargray with criminal action. The record further establishes that the police had sufficient evidence to support *1570 probable

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

cause for threatening criminal prosecution, as discussed herein.

> FN7. At the time of the meeting, Intindola testified that he was not aware that Hargray had received permission from Grover Jones to borrow the garbage can.

[12] It is true that Hargray was forced to make the decision to resign while under time pressure and that he did so without the advice of counsel. While these facts might seem sufficient to support the conclusion that Hargray's resignation was involuntary, the cases finding a resignation to be involuntary based on coercion or duress involve circumstances much more coercive than those in the instant case. For example, in *Paroczay v. Hodges,* 297 F.2d 439 (D.C.Cir.1961), the court found the employee's resignation to be involuntary where the employee was told he had to sign a resignation letter before he left the supervisor's room, or charges would be filed immediately, despite his repeated requests to have more time and to consult an attorney. In *Angarita v. St. Louis County,* 981 F.2d 1537 (8th Cir.1992), the court found that employee police officers suspected of using drugs involuntarily resigned under another set of extremely coercive circumstances. Specifically, they were told that they were not permitted to leave the interrogation room without first signing a resignation form; no specific complaint of their actions was presented to them; their requests to speak with their supervisors or have them present were continually denied; they were threatened with disclosure of the allegations to their family; they were threatened with adverse publicity in the media; a tape recorder was turned off many times during the interrogation; and they were not told the source of their allegations, among other things. *Id.* at 1545.

[13] In contrast to these cases, neither the district court's findings nor the record in the instant case supports the legal conclusion that Hargray's resignation was coerced. Instead, the record reveals: (1) that Hargray was free to leave the police station before signing a resignation statement; (2) that he knew what the charges were against him; (3) that he

knew the sources of the allegations; and (4) that he never requested more time to make a decision, nor did he request to speak with his supervisor or an attorney. Moreover, other than the first few minutes while Hargray was choosing whether to proceed administratively, the entire conversation was on tape. The transcript of the tape reveals that the officers conducted a routine police inquiry. In fact, the tape indicates that the interview was conducted under a casual atmosphere, during which Hargray at times even laughed with the police. Finally, although Hargray may have felt intimidated, we must keep in mind that the test of coercion is conducted via an objective analysis, rather than by the employee's subjective evaluation of the situation. *Stone,* 855 F.2d at 174; *Walsh v. City of Chicago,* 712 F.Supp. 1303, 1308 (N.D.Ill.1989). Objectively, the findings of the district court, in addition to the evidence contained in the record, do not, under the totality of the circumstances, support the legal conclusion that Hargray's resignation was involuntary due to coercion or duress.

### B. *Resignations Obtained by Misrepresentation*

[14] The district court also found Hargray's resignation to be involuntarily obtained by misrepresentation. Under the misrepresentation theory, a court may find a resignation to be involuntary if induced by an employee's reasonable reliance upon an employer's misrepresentation of a material fact concerning the resignation. *Scharf,* 710 F.2d at 1575. A misrepresentation may be material if it concerns an alternative to resignation, such as the possibility of criminal prosecution. *See Covington,* 750 F.2d at 942; *Walsh,* 712 F.Supp. at 1308-09.

[15] Further, an employee is not required to show that the employer intentionally deceived him in order for his resignation to be held involuntary. *Scharf,* 710 F.2d at 1575. Just as the duress or coercion theories apply an objective test, the objective standard is equally applicable in situations involving misrepresentation. The court, therefore, "will neither inquire into the subjective perceptions of the employee, *see Taylor v. United States,* 591 F.2d 688, 692, 219 Ct.Cl. 86 (1979), nor the sub-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

57 F.3d 1560, 10 IER Cases 1409

**(Cite as: 57 F.3d 1560)**

jective intentions of [the employer]." *Scharf,* 710 F.2d at 1575. Thus, in the instant case, Hargray must show (1) that the City knew, or reasonably should have known, that the threatened criminal **\*1571** prosecution could not be substantiated. *Schultz,* 810 F.2d at 1136, and (2) that Hargray reasonably relied on the City's misrepresentation. *Scharf,* 710 F.2d at 1575.

[16] As the parties concede that Hargray reasonably relied on the police officers' representations that he could be prosecuted for grand theft, the question is whether the police knew, or reasonably should have known, that charges of grand theft could not be substantiated against Hargray. In the instant case, as the individuals who ultimately obtained Hargray's resignation were police officers, rather than the City's manager, the question may be analyzed in terms of whether or not the police officers had probable cause to prosecute Hargray for grand theft at the time that they requested his resignation.

The district court found that the police officers did not have probable cause. *Hargray,* 830 F.Supp. at 1473. Hargray agrees, claiming that the police could not have probable cause based solely on his admission that he borrowed the garbage can and the timber. The City responds that probable cause to prosecute for grand theft was based not only on the garbage can and timbers, which the police did not know Hargray had borrowed, but also on other allegations of misappropriation, which were corroborated by the evidence and the witnesses.

The question of what amounts to probable cause is purely a question of law and hence is subject to plenary review by this court. *United States v. Allison,* 953 F.2d 1346, 1350 (11th Cir.1992). After a thorough review of the record, we conclude, contrary to the district court, that the police had probable cause to bring charges of grand theft against Hargray at the time they requested his resignation.

The Florida criminal theft statute provides that a person commits theft if he knowingly obtains or uses the property of another with intent to, either temporarily or permanently, deprive the other per-

son of a right to the property or a benefit therefrom, or appropriate the property to his own use or to the use of any person not entitled thereto. Fla.Stat.Ann. § 812.014 (West 1993); *Daniels v. State,* 587 So.2d 460, 462 (1991). It is grand theft if the property stolen is valued at $300 or more. Fla.Stat.Ann. § 812.014(2)(c)(1).

The existence of probable cause is based on objective standards and the totality of the circumstances. *United States v. Hastamorir,* 881 F.2d 1551, 1557 (11th Cir.1989). "Probable cause to arrest is present when the facts and circumstances within the officer's knowledge are sufficient to warrant a prudent person, or one of reasonable caution, in believing, under the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *United States v. Mastrangelo,* 733 F.2d 793, 799 (11th Cir.1984). As such, the existence of probable cause in the instant case is a two-step inquiry: First, what did the police officers actually know at the time they threatened Hargray with prosecution for grand theft, and second, based on such knowledge, would a reasonable police officer believe that there was probable cause to prosecute Hargray.

At trial, Owens testified that by the time he began his interrogation of Hargray, he knew the following: (1) that an anonymous letter accusing Hargray of misappropriation had been sent to City managers; (2) that three City employees had gone to Wroblewski accusing Hargray of misappropriation; (3) that many other employees interviewed by the police had either personally observed Hargray taking property or had heard about it, thereby corroborating the accusations contained in the letter and in the complaints; (4) that pictures of Hargray's house revealed the existence of a City garbage can, timbers arranged in an apparently permanent nature for landscaping purposes, plants used by the City, new sodding, and an extremely plush, heavily fertilized lawn; (5) that City purchasing orders were signed by Hargray for many of the items found in his yard, which were valued at over $300; and (6) that Hargray was aware that McDonald was using a City trailer for his personal use.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

57 F.3d 1560, 10 IER Cases 1409

**(Cite as: 57 F.3d 1560)**

Owens further testified, and the tape reveals, that during the taped interview Hargray admitted taking the garbage can and the timbers home for his own personal use. Although at trial Hargray states that he **\*1572** borrowed the garbage can with the permission of Grover Jones, and that he borrowed the timbers for a party, he never stated that he "borrowed" anything during the interview.[FN8] Thus, at the time Owens asked for Hargray's resignation, he did not know that Hargray had allegedly borrowed these two items. Finally, Owens testified that Hargray was extremely evasive when questioned as to how he obtained the sodding in his yard.

> FN8. Although Hargray admitted that he knew the 4 x 4's "had to come back," he did not state during the taped interview that he had permission to borrow either of these items, or that he intended to return these items. Thus, although it is true that Owens advised Hargray that he could be prosecuted for grand theft for "borrowing," Hargray never told Owens during the interview that he was merely borrowing these items.
>
> Even assuming, arguendo, that the officers knew that Hargray borrowed the garbage can and timber, as the district court found, the officers nevertheless had probable cause to bring charges of grand theft against Hargray. First, it is apparent that the officers based the existence of probable cause not only on the garbage can and the timber, but also on the other items that the anonymous letter and the other City employees accused Hargray of stealing, in combination with Hargray's inability to account for the way in which he obtained such items.
>
> Second, even if the garbage can and the timber were the only items at issue, the officers did not misrepresent that they had probable cause to bring charges for grand theft, because grand theft includes the temporary taking of the property of another. *See Daniels,* 587 So.2d at 462. Thus, Har-

gray's admission to the police that he in fact took home the garbage can and the timbers for his personal use establishes that there was probable cause to believe grand theft had been committed. Even if the interrogation had revealed an actual intent on the part of Hargray to return these items, the officers had probable cause to prosecute Hargray for temporarily depriving the City of its property.

Long also testified that by the time he began his interrogation of Hargray, he knew the following: (1) that an anonymous letter accusing Hargray of misappropriation had been sent to City managers; (2) that many other employees interviewed by the police had either personally observed Hargray taking property or had heard about it, thereby corroborating the accusations contained in the letter; (3) that pictures of Hargray's house revealed the existence of many of the items alleged to have been stolen from the City; (4) that City purchasing orders were signed by Hargray for many of the items found in his yard; (5) that Hargray was aware that McDonald was using the City trailer for his personal use; and (6) that McDonald had corroborated the allegations made in the anonymous letter against him and the allegations made against him by the City employees during their police interviews. Long testified that during Hargray's interview, he admitted taking City lumber and a garbage can. Long also noted that Hargray could not account for how he obtained the sod in his yard.

Based on the totality of the circumstances and the officers' knowledge described above, we hold that at the time of the interrogation, Owens and Long had probable cause to bring charges of grand theft against Hargray.[FN9] At the time of the investigation, the facts and circumstances within the officers' knowledge were sufficient to warrant a man of reasonable caution in believing that an offense had been committed. *United States v. Tomaszewski,* 833 F.2d 1532, 1535 (11th Cir.1987). As such, the police officers did not misrepresent to Hargray that the alternative to his resignation was proceeding with a grand theft criminal investigation. Con-

sequently, Hargray's resignation cannot be deemed involuntary under the misrepresentation theory.

> FN9. We note that after Hargray signed his resignation, the police abandoned their investigation of Hargray, and Owens admitted at trial that much more would have had to be done with the case before it was presented to the State Attorney. This fact, however, does not vitiate our conclusion that the police had probable cause at the time they told Hargray he could be prosecuted for grand theft.

### IV. CONCLUSION

In sum, we hold that the only reasonable conclusion from the record is that Hargray made a voluntary decision to resign from his position with the City rather than submit to a grand theft criminal investigation. Hargray has attempted to characterize his voluntary resignation as a constructive discharge, entitling him to reinstatement and damages for a resulting deprivation of his property interest in continued employment. He has failed, **\*1573** however, to overcome the presumption of voluntary resignation, either by the duress or coercion theory or by the misrepresentation theory. As Hargray's resignation was voluntary, we conclude that he was not deprived of any protected interest in his employment by the City. As such, he has no due process claim, and is entitled to neither reinstatement nor damages.

REVERSED.

C.A.11 (Fla.),1995.
Hargray v. City of Hallandale
57 F.3d 1560, 10 IER Cases 1409

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

518 F.2d 584                                                                 Page 1

207 Ct.Cl. 333, 518 F.2d 584

**(Cite as: 207 Ct.Cl. 333, 518 F.2d 584)**

▷

Christie v. U. S.
Ct.Cl. 1975.

United States Court of Claims.
Ruth CHRISTIE
v.
The UNITED STATES.
No. 486-73.

July 11, 1975.

Plaintiff, who had tendered her resignation from
government employment, sought reinstatement and
back pay on ground that her resignation was not
voluntary. Cross-motions for summary judgment
were filed. The Court of Claims, Kunzig, J., held
that element of voluntariness of a resignation is
vitiated only when the resignation is submitted un-
der duress brought on by Government action, that
employee resignations are presumed voluntary, that
were plaintiff had a choice, in that she could stand
pat and fight agency's proposed termination for
cause or could resign and accept discontinued ser-
vice retirement, her choice to accept the latter was a
voluntary one, absent any showing that threatened
termination was other than for good cause or that
resignation was obtained as result of agency decep-
tion and that since plaintiff failed to present an ad-
equate claim of coerced resignation the Civil Ser-
vice Commission properly declined to accept her
appeal or afford her a hearing.

Defendant's motion granted; plaintiff's cross-motion
denied; petition dismissed.

Bennett, J., concurred and filed opinion.

Skelton, J., dissented and filed opinion.

West Headnotes

**[1] United States 393 ⚯36**

393 United States
   393I Government in General
      393k36 k. Appointment or Employment and
Tenure of Agents, Clerks, and Employees in Gener-
al. Most Cited Cases
Element of voluntariness of a resignation by a civil
servant is vitiated only when the resignation is sub-
mitted under duress brought on by Government ac-
tion.

**[2] United States 393 ⚯36**

393 United States
   393I Government in General
      393k36 k. Appointment or Employment and
Tenure of Agents, Clerks, and Employees in Gener-
al. Most Cited Cases
Resignations of civil servants are presumed to be
voluntary; such presumption prevails unless the ser-
vant comes forward with sufficient evidence to es-
tablish that the resignation was involuntarily extrac-
ted.

**[3] Officers and Public Employees 283 ⚯76**

283 Officers and Public Employees
   283I Appointment, Qualification, and Tenure
      283I(H) Proceedings for Removal, Suspen-
sion, or Other Discipline
         283I(H)7 Reinstatement and Back Pay
           283k76 k. In General. Most Cited
Cases
Under the doctrine of exhaustion of administrative
remedies, the Court of Claims, in suit by govern-
ment civilian employee seeking reinstatement on
ground that her resignation was not voluntary, was
required to restrict its review to the factual matters
presented to the civil service officials.

**[4] United States 393 ⚯36**

393 United States
   393I Government in General
      393k36 k. Appointment or Employment and
Tenure of Agents, Clerks, and Employees in Gener-
al. Most Cited Cases
Duress, as regards resignation of a civil servant, is
not measured by the employee's subjective evalu-
ation of the situation but, rather, the test is an ob-
jective one.

518 F.2d 584
207 Ct.Cl. 333, 518 F.2d 584
**(Cite as: 207 Ct.Cl. 333, 518 F.2d 584)**

**[5] United States 393 ⟨⟩36**

393 United States
   393I Government in General
      393k36 k. Appointment or Employment and Tenure of Agents, Clerks, and Employees in General. Most Cited Cases

**United States 393 ⟨⟩39(8)**

393 United States
   393I Government in General
      393k39 Compensation of Officers, Agents, and Employees
         393k39(8) k. Compensation After Suspension or Removal. Most Cited Cases
Where, when faced with agency decision to separate her for cause, civilian government employee had a choice, in that she could either stand pat and fight or could choose to resign and accept discontinued service retirement, her choice of the latter did not render her resignation involuntary; merely because she was faced with an inherently unpleasant situation did not obviate voluntariness of her resignation and fact that she may have perceived no viable alternative to resignation did not render her resignation involuntary; hence, she was not entitled to reinstatement and back pay.

**[6] United States 393 ⟨⟩36**

393 United States
   393I Government in General
      393k36 k. Appointment or Employment and Tenure of Agents, Clerks, and Employees in General. Most Cited Cases
Before a resignation by a civil servant to avoid threatened termination for a cause will be found voluntary the threat and termination must be for good cause; however, such "good cause" requirement is met as long as the employee fails to show that the agency knew or believed that the proposed termination could not be substantiated.

**[7] United States 393 ⟨⟩36**

393 United States
   393I Government in General

      393k36 k. Appointment or Employment and Tenure of Agents, Clerks, and Employees in General. Most Cited Cases
Although former government civilian employee, seeking reinstatement and back pay on ground that her resignation was not voluntary, attempted to impugn agency's motivation for proceeding with proposed termination because of alleged physical altercation with her superior the employee did not deny that the incident had taken place, such admission was fatal to her attempt to impeach the decision to terminate her for cause; whether charge could have been sustained had employee chosen to appeal her discharge for cause was irrelevant to determination of whether her resignation was voluntary; admission of incident was prima facie evidence that arguable basis for discharge existed.

**[8] United States 393 ⟨⟩36**

393 United States
   393I Government in General
      393k36 k. Appointment or Employment and Tenure of Agents, Clerks, and Employees in General. Most Cited Cases
Although an ostensibly voluntary resignation by a government employee may be found involuntary if obtained by agency misrepresentation, reliance on the claimed misrepresentation is essential to a finding of involuntariness.

**[9] United States 393 ⟨⟩36**

393 United States
   393I Government in General
      393k36 k. Appointment or Employment and Tenure of Agents, Clerks, and Employees in General. Most Cited Cases
Government employee's separation from service was not to be voided on ground that she was not permitted to set an effective date of her resignation since when she signed the necessary forms requesting her separation from the rolls and her request for discontinued service retirement she adopted the date contained therein as her own; such ratification, signified by her signature, satisfied the requirement that she set her own effective date of resignation.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

518 F.2d 584
207 Ct.Cl. 333, 518 F.2d 584
**(Cite as: 207 Ct.Cl. 333, 518 F.2d 584)**

**[10] Officers and Public Employees 283 ☞ 72.22**

283 Officers and Public Employees
    283I Appointment, Qualification, and Tenure
        283I(H) Proceedings for Removal, Suspension, or Other Discipline
            283I(H)2 Administrative Review
                283k72.21 Decisions Reviewable; Forum for Review
                    283k72.22 k. In General; Adverse Actions. Most Cited Cases
    (Formerly 283k72(2))

**Officers and Public Employees 283 ☞ 76**

283 Officers and Public Employees
    283I Appointment, Qualification, and Tenure
        283I(H) Proceedings for Removal, Suspension, or Other Discipline
            283I(H)7 Reinstatement and Back Pay
                283k76 k. In General. Most Cited Cases
Since former government employee failed to present an adequate claim of coerced resignation the Civil Service Commission properly declined to accept her appeal; likewise, Commission's denial of requested hearing did not require reinstatement.

**[11] Officers and Public Employees 283 ☞ 72.22**

283 Officers and Public Employees
    283I Appointment, Qualification, and Tenure
        283I(H) Proceedings for Removal, Suspension, or Other Discipline
            283I(H)2 Administrative Review
                283k72.21 Decisions Reviewable; Forum for Review
                    283k72.22 k. In General; Adverse Actions. Most Cited Cases
    (Formerly 283k72(2))
Voluntary separations by government employees are not adverse actions and, thus, are not appealable to the Civil Service Commission.

**[12] Administrative Law and Procedure 15A ☞ 441**

15A Administrative Law and Procedure
    15AIV Powers and Proceedings of Administrative Agencies, Officers and Agents
        15AIV(D) Hearings and Adjudications
            15Ak441 k. In General. Most Cited Cases
An agency is not required to grant a hearing any time one is requested.

**[13] Constitutional Law 92 ☞ 4172(6)**

92 Constitutional Law
    92XXVII Due Process
        92XXVII(G) Particular Issues and Applications
            92XXVII(G)7 Labor, Employment, and Public Officials
                92k4163 Public Employment Relationships
                  92k4172 Notice and Hearing; Proceedings and Review
                    92k4172(6) k. Termination or Discharge. Most Cited Cases
    (Formerly 92k278.4(5), 92k318(2))
Nonprobationary federal employees have a property interest in their jobs; as such, they are entitled to a due process hearing if the Government initiates an adverse action to remove them; however, when an employee voluntarily relinquishes his property interest, his separation cannot be considered an adverse action.

**\*586** Elsa R. Kaufman, Washington, D.C. attorney of record, for plaintiff.
Iraline G. Peniston, Washington, D.C., with whom was Acting Asst. Atty. Gen. Irving Jaffe, for defendant.

Before SKELTON, KUNZIG, and BENNETT, Judges.
KUNZIG, Judge:
In this civilian employment action, the court is confronted with a single legal question: whether plaintiff was wrongfully separated from government service, by means of a coerced resignation. We hold that, as a matter of law, plaintiff's resignation was voluntary.

The factual setting in which this case arises may be

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

518 F.2d 584
207 Ct.Cl. 333, 518 F.2d 584
**(Cite as: 207 Ct.Cl. 333, 518 F.2d 584)**

briefly summarized as follows: Plaintiff, a 5-point veteran's preference employee, had continuously served in the Navy Department since 1943. From 1943 until August 1946, plaintiff was on active duty in the United States Naval reserve. At the end of World War II, she was converted to civilian status and remained a civilian employee until the effective date of her resignation, March 10, 1972. At the time of her separation, plaintiff was employed as a Technical Data Management Specialist, GS-13, with the Naval Weapons Engineering Support Activity, located at the Washington, D.C. Navy Yard.

On November 22, 1971, plaintiff was issued an Advance Notice of Proposed Removal for 'Attempting to Inflict Bodily Injury to Your Supervisor-First Offense.' This charge stemmed from an alleged striking incident during a meeting on November 15, 1971, where plaintiff allegedly made threatening gestures toward her supervisor. Plaintiff submitted a written reply denying the charge on December 8, 1971.

By letter dated February 23, 1972, plaintiff was notified of the agency's decision to separate her for cause, effective February 25, 1972. However, since the installation was undergoing a reduction-in-force (RIF), the effective date of plaintiff's discharge was extended to give her the opportunity to explore the alternative of voluntary resignation via Discontinued Service Retirement. While it is disputed as to which side initiated the extension request, the effective date of plaintiff's proposed removal was reset to March 3, 1972.

The period between February 25 and March 3, 1972 was marked by a series of exchanges between the agency and plaintiff. Plaintiff attempted to submit a resignation conditioned by her allegation that it was being tendered under duress. The agency informed plaintiff it could not accept such a condition resignation because it was not 'in consonance with the most current controlling regulation' and advised plaintiff that applicable regulations mandate that such resignations be voluntary. On March 3, 1972, plaintiff tendered a resignation free of protest and

submitted an application for discontinued service retirement, both effective March 10, 1972. Plaintiff's resignation and application for *587 discontinued service retirement were processed and approved by the agency and plaintiff was separated from the Navy Department effective March 10, 1972.

Subsequent to her resignation, plaintiff appealed to the Appeals Examining Office (AEO) of the Civil Service Commission (CSC). In her March 25, 1972 letter, plaintiff switched back to her earlier position that her resignation was involuntary, described its effect as an 'adverse action' taken against her, and requested a hearing before the AEO. The AEO held, in a decision issued on June 12, 1972, that plaintiff's separation by resignation was voluntary. Stating that voluntary separations are not within the CSC's appellate jurisdiction The AEO denied plaintiff's request for a hearing. The decision of the AEO was affirmed by the CSC Board of Appeals and Review (BAR) on December 8, 1972. Having exhausted her administrative remedies, plaintiff filed the present action in this court on December 19, 1973, seeking back pay, reinstatement and other relief.

This case, in its present posture, is before us on cross-motions for summary judgment. Defendant's motion is grounded on plaintiff's failure to establish by objective standards that her resignation was obtained by duress. Plaintiff's cross-motion for summary judgment is premised on the view that the totality of events surrounding her resignation evidences a denial of any viable choice but to resign and thus, as a matter of law, she is entitled to judgment. For the reasons stated below, we conclude that plaintiff's allegation of involuntary resignation fails as a matter of law and therefore dismiss the petition.

[1] This court has enunciated a principle, now firmly established, for determining whether a resignation is voluntarily tendered. The element of voluntariness is vitiated only when the resignation is submitted under duress brought on by Government action. Leone v. United States, 204 Ct.Cl. 334, 339 (1974). The tripart test for such duress is:

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

518 F.2d 584
207 Ct.Cl. 333, 518 F.2d 584
**(Cite as: 207 Ct.Cl. 333, 518 F.2d 584)**

* * * (1) that one side involuntarily accepted the terms of another; (2) that circumstances permitted no other alternative; and (3) that said circumstances were the the result of coercive acts of the opposite party. * * * Fruhauf Southwest Garment Co. v. United States, 111 F.Supp. 945, 951, 126 Ct.Cl. 51, 62 (1953).

[2][3] Employee resignations are presumed to be voluntary. This presumption will prevail unless plaintiff comes forward with sufficient evidence to establish that the resignation was involuntarily extracted. Plaintiff had the opportunity to rebut this presumption before the CSC. This court, under the doctrine of exhaustion of administrative remedies, must restrict its review to the factual matters presented below. See Haynes v. United States, 418 F.2d 1380, 1383, 190 Ct.Cl. 9, 12-13 (1969).

[4][5] Upon review of the facts as they appear in the record before the CSC, it is clear that plaintiff has failed to show that her resignation was obtained by external coercion or duress. Duress is not measured by the employee's subjective evaluation of a situation. Rather, the test is an objective one.McGucken v. United States, 407 F.2d 1349, 1351, 187 Ct.Cl. 284, 289,cert. denied, 396 U.S. 894, 90 S.Ct. 190, 24 L.Ed.2d 170 (1969); Pitt v. United States, 190 Ct.Cl. 506, 513, 420 F.2d 1028, 1032 (1970). While it is possible plaintiff, herself, perceived no viable alternative but to tender her resignation, the record evidence supports CSC's finding that plaintiff chose to resign and accept discontinued service retirement rather than challenge the validity of her proposed discharge for cause. The fact remains, plaintiff had a choice. She could stand pat and fight. She chose not to. Merely because plaintiff was faced with an inherently unpleasant situation in that her choice was arguably limited to two unpleasant alternatives does not obviate the voluntariness of her resignation.**588 Federal Personnel Manual Supp. 752-1, subchapter S1-2a(3).

[6][7] This court has repeatedly upheld the voluntariness of resignations where they were submitted to avoid threatened termination for cause.Pitt v.

United States, supra (termination resulting from possible criminal prosecution); Cosby v. United States, 417 F.2d 1345, 189 Ct.Cl. 528 (1969) (termination for gross insubordination); Autera v. United States, 389 F.2d 815, 182 Ct.Cl. 495 (1968) (termination for incompetence). Of course, the threatened termination must be for good cause in order to precipitate a binding, voluntary resignation.Autera v. United States, supra 389 F.2d at 817, 182 Ct.Cl. at 499. But this 'good cause' requirement is met as long as plaintiff fails to show that the agency knew or believed that the proposed termination could not be substantiated.Leone v. United States, supra 204 Ct.Cl. at 340. Although plaintiff has attempted to impugn the agency's motivation for proceeding with her proposed termination, plaintiff does not deny that the incident which formed the basis of the charge against her had taken place (although she does assert the so-called assault was nothing more than an 'inadvertent touching'). This admission is fatal to plaintiff's attempt to impeach the agency's decision to terminate her for cause. Whether this charge could have been sustained had plaintiff chosen to appeal her discharge for cause is irrelevant. What is relevant is that the admission of this incident is prima facie evidence that an arguable basis for discharge existed.

[8] Plaintiff's suggestion that her resignation was obtained as a result of agency deception is completely unsupported by the record. It is true that CSC regulations recognize that a normally voluntary action is transformed into an involuntary one if obtained by agency misrepresentation. Federal Personnel Manual Supp. 752-1, subchapter S1-2a(1). But reliance on the misrepresentation is an essential element. Here, plaintiff not only fails to show such reliance, her own words completely repudiate it. In her request for consideration to the CSC AEO, dated March 25, 1972, plaintiff did allege that the agency misrepresented the consequences of a dismissal for cause regarding retirement/annuity rights. But in the same sentence, plaintiff concedes that the alleged misrepresentations were corrected 'in later explorations of alternatives' before she submitted her disputed resignation. This concession clearly negates any suggestion that plaintiff relief

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

207 Ct.Cl. 333, 518 F.2d 584
**(Cite as: 207 Ct.Cl. 333, 518 F.2d 584)**

on any purported agency misrepresentations.

[9] Plaintiff's argument that her separation should be voided because she was not permitted to set the effective date of her resignation has no merit. When plaintiff signed the necessary forms requesting her separation from the rolls and her request for discontinued service retirement, she adopted the date contained therein as her own. This ratification, signified by her signature, clearly satisfies the requirements that plaintiff set her own effective date of resignation.

[10][11][12][13] Since plaintiff has failed to present an adequate claim of coerced resignation, CSC properly declined to accept her appeal. Voluntary separations are not adverse actions and are thus not appealable to the CSC. See 5 C.F.R. s 752-201(b).

At oral argument, plaintiff's counsel raised the issue of whether CSC's denial of a requested hearing compels reinstatement. Our answer is that it does not.

It would be folly to suggest that any time a hearing is requested, an agency must grant it. Yet, in effect, that is what plaintiff seems to imply. What plaintiff overlooks is that the legal classification of her separation is determinative of her entitlement to a hearing.

The Supreme Court has recognized that non-probationary Federal employees have a property interest in their jobs. Arnett v. Kennedy, 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974). As such, employees are entitled to a due process hearing if the Government initiates an *589 adverse action to remove them. However, when an employee voluntarily relinquishes her property interest, her separation cannot be considered an adverse action. Since there was no adverse action in this case, a hearing is not required. McGucken v. United States, supra, 407 F.2d at 1352, 187 Ct.Cl. at 289. The underlying rationale is that a Government-initiated removal (adverse action) is analogous to a 'taking' of a property interest; an employee-initiated separation is not. Compare Board of Regents v. Roth, 408 U.S.

564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972) with Perry v. Sindermann, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). Since plaintiff voluntarily relinquished her property interest, the CSC correctly denied her hearing request.

In summary, we hold the CSC properly declined to accept plaintiff's appeal because, as a matter of law, her resignation was voluntary. We further conclude CSC's denial of plaintiff's hearing request was proper.

Accordingly, defendant's motion for summary judgment is granted, plaintiff's cross-motion for summary judgment is denied, and the petition is dismissed.

BENNETT, Judge (concurring):

I join in the opinion and conclusion of Judge KUNZIG. In response to the dissent, however, I wish to add a few comments.

The dissent questions the substantiality of the charge against plaintiff upon which the proposed removal was based. The incident was described in the 'Advanced Notice of Proposed Removal,' as follows:

(2) Incident. On 15 November 1971, at approximately 0900, you came into my office with an information list, to describe certain problems you had encountered while working with the Engineering Change Proposal (ECP) program. You explained that you receive information over the phone from AIR 01A6 on Monday morning, and then relay it, via phone, to NAVAIRTECHSERVFAC. You complained that this took up a great deal of your time. I stated that assuming that the girl in AIR-01A6 reads from a list, she could send the data direct to NAVAIRTECHSERVFAC over the telecopier, and they, in turn, could phone back a confirmation directly to AIR-01A6. You replied in a disgusted manner that the girl at AIR-01A6 had better things to do (or words to that effect). I stated that I would still like to know if she could do it, whereupon you stated 'Well, I won't ask her' (or words to that effect), and proceeded to walk out. I said, 'Ruth, I think you're being unreasonable.' At that, you turned and approached where I was sitting at my

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

518 F.2d 584
207 Ct.Cl. 333, 518 F.2d 584
**(Cite as: 207 Ct.Cl. 333, 518 F.2d 584)**

desk. You stood over me and said in a somewhat strained voice, 'You drive me nuts-you bastard, you're driving me nuts' (or words to that effect). At the same time, you swung at my face with your right hand doubled into a fist, which I stopped with my hands. I became quite concerned, not only for you and your apparant (sic) loss of self-control, but for my own physical safety as well. I asked, 'What's wrong with you Ruth?' You just looked at me and attempted to pound me with your fists, perhaps five or six times. None of the blows hit my head or face, all fell on my hands and forearms with which I warded off the blows. Although these blows were not overly severe in nature, they were never-the-less, in my opinion, intended to inflict bodily harm to me. You then turned and left the office without uttering anything further. Mr. Harold Booher, Publications Presentation Methods Specialist, was in the office at the time and observed the incident, and more specifically, your actions immediately prior to leaving the room. I immediately turned to Mr. Booher and asked him to go see if you were all right. I indicated to him that I was worried about you, but that I was afraid that if I went in to see you personally, that it would only upset you more. Mr. Booher did go in and **\*590** ask you if you were all right, to which you replied that you were.

Perhaps the notion of plaintiff's inflicting bodily injury on her male supervisor is not persuasive, but the striking of a supervisor in anger is surely intolerable in any employment relationship and is a valid basis for removal for cause whether the blows resulted in injury or not.

Furthermore, the incident was witnessed by a third party. Clearly, therefore, this is not a case in which the agency knew or believed that the proposed termination could not be substantiated.

Nor was the resignation the result of deception. In her appeal to the Civil Service Commission, plaintiff wrote:
\* \* \* The false information that removal for misconduct would result in sacrifice of all retirement/annuity rights was originally offered, but was correc-

ted in later exploration of alternatives. (Emphasis supplied.)

Surely plaintiff cannot now be permitted to contradict that statement.

Finally, the dissent is mistaken in suggesting that defendant has admitted the allegations made by plaintiff, to wit, that the incident was contrived and that she was deceived, intimidated, and thereby coerced to resign. Defendant nowhere admits these allegations and, of course, makes no such admission by filing a motion for summary judgment as contrasted to a motion for dismissal. Defendant relies on the various documents in the record which show as a matter of law that plaintiff's resignation was voluntary. With regard to the affidavits filed with plaintiff's brief, defendant correctly notes that
\* \* \* the affidavits filed with plaintiff's brief should be disregarded to the extent they seek to raise new factual matters not presented to The Commission. Consideration of such new materials by this Court is barred by the doctrine requiring exhaustion of administrative remedies.Haynes v. United States, 190 Ct.Cl. 9, 12-13 (1969); Pine v. United States, 178 Ct.Cl. 146, 148, 371 F.2d 466-68 (1967); Long v. United States, 148 Ct.Cl. 4, 9 (1960).

Plaintiff simply has no legal basis for recovery in this court on the facts properly before us on the motions.

SKELTON, Judge (dissenting):
I cannot agree with the decision of the majority because I believe that an injustice has been done in this case.

The sole question before the court is whether the plaintiff Ruth Christie voluntarily resigned her position with the Navy's Bureau of Aeronautics or whether the agency forced her to resign against her will by coercion, intimidation, and duress so as to make her resignation involuntary. I am firmly convinced that her resignation was coerced.

The plaintiff was a five-point veteran's preference eligible employee under the provisions of the Veterans' Preference Act of June 27, 1944, 58 Stat.

207 Ct.Cl. 333, 518 F.2d 584
**(Cite as: 207 Ct.Cl. 333, 518 F.2d 584)**

387, as amended, 5 U.S.C. ss 1302, 2108, and 3309. She founded and organized the Bureau and headed it from 1944 to 1968. In 1968 a Mr. F. M. McNeal was made civilian head and in 1971 a Mr. A. J. McGuckin was made plaintiff's immediate supervisor. Neither man had had any prior experience in the work. The facts show that these two men began a course of harassing conduct toward the plaintiff to provoke her and to eventually get rid of her regardless of the means or the cost. From then on her doom was sealed, and it was only a question of time until a situation could be created on which charges could be brought against her. That opportunity came when McGuckin provoked her to anger and she inadvertently touched his shoulder with her fingers. As a result, plaintiff was charged with 'attempting to inflict bodily injury on your supervisor.' Such a charge was ridiculous on its face. McGuckin was in about as much danger of bodily injury on that occasion as an elephant would be if touched by a gnat or a fly.

The harassing treatment the plaintiff received at the hands of McGuckin and **\*591** McNeal was totally unjustified. Fellow employee Robert Clark said her treatment was 'grossly unfair, if not illegal.' Another employee, Richard Kreider, said the treatment Miss Christie received was 'contemptuous,' but that she 'was very capable, had the respect of her fellow employees, and did nothing to warrant this treatment.' He said further 'this was a pure and simple case of sex discrimination.' (She was the only woman employee, except clerks and secretaries.) Nevertheless, McGuckin and McNeal forced her out regardless of the cost. The time has now come for the cost to be paid.

The plaintiff alleges in this case that the charges arising out of the McGuckin incident were planned, contrived, and ridiculous, and that she had no intention of inflicting any bodily injury on McGuckin; that the charge was held over her head to force her to resign; and was not dismissed until after she resigned; that she was threatened with removal from her job on the charge and was told that if she was so removed she would forfeit all of her retirement benefits that she had earned with 29 years of service (which was of course a misrepresentation and false); that in any event she would be removed in a reduction-in-force program (which was false); and that she could sign a resignation form and still appeal her removal (which was false); and that her resignation was not voluntary but was induced by deceit, duress, intimidation, coercion and time pressure. The defendant filed a motion for summary judgment thereby admitting the foregoing allegations of the plaintiff to be true. Under these circumstances, there is no way that the Government is entitled to a summary judgment.

Faced with the above threats, deceitful and false misrepresentations, pressure, contrived charges, coercion, duress, intimidation, and time pressure, the plaintiff had no choice except to sign the resignation form. She was forced to choose on the one hand between what she believed to be the utter disater of losing her job in disgrace along with her 29 year earned retirement annuity, and on the other hand a bare living on discontinued service retirement. She had a choice, as the poet says, between 'death and exile,' a choice between the 'guillotine and the hangman's noose,' a choice between 'Scylla and Charybdis' (in avoiding one monster you fall prey to another. See Homer Od. XII. 73, 235, 430 and Gautier de Lille Alexandreis (cirea 12).) It is clear that plaintiff had no choice except to sign the resignation form. The 'freedom of choice' required by the regulations below was absent. Under these circumstances, plaintiff's resignation was not voluntary. Defendant's regulations so provide. The regulations are as follows:

Federal Personnel Manual Supplement 752-1, Subchapter S1, Adverse Actions by Agencies (February 4, 1972).

2a(1) Separations and reductions in rank or pay voluntarily initiated by an employee are by their very nature actions which do not require the use of adverse action procedures. On the other hand, a normally voluntary action-i.e., a resignation, optional retirement, or reduction in rank or pay at the employee's request-is an adverse action if it is obtained by duress, time pressure, intimidation, or deception. Whether an action is voluntary or involuntary is determined not by the form of the action but

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

518 F.2d 584
207 Ct.Cl. 333, 518 F.2d 584
**(Cite as: 207 Ct.Cl. 333, 518 F.2d 584)**

the circumstances that produced it.

(2) The Commission holds that an action requested by an employee is voluntary only if the employee has freedom of choice. The general principle is that an action is voluntary if the employee is free to choose, understands the transaction, is given a reasonable time to make his choice, and is permitted to set the effective date.

(3) * * * (I)f the agency uses deception, duress, time pressure or intimidation to force him to choose a particular course of action, the action is involuntary.

S1-2b. (4). Employee does not set effective date. An action is involuntary**592** if the employee does not set the effective date. The agency may point out the desirability of another date, but it may not arbitrarily set an earlier or later date and have the action remain a voluntary one. (Emphasis supplied.)

These regulations plainly provide that:

* * * (A) resignation * * * is an adverse action if it is obtained by duress, time pressure, intimidation, or deception. * * *

All of these elements are present in the instant case. Yet the majority holds that the resignation was voluntary. This is contrary to the facts.

Furthermore, the regulations provide that the resignation is voluntary:

* * * (O)nly if the employee has freedom of choice. * * *

There was no freedom of choice in this case.

But there is more. The regulations provide:

* * * (I)f the agency used deception, duress, time pressure or intimidation to force him (her) to choose a particular course of action, the action is involuntary.

In the face of the Government's admission by the filing of its motion for summary judgment in this case that the agency used deception, duress, time pressure and intimidation to force the plaintiff to sign a resignation form, it is difficult to understand how the majority can hold that the resignation of the plaintiff was voluntary. Even without the Government's admission, the facts affirmatively show

that her resignation was involuntary.

Under the circumstances pointed out above, the resignation form the plaintiff was forced to sign was an adverse action. Therefore, the agency was required to treat it as such and conduct an investigation and accord the plaintiff a hearing. Neither course was followed. The agency clearly violated its own regulations. This violation was made all the more evident by the fact that when the plaintiff signed the resignation form and delivered it to the agency she notified and advised the agency that she was signing the resignation because of coercion and duress by the agency. This information put the agency on notice of her coercion and duress claim, but it ignored these facts and denied the plaintiff the protection guaranteed to her by the regulations.

It should be pointed out that the agency violated its own regulations in another particular. The regulations quoted above provide that:

* * * An action is involuntary if the employee does not set the effective date. (for retirement) * * * (B)ut it (the agency) may not arbitrarily set an earlier or later date and have the action remain a voluntary one.

In this case this regulation was clearly violated because the agency arbitrarily set three different dates for the resignation of plaintiff to become effective without consulting with the plaintiff as to the dates it selected and without allowing the plaintiff to 'set the effective date.' This was a direct violation of the regulations by the agency.

We have often held that a violation by an agency of its own regulations voids an action taken by it against an employee. Here we have not one but several of such violations.

The majority cites cases where we have held that resignations by employees were voluntary and that they were not entitled to any relief. However, a close examination of those cases show they are distinguishable on the facts. The Government anticipated such situations when it promulgated the regulations quoted above that provide that each case depends on its own facts, as follows:

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

207 Ct.Cl. 333, 518 F.2d 584

**(Cite as: 207 Ct.Cl. 333, 518 F.2d 584)**

* * * Whether an action is voluntary or involuntary is determined not by the form of the action but the circumstances that produced it. (Emphasis supplied.)

Consequently the cases cited by the majority are not controlling here. The instant case is more like the facts in Perlman v. United States, 490 F.2d 928, 932-***593** 33, 203 Ct.Cl. 397, 406-08 (1974) that the combination of the acts of the Government denied freedom of choice to the plaintiff as to his voluntary retirement.

The majority have undoubtedly been influenced by those resignation cases where we have denied relief, in which I joined, where the employee was guilty of overreaching or was attempting to gain an undue advantage by resigning. This is not such a case. The plaintiff was not guilty of any such overreaching nor was she trying to gain any extra benefits by resigning. On the other hand, she was bitterly opposed to resigning. She was merely trying to keep body and soul together. She was led to believe by the misrepresentations and coercion of the agency that the only way she could do this was by resigning. There was no way that she could profit or benefit by resigning. The overreaching and unconscionable conduct all occurred on the part of the agency. In short, she was forced out against her will. This sort of conduct should not be condoned, much less approved.

In this case the plaintiff requested a hearing on whether or not her retirement was voluntary (see affidavit of Mr. Carstater, her representative before the Commission, attached to her cross-motion for summary judgment and plaintiff's appeal letter of June 27, 1972). The Commission denied the hearing request, even though plaintiff pointed out that she was entitled to due process. This was clear error. See Arnett v. Kennedy, 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974) where the Supreme Court held in no uncertain terms that a Government job was property and that because of the due process clause it could not be taken from a Government employee without a hearing 'at some stage of the proceeding.' The decision of the Commission

denying such a hearing in this case clearly violates the due process clause of the Constitution, and the opinion of the majority in approving this denial falls into the same error. See the following additional cases holding that property may not be taken from a citizen without a hearing: Connell v. Higginbotham, 403 U.S. 207, 91 S.Ct. 1772, 29 L.Ed.2d 418 (1971) (loss of a state job); Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970) (loss of welfare payments); Morrissey v. Brewer, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972) (revocation of a parole); Wolff v. McDonnell, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974) (cancellation of a prisoner's good-time credits); Bell v. Burson, 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971) (cancellation of a driver's license); Board of Regents v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972) (damaged reputation and standing); Sniadach v. Family Finance Corp., 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969) (garnishment of wages); Fuentes v. Shevin, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972) (seizure of mortagaged property); and Goss v. Lopez, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975) (suspension of school children).

It is obvious that the agency violated its own regulations in several respects; that the resignation of plaintiff was obtained by the agency through deceit, intimidation, misrepresentation, time pressure, duress and coercion (within the meaning of Fruhauf Southwest Garment Co. v. United States, 126 Ct.Cl. 51, 111 F.Supp. 945 (1953)); and that the agency denied the plaintiff due process as required by the Constitution in refusing to grant her a hearing as to the voluntariness of her resignation.

Accordingly, I would allow plaintiff's motion for summary judgment and enter judgment for the plaintiff, awarding her back pay plus other appropriate benefits and restoring her to her position, and I would deny defendant's motion for summary judgment. I would remand the case to the trial judge to determine the amount of plaintiff's recovery under Rule 131(c).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

518 F.2d 584

207 Ct.Cl. 333, 518 F.2d 584
**(Cite as: 207 Ct.Cl. 333, 518 F.2d 584)**

Page 11

Ct.Cl. 1975.

Christie v. U. S.

207 Ct.Cl. 333, 518 F.2d 584

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

109 S.Ct. 1197                                                                                    Page 1
489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412, 57 USLW 4270
**(Cite as: 489 U.S. 378, 109 S.Ct. 1197)**

City of Canton, Ohio v. Harris
U.S.,1989.

Supreme Court of the United States
CITY OF CANTON, OHIO, Petitioner
v.
Geraldine HARRIS et al.
No. 86-1088.

Argued Nov. 8, 1988.
Decided Feb. 28, 1989.

Detainee brought civil rights action against city, al-
leging violation of her right to receive necessary
medical attention while in police custody. The
United States District Court for the Northern Dis-
trict of Ohio entered judgment in favor of detainee,
and city appealed. The Court of Appeals, 6th Cir-
cuit, 798 F.2d 1414, unpublished opinion, reversed
and remanded, and city petitioned for writ of certi-
orari. The Supreme Court, Justice White, held that
inadequacy of police training may serve as basis for
§ 1983 municipal liability only where failure to
train amounts to deliberate indifference to rights of
persons with whom police come into contact.

Vacated and remanded.

Justice Brennan filed concurring opinion.

Justice O'Connor filed opinion concurring in part
and dissenting in part in which Justice Scalia and
Justice Kennedy joined.
West Headnotes
**[1] Civil Rights 78 ⟷1352(1)**

78 Civil Rights
   78III Federal Remedies in General
      78k1342 Liability of Municipalities and Oth-
er Governmental Bodies
         78k1352 Lack of Control, Training, or Su-
pervision; Knowledge and Inaction
           78k1352(1) k. In General. Most Cited
Cases
   (Formerly 78k206(4), 78k13.7)

Under certain circumstances, municipality can be
held liable in civil rights action under § 1983 for
constitutional violations resulting from its failure to
train municipal employees. 42 U.S.C.A. § 1983.

**[2] Federal Courts 170B ⟷452**

170B Federal Courts
   170BVII Supreme Court
      170BVII(B) Review of Decisions of Courts
of Appeals
         170Bk452 k. Certiorari in General. Most
Cited Cases

**Federal Courts 170B ⟷455.1**

170B Federal Courts
   170BVII Supreme Court
      170BVII(B) Review of Decisions of Courts
of Appeals
         170Bk455 Decisions Reviewable and
Grounds for Issuance
         170Bk455.1 k. In General. Most Cited
Cases

**Federal Courts 170B ⟷461**

170B Federal Courts
   170BVII Supreme Court
      170BVII(B) Review of Decisions of Courts
of Appeals
        170Bk460 Review on Certiorari
        170Bk461 k. Questions Not Presented
Below or in Petition for Certiorari. Most Cited
Cases
Writ of certiorari issued pursuant to city's petition
seeking review of decision holding it liable in civil
rights action for failing to train police officers when
to summon medical care for injured detainees
would not be dismissed as improvidently granted,
despite detainee's claim that city failed to preserve
principal issues for review; city's petition directly
addressed issue of circumstances under which inad-
equate training could be found to be "policy" that is
actionable in civil rights action, and detainee's brief
in opposition of petition did not contend that city's

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412, 57 USLW 4270

**(Cite as: 489 U.S. 378, 109 S.Ct. 1197)**

claims were not pressed on appeal. 42 U.S.C.A. § 1983.

**[3] Civil Rights 78 ⚖1351(1)**

78 Civil Rights
   78III Federal Remedies in General
      78k1342 Liability of Municipalities and Other Governmental Bodies
         78k1351 Governmental Ordinance, Policy, Practice, or Custom
         78k1351(1) k. In General. Most Cited Cases
   (Formerly 78k206(3), 78k13.7)
First inquiry in any case alleging municipal liability under § 1983 is question of whether there is direct causal link between municipal policy or custom and alleged constitutional deprivation. 42 U.S.C.A. § 1983.

**[4] Federal Courts 170B ⚖461**

170B Federal Courts
   170BVII Supreme Court
      170BVII(B) Review of Decisions of Courts of Appeals
         170Bk460 Review on Certiorari
         170Bk461 k. Questions Not Presented Below or in Petition for Certiorari. Most Cited Cases
Issue of whether city could be held liable for its alleged "custom" of denying medical care to detainees suffering from emotional or medical ailments would not be considered by Supreme Court on writ of certiorari from Court of Appeals' decision ruling that city could be held liable for failing to adequately train police officers, where "custom" claim was not passed on by Court of Appeals, and was not presented to that Court as distinct ground for decision. 42 U.S.C.A. § 1983.

**[5] Civil Rights 78 ⚖1352(1)**

78 Civil Rights
   78III Federal Remedies in General
      78k1342 Liability of Municipalities and Other Governmental Bodies
         78k1352 Lack of Control, Training, or Su-

pervision; Knowledge and Inaction
         78k1352(1) k. In General. Most Cited Cases
   (Formerly 78k206(4), 78k13.7)
There are limited circumstances in which allegation of "failure to train" can be basis for municipal liability under § 1983; not only unconstitutional policies are actionable under the statute. 42 U.S.C.A. § 1983.

**[6] Civil Rights 78 ⚖1352(4)**

78 Civil Rights
   78III Federal Remedies in General
      78k1342 Liability of Municipalities and Other Governmental Bodies
         78k1352 Lack of Control, Training, or Supervision; Knowledge and Inaction
         78k1352(4) k. Criminal Law Enforcement; Prisons. Most Cited Cases
   (Formerly 78k206(4), 78k13.7)
Inadequacy of police training may serve as basis for § 1983 municipal liability only where failure to train amounts to deliberate indifference to rights of persons with whom police come into contact; only where municipality's failure to train its employees in relevant respect evidences "deliberate indifference" to rights of its inhabitants can such shortcoming be properly thought of as city "policy or custom" that is actionable under § 1983. 42 U.S.C.A. § 1983.

**[7] Civil Rights 78 ⚖1343**

78 Civil Rights
   78III Federal Remedies in General
      78k1342 Liability of Municipalities and Other Governmental Bodies
         78k1343 k. In General. Most Cited Cases
   (Formerly 78k206(1), 78k13.7)
Proper standard for determining when municipality will be liable under § 1983 for constitutional wrongs does not turn on any underlying culpability test that determines when such wrongs have occurred. 42 U.S.C.A. § 1983.

**[8] Civil Rights 78 ⚖1352(4)**

489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412, 57 USLW 4270

**(Cite as: 489 U.S. 378, 109 S.Ct. 1197)**

78 Civil Rights
    78III Federal Remedies in General
        78k1342 Liability of Municipalities and Other Governmental Bodies
            78k1352 Lack of Control, Training, or Supervision; Knowledge and Inaction
                78k1352(4) k. Criminal Law Enforcement; Prisons. Most Cited Cases
        (Formerly 78k206(4), 78k13.7)
In resolving issue of city's liability for failing to properly train police officers, focus must be on adequacy of training program in relation to tasks particular officers must perform; that particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on city, for officer's shortcomings may have resulted from factors other than faulty training program. 42 U.S.C.A. § 1983.

**[9] Civil Rights 78 &#8918;1352(4)**

78 Civil Rights
    78III Federal Remedies in General
        78k1342 Liability of Municipalities and Other Governmental Bodies
            78k1352 Lack of Control, Training, or Supervision; Knowledge and Inaction
                78k1352(4) k. Criminal Law Enforcement; Prisons. Most Cited Cases
        (Formerly 78k206(4), 78k13.7)
City could be held liable to detainee in civil rights action based on detainee's claim that city failed to adequately train police officers in determining whether detainees needed medical care only if city's failure to train represented deliberate indifference to constitutional rights of its inhabitants. 42 U.S.C.A. § 1983.

**[10] Federal Courts 170B &#8918;462**

170B Federal Courts
    170BVII Supreme Court
        170BVII(B) Review of Decisions of Courts of Appeals
            170Bk462 k. Determination and Disposition of Cause. Most Cited Cases
After Supreme Court determined that "deliberate indifference" standard applied to detainee's claim

that city failed to adequately train police officers in deciding whether detainees needed medical care, issue of whether detainee was entitled to have opportunity to prove her case under deliberate indifference rule was matter for Court of Appeals to deal with on remand. 42 U.S.C.A. § 1983.

**\*\*1199 \*378 Syllabus** [FN*]

> FN* The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 287, 50 L.Ed. 499.

Although respondent fell down several times and was incoherent following her arrest by officers of petitioner city's police department, the officers summoned no medical assistance for her. After her release, she was diagnosed as suffering from several emotional ailments requiring hospitalization and subsequent outpatient treatment. Some time later, she filed suit seeking, *inter alia,* to hold the city liable under 42 U.S.C. § 1983 for its violation of her right, under the Due Process Clause of the Fourteenth Amendment, to receive necessary medical attention while in police custody. The jury ruled in her favor on this claim upon the basis of evidence indicating that a city regulation gave shift commanders sole discretion to determine whether a detainee required medical care, and suggesting that commanders were not provided with any special training to make a determination as to when to summon such care for an injured detainee. Both the District Court, in rejecting the city's motion for judgment notwithstanding the verdict, and the Court of Appeals, in ruling that there had been no error in submitting the "failure to train" claim to the jury, held that, under Circuit precedent, a municipality is liable for failure to train its police force, where the plaintiff proves that the municipality acted recklessly, intentionally, or with gross negligence, and that the lack of training was so reckless or grossly negligent that deprivation of persons' constitutional rights was substantially certain to result. However, upon finding that certain aspects of the District Court's jury instructions might have

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412, 57 USLW 4270
**(Cite as: 489 U.S. 378, 109 S.Ct. 1197)**

led the jury to believe that it could find against the city on a mere *respondeat superior* theory, and that the jury's verdict did not state the basis on which it had ruled for respondent, the Court of Appeals reversed the judgment in her favor and remanded the case for a new trial.

*Held:*

1. The writ of certiorari will not be dismissed as improvidently granted on the basis of respondent's claim that petitioner failed to preserve for review the principal issues before this Court. Since the petition for certiorari directly addressed the critical question here-the § 1983 actionability of a municipality's failure to train-and since respondent's brief in opposition neither raised the objection that petitioner had failed to press its claims on the courts below nor informed this Court *379 that petitioner had arguably conceded below that inadequate training is actionable, this Court will exercise its discretion to deem these defects waived. *Oklahoma City v. Tuttle,* 471 U.S. 808, 816, 105 S.Ct. 2427, 2432, 85 L.Ed.2d 791. Moreover, even if the asserted failure of petitioner to present the claims it makes here in the same fashion below actually occurred, that failure does not affect this Court's jurisdiction. Pp. 1202-1203.

2. A municipality may, in certain circumstances, be held liable under § 1983 for constitutional violations resulting from its failure to train its employees. Pp. 1203-1207.

(a) Petitioner's contention that § 1983 liability can be imposed only where the municipal policy in question is itself unconstitutional is rejected, in light of the rule established by the Court in this case that there are limited circumstances in which a "failure to train" allegation can be the basis for liability. Pp. 1203-1204.

(b) The inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train in a relevant respect amounts to deliberate indifference to the constitutional rights of persons with whom the police come into contact. In contrast to the Court of Appeals' overly broad rule, this "deliberate indifference" standard is most consistent with the rule of *Monell v. New York City Dept. of Social **1200 Services,* 436 U.S. 658, 694, 98 S.Ct. 2018, 2037, 56 L.Ed.2d 611 that a city is not liable under § 1983 unless a municipal "policy" or "custom" is the moving force behind the constitutional violation. Only where a failure to train reflects a "deliberate" or "conscious" choice by the municipality can the failure be properly thought of as an actionable city "policy." *Monell* will not be satisfied by a mere allegation that a training program represents a policy for which the city is responsible. Rather, the focus must be on whether the program is adequate to the tasks the particular employees must perform, and if it is not, on whether such inadequate training can justifiably be said to represent "city policy." Moreover, the identified deficiency in the training program must be closely related to the ultimate injury. Thus, respondent must still prove that the deficiency in training actually caused the police officers' indifference to her medical needs. To adopt lesser standards of fault and causation would open municipalities to unprecedented liability under § 1983; would result in *de facto respondeat superior* liability, a result rejected in *Monell;* would engage federal courts in an endless exercise of second-guessing municipal employee-training programs, a task that they are ill suited to undertake; and would implicate serious questions of federalism. Pp. 1204-1207.

3. Although the evidence presently in the record does not satisfy the "deliberate indifference" rule of liability, the question whether respondent should have an opportunity to prove her case under that rule must be left to the Court of Appeals on remand, since the standard of proof the *380 District Court ultimately imposed on her was a lesser one than the one here adopted. P. 1207.

798 F.2d 1414 (CA6 1986), vacated and remanded.

WHITE, J., delivered the opinion of the Court, in which REHNQUIST, C.J., and BRENNAN, MARSHALL, BLACKMUN, and STEVENS, JJ., joined, and in Parts I, II, and III of which O'CONNOR, SCALIA, and KENNEDY, JJ., joined, except as to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412, 57 USLW 4270

**(Cite as: 489 U.S. 378, 109 S.Ct. 1197)**

n. 11. BRENNAN, J., filed a concurring opinion, *post,* p. ---. O'CONNOR, J., filed an opinion concurring in part and dissenting in part, in which SCALIA and KENNEDY, JJ., joined, *post,* p. ---.

*Carter G. Phillips* argued the cause for petitioner. With him on the briefs were *Mark D. Hopson, W. Scott Gwin, William J. Hamann,* and *John S. Coury. David Rudovsky* argued the cause for respondent. With him on the brief were *Emanuella Harris Groves* and *Dexter W. Clark.**

* *Benna Ruth Solomon, Beate Bloch,* and *Richard K. Willard* filed a brief for the International City Management Association et al. as *amici curiae* urging reversal.

*John A. Powell, Steven R. Shapiro, Howard A. Friedman,* and *Michael Aaron Avery* filed a brief for the American Civil Liberties Union et al. as *amici curiae* urging affirmance.

Justice WHITE delivered the opinion of the Court.

[1] In this case, we are asked to determine if a municipality can ever be liable under 42 U.S.C. § 1983 FN1 for constitutional violations resulting from its failure to train municipal employees. We hold that, under certain circumstances, such liability is permitted by the statute.

> FN1. Title 42 U.S.C. § 1983 provides, in relevant part, that:
> "Every person who, under color of any statute, ordinance, regulation, custom, or usage ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress...."

**\*381** I

In April 1978, respondent Geraldine Harris was arrested by officers of the Canton Police Department. Mrs. Harris was brought to the police station in a patrol wagon.

When she arrived at the station, Mrs. Harris was found sitting on the floor of the wagon. She was asked if she needed medical attention, and responded with an incoherent remark. After she was brought inside the station for processing, Mrs. Harris slumped to the floor on two occasions. Eventually, the police officers left Mrs. Harris lying on the floor to prevent her **\*1201** from falling again. No medical attention was ever summoned for Mrs. Harris. After about an hour, Mrs. Harris was released from custody, and taken by an ambulance (provided by her family) to a nearby hospital. There, Mrs. Harris was diagnosed as suffering from several emotional ailments; she was hospitalized for one week and received subsequent outpatient treatment for an additional year.

Some time later, Mrs. Harris commenced this action alleging many state-law and constitutional claims against the city of Canton and its officials. Among these claims was one seeking to hold the city liable under 42 U.S.C. § 1983 for its violation of Mrs. Harris' right, under the Due Process Clause of the Fourteenth Amendment, to receive necessary medical attention while in police custody.

A jury trial was held on Mrs. Harris' claims. Evidence was presented that indicated that, pursuant to a municipal regulation,FN2 shift commanders were authorized to determine, in their sole discretion, whether a detainee required medical **\*382** care. Tr. 2-139-2-143. In addition, testimony also suggested that Canton shift commanders were not provided with any special training (beyond first-aid training) to make a determination as to when to summon medical care for an injured detainee. *Ibid.;* App. to Pet. for Cert. 4a.

> FN2. The city regulation in question provides that a police officer assigned to act as "jailer" at the city police station
> "shall, when a prisoner is found to be unconscious or semi-unconscious, or when he or she is unable to explain his or her condition, or who complains of being ill, have such person taken to a hospital for medical treatment, with permission of his supervisor before admitting the person to City

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Jail."App. 33.

At the close of the evidence, the District Court submitted the case to the jury, which rejected all of Mrs. Harris' claims except one: her § 1983 claim against the city resulting from its failure to provide her with medical treatment while in custody. In rejecting the city's subsequent motion for judgment notwithstanding the verdict, the District Court explained the theory of liability as follows:

"The evidence construed in a manner most favorable to Mrs. Harris could be found by a jury to demonstrate that the City of Canton had a custom or policy of vesting complete authority with the police supervisor of when medical treatment would be administered to prisoners. Further, the jury could find from the evidence that the vesting of such *carte blanche* authority with the police supervisor without adequate training to recognize when medical treatment is needed was grossly negligent or so reckless that future police misconduct was almost inevitable or substantially certain to result." *Id.,* at 16a.

On appeal, the Sixth Circuit affirmed this aspect of the District Court's analysis, holding that "a municipality is liable for failure to train its police force, [where] the plaintiff ... prove[s] that the municipality acted recklessly, intentionally, or with gross negligence." *Id.,* at 5a.[FN3] The Court of Appeals also stated that an additional prerequisite of this theory *383 of liability was that the plaintiff must prove "that the lack of training was so reckless or grossly negligent that deprivations of persons' constitutional rights were substantially certain to result." *Ibid.* Thus, the Court of Appeals found that there had been no error in submitting Mrs. Harris' "failure to train" claim to the jury. However, the Court of Appeals reversed the judgment for respondent, and remanded this case for a new trial, because it found that certain aspects of the District Court's jury instructions might have led the jury to believe that it could find against the city on a mere *respondeat**1202 superior* theory. Because the jury's verdict did not state the basis on which it had ruled for Mrs. Harris on her § 1983 claim, a new trial was ordered.

FN3. In upholding Mrs. Harris' "failure to train" claim, the Sixth Circuit relied on two of its previous decisions which had approved such a theory of municipal liability under § 1983. See *Rymer v. Davis,* 754 F.2d 198 (CA6), vacated and remanded *sub nom. Shepherdsville v. Rymer,* 473 U.S. 901, 105 S.Ct. 3518, 87 L.Ed.2d 646 reinstated, 775 F.2d 756, 757 (1985); *Hays v. Jefferson County,* 668 F.2d 869, 874 (1982).

The city petitioned for certiorari, arguing that the Sixth Circuit's holding represented an impermissible broadening of municipal liability under § 1983. We granted the petition. 485 U.S. 933, 108 S.Ct. 1105, 99 L.Ed.2d 267 (1988).

II

[2] We first address respondent's contention that the writ of certiorari should be dismissed as improvidently granted, because "petitioner failed to preserve for review the principal issues it now argues in this Court." Brief for Respondent 5.

We think it clear enough that petitioner's three "Questions Presented" in its petition for certiorari encompass the critical question before us in this case: Under what circumstances can inadequate training be found to be a "policy" that is actionable under § 1983? See Pet. for Cert. i. The petition itself addressed this issue directly, attacking the Sixth Circuit's "failure to train" theory as inconsistent with this Court's precedents. See *id.,* at 8-12. It is also clear-as respondent conceded at argument, Tr. of Oral Arg. 34, 54-that her brief in opposition to our granting of certiorari did not raise the objection that petitioner had failed to press its claims on the courts below.

As to respondent's contention that the claims made by petitioner here were not made in the same fashion below, that *384 failure, if it occurred, does not affect our jurisdiction; and because respondent did not oppose our grant of review at that time based on her contention that these claims were not pressed below, we will not dismiss the writ as improvid-

Case 2:06-cv-00672-WKW-WC    Document 25-6    Filed 11/16/2007    Page 254 of 273

489 U.S. 378    Page 7
489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412, 57 USLW 4270
**(Cite as: 489 U.S. 378, 109 S.Ct. 1197)**

ently granted. "[T]he 'decision to grant certiorari represents a commitment of scarce judicial resources with a view to deciding the merits ... of the questions presented in the petition.' " *St. Louis v. Praprotnik,* 485 U.S. 112, 120, 108 S.Ct. 915, 922, 99 L.Ed.2d 107 (1988) (quoting *Oklahoma City v. Tuttle,* 471 U.S. 808, 816, 105 S.Ct. 2427, 2432, 85 L.Ed.2d 791 (1985)). As we have expressly admonished litigants in respondent's position: "Nonjurisdictional defects of this sort should be brought to our attention *no later* than in respondent's brief in opposition to the petition for certiorari; if not, we consider it within our discretion to deem the defect waived." *Tuttle, supra,* at 816, 105 S.Ct. at 2432.

It is true that petitioner's litigation posture with respect to the questions presented here has not been consistent; most importantly, petitioner conceded below that " 'inadequate training' [is] a means of establishing municipal liability under Section 1983." Reply Brief for Petitioner 4, n. 3; see also Petition for Rehearing in No. 85-3314 (CA6), p. 1. However, at each stage in the proceedings below, petitioner contested any finding of liability on this ground, with objections of varying specificity. It opposed the District Court's jury instructions on this issue, Tr. 4-369; claimed in its judgment notwithstanding verdict motion that there was "no evidence of a ... policy or practice on the part of the City ... [of] den[ying] medical treatment to prisoners," Motion for Judgment Notwithstanding Verdict in No. C80-18-A (ND Ohio), p. 1; and argued to the Court of Appeals that there was no basis for finding a policy of denying medical treatment to prisoners in this case. See Brief for Appellant in No. 85-3314 (CA6), pp. 26-29. Indeed, petitioner specifically contended that the Sixth Circuit precedents that permitted inadequate training to be a basis for municipal liability on facts similar to these, see n. 3, *supra,* were in conflict with **\*385** our decision in *Tuttle.* Brief for Appellant in No. 85-3314 (CA6), p. 29. These various presentations of the issues below might have been so inexact that we would have denied certiorari had this matter been brought to our attention at the appropriate stage in the proceedings. But they were at least adequate to yield a

decision by the Sixth Circuit on the questions presented for our review now.

**\*\*1203** Here the Sixth Circuit held that where a plaintiff proves that a municipality, acting recklessly, intentionally, or with gross negligence, has failed to train its police force-resulting in a deprivation of constitutional rights that was "substantially certain to result"-§ 1983 permits that municipality to be held liable for its actions. Petitioner's petition for certiorari challenged the soundness of that conclusion, and respondent did not inform us prior to the time that review was granted that petitioner had arguably conceded this point below. Consequently, we will not abstain from addressing the question before us.

III

In *Monell v. New York City Dept. of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), we decided that a municipality can be found liable under § 1983 only where the municipality *itself* causes the constitutional violation at issue. *Respondeat superior* or vicarious liability will not attach under § 1983. *Id.,* at 694-695, 98 S.Ct. at 2037-38. "It is only when the 'execution of the government's policy or custom ... inflicts the injury' that the municipality may be held liable under § 1983." *Springfield v. Kibbe,* 480 U.S. 257, 267, 107 S.Ct. 1114, 1119, 94 L.Ed.2d 293 (1987) (O'CONNOR, J., dissenting) (quoting *Monell, supra,* 436 U.S., at 694, 98 S.Ct. at 2037-38).

[3] Thus, our first inquiry in any case alleging municipal liability under § 1983 is the question whether there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation. The inquiry is a difficult one; one that has left this Court deeply divided in a series of **\*386** cases that have followed *Monell;* [FN4] one that is the principal focus of our decision again today.

FN4. See, *e.g., St. Louis v. Praprotnik,* 485 U.S. 112, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988); *Springfield v. Kibbe,* 480 U.S. 257, 107 S.Ct. 1114, 94 L.Ed.2d 293 (1987);

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412, 57 USLW 4270

**(Cite as: 489 U.S. 378, 109 S.Ct. 1197)**

*Los Angeles v. Heller,* 475 U.S. 796, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986); *Oklahoma City v. Tuttle,* 471 U.S. 808, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985).

A

[4] Based on the difficulty that this Court has had defining the contours of municipal liability in these circumstances, petitioner urges us to adopt the rule that a municipality can be found liable under § 1983 only where "the policy in question [is] itself unconstitutional." Brief for Petitioner 15. Whether such a rule is a valid construction of § 1983 is a question the Court has left unresolved. See, *e.g., St. Louis v. Praprotnik, supra,* 485 U.S., at 147, 108 S.Ct., at 936 (BRENNAN, J., concurring in judgment); *Oklahoma City v. Tuttle, supra,* 471 U.S., at 824, n. 7, 105 S.Ct., at 2437-38, n. 7. Under such an approach, the outcome here would be rather clear: we would have to reverse and remand the case with instructions that judgment be entered for petitioner.FN5 There can be little doubt that on its face the city's policy regarding medical treatment for detainees is constitutional. The policy states that the city jailer "shall ... have [a person needing medical care] taken to a hospital for medical treatment, with ***387** permission of his supervisor...." App. 33. It is difficult ****1204** to see what constitutional guarantees are violated by such a policy.

> FN5. In this Court, in addition to suggesting that the city's failure to train its officers amounted to a "policy" that resulted in the denial of medical care to detainees, respondent also contended the city had a "custom" of denying medical care to those detainees suffering from emotional or mental ailments. See Brief for Respondent 31-32; Tr. of Oral Arg. 38-39. As respondent described it in her brief, and at argument, this claim of an unconstitutional "custom" appears to be little more than a restatement of her "failure-to-train as policy" claim. See *ibid.*
>
> However, to the extent that this claim poses a distinct basis for the city's liability

under § 1983, we decline to determine whether respondent's contention that such a "custom" existed is an alternative ground for affirmance. The "custom" claim was not passed on by the Court of Appeals-nor does it appear to have been presented to that court as a distinct ground for its decision. See Brief of Appellee in No. 85-3314 (CA6), pp. 4-9, 11. Thus, we will not consider it here.

[5] Nor, without more, would a city automatically be liable under § 1983 if one of its employees happened to apply the policy in an unconstitutional manner, for liability would then rest on *respondeat superior.* The claim in this case, however, is that if a concededly valid policy is unconstitutionally applied by a municipal employee, the city is liable if the employee has not been adequately trained and the constitutional wrong has been caused by that failure to train. For reasons explained below, we conclude, as have all the Courts of Appeals that have addressed this issue,FN6 that there are limited circumstances in which an allegation of a "failure to train" can be the basis for liability under § 1983. Thus, we reject petitioner's contention that only unconstitutional policies are actionable under the statute.

> FN6. In addition to the Sixth Circuit decisions discussed in n. 3, *supra,* most of the other Courts of Appeals have held that a failure to train can create liability under § 1983. See, *e.g., Spell v. McDaniel,* 824 F.2d 1380, 1389-1391 (CA4 1987); *Haynesworth v. Miller,* 261 U.S.App.D.C. 66, 80-83, 820 F.2d 1245, 1259-1262 (1987); *Warren v. Lincoln,* 816 F.2d 1254, 1262-1263 (CA8 1987); *Bergquist v. County of Cochise,* 806 F.2d 1364, 1369-1370 (CA9 1986); *Wierstak v. Heffernan,* 789 F.2d 968, 974 (CA1 1986); *Fiacco v. Rensselaer,* 783 F.2d 319, 326-327 (CA2 1986); *Gilmere v. Atlanta,* 774 F.2d 1495, 1503-1504 (CA11 1985) (en banc); *Rock v. McCoy,* 763 F.2d 394, 397-398 (CA10 1985); *Languirand v. Hay-*

*den,* 717 F.2d 220, 227-228 (CA5 1983). Two other Courts of Appeals have stopped short of expressly embracing this rule, and have instead only implicitly endorsed it. See, *e.g., Colburn v. Upper Darby Township,* 838 F.2d 663, 672-673 (CA3 1988); *Lenard v. Argento,* 699 F.2d 874, 885-887 (CA7 1983).

In addition, six current Members of this Court have joined opinions in the past that have (at least implicitly) endorsed this theory of liability under § 1983. See *Oklahoma City v. Tuttle, supra,* 471 U.S., at 829-831, 105 S.Ct., at 2439-2440 (BRENNAN, J., joined by MARSHALL and BLACKMUN, JJ., concurring in part and concurring in judgment); *Springfield v. Kibbe, supra,* 480 U.S., at 268-270, 107 S.Ct., at 1120-1121 (O'CONNOR, J., joined by REHNQUIST, C.J., and Powell and WHITE, JJ., dissenting).

### *388 B

[6][7] Though we agree with the court below that a city can be liable under § 1983 for inadequate training of its employees, we cannot agree that the District Court's jury instructions on this issue were proper, for we conclude that the Court of Appeals provided an overly broad rule for when a municipality can be held liable under the "failure to train" theory. Unlike the question whether a municipality's failure to train employees can ever be a basis for § 1983 liability-on which the Courts of Appeals have all agreed, see n. 6, *supra,*-there is substantial division among the lower courts as to what *degree of fault* must be evidenced by the municipality's inaction before liability will be permitted.[FN7] We hold today that the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact.[FN8] This rule is most consistent with our **1205 admonition*389 in *Monell,* 436 U.S., at 694, 98 S.Ct., at 2037, and *Polk County v. Dodson,* 454 U.S. 312, 326, 102 S.Ct. 445, 454, 70 L.Ed.2d 509 (1981), that a municipality can be

liable under § 1983 only where its policies are the "moving force [behind] the constitutional violation." Only where a municipality's failure to train its employees in a relevant respect evidences a "deliberate indifference" to the rights of its inhabitants can such a shortcoming be properly thought of as a city "policy or custom" that is actionable under § 1983. As Justice BRENNAN's opinion in *Pembaur v. Cincinnati,* 475 U.S. 469, 483-484, 106 S.Ct. 1292, 1300-1301, 89 L.Ed.2d 452 (1986) (plurality) put it: "[M]unicipal liability under § 1983 attaches where-and only where-a deliberate choice to follow a course of action is made from among various alternatives" by city policymakers. See also *Oklahoma City v. Tuttle,* 471 U.S., at 823, 105 S.Ct., at 2436 (opinion of REHNQUIST, J.). Only where a failure to train reflects a "deliberate" or "conscious" choice by a municipality-a "policy" as defined by our prior cases-can a city be liable for such a failure under § 1983.

> FN7. Some courts have held that a showing of "gross negligence" in a city's failure to train its employees is adequate to make out a claim under § 1983. See, *e.g., Bergquist v. County of Cochise, supra,* at 1370; *Herrera v. Valentine,* 653 F.2d 1220, 1224 (CA8 1981). But the more common rule is that a city must exhibit "deliberate indifference" towards the constitutional rights of persons in its domain before a § 1983 action for "failure to train" is permissible. See, *e.g., Fiacco v. Rensselaer, supra,* at 326; *Patzner v. Burkett,* 779 F.2d 1363, 1367 (CA8 1985); *Wellington v. Daniels,* 717 F.2d 932, 936 (CA4 1983); *Languirand v. Hayden, supra,* at 227.

> FN8. The "deliberate indifference" standard we adopt for § 1983 "failure to train" claims does not turn upon the degree of fault (if any) that a plaintiff must show to make out an underlying claim of a constitutional violation. For example, this Court has never determined what degree of culpability must be shown before the particular constitutional deprivation asserted in this

489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412, 57 USLW 4270

**(Cite as: 489 U.S. 378, 109 S.Ct. 1197)**

case-a denial of the due process right to medical care while in detention-is established. Indeed, in *Revere v. Massachusetts General Hospital,* 463 U.S. 239, 243-245, 103 S.Ct. 2979, 2982-2983, 77 L.Ed.2d 605 (1983), we reserved decision on the question whether something less than the Eighth Amendment's "deliberate indifference" test may be applicable in claims by detainees asserting violations of their due process right to medical care while in custody.

We need not resolve here the question left open in *Revere* for two reasons. First, petitioner has conceded that, as the case comes to us, we must assume that respondent's constitutional right to receive medical care was denied by city employees-whatever the nature of that right might be. See Tr. of Oral Arg. 8-9. Second, the proper standard for determining when a municipality will be liable under § 1983 for constitutional wrongs does not turn on any underlying culpability test that determines when such wrongs have occurred. Cf. Brief for Respondent 27.

*Monell's* rule that a city is not liable under § 1983 unless a municipal policy causes a constitutional deprivation will not be satisfied by merely alleging that the existing training program for a class of employees, such as police officers, represents a policy for which the city is responsible.[FN9] That much **\*390** may be true. The issue in a case like this one, however, is whether that training program is adequate; and if it is not, the question becomes whether such inadequate training can justifiably be said to represent "city policy." It may seem contrary to common sense to assert that a municipality will actually have a policy of not taking reasonable steps to train its employees. But it may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.[FN10] In

that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury.[FN11]

> FN9. The plurality opinion in *Tuttle* explained why this must be so:
> "Obviously, if one retreats far enough from a constitutional violation some municipal 'policy' can be identified behind almost any ... harm inflicted by a municipal official; for example, [a police officer] would never have killed Tuttle if Oklahoma City did not have a 'policy' of establishing a police force. But *Monell* must be taken to require proof of a city policy different in kind from this latter example before a claim can be sent to a jury on the theory that a particular violation was 'caused' by the municipal 'policy.' " 471 U.S., at 823, 105 S.Ct., at 2436. Cf. also *id.,* at 833, n. 9, 105 S.Ct., at 2441, n. 9 (opinion of BRENNAN, J.).

> FN10. For example, city policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons. The city has armed its officers with firearms, in part to allow them to accomplish this task. Thus, the need to train officers in the constitutional limitations on the use of deadly force, see *Tennessee v. Garner,* 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985), can be said to be "so obvious," that failure to do so could properly be characterized as "deliberate indifference" to constitutional rights.
> It could also be that the police, in exercising their discretion, so often violate constitutional rights that the need for further training must have been plainly obvious to the city policymakers, who, nevertheless, are "deliberately indifferent" to the need.

> FN11. The record indicates that city did train its officers and that its training in-

cluded first-aid instruction. See App. to Pet. for Cert. 4a. Petitioner argues that it could not have been obvious to the city that such training was insufficient to administer the written policy, which was itself constitutional. This is a question to be resolved on remand. See Part IV, *infra.*

**1206 [8] In resolving the issue of a city's liability, the focus must be on adequacy of the training program in relation to the tasks the particular officers must perform. That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may *391 have resulted from factors other than a faulty training program. See *Springfield v. Kibbe,* 480 U.S., at 268, 107 S.Ct., at 1120 (O'CONNOR, J., dissenting); *Oklahoma City v. Tuttle, supra,* 471 U.S., at 821, 105 S.Ct., at 2435 (opinion of REHNQUIST, J.). It may be, for example, that an otherwise sound program has occasionally been negligently administered. Neither will it suffice to prove that an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct. Such a claim could be made about almost any encounter resulting in injury, yet not condemn the adequacy of the program to enable officers to respond properly to the usual and recurring situations with which they must deal. And plainly, adequately trained officers occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the city liable.

Moreover, for liability to attach in this circumstance the identified deficiency in a city's training program must be closely related to the ultimate injury. Thus in the case at hand, respondent must still prove that the deficiency in training actually caused the police officers' indifference to her medical needs.FN12 Would the injury have been avoided had the employee been trained under a program that was not deficient in the identified respect? Predicting how a hypothetically well-trained officer would have acted under the circumstances may not be an easy task for the factfinder, particularly since mat-

ters of judgment may be involved, and since officers who are well trained are not free from error and perhaps might react very much like the untrained officer in similar circumstances. But judge and jury, doing their respective jobs, will be adequate to the task.

> FN12. Respondent conceded as much at argument. See Tr. of Oral Arg. 50-51; cf. also *Oklahoma City v. Tuttle, supra,* 471 U.S., at 831, 105 S.Ct., at 2440 (opinion of BRENNAN, J.).

To adopt lesser standards of fault and causation would open municipalities to unprecedented liability under § 1983. *392 In virtually every instance where a person has had his or her constitutional rights violated by a city employee, a § 1983 plaintiff will be able to point to something the city "could have done" to prevent the unfortunate incident. See *Oklahoma City v. Tuttle,* 471 U.S., at 823, 105 S.Ct. at 2436 (opinion of REHNQUIST, J.). Thus, permitting cases against cities for their "failure to train" employees to go forward under § 1983 on a lesser standard of fault would result in *de facto respondeat superior* liability on municipalities-a result we rejected in *Monell,* 436 U.S., at 693-694, 98 S.Ct., at 2037. It would also engage the federal courts in an endless exercise of second-guessing municipal employee-training programs. This is an exercise we believe the federal courts are ill suited to undertake, as well as one that would implicate serious questions of federalism. Cf. *Rizzo v. Goode,* 423 U.S. 362, 378-380, 96 S.Ct. 598, 607-608, 46 L.Ed.2d 561 (1976).

[9] Consequently, while claims such as respondent's-alleging that the city's failure to provide training to municipal employees resulted in the constitutional deprivation she suffered-are cognizable under § 1983, they can only yield liability against a municipality where that city's failure to train reflects deliberate indifference to the constitutional rights of its inhabitants.

IV

[10] The final question here is whether this case

489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412, 57 USLW 4270
**(Cite as: 489 U.S. 378, 109 S.Ct. 1197)**

should be remanded for a new trial, or whether, as petitioner suggests, we **1207** should conclude that there are no possible grounds on which respondent can prevail. See Tr. of Oral Arg. 57-58. It is true that the evidence in the record now does not meet the standard of § 1983 liability we have set forth above. But, the standard of proof the District Court ultimately imposed on respondent (which was consistent with Sixth Circuit precedent) was a lesser one than the one we adopt today, see Tr. 4-389-4-390. Whether respondent should have an opportunity to prove her case under the "deliberate indifference" rule we have adopted is a matter for the Court of Appeals to deal with on remand.

#### *393 V

Consequently, for the reasons given above, we vacate the judgment of the Court of Appeals and remand this case for further proceedings consistent with this opinion.

*It is so ordered.*

Justice BRENNAN, concurring.

The Court's opinion, which I join, makes clear that the Court of Appeals is free to remand this case for a new trial.

Justice O'CONNOR, with whom Justice SCALIA and Justice KENNEDY join, concurring in part and dissenting in part.

I join Parts I and II and all of Part III of the Court's opinion except footnote 11, see *ante,* at 1205, n. 11. I thus agree that where municipal policymakers are confronted with an obvious need to train city personnel to avoid the violation of constitutional rights and they are deliberately indifferent to that need, the lack of necessary training may be appropriately considered a city "policy" subjecting the city itself to liability under our decision in *Monell v. New York City Dept. of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). As the Court observes, "[o]nly where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality-a 'policy' as defined by our prior cases-can a city be liable for such a failure under [42 U.S.C.]§ 1983." *Ante,* at 1205. I further agree that a § 1983 plaintiff pressing a "failure to train" claim must

prove that the lack of training was the "cause" of constitutional injury at issue and that this entails more than simply showing "but for" causation. *Ante,* at 1205-1206. Lesser requirements of fault and causation in this context would "open municipalities to unprecedented liability under § 1983,"*ante,* at 1206, and would pose serious federalism concerns. *Ante,* at 1206.

My single point of disagreement with the majority is thus a small one. Because I believe, as the majority strongly hints, *394 see *ibid.,* that respondent has not and could not satisfy the fault and causation requirements we adopt today, I think it unnecessary to remand this case to the Court of Appeals for further proceedings. This case comes to us after a full trial during which respondent vigorously pursued numerous theories of municipal liability including an allegation that the city had a "custom" of not providing medical care to detainees suffering from emotional illnesses. Respondent thus had every opportunity and incentive to adduce the type of proof necessary to satisfy the deliberate indifference standard we adopt today. Rather than remand in this context, I would apply the deliberate indifference standard to the facts of this case. After undertaking that analysis below, I conclude that there is no evidence in the record indicating that the city of Canton has been deliberately indifferent to the constitutional rights of pretrial detainees.

#### I

In *Monell,* the Court held that municipal liability can be imposed under § 1983 only where the municipality, as an entity, can be said to be "responsible" for a constitutional violation committed by one of its employees. "[T]he touchstone of the § 1983 action against a government body is an allegation that official policy is responsible for **1208** a deprivation of rights protected by the Constitution." 436 U.S., at 690, 98 S.Ct., at 2036. The Court found that the language of § 1983, and rejection of the "Sherman Amendment" by the 42d Congress, were both strong indicators that the framers of the Civil Rights Act of 1871 did not intend that municipal governments be held vicari-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412, 57 USLW 4270

**(Cite as: 489 U.S. 378, 109 S.Ct. 1197)**

ously liable for the constitutional torts of their employees. Thus a § 1983 plaintiff seeking to attach liability to the city for the acts of one of its employees may not rest on the employment relationship alone; both fault and causation *as to the acts or omissions of the city itself* must be proved. The Court reaffirms these requirements today.

Where, as here, a claim of municipal liability is predicated upon a failure to act, the requisite degree of fault must be **\*395** shown by proof of a background of events and circumstances which establish that the "policy of inaction" is the functional equivalent of a decision by the city itself to violate the Constitution. Without some form of notice to the city, and the opportunity to conform to constitutional dictates both what it does and what it chooses not to do, the failure to train theory of liability could completely engulf *Monell,* imposing liability without regard to fault. Moreover, absent a requirement that the lack of training at issue bear a very close causal connection to the violation of constitutional rights, the failure to train theory of municipal liability could impose "prophylactic" duties on municipal governments only remotely connected to underlying constitutional requirements themselves.

Such results would be directly contrary to the intent of the drafters of § 1983. The central vice of the Sherman Amendment, as noted by the Court's opinion in *Monell,* was that it "impose[d] a species of vicarious liability on municipalities since it could be construed to impose liability even if the municipality *did not know* of an impending or ensuing riot or did not have the wherewithal to do anything about it." 436 U.S., at 692, n. 57, 98 S.Ct., at 2036, n. 57 (emphasis added). Moreover, as noted in *Monell,* the authors of § 1 of the Ku Klux Act did not intend to create any new rights or duties beyond those contained in the Constitution. *Id.,* at 684-685, 98 S.Ct., at 2032. Thus, § 1 was referred to as "reenacting the Constitution." Cong. Globe, 42d Cong., 1st Sess., 569 (1871) (Rep. Edmunds). Representative Bingham, the author of § 1 of the Fourteenth Amendment, saw the purpose of § 1983 as "the enforcement ... of the Constitution on behalf of every individual citizen of the Republic ... to the extent of the rights guaranteed to him by the Constitution." *Id.,* at App. 81. See also *Chapman v. Houston Welfare Rights Organization,* 441 U.S. 600, 617, 99 S.Ct. 1905, 1916, 60 L.Ed.2d 508 (1979) ("[Section] 1 of the Civil Rights Act of 1871 did not provide for any substantive rights-equal or otherwise. As introduced and enacted, it served only to insure that an individual had a cause of action for violations of the Constitution"). **\*396** Thus § 1983 is not a "federal good government act" for municipalities. Rather it creates a federal cause of action against persons, including municipalities, who deprive citizens of the United States of their constitutional rights.

Sensitive to these concerns, the Court's opinion correctly requires a high degree of fault on the part of city officials before an omission that is not in itself unconstitutional can support liability as a municipal policy under *Monell.* As the Court indicates, "it may happen that ... the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Ante,* at 1205-1206. Where a § 1983 plaintiff can establish that the facts available to city policymakers put them on actual or constructive notice that the particular omission is substantially certain to result in the violation of the constitutional rights of their citizens, the dictates of *Monell* are satisfied. Only then can it be said **\*\*1209** that the municipality has made " 'a deliberate choice to follow a course of action ... from among various alternatives.' " *Ante,* at 1205, quoting *Pembaur v. Cincinnati,* 475 U.S. 469, 483-484, 106 S.Ct. 1292, 1300, 89 L.Ed.2d 452 (1986).

In my view, it could be shown that the need for training was obvious in one of two ways. First, a municipality could fail to train its employees concerning a clear constitutional duty implicated in recurrent situations that a particular employee is certain to face. As the majority notes, see *ante,* at 1205, n. 10, the constitutional limitations established by this Court on the use of deadly force by police officers present one such situation. The con-

489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412, 57 USLW 4270

**(Cite as: 489 U.S. 378, 109 S.Ct. 1197)**

stitutional duty of the individual officer is clear, and it is equally clear that failure to inform city personnel of that duty will create an extremely high risk that constitutional violations will ensue.

The claim in this case-that police officers were inadequately trained in diagnosing the symptoms of emotional illness-falls far short of the kind of "obvious" need for training **\*397** that would support a finding of deliberate indifference to constitutional rights on the part of the city. As the Court's opinion observes, *ante,* at 1204, n. 8, this Court has not yet addressed the precise nature of the obligations that the Due Process Clause places upon the police to seek medical care for pretrial detainees who have been *physically* injured while being apprehended by the police. See *Revere v. Massachusetts General Hospital,* 463 U.S. 239, 246, 103 S.Ct. 2979, 2984, 77 L.Ed.2d 605 (1983) (REHNQUIST, J., concurring). There are thus no clear constitutional guideposts for municipalities in this area, and the diagnosis of mental illness is not one of the "usual and recurring situations with which [the police] must deal." *Ante,* at 1205-1206. The lack of training at issue here is not the kind of omission that can be characterized, in and of itself, as a "deliberate indifference" to constitutional rights.

Second, I think municipal liability for failure to train may be proper where it can be shown that policymakers were aware of, and acquiesced in, a pattern of constitutional violations involving the exercise of police discretion. In such cases, the need for training may not be obvious from the outset, but a pattern of constitutional violations could put the municipality on notice that its officers confront the particular situation on a regular basis, and that they often react in a manner contrary to constitutional requirements. The lower courts that have applied the "deliberate indifference" standard we adopt today have required a showing of a pattern of violations from which a kind of "tacit authorization" by city policymakers can be inferred. See, *e.g., Fiacco v. Rensselaer,* 783 F.2d 319, 327 (CA2 1986) (multiple incidents required for finding of deliberate indifference); *Patzner v. Burkett,* 779 F.2d

1363, 1367 (CA8 1985) ("[A] municipality may be liable if it had notice of prior misbehavior by its officers and failed to take remedial steps amounting to deliberate indifference to the offensive acts"); *Languirand v. Hayden,* 717 F.2d 220, 227-228 (CA5 1983) (municipal liability for failure to train requires "evidence at least of a pattern of similar **\*398** incidents in which citizens were injured or endangered"); *Wellington v. Daniels,* 717 F.2d 932, 936 (CA4 1983) ("[A] failure to supervise gives rise to § 1983 liability, however, only in those situations where there is a history of wide-spread abuse. Only then may knowledge be imputed to the supervisory personnel").

The Court's opinion recognizes this requirement, see *ante,* at 11, and n. 10, but declines to evaluate the evidence presented in this case in light of the new legal standard. *Ante,* at 13. From the outset of this litigation, respondent has pressed a claim that the city of Canton had a custom of denying medical care to pretrial detainees with emotional disorders. See Amended Complaint ¶ 28, App. 27. Indeed, up to and including oral argument before this Court, counsel for respondent continued to assert **\*\*1210** that respondent was attempting to hinge municipal liability upon "both a custom of denying medical care to a certain class of prisoners, and a failure to train police that led to this particular violation." Tr. of Oral Arg. 37-38. At the time respondent filed her complaint in 1980, it was clear that proof of the existence of a custom entailed a showing of "practices ... so permanent and well settled as to constitute a 'custom or usage' with the force of law." *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 168, 90 S.Ct. 1598, 1614, 26 L.Ed.2d 142 (1970); see also *Garner v. Memphis Police Department,* 600 F.2d 52, 54-55, and n. 4 (CA6 1979) (discussing proof of custom in light of *Monell*).

Whatever the prevailing standard at the time concerning liability for failure to train, respondent thus had every incentive to adduce proof at trial of a pattern of violations to support her claim that the city had an unwritten custom of denying medical care to emotionally ill detainees. In fact, respondent presented no testimony from any witness indicating

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412, 57 USLW 4270
**(Cite as: 489 U.S. 378, 109 S.Ct. 1197)**

that there had been past incidents of "deliberate indifference" to the medical needs of emotionally disturbed detainees or that any other circumstance had put the city on actual or constructive notice of a need for additional training in this **\*399** regard. At trial, David Maser, who was Chief of Police of the city of Canton from 1971 to 1980, testified without contradiction that during his tenure he received no complaints that detainees in the Canton jails were not being accorded proper medical treatment. Tr. 4-347-4-348. Former Officer Cherry, who had served as a jailer for the Canton Police Department, indicated that he had never had to seek medical treatment for persons who were emotionally upset at the prospect of arrest, because they usually calmed down when a member of the department spoke with them or one of their family members arrived. *Id.,* at 4-83-4-84. There is quite simply nothing in this record to indicate that the city of Canton had any reason to suspect that failing to provide this kind of training would lead to injuries of any kind, let alone violations of the Due Process Clause. None of the Courts of Appeals that already apply the standard we adopt today would allow respondent to take her claim to a jury based on the facts she adduced at trial. See *Patzner v. Burkett, supra,* at 1367 (summary judgment proper under "deliberate indifference" standard where evidence of only single incident adduced); *Languirand v. Hayden, supra,* at 229 (reversing jury verdict rendered under failure to train theory where there was no evidence of prior incidents to support a finding that municipal policymakers were "consciously indifferent" to constitutional rights); *Wellington v. Daniels, supra,* at 937 (affirming judgment notwithstanding the verdict for municipality under "deliberate indifference" standard where evidence of only a single incident was presented at trial); cf. *Fiacco v. Rensselaer supra,* at 328-332 (finding evidence of "deliberate indifference" sufficient to support jury verdict where a pattern of similar violations was shown at trial).

Allowing an inadequate training claim such as this one to go to the jury based upon a single incident would only invite jury nullification of *Monell.* "To infer the existence of a city policy from the isolated misconduct of a single, low-level officer, and then to hold the city liable on the basis of that policy, **\*400** would amount to permitting precisely the theory of strict *respondeat superior* liability rejected in *Monell.*" *Oklahoma City v. Tuttle,* 471 U.S. 808, 831, 105 S.Ct. 2427, 2440, 85 L.Ed.2d 791 (1985) (BRENNAN, J., concurring in part and concurring in judgment). As the authors of the Ku Klux Act themselves realized, the resources of local government are not inexhaustible. The grave step of shifting those resources to particular areas where constitutional violations are likely to result through the deterrent power of § 1983 should certainly not be taken on the basis of an isolated incident. If § 1983 and the Constitution require the city of Canton to provide detailed medical and psychological**\*\*1211** training to its police officers, or to station paramedics at its jails, other city services will necessarily suffer, including those with far more direct implications for the protection of constitutional rights. Because respondent's evidence falls far short of establishing the high degree of fault on the part of the city required by our decision today, and because there is no indication that respondent could produce any new proof in this regard, I would reverse the judgment of the Court of Appeals and order entry of judgment for the city.

U.S.,1989.
City of Canton, Ohio v. Harris
489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412, 57 USLW 4270

END OF DOCUMENT

151 F.3d 1346                                                            Page 1
151 F.3d 1346, 12 Fla. L. Weekly Fed. C 11
**(Cite as: 151 F.3d 1346)**

▷

Gold v. City of Miami
C.A.11 (Fla.),1998.

United States Court of Appeals,Eleventh Circuit.
Michael C. GOLD, Plaintiff-Appellee,
v.
CITY OF MIAMI, Defendant-Appellant.
**No. 96-5395.**

Aug. 27, 1998.

Arrestee brought § 1983 action against city in con-
nection with his arrest for disorderly conduct. The
United States District Court for the Southern Dis-
trict of Florida, No. 92-1673-CV-JWK, James W.
Kehoe, J., entered judgment on jury verdict for ar-
restee, and city appealed. The Court of Appeals,
Hull, Circuit Judge, held that: (1) arrestee failed to
show city policy of inadequate training and supervi-
sion of police officers in connection with arrests
made under disorderly conduct statute, and, thus,
city could not be held liable under § 1983 on false
arrest claim, and (2) arrestee failed to show city
policy of inadequate training and supervision in
connection with handcuff complaints, thus prevent-
ing imposition of municipal liability for excessive
force claim.

Reversed.

See also: 121 F.3d 1442.
West Headnotes
**[1] Disorderly Conduct 129 ⟜1**

129 Disorderly Conduct
    129k1 k. Nature and Elements of Offenses. Most
Cited Cases
Florida's disorderly conduct statute applies only
when speech by its very utterance inflicts injury or
tends to incite an immediate breach of the peace,
and speakers do not violate statute merely by an-
noying those around them or by employing profane
language to express outrage. West's F.S.A. §
877.03.

**[2] Civil Rights 78 ⟜1348**

78 Civil Rights
    78III Federal Remedies in General
        78k1342 Liability of Municipalities and Oth-
er Governmental Bodies
            78k1348 k. Criminal Law Enforcement;
Prisons. Most Cited Cases
    (Formerly 78k206(2.1))
There is no respondeat superior liability making
municipality liable for wrongful actions of its po-
lice officers in making false arrest. 42 U.S.C.A. §
1983.

**[3] Civil Rights 78 ⟜1351(4)**

78 Civil Rights
    78III Federal Remedies in General
        78k1342 Liability of Municipalities and Oth-
er Governmental Bodies
            78k1351 Governmental Ordinance,
Policy, Practice, or Custom
                78k1351(4) k. Criminal Law Enforce-
ment; Prisons. Most Cited Cases
    (Formerly 78k206(3))
Municipality may be held liable under § 1983 for
actions of police officer only when municipal
"official policy" causes constitutional violation. 42
U.S.C.A. § 1983.

**[4] Civil Rights 78 ⟜1352(1)**

78 Civil Rights
    78III Federal Remedies in General
        78k1342 Liability of Municipalities and Oth-
er Governmental Bodies
            78k1352 Lack of Control, Training, or Su-
pervision; Knowledge and Inaction
                78k1352(1) k. In General. Most Cited
Cases
    (Formerly 78k206(4))
Allegation of failure to train or supervise can be
basis for municipal liability under § 1983 only
where municipality inadequately trains or super-
vises its employees, this failure to train or supervise
is a city policy, and that policy causes employees to

violate citizen's constitutional rights. 42 U.S.C.A. § 1983.

**[5] Civil Rights 78 ⟜1352(1)**

78 Civil Rights
  78III Federal Remedies in General
   78k1342 Liability of Municipalities and Other Governmental Bodies
    78k1352 Lack of Control, Training, or Supervision; Knowledge and Inaction
     78k1352(1) k. In General. Most Cited Cases
  (Formerly 78k206(4))
Since municipality rarely will have express written or oral policy of inadequately training or supervising its employees, § 1983 plaintiff may prove city policy by showing that municipality's failure to train evidenced a "deliberate indifference" to rights of its inhabitants, and, to establish a "deliberate or conscious choice" or such "deliberate indifference," plaintiff must present some evidence that municipality knew of need to train and/or supervise in particular area and the municipality made deliberate choice not to take any action. 42 U.S.C.A. § 1983.

**[6] Civil Rights 78 ⟜1352(4)**

78 Civil Rights
  78III Federal Remedies in General
   78k1342 Liability of Municipalities and Other Governmental Bodies
    78k1352 Lack of Control, Training, or Supervision; Knowledge and Inaction
     78k1352(4) k. Criminal Law Enforcement; Prisons. Most Cited Cases
  (Formerly 78k206(4))
Arrestee failed to show city policy of inadequate training and supervision of police officers in connection with arrests made under disorderly conduct statute, and, thus, city could not be held liable under § 1983 on false arrest claim; arrestee did not present evidence of prior constitutional violations or false arrests involving disorderly conduct statute, but instead submitted evidence only that there were 8,201 disorderly conduct arrests in five year period and that 601 such arrests were dismissed and 700

nol prossed, with no evidence as to reasons for those dispositions or that any such dispositions were due to false arrests for only protected speech. 42 U.S.C.A. § 1983.

**[7] Civil Rights 78 ⟜1420**

78 Civil Rights
  78III Federal Remedies in General
   78k1416 Weight and Sufficiency of Evidence
    78k1420 k. Criminal Law Enforcement; Prisons. Most Cited Cases
  (Formerly 78k242(5))
Evidence that other officers often loosened handcuffs upon request and evidence of one injury due to handcuffing, without any showing of excessive force involved, did not show city policy of inadequate training and supervision of police officers in connection with handcuff complaints, thus preventing imposition of § 1983 liability on city for arrestee's claim that officers acted with excessive force by ignoring his complaints that handcuffs were too tight, where arrestee presented no evidence of any prior incident in which city police officer caused injury by excessive force in handcuffing. 42 U.S.C.A. § 1983.

**[8] Civil Rights 78 ⟜1352(4)**

78 Civil Rights
  78III Federal Remedies in General
   78k1342 Liability of Municipalities and Other Governmental Bodies
    78k1352 Lack of Control, Training, or Supervision; Knowledge and Inaction
     78k1352(4) k. Criminal Law Enforcement; Prisons. Most Cited Cases
  (Formerly 78k206(4))
Arrestee's contentions that police officers were inadequately trained and/or supervised regarding disorderly conduct statute and proper response to handcuff complaints were not the kind of "obvious" need for training that would support finding of deliberate indifference by city to constitutional rights, as required for municipal liability under § 1983; risk from possible imperfections, if any, in city police officers' training and supervision was not obvi-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**[9] Civil Rights 78 ⚖1420**

78 Civil Rights
    78III Federal Remedies in General
        78k1416 Weight and Sufficiency of Evidence
            78k1420 k. Criminal Law Enforcement;
Prisons. Most Cited Cases
    (Formerly 78k242(5))
Expert's conclusory testimony that need for training and/or supervision of police officers regarding disorderly conduct statute and proper response to handcuff complaints should have been obvious to city, and that city was deliberately indifferent in not responding, did not control court's legal analysis of whether any need to train and/or supervise was obvious enough to trigger municipal liability without any evidence of prior incidents putting municipality on notice of that need. 42 U.S.C.A. § 1983.

**[10] Civil Rights 78 ⚖1429**

78 Civil Rights
    78III Federal Remedies in General
        78k1425 Questions of Law or Fact
            78k1429 k. Criminal Law Enforcement;
Prisons. Most Cited Cases
    (Formerly 78k244)
City's failure to investigate false arrest complaints did not raise jury issue regarding whether city was deliberately indifferent to obvious need to supervise its police officers, so as to preclude judgment as matter of law for city on issue of municipal liability under § 1983. 42 U.S.C.A. § 1983.

**[11] Civil Rights 78 ⚖1420**

78 Civil Rights
    78III Federal Remedies in General
        78k1416 Weight and Sufficiency of Evidence
            78k1420 k. Criminal Law Enforcement;
Prisons. Most Cited Cases
    (Formerly 78k242(5))
Record did not support arrestee's contention that city's method of record-keeping prevented any attempts to prove prior incident of false arrest for protected speech, as would support arrestee's attempt to establish city policy or custom that was moving force behind violation of his constitution rights; it was undisputed that city did document all citizens' false arrest complaints, and, although classified as "non-complaints," these reports nevertheless were retained by city for several years. 42 U.S.C.A. § 1983.

**\*1347** Kathryn S. Pecko,Christopher F. Kurtz, Asst. City Attys., A. Quinn Jones, Theresa L. Girten, Robert S. Glazier, Miami, FL, for Defendant-Appellant.
Charles Michael Baron, North Miami Beach, FL, for Plaintiff-Appellee.

Appeal from the United States District Court for the Southern District of Florida.

Before COX and HULL, Circuit Judges, and FAY, Senior Circuit Judge.
HULL, Circuit Judge:
Appellant Michael C. Gold ("Gold") brought a false arrest claim under state law and civil rights actions based on excessive force and arrest without probable cause under section 1983. 42 U.S.C. § 1983. Gold originally sued the City of Miami (the "City"), three City police officers, and the City Police Chief. In an earlier appeal, this Court held that the three City police officers and the City Police Chief were entitled to qualified immunity. *Gold v. City of Miami,* 121 F.3d 1442 (11th Cir.1997) ("*Gold I* ").

While the earlier appeal was pending, Gold's case against the City proceeded to trial. The jury returned a verdict for Gold on both his federal and state claims. The City challenges the jury's verdict on only Gold's section 1983 claims, contending that the district court erred in not granting the City's motions for judgment as a matter of law. After review, we agree and set aside the verdict against the City on Gold's section 1983 claims.

### I. FACTUAL BACKGROUND

#### A. The Arrest

Gold pulled into a congested bank parking lot so

that his passenger could use the bank's **1348** automated teller machine ("ATM").[FN1] While waiting for a parking space to open up, Gold noticed a uniformed police officer nearby. Gold also noticed a woman who did not appear to be handicapped walk to her car parked in a handicapped space, get in, and start to drive away. Disturbed by this, Gold yelled to the officer, "Aren't you supposed to give her a ticket for something like that?"[FN2] The officer did not respond. Gold then found a parking space, parked his car, walked toward the ATM, and loudly remarked to no one in particular, "Miami police don't do shit."

> FN1. The evidence at trial, construed in the light most favorable to Gold, is similar in all material respects to the facts recited in *Gold I. See* 121 F.3d at 1444. Thus we repeat *Gold I* 's recitation of the facts except where the evidence at trial was different.

> FN2. Gold's trial statement is slightly different from his deposition statement at the summary judgment stage, which was, "Aren't you supposed to give them a ticket for parking in a handicapped spot?" *See Gold I,* 121 F.3d at 1444.

Upon hearing Gold's remark, a plainclothes officer who had been standing in the ATM line stated to the uniformed officer, "Hey, I think he's got a problem."[FN3] Gold replied, "I don't have a problem. I'm just saying that Miami police don't do shit." A different plainclothes officer who had been standing next to the uniformed officer then approached Gold and asked him for identification. After Gold produced his Florida driver's license and Florida Bar membership card, the officer headed toward the uniformed officer's patrol car to do a radio-check on the identification. The officer soon was joined by the uniformed officer and the other plainclothes officer.

> FN3. Gold's trial statement is slightly different from his deposition statement at the summary judgment stage, which was, "I think this guys [sic] got a problem." *See*

*Gold I,* 121 F.3d at 1444.

[1] Upon observing all of this, a couple walking away from the ATM machine made a comment on the situation, and Gold responded, "They'll do what they're going to do."[FN4] Gold then walked over to the two plainclothes policemen and one uniformed policeman now gathered around the squad car. He asked the officer who had his ID, "What's going on?" The officer said, "Shut up," but Gold insisted, "I'd like to know what's going on here." The officers then placed Gold under arrest for disorderly conduct.[FN5] The City concedes that Gold's arrest was without probable cause. *See Gold I,* 121 F.3d at 1445-46.[FN6]

> FN4. *Gold I* states that the couple was in line at the ATM and that Gold talked to the couple for a few minutes. *Gold I,* 121 F.3d at 1444. At trial, Gold testified that the couple was walking away from the ATM when the woman made a comment and Gold responded as noted above. Also, *Gold I* includes the substance of the couple's comment. *Id.* At trial, the comment was excluded as hearsay.

> FN5. Although Gold put his hands behind his back without resistence, the officers also charged him for "resisting arrest without violence." However, Gold did not argue to the district court-and does not argue on appeal-that the officers violated his constitutional rights by falsely charging him with resisting arrest. Therefore, this Court does not address this issue.

> FN6. Florida's disorderly conduct statute applies only when speech by its very utterance inflicts injury or tends to incite an immediate breach of the peace. *Gold I,* 121 F.3d at 1445-46. Speakers do not violate the statute "merely by annoying those around them or by employing profane language to express outrage." *Id.* at 1445.

B. The Handcuffing

After handcuffing Gold, the uniformed officer assisted Gold into the back of his patrol car. Some moments later, Gold complained that the handcuffs were so tight that he was in pain.[FN7] The officer did not loosen the handcuffs until roughly fifteen to thirty minutes after Gold complained. As a result, Gold claims that he had numbness on his right wrist lasting a day or two. Gold admits that he did not notice that his skin was broken until he left the jail that day. Gold did not see a doctor regarding any problems resulting from the incident. After five or six hours in custody, Gold was released. The State later dropped the criminal charges against him.

> FN7. Rather than double-locking the metal cuffs such that they would remain at a fixed circumference, the officer had single-locked them, so that they could ratchet down and decrease in circumference while on Gold's wrists.

**\*1349 C. The Police Officers' Training**

At trial, the evidence showed that the City's police officers underwent substantial training at the police academy and afterwards on a wide variety of topics. The City police department exceeded the State of Florida's required number of training hours, and it established departmental rules and regulations and standard operating procedures. Each police officer received a law enforcement handbook and significant instruction on the implementation of Florida criminal law. Each police officer also received updates on recent changes in Florida statutory and case law that the police department's legal advisor thought would affect the officers' operations. Although no one recalls any specific training about the disorderly conduct statute or the constitutional limitations placed by the Florida Supreme Court on that statute in *State v. Saunders,* 339 So.2d 641 (Fla.1976), the disorderly conduct statute was in the officers' handbook for their review.[FN8] The Police Chief and the legal advisor testified that they were not aware of any problem with arrests under the Florida disorderly conduct statute or with the responses to handcuff complaints that would call for any specialized training on these specific issues.

> FN8. Florida's disorderly conduct statute reads:
>
> Whoever commits such acts as are of a nature to corrupt the public morals, or outrage the sense of public decency, or affect the peace and quiet of persons who may witness them, or engages in brawling or fighting, or engages in such conduct as to constitute a breach of the peace or disorderly conduct, shall be guilty of a misdemeanor of the second degree....
>
> Fla. Stat. Ann. § 877.03 (1994).

Gold presented no evidence of any prior false arrest for disorderly conduct or a prior citizen complaint of such a false arrest. Gold presented evidence only (1) that City officers often heard profanities and verbal insults while on patrol; (2) that they brought the incidents to the Police Chief's attention; and (3) that they filed 8,201 disorderly conduct arrests between 1986 and 1991 (not including sealed and expunged cases). However, Gold presented no evidence connecting the profanities and insults to any disorderly conduct arrests.

Gold also presented no evidence of any prior incidents of improper responses to handcuff complaints. Gold presented only evidence that other officers often loosened handcuffs upon request and evidence of one injury due to handcuffing but no showing that this one injury was caused by excessive force or improper handcuffing.

**D. Jury's Verdict**

Answering special interrogatories, the jury found that Gold's arrest was caused by a City policy that reflected deliberate indifference by the City to Gold's civil rights through a failure to train and/or supervise police officers concerning the disorderly conduct statute and the proper response to handcuff complaints. The jury awarded Gold $26,000 in damages on his section 1983 claim arising from the disorderly conduct arrest, $500 in damages on his section 1983 claim for excessive force in handcuffing, and $26,500 on his state law claim for false arrest. Since the federal and state claims involved the

151 F.3d 1346, 12 Fla. L. Weekly Fed. C 11

**(Cite as: 151 F.3d 1346)**

same damages, the district court entered judgment against the City for total damages of $26,500. The court also awarded Gold $59,420 in attorneys' fees under 42 U.S.C. § 1988 and taxed $8,303.78 in costs against the City.

The court denied the City's motion for judgment as a matter of law, which was made at the close of Gold's evidence, renewed at the close of all evidence, and made again post-trial.FN9 The City does not contest the jury's verdict on the state law claim for false arrest but challenges only the verdict on Gold's section 1983 claims.

> FN9. The district court also denied the City's motion for summary judgment, but the City did not appeal along with the other parties in *Gold I. See* 121 F.3d at 1444 & n. 2.

## II. STANDARD OF REVIEW

This Court reviews *de novo* a district court's denial of a motion for judgment as a matter of law. *See Hibiscus Assocs. v. Board of Trustees of the Policemen and Firemen Retirement Sys.,* 50 F.3d 908, 920 (11th Cir.1995). This Court employs the same standard the district court applied, "review[ing] all of the evidence in the light most **\*1350** favorable to, and with all reasonable inferences drawn in favor of, the nonmoving party." *Walker v. Nations-Bank of Florida, N.A.,* 53 F.3d 1548, 1555 (11th Cir.1995). Although the existence of a genuine issue of material fact precludes judgment as a matter of law, "a jury question does not exist because of the presence of a mere scintilla of evidence." *Id.* A motion for judgment as a matter of law will be denied only if "reasonable and fair-minded persons in the exercise of impartial judgment might reach contrary conclusions." *Id.*

## III. DISCUSSION

### A. Municipal Policy Requirement

[2][3] The Supreme Court has placed strict limitations on municipal liability under section 1983. There is no respondeat superior liability making a

municipality liable for the wrongful actions of its police officers in making a false arrest. *See Monell v. Department of Social Servs.,* 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Instead, a municipality may be held liable for the actions of a police officer only when municipal "official policy" causes a constitutional violation. *See id.* at 694-95, 98 S.Ct. 2018. Gold must "identify a municipal 'policy' or 'custom' that caused [his] injury,"*Board of County Com'rs v. Brown,* 520 U.S. 397, ----, 117 S.Ct. 1382, 1388, 137 L.Ed.2d 626 (1997) (citing *Monell,* 436 U.S. at 694, 98 S.Ct. 2018); "It is only when the 'execution of the government's policy or custom ... inflicts the injury' that the municipality may be held liable under § 1983." *City of Canton v. Harris,* 489 U.S. 378, 385, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989).

[4] Thus, the City is not automatically liable under section 1983 even if it inadequately trained or supervised its police officers and those officers violated Gold's constitutional rights. Instead, the Supreme Court has explained that there are only "limited circumstances" in which an allegation of a failure to train or supervise can be the basis for liability under § 1983. *See City of Canton,* 489 U.S. at 387, 109 S.Ct. 1197. The Supreme Court has instructed that these "limited circumstances" occur only where the municipality inadequately trains or supervises its employees, this failure to train or supervise is a city policy, and that city policy causes the employees to violate a citizen's constitutional rights. *Id.* at 389-91, 109 S.Ct. 1197; *see also Kerr v. City of West Palm Beach,* 875 F.2d 1546, 1555 (11th Cir.1989); *Brown,* at ----, ----, 117 S.Ct. at 1388, 1390.

[5] Since a municipality rarely will have an express written or oral policy of inadequately training or supervising its employees, the Supreme Court has further explained that a plaintiff may prove a city policy by showing that the municipality's failure to train evidenced a "deliberate indifference" to the rights of its inhabitants, as follows:
We hold today that the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate in-

151 F.3d 1346, 12 Fla. L. Weekly Fed. C 11

**(Cite as: 151 F.3d 1346)**

difference to the rights of persons with whom the police come into contact. This rule is most consistent with our admonition ... that a municipality can be liable under § 1983 only where its policies are the "moving force [behind] the constitutional violation." Only where a municipality's failure to train its employees in a relevant respect evidences a "deliberate indifference" to the rights of its inhabitants can such a shortcoming be properly thought of as a city "policy or custom" that is actionable under § 1983.... "[M]unicipal liability under § 1983 attaches where-and only where-a deliberate choice to follow a course of action is made from among various alternatives" by city policymakers. Only where a failure to train reflects a "deliberate" or "conscious" choice by a municipality-a "policy" as defined by our prior cases-can a city be liable for such a failure under § 1983.

*City of Canton,* 489 U.S. at 388-89, 109 S.Ct. 1197 (internal citations omitted).

To establish a "deliberate or conscious choice" or such "deliberate indifference," a plaintiff must present some evidence that the municipality knew of a need to train and/or supervise in a particular area and the municipality made a deliberate choice not to take any action. *See Board of County Com'rs v. Brown,* 520 U.S. 397, ---- - ----, 117 S.Ct. **\*1351** 1382, 1390-91, 137 L.Ed.2d 626 (1997); *Young v. City of Augusta, Georgia,* 59 F.3d 1160, 1171-72 (11th Cir.1995); *Church v. City of Huntsville,* 30 F.3d 1332, 1342-46 (11th Cir.1994); *Wright v. Sheppard,* 919 F.2d 665, 674 (11th Cir.1990); *Kerr v. City of West Palm Beach,* 875 F.2d 1546, 1556-57 (11th Cir.1989).[FN10] This Court repeatedly has held that without notice of a need to train or supervise in a particular area, a municipality is not liable as a matter of law for any failure to train and supervise.[FN11] For example, in *Wright v. Sheppard,* 919 F.2d 665 (11th Cir.1990), this Court held that a sheriff's department was not liable for a deputy's acts when "no evidence of a history of widespread prior abuse ... put the sheriff on notice of the need for improved training or supervision." *Id.* at 674. Indeed, in *Church v. City of Huntsville,* 30 F.3d 1332 (11th Cir.1994), this Court reversed a

district court's preliminary injunction against the City of Huntsville, holding that the plaintiffs were not likely to succeed on the merits of their failure-to-train claim without proof that the City was aware of a prior incident in which constitutional rights were similarly violated. *Id.* at 1342-46. *See also Popham v. City of Talladega,* 908 F.2d 1561, 1564-65 (11th Cir.1990) (finding no liability for failure to train when no pattern of incidents put the City on notice of a need to train). More importantly, in *Brooks v. Scheib,* 813 F.2d 1191 (11th Cir.1987), even though there had been ten citizen complaints about police officer Scheib, this Court held that the City did not have any notice of past police misconduct because the plaintiff "never demonstrated that past complaints of police misconduct had any merit." *Id.* at 1193. This Court aptly noted, "Indeed, the number of complaints bears no relation to their validity." *Id.*

> FN10. This high standard of proof is intentionally onerous for plaintiffs; imposing liability on a municipality without proof that a specific policy caused a particular violation would equate to subjecting the municipality to respondeat superior liability-a result never intended by section 1983. As the Supreme Court has explained,
> [t]o adopt lesser standards of fault and causation would open municipalities to unprecedented liability under § 1983. In virtually every instance where a person has had his or her constitutional rights violated by a city employee, a § 1983 plaintiff will be able to point to something the city "could have done" to prevent the unfortunate incident. Thus, permitting cases against cities for their "failure to train" employees to go forward under § 1983 on a lesser standard of fault would result in *de facto respondeat superior* liability on municipalities....
> *Id.* at 391-92, 109 S.Ct. 1197; *see also Brown,* at ----, 117 S.Ct. at 1394 ("Where a court fails to adhere to rigorous requirements of culpability and causation, municipal liability collapses into *respondeat su-*

151 F.3d 1346

151 F.3d 1346, 12 Fla. L. Weekly Fed. C 11

**(Cite as: 151 F.3d 1346)**

*perior* liability.").

FN11. In granting qualified immunity to Police Chief Ross, the *Gold I* court found no evidence that the Police Chief was deliberately indifferent in failing to train the three arresting officers because the court found no indication in the summary judgment record "that a reasonable person in Ross's position would have known that such a failure infringed on constitutional rights." 121 F.3d at 1447.

**B. Gold Presented No Evidence of Prior Incidents**

[6] Gold admits that he presented no evidence of prior constitutional violations or false arrests involving Florida's disorderly conduct statute. Instead, Gold submitted evidence only that there were 8,201 disorderly conduct arrests between 1986 and 1991 and that 601 such arrests were dismissed and 700 such arrests were nol prossed. There was no evidence regarding the reasons for these dispositions or that any such dispositions were due to false arrests for only protected speech. Gold, an attorney, admitted that there can be many reasons why a criminal case is dismissed, such as failure of witnesses or police officers to appear. Both the City's Chief of Police and its Internal Affairs investigator also testified that they could not recall any pattern of complaints for false arrest under the disorderly conduct statute.

[7] Similarly, Gold presented no evidence of a single prior incident in which a City police officer caused an injury by excessive force in handcuffing. Gold presented only evidence that other officers often loosened handcuffs upon request and evidence of one injury due to handcuffing, without any showing of excessive force involved.

**C. No Obvious Need**

Gold stresses that evidence of prior incidents is not required to establish a city policy **\*1352** in this case because the need to train and supervise in the particular areas in issue was so obvious and the likelihood of constitutional violations was highly predictable so that liability attaches for this single incident. In *City of Canton v. Harris,* 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989), the Supreme Court in dictum left open the possibility that a need to train could be "so obvious," resulting in a City's being liable without a pattern of prior constitutional violations. *Id.* at 390, 109 S.Ct. 1197. As an example, the Supreme Court in *City of Canton* referenced the obvious need to train police officers on the constitutional limitations on the use of deadly force, when the city provides the officers with firearms and knows the officers will be required to arrest fleeing felons. *Id.* at 390 n. 10, 109 S.Ct. 1197.

Subsequently, in *Board of County Commissioners v. Brown,* 520 U.S. 397, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997), the Supreme Court characterized the *City of Canton* 's leaving open such a possibility as simply hypothesizing in a narrow range of circumstances that a plaintiff might succeed without showing a pattern of constitutional violations, as follows:

In leaving open in *Canton* the possibility that a plaintiff might succeed in carrying a failure-to-train claim without showing a pattern of constitutional violations, we simply *hypothesized* that, *in a narrow range of circumstances,* a violation of federal rights may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations.

*Brown,* at ----, 117 S.Ct. at 1391 (emphasis added) (holding isolated incident of sheriff's inadequate screening of deputy did not create such an obvious risk that it alone established the municipality's deliberate indifference to the risk that the deputy would use excessive force). In short, to date, the Supreme Court has given only a hypothetical example of a need to train being "so obvious" without prior constitutional violations: the use of deadly force where firearms are provided to police officers. *See City of Canton,* 489 U.S. at 390 n. 10, 109 S.Ct. 1197.

[8][9] In any event, Gold's contentions that the police officers were inadequately trained and/or su-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

151 F.3d 1346, 12 Fla. L. Weekly Fed. C 11

**(Cite as: 151 F.3d 1346)**

pervised regarding the disorderly conduct statute and the proper response to handcuff complaints "fall[ ] far short of the kind of 'obvious' need for training that would support a finding of deliberate indifference to constitutional rights on the part of the city." *City of Canton,* 489 U.S. at 396-97, 109 S.Ct. 1197 (finding no obvious need for police officers to be trained in diagnosing mental illness) (O'Connor, J., concurring in part and dissenting in part); *Young v. City of Augusta, Georgia,* 59 F.3d 1160, 1171-72 (11th Cir.1995) (finding no obvious need to train jail employees "to recognize the need to remove a mentally ill inmate to a hospital or to dispense medication as prescribed").[FN12] "Unlike the risk from a particular glaring omission in a training regimen," the risk from these possible imperfections, if any, in the City police officers' training and supervision here "is not obvious in the abstract." *Brown,* at ----, 117 S.Ct. at 1391.[FN13]

> FN12. In *Young v. City of Augusta, Georgia,* 59 F.3d 1160, 1172 (11th Cir.1995), this Court explained the notice requirement as follows:
>
> Before it may be said that a municipality has made a deliberate choice among alternative courses of action, its policymakers must have had "actual or constructive notice that the particular omission is substantially certain to result in the violation of the constitutional rights of their citizens." This may be demonstrated in one of two ways.
>
> First, the need for a particular type of training may be obvious where jailers face clear constitutional duties in recurrent situations.
>
> Alternatively, the need for more or better training may be obvious where a pattern of constitutional violations exists such that the municipality knows or should know that corrective measures are needed.
>
> *Id.* at 1172 (internal citations and parentheticals omitted).

> FN13. Gold presented expert testimony that the need for training and/or supervi-

sion in these two areas should have been obvious to the City and that the City was deliberately indifferent in not responding. However, an expert's conclusory testimony does not control this Court's legal analysis of whether any need to train and/or supervise was obvious enough to trigger municipal liability without any evidence of prior incidents putting the municipality on notice of that need.

**\*1353 D. *Vineyard* Is Not Applicable**

Gold also relies heavily on *Vineyard v. County of Murray, Georgia,* 990 F.2d 1207, 1212 (11th Cir.1993), but that decision is inapplicable. Vineyard was threatened and beaten repeatedly in the head and chest by sheriff's deputies while handcuffed to a hospital bed. *Id.* at 1209. Vineyard's jaw was broken, and he underwent two surgical operations and treatment for the pain associated with this injury. *Id.* at 1212. Although "it was not unusual to receive complaints" about deputies, "the dispatcher or whoever answer[ed] the telephone ha[d] discretion about the initial handling of the complaint." *Id.* Only the two deputies who committed the beating were assigned to investigate Vineyard's complaints. The sheriff's department did not log or document citizens' complaints in any fashion, much less retain records of such complaints. The two deputies never completed an arrest report for Vineyard's arrest during which the beating occurred. The sheriff's department had no policies or procedures manual. *Id.*

Although there was no evidence of prior beatings by the deputies in *Vineyard,* this Court found that there was sufficient evidence from which the jury could find that Murray County's not having a policy and procedures manual, not requiring the deputies to file an arrest report when beatings or confrontations occur, not logging in or documenting in any way citizens' complaints, and not investigating any complaints together were "the moving force" behind the deputies' "use of gratuitous force." *Id.* at 1213. In contrast, the evidence here shows that the City has policies and procedures, has extensive training for its police officers, acquaints the officers

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

with departmental policies and procedures, documents all citizens' false arrest complaints, and retains those records for a considerable period of time.

[10] Gold stresses that the City's failure to investigate false arrest complaints raises a jury issue regarding whether the City was deliberately indifferent to an obvious need to supervise its police officers. However, false arrest complaints are documented but not investigated because the City's position is that the proper authority to investigate and determine whether there was probable cause for an arrest is the courts and not the police department. Moreover, the City's Internal Affairs does investigate excessive force claims and certain other claims of police misconduct. In any event, because Gold presented no evidence of a prior false arrest for disorderly conduct or even a valid complaint of such false arrest, there is no showing that the City's procedures for handling false arrest complaints affected the officers' conduct here. *See Brooks v. Scheib,* 813 F.2d 1191, 1195 (11th Cir.1987) (finding no evidence from which a jury could infer a municipality's deficient procedures for handling citizen complaints were the moving force of the constitutional violation when the plaintiff failed to show that the prior ten "complaints against [officer] Scheib had some merit and that more effective citizens' complaint procedures would have prevented his injuries").

### E. The City's Record-Keeping

[11] Lastly, Gold contends that he could not prove a pattern of prior false arrests for disorderly conduct because the City kept no records or inadequate records of citizens' false arrest complaints. At trial, it was undisputed that the City does document all citizens' false arrest complaints and then retains that record as far back as 1985 or 1986. Indeed, when Gold made his complaint, the City documented it, and the contents of that record were introduced at trial.

Although classified as "non-complaints," these reports nevertheless are retained by the City and were

available as far back as 1985 or 1986. Thus, the number and nature of the allegations of false arrest for disorderly conduct received by the City since at least 1986 could have been determined by pulling these forms and reading the narratives. Therefore, Gold's claim that the City's record keeping system prevented him from presenting the necessary evidence is not supported by the record in this case. The record also does not show any attempt by Gold to obtain these "non-complaint" files or review them. Gold has failed to establish that the City's method of record-keeping prevented any attempts **\*1354** to prove a prior incident of false arrest for protected speech. FN14

> FN14. Our discussion of this issue does not imply that the City was obligated to keep any such records for the purpose of enabling Gold to prove a claim. However, since the City did document complaints of false arrest, we discuss Gold's contentions about the City's record-keeping system for those documents.

### IV. CONCLUSION

In sum, Gold has not presented any evidence from which the jury could find that the existence of a municipal policy or custom caused or was the moving force behind the violation of Gold's constitutional rights. No facts to sustain the jury's verdict were offered. FN15

> FN15. Because we find no evidence of a City policy of inadequate training and supervision, we need not address the City's contentions (1) that City policy was not the moving force behind any constitutional violations, and (2) that the handcuffing injury was *de minimus* and not cognizable.

The district court erred in denying the City's motion for judgment as a matter of law on Gold's section 1983 claims. Thus, the jury's verdict against the City on Gold's section 1983 claims and the district court's accompanying award of attorneys' fees and costs under 42 U.S.C. § 1988 are set aside. On remand, the district court is directed to enter judg-

151 F.3d 1346, 12 Fla. L. Weekly Fed. C 11
**(Cite as: 151 F.3d 1346)**

ment in favor of the City on Gold's section 1983 claims. The district court's judgment in the amount of $26,500 in favor of Gold and against the City and any costs awarded Gold by reason of that judgment are not affected by this appeal because they remain supported by the jury's verdict on Gold's state law claim for false arrest. The district court's denial of the City's motion for judgment as a matter of law on Gold's section 1983 claims is REVERSED, the jury's verdict on Gold's section 1983 claims is SET ASIDE, and the district court's award of attorneys' fees and costs under section 1988 is VACATED.

C.A.11 (Fla.),1998.
Gold v. City of Miami
151 F.3d 1346, 12 Fla. L. Weekly Fed. C 11

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.