IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

ANTHONY BERNARD MOORER )
)
     Plaintiff, )
)
vs. )   CASE NO:2:06-cv-000672-WK
)
CITY OF MONTGOMERY, *et al.,* )
)
Defendants. )

## PLAINTIFF'S RESPONSE IN OBJECTION TO
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Comes now Plaintiff, and submits this response to the motion for summary judgment submitted by the Defendants. Defendant's motion for summary should be denied, and this cause should set for a jury

Attached in support of the Plaintiff's response are the following evidentiary submissions, including Plaintiff's declaration in which the Plaintiff declares, that the other documents are true representations of the originals.

Exhibit A:    Declaration of Anthony B. Moorer. Exhibits are attached.

Summary judgment may be entered on a claim only if it is shown that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Rule 56 (c), *Federal Rules of Civil Procedure. (F.R.Civ.P.).* In ruling on a motion for summary judgment, the court must view the evidence in a light most favorable to the non-moving party, James herein, and the court must draw all reasonable inferences against the moving party, Defendants herein. *See Celotex Corp v. Catrett*, 477

U.S. 317 (1986); *see also Earley v. Champion International Corp.*, 907 F.2d 1077, 1080 (11th Cir. 1990).

The burden of proof is upon the moving party to establish its *prima facie* entitlement to summary judgment by showing the absence of genuine issues and that it is due to prevail as a matter of law. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604 (11th Cir. 1991). If, *and only if*, the moving party carries out that initial burden is the non-moving party required to come forward with evidence supporting each essential element of its claim. *Celotex Corp. v. Catrett; Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986); *Barfield v. Brieteon*, 883 F.2d 293 (11th Cir. 1989).

In assessing and deciding a motion for summary judgment, the court's function is to determine *only* whether there exist genuine and material issues of fact to be tried and whether the moving party is entitled to judgment as a matter of law. *See Dominick v. Dixie National Life Insurance Co.*, 809 F.2d 1550 (11th Cir. 1987). The court is not understand the conflict in the Defendant's position, one only has to take a cursory review of the evidence in this case.

As stated, under the summary judgment standard above, the court must refrain from deciding such factual issues. Long ago, *in Warrior Tombigbee Tansp. Co. v. M/V Nan Fung*, 695 F.2d 11296, the Eleventh Circuit Court of Civil Appeals set this standard. The Plaintiff has produced evidence, which demonstrates a *prima facie* case of retaliatory conduct on behalf of the Defendants. The Defendant's argument for summary judgments on these bases lacks merit, too.

2

## Prima Facie Case of Discrimination

The Plaintiff has put forth sufficient evidence to state a prima facie case of discrimination. In establishing a prima facie case of discrimination, Plaintiff is only required to present some evidence to demonstrate that the decision of the Defendant was based on the discriminatory criterion. *See Int'l Brotherhood of Teamsters v. United States,* 432 U.S. 324, 358 (1977). Once the Plaintiff presents such evidence, a presumption of illegal discrimination is presented. If this *prima facie* case is presented, the Defendant is then required to produce a legitimate non-discriminatory reason for its employment decision. *Holifield v. Reno,* 115 F.3d 1555, 154 (11th Cir. 1997).

The Defendants do not come forward with a valid non-discriminatory reason why Plaintiff was treated differently. Rather, they argue that the Plaintiff was not treated differently. They base their position on the affidavits submitted by them. The Plaintiff submits that he was treated differently. Whether he was treated differently than similarly situated white employees is a jury question that is not to be resolved at the summary stage of the proceedings.

The Plaintiff has presented a prima facie case, the reasons advanced by the Defendant to support its discriminatory practices are not the real reasons for the adverse employment decision; therefore, they are pretextual. Plaintiff has presented evidence to cast sufficient doubt as to the Defendant's proffered reasons to permit a reasonable fact finder to conclude that Defendant's reasons were not the actual motivation in making its decision in regard to James' terms and conditions of employment with Defendant. *Cooper-Houston v. Southern Ry. Co.*, 37 F.3d 603, 605 (11th Cir. 1994) [citation omitted]. When the Court views the evidence submitted, it can readily discern the same.

This Honorable Court addressed the issue of collateral estoppel in *Brewer v. Dupree,* et *al.*, ___ F.Supp.2d ____ (M.D.Ala.2003), 2003WL 23507795 (Feb. 12, 2003). This Court held hat collateral estopped "...applies if three prerequisites are met: (1) the issues at stake must be identical to the ones alleged in the prior litigation: (2) the issues must have been actually litigated in the prior litigation; and (3) the determination of the issue in the prior litigation must have been a critical and necessary part of the earlier action. *Id* at 4. *Brewer* is instructive in this instance. The issues in this cause are not identical to the ones alleged in the prior litigation; the issues in this cause were not actually litigated in the prior litigation. Therefore, collateral estoppel should not apply.

The Plaintiff alleges in his Complaint that defendant Harris discriminated against him because of his race, black (African American). His claim of discrimination is evaluated under the analysis set forth by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under the framework of *McDonnell Douglas*, to establish a prima facie case of discrimination, Plaintiff is required to show that he is a member of a protected class, that he suffered some adverse employment action, and some other evidence, which allows an inference of discrimination. *See Verizon South, Inc.,* 299 F.Supp.2d 1235, 1241 (M.D.Ala. 2003) (Thompson, Judge), *citing Texas Dep't of Comm. Affairs v. Burdine*, 450 U.S. 248 (1981).

Establishing a prima facie merely requires the plaintiff to establish "facts adequate to permit an inference of discrimination." *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997). The law does not require that the standard to establish a *prima facie* be rigid or inflexible. *See e.g., Schoenfeld v. Babbitt,* 168 F.3d 1257, 1268 (11th Cir. 1999)

4

("...disparate treatment can be established by any proof of actions taken by the employer from which we infer discriminatory animus *because experience has proved that in the absence of any other explanation it is more likely than not that those action were bottomed on impermissible consideration.*") (citing *Hill v. Metro. Atlanta Rapid Trans. Authority*, 848 F.2d 1522 (11th Cir. 1988) (internal punctuation omitted) [Emphasis supplied].

Assuming that there is no direct evidence of employment discrimination, the Plaintiff, nonetheless, has created a presumption of discriminatory intent by establishing a prima facie case of discrimination. *See McDonnell Douglas Corp v. Green*; *Chapman v. Al Transp.* 229 F.3d 1012, 1024 (11th Cir. 2000) (en banc). If the *prima facie* case of discrimination is established, it raises a *rebuttal presumption that the employer is liable for the proscribed practice.   Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981).

At this juncture, the Defendants must articulate some legitimate, nondiscriminatory reason for terminating Plaintiff and not recalling him. *McDonnell Douglas*, 411 at 802. The Plaintiff has shown pretext for discrimination by producing evidence that similarly situated employees with Defendant, outside of the Plaintiff's protected group, received more favorable treatment than Plaintiff. E.g. *Avarado v. Board of Trustees*, 928 F.2d (4th Cir. 1991) (affirming the district court's finding that the employer's articulated reason for not promoting the plaintiff was pretextual, where the plaintiff had performed satisfactorily and had more experience and seniority than the employee who was promoted). Unlike the Defendant's assertion in its memorandum, the Plaintiff has produced evidence of a prima facie case of discrimination. Only if a

defendant articulates such a legitimate, non-discriminatory reason for the disparate treatment will the plaintiff be required to come forward with evidence showing that the articulated reason is pretextual.

Defendants have not come forth with a valid reason why they treated the Plaintiff differently than summarily situated white employees. If, indeed, the articulated reason is pretextual, summary judgment in favor of the Defendants is inappropriate. *See Reeves Sanderson Plumbing Prods.,* Inc. 530 U.S. 133, 148 (2000); *Chapman,* 229 F.3d at 1025, n.11.

_MR. Anthony B Moore_
Anthony B. Moorer, pro se
Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that I have this 26th ay of December 2007, filed a copy of this document with the Clerk of the Court, who will perfect service upon the following using the CM/ECF SYSTEM.

Allison H. Highley, Esq.
Legal Department
City of Montgomery
Post Office Box 1111
Montgomery, Alabama 36101-1111

_Anthony B Moore_
ANTHONY B. MOORE, pro se

**Address of Plaintiff**:
4241 Green Meadow Drive
Montgomery, AL 36108
(334) 221-9415

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

ANTHONY BERNARD MOORER          )

     Plaintiff,                            )
                                )
vs.                             )    CASE NO:2:06-cv-000672-WK
                                )
CITY OF MONTGOMERY, *et al.*,   )
                                )
Defendants.                     )    *Exhibit "A"*
                                )

## DECLARATION OF ANTHONY

Under penalty of perjury, I declare, swear, or affirm that the following statement is true to the best of my knowledge, and I make this statement based on my personal knowledge and observations. My name is ; I am a Black male, over the age of 19; and I reside in Montgomery County, Alabama. I am the plaintiff in the case..

Additionally, I certify that any other documents submitted in conjunction with this declaration and Plaintiff's response to the Defendant's motion for summary judgment are true and exact copy, except for pencil or pen marks attached thereto, of the original and that these documents and that the contents of these documents have not been tampered on changed by me in any manner.

    Exhibit 1.          Part of the hearing in the Circuit Court of Montgomery County Alabama.

    Exhibit 2.          Hearing before the Department of Industrial Relations

I am a former employee of the City of Montgomery. I was hired April 22, 2003. Initially, I worked as service maintenance worker until January 7, 2004. At that time, I was transferred to the painting crew. I was employed with the City of Montgomery until

1

April 19, 2006. My foreman was Mr. Bernard Harris, one of the defendants in this case. He supervised me; I took orders from him.   He assigned duties.

The most dangerous position on the crew is painting high up on the ladder. During my time as a painter, I was the only person assigned to do high work on the latter.

After July 2004, and during 2005, and 2006, the foreman over the paint crew, Bernard Harris, an African American, treated me differently than similarly situated white crew members.  I am a 47 year old African American (black) male.   I was employed by the City of Montgomery as a service maintenance worker.  I was a painter. I was a merit system employee.  There was a five-member paint crew; two blacks and three whites. . I was the only employee required to do "high work," painting on a ladder approximately thirty feet. This work is extremely dangerous and considered to be less desirable. At no time during my employment did the foreman require the white employee to climb the ladder to do painting.  However, whenever  a bucket truck was used to paint high, the foreman would assigned the bucket truck to the white employees.

On April 18, 2006, Thomas Provitt, the assistant director of the Maintenance Department for the City of Montgomery, told me to get "my ass off the City Lot" and not to come back.  (See page 9, lines 5-23, Exhibit 1, and page 56, Exhibit 2, lines 1-23),  He never cursed white employees, and he never asked any of them to get their "ass" of the lot.  Mr. Proitt's action was against policy, but the City accepted his action. I was terminated, was not given a hearing, no advised of any way I could contest my termination.

On July 22, 2005, I was suspended by the City for 29 days without pay for responding, while was on lunch break, to an inmate's inquiry as to how my mother was doing?  This inmate had known my mother for over 35 years, and at the time he asked

2

about her she was terminally ill. All I told the inmate was that she was very ill I was charged with insubordination Decisions makers of the City acquiesced in the decision to suspend me.

Several of the white crew members had been seen taking to inmates, but they were not written up by Mr. Harris; they were not suspended. There is not policy which states that an employee cannot speak to an inmate. Mr. Harris singled me out on the basis of my race.

In the Defendants' brief in support of their motion for summary judgment, the Defendant state at Paragraph 44 that I admit that another similarly situated black male member of the paint crew did not have to do high work. The Defendants have misinterpreted the facts. There was no other black male on the crew except the foreman: Mr. Bernard Harris. There were only five people assigned to the painting crew: me, a black male, three white males, and Mr. Bernard Harris, a black male. There was no other black assigned to the crew.

Mr. Thomas was never my supervisor; though he lied and said that he was my supervisor.

I declare under penalty of perjury that the above is true and correct.

Done this 23[th]rdday of December, 2007.

Anthony B. Moore

1                IN THE FIFTEENTH JUDICIAL CIRCUIT

2               IN AND FOR MONTGOMERY COUNTY

3                  MONTGOMERY, ALABAMA

          2007 DEC 26  P 7 20

4    ANTHONY B. MOORER,

5             PLAINTIFF,

6    vs.                 CIVIL ACTION
                       CASE NO. CV-06-3015

7    DIRECTOR OF THE DEPARTMENT

8    OF INDUSTRIAL RELATIONS,

9             DEFENDANT.

10      _____/

11

12       COURT REPORTER'S TRANSCRIPT OF PROCEEDINGS
                 JULY 16, 2007

13        MONTGOMERY COUNTY COURTHOUSE
                 COURTROOM 3-B

14

15    BEFORE:  THE HONORABLE TRACY S. McCOOEY
              CIRCUIT JUDGE

16

17                APPEARANCES

18    ON BEHALF OF THE PLAINTIFF:

19    FRED BELL, ESQUIRE
       MONTGOMERY, ALABAMA

20

21    ON BEHALF OF THE DEFENDANTS:
       GLEN CHAFFIN, ESQUIRE
       MONTGOMERY, ALABAMA

22

23    ALLISON HIGHLEY, ESQUIRE



PLAINTIFF'S EXHIBIT 1

24

25

               Vicki H. Clark
            Official Court Reporter
              (334) 832-7736

1                          PROCEEDINGS

2              THE COURT:  Okay.  We've got our trial,

3       Anthony Moorer versus Director of the Department

4       of Industrial Relations, CV-06-3015.  Is everyone

5       here?

6              MR. BELL:  Yes.

7              THE COURT:  All right.  Well, y'all can come

8       on up, and I'm . . .

9              MR. CHAFFIN:  Your Honor, I'm -- I don't

10      know if it's reflected in the style, but the City

11      of Montgomery is a co-defendant with the

12      Department of Industrial Relations.

13             THE COURT:  Okay.  Well, I figured.  I knew

14      Allison wasn't here just to observe.

15             Okay.  Well, I am ready whenever y'all

16      are for my first witness.

17             MR. CHAFFIN:  Judge, this is an unemployment

18      compensation case.  The issue before the Court --

19      there's a couple; that is, whether Mr. Moorer

20      here quit or whether he was terminated for

21      misconduct or he's not disqualified at all.

22             THE COURT:  Okay.

23             MR. CHAFFIN:  Of course, that's always an

24      option.  So it will be up to you after hearing

25      the facts to determine if he quit or if he was

1    terminated as well.

2         THE COURT:  Okay.  I've got you.  All right.

3    I am ready whenever y'all are.

4         MR. BELL:  It's on y'all.

5         MR. CHAFFIN:  No.

6         MR. BELL:  I don't know what witness they

7    have, but, Judge, I'd ask for the Rule.

8         THE COURT:  Okay.  If I've got anyone in

9    here who is going to be testifying in this case,

10   I need you to wait in the witness room or out in

11   the hallway.

12        MR. BELL:  The first witness I want to call

13   is Mr. Provitt.

14        THE COURT:  Okay.  Mr. Provitt, if you'd

15   like to come up, sir, and take the stand.  Thank

16   you.

17              **MR. PROVITT,**

18   a witness, after having first been duly sworn to

19   speak the truth, the whole truth, and nothing but

20   the truth, took the stand and testified as

21   follows:

22              **DIRECT EXAMINATION**

23   **BY MR. BELL:**

24   Q.   Good afternoon, Mr. Provitt.

25   A.   Yes, sir.

1    Q.    My name is Fred Bell, and I'm representing

2          Mr. Moorer, Anthony Moorer, in this case.  Are

3          you familiar with Mr. Moorer?

4    A.    Yes, I am.

5    Q.    Can you tell me, sir, where you are employed?

6    A.    City of Montgomery, Maintenance Department.

7    Q.    How long have you been employed there?

8    A.    Thirty-seven years.

9    Q.    And what is your title?

10   A.    Assistant Director.

11   Q.    And would you please tell us generally your

12         duties?

13   A.    My duties is street maintenance, concrete work.

14         I'm a street supervisor, street maintenance.

15   Q.    Has Mr. Moorer -- is Mr. Moorer still employed

16         with the City of Montgomery, if you know?

17   A.    No.

18   Q.    What was the occasion do you have to know -- what

19         is the occasion that caused you to know

20         Mr. Moorer?

21   A.    Mr. Moorer came -- at the time he came to me, he

22         wanted to go to the paint crew, and I helped him

23         got into the paint crew.  Then later on when they

24         transferred him back to me, I knowed Mr. Moorer.

25   Q.    At one time you were Mr. Moorer's supervisor?

```
 1   A.   Yes.

 2   Q.   And when did you cease being his supervisor, if

 3        you remember?

 4   A.   I don't remember the date.

 5   Q.   But was it in 2007, 2006?

 6   A.   No, it was not in 2006.  I do not remember the

 7        date.

 8   Q.   Okay.  So how long were you his supervisor?

 9   A.   I really couldn't tell you.  I don't know the

10        year.  I couldn't tell you.

11   Q.   At one time in the past Mr. Moorer was working on

12        the grass -- I guess you call it grass detail?

13   A.   Cemetery, yes, grass detail, cemetery crew.

14   Q.   And how long did he work on that detail?

15   A.   I really -- I don't know how many months or how

16        many years he worked that.  I couldn't tell you.

17   Q.   Okay.  The last time Mr. Moorer -- do you

18        remember the last time that you saw Mr. Moorer at

19        the -- down at the maintenance department?

20   A.   Yes, I do.

21   Q.   Do you know what year that was?

22   A.   2007?

23   Q.   2007 or 2006?

24   A.   Or 2006.

25   Q.   And you saw him at the maintenance department?
```

1    A.    Right, uh-huh.

2    Q.    And on that date he was under your supervision?

3    A.    Right.  They had just transferred him to me that

4          morning.

5    Q.    They had transferred him that morning?

6    A.    Yeah, to me.

7    Q.    And you placed him on the maintenance -- on the

8          cemetery detail?

9    A.    No.  I placed him on the grass crew at that time.

10   Q.    Okay.  And what does the grass crew do?

11   A.    They cut ditches and they cut grass.

12   Q.    Prior to that morning, he had been on -- in

13         another -- on another crew, I would say crew; is

14         that correct?

15   A.    Yes.

16   Q.    And what crew?  Do you know what crew he was on?

17   A.    He was in a paint crew.

18   Q.    He was on a paint crew?

19   A.    Right.

20   Q.    And sometime after he left the painting crew, he

21         was placed under your supervision?

22   A.    Right.

23   Q.    And so what time does the -- what time does the

24         grass crew leave the maintenance department?

25   A.    It's supposed to leave a little bit after 7:00.

| | | |
|---|---|---|
| 1 | Q. | And so as far as you know on that date, the last |
| 2 | | time you saw, Mr. Moorer did leave around 7:00? |
| 3 | A. | Yes. |
| 4 | Q. | How many people on that crew; do you know? |
| 5 | A. | It's five -- well, it should be seven with the |
| 6 | | foreman, seven men with the foreman. |
| 7 | Q. | So everybody leaves out on this truck? |
| 8 | A. | Right. |
| 9 | Q. | And you had a foreman? |
| 10 | A. | Right. |
| 11 | Q. | And who were your foreman? |
| 12 | A. | Bill Stinson. |
| 13 | Q. | Mr. Bill Stinson? |
| 14 | A. | Uh-huh. |
| 15 | Q. | All right. Now, sometime after they left, |
| 16 | | Mr. Moorer came back; am I correct? |
| 17 | A. | Yes. He came back to the lot. |
| 18 | Q. | Okay. Now, who brought him back? |
| 19 | A. | Bill Stinson. |
| 20 | Q. | In the truck? |
| 21 | A. | Right. |
| 22 | Q. | And there was an altercation or -- well, I won't |
| 23 | | call it an altercation. There was words between |
| 24 | | you and Mr. Moorer? |
| 25 | A. | I wouldn't say words. I just was giving him an |

```
 1              order telling him -- asking him -- asking him why
 2              he was back down there and what -- he disobeyed a
 3              direct order.
 4         Q.   Okay.  Now, what direct order did he disobey?
 5         A.   I told him when they -- when he left with that
 6              crew that morning, I told him he have no business
 7              at the carpenter shop; if he punch in, he signs
 8              out -- if you punch in, then you clock out down
 9              there at my office down at the maintenance shed.
10         Q.   Okay.  So what time did he come back to your
11              office?
12         A.   He came back a little after -- a little before
13              8:00 or a little after 8:00 when he got back.
14         Q.   Okay.  And so instead of coming down to your
15              shop, he stopped at the carpenter shop?
16         A.   Yes.
17         Q.   And were you angry with that?
18         A.   No, sir, I was not angry about it.
19         Q.   Okay.  So at sometime you and Mr. Moorer -- you
20              told Mr. Moorer to leave the lot; is that
21              correct?
22         A.   Yes.  After he said what he -- after I -- I asked
23              Mr. Moorer -- he was on the phone.  I asked him
24              -- I said, what you doing; hang the phone up and
25              come on back down here.  He told me he was not
```

```
 1             going nowhere.  He told me -- Mr. Moorer told me

 2             that he got better things to do.  I asked him

 3             what do you mean by better things to do.  He said

 4             he quit, and I told him to get off the lot.

 5     Q.     Now, when you told him to get off the lot, you

 6             just didn't say get off the lot; you used some

 7             curse words to him, didn't you?

 8     A.     I said get your A off the lot.

 9     Q.     I understand.  But can I -- can I have him to say

10             what he said?

11             THE COURT:  Sure.  That's fine.  It doesn't

12             -- you can say a cuss word.

13     A.     Okay.  I told him to get his ass off the lot.

14     Q.     Did you say goddamn ass?

15     A.     No.

16     Q.     You said get his ass off the lot?

17     A.     Right.

18     Q.     And what did you mean by that?

19     A.     I meaned if he wasn't going to work that he don't

20             need to be doing -- to get off the lot.  He told

21             me he had quit.  And I asked him to sign a

22             resignation, and he refused to sign it.

23     Q.     And so you told him to get his ass off the lot?

24     A.     Yes, that's what I said.

25     Q.     Okay.  So you had fired him?
```

```
1    A.    No.  I cannot fire him.
2    Q.    So if you told him to get off the lot, I mean,
3          what was the purpose?
4    A.    He was not going to work, so what is the purpose
5          of him being on the lot?
6    Q.    Okay.  So you meant for him to leave?
7    A.    If he was not going to work.  He told me he
8          wasn't going to work.  He told me he was going to
9          quit.
10   Q.    Okay.  I understand that.  But I'm saying when
11         you told him to get off the lot, you meant for
12         him to leave.
13   A.    I meant for him to get off the lot.
14   Q.    Okay.  And he did leave?
15   A.    Yes, he left.
16   Q.    Did you ever call him back?
17   A.    I -- he could have came back the next day or came
18         back.  No, I did not call him back.
19   Q.    Okay.  Do you understand my question?
20   A.    I did not call him back.
21   Q.    Okay.  Did you -- did you terminate -- did you
22         terminate him?
23   A.    I cannot -- I do not have the power to terminate
24         him.
25   Q.    So your answer is no?
```

```
 1    A.    No, I did not terminate him.

 2    Q.    Did you recommend termination?

 3    A.    No, I did not recommend termination.

 4    Q.    Did you give him a hearing?

 5    A.    He did not show back up.

 6    Q.    So your answer is --

 7    A.    No.

 8    Q.    -- you didn't give him a hearing.  Did you ever

 9          call the mayor's office?

10    A.    No, I did not.

11    Q.    Did you ever tell your supervisor about what had

12          happened?

13    A.    Yes, I did.

14    Q.    Now, who is your supervisor?

15    A.    Gail Gibson.

16    Q.    Gail Gibson?

17    A.    Yes.

18    Q.    What did she tell you to do?

19    A.    She didn't tell me -- she just told me -- I told

20          her what had happened, and that was it.  She

21          didn't tell me nothing to do.

22    Q.    Okay.  Now, do you remember testifying at the

23          hearing down before the appeals counsel?

24    A.    Yes.

25    Q.    Were you ever going to give Mr. Moorer a hearing?
```

1    A.    If Mr. Moorer would have came back -- came back

2          to work, yes, we would've gave him a hearing.

3    Q.    Okay.  So when did you expect him to come back?

4    A.    I didn't -- I didn't know when to expect him

5          because he -- when I told him to get off the lot,

6          he never did show back up.

7    Q.    If he hadn't gotten off the lot, what were you

8          going to do?

9    A.    I was going to have him escorted off the lot.

10         MR. BELL:  Okay.  I have no further

11   questions.  Judge, can I reserve the right --

12         THE COURT:  Yes, that's fine.  Any

13   questions, Mr. Chaffin?

14         MR. CHAFFIN:  Just a few, Your Honor.

15         THE COURT:  Okay.

16                    **CROSS EXAMINATION**

17   **BY MR. CHAFFIN:**

18   Q.    Mr. Provitt, you've worked with the same

19         department for 37 years?

20   A.    Yes, sir, I have.

21   Q.    Let me ask you just a little bit about what you

22         said.  I believe you said that Mr. Moorer worked

23         for you initially; is that right?

24   A.    Right, uh-huh.

25   Q.    Then he transferred?

| | | |
|---|---|---|
| 1 | A. | To the paint crew. |
| 2 | Q. | And then he came back to you? |
| 3 | A. | Right. |
| 4 | Q. | And that last period was -- he came back to you |
| 5 | | for about an hour? |
| 6 | A. | Well, for about an hour. |
| 7 | Q. | All right. And I heard you mention maintenance |
| 8 | | shed. What's the big deal about the maintenance |
| 9 | | shed? |
| 10 | A. | Okay. We've got a bull room down where we, you |
| 11 | | know, are at, our office. It's like -- |
| 12 | Q. | You have a what? I'm sorry. |
| 13 | A. | A bull room. It's -- |
| 14 | Q. | A bull room? |
| 15 | A. | Yes, uh-huh, where all the mens come and they |
| 16 | | punch in; they sit down. It's a waiting room |
| 17 | | where you can sit. |
| 18 | Q. | And that's over by you? |
| 19 | A. | Yes, sir. That's down at the maintenance shop, |
| 20 | | at our shop. |
| 21 | Q. | Okay. And the carpenter shop is -- |
| 22 | A. | The carpenter shop is about -- I'd say about two |
| 23 | | or three hundred feet from us, you know, about |
| 24 | | three hundred feet from us. |
| 25 | Q. | Now, what, if anything, did you discuss with |

```
 1              Mr. Moorer about the carpenter shop when he was

 2              hired?

 3    A.        Well, I told Mr. Moorer when he came back to me,

 4              they transferred him back to me, that he had no

 5              right and no use of going up to the carpenter

 6              shop; it's best that he just come down here to

 7              the maintenance, our shop, and punch in and out.

 8    Q.        Why did you make a point of that? Why did you

 9              make a point of telling him that?

10    A.        Making a point of that to let him know that they

11              would -- he didn't have to go up there to that

12              carpenter shop for nothing; he just sign in at

13              the place and then check in through down there

14              through our department.

15    Q.        Okay.  So his last day, you got some grass to cut

16              and you get the crew together including

17              Mr. Moorer.  You said he was -- his foreman was

18              Mr. Stinson?

19    A.        Yes, Bill Stinson.

20    Q.        Okay.  And they take off as far as you know?

21    A.        Yes, uh-huh.

22    Q.        And everything was okay as far as you know?

23    A.        Everything was fine when I told him that morning.

24    Q.        And then you heard from Mr. Stinson.  What did

25              you hear from Mr. Stinson?
```

```
 1   A.   Mr. Stinson called me on the radio and said this
 2        man wanted to come back in and I told him to
 3        bring him on back in.
 4   Q.   Did he say why he wanted to come back in?
 5   A.   No, he did not say why he wanted to come back in.
 6   Q.   Okay.  So what happens next?
 7   A.   Okay.  When Bill -- when Bill got down to -- I
 8        was waiting on him and Bill got back --
 9   Q.   Bill is Mr. Stinson?
10   A.   Yes.  When Mr. Stinson got back to the
11        maintenance department, I asked him where the man
12        was.  He said he got him up at the carpenter
13        shop.
14   Q.   Okay.  What's wrong with that?
15   A.   Because if he wasn't going to work, he's supposed
16        to came back to the maintenance shop because I
17        told him and gave him an order that that's where
18        he punch in and everything at.
19   Q.   Yes, sir.  Okay.  So when he told you he was at
20        the carpenter shop, what did you do?
21   A.   I go up there where he was.  I went up to the
22        carpenter shop to get him.
23   Q.   And why did you do that?
24   A.   Because I had gave him a direct order not -- I'd
25        said not to go back up there.
```

1   Q.   Okay.  You go to the carpenter shop and then

2        what?

3   A.   Well, I go to the carpenter shop.  He's on the

4        phone.  I asked him -- I told him to hang the

5        phone up and come on back down there.  He told me

6        he's got better things to do.  I asked him what

7        you mean by better things.  He said I quit.  I

8        said, well, then if you quit, come on down here

9        and sign your resignation.  He said I'm not

10       signing nothing, and that's what when I told him

11       to get his (sic) off the lot.

12            MR. CHAFFIN:  Thank you, sir.  That's all I

13       have at this time.

14            THE COURT:  Anything further?

15            MR. BELL:  Yes.

16            THE COURT:  Okay.

17            MR. BELL:  Yes, ma'am.  I'm sorry.

18                  **REDIRECT EXAMINATION**

19       **BY MR. BELL:**

20  Q.   You were his supervisor?

21  A.   No.

22  Q.   At that time?

23  A.   I was not his direct supervisor.  I'm the

24       assistant director.

25  Q.   Okay.  But you were above him?

1   A.   Right.

2   Q.   You can write a grievance on him, can't you?  Or

3        can you?

4   A.   What do you mean by a grievance?

5   Q.   Could you have written him up for any

6        subordination?  In other words, if he failed to

7        follow a direct order, could you have taken some

8        disciplinary action on him?

9   A.   Yes, I could.

10  Q.   Did you?

11  A.   No, because he did not come back down there to

12       the maintenance shop where I could write him up

13       or whatever.

14  Q.   Have you ever written him up for insubordination?

15  A.   I haven't.

16  Q.   Did you -- after that term, did you ever write

17       him up for anything?

18  A.   No, I haven't.

19  Q.   Okay.  Do you know why he was terminated?

20  A.   Yeah, because he -- he disobeyed a -- he was not

21       terminated.

22  Q.   He wasn't terminated?

23  A.   He was terminated because of three days, no

24       cause, no show.

25  Q.   He was terminated?

1    A.    With no cause and no show.  I did not terminate

2          him.  Three days, no cause, no show.  He did not

3          show back up.

4    Q.    Okay.  Did y'all advise him of -- did you give

5          him a hearing?

6    A.    He did not show back up.

7    Q.    So the City didn't give him a hearing?

8    A.    He did not show back up.

9    Q.    So did y'all advise him he had -- he could have a

10         hearing?

11    A.    He did not show back up.

12            MR. BELL:  Okay.  No further questions.

13            THE COURT:  Anything further?

14                 **RECROSS EXAMINATION**

15    **BY MR. CHAFFIN:**

16    Q.    You did say he quit, did you not?

17    A.    Yes, uh-huh.

18    Q.    Thank you, sir.

19    A.    He said he quit.

20            THE COURT:  Anything further?

21            MR. BELL:  Oh, no, ma'am.

22            THE COURT:  All right.  Does anyone need to

23         question Mr. Provitt again or can he be excused?

24            MR. BELL:  Judge, I want to reserve him

25         because I think there may be some -- I'd like to

1    reserve him.

2        THE COURT:  You might need to call him.

3    Okay.  Mr. Provitt, don't disappear on me.

4        THE WITNESS:  Okay then.

5        THE COURT:  Okay.  Thank you.

6        MR. BELL:  Judge, may I ask him not to

7    discuss his testimony here?

8        THE COURT:  Yes.  Mr. Provitt, don't talk to

9    them about your testimony; okay?

10        THE WITNESS:  Okay.

11        THE COURT:  Just talk about how hot it is

12    outside today.  It's burning up out there.

13        Okay.  Who is our next witness?

14        MR. BELL:  Mr. Moorer.

15        THE COURT:  Okay.  Mr. Moorer.

16                **ANTHONY B. MOORER,**

17    a witness, after having first been duly sworn to

18    speak the truth, the whole truth, and nothing but

19    the truth, took the stand and testified as

20    follows:

21                **DIRECT EXAMINATION**

22    **BY MR. BELL:**

23    Q.    Mr. Moorer, would you state your complete name

24          for the Court, please?

25    A.    Anthony Bernard Moorer.

| | | |
|---|---|---|
| 1 | Q. | Would you spell that, your last name? |
| 2 | A. | M-O-O-R-E-R. |
| 3 | Q. | I say Moore, and you pronounce it Moorer? |
| 4 | A. | But it's pronounced Moorer. |
| 5 | Q. | Okay.  Now, where are you employed now? |
| 6 | A. | Watts Homes. |
| 7 | Q. | Watts Homes? |
| 8 | A. | Yes. |
| 9 | Q. | What's your job? |
| 10 | A. | Painter. |
| 11 | Q. | And, basically, Watts Homes is a corporation here |
| 12 | | in Montgomery? |
| 13 | A. | Yes.  It's just like Aronov.  They build homes |
| 14 | | and we go in and paint them. |
| 15 | Q. | You paint the house.  All right.  Now, prior to |
| 16 | | that time -- well, how long have you been working |
| 17 | | there? |
| 18 | A. | Seven months. |
| 19 | Q. | Prior to that time, were you employed any place? |
| 20 | A. | No. |
| 21 | Q. | I mean, prior to, before -- |
| 22 | A. | Well, yes, the City of Montgomery. |
| 23 | Q. | And how long had you worked at the City of |
| 24 | | Montgomery? |
| 25 | A. | I was in my third year. |

1   Q.   So when was the last time that you worked for the

2        City of Montgomery?

3   A.   April the 18th of '05.

4   Q.   Okay.  '05?

5   A.   '06.

6   Q.   '06.  And when were you hired there?

7   A.   2003, in April 2003.

8   Q.   Were you a merit system employee?

9   A.   Yes.

10  Q.   Now, Mr. Moorer, let's go back to 2003.  What was

11       your job?

12  A.   I got hired in as a grass crew up in the

13       cemetery, and they called that a workmen's -- it

14       was something.  I can't remember right now.

15  Q.   Hard work?

16  A.   Pretty much so.

17  Q.   So, usually, do the new people usually work --

18       the beginning people get on that crew?

19  A.   Yes.

20  Q.   So how long did you work on that crew?

21  A.   Six months.

22  Q.   And so where were you transferred to?

23  A.   A painter down in the maintenance department.

24  Q.   A painter.  And when you say painter -- and I

25       know what it means, but tell us what you would be

```
 1              doing.
 2                   MR. BELL:  And I won't be long, Judge.
 3      Q.   What did you do?
 4      A.   Well, we went around and cleaned up, you know,
 5           painted the bathrooms and things in clubhouses.
 6      Q.   And this was for the City of Montgomery?
 7      A.   Yes.
 8      Q.   You had a supervisor?
 9      A.   Yes.
10      Q.   Who was that supervisor?
11      A.   Bernard Harris.  He was my foreman.
12      Q.   Did you ever have an occasion to file a lawsuit
13           against the City?
14      A.   Yes.
15      Q.   What kind of lawsuit did you file?
16      A.   Discrimination.
17      Q.   And when did you file a discrimination lawsuit?
18      A.   April the 14th, '05.
19      Q.   Okay.  Now -- and, basically --
20                   MR. BELL:  And, Judge, I'm not -- I'm not
21           trying to try it.  I'm just trying to --
22                   THE COURT:  You're fine.
23                   MR. BELL:  Okay.
24      Q.   And so what were your allegations generally?  I
25           don't mean to get into specifics.  What were you
```

```
 1              alleging?

 2    A.        I was alleging that they was having me to do all

 3              the hard work and the other guys to do the low

 4              work.

 5    Q.        When you say the other guys, who are you talking

 6              about?

 7    A.        The white guys.

 8    Q.        So you were -- how many people are on that crew,

 9              that painting crew?

10    A.        Four.

11    Q.        And you just --

12    A.        Two blacks and two whites.

13    Q.        And one was a supervisor?

14    A.        Yeah.  He was my foreman.

15    Q.        Okay.  So when you said the high work,

16              what do you mean?

17    A.        Climbing up the ladder about 20 to 30 feet up in

18              the air every day.

19    Q.        And so you were the only one put on the higher --

20    A.        Yes.

21    Q.        -- on the high work?  The supervisor didn't do

22              high work?

23    A.        No, no.

24    Q.        And you -- and you complained about you were the

25              only one put on the high work?
```

```
 1    A.    Yes.

 2    Q.    And why were you complaining?  Was it dangerous?

 3    A.    Yes, it was dangerous.  And I had been doing the

 4          high work for a whole year.

 5    Q.    And you were the only one that would do the high

 6          work?

 7    A.    Right.

 8    Q.    But on occasion, they would bring in what's

 9          called a bucket, wouldn't they?

10    A.    Yeah, the bucket truck.

11    Q.    Tell the Judge what the bucket is.

12    A.    The bucket is a truck with a bucket on the back

13          and it have a lift on it and it would be

14          operated, you know, by control buttons.

15    Q.    And so when you'd get a bucket, you would get in

16          the bucket to paint?

17    A.    Well, I was only in the bucket --

18    Q.    No.  I don't mean you personally.  A person would

19          get in the bucket to paint high?

20    A.    Yes.

21    Q.    Now, when they got the bucket, who was placed in

22          the bucket?

23    A.    The white guys.

24    Q.    And were you ever placed in the bucket?

25    A.    Yes, along with the white guy, but it was more
```

1       like he was operating it and I wasn't.

2    Q.   And you complained about that?

3    A.   Yes.

4    Q.   And sometime later after you had complained, your

5       mom was ill; am I correct?

6    A.   Yes.

7    Q.   And your mom has passed; is that correct?

8    A.   Yes.  She had cancer.

9    Q.   And after you had filed that complaint, you were

10      given a disciplinary; am I correct?

11   A.   Right.

12   Q.   What were you given a disciplinary for?

13   A.   Saying that I was insubordinate for not helping

14      wash the bucket truck by the wind blew the paint

15      on the truck.

16   Q.   Okay.  On one occasion you were given 29 days

17      off; am I correct?

18   A.   Yes.

19   Q.   And that was after you had filed your lawsuit?

20   A.   Right.

21   Q.   And will you tell the judge why you were given 29

22      days off?

23   A.   They give me 29 days off for speaking to an

24      inmate.  And I told them that --

25   Q.   All right.  Okay.  For speaking to an inmate.

26

```
 1         And what did the inmate say -- did you know that

 2         inmate?

 3   A.    Yes.  He was my next-door neighbor.

 4   Q.    This was your next-door neighbor.  Your mama was

 5         dying?

 6   A.    Right.

 7   Q.    What did the inmate ask you?

 8   A.    He asked me, said, man, how mama doing.

 9   Q.    And what did you say?

10   A.    I said we put her back in the hospital last

11         night.  She had blood clots on her arm.

12   Q.    And did you tell him that she was passing, more

13         than likely passing?

14   A.    Yes.

15   Q.    I know it's kind of emotional.  And were you

16         written up for that?

17   A.    Yes.

18   Q.    And what were -- how many days were you given

19         off?

20   A.    29 days off without pay.

21   Q.    Without pay?

22   A.    Yes.

23   Q.    For speaking -- telling the inmate how your mama

24         was doing?

25   A.    Right.
```

```
 1   Q.   And later on, you got some more -- okay.  Now, I

 2        want to jump a little bit.  Now, on April, you

 3        say April the 18th, you were assigned to

 4        Mr. Provitt; is that correct?

 5   A.   Yes.

 6   Q.   All right.  Now, what happened on April the 17th?

 7   A.   I went up front and talked with Kathy.  She was

 8        the time keeper.  And I asked her, you know,

 9        about her ex-husband, you know, at the time,

10        and she told me that him and her is not no

11        longer together and if I wanted to know

12        anything about him, got to go up and talk to

13        Ms. McCoo (phonetic).

14   Q.   And that was all that was said; right?

15   A.   Yes.

16   Q.   Now, later on, were you approached by some people

17        from the City?

18   A.   Yes.

19   Q.   And who were those people?

20   A.   My foreman.

21   Q.   And what did he tell you?

22   A.   That they wanted to see me down at the

23        maintenance.

24   Q.   And at that time did you go to the maintenance

25        office?
```

```
1    A.    Yes.

2    Q.    And what happened at that time?

3    A.    When I went in, Doug Jones and my immediate

4          supervisor, Roger Johnson, Jr., and Jimmy Wise

5          was in there.  And they told me to go sit in the

6          bull room.

7    Q.    Tell the judge where the bull room is.

8    A.    The bull room is where they punch in at in the

9          morning time and that's where all the guys, you

10         know, gather in at -- to go on for the work

11         detail.

12   Q.    So you were taken off from painting and put in

13         the bull room?

14   A.    Yes.

15   Q.    Were you told that you were going to be

16         reassigned?

17   A.    No.

18   Q.    Okay.  When were you told that you were going to

19         be reassigned?

20   A.    The next morning when they told me to meet them

21         in their office.

22   Q.    So you met them in the office?

23   A.    Yes.

24   Q.    And someone from the City told you that you were

25         going to be reassigned?
```

```
 1   A.    Right, they was going to reassign me to

 2         Mr. Provitt's crew.

 3   Q.    And why were they reassigning you?

 4   A.    They said I violated Code Section 6 and 7 by

 5         going up front and talking to Kathy.

 6   Q.    Have you ever seen other people talk to Kathy?

 7   A.    Yes.

 8   Q.    Many people talk to Kathy?

 9   A.    Yes.

10   Q.    Now, on -- when you came back in -- let's say on

11         the 18th -- you came -- what time did you come

12         in?

13   A.    I got in about 6:45 that morning and I punched in

14         at ten minutes till.

15   Q.    Did you think your reassignment was punishment?

16   A.    Yes.

17   Q.    Okay.  So you went out on the crew, with the

18         crew?

19   A.    Yes.

20   Q.    To cut grass?

21   A.    Right.

22   Q.    Needed your job?

23   A.    Yes.

24   Q.    What happened when you got out there to start

25         cutting grass?
```

```
1    A.    I asked Bill Stinson, the foreman, that they put

2          me on the truck, I asked him what time, you know,

3          we get a break.  He said we don't have breaks on

4          this truck.  Just stand up and get some water and

5          go back to work.  And I said, well, what time is

6          lunch.  He said we don't take lunch.  And that's

7          when I asked to be brought back in.

8    Q.    And at that time you asked to be brought back in?

9    A.    Yes.

10   Q.    Because you wanted to discuss --

11   A.    I wanted to talk with Gail.

12   Q.    Did you think Mr. Stinson was being flippant?  Do

13         you understand what I mean?  Smart?

14   A.    Yes.

15   Q.    Okay.  So when he brought back -- and you told

16         him to come back in?

17   A.    Yes.

18   Q.    Did you ever tell Mr. Stinson or anybody you were

19         quitting?

20   A.    No.

21   Q.    So when he brought you back to the maintenance

22         shop, what happened?

23   A.    That's when I got out of the truck and went to

24         look for my time card, and it was gone.

25   Q.    Okay.  You looked for your time card?
```

```
 1    A.    Yes.

 2    Q.    And your time card was usually kept where?

 3    A.    Up in the rack by the time clock on the left-hand

 4          side.

 5    Q.    So at that time -- at sometime, Mr. Provitt

 6          approached you; is that correct?

 7    A.    Yes.

 8    Q.    And y'all had a conversation?

 9    A.    Right.

10    Q.    What did he say?

11    A.    He came out from around the building.  He was

12          yelling, telling me to get off the phone.  And I

13          told him -- you know, I didn't -- I got off the

14          phone.  Then he asked me -- he said, Mr. Moorer,

15          go on down there and sign your resign paper.  I

16          say I'm not signing --

17    Q.    Resignation papers?

18    A.    Yes.

19    Q.    Okay.

20    A.    I said I'm not signing no papers.  He said, what,

21          you quit?  I said, no, I didn't quit.  No.  I

22          said, did you hear me say I quit?  And that's

23          when he told me to get my -- can I say it?

24          THE COURT:  Sure.

25    A.    That's when he told me to get my goddamn ass off
```

```
 1              the lot.  Then I stepped to him and told him,

 2              said, well, curse me again.  And he pointed out

 3              the gate.

 4    Q.        So you left?

 5    A.        Yes.

 6    Q.        And when you left, I mean, why did you leave,

 7              Mr. Moorer?

 8    A.        He told me to get off the lot and don't come

 9              back.

10    Q.        I mean, did you want your job?

11    A.        Yes, I wanted my job.

12    Q.        So when you left, what did you do?

13    A.        Went to the Mayor's office.

14    Q.        And so you went to the Mayor's office.  Did you

15              talk to somebody up there?

16    A.        I went to -- yes, I talked to the secretary for

17              Mike Briddell.

18    Q.        And so why did you go to the Mayor's office?

19    A.        To have them to see what they can do anything

20              about Provitt cussing me out.

21    Q.        Okay.  So did you have a chance to talk to

22              anybody at that time?

23    A.        No.  He wasn't in.

24    Q.        So what did you do?

25    A.        I left my cell number and he called me back.
```

```
 1    Q.    And so did you go home?

 2    A.    Yes.

 3    Q.    So you didn't go back to the -- you didn't go

 4          back to the work site?

 5    A.    No.

 6    Q.    At sometime did Mr. Briddell call you?

 7    A.    Yes.  He called me after one o'clock.

 8    Q.    And did you tell him what had happened?

 9    A.    Right.

10    Q.    Did Mr. Briddell ever tell you to go back to

11          work?

12    A.    No.

13    Q.    Did anybody ever tell you to go back to work?

14    A.    No.

15    Q.    Did anybody from the Mayor's office or -- call

16          you and say you need to go back to work?

17    A.    No.

18    Q.    Did anybody from the maintenance department call

19          you and say if you don't come back to work,

20          you're going to be abandoned; we're going to get

21          you for abandonment?

22    A.    No.

23    Q.    Did they ever tell you that you were terminated?

24    A.    No.

25    Q.    Did you ever hear from anybody after you talked
```

```
1              to Mr. Briddell?

2     A.       No.

3     Q.       Were you ever advised that you could have a

4              hearing?

5     A.       No.

6     Q.       When did you learn that you had been terminated?

7     A.       When we was at the employment service.

8     Q.       Okay.  Now, I'm going to ask you again.  Did you

9              intentionally quit?

10    A.       No.

11    Q.       And you only left after Mr. Provitt told you to

12             leave?

13    A.       Right.

14    Q.       Were you expecting somebody to call you back?

15    A.       Yes.

16    Q.       And nobody called you back?

17    A.       No.

18    Q.       Would you have taken the job had they called you

19             back?

20    A.       Yes.

21                 MR. BELL:  I have no further questions.

22                 THE COURT:  Any questions?

23                 MR. CHAFFIN:  Yes, ma'am.

24                         CROSS EXAMINATION

25        BY MR. CHAFFIN:
```

```
 1   Q.    I'm Glen Chaffin.  I'm a lawyer with the

 2         Department of Industrial Relations.

 3               Let me ask you -- you mentioned

 4         something; you were suspended for five days.  Who

 5         were you working with when that happened?

 6   A.    I was with the maintenance department, still

 7         painting.

 8   Q.    And I believe you said that was because you

 9         refused to paint from a truck after you'd been

10         ordered to do so?

11   A.    Yes.

12   Q.    That was paint that dropped while painting was

13         going on?

14   A.    No.  It was the day that that last went on, we

15         was out painting in the wind.  And my foreman, I

16         was telling him that that aluminum paint, it

17         flies every time I pick up the roller.  It takes

18         it away.  And I was telling him that you look

19         over there between those cars there and you're

20         going to see some paint.  And, sure enough, it

21         was on the -- paint was on their cars, and it got

22         -- and it spilled on the bucket.

23   Q.    Did you take the suspension?

24   A.    Well, on that right there, I did hope them wipe

25         the truck down.  We did not wash the truck.  All
```

Vicki H. Clark
Official Court Reporter
(334) 832-7736

```
1          we done is wiped it down and skidded water on it

2          and then took it back over there to the

3          electrician's department.

4    Q.    The job was done and you were suspended anyway?

5    A.    Yes.

6    Q.    Now, I believe you had rights to appeal.  Did you

7          appeal that?

8    A.    Yes, I appealed that.

9    Q.    And you had the hearing.  And the suspension, was

10         it upheld?

11   A.    Yes.

12   Q.    Later on, you get almost a 30-day suspension.

13         What was that about?

14   A.    I don't know nothing about no 30 days.

15   Q.    29 days.

16   A.    That was about speaking to an inmate.

17   Q.    Now, when you say speaking to an inmate, is it

18         not true before that last occurrence happened you

19         had been told you are not to talk to inmates?

20   A.    Yes.  But it was -- like I was telling them, it's

21         not in the rule book, sir.

22   Q.    Were you told that the -- were you not told that

23         a supervisor of the jail there, the sheriff, said

24         I don't want them speaking to inmates, so tell

25         them not to do it?
```

```
1    A.    No one at the jail said that.  What had

2          happened --

3    Q.    I asked if you were told that by your

4          supervisor --

5    A.    No.

6    Q.    -- as to why you should not speak to inmates?

7    A.    No.

8    Q.    So, well, let me clarify it.  Were you told

9          before that time not to speak to inmates?

10   A.    That was after the date that I come back in.

11         That morning when I came back in from work, you

12         know, staying at the hospital with my mother that

13         night, and that's when they said that Diane said

14         no talking to the inmates.  And I told them I

15         didn't have no problem with that.  So at the time

16         I'm on my lunch break standing up with the two

17         roller poles in my hand.  And then they came in

18         off the little orange truck there.  When he

19         stepped off, he asked me, said how mama doing.

20         By then, that's when my foreman was pulling up.

21         So he saw the guy standing there talking to me.

22         Then he ran up there and told them didn't I tell

23         you don't be talking to no inmate?  And I told

24         him -- I said B.  He just only asked me about my

25         mother, but he said, but I told you don't be
```

```
 1              talking to inmates.  But he did it in a harsh

 2              manner, and my mother was down, and that made

 3              me . . .

 4    Q.        And I believe you had a right to appeal from that

 5              suspension, did you not?

 6    A.        Rights of appeal?  No.  I had wrote the letter to

 7              the Mayor.  I wrote a letter of rebuttals to the

 8              Mayor and let him know how I didn't like that.

 9    Q.        You didn't request any kind of hearing before the

10              personnel board or anything like that?

11    A.        No.

12    Q.        And the suspension was upheld even though you

13              wrote the letter, was it not?

14    A.        Right, for the paint spilling on the truck by the

15              wind blew the paint on the truck.

16    Q.        Now, you originally were hired to work with the

17              cutting grass when you started; right?

18    A.        That's when I first started, yes.

19    Q.        They switched you over to painting?

20    A.        Right.

21    Q.        And then after that suspension, you -- when you

22              reported back, they put you back to your first

23              job; right?

24    A.        Well, they only put me back -- like they told me

25              that morning when I came in, they was placing me
```

```
 1              back over there only because I went up front and

 2              talked to Kathy.  They say I violated Code

 3              Section 6 and 7.

 4       Q.     All right.  I want to ask you about that.  I

 5              believe you were asking about breaks and lunch

 6              and all of that.  You had done that job before,

 7              had you not?

 8       A.     No, not that job there.

 9       Q.     Well, you had cut grass before?

10       A.     Yes, out on the road crew.

11       Q.     And what did you do about breaks and lunch then?

12       A.     What's that?

13       Q.     What did you do about breaks and lunch when you

14              were first doing it?

15       A.     Well, we took our break at the proper time and

16              the lunch at the proper time.

17       Q.     And you thought it was necessary to confirm that

18              again?  You thought it was necessary to make sure

19              when you returned to your old job you still had

20              that?

21       A.     That wasn't my job, what I was doing there.  That

22              was a punishment.  My job when I first started

23              was working in the cemetery, not in the ditch.

24       Q.     But you were cutting grass, were you not?

25       A.     I was cutting grass at the cemetery and out on
```

```
 1              the road.
 2    Q.        All right.  So this last day, you were coming to
 3              work.  Do you -- do you remember Mr. Provitt
 4              telling you your time card is here; it's not up
 5              there at that shed, so it's going to be right
 6              here; this is where you come to clock in and
 7              clock out?
 8    A.        No, that ain't what he said.
 9    Q.        Do you remember him saying anything about telling
10              you not to go to the carpenter shop?
11    A.        No.  If they did, I wouldn't have went.
12    Q.        Well, that brings up the question you -- you get
13              your assignment with the truck and you go off to
14              do the job; right?  That morning, that last
15              morning, you're on your job with Mr. Stinson and
16              the truck and y'all go off?
17    A.        Yes.
18    Q.        But before you start anything, you say you wanted
19              to go back.  What brought that back?
20    A.        Because of what he said with no breaks and no
21              lunch, and that's when I said I wanted to talk
22              with Gail.
23    Q.        Now, isn't it true -- did you not testify before
24              that you immediately got on the phone to your
25              lawyer?
```

```
 1    A.    Yes, that's what I told him.

 2    Q.    All right.  You just said you wanted to come back

 3          and talk to Gail Gibson, I believe the name is.

 4          But, instead, you called your lawyer?

 5    A.    I was on the phone with -- trying to reach her to

 6          let her know what was going on with me that

 7          morning.  But I never did get a chance.  That's

 8          when Mr. Provitt come out.

 9    Q.    And that's when you would meet Mr. Provitt?

10    A.    Yeah.  That's when he come around yelling.

11    Q.    And tells you to come back to the maintenance

12          shed?

13    A.    No, he didn't tell me to come back to the

14          maintenance shed.  He told me to come down there

15          and sign my resign papers, and I told him I'm not

16          signing no resign papers.  Then he asked me -- he

17          said, well, what you --

18    Q.    You heard him say you said you quit and you deny

19          it?

20    A.    That's when he asked me would you quit, and I

21          told him, no, I didn't quit.  And then that's

22          when he told me -- he said, well, get your

23          goddamn ass off the lot.  And he pointed twice at

24          the gate.

25    Q.    Well, let me ask you this.  You said that you
```

```
 1            appealed at least one suspension and you wrote

 2            letters about the second and so forth.  Why

 3            didn't you do something about this one?

 4    A.      When I --

 5    Q.      Did you try to file an appeal?

 6    A.      On this one here?

 7    Q.      Yes, sir.

 8    A.      Well, on this one right here, the -- it's obvious

 9            that I was terminated when he told me to leave,

10            so . . .

11    Q.      Well, sir, you had been there awhile.  You had a

12            couple of appeals and so forth.  Are you telling

13            me you were not aware that Mr. Provitt did not

14            have authority to fire you?

15    A.      Mr. Provitt didn't -- don't have the authority to

16            fire me.

17    Q.      And I'll ask that.  Well, what makes you think

18            you were fired then?

19    A.      Because he told me to get my ass off the lot and

20            don't come back.

21    Q.      Well, you just said he didn't have authority to

22            fire you?

23    A.      He don't, but that's what he told me to do, and I

24            followed orders.

25    Q.      Well, why didn't you appeal that?
```

43

```
 1    A.    Why didn't I appeal it?

 2    Q.    Yes, sir.

 3    A.    I just wanted to try to find me a lawyer because

 4          of what had happened to me, and that's it.

 5    Q.    Have you always used a lawyer when you've filed

 6          these grievances and so forth?

 7    A.    When I felt like I'm doing -- I've been done

 8          treated wrong, yes.

 9    Q.    You don't think you can handle it by yourself

10          then?

11    A.    How can I?  No.

12    Q.    Well, what about your first one?  Did you have a

13          lawyer?

14    A.    Yes.

15    Q.    Now, I believe you said after this was over --

16          well, tell me what happened.  You leave the lot.

17          Then what did you do as far as contacting the

18          employer?  You said that you talked to Mr.

19          Briddell?

20    A.    Yes.  He called me after one o'clock.  He wasn't

21          in.

22    Q.    Yes.  And he told you what again?  I'm sorry.

23          Just very briefly, if you'll tell me what he told

24          you.

25    A.    The only thing he told me, you know, that when I
```

1   Q.   Well, I don't want to be argumentative.  But

2        didn't you take that to mean, well, if I'm back

3        in three days, I may not lose my job?

4   A.   At the time when he told me that, I felt like I

5        was fired.

6   Q.   All right.  Now, you'd had appeals before.  You

7        know Mr. Briddell was higher than Mr. Provitt.

8        He told you to come back in three days, but you

9        don't do it because you feel like you're fired;

10       is that what you're --

11  A.   I feel like if I went back, they would have me

12       arrested.  So I didn't go.

13  Q.   Even though Mr. Provitt -- I mean, Mr. Briddell

14       suggested that you come back in three days?

15  A.   He didn't tell me that.

16       MR. CHAFFIN:  That's all I have at this

17       time.  Thank you, sir.

18       THE COURT:  Any more questions?

19       MR. BELL:  I just want to clear up --

20       clarify something, Your Honor.

21       THE COURT:  Okay.

22             **REDIRECT EXAMINATION**

23  **BY MR. BELL:**

24  Q.   When you had talked with Gail Gibson, that wasn't

25       the same day that you had come back and called

```
 1              explained to him what had happened and he said,
 2              well, Mr. Moorer -- he said, what you going to do
 3              about it?  I said, I'm going to do what --
 4              exactly what he told me.  And he said, well, if
 5              you're not back in three days, you've abandoned
 6              your job.
 7       Q.     Now, Mr. Briddell, exactly who is he in the
 8              scheme of things?  You've got your supervisor,
 9              Mr. Provitt, and so forth.  Where is Mr. Briddell
10              in that?
11       A.     He's the Mayor's assistant.
12       Q.     So he's well above Mr. Provitt; would it be fair
13              to say that?
14       A.     Right.
15       Q.     And he tells you if you come back, you've got to
16              come back in three days to protect your job?
17       A.     No, he didn't tell me that.
18       Q.     I'm sorry.  I thought --
19       A.     He didn't tell me that.  He said, if I'm not back
20              in three days, I've abandoned my job.
21       Q.     Well, didn't he tell you at that meeting to be
22              back in three days?
23       A.     That didn't mean that he was going to call down
24              there and let them know nothing at maintenance.
25              I mean, he didn't tell me directly to go back.
```

```
 1           your lawyer, is it?
 2     A.    No, sir.  That was like two days before.
 3     Q.    Okay.  And so after you were allegedly
 4           transferred for having talked with Ms. Gail
 5           Gibson, you weren't given a disciplinary for
 6           that, were you?
 7     A.    I was given a disciplinary.  They was trying to
 8           terminate me.
 9     Q.    They gave you a disciplinary for talking to
10           Ms. Gail --
11     A.    Not -- not -- Gail is the director over the
12           maintenance department.  She's over Tom Provitt.
13     Q.    Okay.  I mean, I guess he asked you a question
14           about you talked with Gail Gibson.  Did you ever
15           talk with Gail Gibson?
16     A.    No.
17     Q.    Okay.  Now, the person -- the lady you talked
18           with that got you in this trouble, who was she?
19           What was her name?
20     A.    Ms. Kathy.
21     Q.    Kathy.  Okay.  Now, Mr. Provitt was the assistant
22           director?
23     A.    Right.
24     Q.    You felt like he had the authority to tell you to
25           get off the premises?
```

1   A.   No, but I left anyway.

2   Q.   Okay.  Now, Mr. Briddell never told you to go

3          back to work?

4   A.   No.

5   Q.   Is that true?

6   A.   Yes.

7   Q.   Once again, you never received any papers

8          charging you with abandonment or failure to

9          appear at your job, did you?

10  A.   No.

11        MR. BELL:  I have no further questions.

12        THE COURT:  Anything further?

13               **RECROSS EXAMINATION**

14  **BY MR. CHAFFIN:**

15  Q.   Who is this Kathy you said got you in trouble?

16  A.   She's the time keeper.

17  Q.   And why did you have to talk with her?

18  A.   Because at the time the other lawyer that I had,

19         she told me that I needed to get more evidence

20         about Tim, her ex-husband.  They were letting him

21         come in late and not being write up about it.

22  Q.   And you got in trouble for talking to her?

23  A.   Yes.

24  Q.   What was her response?

25  A.   She told me that her and Tim is no longer

1      together; if there's anything I wanted to know

2      about Tim, I have to go up front and ask

3      Ms. McCoo.

4   Q.   All right.  And you said that got you in trouble.

5      How did that get you in trouble?

6   A.   Beats me, because when I come back down there the

7      next morning, when they told me to go sit in the

8      bull room for the rest of the day, that's what

9      they told me, say I violated Code Section 6 and 7

10     from talking to her.  And that's when they placed

11     me --

12  Q.   She complained about it or do you know?

13  A.   She had to.  That's when they placed me on the --

14     this crew.

15  Q.   Thank you.

16          THE COURT:  Okay.  Anything further?

17          MR. BELL:  I have no further questions.  And

18     I would like -- we would rest, and I sure would

19     like to make a motion.

20          THE COURT:  Okay.  Sure.  You can step down.

21     Thank you, Mr. Moorer.  Okay.  Go ahead, Mr.

22     Bell.

23          MR. BELL:  Your Honor, I don't have to tell

24     them and I certainly don't have to tell the Court

25     that unemployment compensation is for the benefit

Vicki H. Clark
Official Court Reporter
(334) 832-7736

49

1    of the employee.

2         THE COURT:  Right.

3         MR. BELL:  Now, what they're saying is that

4    Mr. Moorer, quote, abandoned his job.

5         THE COURT:  Right.

6         MR. BELL:  Now, Mr. Provitt comes in and

7    says a whole lot of things that he did, but not

8    one time when -- at the unemployment level have

9    they ever said that he did anything but quit his

10   job.  Now, he was ordered by a supervisor to

11   leave the premises.

12        THE COURT:  Right.

13        MR. BELL:  If he hadn't left, he would've

14   subject himself to disobeying an order.  If he

15   had remained, he probably would have subjected

16   himself to being arrested.  Now, he's not a

17   lawyer, and I'm not saying you have to be a

18   lawyer.  But sometimes we expect lay persons to

19   just know all the rules.

20             Now, what he did was to go to the

21   Mayor's office.

22        THE COURT:  Right.

23        MR. BELL:  He sought help from the executive

24   assistant.

25        THE COURT:  Right.

1      MR. BELL:  I'm not here to say what the

2    executive assistant should have done.  I'm not

3    here to guess.  But one thing the executive

4    assistant did not do -- and there's been

5    testimony -- did not call Mr. Provitt to let this

6    man come back; if he's done something wrong, give

7    him a hearing.  He said, if you're away from your

8    job for three days, it's abandonment.  But the

9    man was never charged with abandonment.  So I

10   don't understand how it can be misconduct when he

11   followed an order.  I can see if Mr. Provitt

12   would have called and said, listen, if you want

13   your job, come on back.  Nobody called this man,

14   and I'll just say, Judge, that, initially, he was

15   granted his compensation.  The appeals counsel --

16   the appeal counsel -- the appeals board overrode

17   (sic) with no evidence -- as a matter of fact, we

18   had two hearings.

19      THE COURT:  Right.

20      MR. BELL:  Then they came down -- I know

21   this is de novo.  And, Judge, we just say that

22   there has not been any allegation of abandonment

23   because if he would've abandoned his job, he was

24   supposed to be given a hearing before he was

25   terminated.  So he didn't --

1      THE COURT:  What happened -- I was going to

2   ask you, Mr. Bell -- which maybe you can tell

3   me -- after he talked to Mr. Briddell and Mr.

4   Briddell said, hey, you know, you've got to come

5   back in three days, did he ever get a letter to

6   that effect or -- I mean, take me after there

7   what happened.  What's the next thing your

8   client --

9      MR. BELL:  Nothing.

10      THE COURT:  -- ever got?

11      MR. BELL:  Nothing.  And, Judge, I won't

12   split words, but it's ironic that Mr. Briddell

13   never said you could go back to work; Mr.

14   Briddell gave him a scenario, if you were not.

15   Now, I guess maybe -- and I don't want to keep

16   using the word --

17      THE COURT:  Right.

18      MR. BELL:  Maybe one could argue that he was

19   saying if you don't go back.  But it seems to me,

20   Judge, that somebody should have -- I mean, I

21   worked for the State for a long time.

22      THE COURT:  Sure.

23      MR. BELL:  And if somebody would've said,

24   listen, you have been away from your job for

25   three days and we're going to terminate you for

1    abandonment and we've got to have a hearing --

2    nobody gave him a hearing.  And that's what I'm

3    saying is that when I -- I understand that he

4    could have misconducted, but I'm saying if

5    misconduct is based on his failure to -- not on

6    his failure, but his obeying of an order.  And,

7    Judge, I just think that's just cruel, and I just

8    think that's fundamentally unfair.  And we're

9    resting.

10    THE COURT:  Okay.  Thank you, Mr. Bell.

11    All right.  Guys and girls over here,

12    really, yes, what the Court needs to hear about

13    is give me some evidence about what we did after

14    Mr. Moorer left the grounds.  What I'm really

15    interested in is the conversation he had with

16    Mr. Briddell and what follow-up was done with

17    that conversation; i.e., was a letter sent to

18    him; hey, per our conversation, if you're not

19    back in three days, it's job abandonment; or, you

20    know, per our conversation, I've checked, and

21    you're being fired.

22    MR. CHAFFIN:  Yes, ma'am.

23    THE COURT:  Yes.  Give me some follow-up --

24    MR. CHAFFIN:  I'll get Mr. Briddell to the

25    stand.

 1        abandonment and we've got to have a hearing --

 2        nobody gave him a hearing.  And that's what I'm

 3        saying is that when I -- I understand that he

 4        could have misconducted, but I'm saying if

 5        misconduct is based on his failure to -- not on

 6        his failure, but his obeying of an order.  And,

 7        Judge, I just think that's just cruel, and I just

 8        think that's fundamentally unfair.  And we're

 9        resting.

10             THE COURT:  Okay.  Thank you, Mr. Bell.

11             All right.  Guys and girls over here,

12        really, yes, what the Court needs to hear about

13        is give me some evidence about what we did after

14        Mr. Moorer left the grounds.  What I'm really

15        interested in is the conversation he had with

16        Mr. Briddell and what follow-up was done with

17        that conversation; i.e., was a letter sent to

18        him; hey, per our conversation, if you're not

19        back in three days, it's job abandonment; or, you

20        know, per our conversation, I've checked, and

21        you're being fired.

22             MR. CHAFFIN:  Yes, ma'am.

23             THE COURT:  Yes.  Give me some follow-up --

24             MR. CHAFFIN:  I'll get Mr. Briddell to the

25        stand.

1         THE COURT:  -- on that point.

2         MR. CHAFFIN:  But I will point out if you

3   quit work, you're not given a hearing if you

4   quit.

5         THE COURT:  No.  That's what I'm saying.

6   But I --

7         MR. CHAFFIN:  Yes, ma'am, I understand.

8         THE COURT:  I don't --

9         MR. CHAFFIN:  I'll get Mr. Briddell.

10        THE COURT:  Yes.  And that's what I mean.  I

11   think it's -- it's cloudy whether he quit or not.

12   Do you know what I mean?  But I want to hear

13   about Mr. Briddell and what happened after that.

14                    **MICHAEL BRIDDELL**,

15   a witness, after having first been duly sworn to

16   speak the truth, the whole truth, and nothing but

17   the truth, took the stand and testified as

18   follows:

19                 **DIRECT EXAMINATION**

20   **BY MR. CHAFFIN:**

21   Q.   Would you state your name and what you do for a

22        living, please?

23   A.   My name is Michael Briddell, and I am the

24        executive assistant to Mayor Bobby Bright.

25   Q.   Very briefly, Mr. Briddell, and especially with

```
 1              respect to personnel matters, what would your
 2              duties involve?
 3     A.       If an employee has been disciplined in his or her
 4              department and wants to appeal it to the mayor, I
 5              will preside over the hearing and then make a
 6              recommendation to the mayor.
 7     Q.       All right.  By virtue of your position, do you
 8              know Mr. Moorer here?
 9     A.       Yes, indeed.
10     Q.       And how do you know him?
11     A.       Mr. Moorer had an appeal to the mayor's office in
12              2005.
13     Q.       Do you remember what that was about?
14     A.       He had failed to notify the department that he
15              was going to be late for work when he was
16              returning from Birmingham, and there was some
17              issues of failing to make a phone call to say,
18              hey, I'm not going to be there when I'm supposed
19              to.
20     Q.       So what did you do when you got word of that?
21              Did you set up a hearing or you conducted a
22              hearing?
23     A.       Conducted a hearing that Mr. Moorer requested
24              after the departmental ruling was that he be
25              suspended for five days.
```

```
 1   Q.   All right.  And what happened as a result of that
 2        hearing?
 3   A.   The departmental ruling was upheld.
 4   Q.   And what was your next contact with Mr. Moorer?
 5   A.   Mr. Moorer called me one morning to say that he'd
 6        had some sort of disagreement or altercation and
 7        that he wasn't going to go to work that day or
 8        wasn't going to go back to work that day.
 9   Q.   Let me -- this was about the last day he worked
10        with -- do you remember?
11   A.   Pardon me?
12   Q.   This was about the last day he worked
13        approximately that time?
14   A.   I later found out, yes, that's the case.
15   Q.   And he called you and told you what?
16   A.   He told me that he and Mr. Provitt had had some
17        sort of disagreement and that he wasn't going to
18        work that day.
19   Q.   Did he mention anything about being punished,
20        working with the grass cutting crew?
21   A.   No.
22   Q.   What did you tell him?
23   A.   I said I don't know what is the proper way to
24        handle this dispute, but you've got to come back
25        to work.  If you stay out for three straight
```

```
 1              days, you could be found to have abandoned your
 2              job, and then you'd be gone for good.
 3     Q.       What, if anything, did you say about Mr.
 4              Provitt's authority to fire him?
 5     A.       Pardon me?
 6     Q.       Did you say anything about Mr. Provitt's
 7              authority to terminate him?
 8     A.       No, I don't think that that was something that
 9              came up.
10     Q.       After that, did you hear anything else from
11              Mr. Moorer?
12     A.       I did not.
13     Q.       In your capacity as, I guess, a hearing officer,
14              what happened then?  And by that I mean, did you
15              send him a letter saying that he'd quit or
16              anything of that sort?
17     A.       No, I did not.
18     Q.       And why not?
19     A.       I just assumed that -- I think I got called on a
20              Friday.  I assumed that he was either going to go
21              back to work that Friday or show up at work on
22              Monday or show up at work on Tuesday.  And I had
23              enough other things going on that I did not check
24              up with -- with that particular case.
25     Q.       All right.  Now, let's assume he did not show up.
```

```
 1              And what paperwork or what procedurally would the
 2              City do about that?
 3     A.       There would be some paper forms generated that
 4              said this employee has resigned from his or her
 5              post with the City due to the fact that they
 6              abandoned their job by not showing up for three
 7              shifts.
 8     Q.       Now, what in a situation like that would be sent
 9              to Mr. Moorer, if anything?
10     A.       I don't know.
11     Q.       Okay.  What about other arrangements to pay and
12              that sort of thing?
13     A.       I'm sure that every employee would get what's
14              coming to him or her for the time that they've
15              actually worked.
16     Q.       I'll show you this document which I'm marking
17              D-1.  Can you tell me what this is?
18     A.       This is a Form 10, and it --
19     Q.       All right.  What's a Form 10?
20     A.       A Form 10 is a form that's generated in the
21              City's paperwork system that refers to
22              disciplinary actions, changes in salaries, any
23              type of change in an employee's status.
24     Q.       And what does that one relate to?
25     A.       This one says Anthony Moorer resigned effective
```

```
 1              the 21st of April.
 2    Q.    And who prepares that document?
 3    A.    That would be prepared by the department head for
 4          that employee, I believe.
 5    Q.    And in that case who signed it?
 6    A.    Gail Gibson would have sent it to the mayor's
 7          office, and the mayor would have signed off on
 8          it.
 9    Q.    And it is a regular business document that you
10          use?
11    A.    Yes, indeed.
12    Q.    And it's used routinely?
13    A.    Yes, indeed.
14    Q.    And you would know how to fill it out?
15    A.    I'd know how to handle the -- my portion of the
16          chain of the process that the paperwork requires.
17              THE COURT:  What date did the incident
18          happen again with Mr. Provitt?
19              MR. CHAFFIN:  It was the 7th.
20              MR. BELL:  Actually, it was the 18th, Judge.
21              (Off-the-Record discussion.)
22              THE COURT:  Okay.  April 18th.  And then
23          that letter says that he resigned effective April
24          21st?
25              THE WITNESS:  Yes.
```

1    THE COURT: Okay. Mr. Bridwell, let me ask

2  you this. After -- okay. This guy comes by,

3  leaves a message for you to call him or whatever.

4  You call him. And why did he say he was -- or he

5  came by. What did he tell you?

6    THE WITNESS: I think he said that

7  Mr. Provitt might have used profanity or

8  something, told him to do something and

9  Mr. Moorer decided that he did not want to do it

10  and was going to leave.

11    THE COURT: Okay. Did he ever tell you on

12  the phone I quit?

13    THE WITNESS: He told me that he left and

14  was not going back to work that day.

15    THE COURT: Okay. That day? That he was

16  upset, I assume he told you?

17    THE WITNESS: Yes, indeed.

18    THE COURT: Okay. And you told him, hey, I

19  don't know exactly what happened, but I'll tell

20  you, Mr. Moorer, if you don't go back to work in

21  three days, it's going to be job abandonment?

22    THE WITNESS: Yes.

23    THE COURT: Now, what's the City's policy at

24  that point? Do we send a follow up letter to

25  Mr. Moorer, I mean, a department head or somebody

1    that says, dear Mr. Moorer, you know, on so and

2    so date, there was this incident you left.  If

3    you do not come back to work in three days, that

4    is job abandonment, and we will assume that you

5    have quit?  Do we follow up?

6              THE WITNESS:  Your Honor, that written

7    notice might take place, but it's not done in

8    the mayor's office.  It's also possible that

9    every employee knows that that's part of the

10   employment rules in the City.  If you miss three

11   of your shifts, you've effectively resigned.

12             THE COURT:  Okay.  Is that in the employee

13   handbook?

14             THE WITNESS:  Again, I apologize.  I don't

15   know.

16             THE COURT:  Okay.  Did you call the

17   department head after your conversation with him

18   and say, hey, I talked to Mr. Moorer; I

19   understand there was some incident; let me tell

20   you what I told him?  Did you talk to anybody --

21             THE WITNESS:  Our city departments are

22   divided up between myself and the City's other

23   executive assistant, and the maintenance

24   department is actually under his supervision.  I

25   don't know whether I called Ms. Gibson or whether

1    I just told my colleague, hey, there was an

2    incident involving maintenance; this is how I'm

3    wiping my hands clear because it's your

4    responsibility.

5        THE COURT:  Okay.

6        THE WITNESS:  And that sounds glib, but, I

7    mean, there's just too much --

8        THE COURT:  So, I mean, you don't know if

9    anything was ever sent to him or not?

10       THE WITNESS:  I do not.  All I know is what

11    I told him on the phone.

12       THE COURT:  I've got you.  Who's got the

13    employee handbook?

14       MR. CHAFFIN:  We do.

15       THE COURT:  What does it say?  Does it have

16    something in there about if you miss three days?

17       MS. HIGHLEY:  It does, Your Honor.

18       THE COURT:  Let me see it.  Did Mr. Moorer

19    get one of these?

20       MR. CHAFFIN:  Yes, ma'am.

21       THE COURT:  Okay.  Okay.  I'm sorry.  I

22    didn't mean to interrupt you.

23           But, again, it says unauthorized or

24    unreported absence from work for a period of

25    three days or more may be considered by the

```
 1        appointing authority as resignation.  So it's not
 2        necessarily one.  It just might be.
 3            MR. CHAFFIN:  He was told by the mayor's
 4        assistant it would be, I believe.
 5            THE COURT:  Okay.  Here you go.  I'm sorry.
 6            MR. CHAFFIN:  We would move --
 7            THE COURT:  This is -- yes, that -- we can
 8        put that in.
 9                (At which time Defendant's Exhibit
10                 Number 2 was admitted into
11                 evidence.)
12            THE COURT:  But this is -- this is what the
13        Court is struggling with, Mr. Briddell.  I know
14        you talked to him, and, I mean, obviously,
15        something happened between he and Mr. Provitt,
16        you know, about whether he told him, you know,
17        get yourself off here or I quit or whatever.
18        But, I mean, obviously, there was something.
19                It's -- I just -- I don't understand why
20        a letter wasn't sent to him saying, dear Mr.
21        Moorer, we understand there was an incident on
22        this day.  As you know per phone conversation,
23        Mr. Briddell, if you do not come back to work on
24        this date, it will be considered that you have
25        resigned.  Why don't we do that?
```

1    I mean, I know everyone is thinking,

2    well, why should we have to do that.  But, well,

3    we have to do it because, you know, it gets gray

4    areas about whether someone thinks they were

5    fired or they resigned.  I mean, you know, I'm

6    just trying to figure out why.  And especially,

7    you know, just to dot your eyes and cross your

8    T's.  You know, here's a follow-up letter.  It's

9    in writing, buddy.  We don't need to have any

10   discussion or arguments about what was said or

11   not said.

12         THE WITNESS:  Respectfully, Your Honor --

13         THE COURT:  And I don't mean that was your

14   job, but I'm saying --

15         THE WITNESS:  No.  Sure.

16         THE COURT:  -- why, you know, did the

17   department head not follow up with that.

18         THE WITNESS:  Sure.  I don't know with one

19   hundred percent certainty that a letter wasn't

20   sent or generated to Mr. Moorer.  But I do know

21   that there was no ambiguity in the conversation

22   that I had with Mr. Moorer that morning.  If you

23   do not show up for three days, you have resigned

24   and your job is gone.

25         True, we probably could have been better

1       served by giving additional notification, but

2       we're dealing with adults here.

3            THE COURT:  Well, I agree.  But, you know,

4       even though you're dealing with adults, you're

5       also dealing with folks who sometimes just don't

6       really get it or think, well, maybe that person,

7       you know, doesn't really have the authority or

8       maybe -- I mean, what's -- I don't know.  What's

9       obvious to us might not be obvious to everybody

10      else.  I guess what I'm saying is it just seems

11      like very easily phone calls picked up to, sir,

12      hey, I just had this phone call; I don't know

13      what happened out there, but I told him if you're

14      not back in three days, that's job abandonment.

15      I want a letter sent to him right now saying the

16      phone call was made, that he was told this is

17      from the department head; if you're not back on

18      this date, it's job abandonment.  I mean, I'm

19      just asking.  I'm not telling y'all how to run

20      the City by any means.

21           THE WITNESS:  I don't think there was any

22      confusion in Mr. Moorer's mind after he and I

23      spoke that morning.

24           THE COURT:  But, obviously --

25           THE WITNESS:  Pardon me?

65

```
1          THE COURT:  I said, obviously, the guy does
2     have some confusion which is why we're all
3     sitting here.  You know?
4          MR. CHAFFIN:  Well, I don't know if I agree
5     with that, Your Honor.
6          THE COURT:  Well, you know, I mean, I've got
7     you.  I've got you.
8          THE WITNESS:  I mean, there are a lot of
9     complexities in the City's personnel matters, but
10    that's the one thing that I was able to
11    understand pretty clearly is I tried to learn the
12    geography of city policies, and so that's why I'm
13    pretty sure that I conveyed it without any
14    confusion on Mr. Moorer's part.  If you do not go
15    back to work today or the next day or the day
16    after that, you are gone, and regardless of
17    whether Mr. Provitt is at fault or not, your job
18    has disappeared and you won't have any recourse.
19         THE COURT:  But, I mean, I know this sounds
20    dumb, too.  I mean, I'm just playing devil's
21    advocate for everyone.
22         THE WITNESS:  Sure.
23         THE COURT:  But does Mr. Moorer --
24    Mr. Moorer thinks his boss is whoever is in
25    charge out there, Mr. -- the guy above Mr.
```

1    Provitt or the lady, excuse me, whoever is in

2    charge of that division, not you.  I mean, I know

3    that you're second in charge.  But to an employee

4    working there, they're looking at, okay, this is

5    my boss.  You know what I'm saying?  I mean,

6    they're not thinking the mayor is my boss, the

7    executive assistant.  Do you know what I mean?

8        THE WITNESS:  I could see that, but I think

9    if you appeal a departmental ruling to the

10   mayor's office and you come down to City Hall,

11   then you pretty much know the structure, that the

12   people at City Hall are above your boss.  You're

13   asking for --

14       THE COURT:  Oh, yes, which is why he came

15   there because he's upset and he knows you're

16   above them.

17       THE WITNESS:  Right, right.

18       THE COURT:  So you can do something.

19       THE WITNESS:  And why -- when we spoke that

20   morning on the phone --

21       THE COURT:  Right.

22       THE WITNESS:  -- what I was going to say

23   should supercede anything that was told to him by

24   people who are more directly in his line of

25   supervision.  And so if I say someone has to be

```
 1        back at work within three days or else they've
 2        lost their ability to appeal, then it's pretty
 3        clear, I would think.
 4             THE COURT:  Well, I'm seeing holes in the
 5        City.  This is from the former AREA lawyer.  I
 6        mean, I'm just picking at y'all.
 7             THE WITNESS:  I understand.
 8             THE COURT:  Because that's what I used to
 9        do.  I just -- man, you've got to -- I don't
10        know.  I mean, something like that, you --
11        really, you just -- like I said, I'm not telling
12        you how to do it, but --
13             THE WITNESS:  And, also, I don't know what
14        the --
15             THE COURT:  -- it needs to be a follow-up in
16        writing, you know, and it needs to go out that
17        day, boom.  You know, it's -- I don't know,
18        because when we talk to people and we think
19        things are real clear, it's amazing how not clear
20        it is --
21             THE WITNESS:  And there are --
22             THE COURT:  -- to everybody.  Do you know
23        what I mean?
24             THE WITNESS:  -- plenty of scenarios --
25        sure.  I mean, I agree there are plenty of
```

```
 1        scenarios where there are gray areas and there

 2        can be some ambiguity.  But that issue, I really

 3        see being black or white.

 4              THE COURT:  No.  I mean, I hear what you're

 5        saying.

 6              THE WITNESS:  Sure.

 7              THE COURT:  It's just I just -- I would --

 8        man, I would always tell the City on something

 9        like that, especially, I would always follow up

10        with a letter.  I mean, you know, here's the

11        conversation was had.  This is what's going to be

12        done, boom.  I just -- I mean, I'm not trying to

13        tell you how to do it though.  That is y'all's

14        business.  You can do it however you want.

15              THE WITNESS:  Yes.  Well, we want to be fair

16        to the employees for sure and we also want to be

17        fair to the taxpayer.

18              THE COURT:  And I don't mean y'all are being

19        unfair.  I'm just saying it creates some

20        confusion, you know.  But, no, I'm just sitting

21        here thinking out loud.

22              Okay.  I mean, I've got it.  I wanted to

23        hear it.  I understand what Mr. Riddell says

24        that he did and what their discussion was.

25        (BY MR. CHAFFIN:)
```

```
 1    Q.    Mr. Briddell, it is true that Mr. Moorer has
 2          prosecuted an appeal that was described to you on
 3          a prior case --
 4    A.    I'm sorry?  Say that one more time.
 5    Q.    He has contacted you with a grievance and so
 6          forth, utilized the procedure that's been
 7          described; he has done that on previous
 8          occasions?
 9    A.    Once, yes.
10    Q.    Also, he's sophisticated enough to have filed a
11          discrimination suit against the City that's
12          pending?  Is it still pending or do you know?
13    A.    I don't know.
14    Q.    Is that true or --
15    A.    I think that it's still pending, but, again, I
16          haven't been keeping abreast of it.
17    Q.    But you do have knowledge that he filed one?
18    A.    Yes.
19    Q.    Is it not true that very day he talked with you
20          that he went and got his retirement pay?  Or do
21          you know?
22    A.    I don't know about that.
23    Q.    Thank you, sir.
24          THE COURT:  Okay.  Any questions, Mr. Bell?
25          MR. BELL:  Yes, Judge, just a few.
```

```
 1              THE COURT:  Okay.

 2                         CROSS EXAMINATION

 3         BY MR. BELL:

 4    Q.   How are you doing, Mr. Briddell?

 5    A.   I'm doing well, Mr. Bell.  How about yourself?

 6    Q.   We were fraternity brothers.  I just wanted to

 7         get that out.

 8              If an employee uses vulgarities -- I

 9         won't say vulgarities -- profanity against

10         another employee, would that be something that

11         the City would condone?

12    A.   Absolutely not.

13    Q.   Now, on that day that Mr. Moorer came to you, did

14         he tell you that he had -- Mr. Provitt had,

15         quote, cursed him out?

16    A.   I believe he did.

17    Q.   Did he tell you that Mr. Provitt had told him to

18         get his goddamn ass off the lot?

19    A.   I don't remember the exact words that were

20         attributed to Mr. Provitt.

21    Q.   Would you think that Mr. Provitt as the assistant

22         director -- would he have the authority to tell a

23         -- well, I'll ask you this.  Would you expect a

24         subordinate to obey a superior?

25    A.   Yes.
```

```
 1   Q.   And so if Mr. Provitt had told Mr. Moorer to get
 2        off the lot, I mean, what would you expect
 3        Mr. Moorer to do?
 4   A.   To either get off the lot or contact
 5        Mr. Provitt's superior.
 6   Q.   Okay.  Now, did he have a right to file a
 7        grievance against Mr. Provitt?
 8   A.   Yes.
 9   Q.   I'm asking --
10   A.   Again, I don't know with a hundred percent
11        certainty, but I would think, yes, that, of
12        course.
13   Q.   And, Mr. Briddell, I mean, you seem like a fair
14        man.
15   A.   Thank you.
16   Q.   If Mr. Provitt had used profanity, I mean, that
17        wouldn't be something that you nor the mayor
18        would want?
19   A.   Say it one more time.
20   Q.   If Mr. Provitt had used profanity against
21        Mr. Moorer, which is his subordinate, that
22        wouldn't be something that you nor the mayor nor
23        the City of Montgomery would condone?
24   A.   That's correct.
25   Q.   Now, having said that, did you ever call
```

```
 1              Mr. Provitt?
 2    A.        Mr. Bell, I don't know whether I called
 3              Mr. Provitt or whether I notified the executive
 4              assistant that's over the maintenance department.
 5              It just was so long ago, and, unfortunately, we
 6              have enough --
 7    Q.        You have a lot of incidents?
 8    A.        Different incidents like this that I can't
 9              remember the exact details.
10    Q.        And you have a lot of hearings. I understand.
11              But let me just follow up on something. On all
12              of those -- on that discipline, whether it's one
13              disciplinary, one or two, when Mr. Moorer
14              appealed them, there had been a disciplinary
15              charge filed, had there not?
16    A.        I'm sorry. You --
17    Q.        In other words, for him to appeal a
18              disciplinary --
19    A.        For it to come to my office?
20    Q.        There would've had to have been one lodged
21              against him?
22    A.        Yes.
23    Q.        So you can't appeal a disciplinary if one has not
24              been written against you, can you?
25    A.        That's correct.
```

```
 1    Q.    Well, no disciplinary was lodged against him for
 2          abandonment as far as you know, was it?
 3    A.    As far as I know.
 4    Q.    All right.  Now, Mr. -- the City and the
 5          department had --
 6    A.    If I can just clarify, there wouldn't be any
 7          disciplinary paperwork that would be filed by the
 8          department in the event of a job abandonment.
 9          That's saying I quit; I resign.
10    Q.    Okay.  Good point.  So what would -- now, if
11          Mr. Moorer had been in the hospital for three
12          days, you wouldn't have known it, would you?
13    A.    No, I would not.
14    Q.    Okay.  Suppose he was in an accident and he
15          couldn't call someone.  Would three days -- after
16          he had been in there for five days, would he have
17          automatically been terminated?
18    A.    I think that's why the verbiage that Judge
19          McCooey read stated that it may be interpreted as
20          job abandonment.
21    Q.    And the way that you're interpreting is that
22          you'll give him a hearing to -- when it --
23          wouldn't you think that you would give him a
24          hearing to -- for you to determine whether he
25          left there -- he intentionally left or it was
```

```
 1              something beyond his control?

 2     A.       Is there a question?

 3     Q.       Yes.  Wouldn't it -- wouldn't you think, though,

 4              if since you're going to say someone abandoned

 5              his job or resigned -- they don't use the word

 6              abandoned; you say he resigned.  Wouldn't you

 7              think that before you would know that he had

 8              resigned you would've had to have something from

 9              him?

10              MR. CHAFFIN:  Your Honor, I -- I object.  It

11              calls for speculation.  Plus, he knew exactly why

12              he was going to be out -- why he was out for

13              three days.  I mean, he told him if you don't

14              do --

15              MR. BELL:  Well, there's no testimony about

16              three days, Judge.  He told him -- there was no

17              testimony about three days.  What I'm trying to

18              get him to see, Judge -- and maybe -- is that you

19              just can't automatically assume because someone

20              didn't come back that it's job abandonment.  And

21              the reason that -- I don't care what you would

22              call it.  Maybe you can call him or write him a

23              letter and say why didn't you show up.  I'm not

24              saying you'd have to give him a full-fledged

25              hearing.  But to assume that just because someone
```

1    does not come in in three days that there's a

2    resignation, I mean -- and I'm not suggesting

3    that you --

4         THE WITNESS:  Sure.

5         MR. BELL:  But that's what happened in that

6    instance, Judge.

7         THE COURT:  Well, like I said, I'm not

8    trying to tell Mr. Briddell, the City, how to do

9    their work.  But what should be done just to dot

10   your I's and cross your T's is, again, once you

11   have that -- those two gentlemen had that

12   conversation, Mr. Briddell and Mr. Moorer,

13   Mr. Briddell calls the department head, whoever

14   that is, says I had a conversation with

15   Mr. Moorer; I want a letter going out to him

16   today telling him that we understand there was an

17   incident; that if he does not come back to work

18   in three days that we will assume he has resigned

19   his position, end of story.

20        Now, we just have a situation where I

21   know, Mr. Briddell, you told him that, but I have

22   a guy sitting over there, too, who you know, and

23   whether it's right or wrong, I mean, something

24   happened between he and Mr. Provitt.  You know,

25   exactly what happened, who knows.  Do you know

1   what I mean?  But let's just say he did tell him

2   get your ass off here or whatever, and so this

3   guy is thinking he told me to get my ass off

4   there so I can't go back.  Do you know what I

5   mean?  But you're telling him if you don't come

6   back in three days, I'll assume you've resigned.

7   I mean, there's -- that's where it's missing.  In

8   other words, a letter goes out, hey, Mr. Moorer,

9   we know something happened; we're going to

10  resolve whatever happened, but you have got to

11  come back to work within three days or, else, we

12  will assume you have resigned and we cannot

13  resolve whatever happened.  Do you know what I'm

14  saying?  I mean, it's kind of like that's just

15  left out there.  I mean, I don't know

16  what happened between those two guys.  I mean,

17  who knows?

18          THE WITNESS: , I don't either, but --

19          THE COURT:  You know, it's kind of like it's

20  just out there, what happened.  And I know you're

21  saying you told him to come back in three days,

22  but he's sitting there saying, no, that -- you

23  know, Mr. Provitt told me to get my ass out of

24  here.  It's just there's a disconnect because we

25  need that letter.

1   THE WITNESS:  I would look at the

2  organizational chart of the City and see what

3  position someone had who gave me the conflicting

4  directives, and I would comply with whoever was

5  closest to the top.  It's possible he could have

6  gone to the Mayor and received advice that would

7  have conflicted what I gave him and then he would

8  be rightfully --

9   THE COURT:  I mean --

10   THE WITNESS:  -- to comply with what the

11  mayor said, sure.

12   THE COURT:  I understand, but, gosh, that's

13  why it's so important just to have a paper trail,

14  you know.

15   THE WITNESS:  And in the event that there

16  was an illness or a justifiable reason why

17  someone missed three shifts and then came back

18  and notified the City, I can --

19   THE COURT:  But what bothers me in this

20  situation, though, is we know something happened

21  between he and Mr. Provitt.  Now, exactly what

22  happened, like I said, who knows?  But what we do

23  know is we need to get Mr. Moorer back down there

24  and we need to get to the bottom of what happened

25  and he needs to get down there immediately.

1              THE WITNESS:  That's what I asked him to do.

2              THE COURT:  But he needs to be told -- he

3      needs to be told in a letter, Mr. Moorer, you

4      know, I understand there was an incident between

5      you and Mr. Provitt; the City will be

6      investigating that, you know, getting to the

7      bottom of that, whatever.  But in the meantime,

8      sir, you have to come back to work.  If you do

9      not by this date, then we will assume you have

10     resigned.  Now, if you choose to come back, we

11     will -- whatever you guys do; we will conduct a

12     hearing or we'll get to the bottom of

13     what happened, but we can't get to the bottom of

14     it when you're at home.  Do you know what I'm

15     saying?  I mean --

16             THE WITNESS:  It's a built-in redundancy.

17             THE COURT:  Well, it's really not.  Like I

18     said, I'm -- I mean, when you deal with personnel

19     issues --

20             THE WITNESS:  But, Your Honor, respectfully,

21     how --

22             THE COURT:  I mean, gosh --

23             THE WITNESS:  -- how would the text of such

24     a letter differed from the conversation or the

25     directive that I gave Mr. Moorer that morning?

1    THE COURT:  Man, that is like so -- that's

2    so textbook in the State.  I mean, you follow up

3    with a letter, you know.  I mean, that is just --

4    it's just a given, you know.  I mean, you have a

5    paper trail.  I'm just -- like I said, I'm not

6    trying to tell you how to do your work, but this

7    is where it creates a problem, you know?  I mean,

8    it does.  I guarantee you guys follow up with

9    paper trails at Industrial Relations.

10    MR. CHAFFIN:  We have paper everywhere.

11    THE COURT:  Exactly.

12    MR. CHAFFIN:  So does the City, I can tell

13    you.

14    THE COURT:  Isn't the State like the paper

15    trail gurus?

16    MR. CHAFFIN:  Pardon me?

17    THE COURT:  The State is the paper trail

18    gurus when it comes to employee matters.

19    MR. CHAFFIN:  What can I say.

20    THE COURT:  I mean, really, the State is.

21    MR. CHAFFIN:  Yes.

22    THE COURT:  And there's a reason for it, you

23    know?

24    MR. CHAFFIN:  Well, I don't know about that.

25    THE COURT:  Well, I don't know though.

1    There is a reason for it, you know?

2           MR. CHAFFIN:  Sometimes.

3           THE COURT:  There is.  There is.

4           MR. CHAFFIN:  I mean, we have lots of paper.

5           THE COURT:  I know.  Sometimes we think

6    they're too much, but, you know . .

7           I'm not saying -- you didn't do anything

8    wrong, Mr. Briddell.  I'm not saying that.  I'm

9    just -- but do you see where this just kind of

10   creates a bit of a problem?  Because then I

11   assume he just got a letter that said, hey,

12   you've resigned; we haven't seen you at work, so

13   that's that.

14          Okay.  What else have you got for

15   Mr. Briddell?

16   (BY MR. BELL:)

17   Q.   You're not his supervisor?  You're not

18        Mr. Moorer's supervisor, are you?

19   A.   I'm not in the maintenance department.  I'm not

20        the executive assistant that is tasked with

21        overseeing the maintenance department either.

22   Q.   Well, would you answer me yes or no?

23   A.   I would say yes.  I would say that anyone that

24        works for the City besides the mayor would view

25        me as above them in the organizational chart.

```
 1    Q.    And so if one supervisor says he has to go back
 2          to work and the other supervisor says you can't
 3          come, what are you supposed to do?
 4    A.    Which supervisor is higher?
 5    Q.    And that's in the personnel?
 6    A.    Pardon me?
 7    Q.    And that's your personnel manager?
 8                MR. CHAFFIN:  Your Honor, I object to that
 9          supposition.  Mr. Moorer has already testified he
10          knew that Mr. Provitt didn't have authority to
11          fire him.
12                MR. BELL:  Well, Judge, I'm not talking
13          about firing.  I'm talking about going back to --
14          you see, because that -- that creates a problem
15          for this man.  He goes down there subject to be
16          -- to be arrested.  And I'm not being accusatory
17          either, but I'm going to take a look at that Form
18          10 you just -- and would you give me the -- may I
19          approach him?
20                THE COURT:  Yes.
21          (BY MR. BELL:)
22    Q.    And so this -- this is City of -- County of
23          Montgomery Personnel Department Requisition for
24          Personnel Action?
25    A.    Uh-huh.
```

```
 1    Q.    And so whose form is that?  Is that the City's
 2          form or is it the City/County personnel form?
 3    A.    It must be -- I can't speculate as to whether or
 4          not the County uses this form, but I know that
 5          the City does.
 6    Q.    Where it lists -- does it say anywhere down there
 7          abandonment?
 8    A.    No.  It says resignation.
 9    Q.    It says resignation.  So there was a
10          determination as far as you're concerned that the
11          three days absent was, in effect -- was, in
12          effect, a resignation?
13    A.    Yes.
14                THE COURT:  And but what you told him,
15          Mr. Briddell, is if you don't come back in three
16          days and that's job abandonment and you'll be
17          terminated?
18                THE WITNESS:  Yes.
19                THE COURT:  Is that right?  I mean, you
20          didn't tell him --
21                THE WITNESS:  I don't know the exact words,
22          but --
23                THE COURT:  -- if you don't come back in
24          three days, I'll assume you resigned?  Or I don't
25          know.  I'm just asking you what did you tell him.
```

1         THE WITNESS:  Your Honor, I can't remember

2    the exact wording that day.

3         THE COURT:  Right.

4         THE WITNESS:  But the message was that if

5    you don't come back in three days, it's the same

6    as if you've quit and then you can't get your job

7    back.

8         THE COURT:  Right.

9         THE WITNESS:  Come back and try to work out

10   this discrepancy.  We'll find out who's right,

11   who's wrong.  But if you don't come back in three

12   days, you've lost that ability.

13        THE COURT:  And what does that form say?

14   That he resigned?

15        THE WITNESS:  Yes.

16        THE COURT:  But he didn't resign.  I mean,

17   in y'all's terms, he abandoned his job.

18        THE WITNESS:  Well, job abandonment says --

19        THE COURT:  You guys equate abandonment and

20   resignation with each other?

21        THE WITNESS:  Yes.

22        THE COURT:  In that situation, you're saying

23   they're interchangeable?

24        THE WITNESS:  You willingly terminate your

25   employment with the City through an action that

1    you've taken by opting not to show up for three

2    days.

3         THE COURT:  And Mr. Moorer, at first, was

4    getting his unemployment benefits and then y'all

5    cut him off?

6         MR. CHAFFIN:  From what I understand, he

7    went to a hearing and was awarded benefits.  The

8    employer appealed.  And after a full hearing with

9    the Board of Appeals, they reversed the decision,

10   which is not unusual, as you know.

11        THE COURT:  Sure.  Yes.  So, I mean, he

12   started out he was getting them, and then after

13   the City appealed, they stopped it?

14        MR. CHAFFIN:  After the hearing, yes, ma'am.

15        MR. BELL:  Your Honor, may I say something?

16        THE COURT:  Yes.

17        MR. BELL:  About that.  And this is -- this

18   is one issue we have.  There was a hearing that

19   is not transcribed.  There were two hearings

20   before the Board of Appeals.  Yeah, one is

21   transcribed in which there was evidence taken.  I

22   don't know what the Board of Appeals could have

23   in turn -- could have overturned the hearing

24   officer on because at that first hearing, there

25   was no evidence presented.  So I -- so I'm going

1      -- you know, Your Honor, I just think it's -- I

2      don't know if he has jurisdiction for this second

3      one either because there was nothing -- there was

4      nothing taken.  In other words, they didn't

5      continue him.  There was no evidence taken, and

6      it's not transcribed so the Court can see.  So,

7      you know, I -- I don't -- I don't know.

8              But I've taken enough of the time with

9      Mr. Briddell.

10         THE COURT:  Are we done with Mr. Briddell?

11     I'm sure he's got other things to do besides

12     sitting here and listening to me.  He's busy.

13     But thank you, Mr. Briddell.

14         THE WITNESS:  Thank you very much.

15         THE COURT:  You guys need anything else from

16     Mr. Briddell?

17         MR. CHAFFIN:  No, ma'am.

18         THE COURT:  Thank you.  Have a good day.

19         MR. CHAFFIN:  Judge, I'm not sure what was

20     untranscribed, but the Record certified to the

21     Court is a -- really, it is a long transcript

22     with plenty of testimony in it.  It's not like --

23         THE COURT:  Right.

24         MR. BELL:  I'm not talking about this one we

25     have.  I'm talking about --

1        MR. CHAFFIN:  The Board of Appeals hearing.

2        MR. BELL:  There was two Boards of Appeals

3    hearings.

4        MR. CHAFFIN:  I don't know.

5        MR. BELL:  Yes, because if you read the

6    transcript, Judge, the Board of Appeals says we

7    reopen this; it's kind of unique.

8        MR. CHAFFIN:  Well, I can't comment.  I can

9    say just --

10        MR. BELL:  I know.  It's de novo.

11        THE COURT:  Yes.  I mean, I'll be honest

12    with you, guys and girls.  I mean, I hate to say

13    it, Allison, but the City, they've got to do

14    better on that.  I mean, you know, I know Mr.

15    Briddell thinks that him saying it and he's real

16    clear and --

17        MS. HIGHLEY:  Well, Your Honor, Mr. Moorer

18    in the transcript at the hearing that they're

19    talking about says Mr. Briddell told me if I

20    didn't show up in three days, I abandoned my job.

21    I mean, he understood what Mr. Briddell said.

22        MR. BELL:  Well, the fact that he --

23        MS. HIGHLEY:  It's on the Record.

24        MR. BELL:  The fact that he told him that

25    doesn't mean he understood the man.  Mr. Moorer

1    -- Mr. Briddell never told him and he -- and I'll

2    give some respect to him.  He never said he told

3    him go back to work.  He said, if you don't go

4    back to work in three days, you've abandoned your

5    job.

6            THE COURT:  Right.

7            MR. BELL:  And our contention is still,

8    Judge, there still has to be something for

9    someone to determine that it was job abandonment

10   and therefore a resignation.

11           THE COURT:  And the whole problem with this

12   situation, guys and girls, just like I said, you

13   have a situation where you've had an incident at

14   work.  Something happened between Mr. Moorer and

15   Mr. Provitt.  Okay.  You know, who knows exactly

16   what happened, but, obviously, something

17   happened, and Mr. Moorer left.  And we know there

18   was a conflict; there was accusations of

19   profanity.  Maybe there wasn't.  Maybe he left on

20   his own.  Maybe he didn't.  But, I mean, we have

21   a situation.  So what needs to be done is, like I

22   said, Mr. Briddell needed to pick up the phone,

23   call the head of that department and say we've

24   got a situation; we need to get to the bottom of

25   it, and a letter needs to go out telling Mr.

1    Moorer that if you don't come back to work in

2    three days -- you know, I know there was a

3    situation; we're going to get to the bottom of

4    it; you have to come back to work in the next

5    three days or, else, we'll assume that you have

6    abandoned your job; you've resigned.  If you come

7    back to work within that three days, we are going

8    to conduct a hearing about what happened or

9    whatever verbiage you want to put  But that's

10   the missing link on this one.  I mean, that

11   definitely should have been done on this because

12   this wasn't a case where Mr. Moorer -- let's just

13   say there was no incident.  Let's say this was a

14   situation where he just left, you know, and Mr.

15   Provitt comes out and he doesn't see Mr. Moorer

16   and he's like, man, you know, where did he go.

17   And Mr. Moorer calls Mr. Briddell and says, you

18   know, hey, I just left; you know, I don't want to

19   do my job anymore, whatever.  You know, Mr.

20   Briddell tells him, hey, if you don't come back

21   in three days, man, it's job abandonment.  Well,

22   there's no situation that happened.  There's

23   nothing to be resolved.  But in this case we've

24   got an incident.  I mean, we have to get to the

25   bottom of whatever it is.  And if he chooses when

1    he gets that letter to say I don't want to get to

2    the bottom of it, I don't -- I'm not going to any

3    hearing; I don't care; I'm staying home and the

4    heck with them, then fine, you know.  But, man,

5    that's like a missing link, so to speak.

6        MS. HIGHLEY:  Well, respectfully, Your

7    Honor, Michael Briddell and -- and I took notes

8    while he was testifying.  He did say that, look,

9    just go back.  If you don't go back within three

10   days, you're going to be fired; we'll figure out

11   what happened.  He did tell him that.  And we

12   actually have an affidavit that was submitted as

13   evidence in the lower proceedings to the same

14   effect, that he told him to go back to work.  And

15   so I think that coupled with the fact he's very

16   savvy, if Mr. Briddell --

17       THE COURT:  Well, of course, he is.  He's

18   had lots of little things he's filed and he knows

19   the system.  I'm not saying that.  I mean,

20   obviously, the guy, I mean, he knows all of that.

21       MS. HIGHLEY:  Right.

22       THE COURT:  But my point being is I wouldn't

23   care if I'm sitting here talking to someone who

24   had never filed anything that knew nothing.  My

25   point being is I don't care if you're savvy or

1    not savvy.  That needs to be don --

2    MS. HIGHLEY:  And I -- I agree that letters

3    -- letters are better than oral testimony about

4    something that happened.  I mean, I think

5    everybody would agree with that.

6    THE COURT:  Yes.  But in something like

7    this --

8    MS. HIGHLEY:  But there was no letter.

9    THE COURT:  -- they're not better; they need

10   to be required.  I mean, that needs to -- that

11   needs to be a necessary thing.

12   MS. HIGHLEY:  Right.  But right now, it's

13   not, and so --

14   THE COURT:  I mean, how --

15   MS. HIGHLEY:  I mean, it's just not in our

16   policy or procedures to do that.

17   THE COURT:  I want to scream.  I mean, I'm

18   thinking of the amount of calls that Mr. Briddell

19   gets every day at the City or the amount of

20   employees that come down there and we have no

21   paper trail.  Oh, my goodness.  I'm mortified.

22   MR. CHAFFIN:  Well, Your Honor, we still

23   have a couple of witnesses, but I will point out

24   that the employment relationship was severed by

25   Mr. Moorer's own words; I quit.  We have

1     testimony to that effect.

2          THE COURT:  Well, I know.    haven't heard

3     from the rest of them.  Do you h  ve people who

4     are going to say they heard him   ay I quit?

5          MR. CHAFFIN:  We're going t  have one

6     witness.

7          THE COURT:  I mean, do you   ave anyone who

8     is going to come in here and say  hey heard him

9     say I quit?

10         MS. HIGHLEY:  Well, we had    ovitt.

11         MR. BELL:  Well, it's confl   ting, too.  And

12    we have their own employee in th  hearing said he

13    was there with him and he never   id.  It's in

14    the record he never heard him.    was there with

15    him --

16         MR. CHAFFIN:  Well, that's    mething that --

17    that guy is not here now, so . .

18         THE COURT:  Well, I mean, I   eard

19    Mr. Provitt and I still -- I thi   after

20    Mr. Provitt that I'd still -- yo  know, it's

21    questionable, you know, whether    quit or he

22    said get out of here.

23         MR. CHAFFIN:  Well, let me g   Mr. Stinson

24    in and let's see what happens.

25         THE COURT:  Yes.  No, that'  fine.  I

1    haven't made up my mind yet.  I' just --

2        MR. CHAFFIN:  Yes.

3        THE COURT:  I'm just sittin here thinking

4    about how . . . I mean, Allison, that really does

5    need to be changed.

6        MS. HIGHLEY:  It's not in o r procedure

7    right now.

8        THE COURT:  I know.  Just a  the new lawyer,

9    that really, really does.

10        MS. HIGHLEY:  I'll bring it  p in our staff

11    meeting.

12        THE COURT:  Do you know what I mean?  I'm

13    just --

14        MS. HIGHLEY:  Paper is alway  better.

15        THE COURT:  On personnel iss es, man --

16        MS. HIGHLEY:  I mean, I'm th  queen of memo

17    to file.

18            (Off-the-Record discus ion.)

19        THE COURT:  Do we have Mr. S inson?  Wait.

20    I'll be right back.

21            (Brief recess was held )

22            **BILL STINSON,**

23    a witness, after having first bee  duly sworn to

24    speak the truth, the whole truth, and nothing but

25    the truth, took the stand and tes ified as

|    |     |                                                              |
|----|-----|--------------------------------------------------------------|
| 1  |     | follows:                                                     |
| 2  |     | **DIRECT EXAMINATION**                                       |
| 3  |     | **BY MR. CHAFFIN:**                                           |
| 4  | Q.  | Would you state your name and occupation, please?            |
| 5  | A.  | Bill Stinson, foreman.                                       |
| 6  | Q.  | I'm sorry.  Bill Stinson what?                               |
| 7  | A.  | Bill Stinson.                                                |
| 8  | Q.  | And what do you do for a living?                             |
| 9  | A.  | Foreman.  I'm a foreman at the City of                       |
| 10 |     | Montgomery.                                                  |
| 11 | Q.  | And give me a brief describe -- a brief                      |
| 12 |     | description of your duties.  What do you do?                 |
| 13 | A.  | Well, I take a crew out to cut and clean ditches.            |
| 14 | Q.  | And how long have you been doing that?                       |
| 15 | A.  | For the past seven years.                                    |
| 16 | Q.  | And what do you do with a crew?  Do you give them            |
| 17 |     | directions or what?                                          |
| 18 | A.  | Yes.                                                         |
| 19 | Q.  | By virtue of your job, do you know Mr. Moorer                |
| 20 |     | here?                                                        |
| 21 | A.  | Yes.                                                         |
| 22 | Q.  | How is it that you know him?                                 |
| 23 | A.  | By him working down there and that last day he               |
| 24 |     | worked with me.                                              |
| 25 | Q.  | How many days did he work with you?                          |

| | | |
|---|---|---|
| 1 | A. | It wasn't 30 minutes. |
| 2 | Q. | All right.  Did he work with you prior to that |
| 3 | | last day?  Had you ever worked with him before? |
| 4 | A. | I'd never worked with him before |
| 5 | Q. | Okay.  Well, let's talk about the last day.  You |
| 6 | | come in the morning and report to work and then |
| 7 | | what happens? |
| 8 | A. | Came in the morning, report to work.  I took |
| 9 | | Mr. Anthony to the job site. |
| 10 | Q. | And, now, wait just -- you -- Mr. Moorer? |
| 11 | A. | I mean, Mr. Moorer to the job site. |
| 12 | Q. | How did you know he was working for you?  Did |
| 13 | | somebody tell you? |
| 14 | A. | Yeah.  They told me he was on the truck. |
| 15 | Q. | Who told you that? |
| 16 | A. | Well, Tom. |
| 17 | Q. | Provitt? |
| 18 | A. | Yes. |
| 19 | Q. | Okay.  Mr. Provitt.  So you come into work and |
| 20 | | Mr. Provitt tells you that Mr. Moorer is on your |
| 21 | | crew? |
| 22 | A. | That's right. |
| 23 | Q. | And then what happens? |
| 24 | A. | Well, I showed him the time card where he punched |
| 25 | | at that they had transferred down there. |

|     |     |                                                              |
| --- | --- | ------------------------------------------------------------ |
| 1   | Q.  | Now, what does that mean?  Where was the time                |
| 2   |     | card?                                                        |
| 3   | A.  | The time card was in the box down there.                     |
| 4   | Q.  | Where was the box?                                           |
| 5   | A.  | The box is inside the bull room.  The bull room.             |
| 6   | Q.  | In the maintenance shed?                                      |
| 7   | A.  | Yes, yes.                                                     |
| 8   | Q.  | All right.  And what did he say about the card?              |
| 9   | A.  | Well, I just showed him where you punch in and               |
| 10  |     | punch out because they had transferred him to                |
| 11  |     | another building down there.                                 |
| 12  | Q.  | Was his card there?                                          |
| 13  | A.  | Yeah, his card was there.                                    |
| 14  | Q.  | All right.  So he comes in and reports in.  You              |
| 15  |     | show him his timecard and --                                 |
| 16  | A.  | That's right.  Then we go to the truck.                      |
| 17  | Q.  | All right.  What happens then?                               |
| 18  | A.  | Take him to the job.                                         |
| 19  | Q.  | Where was the job?                                           |
| 20  | A.  | The job was out on Susan Drive and Ryan Road.                |
| 21  | Q.  | And what were you going to do when you got there?            |
| 22  | A.  | Cut and clean the ditch.  So when I pulled up on             |
| 23  |     | the job, Mr. Anthony told me take me back in.  I             |
| 24  |     | said I just can't take you back in; I have to                |
| 25  |     | call in and let them know that you don't want to             |

1    work no more.  He said call in.  So I called in

2    and told them I've got a man that wants to come

3    back to the lot.  They told me to bring him back

4    in.  And I took Mr. Anthony in.  I tried to take

5    him down to where he punch out at, and he told me

6    to let him out the truck right at the gate.  And

7    when I told him you need to go down there, he

8    told me to stop this truck and let me out now.

9    So that's what I did.  I stopped the truck and

10   let him out.  So that's why he never did report

11   down to the end where he was supposed to been let

12   them know that he had -- he was leaving.

13   Q.   Was that your last conversation with him?

14   A.   Yeah, that was my last conversation with him.

15   Q.   What, if anything, was said by him about whether

16        he was going to remain employed?

17   A.   Come back?  What you say again?

18   Q.   What, if anything, was said to you by him about

19        whether he was going to stay at work or what?

20   A.   No.  He was leaving.

21   Q.   Did he mention anything about quitting?

22   A.   Yeah, just quit or he said take me back in and he

23        got ready and said put me out the truck.

24   Q.   Did he indicate to you he wasn't going to work

25        anymore or what?

```
 1   A.   No, he -- yeah, he wasn't going to work no more.

 2        He said he wasn't going to work no more.

 3   Q.   What did he say?  Do you remember his words?

 4   A.   Well --

 5   Q.   Don't worry.  I know it's shocking to hear

 6        somebody at maintenance come up with a curse

 7        word.  If that's your hesitation, go ahead.

 8   A.   He just said he wasn't going to work no more.

 9        That's it.  He quit.

10            THE COURT:  Mr. Stinson, let me ask you

11        this.  Before he came out with you that morning,

12        did you know him?

13            THE WITNESS:  Like which way you talking

14        about knowing him?

15            THE COURT:  Did you know him from the

16        City --

17            THE WITNESS:  Personally?

18            THE COURT:  Yes.

19            THE WITNESS:  No, I didn't know him

20        personally.  I just knowed him by working at the

21        City.

22            THE COURT:  Right.  Did you know he was a

23        pain, that he had sued and had a bunch of

24        hearings and stuff?

25            THE WITNESS:  No, I didn't know that.
```

```
 1          THE COURT:  Did you know he was a

 2     troublemaker, so to speak?

 3          THE WITNESS:  Well, the word was he was a

 4     troublemaker.

 5          THE COURT:  I mean, did you think he was a

 6     troublemaker?  No, I'm just asking you.  In all

 7     honesty, did you say, oh, this guy is a

 8     troublemaker?

 9          THE WITNESS:  No, I didn't think he was a

10     troublemaker.

11          THE COURT:  Okay.  So, anyway, you guys go

12     out.  How many folks were with you; do you

13     remember?

14          THE WITNESS:  Four more.

15          THE COURT:  Okay.  And he said that he asked

16     you about when he could have lunch and a break

17     and you said we don't take breaks, we don't take

18     lunch.

19          THE WITNESS:  No.

20          THE COURT:  Is that true or a lie?

21          THE WITNESS:  No.  No, that's not true.

22          THE COURT:  Okay.  Well, what precipitated,

23     what made him want to come back?  Did anything

24     happen?

25          THE WITNESS:  Well, Mr. Moore was mad when
```

1    he first got in the truck.

2        THE COURT:  He was just ticked that he had

3    to go out and cut grass?

4        THE WITNESS:  Yes, yes.

5        THE COURT:  Well, I mean, what was he

6    saying?

7        THE WITNESS:  Well, he just was cussing a

8    whole lot and saying a whole lot of stuff, what

9    he was going to do, call and --

10       THE COURT:  Was he saying it out loud?

11       THE WITNESS:  Yeah.  We were just regular

12   talking like this.

13       THE COURT:  Everybody was listening to him

14   and he was like, oh, I don't want to go do this?

15       THE WITNESS:  It wasn't but three of us in

16   the truck.

17       THE COURT:  I mean, what was he saying?

18       THE WITNESS:  Well, it's been so long ago.

19   He just was -- you know, just -- just mad, just

20   was talking a whole lot of talk.

21       THE COURT:  What were y'all saying?  Shut

22   up, man?

23       THE WITNESS:  No, I wasn't really paying no

24   attention because --

25       THE COURT:  Were you just ignoring it?

1        .THE WITNESS:  Yeah, ignoring him because I

2    knew he didn't want to work that morning.

3         THE COURT:  Okay.  So you were -- were you

4    driving?

5         THE WITNESS:  Yes, I was driving.

6         THE COURT:  Okay.  So you're just kind of

7    ignoring him, but you're listening to him gripe?

8         THE WITNESS:  Yes, yes, yes.

9         THE COURT:  Okay.  So how long did it take

10    you to get to the site, would you say?

11         THE WITNESS:  I'd say about 0 minutes.

12         THE COURT:  20 minutes?

13         THE WITNESS:  20, 25.

14         THE COURT:  And when you got there, did

15    everybody get out of the truck?

16         THE WITNESS:  No, no, never did get a chance

17    to open the door.

18         THE COURT:  Okay.  And what did he say?

19         THE WITNESS:  Well, when we got there, time

20    we got on the job, he said I just wanted to ride

21    out here and see where it was; you can take me

22    back in.

23         THE COURT:  And what did you say?

24         THE WITNESS:  I said I can't take you back

25    in unless I call into the lot and let them know

1          that I'm bringing you back in.

2                  THE COURT:  Right.

3                  THE WITNESS:  So I called into the lot.

4                  THE COURT:  Okay.  And they said bring him

5          back?

6                  THE WITNESS:  That's right.  I told --

7                  THE COURT:  Did you guys have any discussion

8          on the way back?

9                  THE WITNESS:  On the way back, no, not

10         really.

11                 THE COURT:  What happened when you got back?

12                 THE WITNESS:  About the only thing about it,

13         he might have said I was glad working with y'all.

14                 THE COURT:  Okay.  He got nice on the way

15         back?

16                 THE WITNESS:  Well, I'm glad working with

17         y'all to me -- to me, that he was nice.

18                 THE COURT:  Okay.  Well, what did he say

19         when you guys got back?

20                 THE WITNESS:  When we got back and we pulled

21         in the lot --

22                 THE COURT:  Right.

23                 THE WITNESS:  -- I was going to take him

24         back down to the maintenance department.  That's

25         when he got a little violent, a little rough, and

1    went to kind of cussing and told me to put him

2    out right then.

3        THE COURT:  Right.

4        THE WITNESS:  So I stopped the truck and let

5    him out.

6        THE COURT:  Did you say where is this coming

7    from, why are you cussing at me?

8        THE WITNESS:  No.  I just stopped the truck

9    and let him out.

10        THE COURT:  Did he say anything like I'm

11    quitting or I don't want this job or --

12        THE WITNESS:  Well, it's been so long and he

13    was saying so much --

14        THE COURT:  Right.

15        THE WITNESS:  -- yeah, but I know he was

16    leaving.  He was leaving to go home.  I know that

17    much.

18        THE COURT:  Okay.  How do you know that?

19    Did he say it?

20        THE WITNESS:  Yeah, he said he was; let me

21    out the gate; I'm fixing to leave.

22        THE COURT:  I'm going home?

23        THE WITNESS:  Yeah.  I don't know was he

24    going home or not.

25        THE COURT:  Sure.  But he was leaving?

1        THE WITNESS:  Yeah, he was leaving.

2        THE COURT:  How long have you worked for the

3    City?

4        THE WITNESS:  19 years.

5        THE COURT:  19 years.  Okay.  All right.

6    That's good.  Hold on.  Mr. Bell might -- do you

7    have any more questions?

8        MR. CHAFFIN:  No, ma'am.

9        THE COURT:  Mr. Bell, did you have any

10   questions for Mr. Stinson?

11       MR. BELL:  Yes.

12              **CROSS EXAMINATION**

13   **BY MR. BELL:**

14  Q.   Mr. Stinson?

15  A.   Yes.

16  Q.   Have you ever testified before on this case?

17     Well, let me just rephrase that.

18        You've never gone down before the

19    employment director of Industrial Relations and

20    testified, have you?

21  A.   What do you mean by --

22  Q.   This is the first time you've testified?

23  A.   In a courtroom, yes.

24  Q.   Were you down when Mr. Provitt (sic) was trying

25    to get his unemployment?  Did you testify there

```
 1              before some people?

 2    A.        No.  Well, wait a minute.  What you talking

 3              about?  When he was trying to get his

 4              unemployment?

 5    Q.        Well, that's what this is talking about, trying

 6              to get his unemployment.

 7    A.        Yes.

 8    Q.        Okay.  You did an affidavit?

 9    A.        Yes.

10    Q.        Did you do an affidavit?

11    A.        Yes, I did an affidavit.

12    Q.        Who contacted you to do the affidavit?

13    A.        Contacted me?

14    Q.        Yes.  Who asked you to do this affidavit?

15    A.        Asked me to do it?

16    Q.        Yes, sir.

17    A.        I don't -- I don't really know what you're

18              talking about, who asked me to do the affidavit.

19    Q.        You didn't just come and write an affidavit;

20              right?  I mean, did you write this affidavit?

21    A.        No.  I went downtown to City Hall to do that

22              affidavit.

23    Q.        Okay.  Did you write it?

24    A.        Did I write it?

25    Q.        Yes, sir.  I mean, it's typed.  Can I show you?
```

| | | |
|---|---|---|
| 1 | A. | No, sir, I didn't type it. |
| 2 | Q. | Did you read it?  No.  I mean, before you signed |
| 3 | | it, did you read it?  Mr. Provitt (sic)? |
| 4 | A. | Did I read it? |
| 5 | Q. | Before you signed it? |
| 6 | A. | No, I don't think so.  I don't know.  I don't |
| 7 | | think so.  That's my initials though. |
| 8 | Q. | That's your initials? |
| 9 | A. | Yeah. |
| 10 | Q. | But you didn't read it? |
| 11 | A. | No.  I still can't read it like this here, the |
| 12 | | way it is now, because I can't see it now. |
| 13 | Q. | This is all the glasses -- |
| 14 | A. | Yeah, I can see with these on.  (Witness reviews |
| 15 | | document.)  Yeah, yeah. |
| 16 | Q. | And you remember it now? |
| 17 | A. | Yeah. |
| 18 | Q. | And did you type it up? |
| 19 | A. | Did I type it up? |
| 20 | Q. | Yes.  You don't understand what -- I don't mean |
| 21 | | type it up.  Did you type this or someone type it |
| 22 | | for you? |
| 23 | A. | No, I didn't type it. |
| 24 | Q. | When you signed it, was it already prepared for |
| 25 | | you? |

1   A.   Yes.

2   Q.   Who prepared it for you?

3   A.   I don't know that.

4   Q.   Okay.  Now, it says here that you signed it on

5        the 14th day of July.  If it says that, would

6        that be -- would you agree to that that you

7        signed it on the 14th day of July of 2006?

8   A.   On the 14th?

9   Q.   Yes.

10  A.   (Witness reviews document.)  Ain't this July? Oh,

11       this is 2006.  Yes, sir, I'd agree with that.

12       That's 2006 there.

13  Q.   Yes.  And you said that the last time -- that the

14       incident with Mr. Provitt happened on April the

15       19th, 2006.

16  A.   Now, I can't just -- I don't know whether it was

17       April the 19th --

18  Q.   But what I'm saying, when you wrote this -- when

19       you wrote this affidavit, you told everything

20       that happened, didn't you?

21  A.   Yes.

22  Q.   Now, I want you to take a look at this affidavit.

23       Just use my glasses.  You don't say anything in

24       there about Mr. Provitt was cursing, do you?

25  A.   No.

```
 1    Q.    You don't say anything about he was cursing, do

 2          you?

 3    A.    No.

 4    Q.    But, today, you come down here and say he was

 5          cursing?

 6    A.    I said that?

 7    Q.    Yes.

 8                THE COURT:  No, I don't -- that's what I was

 9          going to ask him.  No one has asked him.  Were

10          you there when Mr. Provitt was talking to

11          Mr. Moorer?

12                THE WITNESS:  No, I wasn't there when

13          Mr. Provitt was talking to Mr. Moorer.

14                THE COURT:  So you didn't see them talking

15          and you don't know what happened?

16                THE WITNESS:  No, I didn't see them talking.

17          I don't know what happened.

18                MR. BELL:  I apologize.  I said Provitt,

19          didn't I?

20                THE COURT:  Yes.

21                MR. BELL:  I'm sorry.

22    Q.    Mr. Moorer.  You never said anything about

23          Mr. Moorer was cursing in this affidavit, did

24          you?

25    A.    No, I didn't want to say that much about him.
```

| | | |
|---|---|---|
| 1 | Q. | Okay.  But, now, today, you want to tell he was |
| 2 | | cursing? |
| 3 | A. | Well, Mr. Moorer, I could say a whole lot about |
| 4 | | Mr. Moorer cursing before he come in, but I don't |
| 5 | | want to say that. |
| 6 | Q. | Okay.  You curse, too? |
| 7 | A. | Huh? |
| 8 | Q. | Do you curse anytime? |
| 9 | A. | Yeah, I curse. |
| 10 | Q. | Now, let me ask you this.  You had said that the |
| 11 | | word was that he was a troublemaker? |
| 12 | A. | Yes.  Yes, I just said that. |
| 13 | Q. | Did Mr. Provitt tell you he was a troublemaker? |
| 14 | A. | No. |
| 15 | Q. | Who told you he was a troublemaker? |
| 16 | A. | It's all -- who told me he was a troublemaker? |
| 17 | Q. | Yes. |
| 18 | A. | Him, if you want to tell the truth, because he -- |
| 19 | | Mr. Anthony, he's a big -- well, he's got a |
| 20 | | little temper. |
| 21 | Q. | And he told you he was a troublemaker? |
| 22 | A. | Might as well said it the way he talked. |
| 23 | Q. | Earlier, when you testified, you said the word |
| 24 | | was he was a troublemaker? |
| 25 | A. | Yes. |

| | | |
|---|---|---|
| 1 | Q. | So I'm -- am I assuming that nobody told you he |
| 2 | | was a troublemaker? |
| 3 | A. | Well, Mr. Anthony, he's the type of person he |
| 4 | | talk about people behind their backs, so you can |
| 5 | | fill it out to whatever it is. |
| 6 | Q. | So would it be safe to say you figured he was a |
| 7 | | troublemaker? |
| 8 | A. | Say I figured he was a troublemaker? |
| 9 | Q. | Yes. You figured he was a troublemaker. It was |
| 10 | | you that figured he was a troublemaker; am I |
| 11 | | correct? |
| 12 | A. | Well, I talked to him. |
| 13 | Q. | My question is, you didn't -- you haven't told -- |
| 14 | | I asked you who said he was a troublemaker. You |
| 15 | | can't tell me, so I'm saying it is you who is -- |
| 16 | A. | No, I can't say who was a troublemaker because |
| 17 | | you've got -- if you work down at the City, we've |
| 18 | | got over a hundred and something guys down there |
| 19 | | and everybody is talking; everybody talks. So I |
| 20 | | just can't put nothing specific on nobody. It's |
| 21 | | gossip go around there all the time, all the |
| 22 | | time. |
| 23 | Q. | Mr. Stinson, isn't it true that Mr. Moorer asked |
| 24 | | you when do you take breaks? |
| 25 | A. | No, because Mr. Moorer didn't work -- Mr. Moorer |

```
 1            didn't wait five minutes before he said take him

 2            back in, so he couldn't go on a break.

 3    Q.    No.  I -- my question is, did he ask you what

 4            time y'all take breaks?

 5    A.    No, because Mr. Moorer didn't talk nothing about

 6            the job on the way out there and nothing about

 7            the way you work.

 8    Q.    Did he ever ask you what time do you take lunch?

 9    A.    No.

10    Q.    Did you ever tell him that you didn't take lunch?

11    A.    No.

12    Q.    You said that there were four of y'all at first

13            in the truck.  Then you said three.  Was it four

14            of y'all --

15    A.    Three of us sitting in the truck.  The rest of

16            them was on the back.

17    Q.    How many was on the back?

18    A.    I think I had three more mens back there.

19    Q.    So three of y'all -- now, who was sitting in the

20            front?  Was Mr. Moorer sitting in the front?

21    A.    No.  Mr. Moorer was sitting behind me.

22    Q.    And somebody else was sitting behind there?

23    A.    I had another -- one on my right-hand side.

24            Mr. Moorer was sitting behind him.

25    Q.    And who was that person on your right-hand side?
```

```
 1    A.    Aaron Harris.

 2    Q.    Aaron Harris?

 3    A.    Yes.

 4    Q.    And Mr. Harris is about, what, 25 years old?

 5    A.    No.  About 21.

 6    Q.    Okay.

 7    A.    Going on 22.

 8    Q.    So Mr. Harris was with you the whole time that

 9          Mr. Moorer and you were talking?

10    A.    Yes.

11    Q.    So if Mr. Moorer had cursed and said he was

12          quitting, wouldn't you think that Mr. Harris

13          would have heard it?

14    A.    Yes.

15              MR. BELL:  Okay.  I have no further

16          questions, Judge.

17              THE COURT:  Okay.  Anything further for

18          Mr. Stinson?

19              MR. CHAFFIN:  I can't think of a thing,

20          Judge.

21              THE COURT:  Okay.  Thank you, Mr. Stinson.

22          Have a nice day.

23              MR. CHAFFIN:  As I said when we began, the

24          Court can find misconduct, and there's two

25          degrees of misconduct, one with and one without
```

```
 1    warning.
 2            THE COURT:  Right.
 3            MR. CHAFFIN:  And so I have some testimony
 4    referring to the conduct.  It should be short.
 5            THE COURT:  Yes.  That's fine.
 6                    DOUGLAS JONES,
 7    a witness, after having first been duly sworn to
 8    speak the truth, the whole truth, and nothing but
 9    the truth, took the stand and testified as
10    follows:
11                  DIRECT EXAMINATION
12    BY MR. CHAFFIN:
13    Q.  Would you state your name and your occupation,
14        please?
15    A.  Douglas Jones.  I'm Assistant Director of the
16        Maintenance Department for the City of
17        Montgomery.
18    Q.  What does that mean exactly, Mr. Jones?  In short
19        testimony, what do you do?
20    A.  There's two assistant directors in the
21        maintenance department.  One is over the street
22        division and one is over the building division.
23        Mr. Provitt is the assistant director that
24        handles streets, drainage, sidewalks.  I'm over
25        the building division.  We handle all the
```

```
1          maintenance of the buildings, the HVAC, any

2          construction or renovation work on all City-owned

3          structures.

4    Q.    Do you know Mr. Moorer here?

5    A.    Yes, sir.

6    Q.    How is it that you know him?

7    A.    Mr. Moorer was a service worker on one of my

8          paint crews for a while.

9    Q.    And what do you do by doing the service work, the

10         paint?

11   A.    He painted.

12   Q.    And how long did he work for you?

13   A.    I'm not quite sure.  I'd have to look back at

14         records to know exactly how long he was --

15   Q.    What kind of painter was he?

16   A.    He was a decent painter.  He had -- he had decent

17         skills.

18   Q.    Why is -- what -- well, pardon me for baffling

19         here.

20              What problems, if any, did you have with

21         his work?

22   A.    When Mr. Moorer was with me, he had -- he was on

23         Bernard Harris' paint crew.  He had a few

24         occasions where he wasn't able to show up for

25         work on time; he either called in late and
```

```
1         reported that he was having problems.  He just

2         didn't -- wasn't able to come in and do things

3         the way the rules state, which says that if you

4         can't be here on time, you need to notify your

5         supervisor before your assigned work time, which

6         is seven o'clock.

7    Q.   And so what -- what harm comes about if that's

8         something that happens?

9    A.   Working on a crew like that, if someone is late

10        like that, it will hold up the entire crew from

11        being able to go out and do their job.  Also, on

12        scheduling work, if I've scheduled a workload

13        based on a full crew being there and one man

14        shows up late or doesn't show up at all, then I

15        have to modify work schedules.

16   Q.   Did you ever say anything to Mr. Moorer about it

17        being a problem?

18   A.   Mr. Moorer was talked to by at that time who was

19        his supervisor, Mr. Dean Johnston.

20   Q.   How do you know that?

21   A.   There's a letter of record in his file.  He had

22        one time where he was talked to -- I know there's

23        at least one letter of reprimand.  Then he was

24        also suspended for a period, I believe, of five

25        days for not being able to show up for work on
```

1      time.

2  Q.  What, if anything, did you have to do with that?

3  A.  At the time on those, I do not believe I had

4      anything to do with actually those except

5      possibly just administrative, my folks talking to

6      me.  That would have been handled through Dean

7      Johnston and my immediate right-hand man which is

8      Jimmy Wise.

9  Q.  All right.  I'll get you some paperwork on that.

10     But tell me what involvement and discussion did

11     you have personally with Mr. Moorer?

12  A.  I remember specifically on one, Mr. Moorer called

13     in, oh, it was around 10:30, 10:45 to Bernard

14     Harris.  At that time he had stated that he was

15     in the hospital and that's why he hadn't called.

16     Once I did some checking, I found out that the

17     phone number that he called Mr. Harris from

18     wasn't actually at the hospital, and when he

19     actually produced records, the records showed

20     that he wasn't at the hospital when he called.

21     He had actually went to the hospital after he had

22     called in.

23  Q.  Did you talk with him about it?

24  A.  Yes, sir.  And based on that, I actually was

25     making a recommendation for a termination at that

1        time.

2    Q.    And what happened?

3    A.    During the time that that happened and I was

4        making a recommendation for dismissal, we decided

5        that since it was disruptive to the crew that he

6        was going to be transferred back over to the

7        street division into a ditch crew which is where

8        he came from before he came onto the paint crew

9        pending his hearing with City Hall.  And then at

10       that time --

11   Q.    Did you talk to Mr. Moorer personally?

12   A.    On the part about the --

13   Q.    Transfer.  Well, let me put it this way.  What

14       did you talk with him about?

15   A.    I talked to him about I was going to recommend --

16       based on him calling in after his assigned work

17       time and him lying about where he was and his

18       past record being considered, I told him that I

19       was recommending dismissal to City Hall.

20   Q.    And what was his response?

21   A.    That would be reflected on a piece of paper for

22       the hearing.  I'm not sure if he actually

23       responded to me at that time or not.

24   Q.    So -- but, yet, he wasn't terminated.  Who made

25       that decision not to -- to transfer him instead?

```
 1          Who made that decision?
 2     A.   That was actually a decision between myself, Mr.
 3          Provitt, and Ms. Gail Gibson, my department
 4          director.  We decided that would be best for the
 5          work and the habits of the crew for him not to go
 6          back into that crew pending his hearing with City
 7          Hall.
 8     Q.   What does that mean, for the best on behalf of
 9          his crew?
10     A.   Mr. Moorer had a tendency to agitate the crew.
11          He was called in on several occasions.  Besides
12          the time of him being late, he was also called in
13          for disobeying a direct order.  He was instructed
14          at some times not to talk to some work release
15          inmates, and he had a problem following the
16          orders of his foreman and all.  And based on that
17          and other items of -- where his crew leader said
18          that he was being disruptive to the crew, we just
19          felt like it would be best for him not to report
20          back to that crew and possibly cause any further
21          problems in that crew.
22     Q.   Let me show you these documents.
23     A.   Okay.
24          THE COURT:  So he, Mr. Jones -- you guys
25          transferred him over to the grass crew or
```

```
 1        whatever.  He -- did he know that there was going
 2        to be a hearing about, I mean, that you were
 3        recommending that he was going to be terminated?
 4                THE WITNESS:  Yes, ma'am, there should be --
 5                THE COURT:  Okay.  He knew that.
 6                THE WITNESS:  Yes, ma'am.  There's paperwork
 7        that will reflect that I was recommending
 8        dismissal.
 9                THE COURT:  Okay.  But you had to have the
10        hearing and all that good stuff?
11                THE WITNESS:  (Nods head.)
12    Q.   I'll show you this document that's labeled Letter
13        of Reprimand, Defendant's Exhibit Number 5, dated
14        April 14th, 2005.  Do you know what that document
15        is?
16    A.   Yes, sir.
17    Q.   What is it?
18    A.   This is a formal letter of reprimand.  We have
19        various stages of counseling and everything in
20        our file.
21    Q.   Is that used routinely in your work?
22    A.   Yes, sir.
23    Q.   And you know how to fill it out?
24    A.   Yes, sir.
25    Q.   Are the events described about the time they
```

1    occurred?

2 A.  Yes, sir.

3 Q.  All right.  So what's that one about?

4 A.  This one here is April the 14th.  He was

5    counseled by his immediate supervisor, Mr. Roger

6    Johnston, Jr., and Bernard Harris the paint crew

7    foreman, in front of Jimmy Wise, building

8    construction superintendent, and Ken McGough,

9    maintenance superintendent, for not following

10   orders.  While at municipal court he was

11   instructed to roll paint on a flag pole, to keep

12   the paint from splattering because the paint was

13   thin and the wind was blowing.  The wind blew the

14   paint onto the bucket truck which was borrowed

15   from traffic engineering.  Bernard Harris who was

16   his foreman had instructed him that he needed to

17   wash the truck off and roll a little bit slower.

18   And at that time Mr. Moorer told Mr. Harris that

19   he was not going to wash any truck, and he told

20   Bernard that the wind was just blowing and mother

21   nature blew the paint on the truck, that it

22   wasn't his fault.

23 Q.  I have here a document that's entitled City and

24   County Personnel Department Recommendation,

25   Personnel Action, dated October 4th, 2005,

| 1 | | Defendant's Exhibit Number 6. Can you look at |
|---|---|---|
| 2 | | that and tell me what it is? Is that the same |
| 3 | | kind of form? |
| 4 | A. | No, sir. This is actually the final paperwork. |
| 5 | | These are the Form 10s that go -- |
| 6 | Q. | Is that form used routinely in your work? |
| 7 | A. | Oh, yes, sir. |
| 8 | Q. | And it's a business form of -- |
| 9 | A. | Any personnel actions that require any type of |
| 10 | | change in personnel action, be it suspension -- |
| 11 | Q. | And the events are entered about the time they |
| 12 | | occurred and you know how to fill it out? |
| 13 | A. | Yes, sir. |
| 14 | Q. | What's that one about? |
| 15 | A. | This one here is where Mr. Moorer was suspended |
| 16 | | for five working days. And if I thumb back -- |
| 17 | | hold on one second. This is the actual Form 10 |
| 18 | | that coincides with the letter of reprimand that |
| 19 | | I had before. This is -- this letter of |
| 20 | | reprimand here, there was a recommendation for a |
| 21 | | suspension on it, and this paperwork here is |
| 22 | | actually the official paperwork signed by -- |
| 23 | Q. | Is that for the painting and the truck -- |
| 24 | A. | Yes, sir. |
| 25 | Q. | -- you just described? |

```
 1              I show you the same form dated, it looks
 2         like, 11/5 -- 11/7/05, and I've marked it
 3         Defendant's Exhibit Number 7.  Is that the same
 4         kind of form?
 5    A.   Yes, sir.  It's the same type for as Exhibit
 6         Number 6.
 7    Q.   Okay.  So you know what it is.  It's used
 8         routinely and you know how to fill it out, and
 9         the events described occurred about that date?
10    A.   Yes, sir.
11    Q.   What's that one about?
12    A.   This one here is where he was suspended for 29
13         working days from November the 2n of '05 through
14         December the 12th of '05.
15    Q.   For what?
16    A.   This is where he was reprimanded for disobeying a
17         direct order from his foreman, Bernard Harris.
18         Our people had been instructed verbally and also
19         by a letter from the sanitation department when
20         there's work release inmates in the area, they do
21         not want anybody carrying on conversations with
22         any work release inmates or having physical
23         contact with them.  Mr. Moorer had been
24         instructed not to have contact with them, but he
25         chose to talk to an inmate, I believe, at --
```

```
 1    Q.    Did this say why?

 2    A.    Did they --

 3    Q.    The prison or --

 4    A.    Actually, it was the jail personnel.  At that

 5          time they were having problems with contraband

 6          and various items going back into the jail, so

 7          they wanted to limit contact --

 8    Q.    Did you talk to Mr. Moorer about that?

 9    A.    No, I don't believe I specifically talked to him.

10          I know Mr. Johnston did, and I know that there

11          was a letter.  I don't know if -- yes, here's

12          actually a copy of the letter that's involved in

13          it that was from the municipal jail, and it was

14          directed to the sanitation department, cemetery,

15          and the chief detail specifying what -- they did

16          not want us to have contact with inmates.

17    Q.    That's fine.  The Court can read that.  I'll show

18          you this document marked Defendant's Exhibit

19          Number 8.  Is this the same kind of form?

20    A.    No.  This is actually a little bit different than

21          all of these.

22    Q.    What's the date of that form?

23    A.    This form here is dated March 29th of 2006.

24    Q.    Okay.  And what kind of form is that?

25    A.    This is actually a Notice of Departmental
```

```
1           Hearing.  When a recommendation is made on an

2           employee to have some kind of disciplinary

3           action, they have to have a departmental hearing.

4           And then depending on whether it's something that

5           requires action from the City Hall, then --

6     Q.    Does that give the result, or why is that form

7           printed?

8     A.    No.  Actually, this form here is printed up, and

9           it's actually read to whoever it's given to.  In

10          this case it was Mr. Moorer letting him know that

11          he had a departmental hearing scheduled for April

12          the 3rd of 2006 in front of Ms. Gail Gibson.

13          It's a notice of departmental hearing.

14    Q.    And is that a regular business document of the

15          company -- I mean --

16    A.    Yes.

17    Q.    I'm sorry.

18    A.    I understood what you meant.

19    Q.    The City.  And you use it routinely?

20    A.    Yes.

21    Q.    And the events described occurred about the date

22          they were entered there?

23    A.    Yes.

24          THE COURT:  Mr. Jones, let me ask you this.

25          When Mr. Moorer was with you on the paint crew
```

1    and, you know, you said you were going to make

2    the recommendation that he be terminated and

3    y'all talked about it and said he needed to be

4    transferred to the grass crew pending that

5    hearing.

6          THE WITNESS:  Yes, ma'am.

7          THE COURT:  And did you tell Mr. Moorer,

8    hey, you know, I'm going to recommend

9    termination, and while we're waiting for that,

10    we're going to put you on grass crew?  Who told

11    him he was going to grass crew while we were

12    waiting on the termination hearing?

13          THE WITNESS:  It would have either been

14    myself or Ms. Gail Gibson, my boss.

15          THE COURT:  Okay.  Do you remember if you

16    told him?  I mean, I'm just trying to figure out

17    what did he say.  What did he say about getting

18    transferred?

19          THE WITNESS:  I'm not quite sure whether I

20    specifically told him or whether Gail did.

21          THE COURT:  Okay.  So you don't remember if

22    he said anything or got mad or, you know, I don't

23    care or -- I mean, what --

24          THE WITNESS:  No, ma'am.

25          THE COURT:  You don't remember?

```
 1              THE WITNESS:  I don't remember.

 2              THE COURT:  Okay.  And we never had that

 3       hearing because he left?

 4              THE WITNESS:  Correct.

 5              THE COURT:  Before we ever got to the

 6       hearing?

 7              THE WITNESS:  Correct.

 8              THE COURT:  Is that correct?

 9              THE WITNESS:  Yes, ma'am.

10              THE COURT:  Okay.  I've got you.  Okay.

11              MR. CHAFFIN:  I have no further questions.

12              THE COURT:  Mr. Bell, any questions you have

13       for Mr. Jones?
```

### CROSS EXAMINATION

**BY MR. BELL:**

```
16   Q.   Mr. Jones, do you have any -- were you privy to

17        the conversations between Mr. Provitt and

18        Mr. Moorer on April the 18th?

19   A.   No, sir.

20   Q.   Do you know if Mr. Provitt cursed Mr. Moorer?

21   A.   No, sir, I do not.

22   Q.   Would you have the authority -- you work at the

23        maintenance department?

24   A.   Yes, sir.

25   Q.   Would you have the authority to tell an employee
```

```
 1              to leave the maintenance area?
 2    A.   If he's being disruptive or possibly a threat to
 3         the department, yes, sir.
 4    Q.   I don't mean under what circumstances.  I'm
 5         saying do you have the authority to tell them to
 6         leave?
 7    A.   Yes, sir.
 8    Q.   If you told an employee to leave, what would you
 9         expect?
10    A.   I would expect him to come back another day with
11         a different attitude.
12    Q.   Well, I think if you told him to leave, wouldn't
13         you expect him to leave?
14    A.   At that point in time, yes, sir.
15    Q.   Well, that's the point in time I'm talking about.
16    A.   Yes, sir.
17    Q.   Okay.  What authority -- if he didn't leave, what
18         could you do?
19    A.   If I deemed it a threat, I could actually call
20         the police department in and have him escorted
21         away from the city lot.
22    Q.   I don't want you to qualify it.  I'm just saying
23         what authority.  I mean, could you call the
24         police?
25    A.   Yes.
```

```
 1   Q.    In some circumstances?

 2   A.    Yes, sir.

 3              THE COURT:  Wait.  Let me ask Mr. Jones

 4         this.  Mr. Jones, if -- okay, you're my

 5         supervisor, and if two of your employees get into

 6         it or -- and you have to tell someone to leave or

 7         they get into it with you and you have to tell

 8         them to leave, do you document that?  What do you

 9         do?

10              THE WITNESS:  Normally, I document it.  I

11         will document if I've had an altercation.

12              THE COURT:  And do we send that employee

13         anything?  Like if you tell them -- like, say, I

14         was being disruptive and you said leave now and I

15         left, do I get a letter from you or anything that

16         says, hey, you'd better come back to work in

17         three days or, else, it's job abandonment or,

18         hey, we can have a hearing about what happened?

19         I mean, I'm just asking what do you do.

20              THE WITNESS:  No, ma'am.  I -- I don't send

21         anything out like that.

22              THE COURT:  You just document it so --

23              THE WITNESS:  I just document that I had to

24         force the employee to leave the lot because of

25         whatever reason it may have been.
```

```
 1              THE COURT:  And you assume they'll be back
 2         the next day?
 3              THE WITNESS:  Correct.
 4              THE COURT:  Okay.  I've got you.  All right.
 5         I'm sorry, Mr. Bell.
 6              MR. BELL:  Oh, no.  No, ma'am.  You're
 7         getting exactly what I was going to get at.
 8         (BY MR. BELL:)
 9    Q.    You said Mr. Moorer was agitating the paint crew?
10    A.    Yes, sir.
11    Q.    When you say agitating, I mean, that's -- that's
12         a conclusion.  Tell me what he was doing.
13    A.    His foreman at the time who was Bernard Harris,
14         after we had our first conversation with
15         Mr. Moorer about his problem of not being able to
16         get to work on time, he went out and he got into
17         a verbal altercation in which I don't see that
18         paperwork here, so I don't know if that was just
19         a verbal talk at the time.  But at that time he
20         got into a little verbal thing with Bernard
21         Harris, and then after that, Mr. Moorer decided
22         that he knew more about how to run a paint crew
23         than Mr. Harris did and started trying to dictate
24         how the crew worked and became very disruptive to
25         the work habits of the crew.
```

1   Q.   Did y'all replace Mr. Harris -- I mean Mr.

2        Moorer?

3   A.   Have we replaced him?

4   Q.   No.  When he left, did y'all replace him?

5   A.   I don't know that we did -- yes, we did.  Yes, we

6        did.

7   Q.   Who did you replace him with?

8   A.   Allen Conway, I believe, is the gentleman's name.

9   Q.   Are you familiar that Mr. Moorer had filed a

10       racial discrimination lawsuit against the City?

11  A.   Not until I believe I was told Friday.

12  Q.   This coming Friday?

13  A.   This past Friday.

14  Q.   So you didn't know that he had filed a lawsuit

15       against Mr. Johnston?

16  A.   No.

17  Q.   Mr. Johnston never told you?

18  A.   No, sir.

19  Q.   You didn't know that he had filed a lawsuit

20       against Mr. Provitt?

21  A.   I knew there were some court cases that involved

22       Mr. Provitt and Mr. Moorer, but I don't know as

23       to what they involved.

24  Q.   Which is a more desirable job, the painting job

25       or the road crew job?

```
 1    A.    I really can't answer that question.  I guess it
 2          depends on the individual.
 3                THE COURT:  I would rather have the road
 4          crew.  I'm so tired of painting my house, I could
 5          scream.  I'd rather be out cutting grass.  I'm
 6          just kidding.
 7          (BY MR. BELL:)
 8    Q.    When he was transferred -- you were there when he
 9          was transferred from the paint crew?
10    A.    Yes, sir.
11    Q.    Wasn't he transferred because he had gone to the
12          front office and talked to somebody?
13    A.    Not that I'm aware of.
14    Q.    Okay.  But in any event, everything that happened
15          that you're talking about occurred before April
16          the 18th of 2006?
17    A.    Yes, sir.
18    Q.    So you know nothing about whether Mr. Provitt
19          cursed Mr. Moorer or not?
20    A.    No, sir.
21    Q.    Are you allowed to curse your employees?  When I
22          say employees, I know they're not your employees.
23          Let's say your subordinates?
24    A.    No, sir.
25    Q.    I mean, what -- if someone -- if a supervisor
```

```
 1          cursed a subordinate, would that be against

 2          policy?

 3    A.    We have -- we have a departmental policy.  I

 4          don't know if it's a city policy.  But we have a

 5          departmental policy that states that as city

 6          employees, it is our responsibility to be

 7          courteous at all times.

 8    Q.    Well, let me ask you, if someone -- if Mr.

 9          Provitt told Mr. Moorer to get his ass off the

10          lot, do you think that would be courteous on his

11          behalf?

12    A.    I -- no, sir, I don't think so.

13    Q.    You don't think it would be courteous?

14    A.    No, sir.

15    Q.    You wouldn't do that, would you?

16    A.    No, sir.

17    Q.    If someone was failing to obey a direct order,

18          what means do you have to discipline that person?

19    A.    At the time you can call them in to the lot for a

20          formal hearing.  If they continue to be

21          disruptive and you, as I've said, deem them to be

22          a threat, if I ask them to leave and they don't

23          want to leave on their own, I will inform them

24          that I have the right to contact the police

25          department and have them escorted off of city
```

```
 1              property.

 2    Q.        Well, but if someone has refused to obey a direct

 3              order, do you consider that to be subordination?

 4    A.        Insubordination.

 5    Q.        Insubordination.

 6    A.        Yes, sir.

 7    Q.        And then if someone is really in subordination,

 8              you have a means to file a disciplinary on them;

 9              isn't that correct?

10    A.        Correct.

11    Q.        And, indeed, that would be one of the things that

12              you would have to consider?

13    A.        Yes, sir.

14    Q.        But you wouldn't curse him, would you?

15    A.        No, sir.

16    Q.        Not out loud, would you?

17    A.        No, sir.

18              MR. BELL:  No further questions.

19              THE COURT:  Anything further?

20              MR. CHAFFIN:  Just a little since you

21              touched on the discrimination suit.

22                        REDIRECT EXAMINATION

23              BY MR. CHAFFIN:

24    Q.        What do you know about who's assigned to paint

25              the higher parts of a building or a pole and who
```

```
 1              is assigned to lower?
 2    A.    No one specifically is assigned to one job.
 3          There are -- on our paint crews there's five
 4          individuals.  At any given point in time, any one
 5          of those five individuals can paint high areas or
 6          low areas.  Not one individual is ever assigned
 7          to either paint high or low.
 8    Q.    What's the racial composition of these crews?
 9    A.    The foreman -- the crew -- the crew that Mr.
10          Moorer was on, Mr. Bernard Harris is black.
11    Q.    That's the supervisor?
12    A.    Yes, sir.  He's the foreman.  They had Curt Hayes
13          on the crew who is white.  I -- without being
14          able to draw names, I believe there's either two
15          whites and three blacks or two blacks and three
16          whites on the crew.
17    Q.    Is it customary for just those that are black to
18          paint the upper portions of an assignment?
19    A.    No, sir.  Like I said, no one specifically is
20          assigned for one thing.  Curt Hayes on that crew
21          loves getting in the bucket truck more than
22          anybody else on the crew.
23    Q.    So he would volunteer for it and that sort of
24          thing?
25    A.    Yes, sir.
```

```
 1              MR. CHAFFIN:  Thank you, sir.

 2                      RECROSS EXAMINATION

 3         BY MR. BELL:

 4    Q.   What color is Curt Hayes?

 5    A.   Sir?

 6    Q.   What color is Curt Hayes?

 7    A.   White.

 8    Q.   What color is Tommy Kilgore?

 9    A.   White.

10    Q.   And what color is Chris Miles?

11    A.   He's white.

12    Q.   He's white.  And so Mr. Provitt is black?

13    A.   Correct.

14    Q.   And Mr. Moorer is black?

15    A.   Yes, sir.

16    Q.   Now, I know you say it's the policy, but let me

17         just ask you.  If Mr. -- if the foreman was

18         making sure that only Mr. Provitt was painting

19         high except in the bucket truck, would that --

20         would you find there to be something wrong with

21         that?

22    A.   Not if the individual hasn't complained to me.  I

23         mean, sometimes I have people who love certain

24         parts of the job.

25    Q.   Well, my question is like, well, then if he had
```

CERTIFICATE

STATE OF ALABAMA      )

COUNTY OF MONTGOMERY  )

I, VICKI H. CLARK, OFFICIAL COURT REPORTER IN AND
FOR THE FIFTEENTH JUDICIAL CIRCUIT, MONTGOMERY
COUNTY, ALABAMA, DO HEREBY CERTIFY THAT I
REPORTED IN MACHINE SHORTHAND THE FOREGOING
HEARING AS STATED IN THE CAPTION HEREOF; THAT MY
SHORTHAND NOTES WERE LATER TRANSCRIBED BY ME OR
UNDER MY SUPERVISION, AND THAT THE FOREGOING
PAGES NUMBERED 2 THROUGH 138, BOTH INCLUSIVE,
REPRESENT A FULL, TRUE AND CORRECT TRANSCRIPT OF
SAID PROCEEDINGS; THAT I AM NEITHER KIN NOR OF
COUNSEL TO ANY PARTIES IN THIS PROCEEDING NOR IN
ANY WAY INTERESTED IN THE RESULT THEREOF.


DATED THIS THE 16TH DAY OF NOVEMBER, 2007.



                    S/Vicki H. Clark
                    VICKI H. CLARK
                    OFFICIAL COURT REPORTER

135

```
 1              complained to Mr. Johnston -- whether he

 2              complained or not, do you think it would be fair

 3              to assign the black person the high jobs and not

 4              assign the whites the high jobs?

 5      A.      Not trying to be contrary, but, Mr. Bell, I don't

 6              care whether somebody is black, white, green, or

 7              yellow as long as they get the job done.  So we

 8              don't assign a specific color to a specific job.

 9      Q.      That's not my question, but I understand.  My

10              question is do you think it would be fair?

11      A.      It would not be fair if that was happening, no,

12              sir.

13      Q.      Do you go out on the -- did you go out with your

14              crew?

15      A.      I -- I have roughly 180 employees that work for

16              me.  Yes, sir, at any given point in time, my

17              employees know that I'll be on the job site where

18              they are.

19      Q.      But you're not -- I mean, on this paint crew, you

20              were not there every time they painted; you're

21              more -- you're the supervisor?

22      A.      Correct.  I'm the assistant director.  I'm

23              responsible for all of them.

24      Q.      So you really wouldn't know unless you were there

25              what happened out there, would you?
```

```
 1    A.    Correct.
 2               MR. BELL:  I have no further questions.
 3               THE COURT:  Anything further?
 4               MR. CHAFFIN:  Nothing, Your Honor.
 5               THE COURT:  Thank you, Mr. Jones.  I
 6    appreciate it.
 7               THE WITNESS:  Thank you.
 8               MR. CHAFFIN:  That's all we have.
 9               THE COURT:  All right.  Well, this is what I
10    think, guys.  Actually, I think our best witness
11    was Mr. Stinson.  And the reason I say that is
12    it's obvious that something happened between
13    Mr. Moorer and Mr. Provitt.  What that was, I
14    don't know.  However, before we even got to that
15    point, there's no question that Mr. Moorer, he
16    knew he was going to be fired because Mr. Jones
17    had told him.  He knew that's why he was on the
18    grass-cutting group, and he went out there from
19    the jump with absolutely no intention of doing
20    anything and wanting to be brought right in.
21               Now, when he went -- I will put it this
22    way.  If -- let's just say Mr. Provitt said get
23    your ass off and he left and didn't come back,
24    then I would say, yeah, we've got a problem; they
25    never sent him anything, blah, blah, blah.
```

```
1    However, Mr. Moorer on his own volition goes to

2    see Mr. Briddell because he's savvy enough to

3    know, hey, I'm going to go see Mr. Briddell.  Mr.

4    Briddell calls him, and there is no question that

5    Mr. Briddell told him if you don't come back in

6    three days, it's job abandonment.

7         Now, like I said, I think the City needs

8    to clean up their policy on that, but that

9    doesn't have anything to do with, you know, the

10   specifics about what happened.

11        There's no question that Mr. Moorer knew

12   if he didn't come back, he was gone, and, you

13   know, that's just the facts.  So you know, I'm

14   upholding the fact that Mr. Moorer is not

15   entitled to his unemployment compensation because

16   he -- you know, job abandonment, which, you know,

17   that's based on the evidence that the Court heard

18   today.  Okay.

19        MR. BELL:  Okay.

20        THE COURT:  Thank you, ladies and gentlemen.

21   I hope everyone has a nice afternoon.  And if

22   someone wants to get me an order -- do you want

23   to get me an order?

24        MR. CHAFFIN:  Yes.

25        THE COURT:  Okay.  And make sure Mr. Bell
```

1        looks at it.

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

MERRILL LEGAL SOLUTION
Court Reporting*Legal Videography*Trail Services

Page 1

1          STATE OF ALABAMA

2        BOARD OF APPEALS
**PRIVATE & CONFIDENTIAL**

3                                        ORIGINAL

4

5     DEPARTMENT OF INDUSTRIAL RELATIONS

6        MONTGOMERY, ALABAMA

7

8

9    IN RE:   Anthony B. Moorer                    **PLAINTIFF'S EXHIBIT**

10            City of Montgomery

11

12        *     *     *     *     *     *     *     *

13        TESTIMONY AND PROCEEDINGS, taken

14    before The Board of Appeals at The

15    Department of Industrial Relation, 1060

16    East South Boulevard, Montgomery,

17    Alabama, on Wednesday, October 25,

18    2006, commencing at approximately

19    1:00 p.m., and reported by Bridgette

20    Mitchell, Court Reporter and

21    Commissioner for the State of Alabama

22    at Large.

23        *     *     *     *     *     *     *     *

MERRILL LEGAL SOLUTION
Court Reporting*Legal Videography*Trail Services

Page 2

1          MS. WEBSTER: We would like to

2     welcome you to the 10:00 a.m. docket of

3     the board of appeals hearing for

4     Wednesday, October 25, 2006, in

5     Montgomery, Alabama. Seated before you

6     today is the board of appeals. To my

7     immediate right is Board Member Mr. Don

8     Jones.

9          MR. JONES: Good morning.

10         MS. WEBSTER: In the center is

11    the chairman of the board of appeals,

12    Mr. John Screws.

13         MR. SCREWS: Good morning.

14         MS. WEBSTER: To his immediate

15    right is Board Member Mr. Joe Blevins.

16         MR. BLEVINS: Good morning.

17         MS. WEBSTER: Our court

18    reporter this morning is Bridgette

19    Mitchell. My name is Fronzena Webster

20    and I serve as officer of the board of

21    appeals.

22         In approximately four weeks, the

23    decision of the Board will be mailed to

MERRILL LEGAL SOLUTION
Court Reporting*Legal Videography*Trail Services

Page 3

1   the address of record of the claimant

2   and the address of record of the

3   employer by certified mail, return

4   receipt requested.  If you do not sign

5   for the decision, it will be returned

6   to our office.  If you disagree with

7   the decision of the Board, you may

8   appeal that decision to the circuit

9   court of the county in which the

10  claimant lives.  The appeal must be

11  filed within thirty days after the

12  decision becomes final.  I'd like to

13  remind you that this is an

14  administrative hearing and the penalty

15  for perjury is the same as any court of

16  law.

17      We are requesting that you speak

18  loudly as you present your testimony so

19  that you may be clearly heard by the

20  board members as well as by our court

21  reporter.  We are also requesting that

22  you turn off and/or disconnect all cell

23  phones and/or pagers as well as any

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trail Services

Page 4

1    taping devices.  Thank you.

2        Case No. 10 is an employer appeal.

3    Will the claimant, Anthony B. Moorer,

4    and his attorney and witness come

5    forward.  And the employer

6    representatives from the City of

7    Montgomery?

8        As I call your names, please raise

9    your hands for identification to the

10   Board.  Claimant, Anthony Moorer.

11       (Claimant raises hand.)

12       MS. WEBSTER:  Subpoenaed

13   witness for Mr. Moorer, Aaron Harris.

14       (Mr. Harris raises hand.)

15       MS. WEBSTER:  Attorney for

16   Mr. Moorer, Fred Bell.

17       (Mr. Bell raises hand.)

18       MS. WEBSTER:  Employer

19   representative, Thomas Provitt.

20       (Mr. Provitt raises hand.)

21       MS. WEBSTER:  And employer

22   representative/attorney, third-year law

23   student, John Craft.

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trail Services

Page 5

1          (Mr. Craft raises hand.)

2          MS. WEBSTER: Paralegal, Micky

3     Hill.

4          (Ms. Hill raises hand.)

5          MS. WEBSTER: Please raise your

6     right hand for the oath.

7          (Whereupon the aforementioned were

8          sworn in.)

9          MR. SCREWS: I'm going to go

10    ahead and cite the case. But before we

11    get started, we've got lawyers. And I

12    just want to explain to the attorneys

13    that this is an administrative hearing

14    only; it is not a court of law. All

15    we're trying to do is determine the

16    facts. Rules of evidence do not apply.

17    You will be given an opportunity to

18    cross-examine both witnesses. I'm just

19    trying to determine the facts.

20          Now, this case is little more

21    complicated than usual. We've heard

22    this case one time before and we're

23    hearing it again for several reasons,

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trail Services

Page 6

1  but I want the -- to ask the questions

2  to properly establish that. So what

3  I'm going to do is to go ahead and cite

4  the case as it was decided before and

5  explain the occurrences that have taken

6  place since the administrative hearing.

7  If you'll be patient with that, we can

8  go through that fairly quickly.

9      The initial case -- and let me just

10  go ahead and cite the case, get in the

11  dates, so we can establish the record

12  and get that clear and make sure

13  everybody understands where we are.

14  This is a second time of hearing the

15  same facts, unless the facts have

16  changed; we'd have to address that.

17      The administrative hearing

18  officer -- what I'm doing now, I'm

19  going to let Mr. Blevins ask everybody

20  what everybody's capacity is in this

21  case. And let's get everybody straight

22  about who the parties are and what

23  their involvement is and if it's

Page 7

1    firsthand knowledge.

2         MR. BLEVINS:  Okay.  Let's

3    start with the employer first.  The

4    employer representative, what was your

5    name, Provitt?

6         MR. PROVITT:  Yes.

7         MR. BLEVINS:  And what is your

8    position with the employer?

9         MR. PROVITT:  Assistant

10   director.

11        MR. BLEVINS:  Assistant

12   director of what department?

13        MR. PROVITT:  Maintenance

14   department.

15        MR. BLEVINS:  Were you the

16   supervisor of the claimant?

17        MR. PROVITT:  I was involved

18   with him.

19        MR. BLEVINS:  He worked in your

20   department --

21        MR. PROVITT:  Right.

22        MR. BLEVINS:  -- in other

23   words?  Okay.  And Mr. Craft?

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trail Services

Page 8

1          MR. CRAFT:  Yes.

2          MR. BLEVINS:  And you're a city

3    employee?

4          MR. CRAFT:  I'm a law clerk.

5          MR. BLEVINS:  Law clerk with

6    the city.  Okay.  So you apparently

7    don't have any firsthand knowledge?

8          MR. CRAFT:  No, sir.

9          MR. BLEVINS:  You're here to

10   represent the city?

11         MR. CRAFT:  That's correct,

12   sir.

13         MR. BLEVINS:  And the

14   paralegal, the same situation?

15         MS. HILL:  Yes, sir.

16         MR. BLEVINS:  And over here, of

17   course you're the witness?

18         MR. HARRIS:  Right.

19         MR. BLEVINS:  Subpoenaed by the

20   claimant and the -- Mr. Bell, is it?

21         MR. BELL:  Yes.

22         MR. BLEVINS:  Okay.  Thank you.

23         MR. SCREWS:  We'll just go

MERRILL LEGAL SOLUTIO
Court Reporting*Legal Videography*Trail Service

Page 9

1    ahead.    And I will refer back to it as

2    I address the witnesses.    The --

3        MR. BLEVINS:    Mr. Jones has a

4    copy of it.

5        MR. SCREWS:    Mr. Jones, you

6    have a copy?

7        MR. SCREWS:    The employer

8    appealed the decision of the

9    administrative hearing officer who

10   conducted a telephone hearing on

11   June 29, 2006.    The administrative

12   hearing officer reversed the

13   determination of the examiner removing

14   the disqualification, granting the

15   claimant with benefits pursuant to

16   section 25-4-78(2), voluntarily leaving

17   work without good cause.

18       This particular appeal was heard by

19   this panel on August 25, 2006, at which

20   time the Board reversed the decision of

21   the administrative hearing officer

22   disqualifying the claimant from

23   receiving benefits pursuant to the same

MERRILL LEGAL SOLUTION
Court Reporting*Legal Videography*Trail Service

Page 10

1  statute.  We're hearing this case

2  again, so we'll basically start over

3  again as if it were not heard, bringing

4  any pertinent facts that we have not

5  heard before, and try to make a

6  resolution of the case.

7      We'll begin questioning of both

8  parties.  Since this is a voluntary

9  leave of work, burden of proof is on

10  the claimant.  And we'll ask Mr. Moorer

11  whether he was fired, laid off, or

12  terminated.

13          MR. BELL:  Let me ask:  Is the

14  burden on him?

15          MR. SCREWS:  The burden of

16  proof in our (2) cases on the -- is on

17  the claimant.

18          MR. BELL:  Claimant?

19          MR. SCREWS:  On the (2).

20          MR. BELL:  They appealed to

21  this -- with all due respect.  The

22  appeal --

23          MR. SCREWS:  You've got to

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trail Service

Page 11

1    prove -- let's just do it this way.

2    We've always addressed the -- the

3    claimant first to establish the fact

4    whether he voluntarily quit.  If we can

5    establish whether he voluntarily quit,

6    then that can be -- the claimant can

7    deny or affirm that point.  And if we

8    decide that he did not voluntarily

9    quit, the burden of proof then at that

10   time falls on the employer to prove

11   that he was actually terminated.  Is

12   that -- do you understand what I'm

13   saying?  We address the claimant first

14   on a (2) issue.

15       So let's begin questioning with

16   a -- on a voluntary -- with the

17   claimant and ask him whether he

18   voluntarily quit this job or was he

19   fired or terminated?

20            MR. MOORER:  I was fired.

21            MR. SCREWS:  You were fired?

22            MR. MOORER:  Yes.

23            MR. SCREWS:  Could you please

MERRILL LEGAL SOLUTIO.
Court Reporting*Legal Videography*Trail Service

Page 12

1    describe the circumstances which

2    immediately preceded to this firing or

3    termination and the reason that was

4    given to you for being fired or

5    terminated.

6         MR. MOORER:  Yes.  On April 17,

7    '06, I had went up front and talked to

8    Cathy -- she is the timekeeper -- and I

9    had asked her, you know, about her

10   ex-husband Tim, you know, would it be

11   okay if I can talk with her, you know,

12   after the job.  So she told me, said

13   they was no longer married and she's

14   not going to discuss his business.  If

15   I wanted to find out anything about

16   him, I'd have to ask him or Coop.  So I

17   said, Okay, fine.  So later on that day

18   after lunch I was called from the

19   police department to come down into the

20   office.  So when I got there, they

21   asked me to sit in the bull room, and I

22   asked them for what.  They said, Well,

23   we'll let you know --

MERRILL LEGAL SOLUTIO
Court Reporting*Legal Videography*Trail Service

Page 13

1      MR. SCREWS:  Let me -- let's go

2  back a little bit.  Were you working

3  for the -- where were you when all this

4  took place?

5      MR. MOORER:  I was working at

6  the police department when they pulled

7  me off the job assignment and asked me

8  to come and --

9      MR. SCREWS:  So you were

10  working at the police department --

11      MR. MOORER:  Right.  Painting.

12      MR. SCREWS:  -- when you made

13  this conversation?

14      MR. MOORER:  No.  I was

15  working -- we just had punched in, and

16  I walked in, you know, to her office

17  before we went on our job assignment up

18  there to the police department.

19      MR. SCREWS:  All right.

20      MR. MOORER:  I went to her

21  office that morning.

22      MR. SCREWS:  And you were

23  doing -- what were you doing at that

MERRILL LEGAL SOLUTIO.
Court Reporting*Legal Videography*Trail Service

Page 14

1    time?  What kind of work wer  you

2    doing?

3              MR. MOORER:  Paintin .

4              MR. SCREWS:  You wer  painting?

5              MR. MOORER:  Yes.

6              MR. SCREWS:  So you asked the

7    lady the question and they then -- they

8    came and got you.  Who got you, your

9    supervisor?

10             MR. MOORER:  Bernard Harris,

11   yes, my supervisor.

12             MR. SCREWS:  Your supervisor.

13   And then what happened?

14             MR. MOORER:  And I asked them

15   what did they want, and he said he

16   didn't know.  So when I got back to the

17   office down there, there was Doug

18   Jones; my immediate supervisor, Roger

19   Johnson, Jr.; and I think it was the

20   director, Jimmy Wise.  So  asked

21   them -- they told me to go sit in the

22   bull room for the rest of the day.  And

23   I asked them why.  They said, We'll let

MERRILL LEGAL SOLUTION
Court Reporting*Legal Videography*Tran Service

Page 15

1   you know in the morning. So I said,

2   How come you can't let me know today?

3   You pulled me off the job site.  They

4   said, Mr. Moorer, we'll let you know in

5   the morning.

6        So when the morning came I went

7   down there to meet them at the office

8   like they told me.  So they sent me to

9   Mr. Provitt's office, told me to go

10  have a seat in there.  So here come

11  Jimmy Wise, you know, the immediate

12  director.  And they came in and they

13  told me, they said I violated code

14  section 6 and 7, saying I went and

15  talked to an employee and that's

16  against the city policy.  So after

17  that, they said, Well, we're going to

18  take you off the truck and put you on

19  the grass crew.  By then they came --

20  they brought in -- I can't think of

21  this guy's name, but -- Bill.  He's a

22  supervisor over the grass crew -- and

23  told me they were placing me on his

MERRILL LEGAL SOLUTION
Court Reporting*Legal Videography*Trail Services

Page 16

1    truck.  So they asked me what size

2    boots I wear and I told them and they

3    got me some safety goggles.

4         So after -- later on -- wait a

5    minute.  Okay.  When they said that,

6    they told me the next day to come in

7    and punch in at their office right

8    outside the door.  So the meeting was

9    over with and we went to the truck.

10   And he took me to the job site.  And I

11   asked the supervisor, Bill, you know,

12   what time was break.  He said, We don't

13   take break on this truck here.  You

14   just get some water, stand up for a

15   minute and go back to work.  I said,

16   Well, what time is lunch?  We don't

17   have lunch on this truck.  I said,

18   Well, let me -- take me back in.  I

19   want to talk with Gill.  So they called

20   in and said, Ten to base, Ten to base,

21   Mr. Moorer wants to come in.  So they

22   told them to bring me in.  So when I

23   had him to drop me off up here to get

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trail Services

Page 17

1    my card, my card was out of the slot.

2    And I picked up the phone to call my

3    lawyer, and by then here comes

4    Mr. Provitt, yelling, telling me to

5    hang the phone up and come on down

6    there and sign the papers. So I told

7    him, What paper?  He said, Your resign

8    paper.  I said, I'm not signing no

9    paper.  He said, Well, get your ass off

10   the lot.  And I walked to him, I said,

11   Cuss me again.  He said -- pointed,

12   just like that (indicating) and I left

13   and went to the mayor's office.  And

14   that's what happened.

15       MR. SCREWS:  All right.

16   According to the record here, you had

17   worked since 2003 until April 17, 2006;

18   is that correct?

19       MR. MOORER:  That's right.

20       MR. SCREWS:  And this happened

21   on -- was April 17 your last day of

22   work?

23       MR. MOORER:  April 18.

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trail Service

Page 18

1          MR. SCREWS:  April 18.  This

2    conversation took place on the 18th?

3          MR. MOORER:  Conversation took

4    place -- which one?  Which one are you

5    talking about?

6          MR. SCREWS:  Well, I'm asking

7    what you just told me.  It says, The

8    claimant last worked with employer on

9    April 17, 2006.

10         MR. MOORER:  Conversation,

11   which one, talking to the employee or

12   with --

13         MR. SCREWS:  The one you just

14   told me, you went to the truck and --

15         MR. MOORER:  That was on the

16   18th.

17         MR. SCREWS:  -- the issue for

18   you to sign a letter of resignation.

19         MR. MOORER:  Yeah, that was on

20   the 18th.

21         MR. SCREWS:  That was on the

22   18th?

23         MR. MOORER:  Right.

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trail Service

Page 19

1    MR. SCREWS: And what happened

2  after that conversation? Did you

3  leave -- did you go away then and just

4  leave work and not call back   You went

5  to see the mayor.

6    MR. MOORER: Yes, I went to the

7  mayor's office.

8    MR. CRAFT: Mr. Screws?

9    MR. SCREWS: Wait a minute,

10 please. Did they ever tell you why you

11 were being taken from the painting crew

12 to the grass crew?

13   MR. MOORER: Yes. They said

14 because I violated code section 6 and

15 7. I went up front and talked to

16 Cathy, had a conversation with her.

17   MR. SCREWS: Did you know you

18 weren't supposed to do that?

19   MR. MOORER: That's not in a

20 rule. All I did was just went up there

21 and asked her a question.

22   MR. SCREWS: Well, is there

23 any -- we'll ask the employer if there

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trail Services

Page 20

1  is such a rule or there's not such a

2  rule.  But you did not realize that was

3  any kind of violation of any kind of

4  policy, to talk to -- is she an inmate

5  at the jail?

6          MR. MOORER:  No, no, no.  She's

7  the timekeeper down at the dirty lot.

8          MR. SCREWS:  Were you away from

9  your post when you were talking to her?

10         MR. MOORER:  Just had punched

11  in and came down there and talked to

12  her, because Bernard, it'd take him,

13  like, ten minutes to come up front

14  there and pick us up.  He picks us up

15  from the paint shed.

16         MR. SCREWS:  The hearing that

17  we conducted here on August 25, you

18  were not present.  Is there a reason

19  for that?

20         MR. MOORER:  Yes.  The reason

21  why, because the letter that Michael

22  Borden, what the city attorney sent me,

23  I thought it was from the Board saying

1933 Richard Arrington Jr. Blvd.S*Birmingham, Al 3520 *www.legalink.com
1-800-888-DEPO

Page 21

1    that Mr. Provitt was going to be out of

2    town on the 25th and they was actually

3    for a request for a continuance.  And

4    by my knowledge, I didn't know -- I

5    thought it was, like, setting up for

6    another hearing.  That's why I wasn't

7    here.

8         MR. SCREWS:  We have a copy of

9    that particular letter.  We have that.

10   I just wanted to make that part of the

11   record.  It is your statement that you

12   were not present for the hearing

13   because of that letter?

14        MR. MOORER:  Yes.  And from my

15   knowledge, you all didn't -- didn't

16   know anything about that letter.

17        MR. SCREWS:  There are several

18   statements in the -- we have letters

19   and correspondence in the file here

20   that stated that you had -- you had

21   stated that you were just going to quit

22   this job because basically what they

23   had been doing to you; is that correct?

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trail Services

Page 22

1       MR. MOORER:  No.

2       MR. SCREWS:  We will take --

3   I'll go ahead and ask the -- while

4   we're here, we'll ask questions of the

5   employer representative.  Who will

6   speak for the employer, please?

7       MR. CRAFT:  I'll go first, if

8   you don't mind.

9       MR. SCREWS:  You're the lawyer

10  for the department?

11      MR. CRAFT:  Yes, sir.

12      MR. SCREWS:  Do you have any

13  firsthand knowledge of what happened?

14      MR. CRAFT:  I just want to

15  introduce some affidavits that are --

16      MR. SCREWS:  This is not a

17  court of law.  We're just trying to --

18  we're going to ask the questions first

19  and then we'll take exhibits as we come

20  along if we need them.  We need to talk

21  to somebody who knew what happened that

22  day, whether this claimant voluntarily

23  left this job or was he terminated.

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trail Services

Page 23

1          MR. CRAFT: That's Mr. Provitt.

2          MR. PROVITT: That's me.

3          MR. SCREWS: Yes, sir. Go

4    ahead, please.

5          MR. PROVITT: Okay. On that

6    day, I got Mr. Moorer. I put him on

7    with Bill Stinson. Bill Stinson

8    carried him out on the job site. After

9    he got --

10          MR. SCREWS: This is as a

11    painter or as a --

12          MR. PROVITT: As a grass

13    cutter. He was --

14          MR. SCREWS: After he had

15    already -- he'd gone to work to paint

16    that day?

17          MR. PROVITT: No, sir, not that

18    day. Not the day I got him. I got him

19    the following day. I got him on, like,

20    the 18th, the day of the 18th. That's

21    the morning I got him, on the 18th. On

22    the 18th when I got him --

23          MR. SCREWS: All right. Excuse

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trail Services

Page 24

1   me.   Your job at that time was what?

2   You were the foreman of the grass crew?

3                MR. PROVITT:   I'm the assistant

4   director of the maintenance department.

5                MR. SCREWS:   Maintenance.

6   Okay.   Go ahead.   I'm sorry.   Go ahead.

7                MR. PROVITT:   Okay.   I got him

8   on the 18th.   When I got him I put him

9   with Bill Stinson.   I told him to go

10  out with Bill and cut grass.   They left

11  the lot that morning.   When they left

12  the lot, Bill called back on the radio

13  and said Mr. Moorer want to come back

14  in.   I told him to bring Anthony Moorer

15  back in.

16      Before Anthony Moorer left out that

17  morning, I told him -- when they gave

18  him to me, I told him, Anthony, you

19  report to me.   You do not go to the

20  carpenter shop to hit the time card or

21  nothing else.   Your time card will be

22  down here at the maintenance shop from

23  now on.   I told him that before he left

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trail Services

Page 25

1    the lot that morning.  After he left

2    the lot, he went to the job site.  He

3    got there on the job site.  By the time

4    he got to the job site, Bill Stinson

5    called me and told me Anthony wanted to

6    come back in.  I told him to bring him

7    back in, then.  At that time when

8    Anthony -- when Bill came down there

9    where I was, where I was, he told me --

10   I asked him where Anthony was.  He told

11   me Anthony was up to the carpenter

12   shop.  At that time, I told Bill, Did I

13   not tell you that he's not supposed to

14   get off up there, he's supposed to come

15   down here and punch out or punch in,

16   whatever?  Bill said, Yeah, you told me

17   that, but he told me he had quit.  He

18   got better things to do.  He quit.  I

19   immediately walked out the door and

20   walked up to the carpenter shop where

21   Mr. Moorer was.  He was on the phone at

22   the time.  I told him to hang up the

23   phone and let's come back down here to

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trall Services

Page 26

1   the office where he was assigned.  He

2   told me he had better things to do.  He

3   was fixing to quit.  At that time, I

4   said, If you're fixing to quit, come

5   down here and sign your resignation.

6   He told me, I'm not signing nothing.

7   That's when I told him to get off the

8   lot.

9           MR. SCREWS:  This happened on

10  the 18th?

11          MR. PROVITT:  On the 18th.

12          MR. SCREWS:  Why is his last

13  day working in his file on the 17th?

14          MR. PROVITT:  Well, whatever

15  the last day -- I'm not -- the date --

16          MR. SCREWS:  You just don't

17  know.  The last day -- your last day

18  that you -- this conversation that you

19  had with him was on the 18th?

20          MR. PROVITT:  I know it was the

21  18th or the 17th.  I know it was during

22  that period that I personally talked to

23  him.

1933 Richard Arrington Jr. Blvd.S*Birmingham, Al 35209*www.legalink.com
1-800-888-DEPO

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trail Services

Page 27

1      MR. SCREWS:  Okay.  And what

2  time of day was this?

3      MR. PROVITT:  First part was a

4  little after seven.  The second part,

5  when he came back to the lot it should

6  have been around eight or a little

7  after.

8      MR. SCREWS:  But this was the

9  day after he had already been on the

10  maintenance crew; is that correct?

11      MR. PROVITT:  That was the day

12  after he had been -- this is a day

13  after they brung him from the police

14  department and told him to sit in the

15  bull room and then assigned him to me.

16  See, it's two different departments

17  down in the maintenance department.  He

18  was on building maintenance side, then

19  they transferred him to me on street

20  maintenance where I take care of the

21  streets and the ditches.

22      MR. SCREWS:  I'll go back to

23  Mr. Moorer.  When you were taken from

MERRILL LEGAL SOLUTION

Court Reporting*Legal Videography*Trail Service

Page 28

1   the painting crew to the maintenance

2   crew, did they actually take you to do

3   work that day on the 17th? Apparently

4   that was the 17th.

5           MR. MOORER:  No.  That was on

6   the 18th.

7           MR. SCREWS:  All this took

8   place on the 18th.

9           MR. MOORER:  Yes.

10           MR. SCREWS:  Was it the same --

11   so you were -- I guess the main

12   supervisor who you said came down to

13   see you, is that someone other than

14   this gentleman here?  How many people

15   told you to leave where you were and go

16   to the maintenance side of things?

17           MR. MOORER:  It was Doug Jones,

18   Jimmy Wise, and my immediate supervisor

19   Robert Johnson, Jr.

20           MR. SCREWS:  Was he present

21   then?

22           MR. MOORER:  No.

23           MR. SCREWS:  He was not

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trail Services

Page 29

1   present.  They just took you and

2   assigned you to him; is that correct?

3           MR. MOORER:  That's what I

4   assumed the next morning, yes.

5           MR. SCREWS:  The next morning?

6           MR. MOORER:  Yes.

7           MR. SCREWS:  So this took

8   place -- all -- when he -- when you

9   went under his charge, that was on the

10  18th, apparently.  And what --

11          MR. MOORER:  Right.

12          MR. SCREWS:  -- you're saying,

13  when Mr. Jones came down was the day

14  before, which must --

15          MR. MOORER:  Was the 17th.

16          MR. SCREWS:  -- have been the

17  17th.

18          MR. MOORER:  The 17th.

19          MR. SCREWS:  And did you

20  actually go to -- report to anybody to

21  do maintenance work on the 17th or they

22  just told you to go on home and then

23  report to him the next morning?

1933 Richard Arrington Jr. Blvd.S*Birmingham, Al 3520 www.legalink.com
1-800-888-DEPO

MERRILL LEGAL SOLUTION
Court Reporting*Legal Videography*Trail Service

Page 30

1      MR. MOORER: On the 17th, I was

2  working already. They came after lunch

3  and pulled me from up there at the

4  police department and asked me to come

5  down to the lot, and that's what I

6  done. And we had a meeting in the room

7  and they told me to go sit in the bull

8  room. And I asked them why. They

9  wouldn't tell me. They said they'll

10  let me know the next day.

11      MR. SCREWS: Okay.

12      MR. MOORER: So I said, Why

13  don't you let me know now? You're

14  taking me off the job. So the next

15  morning, that's when they had assigned

16  me to --

17      MR. SCREWS: I've got it. I'm

18  just getting my own mind straight,

19  because this is a complicated case. I

20  want to make sure all the dates and

21  everything else is straight.

22      Now, there's some witnesses here

23  that would have firsthand knowledge of

1933 Richard Arrington Jr. Blvd.S*Birmingham, Al 35209 www.legalink.com
1-800-888-DEPO

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trail Service

Page 31

1   anything that was said or done on the

2   17th or the 18th.  Do you have any

3   witnesses to account for any of that?

4        MR. MOORER:  Yes.  H was there

5   on the 18th for a while on the truck

6   while we was riding out.

7        MR. SCREWS:  You were -- tell

8   me whether you overheard anything that

9   has any bearing on whether this

10  gentleman either quit or was laid off.

11       MR. HARRIS:  I didn't hear

12  nothing about no quitting.  I just got

13  on the truck and -- clocked in and got

14  on the truck, because I was the lead

15  man on the truck.  So we went out to

16  the ditch.  And then he asked the boss

17  man what -- do we take breaks and all

18  that, when is lunch break.  Well,

19  really, we take breaks two times.  We

20  all don't break at the same time.  We

21  get hot, we have to take a break.

22       MR. SCREWS:  Well, I mean, did

23  he -- did you ever hear any -- he

MERRILL LEGAL SOLUTION
Court Reporting*Legal Videography*Tran Services

Page 32

1    didn't say he was going -- he was going

2    to quit?  Did somebody fire him that

3    day?

4           MR. HARRIS:  I didn't hear

5    nothing about that.

6           MR. SCREWS:  Did you hear

7    anything at all about this

8    dissatisfaction with the times and

9    breaks, anything like that?

10          MR. HARRIS:  No.

11          MR. SCREWS:  So you just were

12   there?  You heard --

13          MR. HARRIS:  Just was there.

14          MR. SCREWS:  All right.  This

15   also -- this case, if I recall, had

16   some discrimination suits that had

17   alleged of prior incidents.  Could you

18   address that, please, sir?

19          MR. MOORER:  Yes.  Back in

20   April 14, '05, we was working again,

21   also up there at the police department,

22   painting the outside.  And the wind was

23   blowing that day and my immediate

MERRILL LEGAL SOLUTION
Court Reporting*Legal Videography*Trail Service

Page 33

1    supervisor, Bernard Harris, went and

2    got -- borrowed a bucket truck from

3    engineering. And we was painting on

4    the flagpole. I was doing the high

5    work and Bernard was doing the lower

6    work. And he was asking me to roll

7    slower because the wind was blowing and

8    it was blowing the paint away, that

9    aluminum paint. And I told him I

10   couldn't roll any slower. If I rolled

11   any slower, I'd just have to, you know,

12   stop. Because, see, aluminum paint, if

13   the wind gets it, it's going to carry

14   it. So, therefore, he's walking around

15   between cars wiping paint off of cars.

16   Then he yelled up there and said that,

17   I told you to roll slower. I said, I

18   can't -- Bernard, I can't roll any

19   slower than what I'm already doing. He

20   said, Well, when we get back, you're

21   going to wash the truck. And that's

22   when I told I wasn't going to wash no

23   truck because mother nature done this

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trail Services

Page 34

1    here and we ain't got no business out

2    here painting in the wind.    And they

3    wrote me up for that and gave me five

4    days off.

5         MR. SCREWS:  And you filed a

6    discrimination suit over that incident?

7         MR. MOORER:  No.  I filed a

8    discrimination, see, over where for a

9    whole year and a half almost I was

10   doing all the high work and wouldn't

11   never let the white guys do the high

12   work.  Only time they done the high

13   work is when they go and get the --

14   what they call the bucket truck.

15   It's -- the name of it was the outlaw,

16   something that I couldn't operate at

17   the time.  I was always on the ladder.

18        MR. SCREWS:  That's all the

19   questions I have at this time.  I would

20   ask the other panelists to address

21   their concerns.  Mr. Jones

22        MR. JONES:  Before I start with

23   the questioning of the claimant, I want

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trail Services

Page 35

1    to ask Ms. Hill a question.  I believe

2    there's a request for separation

3    information in the file that you

4    signed.  Do you remember that?

5              MS. HILL:  Yes, sir.

6              MR. JONES:  And you put job

7    abandonment?

8              MS. HILL:  Yes, sir.

9              MR. JONES:  What days was the

10   claimant out?

11             MS. HILL:  Just a second.

12   We've got that he abandoned his job on

13   April 19.

14             MR. JONES:  So he abandoned his

15   job on April 19?

16             MS. HILL:  Correct.

17             MR. JONES:  Mr. Moorer?

18             MR. MOORER:  Yes.

19             MR. JONES:  Is that right,

20   Mr. Moorer?

21             MR. MOORER:  Yes.

22             MR. JONES:  Did Mr. Stinson

23   take you out to a job site

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trail Services

Page 36

1          MR. MOORER:  Yes.

2          MR. JONES:  He did?  You were

3     in the truck with Mr. Stinson?

4          MR. MOORER:  Yes.

5          MR. JONES:  And you went out to

6     the job site.  Did you tell Mr. Stinson

7     to take you back to the lot, that you

8     weren't going to work there anymore?

9          MR. MOORER:  No.  I told him to

10    take me back to the lot to talk to Gail

11    Gibson, the director.  I never told him

12    that I wasn't going to work there no

13    more.

14         MR. JONES:  Did Mr. Stinson ask

15    you if you were going to come to work

16    the next day?

17         MR. MOORER:  No, he didn't ask

18    me.

19         MR. JONES:  Mr. Provitt?

20         MR. PROVITT:  Yes, sir.

21         MR. JONES:  Provitt is that

22    correct?

23         MR. PROVITT:  Yes, sir.

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trail Services

Page 37

1          MR. JONES:  Mr. Provitt, you

2    saw Mr. Stinson and the claimant leave

3    your area there in a truck, or vehicle,

4    to go to a job site?

5          MR. PROVITT:  They left the

6    lot --

7          MR. JONES:  Did you see them

8    leave?

9          MR. PROVITT:  No, sir, I did

10   not see them leave the lot.

11         MR. JONES:  You saw them what?

12         MR. PROVITT:  I did not see

13   them leave the city lot, no sir.

14         MR. JONES:  And you told

15   Mr. Stinson what?

16         MR. PROVITT:  I told

17   Mr. Stinson to take him out there and

18   put him to work on the grass crew, to

19   cut grass and work just like the rest

20   of the men.

21         MR. JONES:  Did you tell

22   Mr. Moorer that -- what he was going to

23   be doing?

MERRILL LEGAL SOLUTION
Court Reporting*Legal Videography*Trail Services

Page 38

1          MR. PROVITT:  Yes, sir.  I told

2    Mr. Moorer him he would be cutting

3    grass.

4          MR. JONES:  What did he say?

5          MR. PROVITT:  He said okay.

6          MR. JONES:  And they were gone

7    for a while.  And I believe you

8    testified Mr. Stinson called you?

9          MR. PROVITT:  Yes, sir.

10          MR. JONES:  Right?

11          MR. PROVITT:  Yes, sir.

12          MR. JONES:  He called you?

13          MR. PROVITT:  On the radio,

14    two-way radio?

15          MR. JONES:  On the radio?

16          MR. PROVITT:  Yes, sir.

17          MR. JONES:  And what did he

18    tell you?

19          MR. PROVITT:  He told me, he

20    said, Mr. Moorer wants to come back in.

21          MR. JONES:  Did he tell you he

22    wasn't going to cut grass?

23          MR. PROVITT:  No.  He didn't

MERRILL LEGAL SOLUTION
Court Reporting*Legal Videography*Trail Services

Page 39

1    say nothing at the time about --

2         MR. JONES:  Didn't say

3    anything.  Just said he wanted to come

4    back?

5         MR. PROVITT:  Mr. Moorer wants

6    to come back in.

7         MR. JONES:  Did you ask him

8    why?

9         MR. PROVITT:  No, sir.  I told

10   him to bring him back in if he wants to

11   come back in.

12        MR. JONES:  So he brought him

13   back in?

14        MR. PROVITT:  Yes, sir.

15        MR. JONES:  To you?

16        MR. PROVITT:  No, he did not

17   bring him back in.  He was bringing him

18   in to me, but Mr. Moorer got off at the

19   carpenter shop.

20        MR. JONES:  Oh, he didn't get

21   back to you?

22        MR. PROVITT:  No, sir.  He got

23   off to --

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trail Services

Page 40

1          MR. JONES:  Before he got to

2    you?

3          MR. PROVITT:  Before he got to

4    me.

5          MR. JONES:  Did you get out

6    of the truck before you got to

7    Mr. Provitt?

8          MR. MOORER:  Yes.  To go get my

9    time card.  Because they told me to

10   punch in the next day at their office

11   on the outside.

12         MR. JONES:  Wait a minute.

13   Wait a minute.  You got off at the

14   carpenter shop?

15         MR. MOORER:  Yes.

16         MR. JONES:  To get your time

17   card?

18         MR. MOORER:  Right.  Because

19   that's where I always --

20         MR. JONES:  Why?

21         MR. MOORER:  -- punch in?  Why?

22         MR. JONES:  Why?

23         MR. MOORER:  Because that's

Page 41

1    where we --

2          MR. JONES:  Well, you told

3    Mr. Stinson to take you back to the --

4          MR. MOORER:  The lot to talk to

5    Gail Gibson.

6          MR. JONES:  Yeah.  But in the

7    meantime, prior to your getting there,

8    you got off at the carpenter shop?

9          MR. MOORER:  Because that's

10   where my time card -- I'd been punching

11   in there for two years, right there.

12   That's where I got off at.

13         MR. JONES:  What did you need

14   your time card for?

15         MR. MOORER:  Because they told

16   me the next day to punch in down there.

17         MR. JONES:  Wait a minute.

18   They told you the next day?  What did

19   you need your time card for that day

20   when you were on your way back to this

21   fellow's business?

22         MR. MOORER:  Because they told

23   me not to punch in there anymore, so I

MERRILL LEGAL SOLUTION
Court Reporting*Legal Videography*Trail Services

Page 42

1  was getting my --

2          MR. JONES:  Who told --

3          MR. MOORER:  -- time card.

4          MR. JONES:  -- you that?

5          MR. MOORER:  Mr. Provitt and --

6          MR. JONES:  When?

7          MR. MOORER:  -- Doug Jones.

8          MR. JONES:  When?

9          MR. MOORER:  The 18th.  Said,

10  Don't go back to --

11          MR. JONES:  Wait.  Let's --

12  let's go-- when you were taken out by

13  Mr. Stinson, Mr. Stinson called and

14  told Mr. Provitt.  Mr. Provitt talked

15  to him.  He told you to bring him back;

16  is that right?

17          MR. PROVITT:  Right.

18          MR. JONES:  Okay.  Now, you

19  were on your way back, but you got out

20  of the truck at the carpenter shop to

21  get your time card?

22          MR. MOORER:  Right.

23          MR. JONES:  Now, tell me again,

MERRILL LEGAL SOLUTIO
Court Reporting*Legal Videography*Trail Servic

Page 43

1  why did you get out at the carpenter

2  shop on that day when you were asked to

3  be brought back to get your time card?

4      MR. MOORER:  I asked them to

5  bring me back so -- because they told

6  me that they -- that morning when we

7  had the meeting, do not go back up

8  there and punch in anymore, come down

9  to their office and punch in.  That's

10  why I wanted to get my time card, to

11  take it down there.

12      MR. JONES:  Did you get your

13  time card?

14      MR. MOORER:  It was removed

15  before I got there.

16      MR. JONES:  Did he let you out

17  of the truck and wait on your?  Were

18  you in a truck?

19      MR. MOORER:  Yes.

20      MR. JONES:  Did he let you out

21  of the truck and wait on you?

22      MR. MOORER:  No.  Mr. Stinson

23  and Mr. Harris right here --

MERRILL LEGAL SOLUTION
Court Reporting*Legal Videography*Trail Services

Page 44

1          MR. JONES:  Mr. Stinson put you

2     out of the truck?

3          MR. MOORER:  Yeah.

4          MR. JONES:  You got out of the

5     truck --

6          MR. MOORER:  And walked --

7          MR. JONES:  -- to get your time

8     card?

9          MR. MOORER:  Right.

10         MR. JONES:  It wasn't there.

11    Mr. Stinson left you.

12         MR. MOORER:  He was already

13    gone.  When he let me out, he turned

14    around and went on back out

15         MR. JONES:  And you got there

16    and your time card was not on the rack?

17         MR. MOORER:  Right.  So I got

18    on the phone and called my lawyer to

19    let her know that my time card was

20    gone.  That's when Mr. Provitt came

21    around the corner telling me --

22         MR. JONES:  Got on the phone to

23    call your lawyer?  Were you still on

MERRILL LEGAL SOLUTION
Court Reporting*Legal Videography*Tra.. Services

Page 45

1    company time?

2         MR. MOORER:  Yes, I was still

3    on the company time.  Because, see, I

4    felt like --

5         MR. JONES:  You asked to be

6    brought back to this gentleman here?

7         MR. MOORER:  Yes.

8         MR. JONES:  And you were on the

9    phone calling your lawyer?

10        MR. MOORER:  Yes.  Because I

11   felt like I had been violated.

12        MR. JONES:  Pardon me?

13        MR. MOORER:  I felt like that I

14   had been violated.

15        MR. BELL:  Just answer his

16   question.

17        MR. JONES:  I appreciate that,

18   Mr. Bell.  I know how he felt.  But I'm

19   trying to find out why he got out there

20   and that particular time and then when

21   he didn't have his time card -- what

22   did you do when you didn't have your

23   time card?

MERRILL LEGAL SOLUTION
Court Reporting*Legal Videography*Tran Service

Page 46

1    MR. MOORER:  He came --

2    Mr. Provitt came around the corner and

3    told me to hang the phone up, so I hung

4    it up.  And he asked me to come down

5    there and sign my resign papers and I

6    told him, I'm not signing no resign

7    papers.  And that's when he told me to

8    get my ass off the lot and don't come

9    back and that's what I done.

10    MR. JONES:  That's all I have

11    at this time.

12    MR. SCREWS:  Mr. Blevins?

13    MR. BLEVINS:  I was not present

14    on this panel the last time it heard

15    the case.  There's a couple things I'd

16    like to clear up for my own benefit as

17    to how we ever got to this.

18    Mr. Provitt, was the claimant a

19    city merit system employee?

20    MR. PROVITT:  Yes, sir.  He did

21    get paid every two weeks, yes, sir, and

22    on the merit system.

23    MR. BLEVINS:  Classified as a

Page 47

1  painter?

2      MR. PROVITT:  No, sir.  He was

3  certified as Service Maintenance One.

4      MR. BLEVINS:  Does that include

5  glass cutting?

6      MR. PROVITT:  That includes

7  grass cutting.  Service Maintenance

8  One, yes, sir, it includes grass

9  cutting and everything.

10      MR. BLEVINS:  But he had been a

11  painter for three years?

12      MR. PROVITT:  Yes, sir.

13      MR. BLEVINS:  Was this a form

14  of punishment, transferring him to a

15  grass cutting job?

16      MR. PROVITT:  No, sir, it

17  wasn't a form of punishment.  It was a

18  form of -- it was a form of he couldn't

19  get along with his other foreman on the

20  job, Mr. Harris.  Him and Mr. Harris

21  had had several altercations and so

22  they transferred him to me.

23      MR. BLEVINS:  I have to think

Page 48

1    there was more to this situation than

2    him speaking to a lady in the area.

3    Did this have something to do with his

4    transfer?

5         MR. PROVITT:  I can't say it

6    did.  All I know is that they gave him

7    to me and I --

8         MR. BLEVINS:  So you're not

9    familiar with what happened prior to

10   that?

11        MR. PROVITT:  Yes.  I heard.

12        MR. BLEVINS:  But you don't

13   have any firsthand knowledge?

14        MR. PROVITT:  Right.  I heard

15   it.

16        MR. BLEVINS:  Did Mr. Moorer

17   have any right of grievance on

18   transferring him from a painting job to

19   the grass cutting job under the city

20   rules?  Anybody can answer for the

21   city.

22        MR. PROVITT:  At that time,

23   when I asked him that he was going on

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Tran Service

Page 49

1    the grass crew, he said okay

2         MR. BLEVINS:  Okay.  Do you

3    know, Mr. Moorer, if you had any right

4    of protest over the transfer --

5         MR. MOORER:  No, I didn't

6    have --

7         MR. BLEVINS:  -- under the city

8    rules?

9         MR. MOORER:  I didn't have one.

10        MR. BLEVINS:  Okay.

11        MR. MOORER:  Because if I'd of

12   had one, they would --

13        MR. BELL:  Just answer their

14   question.  You just answer their

15   question.

16        MR. BLEVINS:  Mr. Provitt, why

17   was his card removed prior to him

18   returning that day?

19        MR. PROVITT:  When he left, he

20   left the lot with Bill Stinson, I told

21   him don't worry about his time card no

22   more.  His time card would be down on

23   the lot at our end in my department so

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Tra...ervices

Page 50

1   he could punch out and in.       told him

2   that the time card would be     here when

3   he get in.   I told them that before he

4   left out of the lot that mor ing.

5            MR. BLEVINS:  And as I

6   understood his testimony, he found out

7   his card was removed, either he started

8   to call an attorney or did c ll an

9   attorney and you came around the corner

10  along about that time?

11           MR. PROVITT:  Yes, s r.

12  Because I told Mr. Stinson t  bring him

13  to me, and he got out of the truck

14  before he got to come see me    He

15  stopped that crew up at the  arpenter

16  shop where he was told not t  go -- not

17  to report back up there, to  ome down

18  to our lot, down to where I  m at and I

19  will -- where we punch in a d out.

20           MR. BLEVINS:  How f r is your

21  office from this area where his time

22  card was?

23           MR. PROVITT:  I'd s y about a

Page 51

1    hundred yards.

2          MR. BLEVINS:  So apparently

3    someone told you he was down there?

4          MR. PROVITT:  Mr. Stinson came

5    on down -- Mr. Stinson came on down and

6    told me that Mr. -- I said, Where's

7    Mr. Moorer, when Mr. Stinson came into

8    the office.  He said, He got off at the

9    carpenter shop.  I asked him -- I told

10   you to bring him down here.  He said, I

11   couldn't stop him.  I had to let him

12   out.

13         MR. BLEVINS:  That's all I have

14   right now, Mr. Chairman.

15         MR. SCREWS:  Let me -- go

16   ahead, Mr. Jones.  I'm sorry.

17         MR. JONES:  Was there any

18   change in pay --

19         MR. PROVITT:  No, sir.

20         MR. JONES:  -- from the

21   painter's job to the grass-cutting job?

22         MR. PROVITT:  No, sir.

23         MR. JONES:  No change in

Page 52

1  benefits?

2          MR. PROVITT:  No, sir.

3          MR. JONES:  Any change in

4  hours?

5          MR. PROVITT:  No, sir.  The

6  same hours.

7          MR. JONES:  Same thing.  Same

8  pay, same benefit.  And when he -- I

9  believe you testified, in response to

10  Mr. Blevins, that when you told him

11  about cutting grass he said okay?

12          MR. PROVITT:  Yes, sir.

13          MR. JONES:  That's all I have.

14          MR. SCREWS:  Let's get one

15  thing straight.  As far as that

16  testimony that Mr. -- how do you say

17  your last name again?

18          MR. PROVITT:  Provitt.

19          MR. SCREWS:  Provitt.  Stated

20  that he had told you that morning that

21  your time card would not be in the same

22  place it was; is that correct?  Do you

23  recall him telling you that?

MERRILL LEGAL SOLUTIONS
Court Reporting*Legal Videography*Trans Services

Page 53

1        MR. MOORER:  No.

2        MR. SCREWS:  Did you tell him

3    his time card would be in a different

4    place when you talked to him the first

5    time that morning?

6        MR. PROVITT:  When I talked to

7    him that morning, I told him  Don't

8    worry about going back up to the

9    carpenter shop.  Your time card will be

10   down here.

11       MR. SCREWS:  I guess, did you

12   go to the carpenter shop to make a

13   telephone call or to pick your time

14   card?

15       MR. MOORER:  I went there to

16   pick up my time card to take it down

17   there because I was going to talk to

18   Gail Gibson.  That's why I asked to be

19   brought down there.

20       MR. SCREWS:  You don't recall

21   him telling you that the time card

22   wouldn't be there?

23       MR. MOORER:  No.  He didn't

MERRILL LEGAL SOLUTION
Court Reporting*Legal Videography*Trial Services

Page 55

1    him to leave?

2        MR. PROVITT:   Leave the lot?

3    Leave where?

4        MR. BELL:   Mr. Provitt, my

5    question was, did you tell him to leave

6    the lot?

7        MR. PROVITT:   I told him if he

8    wasn't going to sign the resignation

9    papers -- he told me he was going to

10   quit.  I asked him to sign the

11   resignation papers.  And I told him

12   that if he wasn't going to sign the

13   resignation papers, leave.

14       MR. BELL:   Did you tell him to

15   get his ass off the lot?

16       MR. PROVITT:   That's what I

17   said.

18       MR. BELL:   And did you point

19   and tell him to -- did you point?

20       MR. PROVITT:   I pointed out the

21   lot.

22       MR. BELL:   And my question

23   again, you expected him to leave, did

MERRILL LEGAL SOLUTION
Court Reporting*Legal Videography*Tra. Service

Page 56

1    you not?

2        MR. PROVITT:  Yes, I expected

3    him to leave the lot.

4        MR. SCREWS:  The point has been

5    established.  Go ahead.

6        MR. BELL:  He left the lot?

7        MR. PROVITT:  Yes.

8        MR. BELL:  Did you ever contact

9    him again?

10        MR. PROVITT:  No, sir, I did

11    not.

12        MR. BELL:  Now, did you ever

13    testify -- did you ever come -- when

14    they had the hearing down here before,

15    you didn't testify, did you

16        MR. PROVITT:  No, sir.

17        MR. BELL:  Did you make a

18    statement before?

19        MR. PROVITT:  Yes, sir.

20        MR. BELL:  Who did you give

21    that statement to?

22        MR. PROVITT:  Our lawyer.

23        MR. BELL:  Do you know if your

MERRILL LEGAL SOLUTION
Court Reporting*Legal Videography*Tran Services

Page 57

1    statement is in the record?

2         MR. PROVITT:  I don't know.

3         MR. BELL:  Okay.  Now, did you

4    give him a hearing?  Did you give him a

5    hearing?

6         MR. PROVITT:  Did I give him a

7    hearing?

8         MR. BELL:  Yes.

9         MR. PROVITT:  He did not show

10   back up.

11        MR. BELL:  Okay.  Did you

12   notify the mayor's office?

13        MR. PROVITT:  No, sir, I did

14   not notify the mayor's office.

15        MR. BELL:  Okay.  If he hadn't

16   left, what would you have done?

17        MR. PROVITT:  If he hadn't

18   left, then I would have had a hearing.

19        MR. BELL:  All right.  I have

20   no further questions.

21        MR. SCREWS:  I want to

22   establish one thing in response to that

23   testimony.  According -- am I correct,

Page 58

1    Mr. Provitt, he stated to you that he

2    was coming in to quit and in order to

3    properly, procedurally quit, he had to

4    sign something?

5         MR. PROVITT:  He had to sign

6    a resignation.  I told him to come

7    down -- he told me he was quitting, I

8    told him to come down and sign a

9    resignation.  He told me he wasn't

10   signing nothing.

11        MR. SCREWS:  You only said that

12   after he said he was going to quit?

13        MR. PROVITT:  Right

14        MR. BELL:  In lieu of your

15   question, may I ask him another

16   question?

17        MR. SCREWS:  You may.

18        MR. BELL:  So did he resign?

19        MR. PROVITT:  Did --

20        MR. BELL:  Did he resign?

21        MR. PROVITT:  I asked him to

22   leave the lot.  But I do not have the

23   authority to fire him.  Only way I told

Page 59

1   him to leave the lot, because he did

2   not -- he said he was going to quit and

3   was not going to sign a resignation

4   paper.

5         MR. SCREWS:  Let's rephrase the

6   question.  What was the purpose of you

7   asking him to sign something?

8         MR. PROVITT:  He told me he was

9   going to quit.

10        MR. SCREWS:  Okay.

11        MR. BELL:  But you didn't say

12   he resigned.  You wrote -- you stated

13   that he abandoned the job?

14        MR. PROVITT:  Right.

15        MR. BELL:  So which is it, did

16   he resign or did he abandon?

17        MR. PROVITT:  He abandoned the

18   job because after --

19        MR. SCREWS:  It's a play on

20   words.  He --

21        MR. BELL:  I don't think it is.

22        MR. SCREWS:  He's trying to

23   tell you voluntarily quit or -- he

Page 60

1  voluntarily -- or he didn't show up.

2  According to the statutes we're working

3  under, the two statutes, he either

4  voluntarily quit or he didn't.  Was he

5  fired or did he voluntarily quit?

6        MR. BELL:  Well, I think if

7  somebody tells you to leave, you have

8  to leave.

9        MR. SCREWS:  Let's go to the

10  counsel for the city.  Who will speak

11  for the city, please?

12        MR. CRAFT:  I would just like

13  to ask a couple questions about what

14  happened after this incident with

15  Mr. Provitt.

16     Mr. Moorer, where did you go after

17  this incident with Mr. Provitt?

18        MR. MOORER:  To the mayor's

19  office.

20        MR. CRAFT:  Okay.  And did you

21  speak with anybody there?

22        MR. MOORER:  I tried to talk to

23  Michael Briddell.  He wasn't in.  And I

MERRILL LEGAL SOLUTION
Court Reporting*Legal Videography*Tran Services

Page 61

1    left word with the secretary for him to

2    call me.

3            MR. CRAFT:  And he called you

4    back at a later time; is that right?

5            MR. MOORER:  Yes, about

6    one-thirty, after his lunch break.

7            MR. CRAFT:  And what did he

8    tell you after he got in touch with

9    you?

10           MR. MOORER:  He asked me what

11   went on and I told him.  And he asked

12   me was I coming back in.  And I told

13   him, No, because he fired me,

14   terminated me, told me to get my ass

15   off the lot.  That meant that he fired

16   me.  He said, Well, if you don't show

17   up, you abandon your job.

18           MR. CRAFT:  So Mr. Briddell did

19   not advise you that if you didn't go to

20   work for three days that you would be

21   considered in job abandonment?

22           MR. MOORER:  Well, when he told

23   me to get off the lot, that meant that

Page 62

1    I was fired.  When he cussed me and

2    told me to get off the lot, he already

3    had fired me.

4         MR. BELL:  Just answer his

5    question.  Don't make conclusions.

6    Just answer his question.

7         MR. CRAFT:  Did Mr. Briddell

8    tell you to go back to work

9         MR. MOORER:  No.

10        MR. CRAFT:  Okay.  I just want

11   to point out that there is in the

12   record and affidavit from Mr. Briddell

13   stating that he told Mr. Moorer to

14   return to work and advised him that if

15   he was absent for three more days that

16   he would be considered in job

17   abandonment, which is a resignation

18   with the city.

19        MR. SCREWS:  When was this

20   statement made and to whom

21        MR. CRAFT:  This was to the

22   executive assistant for the mayor.

23   When Mr. Moorer left the shop, he went

MERRILL LEGAL SOLUTION
Court Reporting*Legal Videography*Tra..Servi..s

Page 63

1    to the mayor's office to try to speak

2    with Mr. Briddell about this incident.

3    And Mr. Briddell, according to his

4    testimony, wasn't there.  He spoke with

5    him on the phone later.

6         MR. SCREWS:  Do you have

7    anything that states that?  I don't

8    want to take your testimony.

9         MR. CRAFT:  I've got copies of

10    this and it's also --

11         MS. HILL:  That should be in

12    the record.

13         MR. SCREWS:  It's in the

14    record.  All right.  So the letter

15    that's in the file states that

16    subsequently, at the mayor's office,

17    after all this had taken place, that if

18    you don't go back to work, you're going

19    to be fired.  If you don't go back to

20    work for three days, you're going to be

21    considered abandon the job.  That's the

22    testimony that's in the record?

23         MR. CRAFT:  That's correct.  He

MERRILL LEGAL SOLUTION
Court Reporting*Legal Videography*Train Services

Page 64

1   told him to go back to work.

2        MR. SCREWS:  Mr. Moorer, do you

3   recall anybody ever telling you that?

4        MR. MOORER:  Mr. Bridell told

5   me if I didn't show up in three days, I

6   abandon my job.

7        MR. SCREWS:  Did you show up

8   for three days?

9        MR. MOORER:  No.  Because I

10  considered by him telling me to leave,

11  Mr. Provitt, that I was already fired.

12       MR. SCREWS:  Do you recall

13  Mr. Provitt stating to you -- did you

14  ever state to him that you were

15  quitting?  You never stated to him that

16  you were quitting on the telephone?

17       MR. MOORER:  I never had a

18  chance to talk to Mr. Provitt about me

19  quitting.  When I was asked to be

20  brought back in to talk to Gail Gibson

21  and Mr. Stinson called back in and told

22  them that Mr. Moorer wanted to come

23  back in and -- I didn't know who he was

MERRILL LEGAL SOLUTION

Court Reporting*Legal Videography*T.... Serv...s

Page 65

1    talking to -- they said, Bring him back

2    in.  So when we got back through the

3    gate, I asked Mr. Stinson to drop me

4    off at the cabinet shop there there so

5    I can get my card.  And by the time I

6    was looking for my card, that's when

7    he -- Mr. Provitt was coming through

8    telling me to get on down there and

9    sign my resign papers.  And I asked

10   him, I'm not signing no resign papers.

11   He said, Well, get your ass out of the

12   lot.

13         MR. SCREWS:  I'm trying to get

14   your testimony.  Did you -- at any time

15   on the 18th, did you state to

16   Mr. Provitt that you were going to quit

17   your job?

18         MR. MOORER:  No.  I never had a

19   chance to talk to Mr. Provitt.

20         MR. SCREWS:  Mr. Provitt, did

21   he ever state to you that he was going

22   to quit his job?

23         MR. PROVITT:  He told me when

MERRILL LEGAL SOLUTION
Court Reporting*Legal Videography*Tran. Serv.....

Page 66

1    he came back in, I'm going to quit the

2    job.  I'm quitting.  I told him to go

3    down -- come back down to the office to

4    resign.  He said, I'm quitting.

5              MR. SCREWS:  Any other

6    questions from the panel?

7              (No response)

8              MR. SCREWS:  Any more cross-

9    examination from counsel?

10             (No response)

11             MR. SCREWS:  This hearing is

12   adjourned.  Thank you very much.

13

14

15

16

17

18

19

20

21

22

23

```
 1              *  *  *  *  *  *  *  *     *    *
 2              REPORTER'S  CERTIFICATE
 3           *  *  *  *  *  *  *  *  *     *    *
 4    STATE OF ALABAMA
 5    COUNTY OF MONTGOMERY
 6              I hereby certify that the above and
 7    foregoing proceeding was taken down by me by
 8    stenographic means, and that the content
 9    herein was produced in transcript form by
10    computer aid under my supervision and that
11    the foregoing represents, to the best of my
12    ability, a true and correct transcript of
13    the proceedings occurring on said date at
14    said time.
15              I further certify that I am neither
16    of counsel nor of kin to the parties to the
17    action; nor am I in anywise interested in
18    the result of said case.
19
20
21
22    Bridgette Mitchell
      Bridgette Mitchell
23    Reporter and Notary Public
      State of Alabama at Large
```